1                  UNITED STATES DISTRICT COURT

2                   DISTRICT OF SOUTH DAKOTA

3                       NORTHERN DIVISION
   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
4                                        CR. 12-10047-01

5  UNITED STATES OF AMERICA,

6                        Plaintiff,
        -vs-                              VOLUME II of III
7                                         JULY 31, 2013
   MARIO M. CONTRERAS,

8
                        Defendant.
9

10

11                                 U.S. District Courthouse
                                   Sioux Falls, SD
12                                 July 31, 2013
                                   8:40 a.m.
13 *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

14                         JURY TRIAL
                       (VOLUME II of III)
15
   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
16 BEFORE:   The Honorable Lawrence L. Piersol, and a Jury
              U.S. District Court Judge
17            Sioux Falls, SD

18 APPEARANCES:

19 Mr. Thomas J. Wright
   U.S. Attorney's Office
20 PO Box 2638
   Sioux Falls, SD 57101-2638
21
        -and-
22
   Mr. Jay P. Miller
23 U.S. Attorney's Office
   225 S. Pierre St.  Suite 337
24 Pierre, SD 57501-2489
                           for the Plaintiff
25

```
 1    APPEARANCES:  (Continued)

 2

 3    Mr. Sam E. Khoroosi
      Khoroosi Law Office
 4    300 N. Dakota Ave.  Suite 405
      Sioux Falls, SD 57104
 5                            for the Defendant

 6

 7    ALSO PRESENT:  Defendant Mario M. Contreras

 8

 9

10

11

12

13    COURT REPORTER:

14    Jill Connelly, RMR, CRR
      Federal Court Reporter
15    400 S. Phillips Ave.
      Sioux Falls, SD 57104
16    605-330-6669

17

18

19

20

21

22

23

24

25
```

```
 1                * * * * *  JULY 31, 2013  * * * * *

 2          (In open Court, counsel and Defendant present, out of

 3     the presence of the jury, for a 404(b) hearing at

 4     8:40 a.m.)

 5             THE COURT:  Good morning.  You indicated you have

 6     two 404(b) witnesses.  Proceed.

 7             MR. WRIGHT:  We call Shannon Sine.

 8                          SHANNON SINE,

 9     called as a witness, being first duly sworn, testified as

10     follows:

11                       DIRECT EXAMINATION

12     BY MR. WRIGHT:

13     Q.   State your name, please, ma'am.

14     A.   Shannon Sine.

15     Q.   Shannon, this is a big room.  Can you talk up nice and

16     loud for me?

17     A.   Yes.

18     Q.   How old are you?

19     A.   Thirty-two.

20     Q.   Where do you reside?

21     A.   Sisseton, South Dakota.

22     Q.   Are you married?

23     A.   Yes.

24     Q.   Were you the mother of Aleeyah Cook?

25     A.   I am.
```

1   Q.   Shannon, do you understand in this hearing we're just

2   going to talk about a small portion of your overall

3   testimony for the Judge to make a ruling on?

4   A.   Yes.

5   Q.   We're going to go right to that issue.  I want to talk

6   to you about the time that Aleeyah died.  Was that in

7   January of 2012?

8   A.   Yes.

9   Q.   Now, about six months earlier than that, in August of

10  2011, did the Defendant, Mario Contreras, have Aleeyah for

11  a weekend at that time?

12  A.   Yes.

13  Q.   When Aleeyah came back from Mario for the weekend, did

14  you notice anything changing Aleeyah's diaper?

15  A.   Yes.

16  Q.   What was that?

17  A.   A handprint on her butt.

18  Q.   How long was it, after you got Aleeyah back from

19  Mario, that you noticed that handprint on her buttocks?

20  A.   It was overnight.

21  Q.   So it wasn't the night she came back, but it was the

22  next morning?

23  A.   Yes.

24  Q.   Can you describe what you saw?

25  A.   I saw these, about like these three fingers.  They

```
 1    were longer marks, and they both had slits.  I seen the

 2    white marks in between the fingers.

 3    Q.    You described it as a handprint?

 4    A.    Yes.

 5    Q.    Now, can I assume that you would have changed

 6    Aleeyah's diapers during the weekend prior -- during the

 7    week prior to giving her to Mario for the weekend?

 8    A.    Yes.

 9    Q.    Did she have that handprint on her buttocks prior to

10    you giving her to Mario for that weekend?

11    A.    No.

12    Q.    When you saw that handprint the next morning, what was

13    your reaction?

14    A.    I got angry.

15    Q.    Why is that?

16    A.    Because there was a mark on her.  There was a

17    handprint on her butt.

18    Q.    Had you ever seen a mark like that on her buttocks

19    before?

20    A.    No.

21    Q.    There was some reference to the fact she might have

22    had a Mongolian spot on her body.  Did she?

23    A.    Not that I'm aware of.

24    Q.    Did you discuss the handprint that you saw on her

25    buttocks with your husband, Sam?
```

```
1    A.   Yes, I did.

2    Q.   Why did you discuss it with him?

3    A.   Because I was worried.

4    Q.   Did you discuss it with your mom?

5    A.   Yes.

6    Q.   What is her name?

7    A.   Nina Cook.

8    Q.   Did you, Sam, and your mom discuss taking Aleeyah to

9    the clinic that day?

10   A.   Yes.

11   Q.   Why were you discussing that?  Same reason?

12   A.   Same reason.  I was worried.

13   Q.   Did you ever call the Defendant, Mario Contreras, to

14   talk to him about this handprint on Aleeyah's buttocks?

15   A.   Yes.

16   Q.   Shannon, is there any way that you remember this being

17   approximately August of 2011?

18   A.   Yes.

19   Q.   How do you remember it was around that time?

20   A.   I was about eight-and-a-half months pregnant with my

21   son.

22   Q.   Your son's name is?

23   A.   Emerson Sine.

24   Q.   When was Emerson born?

25   A.   September 14.
```

1    Q.   So you remember being really big at the time this

2    incident with the handprint came about?

3    A.   Yes.

4    Q.   I suppose being eight-and-a-half months pregnant

5    during August isn't probably a real comfortable time

6    either.  Is it?

7    A.   No.

8    Q.   So did you call Mario?

9    A.   I did.

10   Q.   Had you talked to him on the phone before?

11   A.   Yes.

12   Q.   Did you know his number?

13   A.   Yes.

14   Q.   When you called to discuss this with him, did he

15   answer the phone?

16   A.   Yes.

17   Q.   Did you recognize the voice on the other end of the

18   phone?

19   A.   Yes.

20   Q.   Whose was it?

21   A.   Mario's.

22   Q.   By the way, do you see Mario in the courtroom today?

23   A.   I do.

24   Q.   Where is he at?

25   A.   Right there.  (Witness indicating)

1    Q.   When you called him to discuss the handprint on the

2    buttocks, just tell us what you said and he said.

3    A.   I asked about it.  I told him I found a handprint on

4    her butt.  He said, "Well, I spanked her because she

5    wouldn't throw away her Pamper."

6    Q.   Did Mario admit to striking her on the buttocks?

7    A.   Yes.

8    Q.   What was the reason he stated?

9    A.   That she wouldn't throw away her Pamper.

10   Q.   To be fair, did Mario apologize to you for what he

11   did?

12   A.   Yes.

13   Q.   Did you accept his apology?

14   A.   I did.

15   Q.   Shannon, did you attempt to take a picture of her

16   buttocks?

17   A.   Yes.

18   Q.   Tell us how you did that.

19   A.   My mom held her, and I took a picture with my cell

20   phone.

21   Q.   With your cell phone camera?

22   A.   Yes.

23   Q.   Did you ultimately try and develop that picture?

24   A.   I did.

25   Q.   Did it turn out very well?

```
1    A.   No.

2              MR. WRIGHT:  May I approach?

3              THE COURT:  You may.

4    BY MR. WRIGHT:

5    Q.   Shannon, I'll ask you to hold in your hand what we

6    marked Exhibit 5.  Do you recognize that?

7    A.   Yes.

8    Q.   What is that, please?

9    A.   It's a picture of Aleeyah's butt.

10   Q.   That's really the overexposed photo you attempted to

11   take of Aleeyah's butt?

12   A.   Yes.

13   Q.   Even though that didn't turn out very well, does that

14   truly and accurately depict what you were trying to

15   photograph that day?

16   A.   Yes.

17   Q.   Is that the handprint or attempted picture of the

18   handprint on her buttocks that you attempted to take in

19   August of 2011?

20   A.   Yes.

21   Q.   Is that correct?

22   A.   Yes.

23             MR. WRIGHT:  Your Honor, that would be all the

24   questions we have for this witness on this issue.

25             THE COURT:  I have a question.  What's the reason
```

```
 1   you tried to take the picture with your camera?

 2           THE WITNESS:  I was worried about somebody

 3   hurting her.

 4           THE COURT:  All right.  Thank you.

 5           MR. WRIGHT:  May I ask another question?

 6           THE COURT:  You may.

 7               CONTINUED DIRECT EXAMINATION

 8   BY MR. WRIGHT:

 9   Q.   Were you trying to document the injury then?

10   A.   I was.

11           MR. WRIGHT:  Thank you.

12           THE COURT:  You can step down.  Thank you.

13                   (Witness excused)

14           THE COURT:  Any questions?  We're not going to

15   have a long cross.  I mean that's an offer.

16           MR. KHOROOSI:  No, Your Honor.

17           MR. WRIGHT:  We have another very brief witness

18   on this issue.

19           THE COURT:  Go ahead.

20           MR. WRIGHT:  Call Nina Cook.

21                   NINA COOK,

22   called as a witness, being first duly sworn, testified as

23   follows:

24               DIRECT EXAMINATION

25   BY MR. WRIGHT:
```

```
 1    Q.   Would you state your name, please.

 2    A.   Nina Cook.

 3    Q.   Nina, this is a big room.  Can you talk up nice and

 4    loud?

 5    A.   Nina Cook.

 6    Q.   Where do you live?

 7    A.   I live in Sisseton, South Dakota.

 8    Q.   Are you married?

 9    A.   I am a widow.

10    Q.   Do you have any children?

11    A.   I have six.

12    Q.   Are you the mother of Shannon Sine?

13    A.   Yes, I am.

14    Q.   Does she also go by Shannon Cook?

15    A.   Yes.

16    Q.   Have you always lived pretty much in the same area as

17    Shannon?

18    A.   Most of the time.

19    Q.   Were you the grandmother then of Aleeyah Cook?

20    A.   Yes.

21    Q.   Was Aleeyah alive essentially between 2010 and 2012?

22    A.   Could you repeat that?

23    Q.   Aleeyah was two years old when she died.  Is that

24    correct?

25    A.   Yes.
```

```
 1    Q.   The time that Aleeyah was alive, did you visit her and

 2    Shannon often?

 3    A.   Yes.

 4    Q.   In fact, during part of Aleeyah's life, did you

 5    actually live with Shannon and her husband, Sam?

 6    A.   Yes.

 7    Q.   Did you have a lot of contact with Shannon during that

 8    time?

 9    A.   Yes.

10    Q.   Pardon me?

11    A.   Yes.

12    Q.   Because you were living with her?

13    A.   Yes.

14    Q.   I want to ask you about an incident in August of 2011

15    when Shannon was about eight-and-a-half months pregnant

16    with Emerson.   Okay?

17         Do you recall talking with Aleeyah -- talking with

18    Shannon, I'm not going to ask what was said, but do you

19    recall discussing something with Shannon about something

20    that had happened to Aleeyah?

21    A.   Yes.

22    Q.   Did Shannon show you something that was wrong with

23    Aleeyah?

24    A.   Yes, she did.

25    Q.   What was that?
```

1    A.   Aleeyah had fingermarks on her buttock.

2    Q.   Did Shannon -- did you see those fingermarks on

3    Aleeyah's buttocks?

4    A.   Yes, I did.

5    Q.   Did you talk with Shannon about taking Aleeyah to the

6    doctor or clinic?

7    A.   Shannon mentioned that she was thinking about taking

8    Aleeyah to get that checked out.   Yes.

9    Q.   Did you talk with Shannon about calling the Defendant,

10   Mario Contreras, about what happened?

11   A.   Yes.

12   Q.   You weren't part of the conversation that Shannon had

13   with Mario.   Were you?

14   A.   No.

15   Q.   Can you testify to the Judge today that you did see

16   the fingermark or handprint on Aleeyah's buttocks?

17   A.   I did see the fingermarks on Aleeyah's butt.

18           MR. WRIGHT:  That would be all, sir.

19           THE COURT:  Were the fingermarks such that they

20   caused you any concern or not?

21           THE WITNESS:  Yes, they did.

22           THE COURT:  Why?

23           THE WITNESS:  Because they shouldn't have been

24   there.   No little child has fingermarks on her buttocks

25   like that.

 1          THE COURT:  Was that in the morning or what time

 2     of day?

 3          THE WITNESS:  That was in the morning.

 4          THE COURT:  Thank you.  Any questions?

 5          MR. KHOROOSI:  No questions, Your Honor.

 6          THE COURT:  You may step down, ma'am.

 7                    (Witness excused)

 8          THE COURT:  I take it with regard to the boy that

 9     says he was cuffed on the head, you're not going to pursue

10     that.  Is that correct?

11          MR. WRIGHT:  I may have misunderstood,

12     Your Honor.  We were going to call him later this afternoon

13     as one of our final witnesses.  I thought we would do his

14     outside of the presence of the jury when we got to that

15     witness.

16          THE COURT:  No.  I thought when you said you were

17     going to have two, I thought it was both of those

18     incidents.

19          MR. WRIGHT:  That's my misunderstanding,

20     Your Honor.  I apologize for that.

21          THE COURT:  I didn't specify by name.  Well, is

22     he available at this point?

23          MR. WRIGHT:  Actually I told him to be here at

24     11:00.

25          THE COURT:  That's all right.  Then we won't deal

1    with that at this point.  We'll have an out of the presence

2    of the jury hearing on that before he would testify.

3              MR. WRIGHT:  Yes, sir.

4              THE COURT:  All right.  The Court, of course, is

5    familiar with 404(b) evidence considerations.  I'll hear

6    briefly from the Government and from the defense before I

7    rule on this.

8              MR. WRIGHT:  Briefly, Your Honor, we would ask

9    the Court to admit this testimony.  It's already in

10   evidence that the Defendant told Agent Mertz during his

11   interview that this child was sitting on the chair, he

12   turned around, and all of a sudden the child was on the

13   floor.  So the Defendant is basically forwarding the

14   defense accident.  That's what he told the FBI agent two to

15   three weeks after the incident.

16        Since they are contending this was an accident, this

17   evidence goes under Rule 404(b) to rebut absence of mistake

18   or accident.  This evidence shows that at least the

19   Defendant has at least one prior incident with the same

20   victim, Aleeyah Cook, that happened very recent in time,

21   five or six months before, where he swatted the child so

22   hard that it left a mark on her buttocks, a mark serious

23   enough for the mother and the grandmother to consider

24   taking the child to the hospital, serious enough for the

25   mother to attempt to document with a photo, serious enough

1    for the mother to call the Defendant and ask him what was

2    going on.

3        The testimony was that the Defendant admitted the

4    swat.  His announced reason was she didn't throw away her

5    Pamper.  He said he apologized and basically felt bad about

6    what he did.  So it goes directly to the announced defense

7    that this was an accident, and we'd ask the Court to

8    receive it.

9            THE COURT:  Mr. Khoroosi?

10           MR. KHOROOSI:  Thank you, Your Honor.

11       Your Honor, I think this alleged act is too

12   attenuated, too loosely attenuated in order to militate in

13   favor of its admission.  Ms. Cook testified that she saw

14   the handprint, which she says was a handprint, but was

15   about this thick, which by my reckoning is probably about

16   three centimeters, the same diameter as that Mongolian spot

17   that Dr. Froloff noted in his report.  Shannon said she

18   wasn't aware of a Mongolian spot.  I would contend that

19   Ms. Sine simply noticed the birthmark.

20           THE COURT:  She said there was a separation

21   between the three fingers in her testimony.

22           MR. KHOROOSI:  She didn't say there was

23   separation between the fingers.  She did say there was a

24   little slit mark.  But it didn't appear, from her

25   testimony, that they were separated.

1          Even assuming that's true, Your Honor, even assuming

2     it's true, it was something she noticed after she took the

3     diaper off.  She didn't testify the child was crying in

4     pain, because she was still hurting from the incident.  She

5     didn't testify the child couldn't sit down.  She didn't

6     testify to any of that.  She testified that she noticed the

7     spot and called --

8          THE COURT:  Are you saying it didn't happen?  I

9     mean according to her testimony, the Defendant admitted it

10    did and apologized for it.

11         MR. KHOROOSI:  Regardless whether it happened,

12    Your Honor, it's inadmissible.  That allegation is

13    inadmissible.  We can assume for the purposes of argument

14    that it did, but it's still more prejudicial than

15    probative.

16         It doesn't go to advance the Government's theory that

17    within two or three days before she came into that --

18    before she died, that Mario assaulted her by -- Mr. Wright

19    said it in his opening statement -- punching her in the

20    head repeatedly.  That's a far cry from swatting a child on

21    the butt, even if it's a little bit too hard.  There's no

22    evidence the child was crying out from pain the next

23    morning.  It wasn't even noticed until the next morning.

24         We don't know what time she got back to mom's house.

25    We don't know any of that.  I would hope it was later if

1      she wasn't changing her diaper until the next morning.  But

2      we don't know any of that.  All we have is a white,

3      overexposed photo that doesn't even show the injury.

4          Your Honor, this is not sufficient to bring in to

5      prove that my client punched his daughter to death.

6          THE COURT:  What about this?  Although I realize

7      you are resisting this evidence coming in.  This incident

8      is one, if you accept the testimony of Shannon Sine, that

9      in this one the Defendant admitted it.  Of course obviously

10     in the present case he's not admitting it.

11         MR. KHOROOSI:  I mean I think assuming the

12     Defendant did admit it, I think it just goes to show that

13     when he's responsible for something, he admits it.

14         THE COURT:  Well, that was the softball that I

15     was tossing you, but nonetheless.

16         MR. KHOROOSI:  Thank you.

17         THE COURT:  All right.  Thank you.

18         The rule of evidence governing admission of prior bad

19     acts is one of inclusion, such that evidence offered for

20     permissible purposes is presumed admissible absent a

21     contrary determination.

22         A case supporting that is United States vs. Cowling,

23     648 F.3d 690, at 699, a 2011 Eighth Circuit decision.

24         For evidence of prior bad acts to be admissible under

25     Federal Rule of Evidence 404(b), the evidence must, first

 1    of all, be relevant to a material issue, which this

 2    evidence is.

 3        Second, it must be similar in kind and not overly

 4    remote in time to the crime charged.  We're talking about

 5    August to January, so it's five or six months.  So it is

 6    both similar in kind and not overly remote.  Similar in

 7    kind in that it is a young child and, in fact, the same

 8    child as is the subject of the charges in this case.

 9        Three, it has to be supported by sufficient evidence,

10    which it is.

11        Fourth, it has to be higher in probative value than

12    prejudicial effect.  United States vs. Williams, 534 F.3d

13    980, a 2008 Eighth Circuit case.

14        Admitting that evidence to show either malice or heat

15    of passion would appear to me to be prohibited propensity

16    evidence.  But it's not being offered for that purpose.

17    It's being offered to prove a lack of accident, because

18    accident is now already an issue in the case.

19        So I'm going to allow the evidence for a limited

20    purpose, with a limiting instruction that tells the jury

21    that they can consider that evidence if they unanimously

22    find it's more likely true than not true, which is a

23    different standard than beyond a reasonable doubt.  I'm

24    going to tell them they can only consider it for purposes

25    of whether or not -- with regard to the accident issue and

```
 1    for no other purpose.

 2        So that's the ruling.  Anything further from the

 3    Government?

 4             MR. WRIGHT:  No, sir.

 5             THE COURT:  From the defense?

 6             MR. KHOROOSI:  Your Honor, I have two small

 7    matters.

 8        I do request that we remove that calendar from the

 9    sight of the jury when it's not relevant to the

10    proceedings.

11             THE COURT:  Does the Government have any reason

12    to leave it up there?  Are you going to keep on using it?

13             MR. WRIGHT:  We're going to use it with other

14    witnesses.  But if he wants it moved, and we're not using

15    it, we have no objection.

16             THE COURT:  All right.

17             MR. KHOROOSI:  I would also request after

18    Dr. Froloff finishes his direct, that I be allowed 10

19    minutes to confer with my expert witness before I begin my

20    cross.

21             THE COURT:  You can.  All right.  Bring in the

22    jury.

23                    (End of 404(b) evidence)

24                 (The jury entered the courtroom)

25        (In open Court, counsel and Defendant present, at
```

1     9:04 a.m.)

2          THE COURT:  Good morning.  Now, I noticed that

3     some of you are in short sleeves.  A couple of you have

4     jackets on.  It's hard for me to get a reading on that as

5     to whether it's too warm or too cold for you.  The rest of

6     it is that I'm sitting up here with a robe on, to boot, and

7     other things underneath it obviously.  I'm warm-blooded, to

8     begin with.  So I'm no good guide as to what the

9     temperature should be.

10         If it gets too warm or too cold, let us know.  It may

11    have to be a majority vote of the jury, and then we'll try

12    to adjust things to be sure you are comfortable as things

13    are going on.

14         Proceed with Dr. Froloff's testimony.

15                    VICTOR FROLOFF, M.D.,

16    resumed as a witness, having been previously sworn,

17    testified as follows:

18         THE COURT:  Good morning, Doctor.  You understand

19    you are still under oath.

20         THE WITNESS:  Good morning, Your Honor.

21         THE COURT:  And you understand you are still

22    under oath from yesterday?

23         THE WITNESS:  Yes.

24                CONTINUED DIRECT EXAMINATION

25    BY MR. MILLER:

```
 1   Q.   Dr. Froloff, where we broke yesterday, we were about
 2   to talk about the neuropathological exam.
 3        Before I move on to that this morning, there are just
 4   a couple issues that maybe got left untouched or unanswered
 5   yesterday.
 6        Do you recall when I showed you Exhibit 9F yesterday?
 7   I had you mark the subgaleal hemorrhages with a black pen,
 8   and that didn't work so well, so I had you use a darker
 9   blue pen to mark it?
10   A.   Yes, I do remember.
11   Q.   I'll show you again Exhibit 9F.  Do you see the area
12   here?
13   A.   Yes.
14   Q.   It appeared you originally marked that with a black
15   pen, but then inadvertently missed that when you drew on it
16   with the blue pen.  Do you see the area I'm referring to?
17   A.   Yes.
18   Q.   What I would ask, just so there's no misunderstanding,
19   would you take the blue pen and mark the area that you had
20   previously marked with the black one?
21   A.   Sure.  I'm marking that with a blue pen.
22             MR. MILLER:  May I publish that to the jury?
23             THE COURT:  You may.
24   BY MR. MILLER:
25   Q.   Dr. Froloff, just so the jury knows what you marked,
```

```
 1    this is the circle you just placed on here this morning,

 2    which would be the second smaller one from the left-hand

 3    side.  Is that correct?

 4    A.   Yes.  That's the area.  Absolutely correct.

 5    Q.   You've already found -- we have the laser pointer for

 6    you today.  Thank you.

 7    A.   I prefer wood stick, anyway, but thank you.

 8    Q.   The next thing I want to visit with you about is you

 9    indicated yesterday that the injuries you observed were

10    acute or, as you put that in lay person's terms, within 72

11    hours.  I have a couple questions for you regarding the

12    timing of when that 72-hour clock starts.

13         When you referred to the 72 hours, are you referring

14    to the time she was admitted to the hospital on January 9,

15    or are you referring to the time when she passed away on

16    January 11?

17    A.   If you are talking about subgaleal hemorrhages?

18    Q.   Yes.

19    A.   Yes.  It's the time of the death.

20    Q.   Tell me why it's the time of death versus the time

21    she's admitted to the hospital.

22    A.   Well, we usually -- it's pointless for me to say

23    anything what's happened at the time of admission, because

24    I never see body.  I open body and examine 18 hours after

25    baby died.  So it's always time of the death.
```

 1   Q.   Even though she was in the hospital and critical, her

 2   body was still functioning during those two days when she

 3   was alive in the hospital.  Correct?

 4   A.   The general answer is correct, because she spent three

 5   days at the hospital, I believe, 9th, 10th, and 11th.  She

 6   was brain dead, but her heart was beating, and they were

 7   trying to support her and take care of her.

 8   Q.   During that time frame her body was healing or at

 9   least attempting to heal and those types of things?

10   A.   Yes.

11   Q.   Now I'm going to move on to the neuropathological

12   exam.  You had that conducted after you did your external

13   and internal exam.  Correct?

14   A.   Yes.

15   Q.   What is a neuropathological examination?

16   A.   It's, again, we're perfectly capable to do examination

17   of the brain in our office by itself, though I did

18   examination of the brain like that many, many times before.

19        In this case I knew, from my experience, that we're

20   going to face numerous experts, and the case is going to be

21   reviewed.  So I just decided to include -- or I decided

22   that a neuropathologist consultation is going to be

23   important.  So we contacted to our neuropathologist, who is

24   a physician pathologist with special training in

25   neuroscience.  They usually examine the brain.  That's what

1    they do for a living.  So I decided to involve her just to

2    have a second opinion, and I'm glad I did that.

3    Q.   Did the neuropathological examination show evidence of

4    a traumatic brain injury?

5    A.   Yes.

6    Q.   Describe what evidence of a traumatic brain injury

7    showed up in the neuropathological examination.

8    A.   I mentioned to you where I extracted the brain and put

9    it in formalin.  It took almost a month to fix the brain,

10   make it firmer.  Then Dr. Santa Cruz came, and we examined

11   brain together.  She was cutting the brain.

12        So we were able to observe on external examination of

13   the brain, which is fixed, we were able to observe some

14   evidence of small subarachnoid hemorrhage.  Subarachnoid

15   hemorrhage, I mentioned to you before, is hemorrhage of the

16   arachnoid.  It was not an extensive type of hemorrhage.

17        We also observed evidence of brain swelling or,

18   scientific name, cerebral edema, brain swelling.  It

19   probably was brain swelling.

20        I have to come back a little bit and explain why we

21   performed the neuropathological examination.  People

22   usually, kids, in particular, don't die just from bruising.

23   Bruising is contusion of the skin.

24        In this case I was able to see subdural hematoma, and

25   people die from subdural hematomas all the time, but you

1    have to have a significant amount in the cranial cavity to

2    be dead from subdural hematoma.

3        What happens with people that have trauma, a lot

4    accumulates inside the cranial cavity and compresses the

5    brain.  This case wasn't significant amount.  So I was

6    looking for injuries inside the brain.

7        So people die from brain swelling or cerebral edema.

8    The reason is, when people develop brain swelling, brain

9    located in a closed compartment.  If you have swelling in

10   your extremities, it doesn't matter.  You'll probably have

11   pain.

12       Inside the cranial cavity, because there is no place

13   to expand, the brain is kind of pushing, goes downward and

14   compresses various bone structures located in the brain

15   stem.  Brain stem, it's an elongated structure between

16   human spinal cord and the brain.  When the swelling occurs

17   and it's pushing brain down, it compresses the brain stem

18   and people stop breathing basically.

19       So on external examination with brain swelling, we saw

20   evidence of cerebellar tonsillar herniation, and then we

21   cut the brain in small samples so the brain was submitted

22   for microscopic examination.  On slice sections of the

23   brain we saw additional evidence of swelling when we cut

24   the cerebellum.

25       The cerebellum is the part of the brain located

 1  slightly in the back and the bottom, responsible for

 2  balancing.  But we saw the skull cerebellar tonsillar

 3  herniation, which is not good things to have.

 4       When we cut the brain, we saw -- in a brain you'll see

 5  -- in the cerebral hemisphere, you'll see kind of holes.

 6  It's called lateral ventricles.  Usually it's widely open.

 7  This case it was compressed because of the swelling of the

 8  brain.

 9       From my experience, and, again, from experience with

10  other people, we'll know what part of the brain we need to

11  sample to see traumatic brain injury under microscope.  So

12  we proceed with this procedure and submit multiple sections

13  from different type of brain, cortex, cerebellum brain

14  stem, and so on and so on.

15       Under microscopic examination, she sent the report,

16  and then I review case again by myself, we saw some

17  evidence of we call it axonal damage of the splenium of the

18  corpus callosum.  This is a structure located in the middle

19  of the brain between the right and left hemisphere.  It's

20  fairly deep inside the brain.  But we were able to see

21  under microscope small areas of hemorrhage and damage to

22  the axons.

23       Remember, I mentioned to you nerve tissue, brain

24  tissue composed of the grey matter.  It's the cortex or

25  nuclei in the brain.  It's brain matter composed of the

1    neurons.  Then white matter.  White matter, predominantly

2    it's a projection of the neuron skull axons.  You will also

3    see supportive tissue.  It's tissue responsible for

4    numerous functions.

5        The point is, when trauma occurs, axonal damage,

6    that's a long projection of the neurons.  It could be

7    damaged.  That's a very significant finding, and I think

8    it's significant injuries.  People can get unconscious

9    after they develop axonal damage, and they can die.

10       So we're able to see in this area.  I think it's

11   significant damage.  We did special stains.  It's a silver

12   type of stains.  Different pathologists use different

13   stains.  We use a particular silver stain, and we're able

14   to kind of highlight this damage.

15       We also saw some minor changes in the spinal cord and

16   some minor changes in the -- I believe in the hippocampus,

17   too.  That's what is significant of the compartment

18   injuries.

19       Again, while the injury is important, I tried to sort

20   out if the injury is related to assault, fall, or other

21   type of injury.  This injury, we see axonal type of damage

22   in, for example, like motor vehicle accidents,

23   assaultive-type physical assaults.  So it's really a rare

24   happening with people falling down.  That's why I try to

25   put all pictures together, neuropathological finding, my

1    autopsy finding, external examination, and that's why I

2    actually came to my conclusion.

3    Q.   I want to talk about something you mentioned during

4    that answer.  You talked about an axonal injury, splenium

5    of corpus callosum.  You said that was deep in the tissue.

6         Could you relate to the jury how deep of a brain

7    injury that was?

8    A.   I can just say it's at least three inches deep.

9    That's kind of average.  Three inches deep inside the

10   brain.  That's a typical place where we're looking for

11   injury of the brain.

12   Q.   Do you have an opinion, within a degree of reasonable

13   medical certainty, as to whether a two-year-old child would

14   have been rendered unconscious that quickly from a short

15   fall, meaning a fall of three feet with a deep brain injury

16   like that?

17   A.   I just can state it's highly unlikely that this injury

18   occurred as a result of the fall.

19   Q.   Following your examination of Aleeyah Cook and during

20   the performance of the autopsy, based on your experience

21   and training, do you have an opinion, within a reasonable

22   degree of medical certainty, regarding the cause of death

23   of Aleeyah Cook?

24   A.   I do.

25   Q.   What is that opinion?

```
 1   A.   In my opinion the cause of death is traumatic brain
 2   injury due to physical assault.
 3   Q.   Is there any question in your mind regarding the cause
 4   of death?
 5   A.   I don't have a question in my mind.  I came to that
 6   opinion.  I expressed my opinion.  That's all.
 7   Q.   Was a Death Certificate prepared in this case?
 8   A.   Yes.
 9   Q.   Dr. Froloff, I'll show you what is marked Government's
10   Exhibit No. 8.  Do you recognize that?
11   A.   Yes.
12   Q.   What is that?
13   A.   Government Exhibit 8, I believe it's a -- is it the
14   copy or original?
15   Q.   Is the Death Certificate certified?
16   A.   It's a Death Certificate for Aleeyah Cook.
17            MR. MILLER:  Your Honor, I would move to
18   introduce Exhibit 8 into evidence.
19            MR. KHOROOSI:  Your Honor, I object.  It's
20   hearsay and goes to the ultimate question.
21            THE COURT:  It's sustained as to foundation.
22            MR. MILLER:  Your Honor, may we approach?
23            THE COURT:  You may.
24   (Side bar with counsel:)
25            THE COURT:  You've got Dr. McGee, the medical
```

```
 1    certifier, and this witness has stated his opinion.  I

 2    don't know that opinion, the physical assault and head

 3    injuries, those are his opinions.  But I don't know if his

 4    opinions went through Dr. McGee.

 5             MR. MILLER:  McGee is the supervisor.  He

 6    testified to that yesterday.  He's the one that signs off

 7    on it.

 8             THE COURT:  He's the supervisor.  We don't know,

 9    has the jury heard, but how does it work?  Does he give his

10    opinion, and Dr. McGee then uses it?  Because he is the

11    supervisor doesn't mean he used this man's opinion.  Until

12    that has been established, then it looks like it's

13    Dr. McGee's opinion.  It hasn't been subject to any kind of

14    testimony or examination.

15             MR. MILLER:  Okay.

16    (End of side bar)

17    BY MR. MILLER:

18    Q.   Do you have that Exhibit 8, Doctor?

19    A.   Yes.

20    Q.   On the Death Certificate it indicates the person that

21    certified this document is Dr. Michael McGee.  Who is that?

22    A.   That's my boss.

23    Q.   And describe the process of how, if you did the

24    autopsy, how he became the person that was the certifier of

25    the Death Certificate.
```

1   A.   Sure.   In cases, when we have to sign cases under our

2   jurisdiction, I mentioned to you 15 counties, I'm signing

3   Death Certificate electronically through the Internet, and

4   it goes to the Department of Health.  It's the State of

5   Minnesota.  In the referral cases, usually the coroner

6   signs the Death Certificate.

7        I mentioned to you the first day, actually yesterday,

8   that because the child died in North Dakota, Department of

9   Health contacted Dr. McGee and asked him to be involved and

10  sign a Death Certificate in this case, because nobody wants

11  to sign -- nobody can sign this case.

12       I know that because they called him multiple times,

13  because there was a little delay between actual autopsy and

14  then neuropathological report.  So it took a month to

15  finish case basically.

16       So Department of Health called him and asked him to

17  sign the Death Certificate for the State of North Dakota.

18  That's why it's not my name, because he's a medical

19  examiner and he's a coroner.  So he's signing it for all

20  cases.

21            MR. MILLER:  Your Honor, I would reoffer the

22  exhibit again under Rule 803(9).

23            MR. KHOROOSI:  Same objection, Your Honor, and

24  add foundation.

25            THE COURT:  Did Dr. McGee use your opinion in

```
 1    then completing and signing this Death Certificate?

 2              THE WITNESS:  Yes.  I hope so.  Yes.

 3              THE COURT:  Well, did he or didn't he?

 4              THE WITNESS:  Yes, he did.

 5              THE COURT:  Because he didn't do any examination

 6    of this little girl.  Did he?

 7              THE WITNESS:  That's a common practice.  He

 8    reviews all cases, and then the Final Autopsy Protocol, his

 9    signature.  He's involved in all violent cases.  So

10    basically we have to come back, and I have to present the

11    case to him and tell him what happened.  He'll look at the

12    body.  He'll never leave the office until he looks at the

13    body personally, because it's of such importance with the

14    cases.  Because he's a medical examiner, he's ultimately

15    responsible for whatever happened in the office, plus his

16    referral cases.

17              THE COURT:  Objection is overruled.  Exhibit 8 is

18    received.

19    BY MR. MILLER:

20    Q.   Doctor, on the Certificate of Death, you list

21    immediate cause of death, consistent with your testimony

22    just a few minutes ago.  I'm going to ask you to take this

23    highlighter and highlight that section of the Death

24    Certificate regarding the immediate cause of death.

25    A.   That's the yellow one.
```

```
 1   Q.    Okay.   Just highlight the words.

 2   A.    (Witness complies.)

 3   Q.    Also, the Death Certificate lists the manner of death.

 4   Do you see that on the form?

 5   A.    Yes.

 6   Q.    Would you highlight that section, as well?

 7   A.    Sure.

 8              MR. MILLER:  Your Honor, may I publish?

 9              THE COURT:  You may.

10   BY MR. MILLER:

11   Q.    Dr. Froloff, the jury couldn't see the document you

12   were looking at while you were testifying.  I now have

13   Exhibit No. 8 on the overhead.  Is this the document that

14   you've just been testifying to?

15   A.    Yes.

16   Q.    Is that the certified Death Certificate regarding

17   Aleeyah Cook?

18   A.    I believe so.

19   Q.    Dr. Froloff, you indicated that this autopsy spanned

20   over a course of two days.  After the first day of the

21   autopsy, did you contact law enforcement or the FBI in

22   South Dakota?

23   A.    Part of my job, after I perform autopsy, I have to

24   release provisional diagnosis, my initial findings without

25   microscopic examination, toxicology.  Yes, I released a
```

```
 1    provisional diagnosis the same day, and I explained my

 2    findings.

 3    Q.   One last thing.  I'll show you what is marked

 4    Government's Exhibit 10.  Do you recognize that document?

 5    A.   Yes.

 6    Q.   What is that?

 7    A.   Exhibit No. 10 is a copy of my CV.

 8    Q.   And CV stands for curriculum vitae?

 9    A.   That's correct.

10    Q.   Some people may refer to it as a resume of sorts?

11    A.   Sure.

12    Q.   Did you provide that curriculum vitae to our office to

13    show your background, experience, and training?

14    A.   Yes.

15    Q.   And is that an accurate copy of the original

16    curriculum vitae you prepared?

17    A.   Yes.

18            MR. MILLER:  Move to introduce Exhibit 10 into

19    evidence.

20            MR. KHOROOSI:  No objection.

21            THE COURT:  Exhibit 10 is received.

22            MR. MILLER:  That's all the questions I have.

23            THE COURT:  Is the defense ready to proceed, or

24    would you like a recess?

25            MR. KHOROOSI:  Could we take a 10-minute recess,
```

1    Your Honor?

2              THE COURT:  Very well.  We'll be in recess 10

3    minutes.  Please stand for the jury.

4                    (Jury left the Courtroom)

5                    (Recess at 9:28 until 9:40 a.m.)

6              THE COURT:  Please bring in the jury.

7                    (Jury entered the courtroom)

8                    CROSS-EXAMINATION

9    BY MR. KHOROOSI:

10   Q.   Good morning.  I'm looking at Government's Exhibit 10,

11   your CV.  Do you have a copy of that in front of you?

12   A.   No, I don't.  I don't need a copy.

13   Q.   You don't need a copy?  Okay.  You're not board

14   certified in forensic pathology, are you?

15   A.   Not yet.

16   Q.   I'm sorry?

17   A.   Not yet.

18   Q.   You have to pass a test in order for that to happen.

19   Don't you?

20   A.   Pardon me?

21   Q.   You have to pass a test first.  Don't you?

22   A.   Yes.

23   Q.   You're not a member of the National Association of

24   Medical Examiners.  Are you?

25   A.   No.

```
 1   Q.   Are you familiar with the National Association's
 2   guidelines?
 3   A.   Sure.
 4   Q.   Would you agree with me it's standard practice to have
 5   autopsies completed in a month -- I'm sorry, to have the
 6   reports completed within a month after examination?
 7   A.   What do you mean by "report"?
 8   Q.   Your final autopsy report.
 9   A.   So you're saying I have to report -- I have to finish
10   the Final Autopsy Protocol in a month?
11   Q.   I'm asking if you would agree with me.
12   A.   Can you repeat the question, please?
13   Q.   Do you agree with me the National Association of
14   Medical Examiners generally requires autopsy reports to be
15   finalized within a month, maybe two months?
16   A.   They are not required.  They recommend.
17   Q.   They recommend.  That didn't happen in this case.  Did
18   it?
19   A.   Sure.  Yes.
20   Q.   Yes, it didn't happen?
21   A.   It didn't happen, no.
22   Q.   In fact, you performed the autopsy the day after the
23   death on January 12, 2012.  Correct?  Was that your
24   testimony, sir?
25   A.   I performed autopsy, yes, on January 12, 2012.  Yes.
```

1   Q.   You signed your report on May 17, 2012.  Didn't you,

2   sir?

3   A.   Dr. McGee signed the report.  Yes.

4   Q.   There was a little extra delay, because you sent it

5   out for a neuropathology consult.  Correct?

6   A.   That's absolutely correct and within normal

7   guidelines.

8   Q.   And you waited until February to send that to the

9   neuropathologist.  Didn't you?

10  A.   Yes.

11  Q.   You received the neuropathology report in April.

12  Didn't you?

13  A.   I think it's marked February 24.

14        THE WITNESS:  Your Honor, can I refresh my

15  memory?

16        THE COURT:  You may.

17  A.   It's marked received February 23, 2012.

18  BY MR. KHOROOSI:

19  Q.   That's when the neuropathology consult received the

20  case, correct, from you?

21  A.   Remember, I mentioned to you before.  You're just kind

22  of trying to ignore some fact.  We have to fix the brain,

23  make it harder.  It's not a good practice to cut a fresh

24  brain.  So in order to examine it completely, you need to

25  fix in the formalin.  It takes weeks, sometimes months to

```
 1  perform.  So when brain is ready and neuropathologist is
 2  available, we call her and ask her to come to our office
 3  and perform neuropathological report.  So it's in her
 4  reports.  It's received February 23rd.
 5  Q.   My question, sir, and maybe I didn't ask it clearly
 6  enough.  But the neuropathologist reported back to you on
 7  April 24, 2012.  Is that correct?
 8  A.   I don't know what you're talking about.  I have a date
 9  here February 23, but whatever.
10  Q.   Do you have a copy of your autopsy report in front of
11  you?
12  A.   Sure.
13  Q.   Does that include a copy of the neuropath consult?
14  A.   Yes.
15  Q.   I'd like to draw your attention to Page 1 of the
16  neuropathology consultation report.
17  A.   Sure.
18  Q.   In the heading there it says, "Collected February 23,
19  2012."  Does it not?
20  A.   Yes, collected and received, and reported on 4-24.
21  Yes.
22  Q.   So your answer to my question is "yes"?
23  A.   Yes.
24  Q.   Your office finalized the report on May 17, 2012?
25  A.   Dr. McGee finalized this case.  Yes.
```

```
 1    Q.   Sir, you testified yesterday that the occipital

 2    contusions, in other words, the injuries to the top of the

 3    head, were older in your opinion.  Correct?

 4    A.   Occipital contusions.  Occipital meaning back,

 5    occipital bone located in the back of the head.

 6    Q.   Meaning in the back.  Okay.

 7    A.   Frontal area, parietal area on the sides, temporal

 8    around the ear, and occipital in the back.

 9    Q.   Thank you.

10    A.   You're welcome.

11    Q.   You would admit you can't date those injuries exactly.

12    None of the injuries can be dated exactly.  Can they?

13    A.   That's correct.  In the CSIs they date exactly.

14    Q.   And this isn't CSI.

15    A.   Yes.  I always warn jury somebody telling you that

16    they can say this happened at 3:45 three days ago.  That

17    means they witnessed this incident or whatever, homicide.

18    It's impossible.

19    Q.   So, in other words, without a history, and you didn't

20    really have a history here, you can't make an exact

21    diagnosis, correct, as to when the injuries occurred?

22    A.   In this case I made exact diagnosis, which is Final

23    Autopsy Protocol.  Are you talking about the dating of the

24    injury in the back of the --

25    Q.   Dating of the injury, sir.  Yes.
```

1    A.   I cannot exactly date injury in the back of the head.

2    Yes.

3    Q.   Or injuries anywhere on the head.

4    A.   I stated yesterday in my opinion injuries in the head,

5    in the subgaleal tissue, and contusions in the head, it's

6    at least three days old.

7    Q.   At least three days old.

8    A.   Yes.

9    Q.   So they could be older.

10   A.   It could be a little bit older, yes.

11   Q.   So when you say all of the injuries were inflicted at

12   the same time, I'd like to step back and consider that.

13   You can't tell, for example, that they were all inflicted

14   in rapid succession within a period of seconds.  Correct?

15   A.   I just can tell you that all injuries, but injuries in

16   the back, look similar external appearance and on the

17   examination under the microscope.  They look similar.  They

18   look recent.  If you ask me can I distinguish if injury

19   occurred in a matter of seconds or minutes?  No, I can't.

20   Q.   I'd like to discuss, just to illustrate the point, a

21   little hypothetical.  Let's say, as I'm sure so many expert

22   witnesses would like to do to attorneys, you hit me with a

23   baseball bat on my left arm.  Five hours later you hit me

24   with a baseball bat on my right arm.

25        Could you tell the difference between the ages of

1  those injuries?

2  A.   The way I answer a question, you know, I'm in

3  pathology.   Pathology, it's a science.   I believe in the

4  fact.   My job is here to interpret medical findings and

5  explain to the jury, prosecution, defense, and Judge.   I

6  don't like to speculate what potentially could happen if.

7  I don't know.

8  Q.   But you would say that they are the same age

9  pathologically.   Wouldn't you?

10  A.   I stated yesterday and I stated a couple minutes,

11  seconds before, in my opinion I think injury to the front,

12  sides, top of the head looks a similar age, a recent

13  injury, except injury in the back.

14  Q.   My question, sir, was if I sustain blunt force trauma

15  to my left arm, five hours later I sustain blunt force

16  injury to my right arm, pathologically they're going to

17  look the same.   Aren't they?

18  A.   Could be.   I don't know.

19  Q.   Let's talk about the retinal hemorrhages for a little

20  bit.

21  A.   Sure.

22  Q.   Isn't it true that sometimes cerebral edema can cause

23  retinal hemorrhaging?

24  A.   Do you want to talk in general or in this particular

25  case?

1    Q.   I'm asking you is it possible for cerebral edema to

2    cause retinal hemorrhaging?

3    A.   It's really rare, but, yes, it's possible.

4    Q.   It is possible.

5    A.   One of the possibilities, yes.

6    Q.   And you noticed -- you counted 18 hemorrhages?

7    A.   Yes, 18 subgaleal hemorrhages.

8    Q.   Okay.  But that doesn't reflect the number of impacts.

9    That's not your testimony.  Is it?

10   A.   That exactly reflects subgaleal hemorrhage.  That's

11   why it's so important, I stressed multiple times, we have

12   to count because it's potential points of impacts.  It

13   reflects impacts.

14   Q.   But a point of impact, sir, is not an instance of

15   impact.

16   A.   I don't know what you're talking about.

17   Q.   If I put my hands on this paper, I've made five points

18   of impact, but there's only been one blow.  Correct?

19   A.   That's correct.

20   Q.   Eventually you sent your samples out to the

21   neuropathologist, and she reported back to you.  Not

22   considering for one moment the hematoma, but one large

23   impact could have caused all of the brain injuries.  Isn't

24   that correct?

25   A.   That's a possibility.

1    Q.    You have no way to tell whether a seizure occurred.

2    Do you?

3    A.    In this case, no.

4    Q.    In performing your autopsy, did you review the

5    patient's entire medical history?

6    A.    Yes.  I got medical history from two hospitals.  I

7    just remember it's almost two inches thick, so I believe

8    it's full file, but, yes, I review medical records.

9    Q.    You reviewed medical records as part of your autopsy?

10   A.    Yes.

11   Q.    Not in preparation for today necessarily, although I'm

12   sure also in preparation for today.

13   A.    I review medical records before Court and after

14   autopsy multiple times.  Yes.

15   Q.    But in preparation for your autopsy, did you review

16   those?

17   A.    No, not in preparation.  Preparation for the Court,

18   preparation for the hearing.

19   Q.    So at the time you performed the autopsy, you had not

20   reviewed this child's medical records?

21   A.    I did not have any medical records.

22   Q.    You didn't know she had any medical records?

23   A.    I know she had medical records, but at the time of

24   autopsy we have minimal information.  I know kid died at

25   the hospital.  I had some kind of initial story, and I

```
 1   explained to the jury we're trying to get as much

 2   information as we can.  So we contacted the FBI, Tribal

 3   Police, we get police report, but this happened later.

 4       I finished the autopsy the next morning, next day,

 5   but, you know, finish examination of the body, but autopsy

 6   takes so long because you need to get medical records from

 7   the hospital, from North Dakota, from South Dakota.  So I

 8   reviewed medical records after.

 9   Q.  So as part of your history, you had Mario's

10   explanation that at some point it appeared she had a

11   seizure.  Correct?

12           MR. MILLER:  Objection.  Hearsay.

13   A.  I didn't have any --

14           THE COURT:  Just a moment.  There's an objection.

15   Overruled.  Go ahead.

16   A.  I didn't have any of Mario's explanation for seizures

17   or -- I just saw the police report.

18   BY MR. KHOROOSI:

19   Q.  Well, you reviewed the police report.  Correct?

20   A.  Yes.

21   Q.  Do you have a copy of the police report you reviewed

22   with you?

23   A.  No, I don't.

24   Q.  The police report didn't mention anything Mario said?

25   A.  No.  Police report mentioned that the girl, the
```

```
1    initial story, because I had multiple stories.  One story
2    said kid fell from the chair, and she was found.  Maybe she
3    had a seizure.  She was immediately unconscious.
4    Q.   Thank you, sir.
5    A.   You're welcome.
6            MR. MILLER:  Objection, Your Honor.  The witness
7    was not allowed to finish his answer.
8            THE COURT:  Was there something else you wanted
9    to say?  Did you get cut off?
10           THE WITNESS:  No.  I didn't want to say anything.
11           THE COURT:  All right.  Overruled.  Go ahead.
12   BY MR. KHOROOSI:
13   Q.   So if she did fall and if she did have a seizure, is
14   there any way to tell pathologically -- in fact, there's no
15   way to tell pathologically that the fall preceded the
16   seizure.  Correct?
17   A.   I don't think she fell.
18   Q.   My question, Doctor, if she fell and if she had a
19   seizure, there's no way, pathologically speaking, to tell
20   whether the seizure preceded the fall?
21   A.   It's, again, I don't know what you're talking about.
22   You are trying to speculate if potentially what happened.
23   I don't know what happened exactly.
24   Q.   I'm not asking you if you know what happened.  I'm
25   asking you to answer my question.
```

1   A.   Can you repeat your question?

2   Q.   My question is, assuming there was a fall and assuming

3   there was a seizure, you have no way to tell whether the

4   seizure came first or the fall came first.   Correct?

5   A.   No.   I don't know the answer.

6   Q.   Okay.   And a number of -- there can be a number of

7   causes for seizures.   Correct?

8   A.   Could be a number of causes for seizures, yes.

9   Q.   Is fetal alcohol syndrome a potential cause of a

10  seizure?

11          MR. MILLER:   Objection.   Arguing facts not in

12  evidence.

13          THE COURT:   Overruled.

14  A.   On the kids?   Kids usually don't consume alcohol.

15  There is no syndrome, I mean -- for an adult.   You're

16  talking about adults.   That's a two-year-old child.

17  BY MR. KHOROOSI:

18  Q.   Sir, my question was, does fetal alcohol syndrome make

19  a child more susceptible to seizures?

20  A.   Sure.

21  Q.   You don't make a finding one way or the other

22  regarding fetal alcohol syndrome or fetal alcohol effects

23  in your report.   Do you?

24  A.   No.

25  Q.   It's often hard to diagnose fetal alcohol effects and

```
 1   fetal alcohol syndrome.  Isn't it?

 2   A.   Yes.

 3   Q.   Some of the symptoms include poorly defined philtrum,

 4   the area below the nose, the little dimple?

 5   A.   Sure.

 6   Q.   It includes a thin upper lip?

 7   A.   Could be.

 8   Q.   There are specialists out there called

 9   dysmorphologists that can make that determination.  Isn't

10   that correct?

11   A.   Probably, yes.

12   Q.   You didn't have a dysmorphology consult.  Did you?

13   A.   No, I did not.

14   Q.   So it's possible that Aleeyah could have had fetal

15   alcohol syndrome or fetal alcohol effects, and you wouldn't

16   know it.  Correct?

17             MR. MILLER:  Your Honor, again, object to facts

18   not in evidence.

19             THE COURT:  Overruled.

20   A.   I don't know.

21   BY MR. KHOROOSI:

22   Q.   You don't know if it's possible?

23   A.   Everything is possible in life.

24   Q.   So it's possible.  Isn't it, sir?  Is that a yes?

25   A.   If your doctor is saying it's possible, I did not see
```

1    any features of fetal alcohol syndrome.  The kid was

2    examined by a physician on --

3    Q.   Are you a dysmorphologist, sir?

4    A.   I'm not a dysmorphologist.  I'm a doctor of 27 years,

5    so have experience about fetal alcohol syndrome.  You don't

6    need to be a dysmorphologist.

7    Q.   You don't need to be a dysmorphologist?

8    A.   Maybe in South Dakota, but I don't know what you're

9    talking about.  Fetal alcohol syndrome can be -- it's not

10   supposed to be made just by dysmorphologist.  It can be

11   made by a pediatrician.  Right?

12   Q.   You didn't send it out to a dysmorphologist.  Did you?

13   A.   I'm not a dysmorphologist.  I didn't see in this case

14   to consult with a dysmorphologist.

15   Q.   Hydrocephalus can also result in an increased risk for

16   seizures.  Isn't that correct?

17   A.   Yes, that's correct.

18   Q.   On the first page of your Final Autopsy Protocol, you

19   describe Aleeyah as a well-developed, well-formed,

20   20-month-year-old female child -- 24-month-old female

21   child.

22   A.   Yes.

23   Q.   You filled out a growth chart, as well.  Didn't you,

24   sir?

25   A.   Yes.

1    Q.   You actually filled out two, but one of which compared

2    head circumference to age and length to weight.  Correct?

3    A.   Yes.

4    Q.   And by your own assessment, it appears you found

5    Aleeyah to be in about it looks like the 80th percentile

6    for head circumference to age.  Is that fair to say?

7    A.   Yes.

8    Q.   She was below the 25th percentile in weight to length.

9    Correct?

10   A.   I don't see -- I don't have a chart.  It's actually

11   not two charts.  It's just one chart, two sides.

12            MR. KHOROOSI:  May I approach, Your Honor?

13            THE COURT:  You may.

14   BY MR. KHOROOSI:

15   Q.   Dr. Froloff, I'm handing you what's been marked

16   Defense Exhibit 116.  You prepared that chart.  Didn't you?

17   A.   Yes.  This is just one of the sides of the growth

18   development chart.  Yes.

19   Q.   But it's the side that shows head circumference to

20   age.  Correct?

21   A.   Yes.  It says head circumference to age.  Yes.

22   Q.   It also shows length to weight.  Correct?

23   A.   That's correct.

24   Q.   I'd like to review your points that you plotted there.

25            MR. KHOROOSI:  Actually first, Your Honor, I

```
 1    would offer Exhibit 116.

 2              MR. MILLER:  Objection as to relevance.

 3              THE COURT:  Overruled.  Go ahead.  Received.

 4    BY MR. KHOROOSI:

 5    Q.   Doctor, you found Aleeyah was in the -- it looks like

 6    about the 80th percentile for head size.  Correct?

 7    A.   Yes.

 8    Q.   She was below the 25th percentile for weight to

 9    length.

10    A.   Yes.

11    Q.   In your Final Autopsy Protocol, your first diagnosis

12    was traumatic head injuries due to physical assault.

13    Correct?

14    A.   Yes.

15    Q.   Doctor, physical assault is not a pathologic

16    diagnosis.  Is it?  It's not a disease you can have.  Is

17    it, sir?

18    A.   It depends what you mean.  We're not in a pathology.

19    We're in forensic pathology.  So my job, when I express my

20    opinion in Final Autopsy Protocol, it's opinion about cause

21    and manner of death.  If I like to put that physical

22    assault, no, but it's a very acceptable in forensic society

23    way to sign a Final Autopsy Protocol.

24    Q.   Physical assault is not a medical diagnosis.  Is it?

25    A.   It's, again, not a medical diagnosis.
```

1    Q.   Now, Doctor, you testified that she fell from a height

2    of about 25 inches.  Is that correct?

3    A.   I didn't testify about that.

4    Q.   You didn't make any testimony as to what type of -- as

5    to what height Aleeyah fell from when you were making your

6    findings?

7    A.   I think I was asked about my opinion, if this injury

8    occurred if child fell from 36 inches.

9    Q.   From 36 inches?

10   A.   36 inches, not 25.

11   Q.   So if a child is lying on a 36-inch table, it would be

12   different than if she's standing on a 36-inch table.

13   Correct?

14   A.   I guess so.

15   Q.   It will increase the effective height of the head.

16   Correct?

17   A.   Sure.  It will be a little bit higher, yes.

18   Q.   And, in general, the longer the fall, the worse the

19   injury.  Correct?  All other things being equal.

20   A.   It's long as a fall.  I have to show it's not that

21   high.  It's that high.  (Witness indicating)  Sure.

22            MR. KHOROOSI:  I don't have any further

23   questions.  Thank you.

24            THE COURT:  Redirect?

25                      REDIRECT EXAMINATION

1    BY MR. MILLER:

2    Q.   Dr. Froloff, the entire autopsy process was not

3    completed until you got the neuropathological report on

4    April 24th.  Correct?

5    A.   Yes.  I have to stress that, you know, in the simple

6    -- well, again, there is nothing simple in forensic

7    pathology, but in a routine, normal case like adult die

8    from heart attack, National Association of the Medical

9    Examiners recommend to release Final Autopsy Protocol in a

10   matter of a month.

11        When someone else is involved, like cardiopathology or

12   neuropathology, it takes much, much longer, and up to, from

13   my experience, half a year to six months.  It's not because

14   I'm trying to delay case.  It's because there's so many

15   people involved.

16        It's like toxicology.  You have to -- you can't enter

17   the Final Autopsy Protocol in a matter of weeks until you

18   get final results.  It could be complicated and take months

19   to release.  So it's not unusual to have this delay,

20   because case needs to be reviewed before released to

21   prosecution, defense, or any authorities.

22   Q.   And that process was not completed until you received

23   the neuropathological report on April 24.  Correct?

24   A.   Yes.  She initially sent me an e-mail with

25   neuropathological report, but I asked her to -- I need a

1    hard copy of the report, signed by her.  So yes.

2    Q.   Then your report was completed less than a month

3    later?

4    A.   It was, yes.  I review case, and I give to review to

5    Dr. McGee, because he's reviewing cases, also.

6    Q.   Defense counsel asked you if dating was not an exact

7    science; in other words, determining the age of an injury

8    is not an exact science.  That's true.  Is it not?

9    A.   Well, all literature and from my experience,

10   experience with my colleagues, it's difficult to date

11   injuries.  Yes.

12   Q.   In other words, in the hypothetical he said you might

13   not be able to tell if one injury is five hours older than

14   another injury.

15   A.   I don't even want to go there, because it's

16   complicated.

17   Q.   But if you talk about a span of days, you can

18   determine whether an injury is acute or nonacute, can you

19   not, in terms of dating?

20   A.   Yes.  You are talking about injuries.  Like

21   contusions, like I mentioned to you, it's recent injuries

22   or old injuries.  Yes.

23   Q.   Other than the injuries you described on the back of

24   the head, you described the other injuries as acute?

25   A.   In my opinion still acute, but it's probably -- it

```
 1    looks older, because under microscope I see more cells,
 2    which are scavenger cells trying to clean up this injury.
 3    This injury looks a little bit different than other
 4    injuries.  Yes.
 5    Q.   Again, when you say these injuries are "acute," what
 6    does that mean in terms of hours or days?
 7    A.   Again, I don't like to use "acute" when I describe
 8    subgaleal hemorrhage or contusions.  I like to use recent.
 9    If you are talking about subdural hematoma, I use acute,
10    because it's generally acceptable by Forensic Society of
11    Phenomenology and Classification.
12    Q.   And on the subdural hematoma, you just write that as
13    an acute injury?
14    A.   Yes.  That's correct.
15    Q.   And, again, when you use that word "acute," what does
16    that mean in terms of hours or days?
17    A.   It's a general classification.  Very general, 72
18    hours, up to 72 hours it's acute subdural hematoma.  From
19    72 hours, which is three days, to two, three weeks is
20    subacute.  Over three weeks we're talking about chronic
21    subdural hematoma.
22    Q.   Other than the injuries on the back of the head, you
23    indicated that the subgaleal hemorrhages all appeared
24    similar in appearance to each other?
25    A.   Yes.
```

1   Q.   Defense counsel asked you if it was possible that a

2   retinal hemorrhage could be caused by a subdural hematoma.

3   You indicated it was possible, but rare?

4   A.   He asked me if it was possible that retinal hemorrhage

5   could be caused by brain swelling.

6   Q.   And you said, would it be characterized not likely?

7   A.   It's possible.

8   Q.   Is it likely?

9   A.   I think it's possible, but compared to other injuries,

10   like I see retinal hemorrhage in the case of traumatic

11   brain injuries all the time.  I've examined hundreds of

12   kids in my life.  So sometimes really rarely you can see.

13   It's more rare to see retinal hemorrhage in the case of a

14   brain swelling.  I can tell you I see brain swelling in

15   kids.  A kid's brain swells, and there's no injuries.  I

16   don't see retinal hemorrhages.  We see retinal hemorrhages

17   as a result of impact type of injury.

18          MR. MILLER:  Thank you.  That's all.

19          THE COURT:  Anything further?

20          MR. KHOROOSI:  Nothing further, Your Honor.

21          THE COURT:  Thank you, Doctor.  You may step

22   down.

23          MR. MILLER:  May the witness be relieved of his

24   subpoena so he can return to St. Paul?

25          THE COURT:  Yes, you're excused.

```
 1                    (Witness excused)

 2            THE COURT:  Call your next witness.

 3            MR. WRIGHT:  Shannon Sine.

 4                      SHANNON SINE,

 5   called as a witness, being first duly sworn, testified as

 6   follows:

 7                   DIRECT EXAMINATION

 8   BY MR. WRIGHT:

 9   Q.   Would you state your name, please.

10   A.   Shannon Sine.

11   Q.   Shannon, this is a big courtroom.  Can you talk up

12   nice and loud for me?

13   A.   Shannon Sine.

14   Q.   How old are you?

15   A.   Thirty-two.

16   Q.   Where do you live?

17   A.   Sisseton, South Dakota.

18   Q.   Are you married?

19   A.   Yes, I am.

20   Q.   What's your husband's name?

21   A.   Samuel Sine.

22   Q.   Shannon, did you graduate from high school?

23   A.   I did.

24   Q.   From where?

25   A.   Woodland Park, Colorado.
```

```
 1    Q.    When did you graduate from high school?

 2    A.    1999.

 3    Q.    After high school did you go into the military?

 4    A.    Yes.

 5    Q.    What branch of the service did you serve in?

 6    A.    The U.S. Army.

 7    Q.    How long were you in the Army?

 8    A.    Approximately seven years.

 9    Q.    Did you reenlist twice in the Army?

10    A.    Yes, I did.

11    Q.    Where did you serve at?

12    A.    I was at Fort Carson, Colorado, Kitzingen, Germany.  I

13    served a year in Iraq, and I went to Fort Hood, Texas.

14    Q.    How long were you overseas in the Army?

15    A.    For three years.

16    Q.    What did you do in the Army?  What was your general

17    job?

18    A.    I was a truck driver.

19    Q.    You served approximately seven years in the U.S. Army?

20    A.    Yes.

21    Q.    Did you receive an honorable discharge?

22    A.    Yes.

23    Q.    After you got out of the Army, did you attend college?

24    A.    Yes, I did.

25    Q.    Where did you attend college at, ma'am?
```

1    A.    Sisseton-Wahpeton College.

2    Q.    I assume that's in the Sisseton area?

3    A.    Yes.

4    Q.    What did you study?

5    A.    General studies.

6    Q.    How long were you in college?

7    A.    Two years.

8    Q.    Did you graduate?

9    A.    Yes.

10   Q.    Did you get a degree?

11   A.    I did.

12   Q.    Shannon, have you given birth to any children in your

13   life?

14   A.    Yes.

15   Q.    The first child that you had was born when?

16   A.    June 29, 2005.

17   Q.    Is that a boy or girl?

18   A.    A boy.

19   Q.    What's his name?

20   A.    Michael Smith.

21   Q.    Shannon, do you currently have custody of him?

22   A.    Yes, I do.

23   Q.    Have you always had custody?

24   A.    Yes.

25   Q.    What's his father's name?

1   A.   Patrick Smith.

2   Q.   The second child you had, is that a boy or girl?

3   A.   A girl.

4   Q.   What's her name?

5   A.   Aleeyah Cook.

6   Q.   Did you always have custody of Aleeyah when she was

7   alive?

8   A.   Yes.

9   Q.   You are aware of what this trial is about.  Aren't

10  you?

11  A.   Yes.

12  Q.   Who is the father of Aleeyah Cook?

13  A.   Mario Contreras.

14  Q.   Do you see him in the courtroom?

15  A.   Yes.

16  Q.   Can you point him out, please?

17  A.   There.  (Witness indicating)

18  Q.   Do you have a third child?

19  A.   Yes.

20  Q.   Is that a boy or girl?

21  A.   Boy.

22  Q.   What's his name?

23  A.   Emerson Sine.

24  Q.   Who is the father of Emerson?

25  A.   Samuel Sine.

```
 1   Q.   That's your current husband?

 2   A.   Yes.

 3   Q.   Have you always had custody of Emerson?

 4   A.   Yes.

 5   Q.   I want to back up for a minute.  When did you meet

 6   Mario Contreras?

 7   A.   When we were in college.

 8   Q.   You were in college where?

 9   A.   Sisseton-Wahpeton College.

10   Q.   How did you meet Mr. Contreras, the Defendant?

11   A.   We had a class together.

12   Q.   Did you start dating?

13   A.   Yes.

14   Q.   Did you date a long time?

15   A.   No.

16   Q.   How many dates had you had with the Defendant before

17   you realized you were pregnant?

18   A.   Approximately four or five.

19   Q.   How far along were you when you told the Defendant you

20   were pregnant?

21   A.   A month and a half.

22   Q.   Do you recall what his reaction was?

23   A.   He wasn't the father.

24   Q.   That's what he told you initially?

25   A.   Yes.
```

1    Q.    You delivered Aleeyah when?

2    A.    December 31, 2009.

3    Q.    Where was she born?

4    A.    Watertown, South Dakota.

5    Q.    Now, between the time that you told the Defendant you

6    were pregnant and the time you delivered Aleeyah, was the

7    Defendant fairly active in your pregnancy or concerned

8    about it?

9    A.    No.

10   Q.    Did he ever ask you how you were getting along or

11   things like that?

12   A.    No.

13   Q.    When Aleeyah was born, did the Defendant,

14   Mr. Contreras, initially sign the birth certificate?

15   A.    No.

16   Q.    Did he demand a DNA test?

17   A.    Yes.

18   Q.    Did he take a DNA test?

19   A.    Yes.

20   Q.    Did it prove that he was the father?

21   A.    Yes.

22   Q.    Is that when he finally signed the birth certificate?

23   A.    Not right away.

24   Q.    When did he finally sign it?  Do you know?  If you

25   know.

```
 1   A.   In August of 2011.

 2   Q.   You said Aleeyah was born in December of 2009?

 3   A.   Yes.

 4   Q.   When she was alive, can you tell us what she liked to

 5   do, what her favorite hobbies or her toys were?

 6   A.   She liked to play dress-up and wear makeup.  She loved

 7   dolls.  She would go to sleep with them and cover them up.

 8   Treat them like babies.

 9   Q.   I'll ask you to hold in your hand Exhibit 4.  Do you

10   recognize that?  Is that a picture of your daughter?

11   A.   Yes.

12   Q.   Shannon, did you take this picture?

13   A.   Yes, I did.

14   Q.   Does this picture accurately depict the way Aleeyah

15   looked when she was alive?

16   A.   Yes.

17                MR. WRIGHT:  Offer Exhibit 4.

18                MR. KHOROOSI:  No objection.

19                THE COURT:  It's received.

20   BY MR. WRIGHT:

21   Q.   Shannon, take a look over your right shoulder for a

22   second.  Do you recall where that picture was taken at?

23   A.   It was at Long Hollow PowWow.

24   Q.   Is that a traditional Native American dress she is

25   wearing?
```

1   A.   Yes.

2   Q.   Now, for the first like 18 months of Aleeyah's life,

3   which would be from December of 2009 to July of 2011, would

4   you say Mr. Contreras was a very involved father in her

5   life?

6   A.   No.

7   Q.   Can you tell us about that, please?

8   A.   He seen her maybe a handful of times.

9   Q.   Did you have full custody of Aleeyah?

10  A.   Yes.

11  Q.   In fact, for the whole two years she was alive?

12  A.   Yes.

13  Q.   Was the Defendant, Mr. Contreras, under any order to

14  pay child support?

15  A.   Yes.

16  Q.   How much was he supposed to pay you?

17  A.   $150 a month.

18  Q.   Did he pay that child support?

19  A.   Yes.

20  Q.   Around July or August 2011 Aleeyah would have been

21  around 18 months old.   Is that right?

22  A.   Yes.

23  Q.   Was there a time in the summer of 2011 that you

24  transferred Aleeyah to the Defendant, and she came back

25  with a problem?

1    A.   Yes.

2    Q.   I want to talk to you about that.  Around August of

3    2011 did Aleeyah come back from a trip to the Defendant's

4    house for a weekend with a problem?

5    A.   Yes.

6    Q.   What was that, ma'am?

7    A.   She had a handprint on her butt.

8              THE COURT:  I'll interrupt now to give an

9    instruction to the jury.  I told you that sometimes I would

10   give you instructions on how evidence could be received for

11   a limited purpose only.  This is one of those times.  This

12   instruction is about that.

13       You are about to hear evidence that the Defendant

14   spanked A.C. leaving a mark, that's Aleeyah Cook, leaving a

15   mark from the spanking in August of 2011.  You may consider

16   this evidence only if you unanimously find it's more likely

17   true than not true.  You decide that by considering all the

18   evidence and deciding what evidence is more believable.

19   This is a lower standard of proof than beyond a reasonable

20   doubt.

21       If you find this evidence has been proved, then you

22   may consider it to help you decide whether there was a lack

23   of accident concerning Aleeyah Cook's injuries that led to

24   her death.  You should give it the weight and value you

25   believe it's entitled to receive.

1       If you find this evidence has not been proved, you

2    must disregard it.  Remember, even if you find the

3    Defendant may have committed a similar act in the past,

4    this is not evidence that he committed such an act in this

5    case.  You may not convict a person simply because you

6    believe he may have committed similar acts in the past.

7       The Defendant is on trial only for the crimes charged,

8    and you may consider the evidence of prior acts only on the

9    issue stated above, which is the question of accident.

10      Proceed.

11         MR. WRIGHT:  Thank you, Your Honor.

12   BY MR. WRIGHT:

13   Q.   After Aleeyah got back from that weekend trip with the

14   Defendant, were you changing her diaper the next morning?

15   A.   Yes.

16   Q.   What, if anything, did you notice?

17   A.   I noticed a handprint on her right butt.

18   Q.   Handprint on her buttocks?

19   A.   Yes.

20   Q.   When you transferred Aleeyah to the Defendant a couple

21   days earlier, had she had that handprint on her buttocks?

22   A.   No.

23   Q.   When you saw the handprint -- how much time passed

24   from the time the Defendant gave Aleeyah back to you and

25   you noticed the handprint?

1    A.    About eight hours.

2    Q.    Was it the next morning you noticed it?

3    A.    Yes.

4    Q.    She came back at night, and you noticed it changing

5    her in the morning?

6    A.    Yes.

7    Q.    When you saw that handprint in the morning, what was

8    your reaction?

9    A.    I was concerned.

10   Q.    Why is that?

11   A.    I was worried somebody was hurting her.

12   Q.    Had you ever seen a handprint on her buttocks like

13   that before?

14   A.    No.

15   Q.    Aleeyah is or was a Native American child?

16   A.    Yes.

17   Q.    Had a little darker skin than Caucasian?

18   A.    Yes.

19   Q.    Did you discuss that handprint that you were able to

20   see with your husband, Sam?

21   A.    Yes.

22   Q.    Did you also discuss it with your mom?

23   A.    Yes.

24   Q.    Can I assume the reason you discussed it with them was

25   the same concern you just outlined?

1   A.   Yes.

2   Q.   Did you and Sam and your mom discuss taking Aleeyah to

3   the clinic?

4   A.   Yes.

5   Q.   Why is that, ma'am?

6   A.   We were concerned somebody was hurting her.

7   Q.   Did you discuss calling the Defendant, Mr. Contreras,

8   and asking him about it?

9   A.   Yes.

10   Q.   Did you discuss -- did you call Mr. Contreras that day

11   and discuss the incident?

12   A.   Yes.

13   Q.   Now, you said this incident happened in August of

14   2011.  Is that right?

15   A.   Yes.

16   Q.   Is there anything in your life that makes you remember

17   it was around August of 2011?

18   A.   Yes.

19   Q.   What is that?

20   A.   I was very pregnant with my little son.

21   Q.   You were very pregnant with your third child at the

22   time?

23   A.   Yes.

24   Q.   When was your third child born?

25   A.   September 14, 2011.

1   Q.   Do you remember being really pregnant at the time

2   Aleeyah had this handprint?

3   A.   Yes.

4   Q.   Can I assume being really pregnant in August probably

5   isn't the most comfortable thing in the world?

6   A.   No, it's not.

7   Q.   That's how you know this is when that happened?

8   A.   Yes.

9   Q.   Did you call the Defendant, Mr. Contreras, then?

10  A.   Yes.

11  Q.   Had you called him before?

12  A.   Yes.

13  Q.   Did you know his phone number?

14  A.   Yes.

15  Q.   Did you talk to him on the phone?

16  A.   Yes.

17  Q.   When you were talking to him on the phone, did you

18  recognize the voice on the other end of the phone?

19  A.   Yes.

20  Q.   Whose was it?

21  A.   Mario's.

22  Q.   What did you say to him about the handprint, and what

23  did he say back?

24  A.   I told him about the handprint, and I was concerned.

25  He told me that he spanked Aleeyah -- he spanked Aleeyah

```
 1   because she wouldn't throw away her Pamper.

 2   Q.    Did the Defendant admit that he struck Aleeyah?

 3   A.    Yes.

 4   Q.    Did he eventually apologize for what he did?

 5   A.    Yes.

 6   Q.    He told you the reason he hit her that hard was what?

 7   A.    Because she wouldn't throw away her Pamper.

 8   Q.    She was 18 months old at the time?

 9   A.    Yes.

10   Q.    Shannon, did you attempt to take a picture of

11   Aleeyah's buttocks?

12   A.    Yes.

13   Q.    Why was that?

14   A.    For documentation.

15   Q.    Had your mom also urged you to take a picture of the

16   buttocks?

17   A.    Yes.

18   Q.    What did you use to take the picture?

19   A.    My cell phone.

20   Q.    After you took that picture, did you find out it

21   didn't turn out very well?

22   A.    Yes.

23            MR. WRIGHT:  May I approach?

24            THE COURT:  You may.

25   BY MR. WRIGHT:
```

1    Q.   I'll show you what has been marked Exhibit No. 5.

2    Could you hold that in your hand, please?  Do you recognize

3    that?

4    A.   Yes.

5    Q.   What is it?

6    A.   It's a picture of Aleeyah's butt.

7    Q.   In fact, is that the overexposed photo you attempted

8    to take of Aleeyah --

9    A.   Yes.

10   Q.   -- in August of 2011 to document the handprint?

11   A.   Yes.

12   Q.   It doesn't show up very well.  Does it?

13   A.   No.

14   Q.   You were trying to take a picture to document it?

15   A.   Yes.

16              MR. WRIGHT:  At this time we offer Exhibit 5.

17              MR. KHOROOSI:  I object to relevance and under

18   Rule 404(b).

19              THE COURT:  Overruled.  Exhibit 5 is received.

20              MR. WRIGHT:  May I publish?

21              THE COURT:  You may.

22   BY MR. WRIGHT:

23   Q.   Shannon, this isn't a very good picture, because it's

24   basically overexposed.  Is that right?

25   A.   Yes.

1   Q.   Now, after that incident in August, were there other

2   times you allowed the Defendant to have custody of Aleeyah

3   for a weekend or short periods of time?

4   A.   Yes.

5   Q.   Were you Court ordered, as far as a visitation order,

6   to give the Defendant custody or give the Defendant weekend

7   visitations with Aleeyah?

8   A.   No.

9   Q.   Was it basically up to you to decide if the Defendant

10  could have Aleeyah --

11  A.   Yes.

12  Q.   -- for certain periods of time?

13  A.   Yes.

14  Q.   So were there other weekends after this August

15  incident that you let Aleeyah stay at times with the

16  Defendant?

17  A.   Yes.

18  Q.   Why did you let Aleeyah stay with the Defendant after

19  this incident where he slapped her on the butt so hard?

20  A.   Because he's her father.

21  Q.   You thought that would be the right thing to do?

22  A.   Yes.

23  Q.   I want to take you to around late November or early

24  December of 2011.  Was there another incident in your mind

25  regarding Teal's Market in Sisseton?

1    A.   Yes.

2    Q.   Did the Defendant have Aleeyah for that particular

3    weekend that we're talking about?

4    A.   Yes.

5    Q.   Had you visited with the Defendant about how you were

6    going to make the exchange, so you were going to get

7    Aleeyah back?

8    A.   Yes.

9    Q.   Where did you agree on that?

10   A.   At Teal's Market.

11   Q.   Is that in the town of Sisseton?

12   A.   Yes.

13   Q.   Is that kind of up there on the hill?

14   A.   Yes.

15   Q.   Did you arrange a date and time when you were going to

16   meet with the Defendant and do the exchange?

17   A.   Yes.

18   Q.   Who went with you?

19   A.   My husband.

20   Q.   Your husband's name is Sam?

21   A.   Yes.

22   Q.   Had Sam been living with you and Aleeyah?

23   A.   Yes.

24   Q.   Was Aleeyah fairly close to Sam?

25   A.   Yes.

1    Q.    Where in the Teal's Market did you meet the Defendant,

2    Mr. Contreras?

3    A.    In the parking lot.

4    Q.    Do you remember if he was already there when you got

5    there, or if you and Sam got there first?

6    A.    Me and Sam got there first.

7    Q.    When you got to Teal's Market, did Sam actually go in

8    the store for a while?

9    A.    Yes.

10   Q.    Did you see the Defendant, Mr. Contreras, show up with

11   Aleeyah?

12   A.    Yes.

13   Q.    When they got out of the car, what was Aleeyah's

14   demeanor?

15   A.    He opened up the door, and Aleeyah started crying

16   right away, reaching for me.

17   Q.    Did she come up to you then?

18   A.    Yes.

19   Q.    Did Mr. Contreras come up and talk to you for a while?

20   A.    Yes.

21   Q.    Can you describe Mr. Contreras' attitude or approach

22   to you when he was talking to you?

23   A.    He was telling me about what they did that weekend and

24   what kind of food Aleeyah ate.

25   Q.    Fairly friendly conversation?

1    A.    Yes.

2    Q.    Weren't having any problem there in the parking lot?

3    A.    No.

4    Q.    At some point did your husband, Sam, come out of the

5    store?

6    A.    Yes.

7    Q.    When he came up to you, were you and Aleeyah and the

8    Defendant standing there?

9    A.    Yes.

10   Q.    When Sam walked up to you, did Aleeyah say anything?

11   A.    Yes.

12   Q.    What was that?

13   A.    She pointed at him and said, "That's my Dada."

14   Q.    Did she point at Sam or the Defendant?

15   A.    At Sam.

16   Q.    So she pointed at Sam and said, "That's my Dada"?

17   A.    Yes.

18   Q.    Was Mr. Contreras, the Defendant, there when she said

19   that?

20   A.    Yes.

21   Q.    Did you notice any change in Mr. Contreras'

22   interaction with you, facial expression or anything, when

23   Aleeyah said that?

24   A.    Yes.

25   Q.    What was that?

1   A.   He stopped talking and quickly left shortly after.

2   Q.   Actually your husband, Sam, is not Aleeyah's

3   biological father.  Is that right?

4   A.   No.

5   Q.   The Defendant is?

6   A.   Yes.

7   Q.   Did you enroll Aleeyah in Head Start?

8   A.   Yes.

9   Q.   Can you tell us what Head Start is?

10  A.   It's a preschool.

11  Q.   Do you need a physical to start Head Start?

12  A.   Yes.

13  Q.   Did you take Aleeyah to get a physical?

14  A.   Yes.

15  Q.   Shannon, can you look over your right shoulder?  The

16  Judge has already received Exhibit 1 in evidence.  The

17  doctor's report says two weeks before her death she was a

18  healthy child.

19  A.   Yes.

20  Q.   Does that coincide with you, as her mother, who had

21  custody of her for two years?

22  A.   Yes.

23  Q.   Shannon, there was significant reference from the

24  prior witness regarding fetal alcohol syndrome.  Was

25  Aleeyah a fetal alcohol syndrome child?

1    A.   No.

2    Q.   Did you ever have one doctor in your life tell you or

3    even suggest that she was fetal alcohol?

4    A.   No.

5    Q.   Were you ever told Aleeyah had any kind of brittle

6    bone disease or weak bones?

7    A.   No.

8    Q.   When you interacted with Aleeyah when she was alive,

9    was she a particularly fussy child in the morning?

10   A.   Sometimes, yes.

11   Q.   Can you tell us about that, please?

12   A.   I would have to wake her up and get her ready for

13   school.  Sometimes she wouldn't cooperate with me.

14   Q.   What did you have to do to get her to cooperate or get

15   going in the morning?

16   A.   Basically gave her my phone and let her watch videos

17   on it.  It calmed her down.

18   Q.   I would like to talk to you about the last week of her

19   life.  On Wednesday, January 4, of 2012, did you ask the

20   Defendant to watch Aleeyah for a few days?

21   A.   Yes.

22   Q.   Did you make arrangements to transfer her to the

23   Defendant on that Wednesday, the 4th?

24   A.   Yes.

25             MR. WRIGHT:  Your Honor, could I ask the witness

1   to leave the witness stand and write something on the

2   calendar?

3              THE COURT:  She may.

4   BY MR. WRIGHT:

5   Q.   Shannon, if you could step off the witness stand for a

6   minute.  Shannon, take this blue pen in your hand.

7        On January 4, is that the date she was transferred to

8   the Defendant?

9   A.   Yes.

10  Q.   Can you just write, "Aleeyah to Mario"?

11  A.   (Witness complies.)

12             MR. WRIGHT:  Your Honor, I have a couple more

13  questions before she writes the next thing.  Can I do those

14  with her standing up?

15             THE COURT:  Sure.

16  BY MR. WRIGHT:

17  Q.   Shannon, how long had you intended for the Defendant

18  to watch Aleeyah?

19  A.   Friday, the 6th.

20  Q.   On Friday, the 6th, did you receive a call from the

21  Defendant?

22  A.   Yes.

23  Q.   What did he want?

24             THE COURT:  That's not working.  I can't hear

25  her.  She'll have to go back to the stand.

233

BY MR. WRIGHT:

Q.   On Friday you received a call from him?

A.   Yes.

Q.   What did he want?

A.   He wanted to keep Aleeyah for the weekend.

Q.   What did you say?

A.   I said "yes."

Q.   Now, can I have you leave now and have you come up here?  On the 6th can you just write, "Mario requests more time"?

A.   (Witness complies.)

Q.   Were you expecting to get Aleeyah back on Sunday, the 8th --

A.   Yes.

Q.   -- of 2012?  Were you missing her?

A.   Yes.

Q.   On Sunday did you talk to Mr. Contreras again?

A.   Yes.

Q.   Tell us about that conversation.

A.   He wanted to keep her, take her to school overnight, and for me to pick her up after school.

Q.   Take her to Head Start the next day?

A.   Yes.

Q.   Did you agree to that?

A.   Yes.

```
 1   Q.   Now, the five nights, Wednesday through Sunday night,

 2   that he had Aleeyah, periodically had you been talking to

 3   Aleeyah?

 4   A.   Yes.

 5   Q.   Talking to her about every night before she went to

 6   bed, as her mother?

 7   A.   Yes.

 8   Q.   In any of those conversations did she make any

 9   statement she was hurt or in trouble or anything?

10   A.   No.

11   Q.   And that Sunday night when he asked if he could take

12   her to Head Start the next day, you agreed.  Right?

13   A.   Yes.

14   Q.   Did you talk to Aleeyah particularly on that Sunday

15   night?

16   A.   Yes.

17   Q.   Can you just tell us what your conversation was with

18   her?

19           MR. KHOROOSI:  Objection.  Calls for hearsay.

20           THE COURT:  Just a moment.  I think we'll take

21   our mid-morning recess now.  We'll be in recess for 15

22   minutes.  Remember what I told you, don't talk to each

23   other about the case.  Keep an open mind until all the

24   evidence is in.  Please stand for the jury.

25               (Jury left the courtroom)
```

1    (Out of the presence of the jury, counsel and Defendant

2    present, the following proceedings occurred:)

3              THE COURT:  Please be seated.  What is the

4    anticipated answer?

5              MR. WRIGHT:  Very short.  I anticipate the

6    witness will say, "I talked to Aleeyah that night, and

7    Aleeyah said, 'Night, night, Mommy, I love you.'"  That's

8    it.  The evidence is not being offered to prove the truth

9    of the matter asserted, that Aleeyah loves her mommy more

10   than she probably did.  It's just demonstrated to show that

11   Aleeyah was alive.  She wasn't in any distress, and she was

12   normal.  Consistent with the Defendant's statement to

13   Agent Mertz that Aleeyah was fine on Sunday night.

14       The defense is trying to throw in this argument that

15   she is the victim of some old injury or old assault that

16   may have caused her death.  The testimony is just to show

17   that she talked to her mom the night before she died and

18   said, "Night, night, Mommy, I love you."  Just a normal

19   child.

20             THE COURT:  Okay.  What rule is it admissible

21   under?

22             MR. WRIGHT:  Your Honor, we contend it's not

23   hearsay, because it's not offered for the truth of the

24   matter asserted.  That's our position.  But we understand

25   this Court tells us what the law is.

 1            THE COURT:  If it's not offered for the truth of

 2     the matter stated, what is it offered for?

 3            MR. WRIGHT:  To show she was alive and normal and

 4     not in any distress at that time.

 5            THE COURT:  Well, that's the inference you would

 6     take from that statement.  Right?

 7            MR. WRIGHT:  That she was okay.  Yes.

 8            THE COURT:  Anything further from the defense?

 9            MR. KHOROOSI:  Well, Your Honor, I guess if

10     that's the anticipated testimony, I would also add a

11     relevance objection.  I think the goal of the testimony, if

12     it's to establish that she seemed all right in the witness'

13     mind, that "Night, night, Mommy, I love you" doesn't go to

14     show that.

15            THE COURT:  I think it does.  It's clearly that

16     inference that they are offering it for, and not, as the

17     Government mentioned, the question whether she loved her

18     mother or not.  We can presuppose that from other

19     testimony.  But it's rather the Government is offering it

20     for the inference that she was okay at that point.

21            MR. KHOROOSI:  I think the same effect can be

22     produced by asking the question, "You talked to her.  Was

23     she alive?  Did she seem okay?"  I think otherwise it's

24     unfairly prejudicial.

25            THE COURT:  I don't suppose you would have any

1    objection to asking the question in that manner.

2            MR. WRIGHT:  We certainly can, if the Court

3    imposes us to.

4            THE COURT:  Beg your pardon?

5            MR. WRIGHT:  We certainly can do that, if that's

6    the Court's ruling, Your Honor.

7            THE COURT:  Well, it makes it a lot simpler.

8            MR. WRIGHT:  Yes, sir.  If that's the way the

9    Court is directing us to go.

10           THE COURT:  Yes, because that's how it will be

11   handled.  We'll be in recess.

12               (Recess at 10:43 until 10:55)

13           THE COURT:  Bring in the jury, please.

14               (The jury entered the courtroom)

15           THE COURT:  Proceed.

16   BY MR. WRIGHT:

17   Q.   Shannon, where we left off, you were talking with

18   Aleeyah on Sunday night, January 8, 2012.  Correct?

19   A.   Yes.

20   Q.   First of all, the conversation you had with Aleeyah,

21   was that a fairly short conversation?

22   A.   Yes.

23   Q.   During the conversation you had with Aleeyah, did you

24   feel she was in any particular distress?

25   A.   No.

1    Q.    Did she sound fairly normal to you?

2    A.    Yes.

3    Q.    Were you concerned about her at all that particular

4    night?

5    A.    No.

6    Q.    That particular Sunday night on January 8, is that the

7    last time you talked to your daughter when she was alive?

8    A.    Yes.

9              MR. WRIGHT:  Again, sir, may we have your

10   permission for her to write that on the calendar?

11             THE COURT:  Yes.

12   BY MR. WRIGHT:

13   Q.    On Sunday, January 8, could you write, "Aleeyah and

14   Shannon talked last time."

15   A.    (Witness complies)

16   Q.    That Sunday night during that conversation with the

17   Defendant and Aleeyah, did you also talk to the Defendant,

18   Mr. Contreras, about the child-support obligation?

19   A.    Yes.

20   Q.    Did Mr. Contreras propose anything to you?

21   A.    Yes.  He wanted to file for joint custody and stop the

22   child support.

23   Q.    Did he explain that he was hoping not to pay anymore

24   child support?

25   A.    Yes.

```
 1   Q.    Were you aware that he owed child support to four
 2   other women for six other children?
 3   A.    Yes.
 4   Q.    When he asked you to terminate the child support, what
 5   did you say?
 6   A.    I said "no."
 7   Q.    What did he say after you said "no"?
 8   A.    He said, "Well, we're just going to have to talk about
 9   it in person."
10   Q.    Shannon, I want to ask you about Monday, January 9th.
11   I know that's a difficult day for you, so if you need to
12   slow me down, go ahead.
13        Did you receive a call at about 8:30 that morning?
14   A.    Yes.
15   Q.    Who was on the phone?
16   A.    Mario.
17   Q.    What did he say?
18   A.    He said, "You need to come down to Coteau.  Aleeyah is
19   in ICU."
20   Q.    And Coteau is the hospital in Sisseton?
21   A.    Yes.
22   Q.    But that's not the hospital where Mario worked at.  Is
23   it?
24   A.    No.
25   Q.    You got that call.  What did you do?
```

```
 1   A.    Hung up the phone.  I rushed down to the hospital.

 2   Q.    When you are going to the hospital, what's going

 3   through your mind?

 4   A.    Thinking maybe she just got a little hurt, and she

 5   would be okay when I got there.

 6   Q.    Did you go to the hospital?

 7   A.    Yes.

 8   Q.    Is that the Coteau Hospital?

 9   A.    Yes.

10   Q.    When you got to the Coteau Hospital, did you find

11   Aleeyah?

12   A.    Yes.

13   Q.    Tell us about that.

14   A.    She was just laying in the bed unresponsive.

15   Q.    Could she speak to you?

16   A.    No.

17   Q.    Do you recall where they had her in the hospital?

18   A.    In the ICU room.

19   Q.    After a short period of time, did the doctors tell you

20   something about what they wanted to do with Aleeyah?

21   A.    Yes.

22   Q.    What was that?

23   A.    To Life Flight her to Fargo.

24   Q.    Did they have to ask your permission to airlift her to

25   Fargo?
```

```
 1    A.    Yes.

 2    Q.    Did they tell you why they were taking her to Fargo?

 3    A.    Just that she was unresponsive, and she needed more

 4    care.

 5    Q.    Did you agree they could take her to Fargo?

 6    A.    Yes.

 7    Q.    Was Aleeyah airlifted up there?

 8    A.    Yes.

 9    Q.    Was that to the Sanford Hospital?

10    A.    Yes.

11    Q.    Shannon, did you end up going up to Fargo?

12    A.    Yes.

13    Q.    Did you fly or drive?

14    A.    I drove.

15    Q.    Do you know, did the Defendant, Mr. Contreras, go to

16    Fargo?

17    A.    Yes.

18    Q.    Did you travel with him up there?

19    A.    No.

20    Q.    Did you alert a number of your family members

21    regarding Aleeyah going up to Fargo?

22    A.    Yes.

23    Q.    When you got to Fargo, I'm not asking what was said,

24    but did you talk to a number of doctors up there?

25    A.    Yes.
```

1    Q.   Can you describe where your family was and where

2    Mr. Contreras' family was up there in Fargo?

3    A.   We were in different waiting rooms.

4    Q.   Were you around the Defendant, Mr. Contreras, much

5    that Monday morning?

6    A.   Not very much.

7    Q.   Do you recall what his demeanor was the few times you

8    were around him?

9    A.   Very quiet.

10   Q.   Now, at Fargo did you have a consultation with a

11   pediatrician named Dr. Arne Graff?

12   A.   Yes.

13   Q.   You are aware Dr. Graff is on our witness list and may

14   testify in this case?

15   A.   Yes.

16   Q.   Shannon, were you present when Dr. Graff told the

17   Defendant, Mr. Contreras, that Aleeyah's injuries were

18   totally inconsistent with a fall?

19   A.   Yes.

20   Q.   What did the Defendant say at that point?

21   A.   He really didn't say nothing.

22   Q.   He didn't even respond.  Did he?

23   A.   No.

24   Q.   Was Aleeyah alive the rest of the day on Monday,

25   January 3rd?

```
1    A.    Yes.

2    Q.    Was she still alive overnight?

3    A.    Yes.

4    Q.    Where did you stay in the hospital that night?

5    A.    With Aleeyah.

6    Q.    In her room?

7    A.    Yes.

8    Q.    Why did you want to stay in her room?

9    A.    She's my daughter.

10   Q.    Do you know where the Defendant stayed that night?

11   A.    No.

12   Q.    Did he stay in the room with you?

13   A.    No.

14   Q.    I want to go to Tuesday, January 10.   Was Aleeyah

15   still alive?

16   A.    Yes.

17   Q.    Now, Shannon, on Tuesday did the doctors talk to you

18   about taking her off life support?

19   A.    Yes.

20   Q.    And can I imagine that was a very difficult thing for

21   you to consider?

22   A.    Yes.

23   Q.    Did you want to talk to someone from another city

24   about that?

25   A.    Yes.
```

```
1    Q.    Who was that?

2    A.    Dr. Geier from Watertown.

3    Q.    Is Dr. Geier from Watertown, is that a man or woman?

4    A.    A woman.

5    Q.    Had she been Aleeyah's primary physician during the

6    two years she was alive?

7    A.    Yes.

8    Q.    I'm not asking you what you and Dr. Geier said, but

9    did Dr. Geier come up to Sanford and talk to you?

10   A.    Yes.

11   Q.    In Fargo?

12   A.    Yes.

13   Q.    Did the two of you talk about that painful decision of

14   whether to terminate the life support?

15   A.    Yes.

16   Q.    On Wednesday, January 11, was the life support

17   terminated?

18   A.    Yes.

19   Q.    Was that a very hard decision?

20   A.    Yes.

21   Q.    I know you didn't write this down, but if you recall,

22   about what time on Wednesday, the 11th, did you terminate

23   life support?

24   A.    About 5:00 p.m.

25   Q.    And that's when she officially died?
```

```
 1    A.   Yes.

 2              MR. WRIGHT:  Could I ask her to leave the witness

 3    stand again, Your Honor, to write something on the

 4    calendar?

 5              THE COURT:  Yes.

 6    BY MR. WRIGHT:

 7    Q.   On the 11th could you just write, "Aleeyah dies."

 8    A.   (Witness complies)

 9    Q.   Could you tell the jury how your daughter's death has

10    affected your life?

11    A.   I don't feel like I have a life anymore.  She was my

12    only daughter, my only daughter I had.  My life ain't

13    normal anymore.

14              MR. WRIGHT:  Thank you.  That's all.

15              THE COURT:  You may examine.

16              MR. KHOROOSI:  Thank you.

17                     CROSS-EXAMINATION

18    BY MR. KHOROOSI:

19    Q.   Good morning, Miss Sine.

20    A.   Good morning.

21    Q.   Feel free to take as much time as you need.

22         Is it safe to say you didn't know Mario very well at

23    the time you became pregnant?  Is that true?

24    A.   Right.

25    Q.   And you didn't really know how he would react to
```

1    hearing news about his daughter.  Correct?

2    A.   Can you rephrase that?

3    Q.   I guess it would be hard to predict how he would react

4    to Dr. Graff telling him certain information about his

5    daughter.  Correct?

6    A.   Yes.

7    Q.   Now, you spoke with Agent Mertz on a couple of

8    occasions.

9    A.   Yes.

10   Q.   You talked about how Aleeyah was physically.

11   A.   Yes.

12   Q.   You talked about the fact that it was kind of a joke

13   within the family that she had a big head and a small body.

14   A.   I wouldn't say that.

15   Q.   You told Agent Mertz that she was a clumsy child and

16   fell a lot?

17   A.   No, I didn't.

18   Q.   You and Mario communicated a lot by text message.

19   Didn't you?

20   A.   Yes.

21   Q.   Gave each other updates on how Aleeyah was doing?

22   A.   Yes.

23   Q.   In fact, at one point you asked Mario to take Aleeyah.

24   Otherwise Social Services would come and get her.  Correct?

25           MR. WRIGHT:  Object, Your Honor.  May we

1    approach?

2           THE COURT:  You may.

3    (Side bar with all counsel:)

4           MR. WRIGHT:  We would ask that be stricken.  This

5    is an example of the issue we filed on a motion in limine,

6    any bad acts, Social Services, DSS, drinking, or any of

7    that.  The Court was very clear that you said before

8    anybody goes into that, we had to approach the bench and

9    get your permission.  I would ask that be stricken, and he

10   not be allowed to go into that.

11          MR. KHOROOSI:  Judge, this goes directly to the

12   characteristics of the alleged victim.  It would be our

13   argument that she was a vulnerable child who was readily

14   exposed to abuse and neglect.  This is a central theme to

15   our defense.  It's absolutely necessary to make this point.

16          MR. WRIGHT:  It's character.

17          THE COURT:  I ruled, though -- just a moment.

18     The Government's request for motions in limine was

19   prohibiting reference or questions regarding the prior

20   arrest conviction or police reports regarding the child's

21   mother or her husband.  Then it was pointed out that

22   Document 59 was really the same thing, and I already ruled

23   on No. 8.

24     So this business about Social Services taking her

25   away, among other things, could reflect on the character of

1    the mother.  That's a type of prior bad act, even though

2    it's not a conviction.  That's something we should take up

3    out of the presence of the jury.

4         I'm not going to strike it now.  I'll have a hearing.

5    If I do strike it, I'll strike it afterwards.  We're going

6    to have the hearing right now.

7    (End of side bar)

8              THE COURT:  Sorry to have you go out for a bit,

9    but there's an evidentiary matter that I have to take care

10   of now.  Don't talk about the case.  Keep an open mind.

11   We'll be in recess very shortly for just a little bit.

12   Please stand for the jury.

13                   (The jury left the courtroom)

14   (Out of the presence of the jury, counsel and Defendant

15   present, the following proceedings occurred:)

16             THE COURT:  Please be seated.  All right.  Where

17   does the defense think it's going?  I want to hear that,

18   and I want to hear the Government's objection.

19             MR. KHOROOSI:  Well, among other things,

20   Your Honor, one of the components to our defense is that

21   Aleeyah had preexisting injuries at the time she sustained

22   the fall on January 9.

23        It's essential that we establish that Aleeyah is or

24   was a vulnerable child whose primary residence was a place

25   where she was not safe, that she was a child who was

 1    injured at other times.

 2              THE COURT:  Move the microphone towards you.

 3              MR. KHOROOSI:  Aleeyah sustained injuries in her

 4    primary home close in time to January 9, relatively

 5    speaking.  The Court has allowed evidence in that -- I

 6    understand we're talking about different subsections of

 7    Rule 404.  But the Court has allowed evidence in that Mario

 8    spanking the child in August of 2011 is admissible, and

 9    it's close enough in time and similar enough in character.

10         I think the evidence will establish that there was

11    drinking in the home.  There was violence in the home.

12    There was an unexplained bruise she sustained shortly

13    before her fall that Mario asked Miss Sine about.  It was

14    on her forehead.  These are all relevant to our case.

15         Further, Your Honor --

16              THE COURT:  Just a minute.  The question you

17    asked was with regard to Social Services.

18              MR. KHOROOSI:  Yes.

19              THE COURT:  That's a different question.  It

20    might be related to those things you're talking about.  But

21    I want to know specifically where you were going with your

22    questioning.

23              MR. KHOROOSI:  Where I was going with the

24    questioning, Your Honor, is to establish, number one, that

25    Miss Sine felt Mario's home was a safe place, even safer

1    than her own.  That impeaches her previous testimony that

2    she was afraid to send her over there.

3              THE COURT:  Are you going to have anybody from

4    Social Services that you propose is going to testify?

5              MR. KHOROOSI:  No.

6              THE COURT:  Well, Social Services can be involved

7    for a whole variety of reasons, and do you have any

8    evidence that Social Services either initiated or, in fact,

9    took away Aleeyah from the home?

10             MR. KHOROOSI:  No, Your Honor.  However, it's not

11   being used to prove the truth of the matter asserted.  It's

12   not being used to prove that Social Services said they

13   would take the child away.  It is used to prove that

14   Miss Sine believed that she was going to lose the children,

15   and they would be placed in foster care.

16             THE COURT:  Can you read back the question that

17   started all this?

18   (The requested portion of the record was read by the

19   reporter.)

20             THE COURT:  Do you have evidence to support that

21   question?

22             MR. KHOROOSI:  Your Honor, now that I look at the

23   records, I don't.  I have evidence -- so I will withdraw

24   that question.  However, the evidence will -- the document

25   I have in front of me has a text message from Miss Sine

1    saying, "Answer your phone.  Aleeyah is going to go in a

2    foster home if not."

3            THE COURT:  Well, that can mean a whole bunch of

4    things.  When was that?

5            MR. KHOROOSI:  December 13, 2011.

6            THE COURT:  Let me hear from the Government on

7    that.

8            MR. WRIGHT:  Your Honor, this is exactly the

9    reason why we filed motion in limine No. 8 in Docket 31,

10   and then Mr. Maher, one of our co-counsel, filed Docket 59,

11   character evidence of victim's mother.

12       Any reference to drinking, any reference to a prior

13   DWI, any reference to anybody being in jail for a period of

14   time, any reference to Social Services is all what we

15   believe to be an improper attempt to dirty up the victim's

16   mother.

17       As I stated during our pretrial conference, the

18   Defendant himself has been in jail five times.  We aren't

19   going into any of those.  We don't think it's proper that

20   the defense go into anything regarding anything that was

21   alleged against the victim, any drinking or anything like

22   that.

23       He just admitted he didn't have any evidence or basis

24   for the last question.  We're seeking to preclude them from

25   improperly putting in character evidence under the illusion

1    that there was some kind of an investigation or she was

2    about to lose her children.

3        As the Court stated, a DSS inquiry or investigation

4    means very little.  I could get Mr. Miller's kids

5    investigated tomorrow just by making a call.  They are

6    mandatorily required to work on any investigation, no

7    matter how frivolous.

8        So we would ask there be no reference at all during

9    this trial to any character involving Shannon or Sam,

10   unless, again, it's a conviction of a felony or a crime

11   involving dishonesty.  That's assuming those people

12   testify.  It's central to our motion in limine.

13       I understood the Court's pretrial conference, and I

14   understand the Court tells us the law and not the reverse.

15   I thought the Court very clearly said to both of us, "Don't

16   go into any of this stuff until you first approach the

17   bench."

18            THE COURT:  Well, it's been agreed that question

19   will be stricken.  But, for instance, if there is other

20   bruising, which defense counsel claims, on the forehead,

21   that's proper.  You can go into that.

22       The fact that without any other showing, other than

23   the fact that there's drinking in the house and so on,

24   that's not in and of itself admissible.  I mean you would

25   have to establish a greater basis for that coming in than

```
 1    just simply the fact there's drinking in the house.

 2         With regard to this question we're talking about, if

 3    she's going to Social Services, that, on the other hand,

 4    could be some of the puffery that goes on back and forth

 5    between parents of a child where there is -- where the

 6    parents are not living together.  Without more, we're not

 7    going to go into that.

 8         But the bruising and other things that actually

 9    happened to this child, that's fair game, and you can go

10    into it.  That's not precluded by anything the Court ruled

11    in the pretrial conference.

12         Does either side have any questions about that?

13              MR. WRIGHT:  No, sir.

14              MR. KHOROOSI:  No, Your Honor.

15              THE COURT:  Okay.  Bring in the jury, please.

16                  (The jury entered the courtroom)

17              THE COURT:  Please be seated.  The jury is

18    instructed to disregard the last question.  There wasn't an

19    answer to the question, anyway, but disregard the last

20    question that was asked.

21         Go ahead, Mr. Khoroosi.

22              MR. KHOROOSI:  Thank you, Your Honor.

23    BY MR. KHOROOSI:

24    Q.  Miss Sine, on the evening of December 14th, Mario had

25    visitation with Aleeyah.  Didn't he?
```

254

1    A.    I can't remember.

2    Q.    He had visitation with her around that time.  Would

3    you agree?

4    A.    Yes.

5    Q.    Around that time when he had visitation with her, he

6    asked you about a bruise on her forehead, where it had come

7    from.  Correct?

8    A.    I don't remember that.

9    Q.    You testified regarding a conversation you and Mario

10   had about child support.

11   A.    Yes.

12   Q.    And on or about the 3rd of January, 2012, so within a

13   week or so before Aleeyah passed away, you offered Mario

14   half custody.  Didn't you?

15   A.    I didn't offer it.  I told him I wanted to talk about

16   it.

17   Q.    In fact, your words were, "Would you be able to have

18   baby half and half, and with an agreeance that there is no

19   child support, the case would be closed."  You sent that in

20   a text message to Mario.  Didn't you, ma'am?

21   A.    I don't remember.  I don't have my text messages.

22   Q.    But you sent a text message to the substance of that.

23   Would it refresh your recollection to see a printout of the

24   text messages?

25   A.    Sure.

```
 1              MR. KHOROOSI:  May I approach, Your Honor?

 2              THE COURT:  Sure.  You may.

 3   BY MR. KHOROOSI:

 4   Q.  Ma'am, I apologize I only have one copy of this.  I'm

 5   going to grab a pen.  I'd like to draw your attention

 6   specifically to the bottom of this page and the top of the

 7   next one.

 8              MR. WRIGHT:  What page number are you on?

 9              MR. KHOROOSI:  For counsel's benefit, I'm on

10   Bates stamp 411 of the Government's discovery.  It would be

11   Page 19 of 25 of the collection of text messages.

12   BY MR. KHOROOSI:

13   Q.  Has your recollection been refreshed, ma'am?

14   A.  Yes, sir.

15   Q.  So you did say, "Would you be able to have baby half

16   and half, and with an agreeance that there is no child

17   support, the case would be closed."

18   A.  Yes.

19   Q.  And that was after the spanking incident.  Correct?

20   A.  Yes.

21   Q.  During the -- I'm sorry, your testimony was after you

22   discovered the mark on Aleeyah, you called Mario and he

23   told you what happened?

24   A.  Yes.

25   Q.  On January 9th Mario called you and told you Aleeyah
```

1  was in the hospital.  Didn't he?

2  A.   Yes.

3  Q.   Called you right away in the morning.  Didn't he?

4  A.   Yes.

5  Q.   Now, you testified you had taken Aleeyah in for her

6  Head Start examination.

7  A.   Yes, I did.

8  Q.   That was the one on 12-28-11?

9  A.   Yes.

10 Q.   That's probably like a million other appointments.

11 You answered a bunch of questions about Aleeyah?

12 A.   I have answered a lot.

13 Q.   You were asked questions regarding Aleeyah's living

14 situation.  Is that correct?

15 A.   I don't believe so.  Just that she lived with me, and

16 I had custody of her.

17 Q.   Did you inform the staff at the hospital that she

18 lives with parents and three siblings?

19 A.   She lives with two siblings and me and my husband.

20 Q.   So if the medical records would reflect that she lives

21 with her parents and three siblings, that's incorrect?

22          MR. WRIGHT:  Object to the relevance of this.

23          THE COURT:  Overruled.

24 A.   I do have a stepson that stays with us sometimes.

25 BY MR. KHOROOSI:

1    Q.   So is that what you told the hospital that day?

2    A.   Yes.

3    Q.   So the medical record is correct.

4    A.   Three children, yes.

5    Q.   And you were asked whether there was domestic violence

6    in the home?

7    A.   Yes.

8              MR. WRIGHT:  Your Honor, may we approach?

9              THE COURT:  You may.

10   (Side bar with all counsel:)

11             MR. WRIGHT:  Same objection.  He's trying to get

12   in through some kind of hospital record something he can't

13   prove otherwise.  If he has evidence as to specific days,

14   and, again, the reports brought up we believe there was

15   essentially absolutely none that would come in, that any

16   reference to hospital or DSS investigations or anything

17   like that all goes to character.  We ask that that be

18   precluded.

19             THE COURT:  What's the evidence you are hoping to

20   get in?

21             MR. KHOROOSI:  What I'm hoping to get in,

22   Your Honor -- well, first of all, it's impeachment

23   evidence.

24             THE COURT:  Impeachment how?

25             MR. KHOROOSI:  Because she informed the hospital

 1    that there was no domestic violence.  It says that in the

 2    medical reports.  However, there was an incident that she

 3    was actually charged for in which she allegedly assaulted

 4    her mother.

 5              THE COURT:  When?

 6              MR. KHOROOSI:  It was close in time to the

 7    child's death.  I have the Complaint.  I can't recall

 8    exactly.  She was charged with assaulting her mother.

 9              THE COURT:  In Tribal Court?

10              MR. KHOROOSI:  Yes.

11              MR. WRIGHT:  She has no conviction of that.

12              MR. KHOROOSI:  I've had the toughest time trying

13    to get records from these people.  I've been told they have

14    incomplete files, Complaints without resolutions.  I have a

15    Complaint, but no order dismissing the charge.  No judgment

16    of acquittal or judgment of conviction.  I'll admit that.

17       I have a Complaint.  I think it's fair game to

18    cross-examine whether or not the incident happened, because

19    there is --

20              THE COURT:  Which incident?  The incident with

21    her mother?

22              MR. KHOROOSI:  The incident with her mother.  My

23    understanding of the incident --

24              THE COURT:  We should have talked about this at

25    the pretrial conference, if you were going to bring this

1    up.

2            MR. KHOROOSI:  My understanding of the incident,

3    Your Honor, is that Miss Cook went to punch her mother in

4    the face while the mother was holding Aleeyah, missed and

5    hit Aleeyah.

6            THE COURT:  Where does your understanding come

7    from?

8            MR. KHOROOSI:  It comes from others who didn't

9    witness the incident.

10           THE COURT:  So it's hearsay.  I mean that's too

11   collateral.  Obviously if we had a conviction, we would be

12   talking about something else.  This is too collateral.

13           MR. KHOROOSI:  Judge, can I use the allegations

14   as impeachment evidence?

15           THE COURT:  Because the medical record said what?

16           MR. KHOROOSI:  The medical record says it's

17   negative for domestic violence.

18           THE COURT:  You can't prove domestic violence,

19   though.

20   (End of side bar)

21           MR. WRIGHT:  Your Honor, is our objection

22   sustained to the last question then?

23           THE COURT:  It is.

24   BY MR. KHOROOSI:

25   Q.   Mario regularly updated you when Aleeyah was in his

1    care.  Didn't he?

2    A.   Yes, he did.

3    Q.   He didn't tell you what -- he would tell you what she

4    had eaten?

5    A.   Yes.

6    Q.   Tell you what she had to drink?

7    A.   Yes.

8    Q.   After the alleged spanking incident in August, you

9    didn't stop visitation.  Did you?

10   A.   No, I didn't.

11   Q.   You didn't call the police.  Did you?

12   A.   No, I didn't.

13   Q.   You didn't take Aleeyah to the hospital.  Did you?

14   A.   No, I didn't.

15   Q.   You didn't discover the marks you say you saw until

16   you were changing her diaper the next morning.  Correct?

17   A.   Correct.

18   Q.   So it wasn't -- you weren't compelled to look by

19   Aleeyah screaming in pain every time she sat down?

20   A.   No.

21   Q.   You testified earlier that you were unaware of a

22   Mongolian spot Aleeyah had.  Was that your testimony?

23   A.   Yes.

24   Q.   If Dr. Froloff noticed a three-centimeter Mongolian

25   spot, your testimony is he would be incorrect?

1          MR. WRIGHT:  Excuse me, Your Honor, stating facts

2    not in evidence.

3          THE COURT:  Well, just a moment.  I believe it's

4    up to the jury to recollect whatever the evidence is.  It's

5    my recollection that the doctor testified there was such a

6    spot.  He didn't say what size it was.  Maybe I'm wrong,

7    but that's my recollection.  What was your objection?  That

8    he didn't testify to it at all or that he didn't testify as

9    to the size of it?

10          MR. WRIGHT:  I guess we don't recall he mentioned

11   it at all.  I believe Mr. Khoroosi asked him about it, but

12   he didn't recognize it.  But, again, as you said, it's the

13   jury's recollection.

14          THE COURT:  It's up to the jury.  I'm not sure.

15   If it's in his report, we can ask about it, anyway.  Go

16   ahead.

17   BY MR. KHOROOSI:

18   Q.   Did you read the autopsy report?

19   A.   No, I didn't.

20   Q.   So my question was, if Dr. Froloff included it in his

21   autopsy report that she had a Mongolian spot measuring

22   three centimeters on her buttocks, would that be incorrect?

23   A.   I believe so, yes.

24   Q.   You believe it would be incorrect?

25   A.   Yes.

1           MR. KHOROOSI:  That's all I have.  Thank you.

2           THE COURT:  Redirect?

3           MR. WRIGHT:  Very briefly, Your Honor.

4                      REDIRECT EXAMINATION

5    BY MR. WRIGHT:

6    Q.   Shannon, regarding the last questions about the

7    possibility of this being a Mongolian spot, Aleeyah was

8    approximately 18 months old at the time she came back from

9    Mario in August of 2011.  Correct?

10   A.   Yes.

11   Q.   Can I assume in the prior 18 months you would have

12   changed her diaper many times?

13   A.   Yes.

14   Q.   Had you ever noticed that handprint or spot before

15   that weekend you gave her to Mario?

16   A.   No.

17   Q.   Was it after she came back that you first noticed that

18   thing that you thought was a handprint?

19   A.   Yes.

20          MR. WRIGHT:  Thank you.  That's all.

21          THE COURT:  Anything further?

22          MR. KHOROOSI:  Nothing further.

23          THE COURT:  Thank you.  You may step down.

24                   (Witness excused)

25          THE COURT:  Call your next witness.

1          MR. WRIGHT:  Deb Crawford.

2                    DEB CRAWFORD,

3     called as a witness, being first duly sworn, testified as

4     follows:

5                  DIRECT EXAMINATION

6     BY MR. WRIGHT:

7     Q.   Would you state your name, please.

8     A.   My name is Debbie Crawford.

9     Q.   Where do you live?

10    A.   I live in Sisseton, South Dakota.

11    Q.   Are you married?

12    A.   Yes.

13    Q.   Do you have any children?

14    A.   I have three children.

15    Q.   Three?

16    A.   Three.

17    Q.   Can you give us your education, please?

18    A.   I have a Bachelor's degree from the University of

19    North Dakota in Grand Forks.  I also have a Master's degree

20    in social work from the University of Wisconsin-Madison.

21    Q.   Are you currently employed?

22    A.   Yes.

23    Q.   Where do you work?

24    A.   I work for Indian Health Services as a clinical social

25    worker in the mental health department.

1   Q.   Can you tell us your general duties, please?

2   A.   Right now for the last five years I have been a

3   clinical social worker, which basically means I do

4   counseling, therapy, crisis counseling, actually couples

5   counseling, as well.  I also do a lot of suicide

6   assessments, risks.  I make appropriate referrals.  Gosh,

7   just anything that's related to mental health.

8   Q.   Did you know Aleeyah Cook?

9   A.   Yes.

10   Q.   How did you know Aleeyah?

11   A.   She is my step-granddaughter.  My son married Shannon,

12   and I met Aleeyah when she was one.

13   Q.   So is Shannon's current husband, Sam Sine, your son?

14   A.   Yes.

15   Q.   So you are the step-grandmother?

16   A.   Step-grandmother.  Well, we just say grandmother or

17   takoja.

18   Q.   Deb, if you can look over your right shoulder, is that

19   Aleeyah there?

20   A.   Yes.

21   Q.   I want to ask you about Monday, January 9 of 2012.

22   Were you summoned to the emergency room in Sisseton?

23   A.   Yes.

24   Q.   I'm not going to ask you what was said, but who called

25   you?

```
1    A.    My son.

2    Q.    Your son, Sam?

3    A.    Yes.

4    Q.    When you got there, were you allowed to see Aleeyah?

5    A.    Yes.

6    Q.    In what kind of shape was she in?

7    A.    She was in the ICU room.  She was on the -- they had

8    intubated her already, I believe, and they were breathing

9    with the airbag for her, and she was laying on the gurney.

10   Q.    Was this shortly after you initially arrived at the

11   hospital?

12   A.    When I got to the hospital, yes.  Sam and Shannon were

13   in the ICU room, and I went there, and that's when I saw

14   Aleeyah.

15   Q.    Was there Dr. Gallagher working at the hospital?

16   A.    Yes.

17   Q.    Is Dr. Gallagher a man or woman?

18   A.    He's a man.

19   Q.    At some point that Monday morning was Dr. Gallagher

20   trying to assemble the family members to ascertain what

21   happened to Aleeyah?

22   A.    Yes, he was.

23   Q.    Who was there when Dr. Gallagher was talking?

24   A.    I think because we had so many questions, so he did

25   want us to come into the family room to discuss what is
```

1    going on, what had happened.

2    Q.   Do you know the Defendant in this case,

3    Mario Contreras?

4    A.   Yes.

5    Q.   Do you see him in the courtroom?

6    A.   Yes.

7    Q.   Where is he at, please?

8    A.   There.  (Witness indicating)

9    Q.   Was he one of the individuals that was there with

10   Dr. Gallagher when Dr. Gallagher was trying to get some

11   history on what happened?

12   A.   Yes, he was.

13   Q.   Was Mr. Contreras the individual you understood -- the

14   only adult that had been with Aleeyah prior to her coming

15   to the hospital?

16   A.   Yes.

17   Q.   Did you understand he's the one that brought her to

18   the hospital?

19   A.   Yes.

20   Q.   But not by ambulance?

21   A.   No.

22   Q.   When Dr. Gallagher was there and the family was

23   assembled, was Dr. Gallagher concentrating a lot of his

24   questions then to Mr. Contreras?

25   A.   He was.

1    Q.    I'm not asking you what Dr. Gallagher said, but can

2    you describe Mr. Contreras' level of cooperation with

3    Dr. Gallagher?

4    A.    Mario was very quiet.  He didn't speak.  Much of the

5    time he was just looking like that.  He didn't talk.

6          My impression was that Dr. Gallagher was having to

7    probe very much to get information from him about the

8    sequence of what had happened just within the last few

9    hours or hour.

10   Q.    When Dr. Gallagher was asking all these questions of

11   Mr. Contreras, was Mr. Contreras giving very, very short

12   answers?

13   A.    He was giving short answers like "yes," "no," "here,"

14   "there."  Kind of very, very short answers.  That's why

15   Dr. Gallagher had to keep saying, "Okay, well, so when this

16   happened," and "When did this happen?"

17   Q.    Did you find this unusual?

18   A.    Yes.

19   Q.    Why?

20   A.    As a social worker --

21          MR. KHOROOSI:  Objection, Your Honor.  The

22   witness hasn't been qualified as an expert.

23          THE COURT:  She can testify as to her own

24   observations.

25   A.    I've been a social worker --

```
 1              MR. KHOROOSI:  Same objection.

 2              THE COURT:  Not as an expert.  Just simply your

 3    own observations.

 4    BY MR. WRIGHT:

 5    Q.   Not as a social worker, just your own observation as

 6    being a member of the family.

 7    A.   He was emotionless, just flat face.

 8    Q.   Were the answers to the doctor's questions all very

 9    short or one-word answers?

10    A.   Short, one-word.  I would expect someone to say

11    everything right then what happened.  "This is what

12    happened."  "This is what happened."  "Then I did this."

13    Right away, because your child is being ventilated or

14    whatever, and you want to give as much information to the

15    doctor right away, because they can still help her and not

16    just --

17    Q.   Did it take Dr. Gallagher a while to get information

18    from the Defendant?

19    A.   To me it did, yes.

20    Q.   Was the Defendant fairly emotionless?

21    A.   Yes.

22              MR. WRIGHT:  Thank you.  That's all.

23              THE COURT:  You may examine.

24              MR. KHOROOSI:  Thank you.

25                        CROSS-EXAMINATION
```

BY MR. KHOROOSI:

Q.   Good morning, Miss Crawford.  Is it fair to say that seeing Aleeyah in the condition she was in was fairly traumatic for you?

A.   Yes.

Q.   Would you agree with me that it would be more traumatic for her parents?

A.   Yes.

Q.   You would further agree with me that individuals handle trauma in different ways from your experience as a person?

A.   No.  In an acute situation --

Q.   There is no question, ma'am.

A.   Okay.  No.  They all pretty much are the same with traumas.

Q.   They are all pretty much the same?

A.   Frantic, screaming, crying.

Q.   Ma'am, there is no question.

A.   Sorry.  I just --

Q.   Don't answer unless there's a question.  Thank you.

     So I'm looking for a yes or no answer.  You are saying it's completely impossible for someone to be in shock or silent as a result of being in a very traumatic situation? Are you saying it's impossible?

A.   From my experience --

1    Q.    What I'm asking you is are you saying it's impossible?

2    Yes or no.

3    A.    It's impossible.

4              MR. KHOROOSI:  Thank you.

5                        REDIRECT EXAMINATION

6    BY MR. WRIGHT:

7    Q.    Miss Crawford, as part of your duties, did you work

8    six years in an emergency room?

9    A.    Actually I worked nine years in the emergency room.

10   Q.    Have you seen a number of people come into the

11   emergency room with very severe injuries?

12             MR. KHOROOSI:  Your Honor, I'll object.  This is

13   beyond the scope of direct.  Again, he's trying to qualify

14   her as an expert.

15             THE COURT:  Sustained.  Beyond direct, and

16   attempting to back qualify.  Sustained.

17   BY MR. WRIGHT:

18   Q.    From your observations of the Defendant that day, was

19   his demeanor fairly emotionless?

20   A.    Yes.

21             MR. KHOROOSI:  Objection, Your Honor.  Asked and

22   answered.

23             THE COURT:  Overruled.

24             MR. WRIGHT:  Thank you.

25             THE COURT:  Anything further?

```
 1              MR. KHOROOSI:  Nothing further.

 2              THE COURT:  Thank you, ma'am.  You may step down.

 3                     (Witness excused)

 4              THE COURT:  Call your next witness.

 5              MR. WRIGHT:  May we approach, Your Honor?

 6              THE COURT:  You may.

 7   (Side bar with all counsel:)

 8              MR. WRIGHT:  We were wondering, with the Court's

 9   permission, if we could break for lunch, because our next

10   witness is scheduled for 1:00.

11              THE COURT:  We'll just about have to then, won't

12   we?  We can let the jury go and have the 404(b) on the

13   other one.  He was supposed to be here at 11:00 this

14   morning.

15              MR. WRIGHT:  That's what I told him.  I haven't

16   seen him yet, but I'll go check.

17              THE COURT:  I'll let the jury go.  All right.

18   (End of side bar)

19              THE COURT:  There is something we're going to try

20   to take care of out of the presence of the jury, so you're

21   going to have a little bit longer lunch than we are.  We'll

22   be in recess until 1:00.

23      Remember, don't talk to anybody else about the case.

24   Don't do any research of any kind on the case.  Keep an

25   open mind until all the evidence is in.  Don't even talk to
```

```
1    each other about the case.  Just go and enjoy lunch.  We'll

2    be in recess until 1:00.  Counsel will stay.

3                    (The jury left the courtroom)

4    (Out of the presence of the jury, counsel and Defendant

5    present, the following 404(b) proceedings occurred at

6    11:50 a.m.:)

7              THE COURT:  Please be seated.  Is your other

8    witness for the 404(b) here?

9              MR. WRIGHT:  May I check, Your Honor?

10             THE COURT:  Yes.  Some of the people in the

11   audience might wonder what in the world is this 404(b)

12   stuff.  That's a rule of evidence with regard to the

13   admission of the prior bad acts.

14                        AUSTIN LaPOINTE,

15   called as a witness, being first duly sworn, testified as

16   follows:

17             THE COURT:  Proceed.

18                      DIRECT EXAMINATION

19   BY MR. WRIGHT:

20   Q.   Sir, would you state your name, please.

21   A.   Austin LaPointe.

22   Q.   Austin, this is a big room.  Can you talk up nice and

23   loud for me?

24   A.   Austin LaPointe.

25   Q.   How old are you?
```

273

```
 1    A.    Sixteen.

 2    Q.    Where do you live?

 3    A.    Currently I live in Winnebago right now.

 4    Q.    Winnebago, Nebraska?

 5    A.    Yes.

 6    Q.    Are you going to enroll in school in the fall?

 7    A.    At TZ, back at TZ.

 8    Q.    What grade are you going to be in?

 9    A.    11th.

10    Q.    What's your mom's name?

11    A.    Oyate.

12    Q.    Oyate?

13    A.    Contreras.

14    Q.    Do you know the Defendant, Mario Contreras?

15    A.    Yes.

16    Q.    Was he married to your mom for a period of time?

17    A.    Yeah.

18    Q.    Are they divorced now?

19    A.    Yes.

20    Q.    Austin, do you have a number of brothers and sisters?

21    A.    I have one brother and a few sisters.

22    Q.    Did you know who Aleeyah Cook was?

23    A.    Yes.

24    Q.    Aleeyah is not your mom's natural daughter.  Was she?

25    A.    No.
```

```
1    Q.    You said you live in Winnebago, Nebraska, now?

2    A.    Yes.

3    Q.    When did you move there?

4    A.    I moved there last week.

5    Q.    Who lives in Winnebago with you?

6    A.    We live with my auntie right now and a few other

7    cousins.

8    Q.    Austin, what year were you born?

9    A.    1997.

10   Q.    From approximately 2001 to 2011, did you spend a lot

11   of time with the Defendant, Mario Contreras?

12   A.    Yes.

13   Q.    Why is that, sir?

14   A.    Can you explain that?

15   Q.    Well, he was married to your mom.  Right?

16   A.    Yes.

17   Q.    And you lived with your mom?

18   A.    Yes.

19   Q.    And he lived with you?

20   A.    Yes.

21   Q.    Did you live with Mario when he lived in North

22   Carolina?

23   A.    Yes.

24   Q.    For a period of time?

25   A.    Yes.
```

Q.   Did you also live with him for a period of time in
South Dakota?

A.   Yes.

Q.   And except for a period of time when he was in the
military, for a lot of that 10 or 11 years, were you living
and around Mario a lot?

A.   Yes.

Q.   Between that time period, 2001 and 2011, Mr. LaPointe,
were there ever times when Mario struck you on the head
with his hand or with his fist?

A.   Yes.

Q.   I know you are probably not counting them, but can you
give us a rough estimate of the number of times?

A.   Maybe more than 50.

Q.   Fifty?  Can you just demonstrate to the Court how
Mario would strike you on the head?

A.   Like that.  (Witness indicating.)

Q.   And the times he struck you on the head, what had you
done?  What did he tell you the reason he was hitting you
for?

A.   Discipline.

Q.   When he would hit you on the head during those 50 or
more times, did he hit you hard?

A.   Yes.

Q.   Did it hurt?

```
 1    A.    Yes.

 2    Q.    Did it hurt a lot?

 3    A.    Yes.

 4    Q.    During the times he struck you on the head, you said

 5    it was with either his fist or hand?

 6    A.    Yes.

 7    Q.    Did it make you cry?

 8    A.    Yes.

 9    Q.    Austin, do you remember an interview you did with

10    Stephanie Knapp in January of 2012?

11    A.    Yes.

12    Q.    During that interview did you describe that Mario

13    actually cracked you on the head, using that word?

14    A.    Yes.

15    Q.    Did you actually gesture with your own fist on your

16    own head during that interview?

17    A.    Yes.

18    Q.    Did you tell Ms. Knapp during that interview that you

19    didn't want to live with Mario anymore?

20    A.    Yes.

21    Q.    Was part of the reason because of the blows on the

22    head?

23    A.    Yes.

24    Q.    Did you ever tell your mom, either when she was

25    married to Mario or afterwards, that Mario was doing that
```

1    to you?

2    A.   Sometimes.

3    Q.   What was your mom's reaction?

4    A.   At times she didn't really care.

5    Q.   After you told your mom, is that when you moved to

6    Winnebago?

7    A.   No.  I moved to Winnebago because I wanted to, not

8    because of that reason.

9            MR. WRIGHT:  Thank you.  That would be the extent

10   of our offer, Your Honor.

11           MR. KHOROOSI:  I have a couple brief questions,

12   Your Honor.

13           THE COURT:  Very well.

14                   CROSS-EXAMINATION

15   BY MR. KHOROOSI:

16   Q.   Good morning, Austin.  You refer to Mario as your dad.

17   Don't you?

18   A.   Yeah.

19   Q.   Now, the times when you say Mario would hit you on the

20   head, these have been mostly in the past few years.

21   Correct?

22   A.   Yes.

23   Q.   You've lived with Mario since you were three, four

24   years old?

25   A.   Yes.

```
 1                MR. KHOROOSI:  Nothing further.  Thank you.

 2                THE COURT:  I have a couple questions.  Austin,

 3     how old were you when Mario first started hitting you on

 4     the head, if you can recall?

 5                THE WITNESS:  Probably have to say about 12, 13.

 6                THE COURT:  Did you ever have lumps on your head

 7     after that that you could feel?

 8                THE WITNESS:  Yeah.

 9                THE COURT:  Did you ever tell him, "Don't do

10     that.  Please stop."

11                THE WITNESS:  Yes.

12                THE COURT:  What did he say?

13                THE WITNESS:  He just kept going.

14                THE COURT:  Were you afraid of him?

15                THE WITNESS:  Yes.

16                THE COURT:  Why?

17                THE WITNESS:  I was afraid he would do it again.

18                THE COURT:  Did he ever do anything other than

19     hit you on your head?

20                THE WITNESS:  He just backhanded me.

21                THE COURT:  In the face?

22                THE WITNESS:  Yeah.

23                THE COURT:  How often?

24                THE WITNESS:  A lot.

25                THE COURT:  As many times as he would hit you on
```

1    the head?

2           THE WITNESS:  As many times as I would talk back.

3           THE COURT:  Then what would happen?

4           THE WITNESS:  He would hit me in the face.

5           THE COURT:  How many times did that happen, do

6    you think?

7           THE WITNESS:  I'd say more than 50.

8           THE COURT:  That he hit you in the face or hit

9    you in the head?

10          THE WITNESS:  He hit me like this sometimes, and

11   he would do that sometimes.

12          THE COURT:  The 50, though, you earlier said it

13   was more than 50 times that he hit you on the head.

14          THE WITNESS:  Yes.

15          THE COURT:  Then separate from that, how many

16   times did he hit you in the face, slap you?

17          THE WITNESS:  Probably more than 50.  Not at a

18   time, but growing up, I would say more than 50.

19          THE COURT:  I take it your mother did not

20   intervene.  Is that right?

21          THE WITNESS:  No.

22          THE COURT:  Thank you.  Did the Court's questions

23   give rise to questions by either side?

24          MR. WRIGHT:  No, sir.

25          MR. KHOROOSI:  No, Your Honor.

1          THE COURT:  Thank you, Austin.  You can step

2    down.

3                   (Witness excused)

4          THE COURT:  I'll hear from the Government briefly

5    on this, and then from the defense.

6          MR. WRIGHT:  Your Honor, our position is detailed

7    in our motion, in our brief.  We believe this is proper

8    404(b) evidence.  Actually the cross-examination this

9    morning and the Court's questions show these were very

10   recent acts, happened close in time to the date of the

11   offense in this case.  It involves blows to the head and

12   blows to the face.  It again goes to the 404(b) rule, act

13   of mistake or accident.

14      The fact the Defendant did strike this child around 50

15   times in his head with his fists, we believe bolsters our

16   position the fact that the daughter, Aleeyah Cook, did not

17   die from a fall.  It goes to rebut their defense that they

18   say this was an accident, which is already in evidence

19   through Agent Mertz' testimony.

20      We did file a brief.  All of our authorities are in

21   there.  As the Court said earlier, the Rule 404(b) is a

22   rule of inclusion.  I don't believe there was anything

23   submitted in response by the defense in terms of

24   authorities.  We would ask the Court to receive the

25   testimony with the proper limiting instruction.

```
 1              THE COURT:  Mr. Khoroosi?

 2              MR. KHOROOSI:  Your Honor, we're dealing with

 3      evidence that's of a different character than the previous

 4      404(b) evidence.

 5              The fact that we're not talking about the alleged

 6      victim here is one of the main differences.

 7              The other, Your Honor, is that we're dealing with a

 8      child who is much, much older than Aleeyah was.  As Austin

 9      said, he lived with Mario until he was -- from the time he

10      was three or four years old until just recently.  I'm

11      guessing when Mario was indicted.

12              Only in recent years, as he started to grow older and

13      more physically capable of handling that type of

14      discipline, would Mario exercise that form of discipline.

15      He didn't testify to anything that happened when he was

16      younger.

17              In that respect, Austin's testimony is not relevant to

18      the material.  It's not relevant to the nature of the

19      charges.  It's not similar in kind.  Even though it's an

20      alleged act that's similar in kind, it's not similar in

21      kind as far as the nature of the alleged victim.

22              Finally, it's much more prejudicial than probative.

23      There is little, if any, doubt in my mind that a jury

24      instruction would not prevent the jury from using this

25      evidence as propensity evidence.
```

1        This evidence is completely -- this evidence is the

2   reason for our motion to sever Count 4.  If the Court's

3   order severing Count 4 is to have any effect on this trial

4   whatsoever to increase the fairness, we can't allow this

5   evidence in, Judge.  Thank you.

6            THE COURT:  The Government is the one obviously

7   moving to keep this -- put this evidence in.  I'm going to

8   allow a response from each party.  I'll tell you what is

9   concerning me about this evidence.

10       The evidence -- there's evidence that Aleeyah was a

11  fussy child in the morning.  A lot of pressure on the

12  Defendant to get to work.  Three other children, two of

13  them older in watching television, but then two little

14  ones, with Aleeyah being a fussy child in the morning.

15       Then Austin, once he gets to adolescence, is when,

16  accepting his testimony, once he gets to adolescence,

17  that's when he starts getting hit about the head by the

18  Defendant, which, once again, is a reaction to an acting up

19  in some instances probably by Austin, and Aleeyah is a

20  little child acting up with the Defendant.

21       If you say the Defendant, which is the Government's

22  theory, beat her on the head, then the propensity to

23  respond to a child is -- that evidence from this witness is

24  strong.  I'm concerned about that.

25       I'll let the Government respond and the defense

1    respond, and then I'm going to rule.

2         MR. WRIGHT:  Well, I think the Court hit the nail

3    on the head.  This evidence is utilized to prove lack of

4    mistake or accident.  The Defendant contended to the FBI

5    agent that this was an accident.  This evidence shows the

6    Defendant struck this young man on the head a number of

7    times, very similar to the fact that he might strike

8    Aleeyah on the head when she was fussy in the morning,

9    which shows she didn't die from an accident.

10        Our theory is there was no fall in this case.  The

11   Defendant made up that story after he struck the child a

12   number of times.  So it goes directly to the exception

13   argument in 404(b).

14        Now, the fact Austin was older when he was struck than

15   when Aleeyah was struck actually we think benefits us

16   because it's recent in time.  If Austin testified he was

17   struck by the Defendant when he was three or four, back in

18   2001, then the defense would be arguing that those offenses

19   are over 11 years old and are remote in time.

20        As the Court knows, the 404(b) rule requires the

21   404(b) conduct not only be similar, but also be a little

22   bit more recent.  The Court's questions and part of the

23   cross-examination shows that it was recent.  It's recent,

24   similar to kind, goes directly to the announced defense of

25   accident.  Critical to our case, Your Honor.  We ask the

1    Court to receive it.

2            THE COURT:  Anything further from the defense?

3            MR. KHOROOSI:  Well, Your Honor, just like

4    Mr. Wright's argument is essentially that because it's such

5    strong propensity evidence, we should let it in.  That's

6    simply not fair.  I mean the issue in this case --

7            THE COURT:  That's not his argument.  That's my

8    concern.

9            MR. KHOROOSI:  Well, and Mr. Wright saying that

10   it goes to lack of accident or mistake doesn't make it

11   true.  The main inference a jury will draw from that,

12   Your Honor, and I think the Court is exactly correct, is

13   that this is a guy who hits kids on the head.  Because he

14   did it to Austin, then he did it to Aleeyah on January 9,

15   2012.

16      The risk that the jury is going to apply that

17   propensity evidence the wrong way is too great, and it

18   can't be cured by a limiting instruction.  Thank you.

19           MR. WRIGHT:  Could I mention one other thing,

20   Your Honor?

21           THE COURT:  You may.

22           MR. WRIGHT:  There's been no showing the jury is

23   not able to follow your instructions.  You can give them an

24   oral instruction on this.  You can give one of your final

25   jury instructions.

1           But just asserting that the jury can't follow it,

2    there's been no showing.  The jury has been very attentive

3    in following all of your instructions.  The Court can give

4    a very careful instruction, if the evidence is received,

5    and also give a final written instruction at the conclusion

6    of the case.  I don't think there's been basis for an

7    accusation that the jury couldn't follow your orders,

8    Your Honor.

9           THE COURT:  Well, I'll let you know, when we come

10   back from lunch, what my ruling is.  We're in recess.

11              (Recess at 12:08 until 1:00)

12   (Out of the presence of the jury, counsel and Defendant

13   present, the following proceedings occurred at 1:04 p.m.)

14          THE COURT:  With regard to the 404(b) question on

15   Austin LaPointe, there are primarily four factors which I

16   mentioned before.

17          It's relevant to a material issue.  There is some

18   relevance.

19          Secondly, similar in kind.  It is.  Different age

20   children, but still both children with the Defendant under

21   stressful situations from them.  Not overly remote in time.

22   It's not.  It started when Austin was 12 and went on until

23   he was apparently 14.

24          Then three, supported by sufficient evidence.  It is.

25          Then, fourth, higher in probative value than

1    prejudicial effect.  The predisposition that this shows,

2    which is not an appropriate use of 404(b) evidence, is

3    strong, very strong in the Court's opinion, and with regard

4    to its probative value, there is probative value.  I want

5    to see for that balancing, what the probative value is.

6         I'm not going to allow his testimony in the case in

7    chief.  But after I hear the defense case, I can best

8    evaluate what the probative value versus the prejudicial

9    effect might be.  So it might be that he'll be allowed as a

10   rebuttal witness, depending, but not in the case in chief,

11   because my concern about it being very strong evidence of

12   predisposition.  So that's the ruling.

13        Ready for your next witness?

14             MR. WRIGHT:  Yes.  May Mr. LaPointe be excused

15   for now then?

16             THE COURT:  Yes.

17             MR. WRIGHT:  Yes, we are ready.

18             THE COURT:  Bring in the jury.

19             (The jury entered the courtroom).

20   (In the presence of the jury, counsel and Defendant

21   present, at 1:07 p.m.)

22             THE COURT:  Call your next witness.

23             MR. WRIGHT:  Dr. Arne Graff.

24                      ARNE GRAFF, M.D.,

25   called as a witness, being first duly sworn, testified as

```
 1    follows:

 2                          DIRECT EXAMINATION

 3    BY MR. WRIGHT:

 4    Q.    Would you state your name, please.

 5    A.    Arne Harlan Graff.

 6    Q.    Where do you live?

 7    A.    In Moorhead, Minnesota.

 8    Q.    What is your occupation?

 9    A.    I'm a physician.

10    Q.    Can we go through your educational background?  Where

11    did you receive your undergraduate education?

12    A.    My undergraduate was from the University of

13    North Dakota in Grand Forks.

14    Q.    What year did you graduate?

15    A.    In '76.

16    Q.    What medical school did you attend?

17    A.    The University of North Dakota in Grand Forks.

18    Q.    Did you graduate?

19    A.    I did.

20    Q.    Did you do an internship?

21    A.    I did a family medicine residency, which includes an

22    internship.

23    Q.    Explain what that is, please.

24    A.    So I did a specialty training in family medicine, so I

25    would take care of babies and adults and the whole gamut of
```

```
 1    delivering babies.  Did that for three years.

 2    Q.   Are you board certified?

 3    A.   I am.

 4    Q.   In what field or fields?

 5    A.   I'm board certified in family medicine.

 6    Q.   What are the requirements to be board certified?

 7    A.   You have to go through a family medicine residency,

 8    and then you have to log so many hours basically of doing

 9    work and show that you have the skills.  Then you take a

10    national board test, which then allows you to say you are

11    board certified.

12    Q.   Do you hold a medical license?

13    A.   I do.

14    Q.   Do you hold it in more than one state?

15    A.   I do, in North Dakota and Minnesota.

16    Q.   Do you have what's called subspecialty training?

17    A.   I do.

18    Q.   Can you describe what that is?

19    A.   Subspecialty training is if you are going to take

20    something you are doing and try to work more focused on an

21    area.  I chose to do that in child abuse pediatrics.

22    Q.   Describe the subspecialty training you had.

23    A.   My training was at Hasbro Children's Hospital, which

24    is in Providence, Rhode Island.  It's a program that's now

25    three years, where you spend that time focused on one area.
```

1    So I worked on physical abuse, sexual abuse, neglect, head

2    trauma, fractures.  Things like that are all related to

3    possibly nonaccidental injury in children.  Trying to

4    understand how they occur, what other things cause it, so I

5    could be available as a consultant.

6    Q.   Are you on staff at any hospitals?

7    A.   I am.  I am on staff at Altru Health Center in

8    Grand Forks and Essentia and Sanford in Fargo.

9    Q.   Dr. Graff, do you hold any teaching positions?

10   A.   I do.  I'm a professor of clinical medicine with the

11   Department of Pediatrics at the School of Medicine at

12   Grand Forks.

13   Q.   Do you also travel and do teaching to other doctors?

14   A.   I do.

15   Q.   On child injuries?

16   A.   I do.

17   Q.   In fact, did you recently teach in San Diego this

18   spring at a conference out there?

19   A.   I just finished a week teaching in Las Vegas actually.

20   Q.   Are you a member of any medical associations or

21   societies?

22   A.   I am a member of the American Academy of Family

23   Medicine and APSAC, which is a professional society of

24   doctors, lawyers, social workers, counselors, that work for

25   children and abuse.

```
 1   Q.    I'll hand you what's been marked Exhibit No. 11.

 2              MR. WRIGHT:  May I approach?

 3              THE COURT:  You may.

 4   BY MR. WRIGHT:

 5   Q.    Do you recognize that?

 6   A.    Yes.  This is my curriculum vitae.

 7   Q.    Is that a curriculum vitae or resume you keep current?

 8   A.    Yes.

 9              MR. WRIGHT:  I'll offer Exhibit 11 at this time.

10              MR. KHOROOSI:  No objection.

11              THE COURT:  Exhibit 11 is received.

12   BY MR. WRIGHT:

13   Q.    Dr. Graff, have you received a number of awards in

14   your career?

15   A.    I've received occasional awards.

16   Q.    Are they all listed in your resume here?

17   A.    I believe they are.

18   Q.    Have you also authored some publications?

19   A.    I have a couple of them, yes.

20   Q.    Are they also listed in your resume?

21   A.    Yes.

22   Q.    What were your publications about?

23   A.    We were working on a wellness program when I was in my

24   family medicine program, and I've been an author in two

25   national textbooks on child abuse.
```

1    Q.    You were published on those?

2    A.    Yes.

3    Q.    Can you give us a rough estimate of the number of

4    academic conferences that you attended on child injuries or

5    child abuse in your career?

6    A.    I've lectured and taught well over several hundred,

7    and I'm sure the numbers are somewhere over 300 with what

8    I've attended and what I've taught.

9    Q.    Did I ask you this morning what is your official

10   title?

11   A.    Right.  So what we're called is I'm a subspecialist in

12   child abuse pediatrics.

13   Q.    So if I call you a subspecialist in child abuse

14   pediatrics, would that be your title then?

15   A.    Yes.

16   Q.    You've been engaged in the practice of medicine for

17   how long?

18   A.    This will be finishing my 29th year.

19   Q.    I think we all know what this means, but what is

20   pediatrics?

21   A.    Pediatrics is taking care of a population of children

22   from birth to about age 18.  It covers that gamut of

23   children.  It's all kinds of health care involved for

24   children.

25   Q.    In addition to lecturing and teaching, have you also

1   seen a number of patients in your career as a medical

2   doctor?

3   A.   Yes.  I'm a clinician.  That's why I see children on a

4   daily basis.

5   Q.   You are still currently a technician or clinician?

6   A.   I am still a clinician, yes.

7   Q.   This is hard to estimate, but can you give us just a

8   rough estimate of the number of patients that you've seen

9   in your medical career?

10  A.   I can't imagine how many it's been.  In my medical

11  career totally, it's probably been somewhere between

12  seventy and a hundred thousand total in 29 years.

13  Q.   In that 29 years, are many of the patients that you

14  saw children?

15  A.   Yes.

16  Q.   Have you in your career dealt with children who have

17  been the victim of a fall?

18  A.   I have.

19  Q.   Have you also had a number of child patients that have

20  been the victims of physical assault?

21  A.   I have.

22  Q.   Can you explain a little bit more about the function

23  of the office you are currently at?

24  A.   From a medical point of view, our role is to become

25  involved as a consultant, either for law enforcement or

Social Service or other medical providers.  When there's a
question of an injury or a finding that is concerning and
nonexplainable, my role is to be another pair of eyes and
brains to try and see whether or not there's a medical
reason, an accidental reason or a nonaccidental reason that
might allow us to understand the mechanics of how this
injury occurred.  That's my job.

Q.   Were you called in for a consultation, evaluation, and
examination of Aleeyah Cook in January of 2012?

A.   I was.

Q.   Is that at the hospital in Fargo?

A.   Yes, it was.

Q.   Did you see Aleeyah as a patient?

A.   I saw her as a consultant, yes.

Q.   How is it you got called into the case, if you recall?

A.   She was currently hospitalized in the pediatric
intensive care.  When children come in when there's a
concern of injuries that are not easily explained, we may
be consulted, and I was in this case, to again offer some
ideas about the injuries that were present and offer
suggestions for how they might have occurred.

Q.   Have you had cases in the past where you've been
called in for consultation and examinations when the death
was believed to be accidental?

A.   Absolutely.

1    Q.   Have you had consultations, examinations when the

2    death was believed to be an assault?

3    A.   Yes.

4    Q.   Did you perform, assist in, or review a physical

5    examination of Aleeyah in January of 2012?

6    A.   Right.  I did a physical examination while she was

7    hospitalized in the peds intensive care.

8    Q.   Tell us about that physical examination.

9    A.   The examination, again, was basically looking at

10   everything, like we do in children, in general; head to

11   toes examination, and make an observation of her neurologic

12   status, her skin, heart, lungs, and everything from head to

13   toes.

14        In her case the concerning findings were, number one,

15   neurologically she was unresponsive, but she was on some

16   medications at that time to help sedate her.  She had a

17   couple simple bruises I noted and then some hemorrhages in

18   one eye.

19   Q.   Did you also do a skeletal survey?

20   A.   Yes, I did.

21   Q.   What is a skeletal survey?

22   A.   A skeletal survey is an X-ray of the entire skeletal

23   part of the body.  It's about the equivalent of a half hour

24   of sunshine on a sunny day.  So it's not much radiation.

25   It's done because when you look at a child on the outside,

1   even if you are an expert in my field, you can't tell that

2   there aren't fractures there.  Kids don't have bruises and

3   swelling and deformed bones when they have these fractures.

4   So you do the X-ray to look at the entire body to get a

5   sense for injuries that might lie underneath that you

6   cannot see or feel on the outside.

7   Q.   Anything else on the initial physical exam or the

8   skeletal survey?

9   A.   No.

10  Q.   Did you also notice or diagnose retinal hemorrhages?

11  A.   Yes, she had retinal hemorrhages.

12  Q.   Can you explain what that is?

13  A.   The back of her eyeball has multiple layers, and has

14  blood vessels and nerves, and that's what allows us to see

15  and process what we see, part of it.

16       In her case there were some bleeds inside there.  When

17  we see bleeding inside the eye, it's indicative of in some

18  cases infection or trauma or other things that helps us

19  kind of decide what was going on.

20  Q.   Did you do any examination which found bleeding inside

21  the head?

22  A.   They had already done a CAT scan of her head, the

23  intensivist had, so I reviewed that.

24  Q.   You are, of course, qualified to read a CAT scan,

25  things like that?

1  A.   I'm qualified to review a CAT scan, but not give an

2  official interpretation.  I'm not a radiologist.

3  Q.   Did you review the CAT scan regarding the inside of

4  her head?

5  A.   I did.  I both looked at it myself, reviewed it, and I

6  talked with radiology, because I had concerns about

7  bleeding that was not identified on the written report.

8  Q.   In all your experience, sir, have you reviewed a

9  number of studies that discuss injuries from falls and

10  physical assaults?

11  A.   I have.

12  Q.   What literature have you reviewed in the course of

13  your career?

14  A.   Well, there are volumes of literature in the head

15  injury field, particularly with areas of short falls.  It's

16  probably the hottest topic in the area that I'm in.  That

17  would include people in neurosurgery; people in what's

18  called biomechanics, who study all the things that happen

19  when you fall; pediatrics; pathology.  So it's across

20  multiple specialties people have looked at this area.

21  Q.   Aleeyah was actually a patient of yours, a person that

22  you were physically looking at in January of 2012.

23  A.   She was.

24  Q.   You were one of the physicians involved in the care of

25  her.  Is that right?

1    A.    I was a consultant, yes.

2    Q.    Did you understand she was eventually taken off life

3    support there in Fargo?

4    A.    Yes, I was aware of that.

5    Q.    Months after Aleeyah was taken off life support, did

6    you receive and review the autopsy photos of Dr. Froloff

7    and Dr. McGee?

8    A.    I did.

9    Q.    Did you find a reference there on the autopsy report

10   that there were 18 different bruises or contusions on

11   Aleeyah's head in the front forehead, the left, right, and

12   front?

13   A.    I remember there were a large number of contusions

14   that were noted.  Yes.

15   Q.    As a specialist in child abuse pediatrics, what does

16   the term "multiple points of impact" mean to you?

17   A.    Well, it's indicative of trauma, multiple sites of

18   trauma.

19   Q.    Did you review the fact that there was skin between

20   some of the contusions?

21   A.    Yes.

22   Q.    Can you explain the significance of that?

23   A.    Well, again, when we look at the outside of children's

24   scalps, we oftentimes will not see any bruising even where

25   there's a fracture or bleeding underneath, because kids'

```
 1    heads -- kids are not little adults.  Kids' heads, the skin
 2    is elastic, so you may see hardly anything on the outside.
 3         In an autopsy when you look underneath, and you see
 4    areas of hemorrhage, it suggests there are multiple areas
 5    in this case of impact that caused that trauma that we saw.
 6    Q.   In your experience, if a child suffers a very serious
 7    injury, left, right, and forehead of the child's head, is
 8    it unusual not to see outward signs of trauma?
 9    A.   No, it's not.  You can have significant trauma inside
10    and have nothing on the outside.
11    Q.   Do you eventually see all the trauma when the autopsy
12    is done and you look inside the head?
13    A.   When you look inside the head or reflect the scalp
14    back, yes.
15    Q.   In your experience, Doctor, are the multiple points of
16    impact, multiple signs of trauma, is that consistent with a
17    single fall?
18    A.   No, it's not.
19    Q.   Did Aleeyah also have injuries to the top of her head?
20    A.   She did.  She had some blood that was noted over the
21    curvature and in between the two hemispheres of the brain.
22    Q.   In addition to the left and right side of her face,
23    there were a number of injuries of about the same age on
24    the top of her head.
25    A.   Correct.  On the autopsy report, right.
```

1    Q.   Doctor, when you and I talked, I guess it was up in

2    Fargo about half a year ago when you and I talked

3    extensively about this case?

4    A.   Yes.

5    Q.   You explained something you called matchstick theory

6    to me.  Do you know what I'm talking about?

7    A.   When we look at injuries like this, again, my role is

8    not to point fingers.  My role is to say what could cause

9    this.

10        So in children who have a fall-type injury, it's

11   different than a teenager or an adult.  In other words, if

12   I'm standing and I faint, I can have this standing

13   perpendicular and fall just like a matchstick either

14   forward or back.  Little kids don't fall like matchsticks.

15   They fall and crumble to the ground.

16        So when you look at an injury from elevation in

17   children, it's different than a child who may be attached

18   to something with their feet and swinging.  It's a

19   different kind of motion.  It's called translational injury

20   and then there's rotational.  Kids that age, when they fall

21   off something, it's more of a translational.  It's one

22   direction.

23   Q.   If a child gets a traumatic injury on the top of their

24   head, is that consistent with a fall?

25   A.   It's not consistent with a fall unless they were, for

1    instance, hanging on the monkey bars or something and fell

2    and lost control and went down straight on their head.

3    Q.   Is it consistent with standing up or standing on a

4    table or sitting in a chair?

5    A.   It would be inconsistent with the normal fall

6    mechanics of a child.

7    Q.   Because if you are standing up or sitting down, your

8    head is pointing straight up?

9    A.   Correct.

10   Q.   You almost have to do a 180, like on a springboard, to

11   land on top of your head.

12   A.   You would have to have some mechanics where the child

13   was rotated and aiming head down.

14   Q.   Are the injuries to a child's head, on the top of the

15   head, consistent with a man standing over that child

16   hitting the child?

17   A.   They could be consistent with that.

18   Q.   Based upon everything we've talked about here, as a

19   specialist in child abuse pediatrics, based upon your

20   subspecialty training and your experience, teaching

21   positions and publications, and your review of the autopsy,

22   do you have an opinion, within a reasonable degree of

23   medical certainty, whether the injuries you observed on

24   Aleeyah Cook in January of 2012 are consistent with a

25   physical assault?

301

```
1    A.    I do.

2    Q.    What is that opinion?

3    A.    I feel they could be consistent with a physical

4    assault.

5    Q.    Do you hold that position strongly?

6    A.    I do.

7    Q.    Do you have an opinion whether or not those injuries

8    are consistent with a fall from either a two-inch chair --

9    I'm sorry, a two-foot chair or a three-foot table?

10   A.    I do.

11   Q.    What is that opinion?

12   A.    I think they are not consistent with a simple fall off

13   a chair.

14   Q.    Not consistent with a fall, but consistent with a

15   physical assault?

16   A.    They would be, yes.

17   Q.    Why is that?  What brings you to that conclusion?

18   A.    Well, again, from the volumes of literature that are

19   out there, we know that kids fall all the time.  Toddlers

20   fall two to three times every day.  So we know there are

21   lots of kids falling down.  We know that when kids fall,

22   statistically the numbers say in a short fall, and by

23   definition a short fall is under five feet.

24        So in short-fall literature, and there's lots of it

25   out there, we know the chance of a serious injury is about
```

```
 1    one in a million.  We do know there are outlying kids.

 2    There are kids that can fall a short distance and die.

 3    Those are kids that have medical conditions or other

 4    problems going on that may put them at risk, for the most

 5    part.

 6         We know that when kids fall short distances, they

 7    don't have massive brain injury from that kind of trauma.

 8    It's just not consistent with it.

 9    Q.   Also, if a child falls on their head, does it take a

10    while for that child to get bad, to go downhill?

11    A.   No.  That's called a lucid interval.  Again, the only

12    times we see it is with a lucid interval, or where a kid

13    will have an injury and then hours later get in trouble,

14    tends to be where there's a special kind of bleed like

15    what's called an epidural, where there's a bleed that's

16    expanding.  We see that in our sporting and athletic

17    events, where kids get hit, do fine, and six hours later

18    get in trouble.

19         The only time we see that in very little kids is when

20    there's trauma causing an artery to get dissected, it's

21    getting torn or stripped, or there's an expanding

22    collection of blood that is slowly catching up, and you

23    don't recognize it on the outside, and they get in trouble.

24    Q.   Have you reviewed the Death Certificate in this case

25    of Aleeyah Cook?
```

303

1   A.   I have.

2   Q.   If I can ask you to look over your right shoulder,

3   Dr. Graff.

4   A.   Okay.

5   Q.   Do you agree with the conclusion of Dr. Froloff that

6   the immediate cause of death of Aleeyah Cook was traumatic

7   head injury?

8   A.   I would agree it's consistent with that.

9   Q.   As a consequence of physical assault?

10   A.   And I would agree it's consistent with that.

11   Q.   Would you agree the death of Aleeyah Cook is not

12   consistent with a fall?

13   A.   It's not consistent with a simple fall, no.

14   Q.   What do you mean by a "simple fall"?

15   A.   Again, a simple fall, up to five feet, simply falling

16   off something and hitting the ground.

17   Q.   I think you said it's about one in a million?

18   A.   The statistics, that's what we're told, yes.

19   Q.   Doctor, do you agree with the Death Certificate where

20   it lists manner of death as homicide?

21   A.   Well, it's not a diagnosis I get to make.  I'm not a

22   forensic pathologist, but I would agree it seems to be

23   consistent with that.

24   Q.   Consistent with homicide?

25   A.   Yes.

```
1    Q.    Homicide is, of course, killing?

2    A.    It's a death caused by someone in my books.

3    Q.    Very good.  Thank you.

4              MR. WRIGHT:  That's all.

5              THE COURT:  You may examine.

6              MR. KHOROOSI:  Thank you.

7                        CROSS-EXAMINATION

8    BY MR. KHOROOSI:

9    Q.    Good afternoon, Dr. Graff.

10   A.    Good afternoon.

11   Q.    You testified that the types of injuries that Aleeyah

12   Cook sustained were not consistent with just a simple fall.

13   A.    That's my opinion, yes.

14   Q.    And when there are additional issues, a simple fall

15   can precipitate death when there are existing injuries.

16   Can't it?

17   A.    Certainly.

18   Q.    If the child has, like you testified, previous medical

19   problems, a simple fall can precipitate that.  Can't it?

20   A.    It depends on what medical problems we're talking

21   about.

22   Q.    But it's possible.  Correct?

23   A.    If a child has an aneurysm and they fall and it

24   ruptures, absolutely, they could get in trouble and die.

25   Q.    Retinal hemorrhaging can have a number of different
```

305

```
1    causes.  Can't it?
2    A.   It does, yes.
3    Q.   Dating a retinal hemorrhage is particularly difficult.
4    Isn't it?
5    A.   I would say it's impossible.
6              MR. KHOROOSI:  Thank you.  I don't have anything
7    further.
8              THE COURT:  Anything further?
9              MR. WRIGHT:  No, sir.
10             THE COURT:  Thank you, Doctor.  You may step
11   down.
12                       (Witness excused)
13             MR. MILLER:  Our next witness is Rose Gaikowski.
14                       ROSE GAIKOWSKI,
15   called as a witness, being first duly sworn, testified as
16   follows:
17                    DIRECT EXAMINATION
18   BY MR. MILLER:
19   Q.   Ma'am, please introduce yourself to the jury.
20   A.   My name is Rose Gaikowski.
21   Q.   Ma'am, I can't help notice, we had a witness yesterday
22   by the same last name as you, Gary Gaikowski.  It's an
23   unusual name.  Are the two of you related to each other?
24   A.   Yes.  He's my brother.
25   Q.   How are you currently employed?
```

1    A.   I am employed at the Woodrow Wilson Keeble Memorial

2    Health Care Center.

3    Q.   Where is that at?

4    A.   In Sisseton.

5    Q.   What is your job title there?

6    A.   I am the performance improvement coordinator, risk

7    management.

8    Q.   What are your duties?

9    A.   It's quality assurance.  It's overseeing the risk

10   management program, supervisory duties.  I supervised -- I

11   supervise the safety officer and the infection control.

12   Q.   As part of your job up at the hospital, did you know

13   an individual by the name of Mario Contreras?

14   A.   Yes.

15   Q.   How did you know Mr. Contreras?

16   A.   Mario was our safety officer, and I supervised him.

17   Q.   Were you his immediate or direct supervisor?

18   A.   Yes, his direct.

19   Q.   How long have you known him in a professional

20   capacity?

21   A.   Mario started in December of 2010, and I've known him

22   since then.

23   Q.   Were you his immediate supervisor from that point

24   forward?

25   A.   Yes.

1    Q.   When Mr. Contreras worked at the hospital, did he have

2    what I would refer to as a regular schedule, instead of

3    shift work where he may work some hours one day and

4    different hours a different day?

5    A.   It was a regular schedule.

6    Q.   What was his regular work schedule?

7    A.   From 8:00 to 4:30.

8    Q.   Prior to -- was that Monday to Friday?

9    A.   Yes, Monday through Friday.

10   Q.   Prior to January 9 of 2012, did you, as his immediate

11   supervisor, have issues with him being late or tardy for

12   work when he was supposed to be there at 8:00 a.m.?

13   A.   Yes.

14   Q.   Tell us about that.

15   A.   I started noticing Mario coming in late for work.  It

16   would be like ten minutes, 15 minutes, just here and there.

17   I had to monitor him coming in for work.  It just got to be

18   too often.  At first I would be like, well, I'll just --

19   maybe he's running a little late.  I didn't say anything.

20        But then it was too often, so I talked with Mario and

21   let him know, "Mario, you are to be here at 8:00, working

22   at 8:00.  You need -- if you are going to be late, you need

23   to call me, let me know you are going to be late and put in

24   leave."  I could no longer just excuse him from --

25   Q.   So you built in a system then, because of the

```
 1    problems, on how you were going to try to correct that

 2    action?

 3    A.    Right.

 4    Q.    How did he react or respond to that consequence for

 5    his being tardy?

 6    A.    He would call, and he would put in his leave.

 7    Q.    Did he express any dissatisfaction with having to do

 8    so?

 9    A.    No.

10    Q.    Now, as part of the system up there, running the IHS

11    Hospital, are time records kept?

12    A.    Yes.

13    Q.    Is that a record kept in the normal course of business

14    of the hospital, even though it's not a medical-type

15    record?

16    A.    Yes.

17              MR. MILLER:  May I approach?

18              THE COURT:  You may.

19    BY MR. MILLER:

20    Q.    I'll show you what's been marked as Government's

21    Exhibit 3.  I'll have some what we call foundational

22    questions for you.  Do you recognize that exhibit?

23    A.    Yes.

24    Q.    Is that a record kept in the normal course of

25    maintaining the hospital?
```

1    A.    Yes.

2    Q.    That's more of an administrative record than medical

3    record?

4    A.    Yes, the time and attendance.

5    Q.    Did you have this record prepared at our request?

6    A.    Yes.

7    Q.    Is what's in front of you, Government's Exhibit 3, an

8    accurate copy of the original that was prepared?

9    A.    Yes.

10          MR. MILLER:  Your Honor, I would move to

11   introduce Government Exhibit 3 into evidence.

12          MR. KHOROOSI:  I object on foundation,

13   Your Honor.

14          THE COURT:  Overruled.  Exhibit 3 is received.

15   BY MR. MILLER:

16   Q.    Miss Gaikowski, describe for the jury what

17   Government's Exhibit 3 is.  What are you looking at?

18   A.    I am looking at Mario's time and attendance, the leave

19   that he submitted during absences.

20   Q.    Does this time frame run from approximately the 1st of

21   July of 2011 until I think the last entry on there is

22   January 3 of 2012?

23   A.    Yes.  The very first one is July.

24   Q.    When you prepared this, did you only put in the days

25   where partial leave was taken?  In other words, if he took

1    the whole day off, that's not listed on that sheet?

2    A.   Right, that's correct.

3    Q.   So these are just partial days?

4    A.   Yes.

5    Q.   Are all the leave requests you see on there for the

6    beginning of the shift at 8:00 a.m., rather than maybe

7    coming back late from lunch or leaving early at the end of

8    the day?

9    A.   Yes.

10   Q.   What I would like you to do, Miss Gaikowski, is take

11   this yellow highlighter, and anytime you see there's a

12   leave request for under an hour, would you just highlight

13   the type of leave taken and whether it's a quarter of an

14   hour, half hour, full hour, whatever the time frame, would

15   you just mark each and every one of those on that exhibit

16   for me?

17   A.   Okay.

18   Q.   I don't know if you were doing it as you marked it.

19   How many different leave requests between, say, July 1 of

20   2011 and January 9 of 2012 was he late for work and then

21   put in a leave slip?

22   A.   Twelve.

23             MR. MILLER:  Your Honor, may I publish

24   Government's Exhibit 3?

25             THE COURT:  You may.

BY MR. MILLER:

Q.   Miss Gaikowski, what I'm doing is I placed Government's Exhibit 3 on what we call an Elmo.  Now the jury can see what you've been looking at and we've been talking about.  If you look at the screen up here, is this the time and attendance sheet you and I have been talking about during your testimony?

A.   Yes.

Q.   The highlighted marks on there are the marks you just put on there at my request?

A.   Yes.

Q.   I now want to talk to you specifically about the day of January 9 of 2012.  Do you know whether or not Mr. Contreras was scheduled to work on that specific day?

A.   Yes, he was scheduled to work.

Q.   What hours was he scheduled to work that day?

A.   From 8:00 to 4:30.

Q.   So that was the regular schedule, same as all the others?

A.   Yes.

        MR. MILLER:  Thank you.  That's all the questions I have.

        MR. KHOROOSI:  I don't have any questions, Your Honor.

        THE COURT:  Thank you.  You may step down.

```
 1                    (Witness excused)

 2            THE COURT:  Call your next witness.

 3            MR. WRIGHT:  Nina Cook.

 4                        NINA COOK,

 5   called as a witness, being first duly sworn, testified as

 6   follows:

 7            MR. KHOROOSI:  Your Honor, before we begin, could

 8   I take a 30-second recess to check and see if my expert is

 9   out there?

10            THE COURT:  Is that expert with regard to this

11   witness?

12            MR. KHOROOSI:  No, Your Honor.  I believe it's

13   with regard to the next one.  I just want to make sure he's

14   here.

15            THE COURT:  Go on out.

16                      (Pause)

17            MR. KHOROOSI:  Thank you, Your Honor.

18            THE COURT:  I gave you an instruction before,

19   before other testimony that will deal with this same

20   manner.  This is a limiting instruction again.

21        You are going to hear evidence that the Defendant

22   spanked Aleeyah Cook, leaving a mark from the spanking in

23   August of 2011.  You may consider this evidence only if you

24   unanimously find it's more likely true than not true.  You

25   decide that by considering all the evidence and deciding
```

1    what evidence is more believable.  This is a lower standard

2    than proof beyond a reasonable doubt.

3         If you find this evidence has been proved, then you

4    may consider it to help you decide whether there's a lack

5    of accident concerning Aleeyah Cook's injuries that led to

6    her death.  You should give it the weight and value you

7    believe it's entitled to receive.

8         If you find this evidence has not been proved, you

9    must disregard it.  Remember, even if you find that the

10   Defendant may have committed a similar act in the past,

11   this is not evidence that he committed such an act in this

12   case.  You may not convict a person simply because you

13   believe he may have committed similar acts in the past.

14        The Defendant is on trial only for the crimes charged,

15   and you may consider the evidence of prior acts only on the

16   issue stated above, which is the question of accident.

17        Go ahead.

18                      DIRECT EXAMINATION

19   BY MR. WRIGHT:

20   Q.   State your name, please.

21   A.   Nina Cook.

22   Q.   Can you talk up nice and loud for me.  Tell me your

23   name again.

24   A.   Nina Cook.

25   Q.   Where do you live?

```
1    A.    I live in Sisseton, South Dakota.

2    Q.    Are you married?

3    A.    Widow.

4    Q.    Do you have any children?

5    A.    I have six.

6    Q.    Are you the mother of Shannon Sine?

7    A.    Yes.

8    Q.    Were you the grandmother of Aleeyah Cook?

9    A.    Yes.

10   Q.    Do you live in the same area as Shannon?

11   A.    Yes.

12   Q.    When Aleeyah was alive between 2010 and 2012, did you

13   often visit Aleeyah over at Shannon and Sam's?

14   A.    Yes.

15   Q.    In fact, did you live with Shannon and Sam and Aleeyah

16   for a period of time?

17   A.    Yes.

18   Q.    Do you know the Defendant, Mario Contreras?

19   A.    Yes.

20   Q.    Do you see him in the courtroom?

21   A.    Yes.

22   Q.    Where is he at, please?

23   A.    Over there.  (Witness indicating)

24   Q.    Does Shannon have a son named Emerson?

25   A.    Yes.
```

315

1   Q.   Was he delivered in September of 2011?

2   A.   Yes.

3   Q.   When Shannon was pregnant, when she was really

4   pregnant with Emerson, just shortly before that in August

5   of 2011, do you recall seeing anything on Aleeyah that got

6   your concern?

7          MR. KHOROOSI:  Your Honor, could we approach?  I

8   have an objection.

9          THE COURT:  Very well.

10  (Side bar with all counsel:)

11         MR. KHOROOSI:  I object.  The evidence is

12  cumulative.

13         THE COURT:  You can make that objection from out

14  there.  I don't want everybody running up here every time

15  for something.  It could have been brought up out of the

16  presence of the jury, too.  Overruled.

17  (End of side bar)

18         THE COURT:  Overruled.  Proceed.

19  BY MR. WRIGHT:

20  Q.   Around that time, August of 2011, do you recall seeing

21  something on Aleeyah's buttocks?

22  A.   Yes, I do.

23  Q.   Was that after she spent the weekend with Mario?

24  A.   Yes.

25  Q.   What do you recall seeing?

```
 1    A.    I saw marks on her butt.  There were like lines, like

 2    fingermarks.

 3    Q.    Had you ever seen those marks on her buttocks before?

 4    A.    No.

 5    Q.    Did you discuss with Shannon the possibility of taking

 6    Aleeyah to the clinic?

 7    A.    Yes.

 8    Q.    Did you talk with Shannon about whether or not she

 9    needed to take a picture?

10    A.    Yes.

11    Q.    Did you or Shannon attempt to take a picture of that?

12    A.    Shannon did.

13    Q.    Do I understand the photo didn't turn out very well?

14    A.    Yes.

15    Q.    Did you actually with your own eyes see the print or

16    the marks on Aleeyah's buttocks?

17    A.    Yes.  I was there when Shannon took the picture.

18    Q.    Did that greatly concern you?

19    A.    Yes.

20              MR. WRIGHT:  Thank you.  That's all.

21              THE COURT:  You may examine.

22                       CROSS-EXAMINATION

23    BY MR. KHOROOSI:

24    Q.    Miss Cook, as a result of the incident you spoke

25    about, neither you, nor your daughter, took Aleeyah to the
```

1    hospital.  Did you?

2    A.   I don't know.

3    Q.   You don't know?

4    A.   If she took her to the hospital?

5    Q.   You don't know if she took her to the hospital?

6    A.   I don't know if she took her to the hospital.  I

7    wasn't there.  I went home.

8    Q.   Okay.

9              MR. KHOROOSI:  Thank you.  No questions.

10             MR. WRIGHT:  Nothing further.

11             THE COURT:  Thank you, ma'am.  You may step down.

12                (Witness excused)

13             THE COURT:  Call your next witness.

14             MR. MILLER:  Kenneth Snell.

15                     KENNETH SNELL, M.D.,

16   called as a witness, being first duly sworn, testified as

17   follows:

18                      DIRECT EXAMINATION

19   BY MR. MILLER:

20   Q.   Good afternoon, Doctor.  Please introduce yourself to

21   the jury.

22   A.   My name is Dr. Kenneth Snell.  I am the coroner for

23   Minnehaha County and a medical examiner for eastern South

24   Dakota.

25   Q.   Could you describe your educational background that's

1   led you to your position?

2   A.   Yes.   I have a Bachelor of Science degree in

3   biomedical sciences from the University of South Alabama,

4   Mobile, Alabama.   I have a Doctorate of Medicine from the

5   same institution, and I have training in anatomic and

6   clinical pathology from the same institution, and I'm board

7   certified in anatomic and clinical pathology.

8        I have training in forensic pathology from the

9   University of North Carolina, Office of the Chief Medical

10   Examiner's Office, and I'm board certified in forensic

11   pathology, as well.

12        I'm licensed to practice in South Dakota.   I've also

13   been licensed to practice medicine in Alabama,

14   North Carolina, and in Tennessee.

15   Q.   I take it from your training and background and your

16   accent, that you are a southern boy.

17   A.   From Alabama, yes.

18   Q.   After you graduated from medical school, did you

19   participate in an internship, residency, fellowship type of

20   thing?

21   A.   Yes.   That was the training I received in anatomic and

22   clinical pathology from the University of South Alabama in

23   Mobile, Alabama.   That's my residency.

24        Then my fellowship was in forensic pathology.

25   Q.   I believe you indicated this previously, but I want to

```
 1    make sure.  Are you licensed to practice medicine?

 2    A.   In South Dakota, yes.

 3    Q.   You said you were board certified.  What are you board

 4    certified in?

 5    A.   I'm board certified in anatomic and clinical

 6    pathology.  Anatomic pathology is looking at solid tissues

 7    for diagnoses.  Case examples would be if you have a skin

 8    biopsy or something along those lines, that's looked at by

 9    an anatomic pathologist.

10         The clinical pathologist is the one that looks at the

11    laboratory tests.  Anytime you have blood taken or a

12    urinalysis, that would be reviewed by a clinical

13    pathologist, if necessary.  I am board certified in both of

14    those, and then also board certified in forensic pathology,

15    which is the subspecialty of pathology in the application

16    of medicine to law.

17    Q.   Are you a member of any professional boards or

18    organizations?

19    A.   Yes.  I'm a member of the National Association of

20    Medical Examiners and the American Academy of Forensic

21    Sciences.

22    Q.   You've talked a lot about your schooling in terms of

23    being a student.  Have you been on the other end and also

24    been a teacher?

25    A.   Yes, sir.  At each one of the places that I've worked
```

```
 1   at, I've conducted lectures to law enforcement, to

 2   coroners, to other medical examiners.  Here in Sioux Falls

 3   I lecture to medical students, to pathology residents, and

 4   also to law enforcement and coroners, as well.

 5   Q.    Describe your work history for the jury.

 6   A.    After completing my fellowship, I worked in Charlotte,

 7   North Carolina, at the Office of the Medical Examiner.  I

 8   then worked in Memphis, Tennessee, for the Office of the

 9   Medical Examiner.

10        From there I moved to Alabama where I served as a

11   chief medical examiner and as the chief medical examiner

12   for the state of Alabama.

13        After serving there, I came here to South Dakota where

14   I serve as the coroner and as the forensic pathologist or

15   medical examiner.

16   Q.    Do you also teach at the medical school?

17   A.    Yes.

18   Q.    Do you also provide training to law enforcement

19   officers?

20   A.    Yes, sir.

21   Q.    Describe your training that you give to law

22   enforcement officers.

23   A.    Several different scenarios.  The first is in October

24   we host a forensics course, which is an eight-hour course,

25   where we cover different forensics topics from the crime
```

```
 1    scene to the courtroom.

 2          Also, I lecture to law enforcement on various topics

 3    that they are interested or concerned with or changes in

 4    the law and how that affects them from a pathology

 5    standpoint.

 6          Also, once a year we have an anthropology course that

 7    is taught here in town, and I lecture at that anthropology

 8    course, as well.

 9    Q.   Have you ever testified in Court before regarding the

10    area of your work field, your specialty?

11    A.   Yes.  In every state that I've been licensed in, I've

12    testified in Court as an expert witness.

13    Q.   Specifically have you ever testified in Federal Court

14    in that regard before today?

15    A.   Yes, sir, I have.

16              MR. MILLER:  May I approach the witness?

17              THE COURT:  You may.

18    BY MR. MILLER:

19    Q.   Dr. Snell, I'll hand you what is marked Government's

20    Exhibit No. 12.  Do you recognize that?

21    A.   Yes.  This is my CV, which lists the items we've been

22    talking about.

23    Q.   A CV in your profession is basically a resume.

24    A.   That's correct.

25    Q.   This is a document you yourself put together, I'm
```

1   assuming?

2   A.   That's correct.

3   Q.   And is what has been marked as Government's

4   Exhibit No. 12 an accurate copy of your curriculum vitae?

5   A.   That is correct.

6           MR. MILLER:  Your Honor, I would move to

7   introduce Government's Exhibit 12 into evidence.

8           MR. KHOROOSI:  No objection.

9           THE COURT:  Exhibit 12 is received.

10  BY MR. MILLER:

11  Q.   Dr. Snell, have you had an opportunity to be a

12  presenter at various lectures or workshops to your peers?

13  A.   Yes, I have.

14  Q.   Would those be listed out and enumerated in your CV?

15  A.   That's correct.

16  Q.   Have you also done writings that are published in the

17  medical field?

18  A.   That is correct.

19  Q.   Likewise, would those be listed in that same

20  curriculum vitae?

21  A.   That is correct.

22  Q.   At the request of our office, did you review various

23  materials related to this case that you are in Court for

24  here today?

25  A.   Yes, sir.  I was asked to review those.

1    Q.    Would you just list or enumerate the various records

2    or categories of records that you were -- that were

3    submitted to you for purposes of your review?

4    A.    Yes.  I reviewed the postmortem examination or autopsy

5    report, along with photographs taken at that time, crime

6    scene photographs that were taken at the scene,

7    certification of death or the Death Certificate, medical

8    records from both the Sanford Fargo medical records and the

9    ER that the child initially presented to, and

10   Dr. Brad Randall's report.

11   Q.    One of the things you talked about that you reviewed

12   were records from the Sanford Fargo Medical Hospital?

13   A.    That's correct.

14   Q.    And did you note in there that a CAT scan was done

15   initially and that a subdural hematoma was found?

16   A.    That is correct.  The initial CT of the head

17   documented a small subdural hemorrhage in the left aspect

18   of the falx near the vertex.  I also documented an anoxic

19   brain injury.

20        Basically what I'm looking at, if you look at the

21   brain, you have the scalp.  Then you have the skull.  When

22   you remove the skull, there's a very thick, tough membrane

23   sitting on top of the brain.  That's the dura.  Blood

24   underneath that dura, before you get to the brain, would be

25   subdural blood.  Also, the brain is like two halves.  Blood

1    between those two halves would be blood along the falx.

2         The other thing it noted was anoxic brain injury.

3    Anoxic means without oxygen.  When the brain doesn't get

4    oxygen, it creates a certain picture to the radiologist,

5    which in their interpretation would indicate this brain has

6    been starved of oxygen and changes associated with that

7    have started to take place.  Those were the findings in the

8    initial CT.

9    Q.   Then you indicated you also reviewed the autopsy

10   report and pictures from the Office of Medical Examiner in

11   Ramsey County?

12   A.   That's correct.

13   Q.   And the findings related to the subdural hemorrhage

14   that was found as a part of that?

15   A.   Yes, sir.  It was.

16   Q.   As it relates to what you saw, as it relates to the

17   appearance of the subdural hematoma in the autopsy report,

18   what of significance did you note in that?

19   A.   The forensic pathologist that performed the autopsy

20   noted that the subdural blood was less than one milliliter,

21   and also showed no signs of organization.  When we say

22   "organization," that means we see signs of aging.  What

23   happens is blood sits in the space there that's created.

24   It will start to undergo changing.  Right now the red

25   cells, inflammatory cells are coming in, converting that

1  and removing that blood.  That would be signs of

2  organization.

3       In this case there was no signs of organization,

4  either grossly, when the forensic pathologist looked at it,

5  or under the microscope when he looked at it with the

6  slides.

7  Q.   The fact that no organization could be seen in the

8  subdural hemorrhage, what does that indicate regarding the

9  age of the hemorrhage?

10  A.   The organization process of a subdural hemorrhage

11  follows a rough guideline that has been documented over

12  years of observing those.  It's a rough guideline, because

13  everybody is different.

14       But when we look at it and see no signs of

15  organization, that tells us this is still in the acute

16  phase, which means we're in there most likely less than

17  five days, can be a little longer than that, but this tells

18  us there's no signs this body is responding, trying to

19  remove that process.  Again, it takes a few days for this

20  process to start.

21       So by us not seeing that, that means we have not seen

22  that process, meaning, again, it's an acute event and has

23  not started to age.

24  Q.   In reviewing the various records that were submitted

25  to you, were you aware that Aleeyah was admitted to the

1    hospital initially on Monday, January 9?

2    A.    Yes, sir.

3    Q.    But that she did not pass away until Wednesday,

4    January 11?

5    A.    That is correct.

6    Q.    Now, when you talk about these number of days for an

7    acute injury, what I want to talk to you about, what time

8    are you saying the clock starts?  Are you talking about the

9    five days back from the admission to the hospital, or five

10   days back from time of death?

11   A.    We would be looking at these injuries and dating these

12   injuries from the time of death, because even though she's

13   in the hospital, her body can still react.  The aging

14   process would be continuing, even though she's in the

15   hospital.

16        So when I say it's an acute process, that's from the

17   time of death going backwards; not from the time of

18   admission.

19   Q.    I want to make sure I understood what you said about

20   the five days.  Are you talking about an acute injury is

21   within five days or at least five days?

22   A.    It's in the range of -- it is less than five days old.

23   Could be a few days of that.  But if we start at the time

24   of death, we know she's in the hospital for three days, so

25   we back up from there, which would tell us the injury

1    occurred approximately right about the time or right before

2    she was admitted to the hospital.

3    Q.   In reviewing the records from the Sanford Fargo

4    Medical Center, did you also note that a skeletal survey or

5    X-ray was done?

6    A.   Yes.  Skeletal survey is when we X-ray the body

7    looking at the different bones, looking for fractures,

8    healing fractures or abnormal growth to those bones.  The

9    survey that was done on the child revealed no evidence or

10   no abnormalities present, indicating there were no signs of

11   fractures, healing fractures, or abnormal bone growth in

12   the child.

13   Q.   Now, as part of that, would that indicate that she had

14   no skull fractures?

15   A.   That is correct.

16   Q.   As it relates to the information that was provided to

17   you about this case, what is the significance in your mind

18   regarding the fact that Aleeyah had no skull fractures?

19   A.   The information that I reviewed indicated this child

20   had fallen from a short height, approximately 36 inches,

21   onto a wood floor covered by linoleum, based on the

22   information that was provided.

23        When we look at the literature on short falls, those

24   children that have symptoms and develop symptoms, the

25   majority of them will have a simple linear skull fracture.

1    In this case the child does not have a simple linear skull

2    fracture.  Doesn't have a skull fracture.

3        So, one, that would say, well, did we really have one?

4    Not all short falls will have them, but a lot of them will.

5    But what we would expect is for a child that had a short

6    fall that became immediately symptomatic, as was reported,

7    we would expect there to be a significant amount of trauma

8    from that short fall, as outlined in the literature.

9        In this case we have no significant trauma to the head

10   in the way of a skull fracture that would be correlated to

11   this sudden unresponsiveness this child experienced.

12       So the story of simple fall, landing onto a wood

13   floor, no skull fracture but immediate symptomatology,

14   meaning went unresponsive, that does not correlate.  The

15   literature in this field would support that fact.  It just

16   does not correlate when you look at those three different

17   things together.

18   Q.   You reviewed the records that were submitted to you,

19   things that indicated her symptoms immediately upon being

20   -- at least what was reported upon being found?

21   A.   Yes.  The symptoms that were reported was that after

22   the reported fall, then she made a sound, and then she was

23   discovered to be stiff and groaning and then became limp.

24   That would be what we call a very rapid onset.

25       We would also say that means there's no lucid

1   interval.  A lucid interval means you are talking, you are

2   awake and everything like that.  If you're in the ER,

3   there's actually a grading scale that they would use.  They

4   would assign a scale.  If you are below that, they would

5   say there's no lucid interval.

6        Based on what we're being told at the scene, this

7   child had no lucid interval, was immediately symptomatic.

8   Again, that would not correspond to a simple fall from a

9   table at a height of 36 inches.

10  Q.   So those two things are inconsistent with each other?

11  A.   That is correct.

12  Q.   Why is that?

13  A.   Again, when we look at our literature on short falls,

14  those children present with a lucid interval, meaning they

15  are normal, they are talking.  They may be complaining of

16  hurt on the head or crying or something along those lines,

17  but they're not immediately unresponsive.  In this case the

18  child is immediately unresponsive.

19       So if we look at our current literature, a short fall

20  should not go immediately unresponsive, as we're being told

21  occurred in this case.  Again, that is not concurrent.

22  They do not agree with one another.

23  Q.   I'm now going to move on specifically to the

24  information you received from the Office of Medical

25  Examiner in Ramsey County.  You indicated you not only

1    received the pathological report, but you also reviewed the

2    pictures and slides, as well?

3    A.    That is correct.

4    Q.    In reviewing those, could you describe for the jury

5    how many different distinct hemorrhages you noticed that

6    could be observed as part of the internal examination that

7    was done on Aleeyah Cook?

8    A.    Yes.  If we look at the injuries, the injuries that

9    stood out was there were contusions or bruising to the top

10   of the head, to each side of the head, to the center of the

11   forehead, and then to the back of the head.  The one to the

12   back of the head was showing -- it was a brownish color,

13   which tells us it's definitely aging.  When you get a

14   bruise, it's a bluish-purple coloration.  Then after a day

15   or so it will change and become a yellowish and then a

16   little bit of green and some brown to it before it goes

17   away.

18        Now, we can't say it's this color for this many days.

19   There is literature out there that would suggest that, but

20   we can't do that.  We're not able to do that.  I've seen

21   too many individuals that get bruised, and they don't fit

22   that scenario.

23        So if we look at the child, the one in the back of the

24   head is showing signs of aging based on the color.  But the

25   others are not, or they're just barely starting.  Remember,

1    this child spent three days in the hospital.  So we would

2    expect there to be some early signs of changing, because

3    the child was in the hospital for three days.

4        But when we look at these, there are a couple that is

5    of exceptional concern.  The scalp, when it's removed off,

6    the area there beneath the scalp and above the skull,

7    that's called the subgaleal tissue.  When we look at that

8    on two of these injuries, the one on top of the head

9    actually had eight distinct little contusions in one little

10   area.  So on the outside it looked like one.  But when you

11   looked at it from the inside, you could see there were

12   eight distinct ones.

13       Also, on the forehead we had the one.  On the right

14   forehead there was actually a group of seven contusions.

15   But on the outside it looked like one.  Then if we look at

16   the left forehead, there was actually two there.

17       The problem with this is if I fall and hit an object,

18   I'm going to have one bruise both on the outside and the

19   inside.  If I fall and I land, I'm going to have it on the

20   side that I hit.  So if I'm standing on this chair and fall

21   over, I'm going to have one contusion on one side of my

22   head that hit the floor.

23       If you look at this child, we have both sides of the

24   head, the forehead, and the top of the head.  That's four

25   different planes to this head that have acute injuries.

1   Two of those have more than seven distinct little

2   contusions inside it.  So that does not correspond to the

3   information provided, which says this child fell from a

4   table.  That would be one injury, because it fell from the

5   table and hit the floor.  That would be one side of the

6   head.

7       How do we accommodate or account for the other three

8   sides?  Also, we have two of them that have more than one

9   impact.  We have seven on one, eight on the other.

10      Also, if we look, when we remove the calvarium, or the

11  top of the skull, remove the dura, we said there was a

12  small subdural hemorrhage, less than one milliliter, which

13  we've also talked about, and also there was evidence of

14  what we call herniation.

15      As the brain swells, and we can see that, the brain

16  has to go somewhere.  One of the areas it goes is it tries

17  to push down along the spinal cord.  The cerebellum sits at

18  the back underside of the brain.  The cerebellum is what

19  allows you to write and do fine motor movement.  If that

20  starts to get pushed down through where the spinal cord is,

21  it would show up as tonsillar herniation.

22      In this case there was evidence of tonsillar

23  herniation.  So that means this brain is really swelling

24  and is trying to go somewhere.  That swelling would

25  correspond to what the radiologist saw when we talked about

1   the hypoxic ischemia injury the radiologist saw on the

2   initial CT.  So we have corresponding signs there.  The

3   subdural corresponds to what they saw on the CT.  So all of

4   that is in agreement with one another.

5   Q.   For purposes of the next question, you said the

6   injuries on the back of the head were older, so I don't

7   want to talk about those as part of this next question or

8   series of questions.  If you look at the injuries to the

9   top of the head, the left, mid, right forehead on those

10  different planes, how many total hemorrhages were noted?

11  A.   As I mentioned, on the top of the head, there are

12  eight of those.  The mid forehead, there's a single one.

13  On the right forehead, there's a group of seven.  Then on

14  the left forehead, there's two.

15       So if we look at that, that is 18 different contusions

16  or bruising on the subgaleal space that we can see, which

17  means we're not talking about a single impact.  We're

18  talking about 18 individual little impacts to this head,

19  and when we say four planes, we're looking at each side,

20  the front and the top.  Those are four different planes.

21       So you can imagine if you ever fall, one surface hits

22  the ground.  That's one plane.  We're looking here at four

23  different planes.  At least two of those have more than

24  seven distinct injuries in that plane.

25  Q.   If we don't worry about the placement on the different

```
 1    planes, let's just talk the sheer number of hemorrhages you

 2    saw, which were 18.  Based on your experience and training,

 3    do you have an opinion, within a degree of medical

 4    certainty, as to whether an individual could get 18

 5    distinct hemorrhages from a single fall?

 6    A.   No, sir.  It would not be possible.

 7    Q.   In reviewing your report, you indicated that you would

 8    expect to see one, maybe two, at the most.  Is that

 9    correct?

10    A.   That is correct.

11    Q.   Now, I understand the one.  You fall and you hit your

12    head.  Why two?

13    A.   In the same photographs, there is a chair at the

14    table.  Also, when we look at the medical records, one

15    story that's documented in there is the child was in the

16    chair and fell.  The other story in the medical record is

17    the child is on the table and falls.

18         If the child is in the chair and falls, there's

19    nothing else for it to hit except for the floor.  If it's

20    on the table and falls, there's the possibility that it hit

21    the chair as it was going to the floor.  So now we have two

22    impacts, and let's say those were in two different areas.

23    We could account for two different planes.

24         Remember, we have four planes that have injuries.

25    And, also, that's only two impacts.  We noted 18 distinct
```

1    impacts to the scalp, whereas we can only account for

2    possibly two, and that's saying the child is standing or

3    sitting on the table.  As it falls, it hits the chair

4    before it hits the floor.

5    Q.    You might have answered my question, at least in part,

6    with what you just said.  My last question was, ignore how

7    many different areas of the head there were, and just count

8    the sheer number.

9         What is the significance of the number of different

10   planes that the hemorrhages were found on?

11   A.    The significance of the number of planes is the fact

12   that if we fall, we get one.  If somehow or another we hit

13   the chair and then hit the floor, that's two.  But we have

14   four different planes involved here.  So that means two

15   planes with injuries we cannot account for with the story

16   of sitting on the table or sitting on the chair and falling

17   to the floor.

18   Q.    Is the number of injuries you saw in the multiple

19   planes indicative of an accidental or nonaccidental injury?

20   A.    In my opinion it would be nonaccidental.

21   Q.    We've talked a little bit and you've referenced a

22   little bit to the dating of injuries and how the bruises

23   break down and change color.  You can see that just on an

24   external bruise.

25        Tell us what happens internally, from a medical

1  standpoint, what happens as the bruise is breaking down and

2  healing.

3  A.   Of course we can get inflammation in there, meaning

4  inflammatory cells can come in.

5      The other thing that happens are what we call

6  macrophages.  These are basically the clean-up cells.  They

7  come in and clean up debris.  They also get rid of the red

8  blood cells that are breaking down.

9      Now, the red blood cells have iron in them.  It's what

10 helps bind the oxygen.  As those break down, the iron is

11 released.  Then the macrophage will come and gobble it up,

12 and it changes its name to a siderophage.

13     A siderophage is a fancy term for a macrophage that

14 has iron in it.  We have a stain that we do that shows up

15 iron.  The only iron we are interested in is the iron

16 that's inside the siderophage.  We can start seeing in

17 contusions or bruises to the skin a siderophage anywhere

18 from around three days to about seven days is when they

19 will first start showing up.  Of course if it's been there

20 multiple days, that number will increase.  If you have a

21 lot of blood there, you have to get rid of all that iron.

22     So the number of siderophages will increase over time.

23 If we do an iron stain and we see a lot of them, that tells

24 us it's been there for several, several days or weeks.  If

25 we see one or two, that tells us we are right at that

1    initial phase when we can see them, which is around Day 3,

2    maybe Day 4.

3         So in this case, this child was in the hospital for

4    three days.  When we look at the scalp injuries that we're

5    concerned about, there is only one or two siderophages in

6    those areas that we're concerned about, which would

7    indicate that those contusions to the scalp are in that

8    three- or four-day range, which would put it occurring at

9    or about the time this child went unresponsive and was

10   admitted to the hospital.

11   Q.   Did you also review the neuropathological exam that

12   was done as part of the autopsy report?

13   A.   Yes, sir.

14   Q.   What did you note of significance as it relates to the

15   neuropathological examination?

16   A.   Yes.  There were several things.  Of course one was

17   the subdural hemorrhage was noted.  Also, they noted optic

18   nerve sheath hemorrhage.  The optic nerve sheath hemorrhage

19   is simply the sheath around the nerve that goes from the

20   eye to the brain.  However, that sheath is in continuation

21   of the dural membrane.

22        Remember, I told you there was subdural blood.  The

23   brain was also swollen.  So the brain, as it swells, can

24   push that blood out along that sheath.  Just having

25   perineural sheath hemorrhage really doesn't mean a lot if

1   you have subdural hemorrhage and cerebral edema, as we do

2   in this case.

3        There was also noted to have, as I said, the cerebral

4   edema with the tonsillar herniation.  But also of note was

5   that deep within the brain there's an area called the

6   corpus callosum, and the splenium of that is a very deep,

7   protected structure.  Traumatic brain injuries that carry a

8   lot of force, a lot of energy with them, can penetrate deep

9   into the brain and disrupt the neurons and the tissues in

10  the deep brain.

11       One of the areas we see these types of deep,

12  penetrating injuries, and we're not talking about a gunshot

13  wound or a stab wound or something like that.  We're

14  talking about a blunt force injury, or somebody striking or

15  me hitting the floor, something like that, on the outside

16  of the brain, and the energy of that transferring into the

17  deep centers of the brain.  We can see trauma in this area

18  that I mentioned of the corpus callosum.

19       So that indicates there is significant energy being

20  transferred from the outside of the skull, outside of the

21  head to deep inside the brain.  A simple fall would not be

22  expected to create that kind of energy that's going to

23  create that.  Of course we are talking about somebody

24  falling from a building or something like that.  But if

25  we're talking short fall, 36 inches, we would not expect to

```
 1   see this kind of energy transferred deep within the brain,

 2   disrupting that brain tissue, as was noted on the

 3   neuropathology examination.

 4   Q.    There is another individual who was in here testifying

 5   before you today, Dr. Snell, regarding the literature that

 6   exists regarding children falling, and from what they call

 7   a short fall, which is a fall of five feet or less.  Are

 8   you familiar with that literature?

 9   A.    There is an extensive amount of that.  Yes, sir.

10   Q.    And is the literature -- what does it support

11   regarding a child dying from a short fall of less than five

12   feet?

13   A.    The literature overwhelmingly will show that the

14   opportunity or the possibility of a child dying from that

15   is less than one per one million children.

16         There is some literature talking about playground

17   injuries.  However, when you look at that, it's still less

18   than one per one million, in the age range we're looking at

19   here, dying from these type of injuries.

20         So it's very, very rare these children would die from

21   any kind of a simple short fall, not a crushing injury, not

22   a major car accident, something like that.  We're talking

23   about a simple fall.  It's just extremely, extremely rare.

24         Part of the literature also talks about children

25   falling in the hospital setting.  In the hospital setting
```

```
 1    we have nurses.  We've got doctors there.  In all of those,

 2    not a single one of those, and there were over 500 in one

 3    case, where they had no deaths.  The most significant

 4    injury was a simple linear skull fracture, but no

 5    subsequent neurological long-term effects, which means this

 6    child recovered normally and was a normal child after that.

 7        So even when we look at those that are in controlled

 8    environments, as a hospital, we do not see deaths from

 9    simple short falls.

10    Q.   You talked about this literature.  If you don't

11    recall, that's fine.  Do you recall the name of the article

12    or the author of the study or studies you just referred to?

13    A.   If I can have one second.  There are two articles I

14    brought with me today that talk about this.

15        The first is entitled, "Annual Risk of Death Resulting

16    From Short Falls Among Children, Less Than One in One

17    Million," by David Chadwick.

18        The other article that I have is "Childhood Head

19    Injuries" by Robert Reece.

20        Both of these articles I brought with me talk about

21    it, and talk about the risk factors and how those children

22    present.

23    Q.   Based on your training and experience, can you testify

24    as to whether or not children, a two-year-old, fall the

25    same way an adult would?
```

```
1    A.    No, sir, they won't.

2    Q.    How does a child fall differently than an adult?

3    A.    What we call the center of gravity is very different

4    on a child than on an adult.  The center of gravity in an

5    adult is in the body, whereas in a child it's in the head,

6    because their heads are much larger when you look at the

7    volume to the body when you compare it to us.  So their

8    falls will be very much different.  Their falls are more

9    centered around the head falling.

10         So, therefore, we see very different dynamics in those

11   type of falls.  That's the reason we have to look at

12   studies that look at falls in children, not at studies in

13   falls in adults, when we evaluate the risk factors from

14   those falls.

15   Q.    Based on what you just said, do most children have

16   bigger heads proportionally than adults do or to their

17   body?

18   A.    In relation to their body, yes, sir.

19   Q.    So would you expect to see, even though the child's

20   head is bigger proportionally than the rest of the body, if

21   they fell, they would have injuries on the top of their

22   head?

23   A.    They can actually have them pretty much anywhere

24   depending on how they fall.  Yes, top of the head would be

25   a very common location.  But depending how they fall, where
```

1    they're falling from, it can be to a lot of different

2    areas.

3         Again, in the literature, if we look, most of these

4    short falls, if they have a skull fracture, it's on -- the

5    side of the head is where the skull fracture would be at,

6    not on the crown of the head.  And, again, the side of the

7    head the skull is a lot thinner than it is on the crown of

8    the head.

9    Q.   But there was no skull fracture at all in this case?

10   A.   In this case, that's correct.

11   Q.   Did you also have an opportunity to review the Death

12   Certificate?

13   A.   Yes, sir.

14   Q.   Dr. Snell, I'm handing you what has been marked as

15   Exhibit No. 8.  Is that document familiar to you?

16   A.   Yes, it is.

17   Q.   Is that the Death Certificate that we referred to?

18   A.   Yes.

19   Q.   I'm going to look at this sideways with you.  The

20   immediate cause of death is listed as a traumatic head

21   injury as a consequence of a physical assault.  Do you

22   agree with that cause of death listed in the Death

23   Certificate?

24   A.   Yes, sir.

25   Q.   Down below it indicates the manner of death is a

1    homicide.  Correct?

2    A.   That is correct.

3    Q.   Do you also agree with that classification?

4    A.   Yes, sir.

5    Q.   Would you agree with me that a homicide is not a

6    medical diagnosis?

7    A.   That is correct.

8    Q.   But typically when an autopsy is performed, is it fair

9    to say that you try to characterize the death as

10   accidental, homicide, suicide, and maybe there's even other

11   categories?

12   A.   That's correct.

13   Q.   None of those categories, accidental, suicidal,

14   homicide, none of those are official medical diagnoses.

15   Correct?

16   A.   That's correct.

17            MR. MILLER:  Thank you.  That's all the questions

18   I have.

19            THE COURT:  You may examine.

20            MR. KHOROOSI:  Thank you, Your Honor.  Could I

21   take 10 minutes?

22            THE COURT:  Yes.  We'll take a 15-minute recess

23   now.  Don't talk to each other about the case.  Don't do

24   any research.  We'll be in recess.

25                 (Recess at 2:20 until 2:35)

```
 1              THE COURT:  Bring in the jury, please.

 2              (The jury entered the courtroom)

 3                    CROSS-EXAMINATION

 4  BY MR. KHOROOSI:

 5  Q.   Good afternoon, Dr. Snell.

 6  A.   Good afternoon.

 7  Q.   In your review of the materials, you didn't look at

 8  the clinic records for Aleeyah.  Did you?

 9  A.   I don't believe I had the clinic records.

10  Q.   And you didn't look at the microscopic slides.  Did

11  you?

12  A.   Yes, sir, I did.

13  Q.   You did?

14  A.   It was after the report was written that I had access

15  to those slides.

16  Q.   It was after the report was written, you said?

17  A.   That's correct.

18  Q.   If I understand your testimony correctly, you said you

19  don't start to see iron forming for three to seven days.

20  Is that fair?

21  A.   That's correct.

22              MR. KHOROOSI:  Thank you.  Nothing further.

23              THE COURT:  Anything further?

24              MR. MILLER:  No redirect, Your Honor.

25              THE COURT:  Very well.  Thank you, Doctor.
```

```
 1    You're excused.

 2                    (Witness excused)

 3         THE COURT:  Call your next witness.

 4         MR. WRIGHT:  At this time we have a couple

 5    stipulations that counsel agreed to that we would like to

 6    put before the Court.

 7         THE COURT:  Very well.  Go ahead.

 8         MR. WRIGHT:  The first stipulation counsel has

 9    talked about, number one, is the residence, the kitchen in

10    the residence of Mr. Contreras' house in January of 2012

11    had a linoleum floor with a wood base underneath it.

12         THE COURT:  Is that so stipulated?

13         MR. KHOROOSI:  So stipulated, Your Honor.

14         THE COURT:  All right.  Then what's the other

15    stipulation?

16         MR. WRIGHT:  The other stipulation is that the

17    Defendant, Mr. Contreras, is an Indian, and the acts

18    occurred within Indian Country.

19         THE COURT:  So stipulated?

20         MR. KHOROOSI:  In spirit, Your Honor, I would add

21    the caveat that the place where the acts were alleged to

22    have occurred lies within Indian Country.

23         THE COURT:  Any objection?

24         MR. WRIGHT:  I don't see the difference.  I

25    understood we had a stipulation.
```

```
 1              THE COURT:  Hold on.  Just a minute.

 2              MR. WRIGHT:  I believe we have a stipulation on

 3    that, Your Honor.

 4              THE COURT:  Okay.  I think you each said the same

 5    thing in a slightly different way.  But, once again, you

 6    state, Mr. Wright, what the stipulation with regard to the

 7    Defendant being an Indian and the offense occurring, the

 8    acts that are claimed to be the offense occurring within

 9    Indian Country.  What is your understanding of the

10    stipulation?

11              MR. WRIGHT:  The same thing.  That the Defendant

12    is an Indian, and the area where the alleged acts occurred

13    is within Indian Country.

14              MR. KHOROOSI:  That's our understanding, as well,

15    Your Honor.

16              THE COURT:  Very well.  Is it so stipulated?

17              MR. KHOROOSI:  It is so stipulated.

18              THE COURT:  All right.  I have told the jury

19    before that when there are stipulated facts, as here, the

20    Government and Prosecutor -- the Prosecutor and Defendant,

21    through its counsel, have stipulated, that is, they have

22    agreed that certain facts are as counsel has just stated.

23    You must, therefore, treat those facts as having been

24    proved.  Anything else?

25              MR. WRIGHT:  Yes, sir.  We have two other
```

```
 1   exhibits we would like to introduce.  Again, I understand

 2   the defense will stipulate to their admission, that is, the

 3   table and one of the chairs that was taken pursuant to the

 4   Search Warrant from Mr. Contreras' kitchen.  That would be

 5   Exhibit 6 and 7 that we would like to bring in and

 6   introduce as evidence.  We didn't bring them in until you

 7   approved.

 8             THE COURT:  Is that agreed?

 9             MR. KHOROOSI:  It is, Your Honor.  So stipulated.

10             THE COURT:  Now, you recognize that after the

11   trial is over, we'll have to have pictures of those put

12   into the record, because the clerk's office isn't going to

13   want to become the repository for the furniture.

14             MR. WRIGHT:  Fully understand.  No objection.

15             THE COURT:  Is that understood by the defense?

16             MR. KHOROOSI:  It is.

17             THE COURT:  Exhibits 6 and 7 are received, with

18   the understanding that there will ultimately be pictures

19   substituted for them.  They're received, though.  Bring

20   them in.

21             MR. WRIGHT:  I think, Your Honor, we still need

22   to put the exhibit tag on them, but other than that,

23   they're ready.

24   (The table and chair, Exhibits 6 and 7, were brought into

25   the courtroom).
```

```
 1              MR. WRIGHT:  With the receipt of those exhibits,
 2     we have no further evidence, and we rest our case.
 3              THE COURT:  Very well.  The defense may proceed.
 4              MR. KHOROOSI:  Before I proceed, Your Honor, I
 5     would like to make a motion outside the presence of the
 6     jury.
 7              THE COURT:  Approach the bench, please.
 8     (Side bar with all counsel:)
 9              THE COURT:  I assume a Rule 29 motion?
10              MR. KHOROOSI:  Yes.
11              THE COURT:  I'll take that when we have our next
12     recess.  It will be taken as if it was made right now.  But
13     I want to keep the case moving along, so we'll do it at the
14     next recess.
15              MR. KHOROOSI:  I would request to adjourn for the
16     day and pick up tomorrow morning.  My expert witness -- I
17     plan to put my expert witness on first.
18              THE COURT:  Isn't he here?
19              MR. KHOROOSI:  He's here, but he's not in proper
20     attire.  I would also like to review additional --
21              THE COURT:  Do you have other evidence you can
22     put on?  Jurors came from a long ways away particularly for
23     this case.  My understanding is you have a full day of
24     testimony.  Don't you?
25              MR. KHOROOSI:  I do.  But I would expect to be
```

```
 1   done tomorrow, Friday morning at the latest.

 2            THE COURT:  Well, we don't know how long the jury

 3   will deliberate.  I mean we need deliberation room.  I want

 4   some evidence to come in this afternoon.  If your expert

 5   isn't dressed up -- what, is he just in a shirt?

 6            MR. KHOROOSI:  Yes, a short-sleeved shirt.

 7            THE COURT:  I don't care.  Other than that,

 8   there's no reason he can't testify.  Right?

 9            MR. KHOROOSI:  I would like to go over his

10   testimony one more time with him.

11            THE COURT:  Do you have any other witnesses you

12   can put on?

13            MR. KHOROOSI:  I do, but the order is important

14   to me.

15            THE COURT:  Then you better put him on.

16            MR. KHOROOSI:  I have one brief witness I can put

17   on today.

18            THE COURT:  You have one brief witness and then

19   you have your expert.  I have want the jury to have full

20   deliberation time.  Particularly these people coming from a

21   distance, there will be pressure on them when they get this

22   case on Friday to decide it.  I want them to have plenty of

23   time to decide it one way or the other.  That's why I don't

24   want to sit and let them go at 2:45 in the afternoon.  I

25   want to get the evidence in.
```

```
 1        It will take a while to settle instructions.  I have a
 2   question as to the instruction with regard to Count 3.
 3   We'll get to that.  I have a question as to how I instruct
 4   on that, not whether I'm going to, but how.
 5        If you want to put on your short witness and then your
 6   guy, your expert, fine.  If you want to put your expert on
 7   first, that's up to you, but I want to keep on moving
 8   ahead.  Or you can change your order of proof and put
 9   somebody else on now.  But I want to move it along and get
10   the evidence in.
11   (End of side bar)
12            MR. KHOROOSI:  Your Honor, I'll call Sierra
13   Wolcott.
14                    SIERRA WOLCOTT,
15   called as a witness, being first duly sworn, testified as
16   follows:
17                 DIRECT EXAMINATION
18   BY MR. KHOROOSI:
19   Q.   Good afternoon, Sierra.  Could you introduce yourself
20   to the jury?
21   A.   I'm Sierra Wolcott.
22   Q.   And how do you spell your last name?
23   A.   W-O-L-C-O-T-T.
24   Q.   What do you do for a living?
25   A.   I'm the administrative assistant for our tribal
```

secretary at the Sisseton-Wahpeton Oyate.

Q.   Is this your first time testifying?

A.   Yes, sir, it is.

Q.   Now, are you familiar with Mario Contreras, the Defendant?

A.   No.

Q.   Had you met him before his daughter passed away in 2012?

A.   No, I hadn't.

Q.   Had you met his daughter, Aleeyah Contreras, before she passed away?

A.   Yes.

Q.   I would like to draw your attention to the night of January 6, 2012.  Is that the night you met Aleeyah Cook?

A.   Yes, sir.

Q.   Where was that?

A.   It was in Enemy Swim at the Community Center for a wake.

Q.   There was a wake going on that night, you said?

A.   Yes.

Q.   You live in a small community.  Did you know of Mario Contreras before that point?

A.   I may have heard his name.  That's about it.

Q.   Are you aware what his role was that evening in the wake?

```
 1   A.   He was singing with the drum, I know.

 2   Q.   How did you happen to meet Aleeyah Cook?

 3   A.   She was with one of the women.  There were four or

 4   five of us in the kitchen.  Her dad was on the drum.

 5   That's all I knew.  Normally we just look after kids if

 6   they need looking after.  That was pretty much it.  She was

 7   hanging out with us.

 8   Q.   Did you notice anything about Aleeyah's behavior or

 9   condition that troubled you?

10   A.   Yes.  She was very lethargic.  We were trying to feed

11   her.  She didn't want to eat.  She ate a little nibble off

12   a couple of chips.  She just wanted to be held.  We were

13   all taking turns holding her.  She was just -- she looked

14   pitiful is how I felt.

15   Q.   Aleeyah displayed a symptom that night that affected

16   you personally.  What was that?

17   A.   Yes.

18            MR. WRIGHT:  Objection.  Counsel is directing on

19   his direct exam.

20            THE COURT:  Overruled.

21   A.   Continue?

22   BY MR. KHOROOSI:

23   Q.   Yes, you can continue.

24   A.   She actually threw up on me.  I went to my van.  I

25   didn't know where her bag was.  Her dad was literally
```

```
 1   singing at the moment, so I didn't want to go ask him where

 2   her stuff was.

 3       I went out to my van and got some of my daughter's

 4   clothes.  She was about the same age.  She had messed on

 5   herself, so I changed her clothes into my daughter's

 6   clothes.

 7           MR. KHOROOSI:  Actually that's all I have.  Thank

 8   you.

 9                     CROSS-EXAMINATION

10   BY MR. WRIGHT:

11   Q.   That night that you came in contact with Aleeyah was

12   January 6, you said?

13   A.   Yes, I believe so.

14   Q.   You said you and some other women were watching

15   Aleeyah in the kitchen?

16   A.   Correct.

17   Q.   Where was Mario?

18   A.   In the gymnasium area.

19   Q.   For how long did you watch Aleeyah, if you know?

20   A.   About an hour and a half.

21   Q.   You said she looked pitiful in that hour and a half?

22   A.   Yes.  She looked very sick.

23   Q.   Did you go alert Mario of that?

24   A.   Someone said she had been feeling sick.  It's pretty

25   normal for us to take care of a kid.
```

1  Q.   So the fact that you thought she looked pitiful, but

2  you didn't go tell her dad that she was really bad.  Is

3  that right?

4  A.   She just looked sick.

5  Q.   In fact, she threw up on you.

6  A.   Yes.

7  Q.   Symptoms common of having the flu.  Isn't it?

8  A.   I suppose so.

9  Q.   People that get the flu take two or three days to get

10  better.  Don't they?

11  A.   Uh-huh.

12  Q.   You have to say yes or no.

13       MR. KHOROOSI:  Your Honor, objection.  Calls for

14  expert testimony.

15       THE COURT:  Overruled.

16  BY MR. WRIGHT:

17  Q.   Is that a fair statement?

18  A.   In my experience with my children, yes, three to seven

19  days, depending.

20  Q.   Would it surprise you to know she was fine on Sunday

21  night, a few nights later?

22  A.   I wouldn't know if she was or not.

23  Q.   That wouldn't be a surprise to you, though.  Would it?

24  A.   No.

25       MR. WRIGHT:  Thank you.

1           MR. KHOROOSI:  No redirect.

2           THE COURT:  Thank you, ma'am.  You may step down.

3                    (Witness excused).

4           THE COURT:  I'm going to have a hearing outside

5      of the presence of the jury.  Don't talk to each other

6      about the case.  Don't do any research.  Keep an open mind

7      until you've heard all the evidence.  Please stand for the

8      jury.

9                    (The jury left the courtroom)

10     (Outside the presence of the jury, counsel and Defendant

11     present, the following proceedings were held at 3:00)

12          THE COURT:  I'll hear the Rule 29 motion now from

13     the defense.

14          MR. KHOROOSI:  Thank you, Your Honor.

15      Your Honor, at this time we would move for a judgment

16     of acquittal.  It's our contention the Government has not

17     met its burden of proof on any of the three counts,

18     especially not beyond a reasonable doubt.

19      The Government has presented multiple expert

20     witnesses, none of whom have been able to say they can

21     exactly date Aleeyah's injuries.  The Government's theory

22     of the case, which they've said time and time again, is

23     that on January 9th Mario Contreras was stressed out

24     because he was late for work, and so he punched his

25     daughter to death in the head.

1    Now, even if you put the ridiculous-sounding premise

2    that this man would actually commit this act for so trivial

3    a reason, the expert testimony simply doesn't support any

4    finder of fact in their determination that unlawfully and

5    with malice aforethought Mr. Contreras did anything

6    intentional to take Aleeyah's life.

7    You have the testimony of Dr. Froloff.  Dr. Froloff

8    indicated that he couldn't really tell when or how the

9    injuries occurred.  Based on his autopsy, he ruled the

10   cause of death was blunt force trauma to the head.  He

11   didn't say he could tell when those occurred.

12   For the prosecution's theory to work, the jury must be

13   convinced beyond a reasonable doubt that all of the

14   precipitating actions happened in a singular instance of

15   violence.  Nowhere is that supported to a reasonable degree

16   of medical certainty, not with Dr. Froloff, not with

17   Dr. Snell.

18   When you look at a symptom, such as the retinal

19   hemorrhaging, one of the Government's experts even said

20   it's impossible to date.  Not it's difficult.  I said it

21   was difficult.  Dr. Graff said it was impossible.  You

22   can't tell when those retinal hemorrhages occurred.

23   In order to believe the Government's theory, a jury

24   would simply have to believe this child was fine

25   beforehand, and died exclusively because of Mario

1   Contreras' conduct.  That fact is simply not supported by

2   any of the evidence that was entered.

3        Where it is supported, it's contradicted.  In short,

4   Your Honor, because the Government can't prove and hasn't

5   met its burden of proof that beyond a reasonable doubt

6   Mario Contreras took any voluntary and intentional act on

7   January 9, 2012, this case can't go to a jury.

8        So we would move for a judgment of acquittal.  Thank

9   you.

10            THE COURT:  What does the Government have to say

11   about that?

12            MR. WRIGHT:  Your Honor, first of all, we

13   disagree with counsel's standard that he's proposing at

14   this point, beyond a reasonable doubt.  It's my

15   understanding the test at this time is that the Court views

16   the evidence most favorable in light of the Government and

17   has to conclude that a reasonable jury could find the

18   Defendant guilty.

19        The evidence that we presented in this case to support

20   the three counts in the Indictment is as follows:

21        First of all, the Court received the Death Certificate

22   in this case, Exhibit 8, which Death Certificate provides

23   that in the opinion of the forensic examiner and his

24   supervisor, this was a homicide case, and the child died

25   from physical blows to the head.  Dr. Froloff and Dr. Snell

1   both testified they counted 18 separate contusions to this

2   child's head.

3       The Defendant's story, according to the FBI agent who

4   interviewed the Defendant three weeks afterwards, is that

5   the child died from a fall from the chair.  Your Honor, you

6   don't even need medical testimony to ascertain that you

7   can't get 18 separate contusions on four different planes

8   on your head from a simple fall from the chair.  As

9   Dr. Snell testified here just a few minutes ago, when you

10  fall, you get one bruise on one side of your head.  It's

11  medically impossible to get a corresponding bruise on the

12  exact opposite side of the head.  So if you find that the

13  Defendant's story that the child fell is not true, that

14  means that the person that made up the story that the child

15  fell, there is strong evidence of guilt against them.

16      The evidence showed the Defendant had exclusive

17  custody, the only adult that had custody of the child

18  during the five days prior to the day the child died.

19  Dr. Froloff and Dr. Snell testified the child died within

20  approximately a three-day period, counting the day of

21  death, in the hospital for three days, at the time the

22  injuries were inflicted.

23      The 18 contusions and wounds to the head we believe

24  shows the malice that was required for such a terrible

25  beating.  This death was inflicted without weapons.  It's

1    the Government's contention the Defendant killed his child

2    literally with his bare hands or fists, which we believe

3    shows evidence of malice in this case.  He is not charged

4    with premeditated murder.  He's only charged with

5    second-degree murder.  The severity of the injuries to the

6    child shows the Defendant's malice at the time in question.

7         It's also significant that Agent Mertz testified that

8    the child was fine on Sunday.  Agent Mertz testified that

9    he asked the Defendant on two different occasions during

10   the interview how was the child leading up to the time of

11   death, and the Defendant in the middle of the interview

12   said Aleeyah was fine on Sunday, the day before she went to

13   the hospital, and he had a question on that, so he asked

14   the Defendant a second time.  The Defendant said, "Yeah,

15   she was fine Sunday night."

16        So all of their suggestions that there's some kind of

17   old injury or preexisting condition or artificial injury

18   doesn't make sense with the Defendant himself saying the

19   child was fine the night before.  That corresponds with the

20   victim, Shannon, who testified that she talked to Aleeyah

21   basically all five days when the Defendant had Aleeyah and

22   was not overly concerned that there was any kind of injury,

23   was not overly concerned on Sunday night when she talked to

24   Aleeyah the night before she died.

25        The evidence also showed that the child had been to

1    Head Start two weeks before she died at the initial

2    interview on the Head Start screening.  It makes less

3    plausible the defense's theory that there's some kind of

4    preexisting condition when a doctor looked her over from

5    head to toe and found no problem with her.

6        In addition to Dr. Froloff, we heard the testimony of

7    Dr. Graff, who is one of the leading pediatricians in the

8    Midwest.  He said this review of the case and review of

9    studies, in his opinion -- or his review of the studies

10   showed that the chances this child would die from a fall

11   like this I believe he said were one in a million.

12   Dr. Snell this afternoon said he thought it was less than

13   one in a million.  So you have plenty of expert testimony

14   that this is not a fall.  It's a homicide when the child

15   was in the Defendant's custody.

16       Other things I think you can consider, which are not

17   as strong as the medical evidence, but the Court can

18   consider them, the Defendant was never really fond of the

19   mother's pregnancy with this child.  He demanded a DNA

20   test.  He had little to do with the child for the first 22

21   months.

22       Just about a couple weeks before the child died, the

23   Defendant heard the child refer to another man as daddy,

24   which totally changed the Defendant's disposition on that

25   conversation.  He talked to Shannon the night before about

1    discontinuing child support.  He wasn't happy when Shannon

2    would not discontinue the child support.

3         The Defendant in this case never called 911.  His

4    child suffers what he said was a horrific fall.  He has

5    access to a cell phone.  There was testimony by Agent Mertz

6    that the Defendant admitted he called somebody else, but he

7    never called an ambulance to come to his residence.  He

8    never called an ambulance to come meet him as he's on the

9    way to the hospital.  He never calls the hospital saying

10   he's on his way in.  What parent would not call an

11   ambulance when his own child fell and suffered an injury

12   like the Defendant wants you to believe.

13        You also heard testimony that you received under

14   Rule 404(b) regarding a butt slap by the Defendant.

15        We've also shown you a reasonable theory on how or why

16   the Defendant could have snapped.  As the Court knows,

17   we're not required to prove a motive.  We don't have to

18   prove how or we don't have to prove why the Defendant

19   committed the offense.  But we think we have forwarded a

20   reasonable theory to explain why someone would inflict such

21   a terrible beating on the child.

22        We introduced testimony that the Defendant was under a

23   great deal of stress at the time, he had five women chasing

24   him for seven separate children for child support.  The

25   night before this happened, he tried to talk Shannon out of

1    future child support payments that she had refused.

2         He was on a very short leash from his supervisor, who

3    had warned him a number of times about being late.  He

4    basically lives 30 miles from where he's driving to where

5    he has to get to work, and he has four kids under the age

6    of 11 that he has to get ready that morning.  There's

7    testimony that Aleeyah is normally a fussy child in the

8    morning.

9         There's no other adults there to help him.  It is the

10   perfect storm, which we believe is a reasonable hypothesis

11   for the jury to consider about why the Defendant snapped

12   that day.

13        Even when he's at the ER, even after Aleeyah falls and

14   he shows up at the hospital, there's testimony from Deb

15   Crawford that the doctors there really had to pry the

16   information out of him.  The Defendant was not coming

17   forward with the details of what happened with the child.

18   The doctors had to repeatedly ask what happened, and the

19   Defendant gave one-word answers and was very stoic.

20        Basically you've heard testimony from three different

21   experts that this is a homicide case.  There's more than

22   enough evidence to send this case to the jury on all three

23   counts.  Our main premise is that there were 18 contusions

24   on the child, one to the mid-forehead, eight to the top of

25   the head, two to the left forehead, and seven to the right

1    side.  You just can't get 18 bruises on the four planes of

2    the head from a simple fall, as the Defendant claimed to

3    Agent Mertz is what happened.  Thank you.

4              THE COURT:  Anything further from the defense?

5              MR. KHOROOSI:  Your Honor, the Government's

6    argument assumed Mr. Contreras was a forensic pathologist

7    who could know at the time his daughter suffered the fall

8    that she had some preexisting injury.  There's no evidence

9    he knew that.  That's not inconsistent with the defense.

10             THE COURT:  If he wouldn't have thought so, he

11   wouldn't have driven 120 miles an hour to get her to the

12   hospital.

13             MR. KHOROOSI:  He drove 120 miles an hour because

14   he was scared.  He didn't analyze the medical evidence.

15   His daughter stopped breathing.  He was doing whatever he

16   could to save her.

17      As for the motive, the prosecution has placed the

18   burden on itself.  Once they advanced those motives, I

19   think it really calls into question the validity of the

20   rest of their evidence, Your Honor.  There is such -- the

21   motives are so tenuous.  The reasons they've advanced are

22   because he was late for work, or because his daughter one

23   time called the guy she lived with "dad."  It just doesn't

24   make sense.  In fact, it defies credulity to the extent it

25   should not be submitted to a jury.

1        But all that aside, the inconsistency of the expert

2   testimony in this case is astounding.  You have four

3   different experts essentially saying four different things.

4   They all agree that the injuries happened sometime

5   relatively close to when the child died, but what does

6   "close" mean?  Does it mean within three days, like

7   Dr. Froloff said?  Does it mean three to seven days, like

8   Dr. Snell said?

9        The testimony just is not reliable enough.  There

10   hasn't been enough evidence that the science is consistent

11   enough in that area, and the dating of the injury is the

12   important thing.

13        Because that hasn't been -- because the Government

14   cannot meet its burden in that area, that's the reason

15   we're requesting the judgment of acquittal.

16           THE COURT:  To begin with, the Court at this

17   stage on a Rule 29 doesn't decide whether or not the

18   Government has proved its case beyond a reasonable doubt.

19   That's the burden, of course, upon the Government if the

20   case is presented to the jury for a decision.

21        But instead, the inferences at this point have to be

22   given to the nonmoving party, which in this case is the

23   Government.  It doesn't work that way, of course, once the

24   case goes to the jury.  Then the Court has to decide, given

25   those inferences to the Government from the evidence, that

1    there is sufficient evidence to submit the case to the jury

2    for its consideration.  Even assuming the jury came back

3    with a guilty verdict, that there was enough evidence then

4    to support that conclusion, if the jury reached such a

5    conclusion and convicted.

6        The jury could under the evidence that has come in so

7    far, with 18 impacts on four planes of the head, aside from

8    the problem of the experts being able to say with any

9    degree of certainty as to for sure when those impacts took

10   place, but they all were in the same ballpark.

11       But aside from that, you have the Defendant himself

12   saying to the authorities that the little girl was all

13   right Sunday night, and then you have her mother, who

14   understood Sunday night, when she spoke with her on the

15   phone, that she was all right.  She won't be all right,

16   under one view of the evidence, if there's 18 injuries to

17   four different planes of her head.

18       So taking that evidence in the light most favorable to

19   the Government, there is a basis to send the case to the

20   jury, and your motion is denied.

21       Now, I believe your expert is here.  We could proceed

22   with him or --

23           MR. KHOROOSI:  I'm not sure if he's here yet.

24   When I went out to look for Miss Wolcott, I called

25   Dr. Randall because I didn't see him.  He was out of the

```
 1    building.  I asked him to come back as soon as possible.

 2    I'm not sure if he's here yet or not.

 3              THE COURT:  Why don't you go out and check.

 4              MR. KHOROOSI:  He's here.

 5              THE COURT:  Do you want a little bit of time to

 6    talk with him?  We'll take a 15-minute recess now so you

 7    have a bit of time.  We'll be in recess.

 8              MR. KHOROOSI:  Thank you.

 9                (Recess at 3:18 until 3:35)

10              THE COURT:  Bring in the jury, please.

11                (The jury entered the courtroom)

12              THE COURT:  Proceed.

13              MR. KHOROOSI:  Thank you, Your Honor.  We call

14    Dr. Brad Randall.

15                     BRAD RANDALL, M.D.,

16    called as a witness, being first duly sworn, testified as

17    follows:

18                   DIRECT EXAMINATION

19    BY MR. KHOROOSI:

20    Q.   Good afternoon.  Could you introduce yourself to the

21    jury.

22    A.   Good afternoon.  My name is Brad Randall.

23    Q.   What's your occupation, Dr. Randall?

24    A.   I'm a forensic pathologist.

25    Q.   How are you employed currently?
```

1    A.    I'm currently self-employed.

2    Q.    What are you self-employed as?

3    A.    I'm self-employed as a consultant in forensic

4    pathology, having retired a few years back.

5    Q.    What was your previous occupation?

6    A.    I was a pathologist with the Laboratory of Clinical

7    Medicine from 1981 to 2008.  I served as a general

8    pathologist doing anatomic and clinical pathology, and also

9    as a forensic pathologist serving as the Minnehaha County

10   Coroner, and doing the autopsies in the eastern part of

11   South Dakota, parts of Minnesota, Iowa, and Nebraska.

12   Q.    How long were you the Minnehaha County Coroner?

13   A.    For approximately 29 years.

14   Q.    You also serve as the South Dakota special death

15   investigator, or you did.

16   A.    I did, yes.

17   Q.    What time period are we talking about there?

18   A.    I believe that was created in the mid 1990s, so it

19   would have been about ten years.

20   Q.    Could you describe your education past high school for

21   the jury?

22   A.    I received two Bachelor of Science degrees from the

23   University of Iowa; an M.D. degree from the University of

24   Iowa.  I then went on for my pathology training to the

25   University of North Carolina in Chapel Hill, where I

1    received my anatomic and clinical pathology residency

2    training, and my forensic pathology training at the Office

3    of the Chief Medical Examiner for the state of North

4    Carolina.

5    Q.    Where are you licensed to practice medicine?

6    A.    I currently have an active license in South Dakota.  I

7    have inactive licenses in Minnesota, Iowa, Nebraska, and

8    North Carolina.

9    Q.    What board certifications do you have?

10   A.    I am board certified by the American Board of

11   Pathology in anatomic, clinical, and forensic pathology.

12   Q.    Dr. Randall, I'm going to hand you what's been marked

13   Exhibit 117.  Would you take a look at that?  Could you

14   tell us what that document is?

15   A.    This document is my curriculum vitae.

16   Q.    As we've heard before, that's what physicians refer to

17   as their resume.  Is that correct?

18   A.    That's correct.

19         MR. KHOROOSI:  Your Honor, I move the admission

20   of Exhibit 117.

21         MR. MILLER:  No objection.

22         THE COURT:  Exhibit 117 is received.

23   BY MR. KHOROOSI:

24   Q.    Dr. Randall, in addition to your current

25   self-employment, what other positions do you hold?

1    A.   I still am a professor of pathology at the Sanford

2    School of Medicine, and I serve as a special consultant to

3    the State of South Dakota for the purposes of infant death

4    investigation and death certification.  I also serve as an

5    investigator with the Institute of Health on a special

6    study for studying infant deaths.

7    Q.   How long have you been a forensic pathologist?

8    A.   I completed my fellowship in 1978.  So it is, what, 36

9    years, 35 years.

10   Q.   How many scholarly articles have you written?

11   A.   Fifty.

12   Q.   How many books have you authored?

13   A.   I've authored two medical books.

14   Q.   You have a number of other honors and awards and

15   activities, as well.  Correct?

16   A.   Yes.

17   Q.   Doctor, I'd like to move on to your involvement with

18   this particular case.

19        Did you review the autopsy performed by Dr. Froloff?

20   A.   Yes.  I reviewed his autopsy report, the pictures from

21   the autopsy, and the microscopic slides.

22   Q.   In addition to those materials, you also viewed some

23   medical records.  Which medical records did you review?

24   A.   I reviewed the medical records from the last admission

25   for Aleeyah Cook when she came into the emergency room, and

```
 1    then during her medical stay at Fargo.  In addition, I

 2    reviewed her clinical -- her clinic visits and her other

 3    health records during the two years of her life.

 4    Q.   So to your knowledge, you've reviewed all of her

 5    medical records?

 6    A.   To the best of my knowledge.

 7    Q.   Did you use all those documents in formulating your

 8    opinion?

 9    A.   Yes, I did.

10    Q.   And is that opinion expressed in your expert report?

11    A.   Yes, it is.

12    Q.   Now, since you filed your report, have you reviewed

13    additional reports from other witnesses called by the

14    prosecution?

15    A.   Yes, I have.

16    Q.   Did they change your opinion at all?

17    A.   No.

18    Q.   Dr. Randall, since you authored your report in April,

19    there have been a couple changes you would like to point

20    out to the facts.  What are those changes?

21    A.   One of the changes --

22              MR. MILLER:  Your Honor, I'm going to object to

23    this.  It's not included in the notice.

24              THE COURT:  Overruled.

25    BY MR. KHOROOSI:
```

1    Q.    Go ahead and answer.

2    A.    One of the changes in the interval, since issuing that

3    report and today, I had an opportunity to review the

4    microscopic slides, and I need a little help remembering

5    what the second issue was.

6    Q.    Did you find out the exact height of the table and

7    chair?

8    A.    Yes, indeed I did.

9    Q.    Do either of those change your conclusions?

10   A.    No.

11   Q.    Let's start off with a big question, Doctor.  Do you

12   agree with all of the factual material contained in

13   Dr. Froloff's report?

14   A.    By and large.  His categorization of 18 particular

15   contusions, I found his pictures a little hard to interpret

16   at times.  I couldn't say that there were exactly 18

17   myself.  I would have to defer to him, since he was

18   actually present at the autopsy.  But that would be the

19   only factual disagreement I would have with his report.

20   Q.    Now, do you agree with his interpretation of those

21   facts?  Let me be more specific.

22        Do you agree with Dr. Froloff that dating of injuries

23   is difficult?

24   A.    Yes, indeed.

25   Q.    Now, we've talked a lot about that over the past few

```
 1   days.  How exactly do you date an injury?

 2   A.    Dating, and by that finding out how long it's been

 3   since an injury occurred and when we look at it, is one of

 4   the most difficult things you can do in forensic pathology.

 5   We approach it by looking at what the injury looks like to

 6   our naked eye, and we also look at it under the microscope,

 7   although perhaps one of the most important things is a good

 8   history.  If we have an accurate history of when an injury

 9   occurred, then that will trump almost everything else.  But

10   if we don't have a history, then often we're left with

11   looking at it under the microscope.

12        My approach to dating an injury has been to combine

13   what's in the literature, what's in the textbooks.  The

14   textbooks give you a nice step-wise progression of changes

15   that occur over time.

16        Then I temper that with 36 years basically of

17   experience of looking at injuries and seeing that sometimes

18   the injury has followed the textbook, and sometimes the

19   injury doesn't follow the textbook.  The textbook provides

20   a good guide, but it isn't always right.

21   Q.    How many autopsies have you performed in your career?

22   A.    In the neighborhood of three thousand.

23   Q.    How many child deaths have you investigated in your

24   career?

25   A.    All child deaths?
```

Q.    Yes.

A.    Probably in the neighborhood of three or four hundred.

Q.    How about cases involving head trauma in child death?

A.    Probably less.  Between 150 and 200.

Q.    So in your 36 years of experience and with all your training, have you seen injuries that you know are older than they look?

A.    Yes.

Q.    Have you seen injuries that were 48, 72 hours older than they look?

A.    Yes.

Q.    And ties in to history, doesn't it?  Can you describe that a little bit more for the jury?

A.    In the course of what we do as a forensic pathologist in childhood deaths, in adult deaths, people die that have sustained injuries.  It often isn't a major issue to us how old that injury was.  They might have a gunshot wound to their head, hit by a motor vehicle, something like that.

      And yet we look at the injury and register it and say, okay, is this following the textbooks or not?  It wasn't an important issue, but it's an observation that we make.

      On many occasions I have seen injuries that I know how old they were, but they didn't follow the book.  They looked younger than they actually were.

Q.    Have you seen injuries that are 96, maybe a hundred or

1    more hours old that look like they just happened?

2    A.   I have, although that's less frequent.

3    Q.   Now, here no one -- in your review of the material, is

4    it a fair statement to say that no one witnessed the actual

5    fall?

6    A.   I at least have not read any of the investigation

7    material that quotes an eyewitness to whatever happened to

8    Aleeyah.

9    Q.   Have you read the police reports in this case?

10   A.   Yes, I have.

11   Q.   Now, how do you rely on eyewitness testimony in order

12   to complete your examinations?

13   A.   As part of our investigation into cause and manner of

14   death, what happened to an individual, we certainly use

15   outside information.  We have to always juggle that to

16   decide how reliable and believable we think it is.

17        If we're dealing with a surveillance camera with a

18   date and time stamp on it, we would feel very comfortable

19   using that.  If it was an intoxicated witness, that would

20   be less reliable.  We have to balance the strength we feel

21   the witness has.

22   Q.   Now, when you and I talked about this case, you

23   mentioned the concept of a black box.  Could you describe

24   that to the jury?

25   A.   I use that in the context that something happened to

1    Aleeyah.  She sustained head injury.  But it occurred in a

2    black box, because there was no one that witnessed the

3    injury.  There is no outside evidence to say what happened.

4        She was in one condition at one point in time.  She

5    was in a near-death situation at a period of time after

6    that.  Exactly what happened in that interval, nobody

7    knows.  No one actually witnessed what happened to Aleeyah

8    that is available for us to use in our investigation.

9    Q.   From a purely pathologic standpoint, can we tell with

10   certainty when these injuries were inflicted or when they

11   occurred?

12   A.   No.

13   Q.   Now, let's just say that Aleeyah were hit or fell or

14   something happened to her head a few days before.  Could

15   you say whether it happened then or now?

16            MR. MILLER:  Objection.  Arguing facts not in

17   evidence.

18            THE COURT:  Overruled.

19   A.   With certainty, no.  The answer is sometimes you can,

20   and sometimes you can't.

21   BY MR. KHOROOSI:

22   Q.   Now, we've heard the word "certainty" a lot over the

23   past couple of days.  Can you talk about how that concept

24   relates to forensic pathology and how elusive it is?

25   A.   Certainty or lack of certainty is a very important

part of decision-making.  There are sometimes in forensic
pathology when we are as close to certain as we can get.  A
surveillance camera captured someone being shot in the
head.  There is no doubt at all about what happened in that
case.

On the other side, there are times in forensic
pathology that we do everything we can possibly think of,
every test, every observation, everything, and we don't
have an idea of what happened.  They are complete unknowns.

Then in the middle we have cases where people have
things wrong with them that we know can cause death but we
know don't necessarily have to be lethal.  But because they
are dead, we say that was the reason they died.  But we
can't say that to complete certainty.  We're just saying it
because all of the circumstances add together.

So sometimes as a forensic pathologist, I wasn't
allowed to say, "I'm 68 percent sure that this person had
bronchopneumonia and that was the reason they died."  So I
have to write down on my report that the cause of death was
bronchopneumonia, even though there may have been
uncertainty.

And by what I am forced to do as a forensic
pathologist, I often will give an opinion, but that opinion
doesn't come with it the level of certainty that I have for
it.

1    Q.   Okay.  Now, just before you testified we heard

2    testimony that in the few days prior to Aleeyah's incident

3    on the 9th, that she was seen vomiting and disoriented.

4              MR. MILLER:  Objection.  Misstatement of the

5    record.

6              THE COURT:  Sustained.

7    BY MR. KHOROOSI:

8    Q.   She was vomiting and lethargic.  Pathologically

9    speaking, what could that tell you, if anything, to the

10   injuries she sustained on the 9th?

11   A.   It may be completely noncontributory.  It may be that

12   she just had a cold or a little bit of stomach flu or

13   something.  It may have no bearing at all.

14        On the other hand, those symptoms can be the symptoms

15   seen in children and adults, but particularly children,

16   that have sustained some degree of head trauma.

17   Q.   In other words, a concussion.

18   A.   Yes.

19   Q.   Now, if a football player, if a big, 300-pound

20   linebacker gets a concussion, why don't they let him go

21   back in the game?

22   A.   The danger in an athlete or anyone that has had a

23   concussion is that it makes the brain more susceptible to a

24   second injury.  There are many instances where a football

25   player has had a concussion.  They've gone back into the

378

1    game, been hit in the head, and have died, either just

2    right there or shortly thereafter.

3    Q.   You stated you read all the expert reports of the

4    physicians who testified here.

5    A.   Yes.

6    Q.   Now, each one seems to mention the height from which

7    Aleeyah fell.  Could you explain to the jury the concept of

8    effective height of the fall and why it makes a difference?

9    A.   The effective height, since we're talking about head

10   injury -- if we're talking about foot injury, it would be

11   how far the foot fell.  If we're talking about head injury,

12   it's how far the head falls.

13        So from a table, a child who is lying down and rolls

14   over, the head has less distance to fall than if they might

15   have been standing up at the time they fall.

16   Q.   Have you calculated the effective fall based on the

17   evidence you've seen?

18   A.   I've calculated the height, the top of the head to the

19   foot, and added that to the height of the table.

20   Q.   What result do you get?

21   A.   I believe it's 67 inches.

22   Q.   So five and a half feet?

23   A.   Yes.

24   Q.   Doctor, just so we're clear, are you testifying a

25   single fall likely caused Aleeyah's injuries?

A.   I don't believe a single fall can explain everything,
all the injuries that were found at the autopsy.

Q.   But do you think a fall could have contributed to her
death?

A.   Yes.

Q.   Why?

A.   For two reasons.  Even though it's been said multiple
times that falls like this rarely cause brain injury like
she had, they can.

     But the second reason is that if there was underlying
brain injury, then a short fall would be much more likely
to cause the changes seen in the brain than had that injury
not been present before the fall.

Q.   Aside from pervious injuries, there could be medical
conditions that would make a child susceptible to a fall.
Is that fair to say?

A.   Yes.

Q.   Is one of those conditions hydrocephalus?

A.   Yes.

Q.   Dr. Randall, you reviewed the growth chart that
Dr. Froloff filled out as part of your -- in preparation
for your testimony today.  Correct?

A.   Yes, I did.

Q.   I'm handing you what's been entered into evidence as
Exhibit 116.  That's Dr. Froloff's growth chart.  Isn't it?

A.   Yes, it is.

        MR. KHOROOSI:  Your Honor, could I publish to the jury?

        THE COURT:  You may.

BY MR. KHOROOSI:

Q.   Doctor, I'm going to put up Dr. Froloff's growth chart.  Could you explain to the jury what they are seeing here?  I think we have a pointer you can use.  Then if you can use this microphone, as well.

A.   This is a standard type of growth chart that in the bottom here it's length versus height, and in the top it is age versus head circumference.  Head circumference is literally taking a tape measure and going around your head and measuring the distance.

     On the top chart, which is head circumference, it's plotted against the age, which is 24 months, and the head circumference, which was 49 centimeters.  Running through this chart are curved lines that represent the percentage the person would follow, whether you're in the 50th percentile, 80th percentile, 10th percentile, whatever.

     So you move to here, and you measure the percentage, and it's around the 80th percentile, meaning that only 20 percent of infants would have a larger head than that, and 80 percent have a smaller head.

Q.   And approximately where did her body fall?

1    A.    It's hard to read here.  I believe we're around the

2    20th percentile.

3    Q.    Dr. Randall, when you were reviewing that chart, do

4    you believe the assessment of -- in other words, do you

5    believe those curved lines are accurate?  Do you believe

6    it's using the right demarcations for percentile?

7              MR. MILLER:  Objection.  Calls for speculation.

8              THE COURT:  Overruled.

9    A.    I believe at the time the chart was created, it was

10   based on as much factual information as the person that

11   created the chart could have.

12   BY MR. KHOROOSI:

13   Q.    Okay.  I'm going to ask you to look.  Was there a date

14   on the chart that you were able to find?

15   A.    Yes, there was.

16   Q.    What's the date on the chart?

17   A.    The year was 1993.

18   Q.    By your examination, where does the chart appear to

19   come from?

20   A.    It comes from an infant formula company.

21   Q.    The manufacturer of infant formula?

22   A.    Yes.

23   Q.    This is what Dr. Froloff used for his official

24   records, to your knowledge?

25   A.    To the best of my knowledge, yes.

1   Q.   Have you plotted Aleeyah's data on another chart?

2   A.   Yes, I have.

3   Q.   I'm handing you what's been marked Exhibit 101.  Do

4   you recognize that chart as the chart you've plotted her

5   data on?

6   A.   Yes, I do.

7   Q.   And did you personally plot the data on the chart?

8   A.   Yes, I did.

9           MR. KHOROOSI:  Your Honor, I would offer

10  Exhibit 101.

11          MR. MILLER:  Objection as to foundation.

12          THE COURT:  Sustained as to foundation, as to the

13  chart, not his marking.

14  BY MR. KHOROOSI:

15  Q.   Doctor, how did you obtain that chart?

16  A.   I found this on the Centers for Disease Control

17  website.

18  Q.   So that's published by the Centers for Disease

19  Control?

20  A.   Yes, it is.

21  Q.   Is it common in your profession to rely on the Centers

22  for Disease Control when looking at statistical averages

23  for children of a certain age?

24  A.   I think they would be one of the preeminent sources of

25  that sort of statistical information.

```
 1   Q.   In your expert opinion, do you deem the CDC's findings

 2   as reliable?

 3   A.   Yes.

 4              MR. KHOROOSI:  Your Honor, I move for the

 5   admission of Exhibit 101.

 6              THE COURT:  Received.

 7              MR. KHOROOSI:  Permission to publish?

 8              THE COURT:  You may.

 9              MR. KHOROOSI:  Your Honor, may Dr. Randall step

10   down from the witness stand?

11              THE COURT:  He may.

12   BY MR. KHOROOSI:

13   Q.   Doctor, if I could have you step down, could you come

14   over here to the Elmo and explain to the jury the

15   difference between these two charts?

16   A.   When we look at the plot of weight to length, the dot

17   falls on the 25th percentile, which is about where it fell

18   on the other chart.  But when we look at the plot of age to

19   head circumference, we see that the plot now is higher.  It

20   is almost at the 90th percentile.

21   Q.   And in what year was your chart created?

22   A.   2000.

23   Q.   Dr. Randall, are you aware of the significance of the

24   difference between the data that would be the fuel for a

25   chart created in 1993 versus the data that would be used in
```

1   2000?

2   A.   The charts are completed using populations of infants.

3   So the infants that were used in the 2000 chart would be

4   closer to our time now and would be more representative of

5   the infants in our era than a chart created in 1993.

6   Q.   Dr. Randall, what are the symptoms of hydrocephalus?

7   First of all, what is hydrocephalus?  Let's back up there.

8   A.   The common term is water on the brain.  It reflects

9   that there is too much fluid surrounding the brain.  It can

10  be because the brain is too small or the head is too big.

11  But the normal relation between brain and cerebral spinal

12  fluid, the fluid around the brain is abnormal.  There's too

13  much.

14  Q.   Based on the data -- scratch that.  If you were

15  performing an autopsy, would it be possible to tell whether

16  the child had hydrocephalus?

17  A.   It would depend on the circumstances.  If it was a

18  child, for example, that didn't have any disease above the

19  neck, then probably I would be able to tell.  If they had

20  some head injury or head pathology to the brain, it might

21  be more difficult to tell in an early hydrocephalus.

22  Q.   Without doing actually any official medical tests,

23  what's the prime symptom of hydrocephalus, just from

24  looking at a kid?

25           MR. MILLER:  Your Honor, may we approach the

1    bench?

2              THE COURT:  You may.

3    (Side bar with all counsel:)

4              MR. MILLER:  Your Honor, I'll object to this line

5    of questioning.  None of this information is included in

6    either Dr. Randall's report or in the notice of expert

7    testimony.

8              MR. KHOROOSI:  Dr. Randall said in his report

9    what the ultimate cause is.  He's going to testify that

10   hydrocephalus is a possibility based on her physical

11   proportions, that she could have had a condition that made

12   it easy for her to die from a four- to six-foot fall.

13             MR. MILLER:  If that's his opinion, they need to

14   give us notice of that.

15             THE COURT:  I read his report.  I saw nothing

16   about this.  When did this come up, anyway?  I mean when

17   did he come up with this idea of hydrocephalic condition as

18   a possibility of making her, I assume, more susceptible to

19   this kind of injury?  Right?

20             MR. KHOROOSI:  Right.

21             THE COURT:  So when did he come up with that?

22             MR. KHOROOSI:  I'm not sure what you mean.

23             THE COURT:  He had to come up with that idea

24   sometime after he wrote the report, because it's not in the

25   report.  Right?  You didn't come up with the idea.  I

1    suspect he did.

2            MR. KHOROOSI:  I'm not sure when he did.

3            THE COURT:  I'm going to hear argument on this.

4    Is this going to be his opinion?  You just said he's not

5    going to opine that she was hydrocephalic.

6            MR. KHOROOSI:  No, but he is going to opine that

7    it is a potential cause of the high degree of damage that

8    was done to the child.

9            THE COURT:  In order to reach that conclusion, he

10   has to decide if she's hydrocephalic.

11           MR. KHOROOSI:  But he's not going to do that.

12   He's going to say it's a possibility.

13           THE COURT:  Well, we'll have a hearing out of the

14   presence of the jury to hear what he is going to talk

15   about.

16   (End of side bar)

17           THE COURT:  We're going to have another chat

18   outside the presence of the jury with regard to an

19   evidentiary issue.  So keep an open mind.  Don't talk to

20   each other about the case.  We'll be in recess while we

21   resolve this, and I'll have you back in.  Please stand for

22   the jury.

23                   (The jury left the courtroom.

24   (Out of the presence of the jury, counsel and Defendant

25   present, the following proceedings occurred at 4:10:)

1          THE COURT:  Please be seated.  There's been an

2     objection by the Government to the fact that Dr. Randall's

3     report doesn't have anything in it about a possible

4     hydrocephalic condition.

5          I'll let the Government state their objection, and

6     then the defense state their response.

7          MR. MILLER:  Your Honor, my objection is that

8     under the rules of evidence, the defense has to give

9     notice, just like the Government does, of intent to use

10    expert testimony.  We not only have to say this is the

11    expert we're going to call.  We have to give notice of what

12    they are going to testify to.  Generally that involves

13    attaching to the notice the report issued by the expert.

14    We did that with our experts, and Mr. Khoroosi did it with

15    Dr. Randall's report.

16         However, nowhere in Dr. Randall's report is there any

17    mention of this hydrocephalic, or whatever the

18    pronunciation is, condition, and how that may make Aleeyah

19    more susceptible to this type of injury, nor was it

20    included in the notice provided by Mr. Khoroosi.

21         Therefore, that leads me to an assumption, and that

22    assumption is that Dr. Randall didn't have that opinion

23    initially.  If he did, and didn't include it in his report,

24    if my assumption is wrong, then that should be barred,

25    because then that would be trial by ambush.

1        If he has formulated this opinion since then, then a

2   supplemental report and supplemental notice should have

3   been filed, so we weren't facing a trial by ambush

4   situation.

5            THE COURT:  Mr. Khoroosi?

6            MR. KHOROOSI:  Your Honor, I think in

7   Dr. Randall's report he details his conclusion.  I would

8   point specifically to Conclusion 4, which discusses,

9   although it doesn't discuss hydrocephalus --

10           THE COURT:  Why don't you read it into the

11  record.

12           MR. KHOROOSI:  Thank you.  It says, "A preceding

13  concussive injury or injuries, which could explain the

14  multifocal nature of the subgaleal hemorrhages, could

15  radically change the neurologic physiologic dynamics of the

16  short fall Aleeyah reportedly sustained on the morning of

17  January 9.  An injury that might otherwise have been

18  trivial, or at least nonlife-threatening, occurring to a

19  previously concussed brain would be far more likely to

20  progress to death.  From a pathologic position, it would be

21  very difficult -- if not impossible -- to differentiate

22  earlier from later injuries.  Or, alternatively stated, it

23  would be very difficult to determine that the severe

24  injuries documented at autopsy occurred as a result of one

25  massive traumatic event versus a lessor event (such as a

1   fall) occurring in the cumulative backdrop of other

2   previous nonlethal injuries."

3        Your Honor, Dr. Randall's testimony regarding a

4   potential for preexisting conditions that would have

5   aggravated or made more likely previous concussive falls or

6   concussive injuries is fair game for his direct testimony.

7   Not only is he testifying that there could be potential

8   alternate causes, but he's entitled to review and criticize

9   if he finds an area to criticize the methods or the

10  materials on which Dr. Froloff relied on in formulating his

11  report.

12            MR. MILLER:  If I may?

13            THE COURT:  You may.

14            MR. MILLER:  Your Honor, prior to the discussion

15  of this hydrocephalus, the defense counsel was going

16  through with Dr. Randall about a preexisting condition such

17  as prior concussive injuries.  That is what is covered in

18  Paragraph No. 4, Opinion No. 4 of Dr. Randall's report.

19       Defense counsel then went on and said, "Is there a

20  medical condition, a preexisting medical condition?"  There

21  is no discussion in Dr. Randall's report of a preexisting

22  medical condition that could contribute to this.  There was

23  no notice of this.  Therefore, the Government disagrees

24  with defense counsel that this is fair game for direct

25  examination in this case.

1      Secondly, we would also object to it as a fact not in

2   evidence, because there is nothing in the record to show

3   that this child had hydrocephalus.  Therefore, him saying

4   if she had it, she would be more susceptible.  It's rank

5   speculation.  Therefore, it shouldn't come before the jury.

6          THE COURT:  I've read Dr. Randall's report.  I

7   don't know where it is in the stack of stuff I have.  Let

8   me see it again, please.

9      Preexisting medical condition isn't talked about at

10  all in Dr. Randall's report in terms of something that is

11  not a preceding concussive injury.  Paragraph 4 deals with

12  that preceding concussive injury.  By medical condition,

13  I'm talking about something like a hydrocephalic condition.

14     Let me look at the disclosure rule.  I think you have

15  it open there.  What's the page?

16         MR. WRIGHT:  Your Honor, did you ask for the

17  statutory citation?

18         THE COURT:  Right.

19         MR. WRIGHT:  It's Rule 16(b)(1)(C).  16(b)(1)(C)

20  requires the disclosure, and then the consequences for

21  failing to comply I believe is Rule 16(d)(2).  We would

22  argue under (2)(C), prohibit the party to introduce the

23  undisclosed evidence.

24         THE COURT:  Maybe this is moot.  I doubt it's

25  moot, but maybe, since we don't have an opinion at this

1    point yet from Dr. Randall.  Maybe there's not an opinion.

2    What's the opinion you think you are going to get,

3    Mr. Khoroosi?

4         MR. KHOROOSI:  Your Honor, the opinion I would

5    expect to get is it's not clear whether this child had

6    hydrocephalus.  That there are indications that it should

7    have been perhaps a possible diagnosis before her

8    precipitating injuries.

9         THE COURT:  In other words, the doctor that did

10   the examination for Head Start, for example, should have

11   noted that or at least possibly should have noted that?

12        MR. KHOROOSI:  It's possible that she should

13   have.

14        THE COURT:  Well, that seems like it's an

15   opinion, if that is what Dr. Randall would opine to, that

16   the rule requires -- the summary must describe the witness'

17   opinions, the bases and reasons for those opinions, and the

18   witness' qualifications.  That certainly isn't in

19   Dr. Randall's opinion, and the failure to comply with that

20   rule, the Court at this stage, since we're in the middle of

21   a trial, can either grant a continuance, or prohibit the

22   party from introducing the undisclosed evidence, or enter

23   any other order that's just under the circumstances.

24        MR. MILLER:  Your Honor, may I ask a question to

25   Dr. Randall that might resolve this issue?

1          THE COURT:  Well, that is certainly tempting.

2     Yes, go ahead.

3          MR. MILLER:  Dr. Randall, you testified on direct

4     examination that you reviewed what you felt was Aleeyah

5     Cook's entire medical history.  Correct?

6          DR. RANDALL:  Yes.

7          MR. MILLER:  Was there anything in there that

8     indicated a diagnosis of hydrocephalus?

9          DR. RANDALL:  Yes.

10          MR. MILLER:  What?

11          DR. RANDALL:  Her exceedingly large head.

12          MR. MILLER:  That's it?

13          DR. RANDALL:  Yes.

14          MR. MILLER:  Would you agree most kids have --

15     their heads are larger proportionally than their body?

16          DR. RANDALL:  Yes, but that's not relevant.

17          MR. MILLER:  So the only thing you have is the

18     child had a large head?

19          DR. RANDALL:  For her age, yes.

20          MR. MILLER:  There's no specific diagnosis for

21     that.

22          DR. RANDALL:  For --

23          MR. MILLER:  Hydrocephalus.

24          DR. RANDALL:  That's correct.

25          MR. MILLER:  And that is a medical condition that

1    can be diagnosed.

2              DR. RANDALL:  Yes.

3              MR. MILLER:  But no one diagnosed it.

4              DR. RANDALL:  That's correct.

5              MR. MILLER:  So you think maybe they missed it?

6              DR. RANDALL:  That possibility exists.

7              MR. MILLER:  Or maybe they didn't.

8              DR. RANDALL:  That, also.

9              MR. MILLER:  So you're just truly speculating.

10             DR. RANDALL:  No.

11             MR. MILLER:  There is no diagnosis that she had

12   this medical condition.

13             DR. RANDALL:  But she had some of the signs that

14   people with hydrocephalus have that are a medical indicator

15   that they should be checked for hydrocephalus.

16             MR. MILLER:  But there's no diagnosis.

17             DR. RANDALL:  That's correct.

18             MR. MILLER:  I guess maybe I shouldn't ask this,

19   but I'm going to.  You are saying you are finding these

20   indications in the medical records.  Why didn't you give us

21   notice of it in your report?

22             DR. RANDALL:  You are asking me a legal question.

23   I'm not in a position to answer that question.

24             MR. MILLER:  You've been around the block a long

25   time.  Haven't you?

```
 1              DR. RANDALL:  Yes.

 2              MR. MILLER:  You've testified many times in

 3    Court.

 4              DR. RANDALL:  Yes.

 5              MR. MILLER:  You have prepared many reports as

 6    part of your expert testimony in Court.

 7              DR. RANDALL:  Yes, but I don't hold myself up as

 8    an attorney.

 9              MR. MILLER:  Your Honor, again, there's no

10    medical diagnosis of hydrocephalus.  I think this is

11    arguing facts not in evidence.  So let's -- we don't even

12    have to go to the issue of notice.  There's no evidence to

13    support -- no facts on the record to support this opinion.

14    It's just speculation.

15              MR. KHOROOSI:  Your Honor, the opinion won't be

16    that the child has hydrocephalus or had hydrocephalus.  The

17    opinion will be that she could have, and if it was missed,

18    it was a possible contributor to her death.  That's all.

19              THE COURT:  So why wasn't that in the report

20    then?

21              MR. KHOROOSI:  That specific conclusion was not

22    in the report.  But the Government was on notice of

23    potential alternate causes of injuries or potential factors

24    that may contribute to a more severe injury in the case of

25    a shorter fall.
```

```
 1              THE COURT:  Not in that report, they weren't.
 2    They were with regard to other concussive injuries.
 3         All right.  Dr. Randall, there must be then criteria,
 4    aside from these charts, there must be criteria as to at
 5    what percentage does one then make a diagnosis of
 6    hydrocephalic condition.
 7              DR. RANDALL:  The head circumference is a
 8    reliable measure of indicating children that should be
 9    screened for hydrocephalus.  In other words, a child whose
10    head circumference was in the 50th percentile range, the
11    chance for them having hydrocephalus is very low.
12         But a child whose head is in the 90th percentile
13    range, that would be a clinical concern for a physician
14    that that child probably should be checked to see if they
15    have hydrocephalus, because a measurable percentage of
16    children with very large heads will have hydrocephalus.
17              THE COURT:  Do you do brain imaging or what to
18    see if a child, in fact, has hydrocephalus?
19              DR. RANDALL:  Yes.  Imaging is the best way to
20    make that diagnosis.
21              THE COURT:  Of course that was never done with
22    her.
23              DR. RANDALL:  No, it wasn't.  Not until after her
24    admission, terminal admission.  At that time it's not a
25    useful test for hydrocephalus.
```

 1          THE COURT:  You said you read all the medical

 2   records.  Her primary care physician was in Watertown.  Did

 3   you read her records?

 4          DR. RANDALL:  I did review it, yes.

 5          THE COURT:  If hydrocephalus was the core of your

 6   defense, I might have to consider granting your

 7   continuance.  Frankly, on the state of the record, I think

 8   it's a red herring, that it's just something that gives a

 9   little argument room is all.  It's something that should

10   have been disclosed in Dr. Randall's opinion, and it

11   wasn't.

12      I'm going to exclude it.  That's my ruling.  You can

13   proceed now with the testimony on other points.

14      Bring in the jury, please.

15              (The jury entered the courtroom)

16          THE COURT:  Please be seated.  Proceed.

17   BY MR. KHOROOSI:

18   Q.   Dr. Randall, if Aleeyah had been injured prior to her

19   fall on January 9th, what symptoms would you expect to see

20   in the preceding few days?

21   A.   Those symptoms could range from nothing at all to

22   symptoms of just not seeming right, to appearing tired,

23   lethargic, vomiting.  In many ways they can appear almost

24   identical to a child that's sick with a mild case of the

25   flu.

1  Q.   Let's talk about the effects of a preexisting injury.

2  Assuming Aleeyah had a concussion when she came into her

3  dad's care.

4        MR. MILLER:  Objection.  Argues facts not in

5  evidence.

6        THE COURT:  Overruled.  The question is a

7  hypothetical.  States "assuming."

8  BY MR. KHOROOSI:

9  Q.   Assuming she had a preexisting head injury, how does

10  that affect her likelihood that a shorter fall is going to

11  do more damage?

12  A.   It may increase it.

13  Q.   How so?

14  A.   The brain in a child is a pretty durable, strong

15  organ.  It can take a fair amount of knocking around.  But

16  when it swells and has some injury inside of it, to begin

17  with, it has less reserve to absorb an injury that follows.

18  Q.   And is there any way that a physician can testify with

19  certainty that all of those injuries happened outside of

20  Mario's care?

21  A.   Excuse me.  I didn't quite understand that.

22  Q.   Sorry.  That's my fault.  I'll re-ask the question.

23       Is it possible to be certain when those preexisting

24  injuries may have occurred, if they exist?

25  A.   No.

1    Q.    Would you be able to tell with certainty from looking

2    at the slides?

3    A.    No.

4    Q.    You heard the other expert testimony, and I believe it

5    was Dr. Snell who referenced color charts.  Do you agree

6    with his opinion of color charts?

7    A.    Charts or change?

8    Q.    Color change, I'm sorry.

9    A.    Color change is nice when it's right, but I don't have

10   a real good feeling for it being right all that often.

11   Q.    Dr. Snell also testified about something like a fall

12   from a building being required to inflict that much force

13   on the brain.  Is that your understanding of the current

14   state of medical science?

15   A.    There was a time when that was the feeling almost to

16   the point of dogma, like it had to be that way and nothing

17   else.

18         Over the years we have started to say every fall

19   doesn't always follow the rules.  The majority of them seem

20   to behave in a certain way, but we're saying some falls

21   either don't produce the injury we would have expected them

22   to, or produce more injury than we would have expected them

23   to.  It's made it much more difficult for those of us

24   testifying to be able to say yes or no to an issue.  We now

25   have to say, "Well, it's maybe more likely than not" or

1    "It's fairly common or rare," but we can't really say, "No,

2    that can't happen."

3    Q.   Is it possible to say, to a reasonable degree of

4    medical certainty, that Aleeyah was not already injured

5    when she came into her dad's care?

6    A.   No.

7            MR. MILLER:  Objection.  Calls for speculation,

8    Your Honor.

9            THE COURT:  Overruled.

10   BY MR. KHOROOSI:

11   Q.   Dr. Randall, in the entire length of your career,

12   approximately how many times have you testified in Court?

13   A.   Several hundred; three, four hundred times.

14   Q.   What percentage would you say has been for the

15   Plaintiff or the Prosecution?

16   A.   The vast majority.

17   Q.   Have you ever testified for the defense in a case such

18   as this?

19   A.   No.

20           MR. KHOROOSI:  Thank you.  I have nothing

21   further.

22           THE COURT:  You may examine.

23                   CROSS-EXAMINATION

24   BY MR. MILLER:

25   Q.   Good afternoon, Doctor.

1    A.    Good afternoon.

2    Q.    You yourself did not personally examine the child.

3    Correct?

4    A.    No, I did not.

5    Q.    So you relied on reports submitted to you to review

6    and base your opinion?

7    A.    Yes, with the exception of the microscopic slides,

8    which I did actually look at myself.

9    Q.    And you indicated on direct examination that as a part

10   of your review of the materials, you reviewed the law

11   enforcement reports.

12   A.    Yes.

13   Q.    I'm reading from your report, Dr. Randall.  It says,

14   "The following material was reviewed in the course of

15   preparing this report:  Medical reports from A.C. regarding

16   her terminal admission on January 9, 2012, and a copy of

17   the Final Autopsy Protocol from the Ramsey County,

18   Minnesota, Medical Examiner (with accompanying autopsy

19   photos)."  That's the extent of what you listed in your

20   report that you reviewed.

21   A.    The report was filed in April.  That's correct.

22   Q.    And based on what materials you had, you reported some

23   details, some facts that you used in forming your

24   conclusion.  Correct?

25   A.    Yes.

```
 1   Q.   In your report you say that there was a fall from a

 2   height of four to five feet.  Is that what's in your

 3   report?

 4   A.   Yes, it is.

 5   Q.   And the information that the Defendant provided to law

 6   enforcement was the last time he saw the child was that she

 7   was sitting on a chair in the kitchen.  Correct?

 8   A.   Yes.

 9   Q.   And that that chair you know is 25 inches high.

10   A.   I know that now, yes.

11   Q.   So somebody provided you information that this was a

12   fall of four to five feet.

13   A.   Yes.

14   Q.   So if the information you were given is inaccurate,

15   then that affects your subsequent opinion.

16   A.   Maybe.

17   Q.   But you weren't told initially -- first of all, when

18   were you given this information that you used to report

19   your detail?

20   A.   In the report?

21   Q.   Yes.

22   A.   Early this year.

23   Q.   Early.  So in 2013?

24   A.   I believe so.

25   Q.   So if the interview with law enforcement was nearly a
```

```
 1    year prior to that in February of 2012, that information
 2    would have been available to give to you?
 3    A.   I can't answer that.  I don't know the answer to that
 4    question.
 5    Q.   But it wasn't.  Was it?
 6    A.   No, not at that time.
 7    Q.   So, in part, your report is based on misinformation
 8    provided to you.
 9    A.   It's based on the information I had at that time.
10    Q.   Then in your first conclusion you say, "Short falls of
11    the type reportedly sustained by A.C. (3 to 6 feet)."  Is
12    that what you said?
13    A.   I don't have the report in front of me.  I will take
14    your word for it.
15    Q.   Would that help refresh your recollection?  I don't
16    want to put words in your mouth, Doctor.
17    A.   Yes.
18    Q.   So we know now that the Defendant says the child was
19    sitting on a chair two feet high, but you are told a height
20    of four to five feet, be it your opinion relies on a fall
21    as high as six feet.  Is that fair to say?
22    A.   Yes.  I believe that came from the medical record.
23    Q.   There's no information provided by the Defendant, the
24    only adult who was there, that there was a fall from as
25    high as six feet.  Correct?
```

1   A.   I believe that's correct.

2   Q.   Yet that's the information you relied on in forming

3   your conclusion.   Correct?

4   A.   Yes.

5   Q.   Would you agree with me that a short fall, say off a

6   two-foot high chair, would not typically result in a death

7   of a child?

8   A.   Yes.

9   Q.   Would you agree with me that a physical assault upon

10  the child by hitting her in the head could cause the

11  constellation of intracranial injuries that was seen in the

12  autopsy photos?

13  A.   Yes.

14  Q.   You indicated that for the most part you agree with

15  the factual determination of Dr. Froloff.   Correct?

16  A.   Yes.

17  Q.   And you couldn't really dispute his finding of 18

18  different subgaleal hemorrhages, because he was there in

19  person, and that's a better tell than just looking at a

20  photograph.

21  A.   Yes.

22  Q.   And if the child would have fallen from a chair of two

23  feet in height, do you agree that would not cause 18

24  subgaleal hemorrhages?

25  A.   Yes.

1    Q.   You talked about the different symptoms that come with

2    a concussive injury.   You talked about lethargic and

3    vomiting and those types of things.   Correct?

4    A.   Yes.

5    Q.   And a concussive injury, these symptoms are caused by

6    intracranial pressure in the head.   Correct?

7    A.   I don't know if the physiology is completely

8    understood, but that is part of it.   Yes.

9    Q.   So if somebody has this intracranial pressure in the

10   head, they're not just going to get better on their own.

11   Are they?

12   A.   Usually do.

13   Q.   They usually do?

14   A.   They usually do.

15   Q.   How long does it take them to recover?

16   A.   That is a matter of some discussion amongst the

17   clinicians.   Most people say usually it is at least a

18   couple days, and it may be a week or more.

19   Q.   Now, were you aware the Defendant reported that on

20   Sunday, the day before she presented at the hospital, that

21   she was fine?

22   A.   Yes.

23   Q.   So how do you explain that if she's fine on Sunday

24   night, she presents at the hospital on Monday morning with

25   18 hemorrhages to her head?

```
 1    A.    I can't explain.  That's not part of what I do.  I

 2    just say what could have happened.

 3    Q.    One of the things you talked about in your testimony

 4    is the black box.  That's when a death is unwitnessed.

 5    Correct?

 6    A.    Yes.

 7    Q.    You don't know what happened.  Correct?

 8    A.    Yes.

 9    Q.    Based on your 36 years of experience, isn't it often

10    able to tell through an autopsy what killed the person,

11    even though there are no eyewitnesses?

12    A.    What killed them, usually we can tell.  Well,

13    sometimes you can and sometimes you can't.  But I think

14    more often than not.

15    Q.    You don't need a video camera, as you said.

16    A.    That's correct.

17    Q.    For example, if somebody comes home and finds a person

18    dead on the floor of the house and they had a heart attack,

19    you can determine that through an autopsy?

20    A.    Actually that is something that is a little more

21    difficult.  We find changes that we ascribe to people that

22    have heart attacks, but we know that person had the same

23    heart an hour earlier and were still alive.  Because we

24    find the changes, we go ahead and call it a myocardial

25    infarction, even though that may or may not be exactly what
```

406

1    happened.

2    Q.   When you examine the heart, there's evidence of heart

3    damage, heart attack.

4    A.   It may well be the same damage that was there for

5    days, hours, years beforehand.

6    Q.   You talked about a concussive injury.  You indicated

7    that when they have a concussive injury, that makes them

8    more susceptible to another injury.

9    A.   Yes.

10   Q.   I'm a football fan, so I watch a lot of football on

11   TV.  You hear a lot about how the NFL now is getting more

12   determined because football players, after they retire,

13   have a lot of cognitive impairment because of concussions

14   they received while playing the game.  Correct?

15   A.   Yes, that's correct.

16   Q.   The reason they are not allowed to go back into the

17   game is that increased risk of cognitive damage to the

18   brain.  Correct?

19   A.   Range from all the way of cognitive damage to dying.

20   Q.   Sir, are you aware of a report in the Journal of

21   Neurotrauma published July 26 of this year by B.L. Brooks

22   entitled "Lingering Effects of Multiple Past Concussions in

23   Adolescents"?

24   A.   No.

25   Q.   Are you aware of a similar report in the Journal of

```
 1   Neurotrauma, also in July of this year, by Noah Silverberg?
 2   A.   No.
 3   Q.   And you're not aware that in those they indicate that
 4   although there is an increased risk of cognitive function,
 5   there is no more --
 6            MR. KHOROOSI:  Objection, Your Honor.
 7   Foundation.  It hasn't been established as a learned
 8   treatise, Your Honor.
 9            THE COURT:  That's true.  Sustained.
10   BY MR. MILLER:
11   Q.   Is the Journal Neurotrauma an accepted treatise?
12   A.   I have no idea.
13   Q.   You've never heard of it?
14   A.   Never heard of it.
15   Q.   But you're not aware of any studies that indicate
16   there are no increased risk of death from a person with a
17   prior concussive injury to one with not?  You're not aware
18   of any such study?
19   A.   No, I'm not.
20   Q.   You indicated you cannot date a contusion with
21   precision.  Correct?
22   A.   Yes.
23   Q.   And the example that Mr. Khoroosi gave yesterday, if I
24   hit one arm and hit the other arm five hours later, over a
25   period of time you won't be able to really tell the
```

1  difference in those two contusions.  Correct?

2  A.   That's correct.

3  Q.   It is true you can put date ranges on injuries.

4  Correct?

5  A.   Sometimes.

6  Q.   Well, there are specific medical terms for those date

7  ranges.  Aren't there?

8  A.   Yes.

9  Q.   For example, an injury is referred to as an acute

10  injury in dating.

11  A.   Yes.

12  Q.   An acute injury in dating would be what?

13  A.   You know, I think 10, 15 years ago I could have

14  answered that.  Now I'm not really sure what it means

15  anymore.

16  Q.   Another term is subacute, which means an older injury

17  than an acute.

18  A.   Yes.

19  Q.   And chronic is an even older injury.

20  A.   Yes.

21  Q.   So even though you might not be precise to the hour or

22  day, you can put a date range on an injury.  Would you

23  agree with that?

24  A.   Again, I think I used to agree with that.  After my

25  experience, I'm not sure that even that is possible

1    anymore.

2    Q.   But yet those are still medically accepted terms?

3    A.   Yes, they are.

4    Q.   Can you tell the difference between a brand new

5    contusion and one that's a day old?

6    A.   Occasionally you can.   Often you can't.

7    Q.   How about a brand new contusion and three days old?

8    A.   More often than not you can, but sometimes you still

9    can be fooled.

10   Q.   How about between a brand new contusion and seven days

11   old?

12   A.   Then it's probably unlikely that you will confuse the

13   two, but it could happen.

14   Q.   So you can tell the difference between something new

15   and something a week old virtually all the time?

16   A.   I don't have -- virtually all the time?   I don't know

17   what that means.

18   Q.   You said on a three-day injury, more likely than not

19   you can tell the difference between the brand new one and

20   the three-day old.

21   A.   Yes.

22   Q.   It's even more likely you can tell the difference

23   between a brand new injury and a seven-day-old one.

24   A.   Yes.

25   Q.   You are aware that Aleeyah was in the custody of her

```
 1    father up until she came to the hospital for seven days

 2    prior to her death.

 3    A.    I knew it was a period of several days.  I didn't know

 4    it was exactly seven.

 5    Q.    If I were to tell you that he took custody of Aleeyah

 6    on January 4th, and she died on the 11th, other than the

 7    time she was in the hospital, she was in his care and

 8    custody for a week prior to her death.

 9    A.    Prior to her death, yes.  I was counting back prior to

10    the date of the 9th.

11    Q.    When you are dating injuries, you would go up to the

12    date of her death.  Would you not?

13    A.    But the interest is from the point of -- the concern

14    is not from the time of death.  It's from where do they

15    fall around the reported time of injury.

16    Q.    But nobody could see the injuries internally on the

17    9th.

18    A.    Precisely.

19    Q.    So when we could see the injuries is how they existed

20    on the 11th, the day she died.

21    A.    Right, which makes determining the 9th all that much

22    more difficult.

23    Q.    So when you are dating injuries, at least internally

24    you have to go back from the date of death.

25    A.    Yes.
```

1   Q.   You heard the testimony of Dr. Snell in talking about

2   the iron staining.  Correct?

3   A.   Yes.

4   Q.   And the presence of, and I might not pronounce this

5   right, siderophages.

6   A.   Siderophages.

7   Q.   Would you agree with his assessment that there were

8   very few of those observed in the internal injuries?

9   A.   Yes.

10   Q.   And the lesser presence of those would indicate a

11   newer injury rather than an older one?

12   A.   That's what the textbooks say.

13   Q.   So that's what the learned treatises say?

14   A.   That's correct.

15   Q.   You disagree with the learned treatises?

16   A.   I have found from my experience, that from time to

17   time injuries don't read the textbooks.

18   Q.   So your opinion differs from the vast majority?

19   A.   I have never seen a polling of people.  I don't know

20   what you mean by "vast majority."  I have a feeling if you

21   polled forensic pathologists, you wouldn't find any

22   consensus at all.

23   Q.   A learned treatise is generally the accepted practice.

24   Isn't it?

25   A.   You have to consider how these learned treatises

became learned treatises.  They started out as

observational studies and became ingrained as observed

fact, when no one has really gone back and looked at how

they came to these conclusions.

Q.    You talked about Aleeyah's symptoms, that somebody

testified to a few days earlier, could have been symptoms

of a prior concussive injury.  Correct?

A.    Yes.

Q.    Could have also been symptoms of the flu?

A.    Indeed.

Q.    And, in fact, getting better two or three days later,

as the Defendant reported, would be consistent with

somebody having the flu and then recovering from it.

A.    Yes, it could.

Q.    Would you agree with me that the cluster of injuries

that were observed in the internal examination during the

autopsy could have been caused by multiple blows to the

head as part of a single physical assault upon her?

A.    Yes.

Q.    You agree or you don't disagree with Dr. Snell and

Dr. Froloff when they say there were 18 separate and

distinct subgaleal hemorrhages?

A.    I can't disagree with them.  I don't know if I would

have come to that conclusion, just looking at the pictures.

But I can't disagree with Dr. Froloff, because he was the

1    one actually there.

2    Q.   Did you agree with Dr. Snell's testimony when he said

3    when you fall, you are going to have one contusion,

4    wherever that is?

5    A.   Yes.

6    Q.   Whatever part of the head hits.

7    A.   Yes.

8    Q.   Maybe two if you hit another object on the way down?

9    A.   Yes.

10   Q.   This child had 18.

11   A.   Yes.

12   Q.   So you're saying if there was a preexisting condition,

13   there were 16 or 17 preexisting concussions?

14   A.   No.

15   Q.   You're saying you agree there's 18 injuries.  Probably

16   only one or two happened in the fall.

17   A.   There are 18 bruises, but that doesn't mean there are

18   18 impacts.

19   Q.   That's right.  Because if somebody hit a person with

20   their fist, they could have four injuries from one blow.

21   A.   Yes.

22   Q.   So three or four blows with the knuckles to the head

23   or four or five blows could cause these 18 subgaleal

24   contusions?

25   A.   Yes.

1   Q.   But if we were to assume hypothetically, like the

2   defense said, that this is just a clumsy child or

3   accident-prone child where she falls down a lot, then there

4   would have to be 16 or 17 prior falls to support all of

5   these different subgaleal hemorrhages?

6   A.   I have to apologize.  I've never heard the defense

7   make that statement.

8   Q.   If they are saying she has a big head and she falls

9   down a lot -- let's just assume hypothetically that these

10  injuries were caused by falls.

11  A.   Okay.

12  Q.   Then there would have to be, other than the one that

13  the defense is arguing happened the morning she was

14  admitted to the hospital, there would have to be several

15  prior falls to support that many subgaleal hemorrhages.

16  A.   Yes, depending upon the surface she might have fallen

17  on.

18  Q.   Did you agree with the doctor's testimony that many of

19  the subgaleal hemorrhages that appeared on Aleeyah's head

20  looked similar in appearance to each other?

21  A.   Yes.

22  Q.   Consistent appearance in those different contusions

23  would indicate that they happened in the same time frame.

24  A.   Not necessarily.

25  Q.   So if you have two injuries -- I'll use the baseball

```
 1   bat analogy that the defense used earlier.  If I get hit
 2   twice in the arm with a baseball arm, once up here and once
 3   down here, you say my injuries, the bruises could look
 4   different?
 5   A.   Yes.
 6   Q.   They could look the same?
 7   A.   Yes.
 8   Q.   As a matter of fact, they more likely look the same.
 9   A.   I can't say.
10            MR. MILLER:  Your Honor, may I have a moment?
11            THE COURT:  You may.
12                      (Pause)
13            MR. MILLER:  No further questions.
14            THE COURT:  Anything further?
15                  REDIRECT EXAMINATION
16   BY MR. KHOROOSI:
17   Q.   Dr. Randall, Mr. Miller asked about whether the
18   symptoms that Aleeyah had the weekend before the fall could
19   have been the result of some common illness.
20   A.   Yes, he did.
21   Q.   Do you recall that?
22   A.   Yes.
23   Q.   Did anything in the medical record indicate she may
24   have had such an illness when she entered the hospital?
25   A.   No.
```

1    Q.   As part of your review, did you review the lab report

2    that was completed on January 10, 2012?

3    A.   Yes.

4    Q.   Do you recall her levels of white blood cell count and

5    lymphocyte count?

6    A.   Yes.

7    Q.   Were the levels low, high, or average?

8    A.   The --

9    Q.   Would it refresh your recollection to take a look at

10   that?

11   A.   Sure.

12   Q.   Have you refreshed your recollection?

13   A.   Yes.  The white count is -- these are different cells

14   that circulate in the blood.  They are usually separated

15   into two major categories, lymphocytes and what we call

16   neutrophils or segmented polynuclear cells.  Basically one

17   of them are used primarily to fight viral or chronic

18   infections.

19        One of them, the neutrophils, are used more to fight

20   bacterial infections.  The total count was decreased.  The

21   neutrophils, the bacterial infection ones, were actually a

22   little bit decreased.  The lymphocyte count was normal.

23   Q.   What does that indicate, Doctor?

24   A.   Usually in children that -- may I take a drink of

25   water?

1   Q.   Please.

2   A.   Usually in children that have illnesses, you will see

3   the white count go up as a whole number, which it didn't in

4   this case.  Sometimes when you see the count go down, you

5   will see that the actual lymphocyte count has gone up as an

6   indicator of viral infections.  That hadn't happened

7   either.  So I suspect this is probably a reasonably -- her

8   usual white count.

9   Q.   So she probably wasn't sick very recently?

10  A.   The blood work does not suggest she was sick

11  beforehand.

12  Q.   Okay.  You were asked about your assessment that

13  Aleeyah fell from a height of four to six feet.

14  A.   Yes.

15  Q.   Now, we've covered this a little bit, but can you

16  explain to the jury how you get that effective height of

17  four to six feet?

18  A.   The effective height would be the height of the

19  platform, plus the height of the individual.

20  Q.   Now, Dr. Randall, I'm showing you what have been

21  entered by stipulation as Government's Exhibits 6 and 7.

22  You probably haven't seen these in person before.  Have you

23  seen photographs of them?

24  A.   Yes.

25           MR. KHOROOSI:  Your Honor, could the witness step

1    out of the stand?

2              THE COURT:  Yes.

3    BY MR. KHOROOSI:

4    Q.   Dr. Randall, it's been testified that this chair

5    stands about 25 inches tall.  Does that appear to be

6    correct?  So 24 to 25 inches tall, if you are sitting on

7    this, that's how high your seat is off the ground.

8    A.   Yes.

9    Q.   Do you recall how tall Aleeyah was when she was

10   sitting?

11   A.   No.

12   Q.   Would it refresh your recollection to look at

13   Dr. Froloff's report?

14   A.   Yes.  It's 52 centimeters.

15   Q.   And that would be approximately 31 inches.  Correct?

16             MR. MILLER:  Your Honor, may I see what they are

17   referring to?

18   A.   Yes, it's 52 centimeters.

19   BY MR. KHOROOSI:

20   Q.   Would you agree, Doctor, it's about 31 inches?

21   A.   No.  It's less than 31 inches.  The 31 inches I think

22   was the top of the head to the feet.

23   Q.   You're correct.  That would be about 23 and a quarter

24   inches.  Correct?

25   A.   That sounds about right.

1    Q.    Could you add about 23 and a quarter inches, and tell

2    the jury how high Aleeyah's head would have been off the

3    ground if she was sitting down?

4    A.    47 inches, which would be about right here.

5    Q.    47 inches.  So that's nearly four feet.  Correct?

6    A.    Yes.

7    Q.    Let's say Aleeyah was standing on the chair.  If she

8    was standing, she would be about 31.1 inches.  Correct?

9    A.    That's correct.

10            MR. MILLER:  Objection.  Facts not in evidence.

11            THE COURT:  Overruled.

12   BY MR. KHOROOSI:

13   Q.    If you were to add 31 inches to 25 inches, how far off

14   the ground are we?

15   A.    We are about 57 inches.

16   Q.    All right.  Now, this table, it's been testified, is

17   about 36 inches off the ground.

18   A.    I'm sorry, that 57, it would be 31 plus 24.  It would

19   be 55.

20   Q.    Which would put us about where?

21   A.    Right here.  (Witness indicating.)

22   Q.    Now, assuming Aleeyah could have climbed up on the

23   table and was sitting --

24            MR. MILLER:  Again, objection, Your Honor.

25   Assuming facts not in evidence.

1              THE COURT:  Overruled.

2    BY MR. KHOROOSI:

3    Q.    You have a table of 36 inches.  Does that appear to be

4    correct?

5    A.    Yes.

6    Q.    Adding her sitting height, her crown to rump line, so

7    23 and a quarter inches.

8    A.    Yes.

9    Q.    How high is her head off the ground?

10   A.    23 and 36, so she would be 59 inches.

11   Q.    Can you indicate where that is to the jury?

12   A.    Right about there.  (Witness indicating.)

13   Q.    Are we still in what we call a short fall,

14   Dr. Randall?

15   A.    Yes.

16   Q.    Now, let's assume she's standing on top of the table.

17   How high is her head off the ground?

18   A.    Now she is 36 plus 31, so she's 67 inches high.

19   Q.    Is that a short fall?

20   A.    I don't think it's entirely clear in the literature

21   all the time whether they are talking about the height of

22   the platform or height of the head.  But if the height of

23   the head is considered, then that would not be considered a

24   short fall.

25   Q.    Now, when you are just looking neuropathologically, in

```
 1   other words, you are just looking at damage to the brain --
 2   go ahead and take your seat.
 3        If Aleeyah was sitting on this chair, could that fall
 4   onto a linoleum wood floor cause the type of injury to her
 5   brain that it did?  I'm not talking about the subgaleal
 6   hemorrhages or the amount.
 7   A.   If she was an otherwise normal child, that would be
 8   very unlikely.
 9   Q.   Would it be possible?
10   A.   Yes.
11   Q.   What if she had been injured before?
12   A.   Then it would be more likely.
13             MR. KHOROOSI:  Thank you.  That's all I have.
14             THE COURT:  Anything further?
15                       RECROSS-EXAMINATION
16   BY MR. MILLER:
17   Q.   Doctor, you talked about the white blood count being
18   normal.
19   A.   Yes.
20   Q.   After the child recovered from the flu, their white
21   blood count would return to normal?
22   A.   Usually, yes.
23   Q.   That would be consistent with the dad's testimony that
24   she was feeling better on Sunday?
25   A.   Yes.
```

1   Q.   And all the information that you've reviewed is that

2   the last time the child was seen, she was sitting in that

3   chair or one just like it.

4   A.   Yes.

5   Q.   There is nothing that you've reviewed that indicated

6   that she was standing on a chair.

7   A.   No.

8   Q.   Nothing to indicate she had climbed up on the table?

9   A.   No.

10   Q.   Much less standing on the table?

11   A.   No.

12   Q.   So that's just all rank speculation.

13   A.   It's a possibility.

14   Q.   It's rank speculation.

15   A.   Rank speculation would be something that couldn't be

16   happening.  Perhaps speculation, without the "rank" in

17   front of it.

18   Q.   You say a fall sitting on this chair to the floor

19   would unlikely cause death?

20   A.   Yes.

21   Q.   Unlikely.

22   A.   Unlikely.

23           MR. MILLER:  Thank you.  That's all I have.

24           THE COURT:  Anything further?

25           MR. KHOROOSI:  Nothing further.

1          THE COURT:  Thank you, Dr. Randall.  You may step

2     down.

3                    (Witness excused)

4          THE COURT:  All right.  We're going to recess for

5     the evening.  Remember what I told you before.  No research

6     of any kind, shape, or form.  Don't talk to each other

7     about the case.  Leave your notes here.  Nobody is going to

8     look at them tonight.  We'll commence again at 9:00 in the

9     morning.  Thank you.  Please stand for the jury.  Counsel

10    stay.

11                  (The jury left the courtroom)

12    (Out of the presence of the jury, counsel and Defendant

13    present, the following proceedings occurred at 5:20:)

14         THE COURT:  Mr. Khoroosi, when do you anticipate

15    you'll complete your evidence tomorrow?

16         MR. KHOROOSI:  I expect to complete it tomorrow

17    afternoon.

18         THE COURT:  That could be 1:00 or 5:00.

19         MR. KHOROOSI:  I would probably expect 2:00 or

20    3:00, Your Honor.

21         THE COURT:  All right.  I just want to know in

22    terms of settling the instructions.  It would appear at

23    this point, unless you wind up sooner than you think, that

24    we'll settle the instructions and argue first thing in the

25    morning on Friday morning.

```
 1        Anything further from the Government?

 2              MR. WRIGHT:  Yes, briefly if I may.

 3              THE COURT:  Yes.

 4              MR. WRIGHT:  Could I take a look at the defense

 5    exhibit, the last exhibit.

 6              MR. KHOROOSI:  I think I have those.

 7              MR. WRIGHT:  Was this received?

 8              THE CLERK:  116.

 9              MR. KHOROOSI:  Yes, that was received under

10    Froloff.

11              MR. WRIGHT:  That was received under Dr. Froloff?

12              MR. KHOROOSI:  Yes.

13              MR. WRIGHT:  That's fine.  Nothing further.

14              MR. KHOROOSI:  Here is 101, Tom.

15              MR. WRIGHT:  I guess I'll make a motion, if I

16    may.

17              THE COURT:  Yes.

18              MR. WRIGHT:  The defense introduced Exhibit 101

19    as a prelude to asking Dr. Randall about water on the

20    brain.  The Court disallowed the testimony.  We ask the

21    foundation for the exhibit be stricken.

22              THE COURT:  I'll hear from the defense.

23              MR. KHOROOSI:  Well, Your Honor, even if a jury

24    does not consider the hydrocephalus, which they're not, I

25    would still introduce evidence of a possibility through
```

```
 1    other witnesses.  In my cross with Dr. Froloff, in my cross

 2    of Dr. Anonye, I brought up whether or not the head

 3    circumference was measured.

 4       I brought up Dr. Froloff's plotting of the head

 5    circumference on his own graph.  I admitted his own exhibit

 6    through him.  I think it's fair to criticize his approach

 7    to plotting the percentile of the head size.

 8            THE COURT:  The exhibit is going to stay in,

 9    because Dr. Froloff testified as to those figures.  He

10    didn't say anything about hydrocephalic condition.  It

11    could be evidence to show simply that there's statistically

12    another percentage under another chart.  It's appropriate

13    it stay in in view of the evidence that the Government put

14    in.  Denied.

15       Anything further from the Government?

16            MR. WRIGHT:  No, sir.  Thank you.

17            THE COURT:  Anything further from the defense?

18            MR. KHOROOSI:  Your Honor, there was one matter

19    that was brought to my attention earlier today.  We had

20    subpoenaed an Edward Seaboy, Jr.  I have spoken to

21    Mr. Seaboy on the phone, and he has been subpoenaed.

22       He came in today during the testimony in the morning.

23    As soon as I found out he was here, I told him he had to

24    leave and stay out until it's his turn to testify.  He did

25    not -- he's only going to testify to a minor matter that
```

1    wasn't discussed this morning.  I expect him to discuss

2    what happened to Aleeyah at the wake on January 6th.

3         It certainly wasn't intentional on my part and I don't

4    think on Mr. Seaboy's part either.  But I wanted to bring

5    that to the attention of the Court, just in case the

6    Government would want to make a motion on it tomorrow.  I

7    would rather take care of it tonight.

8              THE COURT:  How long was he here in the

9    courtroom?

10             MR. KHOROOSI:  I'm not sure how long he was here.

11   Counsel saw him.

12             MR. MILLER:  I was the individual that discovered

13   the issue.  I noticed Mr. Seaboy coming in the courtroom.

14   He had a rather large cowboy hat, and that drew my

15   attention to him maybe from many of the other people in the

16   gallery of the courtroom.  When we broke for lunch, I heard

17   Mr. Khoroosi tell him to come back tomorrow.  That's when I

18   realized this individual was a witness or a potential

19   witness.  I can't say exactly when he came into the

20   courtroom, but I think he was here the majority of the

21   morning session.

22             MR. WRIGHT:  If I may, we are not alleging any

23   bad faith on Mr. Khoroosi's part.  I think he took care of

24   the matter as soon as he could.  I don't think he was

25   trying to have any advantage for having the witness in

1    here.  I think it was just a mistake on the witness' part.

2          THE COURT:  So far it sounds like no harm, no

3    foul.  I appreciate everybody bringing it up.  I'm not

4    going to exclude him from testimony, because it sounds as

5    though it wasn't something other than inadvertence.

6        Beyond that, even if inadvertent, it would still cause

7    a problem because he would load up his testimony, but

8    that's not the case from what I hear.  Thank you for

9    bringing it up, but not a problem.  I'm glad it was brought

10   up tonight, so it won't slow us down tomorrow.  Thank you.

11   We're in recess.

12          (End of proceedings at 5:27 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$150** [1] - 218:17

## '

**'76** [1] - 287:15
**'Night** [1] - 235:7

## 1

**1** [3] - 193:15, 230:16, 310:19
**10** [12] - 174:18, 189:4, 189:7, 189:18, 189:21, 190:2, 190:10, 243:14, 275:5, 343:21, 408:13, 416:2
**10-minute** [1] - 189:25
**101** [5] - 382:3, 382:10, 383:5, 424:14, 424:18
**10:43** [1] - 237:12
**10:55** [1] - 237:12
**10th** [2] - 178:5, 380:20
**11** [9] - 177:16, 244:16, 275:5, 283:19, 290:1, 290:9, 290:11, 326:4, 362:6
**116** [4] - 204:16, 205:1, 379:25, 424:8
**117** [3] - 368:13, 368:20, 368:22
**11:00** [2] - 168:24, 271:13
**11:50** [1] - 272:6
**11th** [6] - 178:5, 244:22, 245:7, 273:9, 410:6, 410:20
**12** [8] - 191:23, 191:25, 278:5, 285:22, 321:20, 322:4, 322:7, 322:9
**12-10047-01** [1] - 155:4
**12-28-11** [1] - 256:8
**120** [2] - 363:11, 363:13
**12:08** [1] - 285:11
**13** [2] - 251:5, 278:5
**14** [3] - 160:25, 222:25, 285:23
**14th** [1] - 253:24
**15** [4] - 186:2, 234:21, 307:16,

408:13
**15-minute** [2] - 343:22, 366:6
**150** [1] - 373:4
**16** [2] - 413:13, 414:4
**16(b)(1)(C** [1] - 390:19
**16(b)(1)(C)** [1] - 390:19
**16(d)(2)** [1] - 390:21
**17** [4] - 192:1, 193:24, 413:13, 414:4
**18** [33] - 177:24, 197:6, 197:7, 218:2, 218:21, 224:8, 262:8, 262:11, 291:22, 297:10, 333:15, 333:18, 334:2, 334:4, 334:25, 358:1, 358:7, 358:23, 362:23, 363:1, 365:7, 365:16, 371:14, 371:16, 403:17, 403:23, 404:25, 412:21, 413:10, 413:15, 413:17, 413:18, 413:23
**180** [1] - 300:10
**19** [1] - 255:11
**1978** [1] - 369:8
**1981** [1] - 367:7
**1990s** [1] - 367:18
**1993** [3] - 381:17, 383:25, 384:5
**1997** [1] - 274:9
**1999** [1] - 212:2
**1:00** [5] - 271:10, 271:22, 272:2, 285:11, 423:18
**1:04** [1] - 285:13
**1:07** [1] - 286:21
**1st** [1] - 309:20

## 2

**2)(C** [1] - 390:22
**20** [1] - 380:22
**20-month-year-old** [1] - 203:20
**200** [1] - 373:4
**2000** [3] - 383:22, 384:1, 384:3
**2001** [3] - 274:10, 275:8, 283:18
**2005** [1] - 213:16
**2008** [2] - 173:13, 367:7
**2009** [3] - 216:2, 217:2, 218:3

**2010** [3] - 165:21, 306:21, 314:12
**2011** [27] - 158:10, 160:17, 163:19, 166:14, 172:23, 217:1, 218:3, 218:20, 218:23, 219:3, 219:15, 222:14, 222:17, 222:25, 225:10, 226:24, 249:8, 251:5, 262:9, 274:10, 275:8, 309:21, 310:20, 312:23, 315:1, 315:5, 315:20
**2012** [32] - 158:7, 165:21, 191:23, 191:25, 192:1, 192:17, 193:7, 193:19, 193:24, 231:19, 233:15, 237:18, 254:12, 264:21, 276:10, 284:15, 293:9, 294:5, 296:22, 300:24, 307:10, 309:22, 310:20, 311:13, 314:12, 345:10, 351:8, 351:14, 357:7, 400:16, 402:1, 416:2
**2013** [4] - 155:7, 155:12, 157:1, 401:23
**20th** [1] - 381:2
**22** [1] - 360:20
**225** [1] - 155:23
**23** [7] - 192:17, 193:9, 193:18, 418:23, 419:1, 420:7, 420:10
**23rd** [1] - 193:4
**24** [6] - 192:13, 193:7, 207:23, 380:16, 418:6, 419:18
**24-month-old** [1] - 203:20
**24th** [1] - 207:4
**25** [7] - 206:2, 206:10, 255:11, 401:9, 418:5, 418:6, 419:13
**25th** [3] - 204:8, 205:8, 383:17
**26** [1] - 406:21
**2638** [1] - 155:20
**27** [1] - 203:4
**29** [7] - 213:16, 292:12, 292:13, 348:9, 355:12, 364:17, 367:13
**29th** [1] - 291:18

**2:00** [1] - 423:19
**2:20** [1] - 343:25
**2:35** [1] - 343:25
**2:45** [1] - 349:24

## 3

**3** [11] - 308:21, 309:7, 309:11, 309:14, 309:17, 309:22, 310:24, 311:3, 337:1, 350:2, 402:11
**30** [1] - 362:4
**30-second** [1] - 312:8
**300** [2] - 156:4, 291:7
**300-pound** [1] - 377:19
**31** [12] - 155:7, 155:12, 157:1, 216:2, 251:9, 418:15, 418:20, 418:21, 419:13, 419:18, 420:18
**31.1** [1] - 419:8
**337** [1] - 155:23
**35** [1] - 369:9
**36** [14] - 206:8, 206:9, 206:10, 327:20, 329:9, 338:25, 369:8, 372:16, 373:5, 405:9, 419:17, 420:3, 420:10, 420:18
**36-inch** [2] - 206:11, 206:12
**3:00** [2] - 355:11, 423:20
**3:18** [1] - 366:9
**3:35** [1] - 366:9
**3:45** [1] - 194:16
**3rd** [2] - 242:25, 254:12

## 4

**4** [11] - 217:9, 217:17, 231:19, 232:7, 282:2, 282:3, 337:2, 388:8, 389:18, 390:11
**4-24** [1] - 193:20
**400** [1] - 156:15
**404** [1] - 249:7
**404(b** [19] - 157:3, 157:6, 169:5, 169:17, 172:25, 174:23, 271:12, 272:5, 272:8,

272:11, 280:8, 280:12, 280:21, 281:4, 283:20, 283:21, 285:14, 286:2, 361:14
**404(b)** [2] - 225:18, 283:13
**405** [1] - 156:4
**411** [1] - 255:10
**47** [2] - 419:4, 419:5
**48** [1] - 373:9
**49** [1] - 380:17
**4:10** [1] - 386:25
**4:30** [2] - 307:7, 311:17
**4th** [2] - 231:23, 410:6

## 5

**5** [4] - 163:6, 225:1, 225:16, 225:19
**50** [8] - 275:14, 275:22, 279:7, 279:12, 279:13, 279:17, 279:18, 280:14
**500** [1] - 340:2
**50th** [2] - 380:19, 395:10
**52** [2] - 418:14, 418:18
**534** [1] - 173:12
**55** [1] - 419:19
**57** [2] - 419:15, 419:18
**57101-2638** [1] - 155:20
**57104** [2] - 156:4, 156:15
**57501-2489** [1] - 155:24
**59** [3] - 247:22, 251:10, 420:10
**5:00** [2] - 244:24, 423:18
**5:20** [1] - 423:13
**5:27** [1] - 427:12

## 6

**6** [7] - 347:5, 347:17, 347:24, 351:14, 353:12, 402:11, 417:21
**605-330-6669** [1] - 156:16
**648** [1] - 172:23
**67** [2] - 378:21,

420:18
**68** [1] - 376:17
**690** [1] - 172:23
**699** [1] - 172:23
**6th** [4] - 232:19,
232:20, 233:9, 426:2

## 7

**7** [4] - 347:5, 347:17,
347:24, 417:21
**72** [6] - 177:10,
177:13, 209:17,
209:18, 209:19, 373:9
**72-hour** [1] - 177:12

## 8

**8** [13] - 184:10,
184:13, 184:18,
185:18, 187:17,
188:13, 237:18,
238:6, 238:13,
247:23, 251:9,
342:15, 357:22
**80** [1] - 380:24
**803(9)** [1] - 186:22
**80th** [4] - 204:5,
205:6, 380:20, 380:22
**8:00** [6] - 307:7,
307:12, 307:21,
307:22, 310:6, 311:17
**8:30** [1] - 239:13
**8:40** [2] - 155:12,
157:4
**8th** [1] - 233:13

## 9

**9** [12] - 177:14,
248:22, 249:4,
264:21, 284:14,
307:10, 310:20,
311:13, 326:1, 357:7,
388:17, 400:16
**90th** [2] - 383:20,
395:12
**911** [1] - 361:3
**96** [1] - 373:25
**980** [1] - 173:13
**9:00** [1] - 423:8
**9:04** [1] - 175:1
**9:28** [1] - 190:5
**9:40** [1] - 190:5
**9F** [2] - 176:6, 176:11
**9th** [10] - 178:5,
239:10, 255:25,
355:23, 377:3,

377:10, 396:19,
410:10, 410:17,
410:21

## A

**A.C** [3] - 219:14,
400:15, 402:11
**a.m** [7] - 155:12,
157:4, 175:1, 190:5,
272:6, 307:12, 310:6
**able** [20] - 179:12,
179:13, 179:24,
181:20, 182:10,
182:13, 208:13,
221:19, 254:17,
255:15, 284:23,
330:20, 355:20,
365:8, 381:14,
384:19, 398:1,
398:24, 405:10,
407:25
**abnormal** [3] - 327:8,
327:11, 384:12
**abnormalities** [1] -
327:10
**absence** [1] - 169:17
**absences** [1] -
309:19
**absent** [1] - 172:20
**absolutely** [6] -
177:4, 192:6, 247:15,
257:15, 293:25,
304:24
**absorb** [1] - 397:17
**abuse** [11] - 247:14,
288:21, 289:1,
289:25, 290:25,
291:5, 291:12,
291:13, 297:15,
300:19
**academic** [1] - 291:4
**Academy** [2] -
289:22, 319:20
**accent** [1] - 318:16
**accept** [2] - 162:13,
172:8
**acceptable** [2] -
205:22, 209:10
**accepted** [3] -
407:11, 409:2, 411:23
**accepting** [1] -
282:16
**access** [2] - 344:14,
361:5
**accident** [20] -
169:14, 169:16,
169:18, 170:7,
173:17, 173:18,

173:25, 219:23,
220:9, 280:13,
280:18, 283:4, 283:5,
283:9, 283:25,
284:10, 313:5,
313:16, 339:22, 414:3
**accident-prone** [1] -
414:3
**accidental** [5] -
293:5, 293:24,
335:19, 343:10,
343:13
**accidents** [1] -
182:22
**accommodate** [1] -
332:7
**accompanying** [1] -
400:18
**according** [2] -
171:9, 358:3
**account** [4] - 332:7,
334:23, 335:1, 335:15
**accumulates** [1] -
180:4
**accurate** [5] -
189:15, 309:8, 322:4,
372:8, 381:5
**accurately** [2] -
163:14, 217:14
**accusation** [1] -
285:7
**acquittal** [4] -
258:16, 355:16,
357:8, 364:15
**act** [10] - 170:11,
220:3, 220:4, 248:1,
280:12, 281:20,
313:10, 313:11,
356:2, 357:6
**acting** [2] - 282:18,
282:20
**action** [1] - 308:2
**actions** [1] - 356:14
**active** [2] - 216:7,
368:6
**activities** [1] -
369:15
**acts** [13] - 172:19,
172:24, 220:6, 220:8,
247:6, 272:13,
280:10, 313:13,
313:15, 345:17,
345:21, 346:8, 346:12
**actual** [3] - 186:13,
374:4, 417:5
**acute** [20] - 177:10,
208:18, 208:24,
208:25, 209:5, 209:7,
209:9, 209:13,
209:15, 209:18,

269:12, 325:15,
325:22, 326:7,
326:16, 326:20,
331:25, 408:9,
408:12, 408:17
**add** [6] - 186:24,
236:10, 345:20,
376:15, 419:1, 419:13
**added** [1] - 378:19
**adding** [1] - 420:6
**addition** [6] - 291:25,
298:22, 360:6,
368:24, 369:22, 370:1
**additional** [4] -
180:23, 304:14,
348:20, 370:13
**adjourn** [1] - 348:15
**adjust** [1] - 175:12
**administrative** [2] -
309:2, 350:25
**admissible** [5] -
172:20, 172:24,
235:20, 249:8, 252:24
**admission** [13] -
170:13, 172:18,
177:23, 272:13,
326:9, 326:18, 347:2,
368:19, 369:24,
383:5, 395:24, 400:16
**admit** [6] - 162:6,
169:9, 172:12,
194:11, 224:2, 258:16
**admits** [1] - 172:13
**admitted** [12] -
170:3, 171:9, 172:9,
177:14, 177:21,
251:23, 325:25,
327:2, 337:10, 361:6,
414:14, 425:5
**admitting** [2] -
172:10, 173:14
**adolescence** [2] -
282:15, 282:16
**Adolescents** [1] -
406:23
**adult** [11] - 201:15,
207:7, 266:14,
299:11, 340:25,
341:2, 341:4, 341:5,
358:17, 373:15,
402:24
**adults** [7] - 201:16,
287:25, 298:1,
341:13, 341:16,
362:9, 377:15
**advance** [1] - 171:16
**advanced** [2] -
363:18, 363:21
**advantage** [1] -
426:25

**affect** [1] - 397:10
**affected** [2] - 245:10,
352:15
**affects** [2] - 321:4,
401:15
**aforethought** [1] -
356:5
**afraid** [3] - 250:2,
278:14, 278:17
**afternoon** [15] -
168:12, 304:9,
304:10, 317:20,
344:5, 344:6, 349:4,
349:24, 350:19,
360:12, 366:20,
366:22, 399:25,
400:1, 423:17
**afterwards** [3] -
248:5, 276:25, 358:4
**age** [21] - 196:8,
196:12, 204:2, 204:6,
204:20, 204:21,
208:7, 285:19,
291:22, 298:23,
299:20, 325:9,
325:23, 339:18,
353:4, 362:5, 380:12,
380:16, 382:23,
383:18, 392:19
**Agent** [9] - 169:10,
235:13, 246:7,
246:15, 280:19,
359:7, 359:8, 361:5,
363:3
**agent** [3] - 169:14,
283:5, 358:3
**ages** [1] - 195:25
**aggravated** [1] -
389:5
**aging** [3] - 324:22,
326:13, 330:13,
330:24
**ago** [5] - 187:22,
194:16, 299:2, 358:9,
408:13
**agree** [38] - 191:4,
191:11, 191:13,
227:9, 233:24, 241:5,
254:3, 269:6, 269:9,
303:5, 303:8, 303:10,
303:11, 303:19,
303:22, 329:22,
342:22, 343:3, 343:5,
364:4, 371:12,
371:20, 371:22,
392:14, 398:5, 403:5,
403:9, 403:14,
403:23, 408:23,
408:24, 411:7,
412:15, 412:20,

413:2, 413:15,
414:18, 418:20
  **agreeance** [2] -
254:18, 255:16
  **agreed** [5] - 234:12,
252:18, 345:5,
346:22, 347:8
  **agreement** [1] -
333:4
  **ahead** [14] - 164:19,
199:15, 200:11,
205:3, 239:12,
253:21, 261:16,
313:17, 345:7, 350:8,
371:1, 392:2, 405:24,
421:2
  **aiming** [1] - 300:13
  **ain't** [1] - 245:12
  **airbag** [1] - 265:9
  **airlift** [1] - 240:24
  **airlifted** [1] - 241:7
  **Alabama** [8] - 318:3,
318:4, 318:13,
318:17, 318:22,
318:23, 320:10,
320:12
  **alcohol** [15] - 201:9,
201:14, 201:18,
201:22, 201:25,
202:1, 202:15, 203:1,
203:5, 203:9, 230:24,
230:25, 231:3
  **Aleeyah** [195] -
157:24, 158:6,
158:10, 158:13,
158:18, 160:8,
165:19, 165:21,
165:23, 166:1,
166:17, 166:20,
166:23, 167:1, 167:5,
167:8, 169:20,
183:19, 183:23,
184:16, 188:17,
202:14, 203:19,
204:5, 205:5, 206:5,
214:5, 214:6, 214:12,
216:1, 216:6, 216:13,
217:2, 217:14, 218:9,
218:20, 218:24,
219:3, 219:14,
219:23, 220:13,
220:20, 220:24,
221:15, 222:2, 223:2,
223:25, 224:2, 225:8,
226:2, 226:7, 226:10,
226:15, 226:18,
227:2, 227:7, 227:22,
227:24, 228:11,
228:15, 228:24,
229:7, 229:10,

229:23, 230:7,
230:13, 230:25,
231:5, 231:8, 231:20,
232:10, 232:18,
233:5, 233:12, 234:2,
234:3, 234:14, 235:6,
235:7, 235:9, 235:11,
235:13, 237:18,
237:20, 237:23,
238:13, 238:17,
239:18, 240:11,
240:20, 241:7,
241:21, 242:24,
243:5, 243:14, 245:7,
246:10, 246:21,
248:21, 248:23,
248:23, 249:3, 250:9,
251:1, 253:25,
254:13, 255:22,
255:25, 256:5,
256:11, 259:4, 259:5,
259:25, 260:13,
260:19, 260:22,
262:7, 264:8, 264:10,
264:12, 264:19,
265:4, 265:14,
265:21, 266:14,
269:3, 273:22,
273:24, 280:16,
281:8, 282:10,
282:14, 282:19,
283:8, 283:15,
284:14, 293:9,
293:13, 294:5,
296:21, 297:5,
298:19, 300:24,
302:25, 303:6,
303:11, 304:11,
312:22, 313:5, 314:8,
314:12, 314:13,
314:15, 315:5, 316:6,
316:25, 325:25,
327:18, 330:7, 344:8,
351:10, 351:14,
352:2, 352:15,
353:11, 353:15,
353:19, 359:12,
359:20, 359:21,
359:24, 362:7,
362:13, 369:25,
374:8, 375:1, 375:7,
375:13, 378:7,
387:18, 388:16,
392:4, 396:18, 397:2,
399:4, 409:25, 410:5,
415:18, 417:13,
418:9, 419:7, 419:22,
421:3, 426:2
  **Aleeyah's** [29] -
158:14, 159:6,
160:14, 163:9,

163:11, 166:4, 167:3,
167:16, 167:17,
218:2, 224:11, 225:6,
228:13, 230:2,
242:17, 244:5,
256:13, 297:11,
315:21, 316:16,
352:8, 355:21, 356:6,
377:2, 378:25, 382:1,
412:5, 414:19, 419:2
  **alert** [2] - 241:20,
353:23
  **alive** [18] - 165:21,
166:1, 178:3, 214:7,
217:4, 217:15,
218:11, 231:8,
235:11, 236:3,
236:23, 238:7,
242:24, 243:2,
243:15, 244:6,
314:12, 405:23
  **allegation** [1] -
171:12
  **allegations** [1] -
259:13
  **alleged** [9] - 170:11,
247:12, 251:21,
260:8, 281:5, 281:20,
281:21, 345:21,
346:12
  **allegedly** [1] - 258:3
  **alleging** [1] - 426:22
  **allow** [5] - 173:19,
282:4, 282:8, 286:6,
293:6
  **allowed** [10] -
174:18, 200:7, 226:2,
247:10, 249:5, 249:7,
265:4, 286:9, 376:17,
406:16
  **allows** [3] - 288:10,
295:14, 332:19
  **almost** [7] - 179:9,
198:7, 300:10, 372:9,
383:20, 396:23,
398:15
  **ALSO** [1] - 156:7
  **alternate** [2] - 389:8,
394:23
  **alternatively** [1] -
388:22
  **Altru** [1] - 289:7
  **ambulance** [4] -
266:20, 361:7, 361:8,
361:11
  **ambush** [2] - 387:25,
388:3
  **AMERICA** [1] - 155:5
  **American** [5] -
217:24, 221:15,

289:22, 319:20,
368:10
  **amount** [6] - 180:1,
180:5, 328:7, 339:9,
397:15, 421:6
  **analogy** [1] - 415:1
  **analyze** [1] - 363:14
  **anatomic** [9] - 318:5,
318:7, 318:21, 319:5,
319:6, 319:9, 367:8,
368:1, 368:11
  **aneurysm** [1] -
304:23
  **angry** [1] - 159:14
  **announced** [3] -
170:4, 170:6, 283:24
  **Annual** [1] - 340:15
  **Anonye** [1] - 425:2
  **anoxic** [3] - 323:18,
324:2, 324:3
  **answer** [18] - 161:15,
178:4, 183:4, 193:22,
196:2, 200:7, 200:25,
201:5, 235:4, 251:1,
253:19, 269:20,
269:21, 371:1,
375:19, 393:23, 402:3
  **answered** [2] -
256:11, 256:12,
270:22, 335:5, 408:14
  **answers** [6] -
267:12, 267:13,
267:14, 268:8, 268:9,
362:19
  **anthropology** [2] -
321:6, 321:7
  **anticipate** [2] -
235:5, 423:14
  **anticipated** [2] -
235:4, 236:10
  **anytime** [2] - 310:11,
319:11
  **anyway** [4] - 177:7,
253:19, 261:15,
385:16
  **apologize** [5] -
162:10, 168:20,
224:4, 255:4, 414:6
  **apologized** [2] -
170:5, 171:10
  **apology** [1] - 162:13
  **appear** [7] - 170:24,
173:15, 381:18,
396:23, 418:5, 420:3,
423:22
  **appearance** [5] -
195:16, 209:24,
324:17, 414:20,
414:22
  **APPEARANCES** [2] -

155:18, 156:1
  **appeared** [4] -
176:14, 199:10,
209:23, 414:19
  **appearing** [1] -
396:22
  **application** [1] -
319:15
  **apply** [1] - 284:16
  **appointments** [1] -
256:10
  **appreciate** [1] -
427:3
  **approach** [19] -
163:2, 184:22,
204:12, 224:23,
228:21, 247:1, 247:8,
252:16, 255:1, 257:8,
271:5, 290:2, 308:17,
315:7, 321:16, 372:5,
372:12, 384:25, 425:6
  **Approach** [1] - 348:7
  **appropriate** [3] -
264:6, 286:2, 425:12
  **approved** [1] - 347:7
  **April** [6] - 192:11,
193:7, 207:4, 207:23,
370:18, 400:21
  **APSAC** [1] - 289:23
  **arachnoid** [1] -
179:16
  **area** [25] - 165:16,
176:11, 176:16,
176:19, 177:4,
182:10, 194:7, 202:4,
213:2, 288:21,
288:25, 296:16,
296:20, 314:10,
321:10, 331:6,
331:10, 338:5,
338:17, 346:12,
353:18, 364:11,
364:14, 389:9
  **areas** [10] - 181:21,
296:15, 298:4,
332:16, 334:22,
335:7, 337:6, 338:11,
342:2
  **argue** [2] - 390:22,
423:24
  **argues** [1] - 397:4
  **arguing** [5] - 201:11,
283:18, 375:16,
394:11, 414:13
  **argument** [9] -
171:13, 235:14,
247:13, 283:13,
284:4, 284:7, 363:6,
386:3, 396:9
  **arm** [8] - 195:23,

195:24, 196:15, 196:16, 407:24, 415:2

**Army** [7] - 212:6, 212:7, 212:9, 212:14, 212:16, 212:19, 212:23

**Arne** [3] - 242:11, 286:23, 287:5

**ARNE** [1] - 286:24

**arrange** [1] - 227:15

**arrangements** [1] - 231:22

**arrest** [1] - 247:20

**arrived** [1] - 265:10

**artery** [1] - 302:20

**article** [2] - 340:11, 340:18

**articles** [3] - 340:13, 340:20, 369:10

**artificial** [1] - 359:17

**ascertain** [2] - 265:20, 358:6

**ascribe** [1] - 405:21

**aside** [5] - 364:1, 365:7, 365:11, 379:14, 395:4

**aspect** [1] - 323:17

**assault** [17] - 182:20, 184:2, 185:2, 205:12, 205:15, 205:22, 205:24, 235:15, 292:20, 294:2, 300:25, 301:4, 301:15, 303:9, 342:21, 403:9, 412:18

**assaulted** [2] - 171:18, 258:3

**assaulting** [1] - 258:8

**assaultive** [1] - 182:23

**assaultive-type** [1] - 182:23

**assaults** [2] - 182:23, 296:10

**assemble** [1] - 265:20

**assembled** [1] - 266:23

**asserted** [3] - 235:9, 235:24, 250:11

**asserting** [1] - 285:1

**assessment** [4] - 204:4, 381:4, 411:7, 417:12

**assessments** [1] - 264:6

**assign** [1] - 329:4

**assist** [1] - 294:4

**assistant** [1] -

350:25

**associated** [1] - 324:6

**Association** [4] - 190:23, 191:13, 207:8, 319:19

**Association's** [1] - 191:1

**associations** [1] - 289:20

**assume** [11] - 159:5, 171:13, 213:2, 221:24, 223:4, 262:11, 348:9, 385:18, 414:1, 414:9, 420:16

**assumed** [1] - 363:6

**assuming** [13] - 171:1, 172:11, 201:2, 252:11, 322:1, 365:2, 397:2, 397:7, 397:9, 419:22, 419:25

**assumption** [3] - 387:21, 387:22, 387:24

**assurance** [1] - 306:9

**astounding** [1] - 364:2

**ate** [2] - 228:24, 352:11

**athlete** [1] - 377:22

**athletic** [1] - 302:16

**attached** [1] - 299:17

**attaching** [1] - 387:13

**attack** [3] - 207:8, 405:18, 406:3

**attacks** [1] - 405:22

**attempt** [5] - 162:15, 169:25, 224:10, 251:15, 316:11

**attempted** [4] - 163:10, 163:17, 163:18, 225:7

**attempting** [2] - 178:9, 270:16

**attend** [3] - 212:23, 212:25, 287:16

**attendance** [3] - 309:4, 309:18, 311:6

**attended** [2] - 291:4, 291:8

**attention** [6] - 193:15, 255:5, 351:13, 425:19, 426:5, 426:15

**attentive** [1] - 285:2

**attenuated** [2] - 170:12

**attire** [1] - 348:20

**attitude** [1] - 228:21

**attorney** [1] - 394:8

**Attorney's** [2] - 155:19, 155:23

**attorneys** [1] - 195:22

**audience** [1] - 272:11

**August** [22] - 158:9, 160:17, 161:5, 163:19, 166:14, 173:5, 217:1, 218:20, 219:2, 219:15, 222:13, 222:17, 223:4, 225:10, 226:1, 226:14, 249:8, 260:8, 262:9, 312:23, 315:4, 315:20

**auntie** [1] - 274:6

**AUSTIN** [1] - 272:14

**Austin** [17] - 272:21, 272:22, 272:24, 273:20, 274:8, 276:9, 277:16, 278:2, 280:1, 281:8, 282:15, 282:19, 283:14, 283:16, 284:14, 285:15, 285:22

**Austin's** [1] - 281:17

**author** [2] - 290:24, 340:12

**authored** [4] - 290:18, 369:12, 369:13, 370:18

**authorities** [4] - 207:21, 280:20, 280:24, 365:12

**autopsies** [3] - 191:5, 367:10, 372:21

**autopsy** [48] - 183:1, 183:20, 185:24, 186:13, 188:19, 188:21, 188:23, 191:8, 191:14, 191:22, 191:25, 193:10, 198:4, 198:9, 198:14, 198:15, 198:19, 198:24, 199:4, 199:5, 207:2, 261:18, 261:21, 297:6, 297:9, 298:3, 298:11, 298:25, 300:21, 323:4, 324:9, 324:17, 324:19, 337:12, 343:8, 356:9, 369:19, 369:20, 369:21, 371:18, 379:2, 384:15, 388:24, 400:18,

403:12, 405:10, 405:19, 412:17

**Autopsy** [10] - 187:8, 191:10, 194:23, 203:18, 205:11, 205:20, 205:23, 207:9, 207:17, 400:17

**available** [5] - 168:22, 193:2, 289:5, 375:8, 402:2

**Ave** [2] - 156:4, 156:15

**average** [2] - 183:9, 416:7

**averages** [1] - 382:22

**awake** [1] - 329:2

**awards** [3] - 290:13, 290:15, 369:14

**aware** [16] - 159:23, 170:18, 214:9, 239:1, 242:13, 297:4, 325:25, 351:24, 383:23, 404:19, 406:20, 406:25, 407:3, 407:15, 407:17, 409:25

**axonal** [5] - 181:17, 182:5, 182:9, 182:21, 183:4

**axons** [2] - 181:22, 182:2

## B

**B.L** [1] - 406:21

**babies** [3] - 217:8, 287:25, 288:1

**baby** [3] - 177:25, 254:18, 255:15

**Bachelor** [2] - 318:2, 367:22

**Bachelor's** [1] - 263:18

**backdrop** [1] - 389:1

**background** [4] - 189:13, 287:10, 317:25, 318:15

**backhanded** [1] - 278:20

**backwards** [1] - 326:17

**bacterial** [2] - 416:20, 416:21

**bad** [9] - 170:5, 172:18, 172:24, 247:6, 248:1, 272:13, 302:10, 354:2, 426:23

**bag** [1] - 352:25

**balance** [1] - 374:20

**balancing** [2] - 181:2, 286:5

**ballpark** [1] - 365:10

**bar** [14] - 184:24, 185:16, 247:3, 248:7, 257:10, 259:20, 271:7, 271:18, 315:10, 315:17, 348:8, 350:11, 385:3, 386:16

**bare** [1] - 359:2

**barely** [1] - 330:25

**barred** [1] - 387:24

**bars** [1] - 300:1

**base** [2] - 345:11, 400:6

**baseball** [4] - 195:23, 195:24, 414:25, 415:2

**based** [18] - 183:20, 300:18, 300:19, 327:21, 329:6, 330:24, 334:2, 340:23, 341:15, 356:9, 378:16, 381:10, 384:14, 385:10, 400:22, 402:7, 402:9, 405:9

**bases** [1] - 391:17

**basis** [5] - 251:23, 252:25, 285:6, 292:4, 365:19

**bat** [3] - 195:23, 195:24, 415:1

**Bates** [1] - 255:10

**bearing** [1] - 377:13

**beat** [1] - 282:22

**beating** [3] - 178:6, 358:25, 361:21

**became** [6] - 185:24, 245:23, 328:6, 328:23, 412:1, 412:2

**become** [3] - 292:24, 330:15, 347:13

**bed** [2] - 234:6, 240:14

**BEFORE** [1] - 155:16

**beforehand** [3] - 356:25, 406:5, 417:11

**Beg** [1] - 237:4

**begin** [5] - 174:19, 175:8, 312:7, 364:16, 397:16

**beginning** [1] - 310:6

**behave** [1] - 398:20

**behavior** [1] - 352:8

**believable** [3] - 219:18, 313:1, 374:16

**below** [5] - 202:4,

204:8, 205:8, 329:4, 342:25

**bench** [4] - 247:8, 252:17, 348:7, 385:1

**beneath** [1] - 331:6

**benefit** [1] - 255:9

**benefits** [1] - 283:15

**best** [4] - 286:7, 370:6, 381:25, 395:19

**better** [6] - 349:15, 354:10, 403:19, 404:10, 412:11, 421:24

**between** [26] - 159:2, 165:21, 170:21, 170:23, 180:15, 181:19, 186:13, 195:25, 216:5, 253:5, 275:8, 292:11, 297:19, 298:21, 310:19, 314:12, 324:1, 373:4, 383:15, 383:24, 384:11, 409:4, 409:10, 409:14, 409:19, 409:23

**beyond** [11] - 173:23, 219:19, 270:13, 270:15, 313:2, 355:18, 356:13, 357:5, 357:14, 364:18, 427:6

**big** [10] - 157:15, 161:1, 165:3, 211:11, 246:13, 272:22, 371:11, 377:19, 384:10, 414:8

**bigger** [2] - 341:16, 341:20

**bind** [1] - 336:10

**biological** [1] - 230:3

**biomechanics** [1] - 296:18

**biomedical** [1] - 318:3

**biopsy** [1] - 319:8

**birth** [4] - 213:12, 216:14, 216:22, 291:22

**birthmark** [1] - 170:19

**bit** [20] - 171:21, 179:20, 195:10, 196:20, 206:17, 209:3, 248:8, 248:11, 271:21, 283:22, 292:22, 330:16, 335:21, 335:22, 366:5, 366:7, 373:13, 377:12, 416:22,

417:15

**black** [6] - 176:7, 176:14, 176:20, 374:23, 375:2, 405:4

**bleed** [2] - 302:14, 302:15

**bleeding** [4] - 295:17, 295:20, 296:7, 297:25

**bleeds** [1] - 295:16

**block** [1] - 393:24

**blood** [21] - 295:14, 298:20, 302:22, 319:11, 323:23, 323:25, 324:1, 324:20, 324:23, 325:1, 336:8, 336:9, 336:21, 337:22, 337:24, 416:4, 416:14, 417:10, 421:17, 421:21

**blooded** [1] - 175:7

**blow** [2] - 197:18, 413:20

**blows** [7] - 276:21, 282:10, 357:25, 412:17, 413:22, 413:23

**blue** [5] - 176:9, 176:16, 176:19, 176:21, 232:6

**bluish** [1] - 330:14

**bluish-purple** [1] - 330:14

**blunt** [4] - 196:14, 196:15, 338:14, 356:10

**board** [15] - 190:13, 288:2, 288:5, 288:6, 288:10, 288:11, 318:6, 318:10, 319:3, 319:5, 319:13, 319:14, 368:9, 368:10

**Board** [1] - 368:10

**boards** [1] - 319:17

**body** [21] - 159:22, 177:24, 178:2, 178:8, 187:12, 187:13, 199:5, 246:13, 294:23, 295:4, 325:18, 326:13, 327:6, 341:5, 341:7, 341:17, 341:18, 341:20, 380:25, 392:15

**bolsters** [1] - 280:15

**bone** [4] - 180:14, 194:5, 231:6, 327:11

**bones** [4] - 231:6, 295:3, 327:7, 327:8

**book** [1] - 373:23

**books** [3] - 304:2, 369:12, 369:13

**boot** [1] - 175:6

**born** [7] - 160:24, 213:15, 216:3, 216:13, 217:2, 222:24, 274:8

**boss** [1] - 185:22

**bottom** [3] - 181:1, 255:6, 380:11

**Box** [1] - 155:20

**box** [3] - 374:23, 375:2, 405:4

**boy** [7] - 168:8, 213:17, 213:18, 214:2, 214:20, 214:21, 318:16

**Brad** [3] - 323:10, 366:14, 366:22

**BRAD** [1] - 366:15

**brain** [100] - 178:6, 178:17, 178:18, 178:25, 179:4, 179:6, 179:8, 179:9, 179:11, 179:13, 179:17, 179:18, 179:19, 180:5, 180:6, 180:7, 180:8, 180:13, 180:14, 180:15, 180:16, 180:17, 180:19, 180:21, 180:23, 180:25, 181:4, 181:8, 181:10, 181:11, 181:13, 181:19, 181:20, 181:23, 181:25, 183:6, 183:10, 183:11, 183:15, 184:1, 192:22, 192:24, 193:1, 197:23, 210:5, 210:11, 210:14, 210:15, 298:21, 302:7, 323:19, 323:21, 323:23, 323:24, 323:25, 324:2, 324:3, 324:5, 332:15, 332:18, 332:23, 337:20, 337:23, 338:5, 338:7, 338:9, 338:10, 338:16, 338:17, 338:21, 339:1, 339:2, 377:23, 379:8, 379:11, 379:12, 384:8, 384:9, 384:10, 384:11, 384:12, 384:20, 388:19, 395:17, 397:14,

398:13, 406:18, 421:1, 421:5, 424:20

**brains** [1] - 293:4

**branch** [1] - 212:5

**brand** [5] - 409:4, 409:7, 409:10, 409:19, 409:23

**break** [3] - 271:9, 335:23, 336:10

**breaking** [2] - 336:1, 336:8

**breathing** [3] - 180:18, 265:8, 363:15

**brief** [6] - 164:17, 277:11, 280:7, 280:20, 349:16, 349:18

**briefly** [5] - 169:6, 169:8, 262:3, 280:4, 424:2

**Bring** [1] - 347:19

**bring** [13] - 172:4, 174:21, 190:6, 237:13, 253:15, 258:25, 286:18, 344:1, 347:5, 347:6, 366:10, 396:14, 426:4

**bringing** [2] - 427:3, 427:9

**brings** [1] - 301:17

**brittle** [1] - 231:5

**broke** [2] - 176:1, 426:16

**bronchopneumoni a** [2] - 376:18, 376:20

**Brooks** [1] - 406:21

**brother** [2] - 273:21, 305:24

**brothers** [1] - 273:20

**brought** [10] - 257:14, 266:17, 315:15, 340:14, 340:20, 347:24, 425:2, 425:4, 425:19, 427:9

**brown** [1] - 330:16

**brownish** [1] - 330:12

**bruise** [8] - 249:12, 254:6, 330:14, 331:18, 335:24, 336:1, 358:10, 358:11

**bruised** [1] - 330:21

**bruises** [8] - 294:17, 295:2, 297:10, 335:22, 336:17, 363:1, 413:17, 415:3

**bruising** [7] - 179:22, 179:23, 252:20, 253:8, 297:24, 330:9,

333:16

**building** [3] - 338:24, 366:1, 398:12

**built** [1] - 307:25

**bunch** [2] - 251:3, 256:11

**burden** [5] - 355:17, 357:5, 363:18, 364:14, 364:19

**business** [2] - 247:24, 308:13

**butt** [13] - 158:17, 159:17, 162:4, 163:9, 163:11, 167:17, 171:21, 219:7, 220:17, 225:6, 226:19, 316:1, 361:14

**buttock** [1] - 167:1

**buttocks** [22] - 158:19, 159:9, 159:18, 159:25, 160:14, 162:2, 162:6, 162:16, 163:18, 167:3, 167:16, 167:24, 169:22, 221:12, 224:11, 224:16, 261:22, 315:21, 316:3, 316:16

**BY** [83] - 157:12, 163:4, 164:8, 164:25, 175:25, 176:24, 185:17, 187:19, 188:10, 190:9, 192:18, 199:18, 200:12, 201:17, 202:21, 204:14, 205:4, 207:1, 211:8, 217:20, 220:12, 224:25, 225:22, 232:4, 232:16, 233:1, 237:16, 238:12, 245:6, 245:18, 253:23, 255:3, 255:12, 256:25, 259:24, 261:17, 262:5, 263:6, 268:4, 269:1, 270:6, 270:17, 272:19, 277:15, 287:3, 290:4, 290:12, 304:8, 305:18, 308:19, 309:15, 311:1, 313:19, 315:19, 316:23, 317:19, 321:18, 322:10, 344:4, 350:18, 352:22, 353:10, 354:16, 366:19, 368:23, 370:25, 375:21,

377:7, 380:5, 381:12,
382:14, 383:12,
396:17, 397:8,
399:10, 399:24,
407:10, 415:16,
418:3, 418:19,
419:12, 420:2, 421:16

**C**

**calculated** [2] -
378:16, 378:18
**calendar** [4] - 174:8,
232:2, 238:10, 245:4
**callosum** [4] -
181:18, 183:5, 338:6,
338:18
**calmed** [1] - 231:17
**calvarium** [1] -
332:10
**camera** [5] - 162:21,
164:1, 374:17, 376:3,
405:15
**cannot** [5] - 195:1,
295:6, 335:15,
364:14, 407:20
**capable** [2] - 178:16,
281:13
**capacity** [1] - 306:20
**captured** [1] - 376:3
**car** [2] - 228:13,
339:22
**cardiopathology** [1]
- 207:11
**care** [22] - 178:7,
241:4, 248:9, 250:15,
260:1, 271:20, 277:4,
287:25, 291:21,
291:23, 293:17,
294:7, 296:24, 349:7,
353:25, 396:2, 397:3,
397:20, 399:5, 410:7,
426:7, 426:23
**Care** [1] - 306:2
**career** [10] - 290:14,
291:5, 292:1, 292:9,
292:11, 292:16,
296:13, 372:21,
372:24, 399:11
**careful** [1] - 285:4
**Carolina** [7] -
274:22, 318:9,
318:14, 320:7,
367:25, 368:4, 368:8
**carry** [1] - 338:7
**Carson** [1] - 212:12
**case** [106] - 172:10,
172:22, 173:8,
173:13, 173:18,

178:19, 178:20,
179:24, 180:5, 181:7,
181:16, 184:7,
186:10, 186:11,
186:15, 187:11,
191:17, 192:20,
193:25, 194:22,
196:25, 198:3,
203:13, 207:7,
207:14, 207:20,
208:4, 210:10,
210:13, 220:5,
234:23, 242:14,
248:10, 249:14,
254:19, 255:17,
266:2, 271:23,
271:24, 272:1,
281:10, 283:10,
283:25, 284:6, 285:6,
286:6, 286:7, 286:10,
293:15, 293:19,
294:14, 295:16,
298:5, 299:3, 302:24,
313:12, 319:7,
322:23, 325:3,
327:17, 328:1, 328:9,
329:17, 329:21,
332:22, 337:3, 338:2,
340:3, 342:9, 342:10,
343:23, 348:2,
348:13, 348:23,
349:22, 355:6,
355:22, 357:7,
357:19, 357:22,
357:24, 359:3, 360:8,
361:3, 362:21,
362:22, 364:2,
364:18, 364:20,
364:22, 364:24,
365:1, 365:19,
369:18, 374:9,
374:22, 376:5,
386:20, 389:25,
394:24, 396:24,
399:17, 417:4, 423:7,
426:5, 427:8
**cases** [13] - 186:1,
186:5, 186:20, 187:8,
187:9, 187:14,
187:16, 208:5,
293:22, 295:18,
373:3, 376:10
**CAT** [5] - 295:22,
295:24, 296:1, 296:3,
323:14
**catching** [1] - 302:22
**categories** [4] -
323:2, 343:11,
343:13, 416:15
**categorization** [1] -

371:14
**Caucasian** [1] -
221:17
**caused** [11] - 167:20,
197:23, 210:2, 210:5,
235:16, 298:5, 304:2,
378:25, 404:5,
412:17, 414:10
**causes** [5] - 201:7,
201:8, 305:1, 389:8,
394:23
**causing** [1] - 302:20
**caveat** [1] - 345:21
**cavity** [3] - 180:1,
180:4, 180:12
**CDC's** [1] - 383:1
**cell** [5] - 162:19,
162:21, 224:19,
361:5, 416:4
**cells** [10] - 209:1,
209:2, 324:25, 336:4,
336:6, 336:8, 336:9,
416:13, 416:16
**center** [3] - 330:10,
341:3, 341:4
**Center** [4] - 289:7,
306:2, 327:4, 351:17
**centered** [1] - 341:9
**Centers** [3] - 382:16,
382:18, 382:21
**centers** [1] - 338:17
**centimeter** [1] -
260:24
**centimeters** [5] -
170:16, 261:22,
380:17, 418:14,
418:18
**central** [2] - 247:14,
252:12
**cerebellar** [2] -
180:20, 181:2
**cerebellum** [5] -
180:24, 180:25,
181:13, 332:17,
332:18
**cerebral** [8] - 179:18,
180:7, 181:5, 196:22,
197:1, 338:1, 338:3,
384:11
**certain** [8] - 226:12,
246:4, 324:4, 346:22,
376:2, 382:23,
397:23, 398:20
**certainly** [7] - 237:2,
237:5, 304:17,
374:14, 391:18,
392:1, 426:3
**certainty** [16] -
183:13, 183:22,
300:23, 334:4,

356:16, 365:9,
375:10, 375:19,
375:22, 375:25,
376:14, 376:24,
397:19, 398:1, 399:4
**certificate** [2] -
216:14, 216:22
**Certificate** [22] -
184:7, 184:15,
184:16, 185:20,
185:25, 186:3, 186:6,
186:10, 186:17,
187:1, 187:20,
187:24, 188:3,
188:16, 302:24,
303:19, 323:7,
342:12, 342:17,
342:23, 357:21,
357:22
**certification** [2] -
323:7, 369:4
**certifications** [1] -
368:9
**certified** [16] -
184:15, 185:21,
188:16, 190:14,
288:2, 288:5, 288:6,
288:11, 318:7,
318:10, 319:3, 319:4,
319:5, 319:13,
319:14, 368:10
**certifier** [2] - 185:1,
185:24
**Chadwick** [1] -
340:17
**chair** [29] - 169:11,
200:2, 300:4, 301:8,
301:9, 301:13,
331:20, 334:13,
334:16, 334:18,
334:21, 335:3,
335:13, 335:16,
347:24, 358:5, 358:8,
371:7, 401:7, 401:9,
402:19, 403:6,
403:22, 418:4, 419:7,
421:3, 422:3, 422:6,
422:18
**chairs** [1] - 347:3
**chance** [2] - 301:25,
395:11
**chances** [1] - 360:10
**change** [10] - 229:21,
330:15, 335:23,
350:8, 370:16, 371:9,
388:15, 398:7, 398:8,
398:9
**changed** [4] - 159:5,
262:12, 353:5, 360:24
**changes** [13] -

182:15, 182:16,
321:3, 324:6, 336:12,
370:19, 370:20,
370:21, 371:2,
372:14, 379:12,
405:21, 405:24
**changing** [7] -
158:14, 172:1,
220:14, 221:4,
260:16, 324:24, 331:2
**Chapel** [1] - 367:25
**character** [8] -
247:16, 247:25,
249:9, 251:11,
251:25, 252:9,
257:17, 281:3
**characteristics** [1] -
247:12
**characterize** [1] -
343:9
**characterized** [1] -
210:6
**charge** [1] - 258:15
**charged** [7] - 173:4,
220:7, 258:3, 258:8,
313:14, 359:3, 359:4
**charges** [2] - 173:8,
281:19
**Charlotte** [1] - 320:6
**chart** [29] - 203:23,
204:10, 204:11,
204:16, 204:18,
379:20, 379:25,
380:7, 380:10,
380:15, 380:18,
381:3, 381:9, 381:11,
381:14, 381:16,
381:18, 382:1, 382:4,
382:7, 382:13,
382:15, 383:18,
383:21, 383:25,
384:3, 384:5, 425:12
**charts** [7] - 204:11,
383:15, 384:2, 395:4,
398:5, 398:6, 398:7
**chasing** [1] - 361:23
**chat** [1] - 386:17
**check** [4] - 271:16,
272:9, 312:8, 366:3
**checked** [3] - 167:8,
393:15, 395:14
**chief** [4] - 286:7,
286:10, 320:11
**Chief** [2] - 318:9,
368:3
**child** [165] - 167:24,
169:11, 169:12,
169:21, 169:24,
171:3, 171:5, 171:20,
171:22, 173:7, 173:8,

183:13, 186:8,
201:16, 201:19,
203:20, 203:21,
206:8, 206:11,
213:15, 214:2,
214:18, 218:14,
218:18, 221:15,
222:21, 222:24,
230:18, 230:25,
231:9, 235:19,
238:18, 238:22,
238:24, 239:1, 239:4,
246:15, 247:13,
248:24, 248:25,
249:8, 250:13, 253:5,
253:9, 254:10,
254:19, 255:16,
268:13, 280:14,
281:8, 282:11,
282:14, 282:20,
282:23, 283:11,
288:21, 289:15,
290:25, 291:4, 291:5,
291:12, 291:13,
292:19, 294:25,
297:15, 298:6,
299:17, 299:23,
300:6, 300:12,
300:15, 300:16,
300:19, 302:9,
302:10, 304:18,
304:23, 323:9, 327:9,
327:12, 327:19,
328:1, 328:5, 328:11,
329:7, 329:18,
330:23, 331:1, 331:3,
331:23, 332:3,
334:15, 334:17,
334:18, 335:2, 337:3,
337:9, 339:11,
339:14, 340:6, 341:2,
341:4, 341:5, 356:24,
357:24, 358:5,
358:13, 358:14,
358:17, 358:18,
358:19, 359:1, 359:6,
359:8, 359:10,
359:19, 359:25,
360:10, 360:14,
360:19, 360:20,
360:22, 360:23,
361:1, 361:2, 361:4,
361:11, 361:21,
361:24, 362:1, 362:7,
362:17, 362:24,
364:5, 372:23,
372:25, 373:3,
378:13, 379:15,
384:16, 384:18,
386:8, 390:3, 391:5,
392:18, 394:16,

395:9, 395:12,
395:14, 395:18,
396:24, 397:14,
400:2, 401:6, 402:18,
403:7, 403:10,
403:22, 413:10,
414:2, 414:3, 421:7,
421:20, 422:2
   **child's** [7] - 198:20,
247:20, 258:7, 298:7,
300:14, 341:19, 358:2
   **child-support** [1] -
238:18
   **Childhood** [1] -
340:18
   **childhood** [1] -
373:15
   **children** [43] -
165:10, 213:12,
239:2, 250:14, 252:2,
257:4, 263:13,
263:14, 282:12,
285:20, 289:3,
289:25, 291:21,
291:23, 291:24,
292:3, 292:14,
292:16, 293:17,
294:10, 299:10,
299:17, 314:4,
327:24, 329:14,
339:6, 339:15,
339:20, 339:24,
340:21, 340:24,
341:12, 341:15,
354:18, 361:24,
377:15, 382:23,
395:8, 395:16,
416:24, 417:2
   **Children** [1] - 340:16
   **Children's** [1] -
288:23
   **children's** [1] -
297:23
   **chips** [1] - 352:12
   **chose** [1] - 288:21
   **chronic** [3] - 209:20,
408:19, 416:17
   **circle** [1] - 177:1
   **Circuit** [2] - 172:23,
173:13
   **circulate** [1] - 416:14
   **circumference** [13] -
204:2, 204:6, 204:19,
204:21, 380:12,
380:15, 380:17,
383:19, 395:7,
395:10, 425:3, 425:5
   **circumstances** [3] -
376:15, 384:17,
391:23

   **citation** [1] - 390:17
   **city** [1] - 243:23
   **claimed** [2] - 346:8,
363:2
   **claims** [1] - 252:20
   **class** [1] - 215:11
   **Classification** [1] -
209:11
   **classification** [2] -
209:17, 343:3
   **clean** [3] - 209:2,
336:6, 336:7
   **clean-up** [1] - 336:6
   **clear** [4] - 247:7,
378:24, 391:5, 420:20
   **clearly** [3] - 193:5,
236:15, 252:15
   **CLERK** [1] - 424:8
   **clerk's** [1] - 347:12
   **client** [1] - 172:5
   **climbed** [2] - 419:22,
422:8
   **clinic** [7] - 160:9,
167:6, 222:3, 316:6,
344:8, 344:9, 370:2
   **clinical** [14] - 263:24,
264:3, 289:10, 318:6,
318:7, 318:22, 319:5,
319:10, 319:12,
367:8, 368:1, 368:11,
370:2, 395:13
   **Clinical** [1] - 367:6
   **clinician** [3] - 292:3,
292:5, 292:6
   **clinicians** [1] -
404:17
   **clock** [2] - 177:12,
326:8
   **close** [8] - 227:24,
249:4, 249:9, 258:6,
280:10, 364:5, 364:6,
376:2
   **closed** [3] - 180:9,
254:19, 255:17
   **closer** [1] - 384:4
   **clothes** [3] - 353:4,
353:5, 353:6
   **clumsy** [2] - 246:15,
414:2
   **cluster** [1] - 412:15
   **co** [1] - 251:10
   **co-counsel** [1] -
251:10
   **cognitive** [4] -
406:13, 406:17,
406:19, 407:4
   **coincide** [1] - 230:20
   **cold** [3] - 175:5,
175:10, 377:12
   **collateral** [2] -

259:11, 259:12
   **colleagues** [1] -
208:10
   **Collected** [1] -
193:18
   **collected** [1] -
193:20
   **collection** [2] -
255:11, 302:22
   **college** [5] - 212:23,
212:25, 213:6, 215:7,
215:8
   **College** [2] - 213:1,
215:9
   **color** [8] - 330:12,
330:18, 330:24,
335:23, 398:5, 398:6,
398:8, 398:9
   **Colorado** [2] -
211:25, 212:12
   **coloration** [1] -
330:14
   **combine** [1] - 372:12
   **comfortable** [4] -
161:5, 175:12, 223:5,
374:18
   **coming** [10] - 172:7,
252:25, 266:14,
307:15, 307:17,
310:7, 324:25,
349:20, 362:16,
426:13
   **commence** [1] -
423:8
   **commit** [1] - 356:2
   **committed** [7] -
220:3, 220:4, 220:6,
313:10, 313:11,
313:13, 361:19
   **common** [7] - 187:7,
341:25, 354:7,
382:21, 384:8, 399:1,
415:19
   **communicated** [1] -
246:18
   **community** [1] -
351:21
   **Community** [1] -
351:17
   **company** [1] -
381:20
   **compare** [1] - 341:7
   **compared** [2] -
204:1, 210:9
   **compartment** [2] -
180:9, 182:17
   **compelled** [1] -
260:18
   **complaining** [1] -
329:15

   **complaint** [2] -
258:7, 258:17
   **Complaint** [1] -
258:15
   **Complaints** [1] -
258:14
   **complete** [5] -
374:12, 376:9,
376:14, 423:15,
423:16
   **completed** [8] -
191:5, 191:6, 207:3,
207:22, 208:2, 369:8,
384:2, 416:2
   **completely** [5] -
192:24, 269:22,
282:1, 377:11, 404:7
   **completing** [2] -
187:1, 320:6
   **complicated** [2] -
207:18, 208:16
   **complies** [5] - 188:2,
232:11, 233:11,
238:15, 245:8
   **comply** [2] - 390:21,
391:19
   **components** [1] -
248:20
   **composed** [2] -
181:24, 181:25
   **compressed** [1] -
181:7
   **compresses** [3] -
180:4, 180:14, 180:17
   **concentrating** [1] -
266:23
   **concept** [3] - 374:23,
375:23, 378:7
   **concern** [10] -
167:20, 221:25,
284:8, 286:11,
293:18, 315:6,
316:18, 331:5,
395:13, 410:13
   **concerned** [11] -
216:7, 221:9, 222:6,
223:24, 238:3,
282:24, 321:3, 337:5,
337:6, 359:22, 359:23
   **concerning** [5] -
219:23, 282:9, 293:2,
294:14, 313:5
   **concerns** [1] - 296:6
   **conclude** [1] -
357:17
   **Conclusion** [1] -
388:8
   **conclusion** [13] -
183:2, 285:5, 301:17,
303:5, 365:4, 365:5,

386:9, 388:7, 394:21, 400:24, 402:10, 403:3, 412:24

**conclusions** [2] - 371:9, 412:4

**concurrent** [1] - 329:21

**concussed** [1] - 388:19

**concussion** [5] - 377:17, 377:20, 377:23, 377:25, 397:2

**concussions** [2] - 406:13, 413:13

**Concussions** [1] - 406:22

**concussive** [13] - 388:13, 389:5, 389:6, 389:17, 390:11, 390:12, 395:2, 404:2, 404:5, 406:6, 406:7, 407:17, 412:7

**condition** [21] - 269:3, 352:9, 359:17, 360:4, 375:4, 385:11, 385:17, 387:4, 387:18, 389:16, 389:20, 389:22, 390:9, 390:12, 390:13, 392:25, 393:12, 395:6, 413:12, 425:10

**conditions** [4] - 302:3, 379:15, 379:18, 389:4

**conduct** [2] - 283:21, 357:1

**conducted** [2] - 178:12, 320:1

**confer** [1] - 174:19

**conference** [5] - 251:17, 252:13, 253:11, 258:25, 289:18

**conferences** [1] - 291:4

**confuse** [1] - 409:12

**Connelly** [1] - 156:14

**consensus** [1] - 411:22

**consequence** [3] - 303:9, 308:4, 342:21

**consequences** [1] - 390:20

**consider** [17] - 169:23, 173:21, 173:24, 195:12, 219:15, 219:22, 220:8, 243:21, 312:23, 313:4,

313:15, 360:16, 360:18, 362:11, 396:6, 411:25, 424:24

**consideration** [1] - 365:2

**considerations** [1] - 169:5

**considered** [2] - 420:23

**considering** [3] - 197:22, 219:17, 312:25

**consistent** [26] - 187:21, 235:12, 298:16, 299:24, 299:25, 300:3, 300:15, 300:17, 300:24, 301:3, 301:8, 301:12, 301:14, 302:8, 303:8, 303:10, 303:12, 303:13, 303:23, 303:24, 304:12, 364:10, 412:12, 414:22, 421:23

**constellation** [1] - 403:11

**consult** [5] - 192:5, 192:19, 193:13, 202:12, 203:14

**consultant** [6] - 289:5, 292:25, 293:14, 297:1, 367:3, 369:2

**consultation** [5] - 178:22, 193:16, 242:10, 293:8, 293:23

**consultations** [1] - 294:1

**consulted** [1] - 293:19

**consume** [1] - 201:14

**contact** [3] - 166:7, 188:21, 353:11

**contacted** [3] - 178:23, 186:9, 199:2

**contained** [1] - 371:12

**contend** [2] - 170:18, 235:22

**contended** [1] - 283:4

**contending** [1] - 169:16

**contention** [2] - 355:16, 359:1

**context** [1] - 374:25

**continuance** [2] - 391:21, 396:7

**continuation** [1] - 337:20

**Continue** [1] - 352:21

**continue** [1] - 352:23

**CONTINUED** [2] - 164:7, 175:24

**Continued** [1] - 156:1

**continuing** [1] - 326:14

**contradicted** [1] - 357:3

**contrary** [1] - 172:21

**Contreras** [44] - 156:7, 158:10, 160:13, 167:10, 214:13, 215:6, 215:10, 216:14, 218:4, 218:13, 222:7, 222:10, 223:9, 228:2, 228:10, 228:19, 229:18, 233:17, 238:18, 238:20, 241:15, 242:4, 242:17, 266:3, 266:13, 266:24, 267:11, 273:13, 273:14, 274:11, 306:13, 306:15, 307:1, 311:14, 314:18, 345:17, 351:4, 351:10, 351:22, 355:23, 356:5, 357:6, 363:6

**CONTRERAS** [1] - 155:7

**Contreras'** [7] - 228:21, 229:21, 242:2, 267:2, 345:10, 347:4, 357:1

**contribute** [2] - 389:22, 394:24

**contributed** [1] - 379:3

**contributor** [1] - 394:18

**control** [2] - 300:2, 306:11

**Control** [3] - 382:16, 382:19, 382:22

**controlled** [1] - 340:7

**contusion** [7] - 179:23, 331:21, 407:20, 409:5, 409:7, 409:10, 413:3

**contusions** [23] - 194:2, 194:4, 195:5, 208:21, 209:8,

297:10, 297:13, 297:20, 330:9, 331:9, 331:14, 332:2, 333:15, 336:17, 337:7, 358:1, 358:7, 358:23, 362:23, 371:15, 408:1, 413:24, 414:22

**conversation** [10] - 167:12, 228:25, 233:19, 234:17, 237:20, 237:21, 237:23, 238:16, 254:9, 360:25

**conversations** [1] - 234:8

**converting** [1] - 324:25

**convict** [2] - 220:5, 313:12

**convicted** [1] - 365:5

**conviction** [6] - 247:20, 248:2, 252:10, 258:11, 258:16, 259:11

**convinced** [1] - 356:13

**COOK** [2] - 164:21, 312:4

**Cook** [36] - 157:24, 160:7, 164:20, 165:2, 165:5, 165:14, 165:19, 169:20, 170:13, 183:19, 183:23, 184:16, 188:17, 214:5, 214:12, 219:14, 259:3, 264:8, 273:22, 280:16, 293:9, 300:24, 302:25, 303:6, 303:11, 304:12, 312:3, 312:22, 313:21, 313:24, 314:8, 316:24, 330:7, 351:14, 352:2, 369:25

**Cook's** [3] - 219:23, 313:5, 392:5

**cooperate** [2] - 231:13, 231:14

**cooperation** [1] - 267:2

**coordinator** [1] - 306:6

**copy** [14] - 184:14, 189:7, 189:15, 190:11, 190:12, 190:13, 193:10, 193:13, 199:21, 208:1, 255:4, 309:8,

322:4, 400:16

**cord** [4] - 180:16, 182:15, 332:17, 332:20

**core** [1] - 396:5

**coroner** [4] - 186:5, 186:19, 317:22, 320:14

**Coroner** [2] - 367:10, 367:12

**coroners** [2] - 320:2, 320:4

**corpus** [4] - 181:18, 183:5, 338:6, 338:18

**Correct** [1] - 412:7

**correct** [125] - 163:21, 165:24, 168:10, 177:3, 177:4, 178:3, 178:4, 178:13, 189:9, 191:23, 192:5, 192:6, 192:20, 193:7, 194:3, 194:13, 194:21, 195:14, 197:18, 197:19, 197:24, 199:11, 199:19, 200:16, 201:4, 201:7, 202:10, 202:16, 203:16, 203:17, 204:2, 204:9, 204:20, 204:22, 204:23, 205:6, 205:13, 206:2, 206:13, 206:16, 206:19, 207:4, 207:23, 209:14, 237:18, 246:1, 246:5, 246:24, 254:7, 255:19, 256:14, 257:3, 260:16, 260:17, 262:9, 277:21, 284:12, 298:25, 300:9, 304:22, 308:1, 310:2, 321:24, 322:2, 322:5, 322:15, 322:18, 322:21, 323:13, 323:16, 324:12, 326:5, 327:15, 329:11, 330:3, 334:9, 334:10, 342:10, 343:1, 343:2, 343:7, 343:12, 343:15, 343:16, 344:17, 344:21, 353:16, 368:17, 368:18, 369:15, 379:22, 392:5, 392:24, 393:4, 393:17, 400:3, 400:21, 400:24, 401:7, 402:25, 403:1,

403:3, 403:15, 404:3, 404:6, 405:5, 405:7, 405:16, 406:14, 406:15, 406:18, 407:21, 408:1, 408:2, 408:4, 411:2, 411:14, 418:6, 418:15, 418:23, 418:24, 419:5, 419:8, 419:9, 420:4

**correctly** [1] - 344:18
**correlate** [2] - 328:14, 328:16
**correlated** [1] - 328:10
**correspond** [3] - 329:8, 332:2, 332:25
**corresponding** [2] - 333:2, 358:11
**corresponds** [2] - 333:3, 359:19
**cortex** [2] - 181:13, 181:24
**Coteau** [4] - 239:18, 239:20, 240:8, 240:10
**Counsel** [1] - 272:2
**counsel** [31] - 157:2, 174:25, 184:24, 208:6, 210:1, 235:1, 247:3, 248:14, 251:10, 252:20, 257:10, 271:7, 272:4, 285:12, 286:20, 315:10, 345:5, 345:8, 346:21, 346:22, 348:8, 352:18, 355:10, 385:3, 386:24, 389:15, 389:19, 389:24, 423:9, 423:12, 426:11
**counsel's** [2] - 255:9, 357:13
**counseling** [3] - 264:4, 264:5
**counselors** [1] - 289:24
**Count** [3] - 282:2, 282:3, 350:2
**count** [13] - 197:12, 335:7, 416:4, 416:5, 416:13, 416:20, 416:22, 417:3, 417:4, 417:5, 417:8, 421:17, 421:21
**counted** [2] - 197:6, 358:1
**counties** [1] - 186:2
**counting** [3] - 275:12, 358:20, 410:9
**Country** [4] - 345:18,

345:22, 346:9, 346:13
**counts** [3] - 355:17, 357:20, 362:23
**County** [6] - 317:23, 324:11, 329:25, 367:9, 367:12, 400:17
**couple** [18] - 175:3, 176:4, 177:11, 196:10, 220:20, 232:12, 246:7, 277:11, 278:2, 290:19, 294:17, 331:4, 345:4, 352:12, 360:22, 370:19, 375:23, 404:18
**couples** [1] - 264:4
**course** [21] - 169:4, 172:9, 188:20, 295:24, 296:12, 304:1, 308:13, 308:24, 320:24, 321:6, 321:8, 336:3, 336:19, 337:16, 338:23, 364:19, 364:23, 373:14, 395:21, 400:14
**COURT** [287] - 155:1, 156:13, 157:5, 163:3, 163:25, 164:4, 164:6, 164:12, 164:14, 164:19, 167:19, 167:22, 168:1, 168:4, 168:6, 168:8, 168:16, 168:21, 168:25, 169:4, 170:9, 170:20, 171:8, 172:6, 172:14, 172:17, 174:5, 174:11, 174:16, 174:21, 175:2, 175:18, 175:21, 176:23, 184:21, 184:23, 184:25, 185:8, 186:25, 187:3, 187:5, 187:17, 188:9, 189:21, 189:23, 190:2, 190:6, 192:16, 199:14, 200:8, 200:11, 201:13, 202:19, 204:13, 205:3, 206:24, 210:19, 210:21, 210:25, 211:2, 217:19, 219:8, 224:24, 225:19, 225:21, 232:3, 232:15, 232:24, 234:20, 235:3, 235:20, 236:1, 236:5, 236:8, 236:15, 236:25, 237:4, 237:7,

237:10, 237:13, 237:15, 238:11, 245:5, 245:15, 247:2, 247:17, 248:8, 248:16, 249:2, 249:16, 249:19, 250:3, 250:6, 250:16, 250:20, 251:3, 251:6, 252:18, 253:15, 253:17, 255:2, 256:23, 257:9, 257:19, 257:24, 258:5, 258:9, 258:20, 258:24, 259:6, 259:10, 259:15, 259:18, 259:23, 261:3, 261:14, 262:2, 262:21, 262:23, 262:25, 267:23, 268:2, 268:23, 270:15, 270:23, 270:25, 271:2, 271:4, 271:6, 271:11, 271:17, 271:19, 272:7, 272:10, 272:17, 277:13, 278:2, 278:6, 278:9, 278:12, 278:14, 278:16, 278:18, 278:21, 278:23, 278:25, 279:3, 279:5, 279:8, 279:12, 279:15, 279:19, 279:22, 280:1, 280:4, 281:1, 282:6, 284:2, 284:7, 284:21, 285:9, 285:14, 286:16, 286:18, 286:22, 290:3, 290:11, 304:5, 305:8, 305:10, 308:18, 309:14, 310:25, 311:25, 312:2, 312:10, 312:15, 312:18, 315:9, 315:13, 315:18, 316:21, 317:11, 317:13, 321:17, 322:9, 343:19, 343:22, 344:1, 344:23, 344:25, 345:3, 345:7, 345:12, 345:14, 345:19, 345:23, 346:1, 346:4, 346:16, 346:18, 347:8, 347:10, 347:15, 347:17, 348:3, 348:7, 348:9, 348:11, 348:18, 348:21, 349:2, 349:7, 349:11, 349:15, 349:18,

352:20, 354:15, 355:2, 355:4, 355:12, 357:10, 363:4, 363:10, 364:16, 366:3, 366:5, 366:10, 366:12, 368:22, 370:24, 375:18, 377:6, 380:4, 381:8, 382:12, 383:6, 383:8, 383:11, 385:2, 385:15, 385:21, 385:23, 386:3, 386:9, 386:13, 386:17, 387:1, 388:5, 388:10, 389:13, 390:6, 390:18, 390:24, 391:9, 391:14, 392:1, 394:19, 395:1, 395:17, 395:21, 396:1, 396:5, 396:16, 397:6, 399:9, 399:22, 407:9, 415:11, 415:14, 418:2, 419:11, 420:1, 421:14, 422:24, 423:1, 423:4, 423:14, 423:18, 423:21, 424:3, 424:17, 424:22, 425:8, 425:17, 426:8, 427:2
**Court** [46] - 155:16, 156:14, 157:2, 169:4, 169:9, 170:7, 174:25, 198:13, 198:17, 226:5, 235:25, 237:2, 237:9, 247:7, 249:5, 249:7, 252:3, 252:14, 252:15, 253:10, 258:9, 275:15, 280:21, 280:24, 283:2, 283:20, 284:1, 284:12, 285:3, 321:9, 321:12, 321:13, 322:23, 345:6, 357:15, 357:21, 360:17, 361:16, 364:16, 364:24, 391:20, 394:3, 394:6, 399:12, 424:20, 426:5
**Court's** [8] - 237:6, 252:13, 271:8, 279:22, 280:9, 282:2, 283:22, 286:3
**Courthouse** [1] - 155:11
**courtroom** [23] - 161:22, 174:24, 190:7, 211:11, 214:14, 234:25, 237:14, 248:13, 253:16, 266:5, 272:3,

314:20, 321:1, 344:2, 355:9, 366:11, 386:23, 396:15, 423:11, 426:9, 426:13, 426:16, 426:20
**Courtroom** [1] - 190:4
**courtroom)** [2] - 286:19, 347:25
**cousins** [1] - 274:7
**cover** [2] - 217:7, 320:25
**covered** [3] - 327:21, 389:17, 417:15
**covers** [1] - 291:22
**cowboy** [1] - 426:14
**cowling** [1] - 172:22
**CR** [1] - 155:4
**cracked** [1] - 276:13
**cranial** [3] - 180:1, 180:4, 180:12
**Crawford** [5] - 263:1, 263:8, 269:2, 270:7, 362:15
**CRAWFORD** [1] - 263:2
**create** [2] - 338:22, 338:23
**created** [7] - 324:23, 367:18, 381:9, 381:11, 383:21, 383:25, 384:5
**creates** [1] - 324:4
**credulity** [1] - 363:24
**crime** [4] - 173:4, 252:10, 320:25, 323:5
**crimes** [2] - 220:7, 313:14
**crisis** [1] - 264:4
**criteria** [2] - 395:3, 395:4
**critical** [2] - 178:1, 283:25
**criticize** [3] - 389:8, 389:9, 425:6
**CROSS** [9] - 190:8, 245:17, 268:25, 277:14, 304:7, 316:22, 343:3, 353:9, 399:23
**cross** [7] - 164:15, 174:20, 258:18, 280:8, 283:23, 425:1
**cross-examination** [2] - 280:8, 283:23
**CROSS-EXAMINATION** [9] - 190:8, 245:17, 268:25, 277:14,

304:7, 316:22, 344:3, 353:9, 399:23
**cross-examine** [1] - 258:18
**crown** [3] - 342:6, 342:7, 420:6
**CRR** [1] - 156:14
**crumble** [1] - 299:15
**crushing** [1] - 339:21
**Cruz** [1] - 179:10
**cry** [2] - 171:20, 276:7
**crying** [5] - 171:3, 171:22, 228:15, 269:17, 329:16
**CSI** [1] - 194:14
**CSIs** [1] - 194:13
**CT** [4] - 323:16, 324:8, 333:2, 333:3
**cuffed** [1] - 168:9
**cumulative** [2] - 315:12, 389:1
**cured** [1] - 284:18
**current** [6] - 215:1, 264:13, 290:7, 329:19, 368:24, 398:13
**curriculum** [8] - 189:8, 189:12, 189:16, 290:6, 290:7, 322:4, 322:20, 368:15
**curvature** [1] - 298:21
**curved** [2] - 380:18, 381:5
**custody** [17] - 213:21, 213:23, 214:6, 215:3, 218:9, 226:2, 226:6, 230:21, 238:21, 254:14, 256:16, 358:17, 360:15, 409:25, 410:5, 410:8
**cut** [5] - 180:21, 180:23, 181:4, 192:23, 200:9
**cutting** [1] - 179:11
**CV** [6] - 189:7, 189:8, 190:11, 321:21, 321:23, 322:14

## D

**dad** [5] - 277:16, 352:4, 352:25, 354:2, 363:23
**dad's** [3] - 397:3, 399:5, 421:23
**Dada** [2] - 229:13,

229:16
**daddy** [1] - 360:23
**daily** [1] - 292:4
**DAKOTA** [1] - 155:2
**Dakota** [26] - 156:4, 157:21, 165:7, 186:8, 186:17, 188:22, 199:7, 203:8, 211:17, 216:4, 263:10, 263:19, 275:2, 287:13, 287:17, 288:15, 314:1, 317:24, 318:12, 319:2, 320:13, 367:11, 367:14, 368:6, 369:3
**damage** [14] - 181:17, 181:21, 182:5, 182:9, 182:11, 182:14, 182:21, 386:7, 397:11, 406:3, 406:4, 406:17, 406:19, 421:1
**damaged** [1] - 182:7
**danger** [1] - 377:22
**darker** [2] - 176:8, 221:17
**data** [6] - 382:1, 382:5, 382:7, 383:24, 383:25, 384:14
**date** [22] - 193:8, 194:11, 194:13, 195:1, 208:10, 215:14, 227:15, 232:7, 280:10, 355:21, 356:20, 372:1, 374:18, 381:13, 381:16, 407:20, 408:3, 408:6, 408:22, 410:10, 410:12, 410:24
**dated** [1] - 194:12
**dates** [1] - 215:16
**dating** [16] - 194:23, 194:25, 208:6, 208:19, 215:12, 305:3, 326:11, 335:22, 364:11, 371:22, 372:2, 372:12, 408:10, 408:12, 410:11, 410:23
**daughter** [17] - 172:5, 217:10, 238:7, 243:9, 245:12, 246:1, 246:5, 273:24, 280:16, 316:25, 351:7, 351:10, 355:25, 363:7, 363:15, 363:22

**daughter's** [3] - 245:9, 353:3, 353:5
**David** [1] - 340:17
**days** [56] - 171:17, 178:2, 178:5, 188:20, 194:16, 195:6, 195:7, 208:17, 209:6, 209:16, 209:19, 220:21, 231:20, 257:13, 309:24, 310:3, 325:17, 325:19, 326:6, 326:9, 326:10, 326:20, 326:21, 326:22, 326:23, 326:24, 330:18, 331:1, 331:3, 336:18, 336:20, 336:24, 337:4, 344:19, 354:9, 354:19, 358:18, 358:21, 359:21, 364:6, 364:7, 372:1, 375:14, 375:23, 377:2, 396:20, 404:18, 406:5, 409:7, 409:10, 410:1, 410:3, 412:6, 412:11
**dead** [4] - 178:6, 180:2, 376:13, 405:18
**deal** [3] - 168:25, 312:19, 361:23
**dealing** [3] - 281:2, 281:7, 374:17
**deals** [1] - 390:11
**dealt** [1] - 292:16
**death** [60] - 172:5, 177:19, 177:20, 177:25, 183:22, 184:1, 184:4, 187:21, 187:24, 188:3, 191:23, 205:21, 219:24, 230:17, 235:16, 245:9, 258:7, 293:23, 294:2, 303:6, 303:11, 303:20, 304:2, 304:15, 313:6, 323:7, 326:10, 326:12, 326:17, 326:24, 342:20, 342:22, 342:25, 343:9, 355:25, 356:10, 358:21, 358:25, 359:11, 367:14, 369:3, 369:4, 373:3, 374:14, 375:5, 376:11, 376:19, 379:4, 388:20, 394:18, 403:6, 405:4, 407:16, 410:2, 410:8, 410:9, 410:12,

410:14, 410:24, 422:19
**Death** [23] - 184:7, 184:15, 184:16, 185:20, 185:25, 186:3, 186:6, 186:10, 186:17, 187:1, 187:20, 187:23, 188:3, 188:16, 302:24, 303:19, 323:7, 340:15, 342:11, 342:17, 342:22, 357:21, 357:22
**deaths** [7] - 340:3, 340:8, 369:6, 372:23, 372:25, 373:15
**Deb** [3] - 263:1, 264:18, 362:14
**DEB** [1] - 263:2
**Debbie** [1] - 263:8
**debris** [1] - 336:7
**December** [7] - 216:2, 217:2, 218:3, 226:24, 251:5, 253:24, 306:21
**decide** [12] - 219:17, 219:22, 226:9, 295:19, 312:25, 313:4, 349:22, 349:23, 364:17, 364:24, 374:16, 386:10
**decided** [3] - 178:21, 179:1
**deciding** [2] - 219:18, 312:25
**decision** [5] - 172:23, 244:13, 244:19, 364:20, 376:1
**decision-making** [1] - 376:1
**decreased** [2] - 416:20, 416:22
**deem** [1] - 383:1
**deep** [14] - 181:20, 183:5, 183:6, 183:8, 183:9, 183:15, 338:5, 338:6, 338:8, 338:10, 338:11, 338:17, 338:21, 339:1
**Defendant** [123] - 155:8, 156:5, 156:7, 157:2, 158:10, 160:13, 167:9, 169:10, 169:13, 169:19, 170:1, 170:3, 171:9, 172:9, 172:12, 174:25, 215:10, 215:16, 215:19,

216:5, 216:7, 216:13, 218:13, 218:24, 219:13, 220:3, 220:7, 220:14, 220:20, 220:24, 222:7, 223:9, 224:2, 226:2, 226:6, 226:9, 226:16, 226:18, 227:2, 227:5, 227:16, 228:1, 228:10, 229:8, 229:14, 229:18, 230:5, 231:20, 231:23, 232:8, 232:17, 232:21, 235:1, 238:17, 241:15, 242:4, 242:17, 242:20, 243:10, 248:14, 251:18, 266:2, 268:18, 268:20, 270:18, 272:4, 273:14, 274:11, 280:14, 282:12, 282:18, 282:20, 282:21, 283:4, 283:6, 283:11, 283:17, 285:12, 285:20, 286:20, 312:21, 313:10, 313:14, 314:18, 345:17, 346:7, 346:11, 346:20, 351:5, 355:10, 357:18, 358:4, 358:16, 359:1, 359:9, 359:11, 359:14, 359:18, 359:21, 360:18, 360:23, 361:3, 361:6, 361:12, 361:14, 361:16, 361:18, 361:22, 362:11, 362:16, 362:19, 363:2, 365:11, 386:24, 401:5, 402:18, 402:23, 404:19, 412:12, 423:12
**Defendant's** [7] - 219:3, 235:12, 358:3, 358:13, 359:6, 360:15, 360:24
**defense** [45] - 169:6, 169:14, 170:6, 174:5, 189:23, 196:5, 207:21, 208:6, 210:1, 235:14, 236:8, 247:15, 248:17, 248:20, 251:20, 252:20, 280:5, 280:17, 280:23, 282:25, 283:18,

283:24, 284:2, 286:7,
347:2, 347:15, 348:3,
355:13, 363:4, 363:9,
387:6, 387:8, 389:15,
389:19, 389:24,
396:6, 399:17, 414:2,
414:6, 414:13, 415:1,
424:4, 424:18,
424:22, 425:17

**Defense** [1] - 204:16

**defense's** [1] - 360:3

**defer** [1] - 371:17

**defies** [1] - 363:24

**defined** [1] - 202:3

**definitely** [1] -
330:13

**definition** [1] -
301:23

**deformed** [1] - 295:3

**degree** [15] - 183:12,
183:22, 213:10,
263:18, 263:19,
300:22, 318:2, 334:3,
356:15, 359:5, 365:9,
367:23, 377:16,
386:7, 399:3

**degrees** [1] - 367:22

**delay** [4] - 186:13,
192:4, 207:14, 207:19

**deliberate** [1] - 349:3

**deliberation** [2] -
349:3, 349:20

**delivered** [3] - 216:1,
216:6, 315:1

**delivering** [1] - 288:1

**demand** [1] - 216:16

**demanded** [1] -
360:19

**demarcations** [1] -
381:6

**demeanor** [3] -
228:14, 242:7, 270:19

**demonstrate** [1] -
275:15

**demonstrated** [1] -
235:10

**denied** [2] - 365:20,
425:14

**department** [1] -
263:25

**Department** [4] -
186:4, 186:8, 186:16,
289:11

**depict** [2] - 163:14,
217:14

**describe** [20] -
158:24, 179:6,
185:23, 203:19,
209:7, 228:21, 242:1,
267:2, 276:12,

288:18, 288:22,
309:16, 317:25,
320:5, 320:21, 330:4,
367:20, 373:12,
374:23, 391:16

**described** [3] -
159:3, 208:23, 208:24

**detail** [1] - 401:19

**detailed** [1] - 280:6

**details** [3] - 362:17,
388:7, 400:23

**determination** [4] -
172:21, 202:9, 356:4,
403:15

**determine** [3] -
208:18, 388:23,
405:19

**determined** [1] -
406:12

**determining** [2] -
208:7, 410:21

**develop** [4] - 162:23,
180:8, 182:9, 327:24

**developed** [1] -
203:19

**development** [1] -
204:18

**diagnose** [2] -
201:25, 295:10

**diagnosed** [2] -
393:1, 393:3

**diagnoses** [2] -
319:7, 343:14

**diagnosis** [18] -
188:24, 189:1,
194:21, 194:22,
205:11, 205:16,
205:24, 205:25,
303:21, 343:6, 391:7,
392:8, 392:20,
393:11, 393:16,
394:10, 395:5, 395:20

**diameter** [1] - 170:16

**diaper** [6] - 158:14,
171:3, 172:1, 220:14,
260:16, 262:12

**diapers** [1] - 159:6

**die** [13] - 179:22,
179:25, 180:7, 182:9,
207:7, 280:17, 283:9,
302:2, 304:24,
339:20, 360:10,
373:15, 385:12

**died** [22] - 158:6,
165:23, 171:18,
177:25, 186:8,
198:24, 235:17,
244:25, 356:25,
357:24, 358:5,
358:18, 358:19,

359:24, 360:1,
360:22, 364:5,
376:13, 376:18,
378:1, 410:6, 410:20

**Diego** [1] - 289:17

**dies** [1] - 245:7

**difference** [10] -
195:25, 345:24,
378:8, 383:15,
383:24, 408:1, 409:4,
409:14, 409:19,
409:22

**differences** [1] -
281:6

**different** [54] -
173:23, 181:13,
182:12, 206:12,
209:3, 242:3, 249:6,
249:19, 269:10,
281:3, 285:19,
297:10, 299:11,
299:17, 299:19,
304:25, 307:4,
310:19, 320:23,
320:25, 325:13,
327:7, 328:16, 330:5,
331:25, 333:10,
333:15, 333:20,
333:23, 333:25,
334:22, 334:23,
335:7, 335:9, 335:14,
341:3, 341:8, 341:10,
342:1, 346:5, 358:7,
359:9, 362:20, 364:3,
365:17, 403:18,
404:1, 414:5, 414:22,
415:4, 416:13

**differentiate** [1] -
388:21

**differently** [1] -
341:2

**differs** [1] - 411:18

**difficult** [14] -
208:10, 239:11,
243:20, 305:3,
356:20, 356:21,
371:23, 372:4,
384:21, 388:21,
388:23, 398:23,
405:21, 410:22

**dimple** [1] - 202:4

**direct** [10] - 174:18,
270:13, 270:15,
306:17, 306:18,
352:19, 389:6,
389:24, 392:3, 400:9

**DIRECT** [13] -
157:11, 164:7,
164:24, 175:24,
211:7, 263:5, 272:18,

287:2, 305:17,
313:18, 317:18,
350:17, 366:18

**directing** [2] - 237:9,
352:18

**direction** [1] - 299:22

**directly** [4] - 170:6,
247:11, 283:12,
283:24

**dirty** [1] - 251:15

**disagree** [5] -
357:13, 411:15,
412:20, 412:23,
412:25

**disagreement** [1] -
371:19

**disagrees** [1] -
389:23

**disallowed** [1] -
424:20

**discharge** [1] -
212:21

**discipline** [3] -
275:21, 281:14

**disclosed** [1] -
396:10

**disclosure** [2] -
390:14, 390:20

**discontinue** [1] -
361:2

**discontinuing** [1] -
361:1

**discover** [1] - 260:15

**discovered** [3] -
255:22, 328:23,
426:12

**discovery** [1] -
255:10

**discuss** [18] -
159:24, 160:2, 160:4,
160:8, 161:14, 162:1,
195:20, 221:19,
221:22, 222:2, 222:7,
222:10, 222:11,
265:25, 296:9, 316:5,
388:9, 426:1

**discussed** [2] -
221:24, 426:1

**discusses** [1] -
388:8

**discussing** [2] -
160:11, 166:19

**discussion** [3] -
389:14, 389:21,
404:16

**disease** [3] - 205:16,
231:6, 384:18

**Disease** [3] - 382:16,
382:18, 382:22

**dishonesty** [1] -

252:11

**dismissing** [1] -
258:15

**disoriented** [1] -
377:3

**displayed** [1] -
352:15

**disposition** [1] -
360:24

**dispute** [1] - 403:17

**disregard** [4] -
220:2, 253:18,
253:19, 313:9

**disrupt** [1] - 338:9

**disrupting** [1] -
339:2

**dissatisfaction** [1] -
308:7

**dissected** [1] -
302:20

**distance** [4] - 302:2,
349:21, 378:14,
380:14

**distances** [1] - 302:6

**distinct** [8] - 330:5,
331:9, 331:12, 332:1,
333:24, 334:5,
334:25, 412:22

**distinguish** [1] -
195:18

**distress** [3] - 235:11,
236:4, 237:24

**DISTRICT** [2] -
155:1, 155:2

**District** [2] - 155:11,
155:16

**DIVISION** [1] - 155:3

**divorced** [1] - 273:18

**DNA** [3] - 216:16,
216:18, 360:19

**Docket** [1] - 251:9,
251:10

**doctor** [20] - 167:6,
187:20, 202:25,
203:4, 205:5, 205:15,
231:2, 261:5, 268:15,
292:2, 299:1, 303:19,
360:4, 369:17,
378:24, 380:6,
382:15, 383:13,
391:9, 421:17

**Doctor** [14] - 175:18,
185:18, 200:18,
206:1, 210:21,
298:15, 305:10,
317:20, 344:25,
371:11, 399:25,
402:16, 416:23,
418:20

**doctor's** [3] - 230:17,

268:8, 414:18
**Doctorate** [1] - 318:4
**doctors** [8] - 240:19, 241:24, 243:17, 289:13, 289:24, 340:1, 362:15, 362:18
**Document** [1] - 247:22
**document** [13] - 164:9, 169:25, 185:21, 188:11, 188:13, 189:4, 225:10, 225:14, 250:24, 321:25, 342:15, 368:14, 368:15
**documentation** [1] - 224:14
**documented** [5] - 323:17, 323:18, 325:11, 334:15, 388:24
**documents** [1] - 370:7
**dogma** [1] - 398:16
**dolls** [1] - 217:7
**domestic** [4] - 257:5, 258:1, 259:17, 259:18
**done** [13] - 275:19, 294:25, 295:22, 298:12, 322:16, 323:14, 327:5, 327:9, 330:7, 337:12, 349:1, 386:8, 395:21
**door** [1] - 228:15
**dot** [1] - 383:16
**doubt** [11] - 173:23, 219:20, 281:23, 313:2, 355:18, 356:13, 357:5, 357:14, 364:18, 376:4, 390:24
**down** [42] - 164:12, 168:6, 171:5, 180:17, 182:24, 210:22, 231:17, 239:12, 239:18, 240:1, 244:21, 260:19, 262:23, 271:2, 280:2, 300:2, 300:7, 300:13, 301:21, 305:11, 311:25, 317:11, 332:17, 332:20, 335:23, 336:1, 336:8, 336:10, 342:25, 355:2, 376:19, 378:13, 383:10, 383:13, 413:8, 414:3, 414:9, 415:3, 417:4, 419:3, 423:2, 427:10

**downhill** [1] - 302:10
**downward** [1] - 180:13
**DR** [23] - 392:6, 392:9, 392:11, 392:13, 392:16, 392:19, 392:22, 392:24, 393:2, 393:4, 393:6, 393:8, 393:10, 393:13, 393:17, 393:22, 394:1, 394:4, 394:7, 395:7, 395:19, 395:23, 396:4
**Dr** [137] - 170:17, 174:18, 175:14, 176:1, 176:25, 179:10, 184:9, 184:25, 185:4, 185:10, 185:13, 185:21, 186:9, 186:25, 188:11, 188:19, 192:3, 193:25, 204:15, 207:2, 208:5, 242:11, 242:13, 242:16, 244:2, 244:3, 244:8, 244:9, 246:4, 260:24, 261:20, 265:15, 265:17, 265:19, 265:23, 266:10, 266:22, 266:23, 267:1, 267:3, 267:6, 267:10, 267:15, 268:17, 286:23, 289:9, 290:13, 297:6, 297:7, 303:3, 303:5, 304:9, 317:22, 321:19, 322:11, 323:10, 339:5, 342:14, 344:5, 356:7, 356:16, 356:17, 356:21, 357:25, 358:9, 358:19, 360:6, 360:7, 360:12, 364:7, 364:8, 365:25, 366:14, 366:23, 368:12, 368:24, 369:19, 370:18, 371:13, 371:22, 379:20, 379:21, 379:25, 380:6, 381:3, 381:23, 383:9, 383:23, 384:6, 385:6, 385:8, 387:2, 387:15, 387:16, 387:22, 388:7, 389:3, 389:10, 389:16, 389:18, 389:21, 390:6, 390:10, 391:1, 391:15, 391:19, 391:25, 392:3, 395:3,

396:10, 396:18, 398:5, 398:11, 399:11, 400:13, 403:15, 411:1, 412:20, 412:21, 412:25, 413:2, 415:17, 417:20, 418:4, 418:13, 420:14, 423:1, 424:11, 424:19, 425:1, 425:2, 425:4, 425:9
**draw** [4] - 193:15, 255:5, 284:11, 351:13
**dress** [2] - 217:6, 217:24
**dress-up** [1] - 217:6
**dressed** [1] - 349:5
**drew** [2] - 176:15, 426:14
**drink** [2] - 260:6, 416:24
**drinking** [6] - 247:6, 249:11, 251:12, 251:21, 252:23, 253:1
**drive** [1] - 241:13
**driven** [1] - 363:11
**driver** [1] - 212:18
**driving** [1] - 362:4
**drove** [2] - 241:14, 363:13
**drum** [1] - 352:1, 352:4
**DSS** [3] - 247:6, 252:3, 257:16
**due** [2] - 184:2, 205:12
**duly** [11] - 157:9, 164:22, 211:5, 263:3, 272:15, 286:25, 305:15, 312:5, 317:16, 350:15, 366:16
**dura** [3] - 323:23, 323:24, 332:11
**durable** [1] - 397:14
**dural** [1] - 337:21
**during** [29] - 159:6, 161:5, 166:4, 166:7, 169:10, 178:2, 178:8, 183:3, 183:19, 237:23, 238:16, 244:5, 251:17, 252:8, 255:21, 275:22, 276:4, 276:12, 276:16, 276:18, 309:19, 311:7, 358:18, 359:9, 370:1, 370:3, 412:16, 425:22
**duties** [4] - 264:1,

270:7, 306:8, 306:10
**DWI** [1] - 251:13
**dying** [4] - 339:11, 339:14, 339:19, 406:19
**dynamics** [2] - 341:10, 388:15
**dysmorphologist** [8] - 203:3, 203:4, 203:6, 203:7, 203:10, 203:12, 203:13, 203:14
**dysmorphologists** [1] - 202:9
**dysmorphology** [1] - 202:12

# E

**e-mail** [1] - 207:24
**ear** [1] - 194:8
**early** [6] - 226:23, 310:7, 331:2, 384:21, 401:22, 401:23
**easily** [1] - 293:18
**eastern** [2] - 317:23, 367:10
**easy** [1] - 385:12
**eat** [1] - 352:11
**eaten** [1] - 260:4
**edema** [6] - 179:18, 180:7, 196:22, 197:1, 338:1, 338:4
**education** [3] - 263:17, 287:11, 367:20
**educational** [2] - 287:10, 317:25
**Edward** [1] - 425:20
**effect** [5] - 173:12, 236:21, 282:3, 286:1, 286:9
**effective** [6] - 206:15, 378:8, 378:9, 378:16, 417:16, 417:18
**effects** [5] - 201:22, 201:25, 202:15, 340:5, 397:1
**Effects** [1] - 406:22
**eight** [10] - 160:20, 161:4, 166:15, 221:1, 320:24, 331:9, 331:12, 332:9, 333:12, 362:24
**eight-and-a-half** [3] - 160:20, 161:4, 166:15
**eight-hour** [1] - 320:24

**Eighth** [2] - 172:23, 173:13
**either** [18] - 161:6, 173:14, 250:8, 253:12, 276:5, 276:24, 279:23, 292:25, 299:13, 301:8, 325:4, 371:9, 378:1, 385:6, 391:21, 398:21, 417:7, 426:4
**elastic** [1] - 298:2
**electronically** [1] - 186:3
**elevation** [1] - 299:16
**Elmo** [2] - 311:3, 383:14
**elongated** [1] - 180:15
**elusive** [1] - 375:24
**emergency** [5] - 264:22, 270:8, 270:9, 270:11, 369:25
**Emerson** [8] - 160:23, 160:24, 166:16, 214:23, 214:24, 215:3, 314:24, 315:4
**emotionless** [3] - 268:7, 268:20, 270:19
**employed** [7] - 263:21, 305:25, 306:1, 366:25, 367:1, 367:2, 367:3
**employment** [1] - 368:25
**End** [8] - 174:23, 185:16, 248:7, 259:20, 315:17, 350:11, 386:16, 427:12
**end** [6] - 161:17, 223:18, 241:11, 271:18, 310:7, 319:23
**Enemy** [1] - 351:17
**energy** [5] - 338:8, 338:16, 338:19, 338:22, 339:1
**enforcement** [10] - 188:21, 292:25, 320:1, 320:4, 320:18, 320:22, 321:2, 400:11, 401:6, 401:25
**engaged** [1] - 291:16
**enjoy** [1] - 272:1
**enroll** [2] - 230:7, 273:6
**enter** [2] - 207:16, 391:22
**entered** [12] -

174:24, 190:7, 237:14, 253:16, 286:19, 344:2, 357:2, 366:11, 379:24, 396:15, 415:24, 417:21

**entire** [6] - 198:5, 207:2, 294:22, 295:4, 392:5, 399:11

**entirely** [1] - 420:20

**entitled** [5] - 219:25, 313:7, 340:15, 389:8, 406:22

**entry** [1] - 309:21

**enumerate** [1] - 323:1

**enumerated** [1] - 322:14

**environments** [1] - 340:8

**epidural** [1] - 302:15

**equal** [1] - 206:19

**equivalent** [1] - 294:23

**ER** [3] - 323:9, 329:2, 362:13

**era** [1] - 384:5

**especially** [1] - 355:18

**Essentia** [1] - 289:8

**essential** [1] - 248:23

**essentially** [4] - 165:21, 257:15, 284:4, 364:3

**establish** [5] - 236:12, 248:23, 249:10, 249:24, 252:25

**established** [2] - 185:12, 407:7

**estimate** [4] - 275:13, 291:3, 292:7, 292:8

**evaluate** [2] - 286:8, 341:13

**evaluation** [1] - 293:8

**evening** [3] - 253:24, 351:24, 423:5

**event** [3] - 325:22, 388:25

**events** [1] - 302:17

**eventually** [4] - 197:20, 224:4, 297:2, 298:11

**Evidence** [1] - 172:25

**evidence** [138] - 169:5, 169:10,

169:17, 169:18, 171:22, 172:7, 172:18, 172:19, 172:24, 172:25, 173:2, 173:9, 173:14, 173:16, 173:19, 173:21, 174:23, 179:3, 179:6, 179:14, 179:17, 180:20, 180:23, 181:17, 184:18, 189:19, 201:12, 202:18, 219:10, 219:13, 219:16, 219:18, 219:21, 220:1, 220:4, 220:8, 230:16, 234:24, 235:8, 249:5, 249:7, 249:10, 250:8, 250:20, 250:23, 250:24, 251:11, 251:23, 251:25, 257:13, 257:19, 257:23, 259:14, 261:2, 261:4, 271:25, 272:12, 280:8, 280:18, 281:3, 281:4, 281:25, 282:1, 282:5, 282:7, 282:9, 282:10, 282:23, 283:3, 283:5, 284:5, 284:17, 285:4, 285:24, 286:2, 286:11, 309:11, 312:21, 312:23, 312:25, 313:1, 313:3, 313:8, 313:11, 313:15, 315:11, 322:7, 327:9, 332:13, 332:22, 347:6, 348:2, 348:21, 349:4, 349:25, 350:10, 355:7, 357:2, 357:16, 357:19, 358:15, 358:16, 359:3, 359:25, 360:17, 362:22, 363:8, 363:14, 363:20, 364:10, 364:25, 365:1, 365:3, 365:6, 365:16, 365:18, 375:3, 375:17, 378:17, 379:24, 387:8, 390:2, 390:23, 391:22, 394:11, 394:12, 397:5, 406:2, 419:10, 419:25, 423:15, 424:25, 425:11, 425:13

**evidentiary** [2] - 248:9, 386:19

**exact** [6] - 194:20, 194:22, 208:6, 208:8,

358:12, 371:6

**exactly** [16] - 194:11, 194:12, 194:13, 195:1, 197:10, 200:23, 251:8, 258:8, 284:12, 355:21, 371:16, 372:1, 375:6, 405:25, 410:4, 426:19

**exam** [6] - 176:2, 178:12, 178:13, 295:7, 337:11, 352:19

**examination** [38] - 178:15, 178:16, 178:18, 179:3, 179:7, 179:12, 179:21, 180:19, 180:22, 181:15, 183:1, 183:19, 185:14, 187:5, 188:25, 191:6, 195:17, 199:5, 256:6, 280:8, 283:23, 293:9, 294:5, 294:6, 294:8, 294:9, 294:11, 295:20, 323:4, 330:6, 337:15, 339:3, 381:18, 389:25, 391:10, 392:4, 400:9, 412:16

**EXAMINATION** [27] - 157:11, 164:7, 164:24, 175:24, 190:8, 206:25, 211:7, 245:17, 262:4, 263:5, 268:25, 270:5, 272:18, 277:14, 287:2, 304:7, 305:17, 313:18, 316:22, 317:18, 344:3, 350:17, 353:9, 366:18, 399:23, 415:15, 421:15

**examinations** [3] - 293:23, 294:1, 374:12

**examine** [12] - 177:24, 178:25, 192:24, 245:15, 258:18, 268:23, 304:5, 316:21, 343:19, 399:22, 400:2, 406:2

**examined** [3] - 179:10, 203:22, 210:11

**examiner** [7] - 186:19, 187:14, 317:23, 320:11, 320:15, 357:23

**Examiner** [6] - 320:7, 320:9, 324:10, 329:25, 368:3, 400:18

**Examiner's** [1] -

318:10

**Examiners** [4] - 190:24, 191:14, 207:9, 319:20

**examiners** [1] - 320:2

**example** [8] - 182:22, 195:13, 247:5, 384:18, 391:10, 405:17, 407:23, 408:9

**examples** [1] - 319:7

**exceedingly** [1] - 392:11

**except** [3] - 196:13, 275:4, 334:19

**exception** [2] - 283:12, 400:7

**exceptional** [1] - 331:5

**exchange** [2] - 227:6, 227:16

**exclude** [2] - 396:12, 427:4

**exclusive** [1] - 358:16

**exclusively** [1] - 356:25

**excuse** [3] - 261:1, 307:24, 397:21

**excused** [14] - 164:13, 168:7, 210:25, 211:1, 262:24, 271:3, 280:3, 286:14, 305:12, 312:1, 317:12, 345:1, 345:2, 423:3

**excused)** [1] - 355:3

**exercise** [1] - 281:14

**Exhibit** [46] - 163:6, 176:6, 176:11, 184:10, 184:13, 184:18, 185:18, 187:17, 188:13, 189:4, 189:7, 189:18, 190:10, 204:16, 205:1, 217:9, 217:17, 225:1, 225:16, 225:19, 230:16, 290:1, 290:9, 290:11, 308:21, 309:7, 309:11, 309:14, 309:17, 310:24, 311:3, 321:20, 322:4, 322:7, 322:9, 342:15, 347:5, 357:22, 368:13, 368:20, 368:22, 379:25, 382:3, 382:10, 383:5, 424:18

**exhibit** [10] - 186:22, 189:21, 308:22, 310:15, 347:22, 424:5, 424:21, 425:5, 425:8

**exhibits** [3] - 347:1, 347:17, 348:1

**Exhibits** [2] - 347:24, 417:21

**exist** [1] - 397:24

**existed** [1] - 410:19

**existing** [1] - 304:15

**exists** [2] - 339:6, 393:6

**expand** [1] - 180:13

**expanding** [2] - 302:16, 302:21

**expect** [13] - 268:10, 328:5, 328:7, 331:2, 334:8, 338:25, 341:19, 348:25, 391:5, 396:19, 423:16, 423:19, 426:1

**expected** [3] - 338:22, 398:21, 398:22

**expecting** [1] - 233:12

**experience** [23] - 178:19, 181:9, 183:20, 189:13, 203:5, 207:13, 208:9, 208:10, 269:10, 269:25, 296:8, 298:6, 298:15, 300:20, 334:2, 340:23, 354:18, 372:17, 373:5, 405:9, 408:25, 411:16

**experienced** [1] - 328:11

**expert** [30] - 174:19, 195:21, 267:22, 268:2, 270:14, 295:1, 312:8, 312:10, 321:12, 348:16, 348:17, 349:4, 349:19, 350:6, 354:14, 355:19, 356:3, 360:13, 364:1, 365:21, 370:10, 378:3, 383:1, 385:6, 387:10, 387:11, 387:13, 394:6, 398:4

**experts** [6] - 178:20, 356:19, 362:21, 364:3, 365:8, 387:14

**explain** [17] - 179:20, 196:5, 238:23, 274:14, 287:23,

292:22, 295:12, 297:22, 361:20, 378:7, 379:1, 380:7, 383:14, 388:13, 404:23, 405:1, 417:16
**explained** [4] - 189:1, 199:1, 293:18, 299:5
**explanation** [2] - 199:10, 199:16
**exposed** [1] - 247:14
**express** [2] - 205:19, 308:7
**expressed** [2] - 184:6, 370:10
**expression** [1] - 229:22
**extensive** [2] - 179:16, 339:9
**extensively** [1] - 299:3
**extent** [3] - 277:9, 363:24, 400:19
**external** [6] - 178:12, 179:12, 180:19, 183:1, 195:16, 335:24
**extra** [1] - 192:4
**extracted** [1] - 179:8
**extremely** [2] - 339:23
**extremities** [1] - 180:10
**eye** [4] - 294:18, 295:17, 337:20, 372:6
**eyeball** [1] - 295:13
**eyes** [2] - 293:3, 316:15
**eyewitness** [2] - 374:7, 374:11
**eyewitnesses** [1] - 405:11

**F**

**F.3d** [2] - 172:23, 173:12
**face** [9] - 178:20, 259:4, 268:7, 278:21, 279:4, 279:8, 279:16, 280:12, 298:22
**facial** [1] - 229:22
**facing** [1] - 388:3
**fact** [39] - 159:21, 166:4, 173:7, 191:22, 192:22, 196:4, 200:14, 218:11, 225:7, 246:12, 246:23, 250:8, 252:22, 252:23,

253:1, 254:17, 280:14, 280:16, 281:5, 283:7, 283:14, 289:17, 297:19, 314:15, 325:7, 327:18, 328:15, 335:11, 354:1, 354:5, 356:4, 357:1, 363:24, 387:2, 390:1, 395:18, 412:3, 412:11, 415:8
**factors** [4] - 285:15, 340:21, 341:13, 394:23
**facts** [15] - 201:11, 202:17, 261:1, 346:19, 346:22, 346:23, 370:20, 371:21, 375:16, 394:11, 394:13, 397:4, 400:23, 419:10, 419:25
**factual** [4] - 371:12, 371:19, 381:10, 403:15
**failing** [1] - 390:21
**failure** [1] - 391:19
**faint** [1] - 299:12
**fair** [16] - 162:10, 204:6, 253:9, 258:17, 269:2, 284:6, 343:8, 344:20, 354:17, 374:4, 379:16, 389:6, 389:24, 397:15, 402:21, 425:6
**fairly** [10] - 181:20, 216:7, 227:24, 228:25, 237:21, 238:1, 268:20, 269:3, 270:19, 399:1
**fairness** [1] - 282:4
**faith** [1] - 426:23
**fall** [113] - 182:20, 183:15, 183:18, 200:13, 200:15, 200:20, 201:2, 201:4, 206:18, 206:20, 242:18, 248:22, 249:13, 273:6, 280:17, 283:10, 292:17, 296:19, 298:17, 299:10, 299:13, 299:14, 299:15, 299:20, 299:24, 299:25, 300:5, 301:8, 301:12, 301:14, 301:19, 301:20, 301:21, 301:22, 301:23, 301:24, 302:2, 302:6, 303:12, 303:13,

303:14, 303:15, 304:12, 304:14, 304:19, 304:23, 328:6, 328:8, 328:12, 328:22, 329:8, 329:19, 331:17, 331:19, 331:20, 333:21, 334:5, 334:11, 335:12, 338:21, 338:25, 339:7, 339:11, 339:21, 339:23, 340:24, 341:2, 341:24, 341:25, 358:5, 358:8, 358:10, 360:10, 360:14, 361:4, 363:2, 363:7, 374:5, 378:8, 378:14, 378:15, 378:16, 378:25, 379:1, 379:3, 379:11, 379:13, 379:15, 380:25, 385:12, 388:16, 389:1, 394:25, 396:19, 397:10, 398:11, 398:18, 401:1, 401:12, 402:20, 402:24, 403:5, 410:15, 413:3, 413:16, 415:18, 420:13, 420:19, 420:24, 421:3, 422:18
**fall-type** [1] - 299:10
**fallen** [1] - 327:20, 403:22, 414:16
**falling** [9] - 182:24, 301:21, 303:15, 335:16, 338:24, 339:6, 339:25, 341:9, 342:1
**Falls** [7] - 155:11, 155:17, 155:20, 156:4, 156:15, 320:2, 340:16
**falls** [30] - 296:9, 296:15, 302:9, 327:23, 328:4, 329:13, 334:17, 334:18, 334:20, 335:3, 340:9, 341:8, 341:11, 341:12, 341:13, 341:14, 342:4, 362:13, 378:12, 379:8, 383:17, 389:5, 398:20, 402:10, 414:3, 414:4, 414:8, 414:10, 414:15
**falx** [2] - 323:18, 324:1

**familiar** [5] - 169:5, 191:1, 339:8, 342:15, 351:4
**Family** [1] - 289:22
**family** [13] - 241:20, 242:1, 242:2, 246:13, 265:20, 265:25, 266:22, 268:6, 287:21, 287:24, 288:5, 288:7, 290:24
**fan** [1] - 406:10
**fancy** [1] - 336:13
**far** [10] - 171:20, 215:19, 226:5, 281:21, 365:7, 378:11, 378:12, 388:19, 419:13, 427:2
**Fargo** [19] - 240:23, 240:25, 241:2, 241:5, 241:11, 241:16, 241:21, 241:23, 242:2, 242:10, 244:11, 289:8, 293:11, 297:3, 299:2, 323:8, 323:12, 327:3, 370:1
**father** [8] - 214:12, 214:24, 215:23, 216:20, 218:4, 226:20, 230:3, 410:1
**father's** [1] - 213:25
**fault** [1] - 397:22
**favor** [1] - 170:13
**favorable** [2] - 357:16, 365:18
**favorite** [1] - 217:5
**FBI** [5] - 169:14, 188:21, 199:2, 283:4, 358:3
**features** [1] - 203:1
**February** [7] - 192:8, 192:13, 192:17, 193:4, 193:9, 193:18, 402:1
**Federal** [3] - 156:14, 172:25, 321:13
**feed** [1] - 352:10
**feet** [18] - 183:15, 299:18, 301:23, 303:15, 339:7, 339:12, 378:22, 401:2, 401:12, 402:19, 402:20, 402:21, 402:25, 403:23, 417:13, 417:17, 418:22, 419:5
**feet** [1] - 402:11
**fell** [20] - 200:2, 200:17, 200:18, 206:1, 206:5, 206:8,

246:16, 300:1, 332:3, 332:4, 334:16, 341:21, 358:13, 358:15, 361:11, 375:13, 378:7, 378:11, 383:17, 417:13
**fellowship** [4] - 318:19, 318:24, 320:6, 369:8
**felony** [1] - 252:10
**felt** [4] - 170:5, 249:25, 352:14, 392:4
**female** [2] - 203:20
**fetal** [14] - 201:9, 201:18, 201:22, 201:25, 202:1, 202:14, 202:15, 203:1, 203:5, 203:9, 230:24, 230:25, 231:3
**few** [18] - 187:22, 231:20, 242:7, 267:8, 273:21, 274:6, 277:20, 325:19, 326:23, 354:21, 358:9, 367:4, 371:25, 375:14, 377:2, 396:20, 411:8, 412:6
**field** [6] - 288:4, 295:1, 296:15, 321:10, 322:17, 328:15
**fields** [1] - 288:4
**fifty** [2] - 275:15, 369:11
**fight** [2] - 416:17, 416:19
**figures** [1] - 425:9
**file** [3] - 198:8, 238:21, 280:20
**filed** [6] - 247:5, 251:9, 251:10, 370:12, 388:3, 400:21
**files** [1] - 258:14
**filled** [3] - 203:23, 204:1, 379:21
**final** [5] - 168:13, 191:8, 201:78, 284:24, 285:5
**Final** [10] - 187:8, 191:10, 194:22, 203:18, 205:11, 205:20, 205:23, 207:9, 207:17, 400:17
**finalized** [3] - 191:15, 193:24, 193:25
**finally** [3] - 216:22, 216:24, 281:22
**finder** [1] - 356:4

**findings** [8] - 188:24, 189:2, 196:4, 206:6, 294:14, 324:7, 324:13, 383:1

**fine** [14] - 235:13, 302:17, 332:19, 340:11, 350:6, 354:20, 356:24, 359:8, 359:12, 359:15, 359:19, 404:21, 404:23, 424:13

**fingermark** [1] - 167:16

**fingermarks** [6] - 167:1, 167:2, 167:17, 167:19, 167:24, 316:2

**fingers** [5] - 158:25, 159:2, 170:21, 170:23, 299:8

**finish** [4] - 186:15, 191:9, 199:5, 200:7

**finished** [2] - 199:4, 289:19

**finishes** [1] - 174:18

**finishing** [1] - 291:18

**firmer** [1] - 179:10

**first** [45] - 157:9, 164:22, 172:25, 186:7, 188:20, 190:21, 201:4, 203:18, 204:25, 205:11, 211:5, 213:15, 218:2, 228:5, 228:6, 237:20, 252:16, 257:22, 262:17, 263:3, 272:15, 278:3, 286:25, 305:15, 307:18, 309:23, 312:5, 317:16, 320:23, 336:19, 340:15, 345:8, 348:17, 350:7, 350:15, 351:2, 357:12, 357:21, 360:20, 366:16, 384:7, 401:17, 402:10, 423:24

**fist** [4] - 275:10, 276:5, 276:15, 413:20

**fists** [2] - 280:15, 359:2

**fit** [1] - 330:21

**five** [31] - 169:21, 173:5, 195:23, 196:15, 197:17, 208:13, 215:18, 234:1, 251:18, 264:2, 301:23, 303:15,

325:17, 326:9, 326:20, 326:21, 326:22, 339:7, 339:11, 352:4, 358:18, 359:21, 361:23, 378:22, 401:2, 401:12, 402:20, 407:24, 413:23

**fix** [3] - 179:9, 192:22, 192:25

**fixed** [1] - 179:13

**flat** [1] - 268:7

**Flight** [1] - 240:23

**floor** [15] - 169:13, 327:21, 328:13, 331:22, 332:5, 334:19, 334:21, 335:4, 335:13, 335:17, 338:15, 345:11, 405:18, 421:4, 422:18

**flu** [7] - 354:7, 354:9, 377:12, 396:25, 412:9, 412:13, 421:20

**fluid** [3] - 384:9, 384:12

**fly** [1] - 241:13

**focused** [2] - 288:20, 288:25

**follow** [7] - 284:23, 285:1, 285:7, 372:19, 373:23, 380:19, 398:19

**followed** [1] - 372:18

**following** [11] - 183:19, 235:2, 248:15, 272:5, 285:3, 285:13, 355:11, 373:20, 386:25, 400:14, 423:13

**follows** [15] - 157:10, 164:23, 175:17, 211:6, 263:4, 272:16, 287:1, 305:16, 312:6, 317:17, 325:11, 350:16, 357:20, 366:17, 397:17

**fond** [1] - 360:18

**food** [1] - 228:24

**fooled** [1] - 409:9

**foot** [7] - 301:9, 378:10, 378:11, 378:19, 385:12, 403:6

**football** [5] - 377:19, 377:24, 406:10, 406:12

**force** [6] - 196:14, 196:15, 338:8, 338:14, 356:10,

398:12

**forced** [1] - 376:22

**forehead** [16] - 249:14, 252:20, 254:6, 297:11, 298:7, 330:11, 331:13, 331:14, 331:16, 331:24, 333:9, 333:12, 333:13, 333:14, 362:24, 362:25

**forensic** [28] - 190:14, 205:19, 205:22, 207:6, 303:22, 318:8, 318:10, 318:24, 319:14, 320:14, 324:19, 325:4, 357:23, 363:6, 366:24, 367:3, 367:9, 368:2, 368:11, 369:7, 372:4, 373:14, 375:24, 376:1, 376:6, 376:16, 376:22, 411:21

**Forensic** [2] - 209:10, 319:20

**forensics** [2] - 320:24, 320:25

**Forks** [1] - 263:19, 287:13, 287:17, 289:8, 289:12

**form** [3] - 188:4, 281:14, 423:6

**formalin** [1] - 179:9, 192:25

**formed** [1] - 203:19

**forming** [3] - 344:19, 400:23, 403:2

**formula** [2] - 381:20, 381:21

**formulated** [1] - 388:1

**formulating** [2] - 370:7, 389:10

**Fort** [2] - 212:12, 212:13

**forth** [1] - 253:4

**forward** [3] - 299:14, 306:24, 362:17

**forwarded** [1] - 361:19

**forwarding** [1] - 169:13

**foster** [2] - 250:15, 251:2

**foul** [1] - 427:3

**foundation** [7] - 184:21, 186:24, 309:12, 382:11,

382:12, 407:7, 424:21

**foundational** [1] - 308:21

**four** [33] - 215:18, 239:1, 277:23, 281:10, 283:17, 285:15, 331:24, 333:19, 333:20, 333:22, 334:24, 335:14, 337:8, 352:3, 358:7, 362:5, 363:1, 364:2, 364:3, 365:7, 365:17, 373:2, 385:12, 399:13, 401:2, 401:12, 402:20, 413:20, 413:23, 413:23, 417:13, 417:17, 419:5

**four-day** [1] - 337:8

**fourth** [2] - 173:11, 285:25

**fracture** [10] - 297:25, 327:25, 328:2, 328:10, 328:13, 340:4, 342:4, 342:5, 342:9

**fractures** [9] - 289:2, 295:2, 295:3, 327:7, 327:8, 327:11, 327:14, 327:18

**frame** [4] - 178:8, 309:20, 310:14, 414:23

**Frankly** [1] - 396:7

**frantic** [1] - 269:17

**free** [1] - 245:21

**frequent** [1] - 374:2

**fresh** [1] - 192:23

**Friday** [8] - 232:19, 232:20, 233:2, 307:8, 307:9, 349:1, 349:22, 423:25

**friendly** [1] - 228:25

**frivolous** [1] - 252:7

**Froloff** [32] - 170:17, 174:18, 176:1, 176:25, 184:9, 188:11, 188:19, 204:15, 207:2, 260:24, 261:20, 297:6, 303:5, 356:7, 356:16, 357:25, 358:19, 360:6, 364:7, 369:19, 371:22, 379:21, 381:23, 389:10, 403:15, 412:21, 412:25, 424:10, 424:11, 425:1, 425:9

**FROLOFF** [1] -

175:15

**Froloff's** [6] - 175:14, 371:13, 379:25, 380:6, 418:13, 425:4

**front** [10] - 190:11, 193:10, 196:14, 250:25, 297:11, 297:12, 309:7, 333:20, 402:13, 422:17

**frontal** [1] - 194:7

**fuel** [1] - 383:24

**full** [5] - 198:8, 218:9, 310:14, 348:23, 349:19

**fully** [1] - 347:14

**function** [2] - 292:22, 407:4

**functioning** [1] - 178:2

**functions** [1] - 182:4

**furniture** [1] - 347:13

**fussy** [5] - 231:9, 282:11, 282:14, 283:8, 362:7

**future** [1] - 362:1

## G

**Gaikowski** [6] - 305:13, 305:20, 305:22, 309:16, 310:10, 311:2

**GAIKOWSKI** [1] - 305:14

**Gallagher** [14] - 265:15, 265:17, 265:19, 265:23, 266:10, 266:22, 266:23, 267:1, 267:3, 267:6, 267:10, 267:15, 268:17

**gallery** [1] - 426:16

**game** [8] - 253:9, 258:17, 377:21, 378:1, 389:6, 389:24, 406:14, 406:17

**gamut** [2] - 287:25, 291:22

**Gary** [1] - 305:22

**Geier** [4] - 244:2, 244:3, 244:8, 244:9

**general** [10] - 178:4, 196:24, 206:18, 209:17, 212:16, 213:5, 264:1, 294:10, 367:7

**generally** [4] - 191:14, 209:10,

387:12, 411:23
**Germany** [1] -
212:12
  **gesture** [1] - 276:15
**girl** [7] - 187:6,
199:25, 213:17,
214:2, 214:3, 214:20,
365:12
  **given** [5] - 213:12,
364:22, 364:24,
401:14, 401:18
  **glad** [1] - 179:2,
427:9
  **goal** [1] - 236:11
  **gobble** [1] - 336:11
  **gosh** [1] - 264:6
  **governing** [1] -
172:18
  **Government** [32] -
169:6, 174:3, 174:11,
184:13, 236:17,
236:19, 251:6, 280:4,
282:6, 282:25,
309:11, 346:20,
355:16, 355:19,
357:4, 357:10,
357:16, 364:13,
364:18, 364:19,
364:23, 364:25,
365:19, 387:2, 387:5,
387:9, 389:23,
394:22, 424:1,
425:13, 425:15, 426:6
  **Government's** [22] -
171:16, 184:9, 189:4,
190:10, 247:18,
248:18, 255:10,
282:21, 308:20,
309:7, 309:17,
310:24, 311:3,
321:19, 322:3, 322:7,
355:21, 356:19,
356:23, 359:1, 363:5,
417:21
  **grab** [1] - 255:5
  **grade** [1] - 273:8
  **grading** [1] - 329:3
  **graduate** [5] -
211:22, 212:1, 213:8,
287:14, 287:18
  **graduated** [1] -
318:18
  **Graff** [12] - 242:11,
242:13, 242:16,
246:4, 286:23, 287:5,
289:9, 290:13, 303:3,
304:9, 356:21, 360:7
  **GRAFF** [1] - 286:24
  **Grand** [5] - 263:19,
287:13, 287:17,

289:8, 289:12
  **granddaughter** [1] -
264:11
  **grandmother** [6] -
165:19, 169:23,
264:15, 264:16, 314:8
  **grant** [1] - 391:21
  **granting** [1] - 396:6
  **graph** [1] - 425:5
  **gravity** [2] - 341:3,
341:4
  **great** [2] - 284:17,
361:23
  **greater** [1] - 252:25
  **greatly** [1] - 316:18
  **green** [1] - 330:16
  **grey** [1] - 181:24
  **groaning** [1] -
328:23
  **grossly** [1] - 325:4
  **ground** [2] - 299:15,
303:16, 333:22,
418:7, 419:3, 419:14,
419:17, 420:9, 420:17
  **group** [2] - 331:14,
333:13
  **grow** [1] - 281:12
  **growing** [1] - 279:18
  **growth** [8] - 203:23,
204:17, 327:8,
327:11, 379:20,
379:25, 380:6, 380:10
  **guess** [7] - 206:14,
236:9, 246:3, 261:10,
299:1, 393:18, 424:15
  **guessing** [1] -
281:11
  **guide** [2] - 175:8,
372:20
  **guideline** [2] -
325:11, 325:12
  **guidelines** [2] -
191:2, 192:7
  **guilt** [1] - 358:15
  **guilty** [2] - 357:18,
365:3
  **gunshot** [2] - 338:12,
373:17
  **gurney** [1] - 265:9
  **guy** [3] - 284:13,
350:6, 363:23
  **gymnasium** [1] -
353:18

# H

**half** [16] - 160:20,
161:4, 166:15,
207:13, 215:21,

254:14, 254:18,
255:15, 255:16,
294:23, 299:2,
310:14, 353:20,
353:21, 378:22
  **halves** [2] - 323:25,
324:1
  **hand** [12] - 163:5,
177:2, 217:9, 225:2,
232:6, 253:3, 275:10,
276:5, 290:1, 321:19,
368:12, 377:14
  **handful** [1] - 218:8
  **handing** [4] - 204:15,
342:14, 379:24, 382:3
  **handle** [1] - 269:10
  **handled** [1] - 237:11
  **handling** [1] - 281:13
  **handprint** [31] -
158:17, 158:19,
159:3, 159:9, 159:12,
159:17, 159:24,
160:14, 161:2, 162:1,
162:3, 163:17,
163:18, 167:16,
170:14, 219:7,
220:17, 220:18,
220:21, 220:23,
220:25, 221:7,
221:12, 221:19,
223:2, 223:22,
223:24, 225:10,
262:14, 262:18
  **hands** [2] - 197:17,
359:2
  **hanging** [2] - 300:1,
352:7
  **happy** [1] - 361:1
  **hard** [13] - 169:22,
171:21, 175:4,
201:25, 208:1, 224:6,
226:19, 244:19,
246:3, 275:23, 292:7,
371:15, 381:1
  **harder** [1] - 192:23
  **hardly** [1] - 298:2
  **Harlan** [1] - 287:5
  **harm** [1] - 427:2
  **Hasbro** [1] - 288:23
  **hat** [1] - 426:14
  **Head** [10] - 230:7,
230:9, 230:11,
233:22, 234:12,
256:6, 340:18, 360:1,
360:2, 391:10
  **head** [156] - 168:9,
171:20, 185:2, 194:3,
194:5, 195:1, 195:3,
195:4, 195:5, 196:12,
204:2, 204:6, 204:19,

204:21, 205:6,
205:12, 206:15,
208:24, 209:22,
246:13, 275:9,
275:16, 275:18,
275:22, 276:4,
276:13, 276:16,
276:22, 277:20,
278:4, 278:6, 278:19,
279:1, 279:9, 279:13,
280:11, 280:15,
282:17, 282:22,
283:3, 283:6, 283:8,
284:13, 289:1,
294:10, 294:12,
295:21, 295:22,
296:4, 296:14,
297:11, 298:7,
298:12, 298:13,
298:19, 298:24,
299:24, 300:2, 300:8,
300:11, 300:13,
300:14, 300:15,
302:9, 303:7, 323:16,
328:9, 329:16,
330:10, 330:11,
330:12, 330:24,
331:8, 331:22,
331:24, 331:25,
332:6, 333:6, 333:9,
333:11, 333:18,
334:12, 335:7,
338:21, 341:5, 341:9,
341:20, 341:22,
341:24, 342:5, 342:6,
342:7, 342:8, 342:20,
355:25, 356:10,
357:25, 358:2, 358:8,
358:10, 358:12,
358:23, 360:5,
362:25, 363:2, 365:7,
365:17, 373:3,
373:18, 375:1,
375:14, 376:4,
377:16, 378:1, 378:9,
378:11, 378:12,
378:14, 378:18,
380:12, 380:13,
380:15, 380:16,
380:23, 380:24,
383:19, 384:10,
384:20, 392:11,
392:18, 395:7,
395:10, 395:12,
397:9, 403:10, 404:6,
404:10, 404:25,
412:18, 413:6,
413:22, 414:8,
414:19, 418:22,
419:2, 420:9, 420:17,
420:22, 420:23,

425:2, 425:4, 425:7
  **heading** [1] - 193:18
  **heads** [6] - 298:1,
341:6, 341:16,
392:15, 395:16
  **heal** [1] - 178:9
  **healing** [4] - 178:8,
327:8, 327:11, 336:2
  **Health** [7] - 186:4,
186:9, 186:16,
263:24, 289:7, 306:2,
369:5
  **health** [4] - 263:25,
264:7, 291:23, 370:3
  **healthy** [1] - 230:18
  **hear** [15] - 169:5,
219:13, 232:24,
248:17, 248:18,
251:6, 280:4, 286:7,
312:21, 355:12,
386:3, 386:14,
406:11, 424:22, 427:8
  **heard** [16] - 169:9,
351:23, 355:7, 360:6,
360:23, 361:13,
362:20, 368:16,
375:22, 377:1, 398:4,
407:13, 407:14,
411:1, 414:6, 426:16
  **hearing** [9] - 157:3,
158:1, 169:2, 198:18,
246:1, 248:4, 248:6,
355:4, 386:13
  **hearsay** [5] - 184:20,
199:12, 234:19,
235:23, 259:10
  **heart** [9] - 178:6,
207:8, 294:12,
405:18, 405:22,
405:23, 406:2, 406:3
  **heat** [1] - 173:14
  **height** [24] - 206:1,
206:5, 206:15,
327:20, 329:9, 371:6,
378:6, 378:8, 378:9,
378:18, 378:19,
380:11, 401:2,
402:19, 403:23,
417:13, 417:16,
417:18, 417:19,
420:6, 420:21, 420:22
  **held** [3] - 162:19,
352:12, 355:11
  **help** [8] - 219:22,
268:15, 294:16,
305:21, 313:4, 362:9,
371:4, 402:15
  **helps** [2] - 295:18,
336:10
  **hematoma** [10] -

179:24, 180:2,
197:22, 209:9,
209:12, 209:18,
209:21, 210:2,
323:15, 324:17
  **hematomas** [1] -
179:25
  **hemisphere** [2] -
181:5, 181:19
  **hemispheres** [1] -
298:21
  **hemorrhage** [24] -
179:14, 179:15,
179:16, 181:21,
197:10, 209:8, 210:2,
210:4, 210:10,
210:13, 298:4, 305:3,
323:17, 324:13,
325:8, 325:9, 325:10,
332:12, 337:17,
337:18, 337:25, 338:1
  **hemorrhages** [26] -
176:7, 177:17,
196:19, 197:6, 197:7,
209:23, 210:16,
294:17, 295:10,
295:11, 330:5,
333:10, 334:1, 334:5,
335:10, 356:22,
388:14, 403:18,
403:24, 404:25,
412:22, 414:5,
414:15, 414:19, 421:6
  **hemorrhaging** [4] -
196:23, 197:2,
304:25, 356:19
  **herniation** [6] -
180:20, 181:3,
332:14, 332:21,
332:23, 338:4
  **herring** [1] - 396:8
  **herself** [1] - 353:5
  **high** [18] - 206:21,
211:22, 212:1, 212:3,
367:20, 386:7, 401:9,
402:19, 402:21,
402:25, 403:6, 416:7,
418:7, 419:2, 420:9,
420:17, 420:18
  **higher** [4] - 173:11,
206:17, 285:25,
383:19
  **highlight** [5] -
182:14, 187:23,
188:1, 188:6, 310:12
  **highlighted** [1] -
311:9
  **highlighter** [2] -
187:23, 310:11
  **highly** [1] - 183:17

  **hill** [1] - 227:13
  **Hill** [1] - 367:25
  **himself** [3] - 251:18,
359:18, 365:11
  **hippocampus** [1] -
182:16
  **history** [12] - 194:19,
194:20, 198:5, 198:6,
199:9, 266:11, 320:5,
372:8, 372:10,
373:12, 392:5
  **hit** [35] - 195:22,
195:23, 224:6, 259:5,
275:22, 275:23,
277:19, 278:19,
278:25, 279:4, 279:8,
279:10, 279:13,
279:16, 282:17,
283:2, 302:17,
331:17, 331:20,
331:22, 332:5,
334:11, 334:19,
334:20, 335:12,
335:13, 373:18,
375:13, 378:1,
407:24, 413:8,
413:19, 415:1
  **hits** [5] - 284:13,
333:21, 335:3, 335:4,
413:6
  **hitting** [6] - 275:19,
278:3, 300:16,
303:16, 338:15,
403:10
  **hobbies** [1] - 217:5
  **hold** [10] - 163:5,
217:9, 225:2, 288:12,
288:14, 289:9, 301:5,
346:1, 368:25, 394:7
  **holding** [2] - 259:4,
352:13
  **holes** [1] - 181:5
  **Hollow** [1] - 217:23
  **home** [9] - 249:4,
249:11, 249:25,
250:9, 251:2, 257:6,
317:7, 405:17
  **homicide** [11] -
194:17, 303:20,
303:24, 304:1, 343:1,
343:5, 343:10,
343:14, 357:24,
360:14, 362:21
  **Honor** [120] - 163:23,
164:16, 168:5,
168:12, 168:20,
169:8, 170:10,
170:11, 171:1,
171:12, 172:4, 174:6,
175:20, 184:17,

184:19, 184:22,
186:21, 186:23,
188:8, 190:1, 192:14,
200:6, 202:17,
204:12, 204:25,
210:20, 220:11,
231:25, 232:12,
235:22, 236:9, 237:6,
245:3, 246:25,
248:20, 249:15,
249:24, 250:10,
250:22, 251:8,
253:14, 253:22,
255:1, 257:8, 257:22,
259:3, 259:21, 261:1,
262:3, 267:21,
270:12, 270:21,
271:5, 272:9, 277:10,
277:12, 279:25,
280:6, 281:2, 281:7,
283:25, 284:3,
284:12, 284:20,
285:8, 309:10,
309:13, 310:23,
311:24, 312:7,
312:12, 312:17,
315:7, 322:6, 343:20,
344:24, 345:13,
345:20, 346:3,
346:15, 347:9,
347:21, 348:4,
350:12, 354:13,
355:14, 355:15,
357:4, 357:12, 358:5,
363:5, 363:20,
366:13, 368:19,
370:22, 380:2, 382:9,
383:4, 383:9, 384:25,
385:4, 387:7, 388:6,
389:3, 389:14,
390:16, 391:4,
391:24, 394:9,
394:15, 399:8, 407:6,
407:8, 415:10,
417:25, 418:16,
419:24, 423:20,
424:23, 425:18
  **honorable** [1] -
212:21
  **Honorable** [1] -
155:16
  **honors** [1] - 369:14
  **Hood** [1] - 212:13
  **hope** [2] - 171:25,
187:2
  **hoping** [3] - 238:23,
257:19, 257:21
  **horrific** [1] - 361:4
  **hospital** [61] -
169:24, 177:14,

177:21, 178:1, 178:3,
178:5, 198:25, 199:7,
239:20, 239:22,
240:1, 240:2, 240:6,
240:17, 243:4, 256:1,
256:17, 257:1,
257:12, 257:16,
257:25, 260:13,
265:11, 265:12,
265:15, 266:15,
266:18, 293:11,
306:12, 307:1,
308:14, 308:25,
317:1, 317:4, 317:5,
317:6, 326:1, 326:9,
326:13, 326:15,
326:24, 327:2, 331:1,
331:3, 337:3, 337:10,
339:25, 340:8,
358:21, 359:13,
361:9, 362:14,
363:12, 404:20,
404:24, 410:1, 410:7,
414:14, 415:24
  **Hospital** [6] - 240:8,
240:10, 241:9,
288:23, 308:11,
323:12
  **hospitalized** [2] -
293:16, 294:7
  **hospitals** [2] - 198:6,
289:6
  **host** [1] - 320:24
  **hottest** [1] - 296:16
  **hour** [13] - 267:9,
294:23, 310:12,
310:14, 320:24,
353:20, 353:21,
363:11, 363:13,
405:23, 408:21
  **hours** [23] - 177:11,
177:13, 177:24,
195:23, 196:15,
208:13, 209:6,
209:16, 209:18,
209:19, 221:1, 267:9,
288:8, 302:13,
302:17, 307:3, 307:4,
311:16, 373:9, 374:1,
406:5, 407:24
  **house** [6] - 171:24,
219:4, 252:23, 253:1,
345:10, 405:18
  **human** [1] - 180:16
  **hundred** [6] - 291:6,
292:12, 373:2,
373:25, 399:13
  **hundreds** [1] -
210:11
  **hung** [1] - 240:1

  **hurt** [5] - 234:9,
240:4, 275:25, 276:2,
329:16
  **hurting** [4] - 164:3,
171:4, 221:11, 222:6
  **husband** [10] -
159:25, 166:5, 215:1,
221:20, 227:19,
229:4, 230:2, 247:21,
256:19, 264:13
  **husband's** [2] -
211:20, 227:20
  **hydrocephalic** [8] -
385:17, 386:5,
386:10, 387:4,
387:17, 390:13,
395:6, 425:10
  **hydrocephalus** [27] -
203:15, 379:18,
384:6, 384:7, 384:16,
384:21, 384:23,
385:10, 388:9,
389:15, 390:3, 391:6,
392:8, 392:23,
393:14, 393:15,
394:10, 394:16,
395:9, 395:11,
395:15, 395:16,
395:18, 395:25,
396:5, 424:24
  **hypothesis** [1] -
362:10
  **hypothetical** [3] -
195:21, 208:12, 397:7
  **hypothetically** [2] -
414:1, 414:9
  **hypoxic** [1] - 333:1

## I

  **ICU** [4] - 239:19,
240:18, 265:7, 265:13
  **idea** [5] - 376:9,
385:17, 385:23,
385:25, 407:12
  **ideas** [1] - 293:20
  **identical** [1] - 396:24
  **identified** [1] - 296:7
  **ignore** [2] - 192:22,
335:6
  **IHS** [1] - 308:10
  **II** [2] - 155:6, 155:14
  **III** [2] - 155:6, 155:14
  **illness** [2] - 415:19,
415:24
  **illnesses** [1] - 417:2
  **illusion** [1] - 251:25
  **illustrate** [1] - 195:20
  **imagine** [3] - 243:20,

292:10, 333:21

**imaging** [2] - 395:17, 395:19

**immediate** [8] - 187:21, 187:24, 303:6, 306:17, 306:23, 307:10, 328:13, 342:20

**immediately** [7] - 200:3, 328:6, 328:19, 329:7, 329:17, 329:18, 329:20

**impact** [10] - 197:14, 197:15, 197:18, 197:23, 210:17, 297:16, 298:5, 298:16, 332:9, 333:17

**impacts** [10] - 197:8, 197:12, 197:13, 333:18, 334:22, 334:25, 335:1, 365:7, 365:9, 413:18

**impairment** [1] - 406:13

**impeaches** [1] - 250:1

**impeachment** [3] - 257:22, 257:24, 259:14

**importance** [1] - 187:13

**important** [8] - 178:23, 182:19, 197:11, 349:13, 364:12, 372:7, 373:21, 375:25

**imposes** [1] - 237:3

**impossible** [10] - 194:18, 269:22, 269:24, 270:1, 270:3, 305:5, 356:20, 356:21, 358:11, 388:21

**impression** [1] - 267:6

**improper** [1] - 251:15

**improperly** [1] - 251:25

**improvement** [1] - 306:6

**inaccurate** [1] - 401:14

**inactive** [1] - 368:7

**inadmissible** [2] - 171:12, 171:13

**inadvertence** [1] - 427:5

**inadvertent** [1] - 427:6

**inadvertently** [1] - 176:15

**inch** [1] - 301:8

**inches** [31] - 183:8, 183:9, 198:7, 206:2, 206:8, 206:9, 206:10, 327:20, 329:9, 338:25, 378:21, 401:9, 418:5, 418:6, 418:15, 418:20, 418:21, 418:24, 419:1, 419:4, 419:5, 419:8, 419:13, 419:15, 419:17, 420:3, 420:7, 420:10, 420:18

**incident** [25] - 161:2, 166:14, 169:15, 169:19, 171:4, 172:7, 194:17, 222:11, 222:13, 226:1, 226:15, 226:19, 226:24, 255:19, 258:2, 258:18, 258:20, 258:22, 258:23, 259:2, 259:9, 260:8, 316:24, 377:2

**incidents** [1] - 168:18

**include** [5] - 178:21, 193:13, 202:3, 296:17, 387:23

**included** [4] - 261:20, 370:23, 385:5, 387:20

**includes** [2] - 202:6, 287:21

**inclusion** [2] - 172:19, 280:22

**incomplete** [1] - 258:14

**inconsistency** [1] - 364:1

**inconsistent** [4] - 242:18, 300:5, 329:10, 363:9

**incorrect** [4] - 256:21, 260:25, 261:22, 261:24

**increase** [5] - 206:15, 282:4, 336:20, 336:22, 397:12

**increased** [4] - 203:15, 406:17, 407:4, 407:16

**indeed** [3] - 371:8, 371:24, 412:10

**Indian** [8] - 263:24, 345:17, 345:18,

345:22, 346:7, 346:9, 346:12, 346:13

**indicate** [12] - 324:5, 325:8, 327:13, 337:7, 407:3, 407:15, 411:10, 414:23, 415:23, 416:23, 420:11, 422:8

**indicated** [18] - 157:5, 177:9, 188:19, 209:23, 210:3, 318:25, 324:9, 327:19, 328:19, 329:25, 334:7, 356:8, 392:8, 400:9, 403:14, 406:6, 407:20, 422:5

**indicates** [3] - 185:20, 338:19, 342:25

**indicating** [10] - 161:25, 206:21, 214:17, 266:8, 275:17, 314:23, 327:10, 395:8, 419:21, 420:12

**indications** [2] - 391:6, 393:20

**indicative** [3] - 295:17, 297:17, 335:19

**indicator** [2] - 393:14, 417:6

**indicted** [1] - 281:11

**Indictment** [1] - 357:20

**individual** [9] - 266:13, 306:13, 333:18, 334:4, 339:4, 374:14, 417:19, 426:12, 426:18

**individuals** [3] - 266:9, 269:9, 330:21

**infant** [4] - 369:3, 369:6, 381:20, 381:21

**infants** [4] - 380:23, 384:2, 384:3, 384:5

**infarction** [1] - 405:25

**infection** [3] - 295:18, 306:11, 416:21

**infections** [3] - 416:18, 416:20, 417:6

**inference** [4] - 236:5, 236:16, 236:20, 284:11

**inferences** [2] - 364:21, 364:25

**inflammation** [1] - 336:3

**inflammatory** [2] - 324:25, 336:4

**inflict** [2] - 361:20, 398:12

**inflicted** [5] - 195:11, 195:13, 358:22, 358:25, 375:10

**inform** [1] - 256:17

**information** [25] - 198:24, 199:2, 246:4, 267:7, 268:14, 268:17, 327:16, 327:19, 327:22, 329:24, 332:3, 362:16, 374:15, 381:10, 382:25, 385:5, 401:5, 401:11, 401:14, 401:18, 402:1, 402:9, 402:23, 403:2, 422:1

**informed** [1] - 257:25

**ingrained** [1] - 412:2

**initial** [9] - 188:24, 198:25, 200:1, 295:7, 323:16, 324:8, 333:2, 337:1, 360:1

**initiated** [1] - 250:8

**injured** [4] - 249:1, 396:18, 399:4, 421:11

**injuries** [111] - 177:9, 180:6, 182:8, 182:18, 185:3, 194:2, 194:11, 194:12, 194:21, 195:3, 195:4, 195:11, 195:15, 196:1, 197:23, 205:12, 208:11, 208:20, 208:21, 208:22, 208:23, 208:24, 209:4, 209:5, 209:22, 210:9, 210:11, 210:15, 219:23, 242:17, 248:21, 249:3, 270:11, 289:15, 291:4, 293:18, 293:20, 295:5, 296:9, 298:19, 298:23, 299:7, 300:14, 300:23, 301:7, 304:11, 304:15, 313:5, 326:11, 326:12, 330:8, 331:8, 331:25, 333:6, 333:8, 333:24, 334:24, 335:15, 335:18, 335:22, 337:4, 338:7, 338:12, 339:17, 339:19, 341:21, 355:21,

356:9, 358:22, 359:5, 364:4, 365:16, 371:22, 372:17, 373:6, 373:9, 373:16, 373:22, 373:25, 375:10, 377:10, 378:25, 379:2, 379:14, 388:13, 388:22, 388:24, 389:2, 389:6, 389:17, 391:8, 394:23, 395:2, 397:19, 397:24, 403:11, 408:3, 410:11, 410:16, 410:19, 410:23, 411:8, 411:17, 412:15, 413:15, 413:20, 414:10, 414:25, 415:3

**Injuries** [1] - 340:19

**injury** [115] - 169:4, 172:3, 179:4, 179:6, 181:11, 182:19, 182:20, 182:21, 183:4, 183:7, 183:11, 183:15, 183:17, 184:2, 194:24, 194:25, 195:1, 195:18, 196:11, 196:13, 196:16, 206:7, 206:19, 208:7, 208:13, 208:14, 208:18, 209:2, 209:3, 209:13, 210:17, 235:15, 289:3, 293:2, 293:7, 296:15, 298:7, 299:10, 299:16, 299:19, 299:23, 301:25, 302:7, 302:13, 303:7, 323:19, 324:2, 326:7, 326:20, 326:25, 332:4, 333:1, 335:19, 338:14, 339:21, 340:4, 342:21, 359:17, 359:22, 361:11, 363:8, 364:11, 372:1, 372:3, 372:5, 372:8, 372:12, 372:18, 372:19, 373:17, 373:19, 375:1, 375:3, 377:24, 378:10, 378:11, 379:8, 379:11, 379:12, 384:20, 385:19, 387:19, 388:13, 388:17, 390:11, 390:12, 394:24, 397:1, 397:9, 397:16, 397:17, 399:21, 398:22,

404:2, 404:5, 406:6, 406:7, 406:8, 407:17, 408:9, 408:10, 408:12, 408:16, 408:19, 408:22, 409:18, 409:23, 410:15, 411:11, 412:7, 421:4
**inquiry** [1] - 252:3
**inside** [18] - 180:4, 180:6, 180:12, 181:20, 183:9, 295:16, 295:17, 295:20, 296:3, 298:9, 298:12, 298:13, 331:11, 331:19, 332:2, 336:16, 338:21, 397:16
**instance** [4] - 197:14, 252:19, 300:1, 356:14
**instances** [2] - 282:19, 377:24
**instead** [2] - 307:2, 364:21
**Institute** [1] - 369:5
**institution** [2] - 318:5, 318:6
**instruct** [1] - 350:3
**instructed** [1] - 253:18
**instruction** [12] - 173:20, 219:9, 219:12, 280:25, 281:24, 284:18, 284:24, 285:4, 285:5, 312:18, 312:20, 350:2
**instructions** [7] - 219:10, 284:23, 284:25, 285:3, 350:1, 423:22, 423:24
**intended** [1] - 232:17
**intensive** [2] - 293:17, 294:7
**intensivist** [1] - 295:23
**intent** [1] - 387:9
**intentional** [3] - 356:6, 357:6, 426:3
**interacted** [1] - 231:8
**interaction** [1] - 229:22
**interest** [1] - 410:13
**interested** [2] - 321:3, 336:15
**internal** [4] - 178:13, 330:6, 411:8, 412:16
**internally** [3] - 335:25, 410:16, 410:23

**Internet** [1] - 186:3
**internship** [3] - 287:20, 287:22, 318:19
**interpret** [2] - 196:4, 371:15
**interpretation** [3] - 296:2, 324:5, 371:20
**interrupt** [1] - 219:8
**interval** [9] - 302:11, 302:12, 329:1, 329:5, 329:7, 329:14, 371:2, 375:6
**intervene** [1] - 279:20
**interview** [9] - 169:11, 276:9, 276:12, 276:16, 276:18, 359:10, 359:11, 360:2, 401:25
**interviewed** [1] - 358:4
**intoxicated** [1] - 374:19
**intracranial** [3] - 403:11, 404:6, 404:9
**introduce** [12] - 184:18, 189:18, 305:19, 309:11, 317:20, 322:7, 347:1, 347:6, 350:19, 366:20, 390:22, 424:25
**introduced** [2] - 361:22, 424:18
**introducing** [1] - 391:22
**intubated** [1] - 265:8
**investigated** [2] - 252:5, 372:23
**investigation** [7] - 252:1, 252:3, 252:6, 369:4, 374:6, 374:13, 375:8
**investigations** [1] - 257:16
**investigator** [2] - 367:15, 369:5
**involve** [1] - 179:1
**involved** [10] - 186:9, 187:9, 207:11, 207:15, 218:4, 250:6, 291:23, 292:25, 296:24, 335:14
**involvement** [1] - 369:17
**involves** [2] - 280:11, 387:12
**involving** [3] - 252:9, 252:11, 373:3

**Iowa** [4] - 367:11, 367:23, 367:24, 368:7
**Iraq** [1] - 212:13
**iron** [10] - 336:9, 336:10, 336:14, 336:15, 336:21, 336:23, 344:19, 411:2
**ischemia** [1] - 333:1
**Island** [1] - 288:24
**issue** [19] - 158:5, 163:24, 164:18, 173:1, 173:18, 173:25, 220:9, 247:5, 284:6, 285:17, 313:16, 371:5, 373:16, 373:21, 386:19, 391:25, 394:12, 398:24, 426:13
**issued** [1] - 387:13
**issues** [3] - 176:4, 304:14, 307:11
**issuing** [1] - 371:2
**items** [1] - 321:21
**itself** [3] - 178:17, 252:24, 363:18

**J**

**jackets** [1] - 175:4
**jail** [2] - 251:13, 251:18
**January** [43] - 158:7, 173:5, 177:14, 177:16, 191:23, 191:25, 231:19, 232:7, 237:18, 238:6, 238:13, 239:10, 242:25, 243:14, 244:16, 248:22, 249:4, 254:12, 255:25, 264:21, 276:10, 284:14, 293:9, 294:5, 296:22, 300:24, 307:10, 309:22, 310:20, 311:13, 326:1, 326:4, 345:10, 351:14, 353:12, 355:23, 357:7, 388:17, 396:19, 400:16, 410:6, 416:2, 426:2
**Jay** [1] - 155:22
**Jill** [1] - 156:14
**job** [7] - 188:23, 196:4, 205:19, 212:17, 293:7, 306:5, 306:12
**joint** [1] - 238:21

**joke** [1] - 246:12
**Journal** [3] - 406:20, 406:25, 407:11
**Jr** [1] - 425:20
**Judge** [7] - 155:16, 158:3, 167:15, 196:5, 230:16, 247:11, 282:5
**judge** [1] - 259:13
**judgment** [5] - 258:15, 258:16, 355:15, 357:8, 364:15
**juggle** [1] - 374:15
**JULY** [2] - 155:7, 157:1
**July** [8] - 155:12, 218:3, 218:20, 309:21, 309:23, 310:19, 406:21, 407:1
**June** [1] - 213:16
**jurisdiction** [1] - 186:2
**jurors** [1] - 348:22
**jury** [108] - 157:3, 168:14, 169:2, 173:20, 174:9, 174:22, 174:24, 175:11, 176:22, 176:25, 183:6, 185:9, 188:11, 190:3, 190:6, 194:15, 196:5, 199:1, 219:9, 234:24, 235:1, 237:13, 237:14, 245:9, 248:3, 248:12, 248:13, 248:14, 253:15, 253:16, 253:17, 261:4, 261:14, 271:12, 271:17, 271:20, 272:3, 272:4, 281:23, 281:24, 284:11, 284:16, 284:22, 284:25, 285:1, 285:2, 285:7, 285:12, 286:18, 286:19, 286:20, 305:19, 309:16, 311:4, 315:16, 317:21, 320:5, 330:4, 344:1, 344:2, 346:18, 348:6, 349:2, 349:19, 350:20, 355:5, 355:8, 355:9, 355:10, 356:12, 356:23, 357:7, 357:17, 362:11, 362:22, 363:25, 364:20, 364:24, 365:1, 365:2, 365:4, 365:6, 365:20, 366:10, 366:11, 366:21, 367:21,
**jury's** [1] - 261:13

**K**

**Keeble** [1] - 306:1
**keep** [13] - 174:12, 233:5, 233:20, 234:23, 248:10, 267:15, 271:24, 282:7, 290:7, 348:13, 350:7, 355:6, 386:19
**Kenneth** [2] - 317:14, 317:22
**KENNETH** [1] - 317:15
**kept** [4] - 278:13, 308:11, 308:13, 308:24
**KHOROOSI** [172] - 164:16, 168:5, 170:10, 170:22, 171:11, 172:11, 172:16, 174:6, 174:17, 184:19, 186:23, 189:20, 189:25, 190:9, 192:18, 199:18, 200:12, 201:17, 202:21, 204:12, 204:14, 204:25, 205:4, 206:22, 210:20, 217:18, 225:17, 234:19, 236:9, 236:21, 245:16, 245:18, 247:11, 248:19, 249:3, 249:18, 249:23, 250:5, 250:10, 250:22, 251:5, 253:14, 253:22, 253:23, 255:1, 255:3, 255:9, 255:12, 256:25, 257:21, 257:25, 258:6, 258:10, 258:12, 258:22, 259:2, 259:8, 259:13,

373:13, 374:24, 378:7, 380:3, 380:7, 383:14, 386:14, 386:18, 386:22, 386:23, 386:24, 390:5, 396:14, 396:15, 417:16, 419:2, 420:11, 423:9, 423:11, 423:12, 424:23
**JURY** [1] - 155:14
**Jury** [4] - 155:16, 190:4, 190:7, 234:25

259:16, 259:24, 261:17, 262:1, 262:22, 267:21, 268:1, 268:24, 269:1, 270:4, 270:12, 270:21, 271:1, 277:11, 277:15, 278:1, 279:25, 281:2, 284:3, 284:9, 290:10, 304:6, 304:8, 305:6, 309:12, 311:23, 312:7, 312:12, 312:17, 315:7, 315:11, 316:23, 317:9, 322:8, 343:20, 344:4, 344:22, 345:13, 345:20, 346:14, 346:17, 347:9, 347:16, 348:4, 348:10, 348:15, 348:19, 348:25, 349:6, 349:9, 349:13, 349:16, 350:12, 350:18, 352:22, 353:7, 354:13, 355:1, 355:14, 363:5, 363:13, 365:23, 366:4, 366:8, 366:13, 366:19, 368:19, 368:23, 370:25, 375:21, 377:7, 380:2, 380:5, 381:12, 382:9, 382:14, 383:4, 383:7, 383:9, 383:12, 385:8, 385:20, 385:22, 386:2, 386:6, 386:11, 388:6, 388:12, 391:4, 391:12, 394:15, 394:21, 396:17, 397:8, 399:10, 399:20, 407:6, 415:16, 417:25, 418:3, 418:19, 419:12, 420:2, 421:13, 422:25, 423:16, 423:19, 424:6, 424:9, 424:12, 424:14, 424:23, 425:18, 426:10
**Khoroosi** [13] - 156:3, 156:3, 170:9, 253:21, 261:11, 281:1, 387:14, 387:20, 388:5, 391:3, 407:23, 423:14, 426:17
**Khoroosi's** [1] - 426:23
**kid** [6] - 198:24, 200:2, 203:1, 302:12, 353:25, 384:24

**kid's** [1] - 210:15
**kids** [23] - 179:22, 201:14, 210:12, 210:15, 252:4, 284:13, 295:2, 298:1, 299:14, 299:20, 301:19, 301:21, 302:1, 302:2, 302:3, 302:6, 302:17, 302:19, 352:5, 362:5, 392:14
**kids'** [2] - 297:25, 298:1
**killed** [3] - 359:1, 405:10, 405:12
**killing** [1] - 304:1
**kind** [36] - 173:3, 173:6, 173:7, 180:13, 181:5, 182:14, 183:9, 185:13, 192:21, 198:25, 227:13, 228:24, 231:5, 246:12, 252:1, 257:12, 265:6, 267:14, 271:24, 281:19, 281:20, 281:21, 283:24, 285:19, 295:19, 299:19, 302:7, 302:14, 338:22, 339:1, 339:21, 359:16, 359:22, 360:3, 385:19, 423:6
**kinds** [1] - 291:23
**kitchen** [5] - 345:9, 347:4, 352:4, 353:15, 401:7
**Kitzingen** [1] - 212:12
**Knapp** [2] - 276:10, 276:18
**knocking** [1] - 397:15
**knowledge** [4] - 370:4, 370:6, 381:24, 381:25
**known** [2] - 306:19, 306:21
**knows** [4] - 176:25, 283:20, 361:16, 375:7
**knuckles** [1] - 413:22

## L

**lab** [1] - 416:1
**Laboratory** [1] - 367:6
**laboratory** [1] -

319:11
**lack** [6] - 173:17, 219:22, 283:3, 284:10, 313:4, 375:25
**land** [2] - 300:11, 331:19
**landing** [1] - 328:12
**LaPointe** [6] - 272:14, 272:21, 272:24, 275:8, 285:15, 286:14
**large** [7] - 197:22, 297:13, 371:14, 392:11, 392:18, 395:16, 426:14
**larger** [3] - 341:6, 380:23, 392:15
**Las** [1] - 289:19
**laser** [1] - 177:5
**last** [20] - 189:3, 231:18, 238:7, 238:14, 251:24, 253:18, 253:19, 259:22, 262:6, 264:2, 267:8, 274:4, 305:22, 309:21, 335:6, 350:22, 369:24, 401:6, 422:2, 424:5
**late** [11] - 226:23, 307:11, 307:15, 307:19, 307:22, 307:23, 310:7, 310:20, 355:24, 362:3, 363:22
**lateral** [1] - 181:6
**latest** [1] - 349:1
**law** [14] - 188:21, 235:25, 252:14, 292:25, 319:16, 320:1, 320:4, 320:18, 320:21, 321:2, 321:4, 400:10, 401:5, 401:25
**Law** [1] - 156:3
**Lawrence** [1] - 155:16
**lawyers** [1] - 289:24
**lay** [1] - 177:10
**layers** [1] - 295:13
**laying** [2] - 240:14, 265:9
**leading** [2] - 359:10, 360:7
**leads** [1] - 387:21
**learned** [6] - 407:7, 411:13, 411:15, 411:23, 411:25, 412:1
**leash** [1] - 362:2
**least** [15] - 169:18, 169:19, 178:9, 183:8, 195:6, 195:7, 326:21,

328:20, 333:23, 335:5, 374:6, 388:18, 391:11, 404:17, 410:23
**leave** [16] - 174:12, 187:12, 232:1, 233:8, 245:2, 307:24, 308:6, 309:18, 309:25, 310:5, 310:12, 310:13, 310:19, 310:21, 423:7, 425:24
**leaving** [4] - 219:14, 310:7, 312:22
**lecture** [3] - 320:3, 321:2, 321:7
**lectured** [1] - 291:6
**lectures** [2] - 320:1, 322:12
**lecturing** [1] - 291:25
**led** [3] - 219:23, 313:5, 318:1
**left** [24] - 169:22, 176:4, 177:2, 181:19, 190:4, 195:23, 196:15, 230:1, 234:25, 237:17, 248:13, 272:3, 297:11, 298:7, 298:22, 323:17, 331:16, 333:9, 333:14, 355:9, 362:25, 372:10, 386:23, 423:11
**left-hand** [1] - 177:2
**legal** [1] - 393:22
**length** [7] - 204:2, 204:8, 204:22, 205:9, 380:11, 383:16, 399:11
**less** [18] - 208:2, 324:20, 325:16, 326:22, 332:12, 339:7, 339:11, 339:15, 339:17, 360:2, 360:12, 373:4, 374:2, 374:20, 378:14, 397:17, 418:21, 422:10
**Less** [1] - 340:16
**lesser** [1] - 411:10
**lessor** [1] - 388:25
**lethal** [1] - 376:12
**lethargic** [4] - 352:10, 377:8, 396:23, 404:2
**level** [2] - 267:2, 376:24
**levels** [2] - 416:4, 416:7
**license** [2] - 288:12,

368:6
**licensed** [5] - 318:12, 318:13, 319:1, 321:11, 368:5
**licenses** [1] - 368:7
**lie** [1] - 295:5
**lies** [1] - 345:22
**life** [20] - 166:4, 202:23, 210:12, 213:13, 218:2, 218:5, 222:16, 231:2, 231:19, 243:18, 244:14, 244:16, 244:23, 245:10, 245:11, 245:12, 297:2, 297:5, 356:6, 370:3
**Life** [1] - 240:23
**light** [2] - 357:16, 365:18
**likelihood** [1] - 397:10
**likely** [15] - 173:22, 210:6, 210:8, 219:16, 312:24, 325:16, 378:25, 379:11, 388:19, 389:5, 398:25, 409:18, 409:22, 415:8, 421:12
**likewise** [1] - 322:19
**limine** [4] - 247:5, 247:18, 251:9, 252:12
**limited** [2] - 173:19, 219:11
**limiting** [4] - 173:20, 280:25, 284:18, 312:20
**limp** [1] - 328:23
**line** [2] - 385:4, 420:6
**linear** [3] - 327:25, 328:1, 340:4
**linebacker** [1] - 377:20
**lines** [5] - 316:1, 319:8, 329:16, 380:18, 381:5
**Lingering** [1] - 406:22
**linoleum** [1] - 327:21, 345:11, 421:4
**lip** [1] - 202:6
**list** [3] - 187:20, 242:13, 323:1
**listed** [8] - 290:16, 290:20, 310:1, 322:14, 322:19, 342:20, 342:22, 400:19
**lists** [3] - 188:3, 303:20, 321:21

literally [3] - 352:25, 359:2, 380:13
literature [21] - 208:9, 296:12, 296:14, 301:18, 301:24, 327:23, 328:8, 328:15, 329:13, 329:19, 330:19, 339:5, 339:8, 339:10, 339:13, 339:16, 339:24, 340:10, 342:3, 372:13, 420:20
live [19] - 165:6, 165:7, 166:5, 211:16, 263:9, 263:10, 273:2, 273:3, 274:1, 274:6, 274:21, 275:1, 276:19, 287:6, 313:25, 314:1, 314:10, 314:15, 351:21
lived [8] - 165:16, 256:15, 274:17, 274:19, 274:21, 277:23, 281:9, 363:23
lives [5] - 256:18, 256:19, 256:20, 274:5, 362:4
living [7] - 166:12, 179:1, 227:22, 253:6, 256:13, 275:5, 350:24
load [1] - 427:7
located [5] - 180:9, 180:14, 180:25, 181:18, 194:5
location [1] - 341:25
log [1] - 288:8
long-term [1] - 340:5
look [68] - 187:11, 195:16, 195:17, 195:18, 196:17, 217:21, 230:15, 250:22, 260:18, 264:18, 294:25, 295:4, 297:23, 298:3, 298:12, 298:13, 299:7, 299:16, 303:2, 311:5, 323:20, 325:14, 327:23, 328:16, 329:13, 329:19, 330:8, 330:23, 331:4, 331:7, 331:15, 331:23, 332:10, 333:8, 333:15, 334:14, 337:4, 339:17, 340:7, 341:6, 341:11, 341:12, 342:3, 342:19, 344:7,

344:10, 352:5, 356:18, 365:24, 368:13, 372:3, 372:6, 373:7, 373:10, 373:19, 374:1, 381:13, 383:16, 383:18, 390:14, 400:8, 415:3, 415:6, 415:8, 416:9, 418:12, 423:8, 424:4
looked [18] - 217:15, 296:5, 296:20, 319:8, 325:4, 325:5, 331:10, 331:11, 331:15, 352:13, 353:21, 353:22, 354:1, 354:4, 360:4, 373:24, 412:3, 414:20
looking [30] - 180:6, 183:10, 188:12, 190:10, 267:5, 269:21, 294:9, 296:22, 309:17, 309:18, 311:4, 319:6, 323:20, 326:11, 327:7, 333:19, 333:22, 339:18, 352:6, 372:5, 372:11, 372:17, 382:22, 384:24, 398:1, 403:19, 412:24, 420:25, 421:1
looks [9] - 185:12, 187:12, 196:12, 204:5, 205:5, 209:1, 209:3, 319:10, 372:5
loosely [1] - 170:12
lose [2] - 250:14, 252:2
lost [1] - 300:2
loud [5] - 157:16, 165:4, 211:12, 272:23, 313:22
love [3] - 235:7, 235:18, 236:13
loved [2] - 217:6, 236:17
loves [1] - 235:9
low [2] - 395:11, 416:7
lower [2] - 219:19, 313:1
lucid [7] - 302:11, 302:12, 328:25, 329:1, 329:5, 329:7, 329:14
lumps [1] - 278:6
lunch [6] - 271:9, 271:21, 272:1, 285:10, 310:7, 426:16

lungs [1] - 294:12
lying [2] - 206:11, 378:13
lymphocyte [3] - 416:5, 416:22, 417:5
lymphocytes [1] - 416:15

M

M.D [5] - 175:15, 286:24, 317:15, 366:15, 367:23
ma'am [15] - 157:13, 168:6, 212:25, 219:6, 222:5, 254:20, 255:4, 255:13, 269:13, 269:18, 271:2, 305:19, 305:21, 317:11, 355:2
macrophage [2] - 336:11, 336:13
macrophages [1] - 336:6
Madison [1] - 263:20
Maher [1] - 251:10
mail [1] - 207:24
main [3] - 281:6, 284:11, 362:23
maintaining [1] - 308:25
major [3] - 339:22, 373:16, 416:15
majority [7] - 175:11, 327:25, 398:19, 399:16, 411:18, 411:20, 426:20
makeup [1] - 217:6
malice [5] - 173:14, 356:5, 358:24, 359:3, 359:6
man [7] - 244:3, 265:17, 265:18, 283:6, 300:15, 356:2, 360:23
man's [1] - 185:11
management [2] - 306:7, 306:10
mandatorily [1] - 252:6
manner [7] - 188:3, 205:21, 237:1, 303:20, 312:20, 342:25, 374:13
manufacturer [1] - 381:21
Mario [69] - 156:7, 158:10, 158:13, 158:19, 159:7,

159:10, 160:13, 161:8, 161:22, 162:6, 162:10, 167:10, 167:13, 171:18, 199:24, 214:13, 215:6, 232:10, 233:9, 239:16, 239:22, 245:22, 246:18, 246:23, 249:7, 249:13, 253:24, 254:9, 254:13, 254:20, 255:22, 255:25, 259:25, 262:9, 262:15, 266:3, 267:4, 273:14, 274:11, 274:21, 275:6, 275:9, 275:16, 276:12, 276:19, 276:25, 277:16, 277:19, 277:23, 278:3, 281:9, 281:11, 281:14, 306:13, 306:16, 306:21, 307:15, 307:20, 307:21, 314:18, 315:23, 351:4, 351:21, 353:17, 353:23, 355:23, 356:25, 357:6
MARIO [1] - 155:7
Mario's [7] - 161:21, 199:9, 199:16, 223:21, 249:25, 309:18, 397:20
mark [13] - 159:16, 159:18, 169:22, 170:24, 176:7, 176:9, 176:19, 219:14, 219:15, 255:22, 310:15, 312:22
marked [18] - 163:6, 176:14, 176:20, 176:25, 184:9, 189:3, 192:13, 192:17, 204:15, 225:1, 290:1, 308:20, 310:18, 321:19, 322:3, 342:14, 368:12, 382:3
Market [4] - 226:25, 227:10, 228:1, 228:7
marking [2] - 176:21, 382:13
marks [8] - 159:1, 159:2, 260:15, 311:9, 316:1, 316:3, 316:16
married [9] - 157:22, 165:8, 211:18, 263:11, 264:11, 273:16, 274:15, 276:25, 314:2

massive [2] - 302:7, 388:25
Master's [1] - 263:19
matchstick [2] - 299:5, 299:13
matchsticks [1] - 299:14
material [7] - 173:1, 281:18, 285:17, 371:12, 374:3, 374:7, 400:14
materials [6] - 322:23, 344:7, 369:22, 389:10, 400:10, 400:22
matter [19] - 180:10, 181:24, 181:25, 182:1, 195:19, 207:10, 207:17, 235:9, 235:24, 236:2, 248:9, 250:11, 252:7, 404:16, 415:8, 425:18, 425:25, 426:24
matters [1] - 174:7
McGee [11] - 184:25, 185:4, 185:5, 185:10, 185:21, 186:9, 186:25, 192:3, 193:25, 208:5, 297:7
McGee's [1] - 185:13
mean [24] - 164:15, 171:9, 172:11, 185:11, 191:7, 201:15, 205:18, 209:6, 209:16, 251:3, 252:24, 259:10, 284:6, 297:16, 303:14, 337:25, 349:3, 364:6, 364:7, 385:16, 385:22, 411:20, 413:17
meaning [8] - 183:15, 194:4, 194:6, 325:22, 328:14, 329:14, 336:3, 380:22
means [18] - 194:17, 252:4, 264:3, 291:19, 324:3, 324:22, 325:16, 325:21, 328:25, 329:1, 332:23, 333:17, 335:14, 340:5, 358:14, 408:14, 408:16, 409:17
measurable [1] - 395:15
measure [3] - 380:13, 380:21, 395:8
measured [1] - 425:3

**measuring** [2] - 261:21, 380:14

**mechanics** [3] - 293:6, 300:6, 300:12

**Medical** [13] - 190:24, 191:14, 207:8, 318:9, 319:20, 320:7, 320:9, 323:12, 324:10, 327:4, 329:24, 368:3, 400:18

**medical** [86] - 183:13, 183:22, 184:25, 186:18, 187:14, 196:4, 198:5, 198:6, 198:8, 198:9, 198:13, 198:20, 198:21, 198:22, 198:23, 199:6, 199:8, 205:24, 205:25, 256:20, 257:3, 258:2, 259:15, 259:16, 287:16, 288:12, 289:20, 292:1, 292:9, 292:10, 292:24, 293:1, 293:4, 300:23, 302:3, 304:18, 304:20, 308:14, 309:2, 317:23, 318:18, 320:2, 320:3, 320:11, 320:15, 320:16, 322:17, 323:7, 323:8, 334:3, 334:14, 334:16, 335:25, 343:6, 343:14, 356:16, 358:6, 360:17, 363:14, 369:13, 369:23, 369:24, 370:1, 370:5, 379:14, 384:22, 389:20, 389:22, 390:9, 390:12, 392:5, 392:25, 393:12, 393:14, 393:20, 394:10, 396:1, 398:14, 399:4, 400:15, 402:22, 408:6, 415:23

**medical-type** [1] - 308:14

**medically** [2] - 358:11, 409:2

**medications** [1] - 294:16

**medicine** [11] - 287:21, 287:24, 288:5, 288:7, 289:10, 290:24, 291:16, 318:13, 319:1, 319:16, 368:5

**Medicine** [5] - 289:11, 289:23, 318:4, 367:3, 369:2

**meet** [7] - 215:5, 215:10, 227:16, 228:1, 352:2, 361:8, 364:14

**member** [6] - 190:23, 268:6, 289:20, 289:22, 319:17, 319:19

**members** [2] - 241:20, 265:20

**membrane** [2] - 323:22, 337:21

**Memorial** [1] - 306:1

**memory** [1] - 192:15

**Memphis** [1] - 320:8

**mental** [2] - 263:25, 264:7

**mention** [4] - 199:24, 284:19, 378:6, 387:17

**mentioned** [16] - 167:7, 179:8, 179:15, 181:23, 183:3, 186:2, 186:7, 192:21, 199:25, 208:21, 236:17, 261:10, 285:16, 333:11, 338:18, 374:23

**Mertz** [18] - 169:10, 235:13, 246:7, 246:15, 359:7, 359:8, 361:5, 363:3

**Mertz'** [1] - 280:19

**message** [4] - 246:18, 250:25, 254:20, 254:22

**messages** [3] - 254:21, 254:24, 255:11

**messed** [1] - 353:4

**met** [6] - 264:12, 351:7, 351:10, 351:14, 355:17, 357:5

**methods** [1] - 389:9

**Michael** [2] - 185:21, 213:20

**microphone** [2] - 249:2, 380:9

**microscope** [7] - 181:11, 181:21, 195:17, 209:1, 325:5, 372:6, 372:11

**microscopic** [7] - 180:22, 181:15, 188:25, 344:10, 369:21, 371:4, 400:7

**mid** [1] - 234:21, 333:9, 333:12,

362:24, 367:18

**mid-forehead** [1] - 362:24

**mid-morning** [1] - 234:21

**middle** [4] - 181:18, 359:11, 376:10, 391:20

**Midwest** [1] - 360:8

**might** [20] - 159:21, 208:12, 249:20, 272:11, 283:7, 286:9, 293:6, 293:21, 295:5, 335:5, 373:17, 378:14, 384:20, 388:17, 391:25, 396:6, 408:21, 411:4, 414:16

**mild** [1] - 396:24

**miles** [3] - 362:4, 363:11, 363:13

**military** [2] - 212:3, 275:5

**militate** [1] - 170:12

**MILLER** [84] - 175:25, 176:22, 176:24, 184:17, 184:22, 185:5, 185:15, 185:17, 186:21, 187:19, 188:8, 188:10, 189:18, 189:22, 199:12, 200:6, 201:11, 202:17, 205:2, 207:1, 210:18, 210:23, 305:13, 305:18, 308:17, 308:19, 309:10, 309:15, 310:23, 311:1, 311:21, 317:14, 317:19, 321:16, 321:18, 322:6, 322:10, 343:17, 344:24, 368:21, 370:22, 375:16, 377:4, 381:7, 382:11, 384:25, 385:4, 385:13, 387:7, 389:12, 389:14, 391:24, 392:3, 392:7, 392:10, 392:12, 392:14, 392:17, 392:20, 392:23, 392:25, 393:3, 393:5, 393:7, 393:9, 393:11, 393:16, 393:18, 393:24, 394:2, 394:5, 394:9, 397:4, 399:7, 399:24, 407:10, 415:10, 415:13,

418:16, 419:10, 419:24, 421:16, 422:23, 426:12

**Miller** [2] - 155:22, 415:17

**Miller's** [1] - 252:4

**milliliter** [2] - 324:20, 332:12

**million** [7] - 256:10, 302:1, 303:17, 339:15, 339:18, 360:11, 360:13

**Million** [1] - 340:17

**mind** [12] - 184:3, 184:5, 226:24, 234:23, 236:13, 240:3, 248:10, 271:25, 281:23, 327:17, 355:6, 386:19

**minimal** [1] - 198:24

**Minnehaha** [3] - 317:23, 367:9, 367:12

**Minnesota** [6] - 186:5, 287:7, 288:15, 367:11, 368:7, 400:18

**minor** [3] - 182:15, 182:16, 425:25

**minute** [4] - 215:5, 232:6, 249:16, 346:1

**minutes** [10] - 174:19, 187:22, 190:3, 195:19, 196:10, 234:22, 307:16, 343:21, 358:9

**misinformation** [1] - 402:7

**Miss** [11] - 245:19, 249:13, 249:25, 250:14, 250:25, 253:24, 259:3, 269:2, 310:10, 316:24, 365:24

**miss** [3] - 270:7, 309:16, 311:2

**missed** [4] - 176:15, 259:4, 393:5, 394:17

**missing** [1] - 233:15

**misstatement** [1] - 377:4

**mistake** [5] - 169:17, 280:13, 283:4, 284:10, 427:1

**misunderstanding** [2] - 168:19, 176:18

**misunderstood** [1] - 168:11

**Mobile** [2] - 318:4, 318:23

**mom** [12] - 160:4, 160:8, 162:19,

221:22, 222:2, 224:15, 235:17, 273:16, 274:15, 274:17, 276:24, 277:5

**mom's** [4] - 171:24, 273:10, 273:24, 277:3

**moment** [7] - 197:22, 199:14, 234:20, 247:17, 261:3, 353:1, 415:10

**Mommy** [3] - 235:7, 235:18, 236:13

**mommy** [1] - 235:9

**Monday** [9] - 239:10, 242:5, 242:24, 264:21, 265:19, 307:8, 307:9, 326:1, 404:24

**Mongolian** [7] - 159:22, 170:16, 170:18, 260:22, 260:24, 261:21, 262:7

**monitor** [1] - 307:17

**monkey** [1] - 300:1

**month** [10] - 179:9, 186:14, 191:5, 191:6, 191:10, 191:15, 207:10, 208:2, 215:21, 218:17

**months** [18] - 158:9, 160:20, 161:4, 166:15, 169:21, 173:5, 191:15, 192:25, 207:13, 207:18, 218:2, 218:21, 224:8, 262:8, 262:11, 297:5, 360:21, 380:16

**Moorhead** [1] - 287:7

**moot** [2] - 390:24, 390:25

**morning** [50] - 157:5, 158:22, 159:12, 168:1, 168:3, 171:23, 172:1, 175:2, 175:18, 175:20, 176:3, 177:1, 190:10, 199:4, 220:14, 221:2, 221:5, 221:7, 231:9, 231:15, 234:21, 239:13, 242:5, 245:19, 245:20, 256:3, 260:16, 265:19, 269:2, 271:14, 277:16, 280:9, 282:11, 282:14, 283:8, 291:9, 348:16, 349:1, 362:6, 362:8, 388:16, 404:24, 414:13, 423:9,

423:25, 425:22, 426:1, 426:21

**most** [15] - 165:18, 223:5, 302:4, 325:16, 334:8, 340:3, 341:15, 342:3, 357:16, 365:18, 372:4, 372:7, 392:14, 403:14, 404:17

**mostly** [1] - 277:20

**mother** [21] - 157:24, 165:12, 169:23, 169:25, 170:1, 230:20, 234:6, 236:18, 247:21, 248:1, 251:11, 251:16, 258:4, 258:8, 258:21, 258:22, 259:3, 259:4, 279:19, 314:6, 365:13

**mother's** [1] - 360:19

**motion** [12] - 247:5, 251:9, 252:12, 280:7, 282:2, 299:19, 348:5, 348:9, 355:12, 365:20, 424:15, 426:6

**motions** [1] - 247:18

**motive** [2] - 361:17, 363:17

**motives** [2] - 363:18, 363:21

**motor** [3] - 182:22, 332:19, 373:18

**mouth** [1] - 402:16

**Move** [1] - 249:2

**move** [15] - 176:3, 178:11, 184:17, 189:18, 274:3, 309:10, 322:6, 329:23, 350:9, 355:15, 357:8, 368:19, 369:17, 380:21, 383:4

**moved** [5] - 174:14, 274:4, 277:5, 277:7, 320:10

**movement** [1] - 332:19

**moving** [3] - 282:7, 348:13, 350:7

**MR** [379] - 157:7, 157:12, 163:2, 163:4, 163:23, 164:5, 164:8, 164:11, 164:16, 164:17, 164:20, 164:25, 167:18, 168:5, 168:11, 168:19, 168:23, 169:3, 169:8, 170:10, 170:22, 171:11,

172:11, 172:16, 174:4, 174:6, 174:13, 174:17, 175:25, 176:22, 176:24, 184:17, 184:19, 184:22, 185:5, 185:15, 185:17, 186:21, 186:23, 187:19, 188:8, 188:10, 189:18, 189:20, 189:22, 189:25, 190:9, 192:18, 199:12, 199:18, 200:6, 200:12, 201:11, 201:17, 202:17, 202:21, 204:12, 204:14, 204:25, 205:2, 205:4, 206:22, 207:1, 210:18, 210:20, 210:23, 211:3, 211:8, 217:17, 217:18, 217:20, 220:11, 220:12, 224:23, 224:25, 225:16, 225:17, 225:20, 225:22, 231:25, 232:4, 232:12, 232:16, 233:1, 234:19, 235:5, 235:22, 236:3, 236:7, 236:9, 236:21, 237:2, 237:5, 237:8, 237:16, 238:9, 238:12, 245:2, 245:6, 245:14, 245:16, 245:18, 246:25, 247:4, 247:11, 247:16, 248:19, 249:3, 249:18, 249:23, 250:5, 250:10, 250:22, 251:5, 251:8, 253:13, 253:14, 253:22, 253:23, 255:1, 255:3, 255:8, 255:9, 255:12, 256:22, 256:25, 257:8, 257:11, 257:21, 257:25, 258:6, 258:10, 258:11, 258:12, 258:22, 259:2, 259:8, 259:13, 259:16, 259:21, 259:24, 261:1, 261:10, 261:17, 262:1, 262:3, 262:5, 262:20, 262:22, 263:1, 263:6, 267:21, 268:1, 268:4, 268:22, 268:24, 269:1, 270:4, 270:6,

270:12, 270:17, 270:21, 270:24, 271:1, 271:5, 271:8, 271:15, 272:9, 272:19, 277:9, 277:11, 277:15, 278:1, 279:24, 279:25, 280:6, 281:2, 283:2, 284:3, 284:9, 284:19, 284:22, 286:14, 286:17, 286:23, 287:3, 290:2, 290:4, 290:9, 290:10, 290:12, 304:4, 304:6, 304:8, 305:6, 305:9, 305:13, 305:18, 308:17, 308:19, 309:10, 309:12, 309:15, 310:23, 311:1, 311:21, 311:23, 312:3, 312:7, 312:12, 312:17, 313:19, 315:7, 315:11, 315:19, 316:20, 316:23, 317:9, 317:10, 317:14, 317:19, 321:16, 321:18, 322:6, 322:8, 322:10, 343:17, 343:20, 344:4, 344:22, 344:24, 345:4, 345:8, 345:13, 345:16, 345:20, 345:24, 346:2, 346:11, 346:14, 346:17, 346:25, 347:9, 347:14, 347:16, 347:21, 348:1, 348:4, 348:10, 348:15, 348:19, 348:25, 349:6, 349:9, 349:13, 349:16, 350:12, 350:18, 352:18, 352:22, 353:7, 353:10, 354:13, 354:16, 354:25, 355:1, 355:14, 357:12, 363:5, 363:13, 365:23, 366:4, 366:8, 366:13, 366:19, 368:19, 368:21, 368:23, 370:22, 370:25, 375:16, 375:21, 377:4, 377:7, 380:2, 380:5, 381:7, 381:12, 382:9, 382:11, 382:14, 383:4, 383:7, 383:9, 383:12, 384:25, 385:4, 385:8,

385:13, 385:20, 385:22, 386:2, 386:6, 386:11, 387:7, 388:6, 388:12, 389:12, 389:14, 390:16, 390:19, 391:4, 391:12, 391:24, 392:3, 392:7, 392:10, 392:12, 392:14, 392:17, 392:20, 392:23, 392:25, 393:3, 393:5, 393:7, 393:9, 393:11, 393:16, 393:18, 393:24, 394:2, 394:5, 394:9, 394:15, 394:21, 396:17, 397:4, 397:8, 399:7, 399:10, 399:20, 399:24, 407:6, 407:10, 415:10, 415:13, 415:16, 417:25, 418:3, 418:16, 418:19, 419:10, 419:12, 419:24, 420:2, 421:13, 421:16, 422:23, 422:25, 423:16, 423:19, 424:2, 424:4, 424:6, 424:7, 424:9, 424:11, 424:12, 424:13, 424:14, 424:15, 424:18, 424:23, 425:16, 425:18, 426:10, 426:12, 426:22

**multifocal** [1] - 388:14

**Multiple** [1] - 406:22

**multiple** [17] - 181:12, 186:12, 197:11, 198:14, 200:1, 295:13, 296:20, 297:16, 297:17, 298:4, 298:15, 298:16, 335:18, 336:20, 355:19, 379:7, 412:17

**murder** [2] - 359:4, 359:5

**must** [9] - 172:25, 173:3, 220:2, 313:9, 346:23, 356:12, 391:16, 395:3, 395:4

**myocardial** [1] - 405:24

**N**

**nail** [1] - 283:2

**naked** [1] - 372:6

**name** [31] - 157:13, 160:6, 160:22, 165:1, 168:21, 179:18, 186:18, 211:9, 211:20, 213:19, 213:25, 214:4, 214:22, 227:20, 263:7, 263:8, 272:20, 273:10, 287:4, 305:20, 305:22, 305:23, 306:13, 313:20, 313:23, 317:22, 336:12, 340:11, 350:22, 351:23, 366:22

**named** [2] - 242:11, 314:24

**national** [2] - 288:10, 290:25

**National** [5] - 190:23, 191:1, 191:13, 207:8, 319:19

**Native** [2] - 217:24, 221:15

**natural** [1] - 273:24

**nature** [3] - 281:18, 281:21, 388:14

**near** [2] - 323:18, 375:5

**near-death** [1] - 375:5

**nearly** [2] - 401:25, 419:5

**Nebraska** [4] - 273:4, 274:1, 367:11, 368:7

**necessarily** [3] - 198:11, 376:12, 414:24

**necessary** [2] - 247:15, 319:13

**neck** [1] - 384:19

**need** [21] - 181:10, 190:12, 190:13, 192:24, 199:6, 203:6, 203:7, 207:25, 230:11, 239:11, 239:18, 245:21, 307:22, 347:21, 349:3, 352:6, 358:6, 371:4, 385:13, 405:15

**needed** [2] - 241:3, 316:9

**needs** [1] - 207:20

**negative** [1] - 259:17

**neglect** [2] - 247:14,

289:1
**neighborhood** [2] - 372:22, 373:2
**nerve** [4] - 181:23, 337:18, 337:19
**nerves** [1] - 295:14
**neurologic** [2] - 294:11, 388:15
**neurological** [1] - 340:5
**neurologically** [1] - 294:15
**neuron** [1] - 182:2
**neurons** [3] - 182:1, 182:6, 338:9
**neuropath** [1] - 193:13
**neuropathological** [14] - 176:2, 178:11, 178:15, 179:3, 179:7, 179:21, 182:25, 186:14, 193:3, 207:3, 207:23, 207:25, 337:11, 337:15
**neuropathologicall y** [1] - 420:25
**neuropathologist** [6] - 178:22, 178:23, 192:9, 193:1, 193:6, 197:21
**neuropathology** [6] - 192:5, 192:11, 192:19, 193:16, 207:12, 339:3
**neuroscience** [1] - 178:25
**neurosurgery** [1] - 296:17
**Neurotrauma** [3] - 406:21, 407:1, 407:11
**neutrophils** [3] - 416:16, 416:19, 416:21
**never** [12] - 177:24, 187:12, 360:18, 361:3, 361:7, 361:8, 361:9, 395:21, 407:13, 407:14, 411:19, 414:6
**new** [6] - 409:4, 409:7, 409:10, 409:14, 409:19, 409:23
**newer** [1] - 411:11
**news** [1] - 246:1
**next** [30] - 158:22, 159:12, 171:22, 171:23, 172:1, 177:8, 199:4, 211:2, 220:14, 221:2, 232:13,

233:22, 234:12, 255:7, 260:16, 262:25, 271:4, 271:9, 286:13, 286:22, 305:13, 312:2, 312:13, 317:13, 333:5, 333:7, 345:3, 348:11, 348:14
**NFL** [1] - 406:11
**nibble** [1] - 352:11
**nice** [7] - 157:15, 165:3, 211:12, 272:22, 313:22, 372:14, 398:9
**Night** [2] - 235:18, 236:13
**night** [33] - 158:21, 221:4, 234:1, 234:5, 234:11, 234:15, 235:6, 235:7, 235:13, 235:17, 235:18, 236:13, 237:18, 238:4, 238:6, 238:16, 243:4, 243:10, 351:13, 351:14, 351:19, 352:15, 353:11, 354:21, 359:15, 359:19, 359:23, 359:24, 360:25, 361:25, 365:13, 365:14, 404:24
**nights** [2] - 234:1, 354:21
**NINA** [2] - 164:21, 312:4
**Nina** [8] - 160:7, 164:20, 165:2, 165:3, 165:5, 312:3, 313:21, 313:24
**nine** [1] - 270:9
**Noah** [1] - 407:1
**nobody** [5] - 186:10, 186:11, 375:6, 410:16, 423:7
**nonaccidental** [4] - 289:3, 293:5, 335:19, 335:20
**nonacute** [1] - 208:18
**noncontributory** [1] - 377:11
**none** [6] - 194:12, 257:15, 343:13, 343:14, 355:20, 385:5
**nonetheless** [1] - 172:15
**nonexplainable** [1] - 293:3
**nonlethal** [1] - 389:2

**nonlife** - 388:18
**nonlife-threatening** [1] - 388:18
**nonmoving** [1] - 364:22
**normal** [18] - 192:6, 207:7, 235:12, 235:18, 236:3, 238:1, 245:13, 300:5, 308:13, 308:24, 329:15, 340:6, 353:25, 384:11, 416:22, 421:7, 421:18, 421:21
**normally** [3] - 340:6, 352:5, 362:7
**North** [14] - 186:8, 186:17, 199:7, 263:19, 274:21, 287:13, 287:17, 288:15, 318:9, 318:14, 320:7, 367:25, 368:3, 368:8
**NORTHERN** [1] - 155:3
**nose** [1] - 202:4
**note** [5] - 323:14, 324:18, 327:4, 337:14, 338:4
**noted** [14] - 170:17, 294:17, 297:14, 298:20, 324:2, 324:20, 333:10, 334:25, 337:17, 338:3, 339:2, 391:11
**notes** [1] - 423:7
**nothing** [19] - 207:6, 210:20, 242:21, 262:22, 271:1, 278:1, 298:10, 317:10, 334:19, 344:22, 385:15, 390:2, 396:21, 398:16, 399:20, 422:5, 422:8, 422:25, 424:13
**notice** [18] - 158:14, 220:16, 229:21, 295:10, 305:21, 352:8, 370:23, 385:6, 385:14, 387:9, 387:11, 387:13, 387:20, 388:2, 389:23, 393:21, 394:12, 394:22
**noticed** [16] - 158:19, 170:19, 171:2, 171:6, 171:23, 175:2, 197:6, 220:17, 220:25, 221:2, 221:4, 260:24, 262:14,

262:17, 330:5, 426:13
**noticing** [1] - 307:15
**November** [1] - 226:23
**nowhere** [2] - 356:15, 387:16
**nuclei** [1] - 181:25
**number** [37] - 161:12, 197:8, 201:6, 201:8, 223:13, 241:20, 241:24, 249:24, 255:8, 270:10, 273:20, 275:13, 283:6, 283:12, 290:13, 291:3, 292:1, 292:8, 292:19, 294:14, 296:9, 297:13, 298:23, 304:25, 326:6, 334:1, 335:8, 335:9, 335:11, 335:18, 336:20, 336:22, 345:9, 362:3, 369:14, 417:3
**numbers** [2] - 291:7, 301:22
**numerous** [2] - 178:20, 182:4
**nurses** [1] - 340:1

**O**

**oath** [2] - 175:19, 175:22
**object** [33] - 184:19, 202:17, 225:17, 246:25, 256:22, 270:12, 309:12, 315:11, 331:17, 370:22, 385:4, 390:1, 413:8
**objection** [41] - 174:15, 186:23, 187:17, 189:20, 199:12, 199:14, 200:6, 201:11, 205:2, 217:18, 234:19, 236:11, 237:1, 248:18, 257:11, 259:21, 261:7, 267:21, 268:1, 270:21, 290:10, 315:8, 315:13, 322:8, 345:23, 347:14, 352:18, 354:13, 368:21, 375:16, 377:4, 381:7, 382:11, 387:2, 387:5, 387:7, 397:4, 399:7, 407:6, 419:10, 419:24

**obligation** [1] - 238:18
**observation** [4] - 268:5, 294:11, 373:21, 376:8
**observational** [1] - 412:2
**observations** [3] - 267:24, 268:3, 270:18
**observe** [2] - 179:12, 179:13
**observed** [7] - 177:9, 179:17, 300:23, 330:6, 411:8, 412:2, 412:16
**observing** [1] - 325:12
**obtain** [1] - 382:15
**obviously** [4] - 172:9, 175:7, 259:11, 282:6
**occasional** [1] - 290:15
**occasionally** [1] - 409:6
**occasions** [3] - 246:8, 359:9, 373:22
**occipital** [5] - 194:1, 194:4, 194:5, 194:8
**occupation** [3] - 287:8, 366:23, 367:5
**occur** [2] - 289:4, 372:15
**occurred** [27] - 183:18, 194:21, 195:19, 198:1, 206:8, 235:2, 248:15, 272:5, 285:13, 293:7, 293:21, 327:1, 329:21, 345:18, 345:22, 346:12, 356:9, 356:11, 356:22, 372:3, 372:9, 375:1, 375:11, 386:25, 388:24, 397:24, 423:13
**occurring** [5] - 337:8, 346:7, 346:8, 388:18, 389:1
**occurs** [2] - 180:16, 182:5
**October** [1] - 320:23
**OF** [2] - 155:2, 155:5
**offense** [4] - 280:11, 346:7, 346:8, 361:19
**offenses** [1] - 283:18
**offer** [10] - 164:15, 205:1, 217:17, 225:16, 254:15, 277:10, 290:9,

293:19, 293:20, 382:9
  **offered** [8] - 172:19,
173:16, 173:17,
235:8, 235:23, 236:1,
236:2, 254:13
  **offering** [2] - 236:16,
236:19
  **office** [5] - 178:17,
187:12, 187:15,
189:12, 193:2,
193:24, 292:23,
322:22, 347:12
  **Office** [10] - 155:19,
155:23, 156:3, 318:9,
318:10, 320:7, 320:8,
324:10, 329:24, 368:2
  **officer** [2] - 306:11,
306:16
  **officers** [2] - 320:19,
320:22
  **official** [5] - 291:9,
296:2, 343:14,
381:23, 384:22
  **officially** [1] - 244:25
  **often** [14] - 166:2,
201:25, 278:23,
307:18, 307:20,
314:13, 372:10,
373:16, 376:23,
398:10, 405:9,
405:14, 409:6, 409:8
  **oftentimes** [1] -
297:24
  **old** [30] - 157:18,
165:23, 183:13,
195:6, 195:7, 201:16,
208:22, 211:14,
218:21, 224:8,
235:15, 262:8,
272:25, 277:24,
278:3, 281:10,
283:19, 326:22,
340:24, 359:17,
373:17, 373:23,
374:1, 409:5, 409:7,
409:11, 409:15,
409:20, 409:23
  **older** [15] - 194:3,
195:9, 195:10,
208:13, 209:1, 281:8,
281:12, 282:13,
283:14, 333:6, 373:6,
373:9, 408:16,
408:19, 411:11
  **once** [9] - 282:15,
282:16, 282:18,
321:6, 346:5, 363:18,
364:23, 415:2
  **one** [144] - 168:13,
169:19, 172:8, 172:9,

172:19, 176:20,
177:2, 185:6, 187:25,
189:3, 197:5, 197:18,
197:22, 200:1,
201:21, 204:1,
204:11, 204:17,
208:13, 219:11,
231:2, 246:23,
248:20, 249:24,
251:10, 255:4, 255:7,
256:8, 264:12, 266:9,
266:17, 268:9,
268:10, 271:13,
273:21, 281:6, 282:6,
284:19, 284:24,
288:14, 288:25,
294:14, 294:18,
296:24, 299:21,
302:1, 303:17, 307:3,
309:23, 310:15,
312:13, 319:10,
319:25, 323:11,
324:20, 328:3,
329:22, 330:11,
330:23, 331:8, 331:9,
331:10, 331:13,
331:15, 331:18,
331:21, 332:4, 332:5,
332:8, 332:9, 332:12,
332:16, 333:4,
333:12, 333:21,
333:22, 334:8,
334:11, 334:14,
335:12, 336:25,
337:5, 337:16,
338:11, 339:15,
339:18, 340:2,
340:13, 345:9, 347:3,
349:10, 349:16,
349:18, 349:23,
352:3, 356:19,
358:10, 360:7,
360:11, 360:13,
362:19, 362:24,
363:22, 365:16,
370:21, 371:2, 372:3,
372:7, 374:3, 374:4,
375:2, 375:4, 375:7,
378:6, 379:18,
382:24, 388:24,
393:3, 395:5, 405:3,
407:17, 407:24,
409:5, 409:19,
409:23, 411:11,
412:3, 413:1, 413:3,
413:16, 413:20,
414:12, 416:16,
416:19, 422:3, 425:18
  **One** [2] - 340:16
  **one-word** [3] - 268:9,
268:10, 362:19

ones [3] - 282:14,
331:12, 416:21
  **onset** [1] - 328:24
  **open** [10] - 157:2,
174:25, 177:24,
181:6, 234:23,
248:10, 271:25,
355:6, 386:19, 390:15
  **opened** [1] - 228:15
  **opening** [1] - 171:19
  **opine** [3] - 386:5,
386:6, 391:15
  **opinion** [5] - 179:2,
183:12, 183:21,
183:25, 184:1, 184:6,
185:1, 185:2, 185:10,
185:11, 185:13,
186:25, 194:3, 195:4,
196:11, 205:20,
206:7, 208:25, 286:3,
300:22, 301:2, 301:7,
301:11, 304:13,
334:3, 335:20,
357:23, 360:9, 370:8,
370:10, 370:16,
376:3, 383:1,
385:13, 386:4,
387:22, 388:1,
390:25, 391:1, 391:2,
391:4, 391:15,
391:19, 394:13,
394:15, 394:17,
396:10, 398:6, 400:6,
401:15, 402:20,
411:18
  **Opinion** [1] - 389:18
  **opinions** [4] - 185:3,
185:4, 391:17
  **opportunity** [4] -
322:11, 339:14,
342:11, 371:3
  **opposite** [1] - 358:12
  **optic** [2] - 337:17,
337:18
  **oral** [1] - 284:24
  **order** [13] - 170:12,
190:18, 192:24,
218:13, 226:5,
258:15, 282:3,
349:13, 350:8,
356:23, 374:11,
386:9, 391:23
  **ordered** [1] - 226:5
  **orders** [1] - 285:7
  **organ** [1] - 397:15
  **organization** [7] -
324:21, 324:22,
325:2, 325:3, 325:7,
325:10, 325:15
  **organizations** [1] -

319:18
  **original** [3] - 184:14,
189:15, 309:8
  **originally** [1] -
176:14
  **otherwise** [5] -
236:23, 246:24,
257:13, 388:17, 421:7
  **outlined** [2] - 221:25,
328:8
  **outlying** [1] - 302:1
  **Outside** [1] - 355:10
  **outside** [19] -
168:14, 294:25,
295:6, 297:23, 298:2,
298:10, 302:23,
331:10, 331:15,
331:18, 338:15,
338:20, 348:5, 355:4,
374:15, 375:3,
386:18, 397:19
  **outward** [1] - 298:8
  **overall** [1] - 158:2
  **overexposed** [4] -
163:10, 172:3, 225:7,
225:24
  **overhead** [1] -
188:13
  **overly** [5] - 173:3,
173:6, 285:21,
359:22, 359:23
  **overnight** [3] -
158:20, 233:20, 243:2
  **Overruled** [1] -
256:23
  **overruled** [20] -
187:17, 199:15,
200:11, 201:13,
202:19, 205:3,
225:19, 270:23,
309:14, 315:16,
315:18, 352:20,
354:15, 370:24,
375:18, 381:8, 397:6,
399:9, 419:11, 420:1
  **overseas** [1] -
212:14
  **overseeing** [1] -
306:9
  **overwhelmingly** [1] -
339:13
  **owed** [1] - 239:1
  **own** [12] - 204:4,
250:1, 267:23, 268:3,
268:5, 276:15,
276:16, 316:15,
361:11, 404:10, 425:5
  **oxygen** [4] - 324:3,
324:4, 324:6, 336:10
  **Oyate** [3] - 273:11,

273:12, 351:1

# P

  **p.m** [4] - 244:24,
285:13, 286:21,
427:12
  **Page** [2] - 193:15,
255:11
  **page** [4] - 203:18,
255:6, 255:8, 390:15
  **pain** [4] - 171:4,
171:22, 180:11,
260:19
  **painful** [1] - 244:13
  **pair** [1] - 293:3
  **Pamper** [5] - 162:5,
162:9, 170:5, 224:1,
224:7
  **paper** [1] - 197:17
  **Paragraph** [1] -
389:18
  **paragraph** [1] -
390:11
  **pardon** [3] - 166:10,
190:20, 237:4
  **parent** [1] - 361:10
  **parents** [5] - 253:5,
253:6, 256:18,
256:21, 269:7
  **parietal** [1] - 194:7
  **Park** [1] - 211:25
  **parking** [2] - 228:3,
229:2
  **part** [39] - 166:4,
167:12, 180:25,
181:10, 188:23,
198:9, 199:9, 270:7,
276:21, 283:22,
294:23, 295:15,
302:5, 306:12,
308:10, 324:14,
327:13, 330:6, 333:7,
335:5, 337:12,
339:24, 367:10,
374:13, 376:1,
379:21, 394:6, 400:9,
402:7, 403:14, 404:8,
405:1, 412:18, 413:6,
416:1, 426:3, 426:4,
426:23, 427:1
  **partial** [2] - 309:25,
310:3
  **participate** [1] -
318:19
  **particular** [9] -
179:22, 182:13,
196:24, 227:2,
237:24, 238:3, 238:6,

369:18, 371:14
**particularly** [7] -
231:9, 234:14,
296:15, 305:3,
348:22, 349:20,
377:15
**parts** [1] - 367:11
**party** [4] - 282:8,
364:22, 390:22,
391:22
**pass** [3] - 190:18,
190:21, 326:3
**passed** [5] - 177:15,
220:23, 254:13,
351:7, 351:11
**passion** [1] - 173:15
**Past** [1] - 406:22
**past** [9] - 220:3,
220:6, 277:20,
293:22, 313:10,
313:13, 367:20,
371:25, 375:23
**pathologic** [3] -
205:15, 375:9, 388:20
**pathological** [1] -
330:1
**pathologically** [6] -
196:9, 196:16,
200:14, 200:15,
200:19, 377:8
**pathologist** [17] -
178:24, 303:22,
319:9, 319:10,
319:13, 320:14,
324:19, 325:4, 363:6,
366:24, 367:6, 367:8,
367:9, 369:7, 373:14,
376:16, 376:23
**pathologists** [2] -
182:12, 411:21
**Pathology** [1] -
368:11
**pathology** [31] -
190:14, 196:3,
205:18, 205:19,
207:7, 296:19, 318:6,
318:7, 318:8, 318:11,
318:22, 318:24,
319:6, 319:14,
319:15, 320:3, 321:4,
367:4, 367:8, 367:24,
368:1, 368:2, 368:11,
369:1, 372:4, 375:24,
376:2, 376:7, 384:20
**patient** [2] - 293:13,
296:21
**patient's** [1] - 198:5
**patients** [4] - 292:1,
292:8, 292:13, 292:19
**Patrick** [1] - 214:1

Paul [1] - 210:24
**Pause** [2] - 312:16,
415:12
**pay** [4] - 218:14,
218:16, 218:18,
238:23
**payments** [1] - 362:1
**pediatric** [1] - 293:16
**pediatrician** [2] -
203:11, 242:11
**pediatricians** [1] -
360:7
**pediatrics** [8] -
288:21, 291:12,
291:14, 291:20,
291:21, 296:19,
297:15, 300:19
**Pediatrics** [1] -
289:11
**peds** [1] - 294:7
**peers** [1] - 322:12
**pen** [8] - 176:7,
176:9, 176:15,
176:16, 176:19,
176:21, 232:6, 255:5
**penetrate** [1] - 338:8
**penetrating** [1] -
338:12
**people** [27] - 179:21,
179:25, 180:3, 180:7,
180:8, 180:18,
181:10, 182:8,
182:24, 189:10,
207:15, 252:11,
258:13, 270:10,
272:10, 296:17,
296:20, 349:20,
354:9, 373:15,
376:10, 393:14,
404:17, 405:21,
411:19, 426:15
**per** [2] - 339:15,
339:18
**percent** [3] - 376:17,
380:23, 380:24
**percentage** [6] -
380:18, 380:21,
395:5, 395:15,
399:14, 425:12
**percentile** [5] -
204:5, 204:8, 205:6,
205:8, 380:20,
380:22, 381:2, 381:6,
383:17, 383:20,
395:10, 395:12, 425:7
**perfect** [1] - 362:10
**perfectly** [1] - 178:16
**perform** [4] - 188:23,
193:1, 193:3, 294:4
**performance** [2] -

183:20, 306:6
**performed** [8] -
179:21, 191:22,
191:25, 198:19,
324:19, 343:8,
369:19, 372:21
**performing** [2] -
198:4, 384:15
**perhaps** [3] - 372:7,
391:7, 422:16
**perineural** [1] -
337:25
**period** [14] - 195:14,
240:19, 251:13,
273:16, 274:24,
275:1, 275:4, 275:8,
314:16, 358:20,
367:17, 375:5,
407:25, 410:3
**periodically** [1] -
234:2
**periods** [2] - 226:3,
226:12
**permissible** [1] -
172:20
**permission** [5] -
238:10, 240:24,
247:9, 271:9, 383:7
**perpendicular** [1] -
299:13
**person** [18] - 185:20,
185:24, 220:5, 239:9,
269:11, 296:21,
313:12, 358:14,
376:17, 380:19,
381:10, 403:19,
405:10, 405:17,
405:22, 407:16,
413:19, 417:22
**person's** [1] - 177:10
**personally** [4] -
187:13, 352:16,
382:7, 400:2
**pervious** [1] - 379:14
**phase** [2] - 325:16,
337:1
**Phenomenology** [1]
- 209:11
**Phillips** [1] - 156:15
**philtrum** [1] - 202:3
**phone** [17] - 161:10,
161:15, 161:18,
162:20, 162:21,
223:13, 223:15,
223:17, 223:18,
224:19, 231:16,
239:15, 240:1, 251:1,
361:5, 365:15, 425:21
**photo** [5] - 163:10,
169:25, 172:3, 225:7,

316:13
**photograph** [2] -
163:15, 403:20
**photographs** [4] -
323:5, 323:6, 334:13,
417:23
**photos** [2] - 297:6,
403:12
**photos)** [1] - 400:19
**physical** [25] -
182:23, 184:2, 185:2,
205:12, 205:15,
205:21, 205:24,
230:11, 230:13,
289:1, 292:20, 294:4,
294:6, 294:8, 295:7,
296:10, 300:25,
301:3, 301:15, 303:9,
342:21, 357:25,
385:10, 403:9, 412:18
**physically** [3] -
246:10, 281:13,
296:22
**physician** [7] -
178:24, 203:2, 244:5,
287:9, 395:13, 396:2,
397:18
**physicians** [3] -
296:24, 368:16, 378:4
**physiologic** [1] -
388:15
**physiology** [1] -
404:7
**pick** [2] - 233:21,
348:16
**picture** [21] - 162:15,
162:19, 162:23,
163:9, 163:17, 164:1,
217:10, 217:12,
217:14, 217:22,
224:10, 224:15,
224:18, 224:20,
225:6, 225:14,
225:23, 316:9,
316:11, 316:17, 324:4
**pictures** [8] - 182:25,
324:10, 330:2,
347:11, 347:18,
369:20, 371:15,
412:24
**Pierre** [2] - 155:23,
155:24
**Piersol** [1] - 155:16
**pitiful** [3] - 352:14,
353:21, 354:1
**place** [7] - 180:12,
183:10, 248:24,
249:25, 324:7,
345:21, 365:10
**placed** [4] - 177:1,

250:15, 311:2, 363:17
**placement** [1] -
333:25
**places** [1] - 319:25
**Plaintiff** [3] - 155:6,
155:24, 399:15
**plan** [1] - 348:17
**plane** [2] - 333:22,
333:24
**planes** [17] - 331:25,
333:10, 333:19,
333:20, 333:23,
334:1, 334:23,
334:24, 335:10,
335:11, 335:14,
335:15, 335:19,
358:7, 363:1, 365:7,
365:17
**platform** [2] -
417:19, 420:22
**plausible** [1] - 360:3
**play** [1] - 217:6
**player** [2] - 377:19,
377:25
**players** [1] - 406:12
**playground** [1] -
339:16
**playing** [1] - 406:14
**plenty** [2] - 349:22,
360:13
**plot** [4] - 382:7,
383:16, 383:18,
383:19
**plotted** [4] - 204:24,
380:16, 382:1, 382:4
**plotting** [2] - 425:4,
425:7
**plus** [4] - 187:15,
417:19, 419:18,
420:18
**PO** [1] - 155:20
**point** [27] - 168:22,
169:1, 182:5, 195:20,
197:14, 199:10,
214:16, 229:4,
229:14, 236:20,
242:20, 246:23,
247:15, 265:19,
292:24, 299:8,
306:23, 351:22,
357:14, 364:21,
370:19, 375:4, 388:8,
391:1, 398:16,
410:13, 423:23
**pointed** [3] - 229:13,
229:16, 247:21
**pointer** [2] - 177:5,
380:8
**pointing** [1] - 300:8
**pointless** [1] -

177:22

**points** [6] - 197:12, 197:17, 204:24, 297:16, 298:15, 396:13

**police** [9] - 199:3, 199:17, 199:19, 199:21, 199:24, 199:25, 247:20, 260:11, 374:9

**Police** [1] - 199:3

**polled** [1] - 411:21

**polling** [1] - 411:19

**polynuclear** [1] - 416:16

**poorly** [1] - 202:3

**population** [1] - 291:21

**populations** [1] - 384:2

**portion** [2] - 158:2, 250:18

**position** [7] - 235:24, 280:6, 280:16, 301:5, 318:1, 388:20, 393:23

**positions** [3] - 289:9, 300:21, 368:25

**possibilities** [1] - 197:5

**possibility** [11] - 197:25, 262:7, 316:5, 334:20, 339:14, 385:10, 385:18, 386:12, 393:6, 422:13, 424:25

**possible** [25] - 197:1, 197:3, 197:4, 202:14, 202:22, 202:23, 202:24, 202:25, 210:1, 210:3, 210:4, 210:7, 210:9, 304:22, 334:6, 366:1, 384:15, 387:3, 391:7, 391:12, 394:18, 397:23, 399:3, 408:25, 421:9

**possibly** [4] - 289:3, 335:2, 376:7, 391:11

**postmortem** [1] - 323:4

**potential** [8] - 197:12, 201:9, 386:7, 389:4, 389:7, 394:23, 426:18

**potentially** [2] - 196:6, 200:22

**PowWow** [1] - 217:23

**practice** [9] - 187:7, 191:4, 192:23, 291:16, 318:12,

318:13, 319:1, 368:5, 411:23

**preceded** [2] - 200:15, 200:20

**preceding** [4] - 388:12, 390:11, 390:12, 396:20

**precipitate** [2] - 304:15, 304:19

**precipitating** [2] - 356:14, 391:8

**precise** [1] - 408:21

**precisely** [1] - 410:18

**precision** [1] - 407:21

**preclude** [1] - 251:24

**precluded** [2] - 253:10, 257:18

**predict** [1] - 246:3

**predisposition** [2] - 286:1, 286:12

**predominantly** [1] - 182:1

**preeminent** [1] - 382:24

**preexisting** [14] - 248:21, 359:17, 360:4, 363:8, 389:4, 389:16, 389:20, 389:23, 390:9, 397:1, 397:9, 397:23, 413:12, 413:13

**prefer** [1] - 177:7

**pregnancy** [2] - 216:7, 360:19

**pregnant** [13] - 160:20, 161:4, 166:15, 215:17, 215:20, 216:6, 222:20, 222:21, 223:1, 223:4, 245:23, 315:3, 315:4

**prejudicial** [6] - 171:14, 173:12, 236:24, 281:22, 286:1, 286:8

**prelude** [1] - 424:19

**premeditated** [1] - 359:4

**premise** [2] - 356:1, 362:23

**preparation** [7] - 198:11, 198:12, 198:15, 198:17, 198:18, 379:21

**prepared** [7] - 184:7, 189:16, 204:16, 309:5, 309:8, 309:24, 394:5

**preparing** [1] - 400:15

**preschool** [1] - 230:10

**presence** [20] - 157:3, 168:14, 169:1, 235:1, 248:3, 248:14, 271:20, 272:4, 285:12, 286:20, 315:16, 348:5, 355:5, 355:10, 386:14, 386:18, 386:24, 411:4, 411:10, 423:12

**PRESENT** [1] - 156:7

**present** [19] - 157:2, 172:10, 174:25, 187:10, 235:2, 242:16, 248:15, 272:5, 285:13, 286:21, 293:20, 327:10, 329:14, 340:22, 355:11, 371:18, 379:13, 386:25, 423:13

**presented** [5] - 323:9, 355:19, 357:19, 364:20, 404:20

**presenter** [1] - 322:12

**presents** [1] - 404:24

**pressure** [4] - 282:11, 349:21, 404:6, 404:9

**presumed** [1] - 172:20

**presuppose** [1] - 236:18

**pretrial** [4] - 251:17, 252:13, 253:11, 258:25

**pretty** [7] - 165:16, 269:14, 269:16, 341:23, 352:6, 353:24, 397:14

**prevent** [1] - 281:24

**previous** [6] - 250:1, 281:3, 304:18, 367:5, 389:2, 389:5

**previously** [4] - 175:16, 176:20, 318:25, 388:19

**primarily** [2] - 285:15, 416:17

**primary** [4] - 244:5, 248:24, 249:4, 396:2

**prime** [1] - 384:23

**print** [1] - 316:15

**printout** [1] - 254:23

**probative** [8] -

171:15, 173:11, 281:22, 285:25, 286:4, 286:5, 286:8

**probe** [1] - 267:7

**problem** [8] - 218:25, 219:4, 229:2, 331:17, 360:5, 365:8, 427:7, 427:9

**problems** [4] - 302:4, 304:19, 304:20, 308:1

**procedure** [1] - 181:12

**proceed** [14] - 157:6, 175:14, 181:12, 189:23, 220:10, 237:15, 272:17, 315:18, 348:3, 348:4, 365:21, 366:12, 396:13, 396:16

**proceedings** [9] - 174:10, 235:2, 248:15, 272:5, 285:13, 355:11, 386:25, 423:13, 427:12

**process** [10] - 185:23, 207:2, 207:22, 295:15, 325:10, 325:19, 325:20, 325:22, 326:14, 326:16

**produce** [2] - 398:21, 398:22

**produced** [1] - 236:22

**profession** [2] - 321:23, 382:21

**professional** [3] - 289:23, 306:19, 319:17

**professor** [2] - 289:10, 369:1

**program** [4] - 288:24, 290:23, 290:24, 306:10

**progress** [1] - 388:20

**progression** [1] - 372:14

**prohibit** [2] - 390:22, 391:21

**prohibited** [1] - 173:15

**prohibiting** [1] - 247:19

**projection** [2] - 182:2, 182:6

**prone** [1] - 414:3

**pronounce** [1] - 411:4

**pronunciation** [1] - 387:18

**proof** [5] - 219:19, 313:2, 350:8, 355:17, 357:5

**propensity** [5] - 173:15, 281:25, 282:22, 284:5, 284:17

**proper** [5] - 251:19, 252:21, 280:7, 280:25, 348:19

**proportionally** [3] - 341:16, 341:20, 392:15

**proportions** [1] - 385:11

**propose** [2] - 238:20, 250:4

**proposing** [1] - 357:13

**Prosecution** [1] - 399:15

**prosecution** [4] - 196:5, 207:21, 363:17, 370:14

**prosecution's** [1] - 356:12

**Prosecutor** [2] - 346:20

**protected** [1] - 338:7

**Protocol** [10] - 187:8, 191:10, 194:23, 203:18, 205:11, 205:20, 205:23, 207:9, 207:17, 400:17

**prove** [14] - 172:5, 173:17, 216:20, 235:8, 250:11, 250:12, 250:13, 257:13, 259:18, 283:3, 357:4, 361:17, 361:18

**proved** [6] - 219:21, 220:1, 313:3, 313:8, 346:24, 364:18

**provide** [2] - 189:12, 320:18

**provided** [8] - 327:16, 327:22, 332:3, 387:20, 401:5, 401:11, 402:8, 402:23

**Providence** [1] - 288:24

**providers** [1] - 293:1

**provides** [2] - 357:22, 372:19

**provisional** [2] - 188:24, 189:1

**pry** [1] - 362:15

**publications** [3] -

290:18, 290:22,
300:21

**publish** [6] - 176:22,
188:8, 225:20,
310:23, 380:2, 383:7

**published** [4] -
291:1, 322:16,
382:18, 406:21

**puffery** [1] - 253:4

**punch** [1] - 259:3

**punched** [2] - 172:5,
355:24

**punching** [1] -
171:19

**purely** [1] - 375:9

**purple** [1] - 330:14

**purpose** [4] - 173:16,
173:20, 174:1, 219:11

**purposes** [6] -
171:13, 172:20,
173:24, 323:3, 333:5,
369:3

**pursuant** [1] - 347:3

**pursue** [1] - 168:9

**push** [2] - 332:17,
337:24

**pushed** [1] - 332:20

**pushing** [2] - 180:13,
180:17

**put** [32] - 177:10,
179:8, 182:25,
197:17, 205:21,
282:7, 302:4, 307:23,
308:6, 309:24,
310:21, 311:10,
321:25, 337:8, 345:6,
347:11, 347:22,
348:17, 348:22,
349:12, 349:15,
349:16, 350:5, 350:6,
350:8, 356:1, 380:6,
402:16, 408:3,
408:22, 419:20,
425:13

**putting** [1] - 251:25

## Q

**qualifications** [1] -
391:18

**qualified** [3] -
267:22, 295:24, 296:1

**qualify** [2] - 270:13,
270:16

**quality** [1] - 306:9

**quarter** [4] - 310:13,
418:23, 419:1, 420:7

**questioning** [3] -
249:22, 249:24, 385:5

**questions** [30] -
163:24, 164:14,
168:4, 168:5, 177:11,
189:22, 206:23,
232:13, 247:19,
253:12, 256:11,
256:13, 262:6,
265:24, 266:24,
267:10, 268:8,
277:11, 278:2,
279:22, 279:23,
280:9, 283:22,
308:22, 311:21,
311:23, 317:9, 333:8,
343:17, 415:13

**quickly** [2] - 183:14,
230:1

**quiet** [2] - 242:9,
267:4

**quite** [1] - 397:21

**quotes** [1] - 374:7

## R

**radiation** [1] - 294:24

**radically** [1] - 388:15

**radiologist** [4] -
296:2, 324:4, 332:25,
333:1

**radiology** [1] - 296:6

**Ramsey** [3] - 324:11,
329:25, 400:17

**Randall** [29] -
365:25, 366:14,
366:22, 366:23,
368:12, 368:24,
370:18, 379:20,
381:3, 383:9, 383:23,
384:6, 385:8, 387:22,
389:16, 391:1,
391:15, 391:25,
392:3, 395:3, 396:18,
399:11, 400:13,
415:17, 417:20,
418:4, 420:14, 423:1,
424:19

**RANDALL** [24] -
366:15, 392:6, 392:9,
392:11, 392:13,
392:16, 392:19,
392:22, 392:24,
393:2, 393:4, 393:6,
393:8, 393:10,
393:13, 393:17,
393:22, 394:1, 394:4,
394:7, 395:7, 395:19,
395:23, 396:4

**Randall's** [13] -
323:10, 385:6, 387:2,
387:15, 387:16,

388:7, 389:3, 389:18,
389:21, 390:6,
390:10, 391:19,
396:10

**range** [8] - 326:22,
337:8, 339:18,
395:10, 395:13,
396:21, 406:19,
408:22

**ranges** [2] - 408:3,
408:7

**rank** [5] - 390:4,
422:12, 422:14,
422:15, 422:16

**rapid** [2] - 195:14,
328:24

**rare** [7] - 182:23,
197:3, 210:3, 210:13,
339:20, 339:23, 399:1

**rarely** [2] - 210:12,
379:8

**rather** [5] - 236:19,
310:6, 411:11, 426:7,
426:14

**ray** [4] - 294:22,
295:4, 327:5, 327:6

**re** [1] - 397:22

**re-ask** [1] - 397:22

**reach** [1] - 386:9

**reached** [1] - 365:4

**reaching** [1] - 228:16

**react** [4] - 245:25,
246:3, 308:4, 326:13

**reaction** [5] - 159:13,
215:22, 221:8, 277:3,
282:18

**read** [14] - 250:16,
250:18, 261:18,
295:24, 374:6, 374:9,
378:3, 381:1, 385:15,
388:10, 390:6, 396:1,
396:3, 411:17

**readily** [1] - 247:13

**reading** [2] - 175:4,
400:13

**ready** [7] - 189:23,
193:1, 231:12,
286:13, 286:17,
347:23, 362:6

**real** [2] - 161:5,
398:10

**realize** [1] - 172:6

**realized** [2] - 215:17,
426:18

**really** [26] - 161:1,
163:10, 182:23,
194:20, 197:3,
210:12, 223:1, 223:4,
242:21, 245:25,
247:22, 277:4, 315:3,

328:3, 332:23,
337:25, 354:2, 356:8,
360:18, 362:15,
363:19, 399:1,
403:17, 407:25,
408:14, 412:3

**reason** [25] - 160:11,
160:12, 162:8,
163:25, 170:4,
174:11, 180:8,
221:24, 224:6, 251:9,
275:19, 276:21,
277:8, 282:2, 293:5,
341:11, 349:8, 356:3,
364:14, 376:13,
376:18, 379:10,
406:16

**reasonable** [17] -
173:23, 183:12,
183:21, 219:19,
300:22, 313:2,
355:18, 356:13,
356:15, 357:5,
357:14, 357:17,
361:15, 361:20,
362:10, 364:18, 399:3

**reasonably** [1] -
417:7

**reasons** [4] - 250:7,
363:21, 379:7, 391:17

**rebut** [2] - 169:17,
280:17

**rebuttal** [1] - 286:10

**receipt** [1] - 348:1

**receive** [10] - 170:8,
212:21, 219:25,
232:20, 239:13,
280:24, 284:1,
287:11, 297:6, 313:7

**received** [34] -
187:18, 189:21,
192:11, 192:17,
192:19, 193:4,
193:20, 207:22,
217:19, 219:10,
225:19, 230:16,
233:2, 285:4, 290:11,
290:13, 290:15,
309:14, 318:21,
322:9, 329:24, 330:1,
347:17, 347:19,
357:21, 361:13,
367:22, 368:1,
368:22, 383:6,
406:14, 424:7, 424:9,
424:11

**Received** [1] - 205:3

**recent** [11] - 169:20,
195:18, 196:12,
208:21, 209:8,

328:3, 332:23,
337:25, 354:2, 356:8,
280:10, 281:12,
283:16, 283:22,
283:23

**recently** [3] - 281:10,
289:17, 417:9

**recess** [20] - 189:24,
189:25, 190:2,
234:21, 237:11,
248:11, 271:22,
272:2, 285:10, 312:8,
343:22, 343:24,
348:12, 348:14,
366:6, 366:7, 386:20,
423:4, 427:11

**Recess** [5] - 190:5,
237:12, 285:11,
343:25, 366:9

**reckoning** [1] -
170:15

**recognize** [14] -
161:17, 163:6,
184:10, 189:4,
217:10, 223:18,
225:2, 261:12, 290:5,
302:23, 308:22,
321:20, 347:10, 382:4

**recollect** [1] - 261:4

**recollection** [9] -
254:23, 255:13,
261:5, 261:7, 261:13,
402:15, 416:9,
416:12, 418:12

**recommend** [3] -
191:16, 191:17, 207:9

**record** [2] - 250:18,
257:3, 257:12,
259:15, 259:16,
308:13, 308:15,
308:24, 309:2, 309:3,
309:5, 334:16,
347:12, 377:5,
388:11, 390:2,
394:13, 396:7,
402:22, 415:23

**records** [2] - 198:8,
198:9, 198:13,
198:20, 198:21,
198:22, 198:23,
199:6, 199:8, 250:23,
256:20, 258:13,
308:11, 323:1, 323:2,
323:8, 323:12,
325:24, 327:3,
328:18, 334:14,
344:8, 344:9, 369:23,
369:24, 370:3, 370:5,
381:24, 393:20,
396:2, 396:3

**recover** [1] - 404:15

**recovered** [2] -

340:6, 421:20
**recovering** [1] -
412:13
**RECROSS** [1] -
421:15
**RECROSS-
EXAMINATION** [1] -
421:15
**red** [4] - 324:24,
336:7, 336:9, 396:8
**redirect** [4] - 206:24,
262:2, 344:24, 355:1
**REDIRECT** [4] -
206:25, 262:4, 270:5,
415:15
**Reece** [1] - 340:19
**reenlist** [1] - 212:9
**refer** [5] - 189:10,
277:16, 307:2,
360:23, 368:16
**reference** [10] -
159:21, 230:23,
247:19, 251:12,
251:13, 251:14,
252:8, 257:16, 297:9
**referenced** [2] -
335:21, 398:5
**referral** [2] - 186:5,
187:16
**referrals** [1] - 264:6
**referred** [4] - 177:13,
340:12, 342:17, 408:9
**referring** [4] -
176:16, 177:13,
177:15, 418:17
**reflect** [4] - 197:8,
247:25, 256:20,
298:13
**reflects** [3] - 197:10,
197:13, 384:8
**refresh** [5] - 192:14,
254:23, 402:15,
416:9, 418:12
**refreshed** [2] -
255:13, 416:12
**refused** [1] - 362:1
**regard** [14] - 168:8,
173:25, 249:17,
253:2, 272:12,
285:14, 286:3,
312:10, 312:13,
321:14, 346:6, 350:2,
386:18, 395:2
**regarding** [25] -
177:11, 183:22,
184:3, 187:24,
188:16, 201:22,
226:25, 230:24,
241:21, 247:19,
247:20, 251:20,

254:9, 256:13, 262:6,
296:3, 321:9, 325:8,
327:18, 339:5, 339:6,
339:11, 361:14,
389:3, 400:15
**regardless** [1] -
171:11
**register** [1] - 373:19
**regular** [4] - 307:2,
307:5, 307:6, 311:18
**regularly** [1] - 259:25
**relate** [1] - 183:6
**related** [7] - 182:20,
249:20, 264:7, 289:2,
305:23, 322:23,
324:13
**relates** [5] - 324:16,
327:16, 337:14,
375:24
**relation** [2] - 341:18,
384:11
**relatively** [1] - 249:4,
364:5
**release** [3] - 188:24,
207:9, 207:19
**released** [3] -
188:25, 207:20,
336:11
**relevance** [5] -
205:2, 225:17,
236:11, 256:22,
285:18
**relevant** [7] - 173:1,
174:9, 249:14,
281:17, 281:18,
285:17, 392:16
**reliable** [5] - 364:9,
374:16, 374:20,
383:2, 395:8
**relied** [3] - 389:10,
400:5, 403:2
**relies** [1] - 402:20
**relieved** [1] - 210:23
**rely** [2] - 374:11,
382:21
**remember** [23] -
160:16, 160:19,
161:1, 176:10,
181:23, 192:21,
198:7, 220:2, 222:16,
223:1, 228:4, 234:22,
254:1, 254:8, 254:21,
271:23, 276:9,
297:13, 313:9,
330:25, 334:24,
337:22, 423:5
**remembering** [1] -
371:4
**remote** [4] - 173:4,
173:6, 283:19, 285:21

**remove** [5] - 174:8,
323:22, 325:19,
332:10, 332:11
**removed** [1] - 331:5
**removing** [1] - 325:1
**rendered** [1] -
183:14
**reoffer** [1] - 186:21
**repeat** [3] - 165:22,
191:12, 201:1
**repeatedly** [2] -
171:20, 362:18
**rephrase** [1] - 246:2
**report** [84] - 170:17,
181:15, 186:14,
191:7, 191:8, 191:9,
192:1, 192:3, 192:11,
193:3, 193:10,
193:16, 193:24,
199:3, 199:17,
199:19, 199:21,
199:24, 199:25,
201:23, 207:3,
207:23, 207:25,
208:1, 208:2, 230:17,
261:15, 261:18,
261:21, 296:7, 297:9,
298:25, 323:5,
323:10, 324:10,
324:17, 330:1, 334:7,
337:12, 344:14,
344:16, 369:20,
370:10, 370:12,
370:18, 371:3,
371:13, 371:19,
376:19, 385:6, 385:8,
385:15, 385:24,
385:25, 387:3,
387:13, 387:15,
387:16, 387:23,
388:2, 388:7, 389:11,
389:18, 389:21,
390:6, 390:10,
393:21, 394:19,
394:22, 395:1,
400:13, 400:15,
400:20, 400:21,
401:1, 401:3, 401:18,
401:20, 402:7,
402:13, 406:20,
406:25, 416:1, 418:13
**reported** [11] - 193:6,
193:20, 197:21,
328:6, 328:20,
328:21, 328:22,
400:22, 404:19,
410:15, 412:12
**reportedly** [2] -
388:16, 402:11
**REPORTER** [1] -

156:13
**reporter** [1] - 250:19
**Reporter** [1] - 156:14
**reports** [13] - 191:6,
191:14, 193:4,
247:20, 257:14,
258:2, 370:13, 374:9,
378:3, 394:5, 400:5,
400:11, 400:15
**repository** [1] -
347:13
**represent** [1] -
380:18
**representative** [1] -
384:4
**request** [8] - 174:8,
174:17, 247:18,
309:5, 310:12,
311:10, 322:22,
348:15
**requested** [1] -
250:18
**requesting** [1] -
364:15
**requests** [3] - 233:9,
310:5, 310:19
**required** [5] -
191:16, 252:6,
358:24, 361:17,
398:12
**requirements** [1] -
288:6
**requires** [4] - 191:14,
283:20, 390:20,
391:16
**research** [4] -
271:24, 343:24,
355:6, 423:5
**reserve** [1] - 397:17
**reside** [1] - 157:20
**residence** [4] -
248:24, 345:9,
345:10, 361:7
**residency** [5] -
287:21, 288:7,
318:19, 318:23, 368:1
**residents** [1] - 320:3
**resisting** [1] - 172:7
**resolutions** [1] -
258:14
**resolve** [2] - 386:21,
391:25
**respect** [1] - 281:17
**respond** [5] - 242:22,
282:23, 282:25,
283:1, 308:4
**responding** [1] -
325:18
**response** [3] -
280:23, 282:8, 387:6

**responsible** [4] -
172:13, 181:1, 182:3,
187:15
**rest** [5] - 175:5,
242:24, 341:20,
348:2, 363:20
**result** [9] - 183:18,
203:15, 210:17,
269:23, 316:24,
378:20, 388:24,
403:6, 415:19
**Resulting** [1] -
340:15
**results** [1] - 207:18
**resume** [6] - 189:10,
290:7, 290:16,
290:20, 321:23,
368:17
**resumed** [1] - 175:16
**retinal** [15] - 196:19,
196:23, 197:2, 210:2,
210:4, 210:10,
210:13, 210:16,
295:10, 295:11,
304:25, 305:3,
356:18, 356:22
**retire** [1] - 406:12
**retired** [1] - 367:4
**return** [2] - 210:24,
421:21
**revealed** [1] - 327:9
**reverse** [1] - 252:14
**review** [34] - 181:16,
198:4, 198:8, 198:13,
198:15, 204:24,
208:4, 294:4, 296:1,
296:3, 297:6, 297:19,
300:21, 322:22,
322:25, 323:3,
337:11, 342:11,
344:7, 348:20, 360:8,
360:9, 369:19,
369:23, 371:3, 374:3,
389:8, 396:4, 400:5,
400:10, 416:1
**reviewed** [31] -
178:21, 198:9,
198:20, 199:8,
199:19, 199:21,
207:20, 295:23,
296:5, 296:8, 296:12,
302:24, 319:12,
323:4, 323:11, 324:9,
327:19, 328:18,
330:1, 369:20,
369:24, 370:2, 370:4,
370:12, 379:20,
392:4, 400:10,
400:14, 400:20,
422:1, 422:5

reviewing [6] - 208:5, 325:24, 327:3, 330:4, 334:7, 381:3
reviews [1] - 187:8
Rhode [1] - 288:24
rid [2] - 336:7, 336:21
ridiculous [1] - 356:1
ridiculous-sounding [1] - 356:1
rise [1] - 279:23
risk [10] - 203:15, 284:16, 302:4, 306:6, 306:9, 340:21, 341:13, 406:17, 407:4, 407:16
Risk [1] - 340:15
risks [1] - 264:6
RMR [1] - 156:14
robe [1] - 175:6
Robert [1] - 340:19
role [5] - 292:24, 293:3, 299:7, 299:8, 351:24
rolls [1] - 378:13
room [17] - 157:15, 165:3, 240:18, 243:6, 243:8, 243:12, 264:22, 265:7, 265:13, 265:25, 270:8, 270:9, 270:11, 272:22, 349:3, 369:25, 396:9
rooms [1] - 242:3
Rose [2] - 305:13, 305:20
ROSE [1] - 305:14
rotated [1] - 300:13
rotational [1] - 299:20
rough [5] - 275:13, 291:3, 292:8, 325:11, 325:12
routine [1] - 207:7
rule [11] - 169:7, 172:18, 235:20, 272:12, 280:12, 280:22, 283:1, 283:20, 390:14, 391:16, 391:20
Rule [12] - 169:17, 172:25, 186:22, 225:18, 249:7, 280:21, 348:9, 355:12, 361:14, 364:17, 390:19, 390:21
ruled [4] - 247:17, 247:22, 253:10, 356:9
rules [2] - 387:8,

398:19
ruling [6] - 158:3, 174:2, 237:6, 285:10, 286:12, 396:12
rump [1] - 420:6
run [1] - 309:20
running [4] - 307:19, 308:10, 315:14, 380:17
ruptures [1] - 304:24
rushed [1] - 240:1

S

safe [3] - 245:22, 248:25, 249:25
safer [1] - 249:25
safety [2] - 306:11, 306:16
Sam [23] - 156:3, 159:25, 160:8, 166:5, 221:20, 222:2, 227:20, 227:22, 227:24, 228:5, 228:6, 228:7, 229:4, 229:10, 229:14, 229:15, 229:16, 230:2, 252:9, 264:13, 265:2, 265:12, 314:15
Sam's [1] - 314:13
sample [1] - 181:11
samples [2] - 180:21, 197:20
Samuel [2] - 211:21, 214:25
San [1] - 289:17
Sanford [7] - 241:9, 244:9, 289:8, 323:8, 323:12, 327:3, 369:1
Santa [1] - 179:10
sat [1] - 260:19
save [1] - 363:16
saw [29] - 158:24, 158:25, 159:12, 159:24, 170:13, 180:19, 180:23, 181:2, 181:4, 181:16, 182:15, 199:17, 220:23, 221:7, 260:15, 265:13, 292:14, 293:14, 298:5, 316:1, 324:16, 332:25, 333:1, 333:3, 334:2, 335:18, 385:15, 401:6, 426:11
scale [2] - 329:3, 329:4
scalp [7] - 298:13, 323:21, 331:5, 331:6,

335:1, 337:4, 337:7
scalps [1] - 297:24
scan [5] - 295:22, 295:24, 296:1, 296:3, 323:14
scared [1] - 363:14
scavenger [1] - 209:2
scenario [1] - 330:22
scenarios [1] - 320:23
scene [4] - 321:1, 323:6, 329:6
schedule [4] - 307:2, 307:5, 307:6, 311:18
scheduled [4] - 271:10, 311:14, 311:15, 311:16
scholarly [1] - 369:10
school [11] - 211:22, 212:1, 212:3, 231:13, 233:20, 233:21, 273:6, 287:16, 318:18, 320:16, 367:20
School [2] - 289:11, 369:2
schooling [1] - 319:22
Science [2] - 318:2, 367:22
sciences [5] - 196:3, 208:7, 208:8, 364:10, 398:14
Sciences [1] - 319:21
sciences [1] - 318:3
scientific [1] - 179:18
scope [1] - 270:13
scratch [1] - 384:14
screaming [2] - 260:19, 269:17
screen [1] - 311:5
screened [1] - 395:9
screening [1] - 360:2
SD [6] - 155:11, 155:17, 155:20, 155:24, 156:4, 156:15
Seaboy [3] - 425:20, 425:21, 426:13
Seaboy's [1] - 426:4
Search [1] - 347:4
seat [2] - 418:7, 421:2
seated [6] - 235:3, 248:16, 253:17, 272:7, 387:1, 396:16
second [11] - 173:3,

177:2, 179:2, 214:2, 217:22, 340:13, 359:5, 359:14, 371:5, 377:24, 379:10
second-degree [1] - 359:5
secondly [2] - 285:19, 390:1
seconds [3] - 195:14, 195:19, 196:11
secretary [1] - 351:1
section [2] - 187:23, 188:6
sections [2] - 180:22, 181:12
sedate [1] - 294:16
see [85] - 161:22, 167:2, 167:15, 167:17, 176:11, 176:16, 177:24, 179:24, 181:4, 181:5, 181:11, 181:20, 182:3, 182:10, 182:21, 188:4, 188:11, 202:25, 203:13, 204:10, 209:1, 210:10, 210:12, 210:13, 210:14, 210:16, 214:14, 221:20, 228:10, 254:23, 265:4, 266:5, 286:5, 292:3, 293:4, 293:13, 295:6, 295:14, 295:15, 295:17, 297:24, 298:2, 298:3, 298:8, 298:11, 302:12, 302:16, 302:19, 310:5, 310:11, 311:4, 312:8, 314:20, 316:15, 324:22, 325:14, 331:11, 332:15, 333:16, 334:8, 335:23, 336:23, 336:25, 337:1, 338:11, 338:17, 339:1, 340:8, 341:10, 341:19, 344:19, 345:24, 365:25, 383:19, 390:8, 395:14, 395:18, 396:19, 410:16, 410:19, 417:2, 417:4, 417:5, 418:16
seeing [4] - 269:3, 315:5, 315:20, 315:25, 325:21, 336:16, 372:17, 380:7

seeking [1] - 251:24
seem [2] - 236:23, 398:19
seeming [1] - 396:22
segmented [1] - 416:16
seizure [10] - 198:1, 199:11, 200:3, 200:13, 200:16, 200:19, 200:20, 201:3, 201:4, 201:10
seizures [5] - 199:16, 201:7, 201:8, 201:19, 203:16
self [4] - 367:1, 367:2, 367:3, 368:25
self-employed [3] - 367:1, 367:2, 367:3
self-employment [1] - 368:25
send [5] - 192:8, 203:12, 250:2, 362:22, 365:19
sense [2] - 295:5, 359:18, 363:24
sent [6] - 181:15, 192:4, 197:20, 207:24, 254:19, 254:22
separate [5] - 279:15, 358:1, 358:7, 361:24, 412:21
separated [2] - 170:25, 416:14
separation [2] - 170:20, 170:23
September [3] - 160:25, 222:25, 315:1
sequence [1] - 267:8
series [1] - 333:8
serious [5] - 169:22, 169:24, 169:25, 298:6, 301:25
serve [6] - 212:5, 212:11, 320:14, 367:14, 369:2, 369:4
served [4] - 212:13, 212:19, 320:10, 367:7
Service [1] - 293:1
service [1] - 212:5
Services [11] - 246:24, 247:6, 247:24, 249:17, 250:4, 250:6, 250:8, 250:12, 251:14, 253:3, 263:24
serving [2] - 320:13, 367:9
session [1] - 426:21
setting [1] - 339:25

**settle** [2] - 350:1, 423:24

**settling** [1] - 423:22

**seven** [17] - 212:8, 212:19, 331:14, 332:1, 332:9, 333:13, 333:24, 336:18, 344:19, 354:18, 361:24, 362:25, 364:7, 409:10, 409:23, 410:1, 410:4

**seven-day-old** [1] - 409:23

**seventy** [1] - 292:12

**sever** [1] - 282:2

**several** [8] - 291:6, 320:23, 336:24, 337:16, 399:13, 410:3, 414:14

**severe** [3] - 270:11, 388:23, 394:24

**severing** [1] - 282:3

**severity** [1] - 359:5

**sexual** [1] - 289:1

**Shannon** [65] - 157:7, 157:14, 157:15, 158:1, 160:16, 162:15, 163:5, 165:12, 165:14, 165:17, 166:2, 166:5, 166:7, 166:15, 166:18, 166:19, 166:22, 167:2, 167:5, 167:7, 167:9, 167:12, 170:17, 172:8, 211:3, 211:10, 211:11, 211:13, 211:22, 213:12, 213:21, 217:12, 217:21, 224:10, 225:23, 230:15, 230:23, 232:5, 232:6, 232:17, 237:17, 238:14, 239:10, 241:11, 242:16, 243:17, 252:9, 262:6, 264:11, 265:12, 314:6, 314:10, 314:13, 314:15, 314:24, 315:3, 316:5, 316:8, 316:11, 316:12, 316:17, 359:20, 360:25, 361:1, 361:25

**SHANNON** [2] - 157:8, 211:4

**Shannon's** [1] - 264:13

**shape** [2] - 265:6, 423:6

**sheath** [6] - 337:18, 337:19, 337:20, 337:24, 337:25

**sheer** [2] - 334:1, 335:8

**sheet** [2] - 310:1, 311:6

**shift** [2] - 307:3, 310:6

**shirt** [2] - 349:5, 349:6

**shock** [1] - 269:22

**Short** [2] - 340:16, 402:10

**short** [40] - 175:3, 183:14, 226:3, 235:5, 237:21, 240:19, 267:11, 267:13, 267:14, 268:9, 268:10, 296:15, 301:22, 301:23, 301:24, 302:2, 302:6, 327:20, 327:23, 328:4, 328:5, 328:8, 329:13, 329:19, 338:25, 339:7, 339:11, 339:21, 340:9, 342:4, 349:6, 350:5, 357:3, 362:2, 379:11, 388:16, 403:5, 420:13, 420:19, 420:24

**short-fall** [1] - 301:24

**short-sleeved** [1] - 349:6

**shorter** [2] - 394:25, 397:10

**shortly** [6] - 230:1, 248:11, 249:12, 265:10, 315:4, 378:2

**shot** [1] - 376:3

**shoulder** [4] - 217:21, 230:15, 264:18, 303:2

**show** [24] - 166:22, 172:3, 172:12, 173:14, 176:11, 179:3, 184:9, 189:3, 189:13, 206:20, 225:1, 225:12, 228:10, 235:10, 235:16, 236:3, 236:14, 280:9, 288:9, 308:20, 332:21, 339:13, 390:2, 425:11

**showed** [6] - 176:6, 179:7, 324:21, 358:16, 359:25, 360:10

**showing** [7] - 252:22, 284:22, 285:2, 330:12, 330:24, 336:19, 417:20

**shown** [1] - 361:15

**shows** [12] - 169:18, 204:19, 204:22, 283:5, 283:9, 283:23, 286:1, 336:14, 358:24, 359:3, 359:6, 362:14

**siblings** [3] - 256:18, 256:19, 256:21

**sick** [6] - 353:22, 354:3, 354:4, 396:24, 417:9, 417:10

**side** [23] - 177:3, 185:16, 204:19, 248:7, 253:12, 259:20, 271:18, 279:23, 298:22, 315:17, 330:10, 331:20, 331:21, 332:5, 333:19, 342:5, 342:6, 350:11, 358:10, 358:12, 363:1, 376:6, 386:16

**Side** [7] - 184:24, 247:3, 257:10, 271:7, 315:10, 348:8, 385:3

**siderophage** [4] - 336:12, 336:13, 336:16, 336:17

**siderophages** [4] - 336:22, 337:5, 411:5, 411:6

**sides** [6] - 194:7, 196:12, 204:11, 204:17, 331:23, 332:8

**sideways** [1] - 342:19

**Sierra** [3] - 350:12, 350:19, 350:21

**SIERRA** [1] - 350:14

**sight** [1] - 174:9

**sign** [8] - 186:1, 186:10, 186:11, 186:17, 205:23, 216:14, 216:24

**signature** [1] - 187:9

**signed** [4] - 192:1, 192:3, 208:1, 216:22

**significance** [7] - 297:22, 324:18, 327:17, 335:9, 335:11, 337:14, 383:23

**significant** [13] - 180:1, 180:5, 182:7,

182:8, 182:11, 182:17, 230:23, 298:9, 328:7, 328:9, 338:19, 340:3, 359:7

**signing** [3] - 186:2, 186:19, 187:1

**signs** [15] - 185:6, 186:6, 298:8, 298:16, 324:21, 324:22, 325:1, 325:3, 325:14, 325:18, 327:10, 330:24, 331:2, 333:2, 393:13

**silent** [1] - 269:23

**silver** [2] - 182:11, 182:13

**Silverberg** [1] - 407:1

**similar** [21] - 173:3, 173:6, 195:16, 195:17, 196:12, 209:24, 220:3, 220:6, 249:9, 281:19, 281:20, 283:7, 283:21, 283:24, 285:19, 313:10, 313:13, 406:25, 414:20

**simple** [21] - 207:5, 207:6, 294:17, 301:12, 303:13, 303:14, 303:15, 304:12, 304:14, 304:19, 327:25, 328:1, 328:12, 329:8, 338:21, 339:21, 339:23, 340:4, 340:9, 358:8, 363:2

**simpler** [1] - 237:7

**simply** [12] - 170:19, 220:5, 253:1, 268:2, 284:6, 303:15, 313:12, 337:19, 356:3, 356:24, 357:1, 425:11

**Sine** [20] - 157:7, 157:14, 160:23, 165:12, 170:19, 172:8, 211:3, 211:10, 211:13, 211:21, 214:23, 214:25, 245:19, 249:13, 249:25, 250:14, 250:25, 253:24, 264:13, 314:6

**SINE** [2] - 157:8, 211:4

**singing** [2] - 352:1, 353:1

**single** [8] - 298:17,

333:12, 333:17, 334:5, 340:2, 378:25, 379:1, 412:18

**singular** [1] - 356:14

**Sioux** [6] - 155:11, 155:17, 155:20, 156:4, 156:15, 320:2

**Sisseton** [14] - 157:21, 165:7, 211:17, 213:1, 213:2, 215:9, 226:25, 227:11, 239:20, 263:10, 264:22, 306:4, 314:1, 351:1

**Sisseton-Wahpeton** [3] - 213:1, 215:9, 351:1

**sisters** [2] - 273:20, 273:21

**sit** [2] - 171:5, 349:24

**sites** [1] - 297:17

**sits** [2] - 324:23, 332:17

**sitting** [18] - 169:11, 175:6, 300:4, 300:7, 323:23, 335:3, 335:16, 401:7, 402:19, 418:6, 418:10, 419:3, 419:23, 420:6, 421:3, 422:2, 422:18

**situation** [5] - 256:14, 269:12, 269:23, 375:5, 388:4

**situations** [1] - 285:21

**six** [14] - 158:9, 165:11, 169:21, 173:5, 207:13, 239:2, 270:8, 302:17, 314:5, 385:12, 402:21, 402:25, 417:13, 417:17

**six-foot** [1] - 385:12

**sixteen** [1] - 273:1

**size** [4] - 205:6, 261:6, 261:9, 425:7

**skeletal** [2] - 294:19, 294:21, 294:22, 295:8, 327:4, 327:6

**skills** [1] - 288:9

**skin** [7] - 179:23, 221:17, 294:12, 297:19, 298:1, 319:7, 336:17

**skull** [19] - 181:2, 182:2, 323:21, 323:22, 327:14, 327:18, 327:25, 328:1, 328:2, 328:10,

328:13, 331:6, 332:11, 338:20, 340:4, 342:4, 342:5, 342:7, 342:9

**slap** [2] - 279:16, 361:14

**slapped** [1] - 226:19

**sleep** [1] - 217:7

**sleeved** [1] - 349:6

**sleeves** [1] - 175:3

**slice** [1] - 180:22

**slides** [8] - 325:6, 330:2, 344:10, 344:15, 369:21, 371:4, 398:2, 400:7

**slightly** [2] - 181:1, 346:5

**slip** [1] - 310:21

**slit** [1] - 170:24

**slits** [1] - 159:1

**slow** [2] - 239:12, 427:10

**slowly** [1] - 302:22

**small** [10] - 158:2, 174:6, 179:14, 180:21, 181:21, 246:13, 323:17, 332:12, 351:21, 384:10

**smaller** [2] - 177:2, 380:24

**Smith** [2] - 213:20, 214:1

**snapped** [2] - 361:16, 362:11

**Snell** [17] - 317:14, 317:22, 321:19, 322:11, 339:5, 342:14, 344:5, 356:17, 357:25, 358:9, 358:19, 360:12, 364:8, 398:5, 398:11, 411:1, 412:20

**SNELL** [1] - 317:15

**Snell's** [1] - 413:2

**Social** [11] - 246:24, 247:6, 247:24, 249:17, 250:4, 250:6, 250:8, 250:12, 251:14, 253:3, 293:1

**social** [7] - 263:20, 263:24, 264:3, 267:20, 267:25, 268:5, 289:24

**societies** [1] - 289:21

**society** [2] - 205:22, 289:23

**Society** [1] - 209:10

**softball** [1] - 172:14

**solid** [1] - 319:6

**someone** [8] - 207:11, 243:23, 268:10, 269:22, 304:2, 353:24, 361:20, 376:3

**sometime** [2] - 364:4, 385:24

**sometimes** [21] - 192:25, 196:22, 210:12, 219:9, 231:10, 231:13, 256:24, 277:2, 279:10, 279:11, 372:17, 372:18, 375:19, 375:20, 376:1, 376:16, 405:13, 408:5, 409:8, 417:4

**somewhere** [4] - 291:7, 292:11, 332:16, 332:24

**son** [7] - 160:21, 222:20, 264:11, 264:13, 265:1, 265:2, 314:24

**son's** [1] - 160:22

**soon** [3] - 366:1, 425:23, 426:24

**sooner** [1] - 423:23

**sorry** [9] - 190:16, 191:5, 248:8, 255:21, 269:19, 301:9, 397:22, 398:8, 419:18

**sort** [2] - 182:19, 382:25

**sorts** [1] - 189:10

**sound** [2] - 238:1, 328:22

**sounding** [1] - 356:1

**sounds** [3] - 418:25, 427:2, 427:4

**sources** [1] - 382:24

**South** [20] - 157:21, 165:7, 188:22, 199:7, 203:8, 211:17, 216:4, 263:10, 275:2, 314:1, 317:23, 318:3, 318:12, 318:22, 319:2, 320:13, 367:11, 367:14, 368:6, 369:3

**SOUTH** [1] - 155:2

**southern** [1] - 318:16

**space** [2] - 324:23, 333:16

**span** [1] - 208:17

**spanked** [5] - 162:4, 219:14, 223:25,

312:22

**spanking** [5] - 219:15, 249:8, 255:19, 260:8, 312:22

**spanned** [1] - 188:19

**speaking** [3] - 200:19, 249:5, 377:9

**special** [6] - 178:24, 182:11, 302:14, 367:14, 369:2, 369:5

**specialist** [2] - 297:15, 300:19

**specialists** [1] - 202:8

**specialties** [1] - 296:20

**specialty** [2] - 287:24, 321:10

**specific** [6] - 257:13, 311:14, 371:21, 392:20, 394:21, 408:6

**specifically** [6] - 249:21, 255:6, 311:12, 321:13, 329:23, 388:8

**specify** [1] - 168:21

**speculate** [2] - 196:6, 200:22

**speculating** [1] - 393:9

**speculation** [8] - 381:7, 390:5, 394:14, 399:7, 422:12, 422:14, 422:15, 422:16

**spell** [1] - 350:22

**spend** [2] - 274:10, 288:25

**spent** [3] - 178:4, 315:23, 331:1

**spinal** [5] - 180:16, 182:15, 332:17, 332:20, 384:11

**spirit** [1] - 345:20

**splenium** [3] - 181:17, 183:4, 338:6

**spoken** [1] - 425:20

**sporting** [1] - 302:16

**spot** [10] - 159:22, 170:16, 170:18, 171:7, 260:22, 260:25, 261:6, 261:21, 262:7, 262:14

**spring** [1] - 289:18

**springboard** [1] - 300:10

**St** [2] - 155:23, 210:24

**stab** [1] - 338:13

**stack** [1] - 390:7

**staff** [3] - 256:17, 289:6, 289:7

**stage** [2] - 364:17, 391:20

**stain** [3] - 182:13, 336:14, 336:23

**staining** [1] - 411:2

**stains** [3] - 182:11, 182:12, 182:13

**stamp** [2] - 255:10, 374:18

**stand** [12] - 190:3, 232:1, 232:5, 232:25, 234:24, 245:3, 248:12, 355:7, 383:10, 386:21, 418:1, 423:9

**standard** [6] - 173:23, 191:4, 219:19, 313:1, 357:13, 380:10

**standing** [17] - 206:12, 229:8, 232:14, 299:12, 300:3, 300:7, 300:15, 331:20, 335:2, 378:15, 419:7, 419:8, 420:16, 422:6, 422:10

**standpoint** [3] - 321:5, 336:1, 375:9

**stands** [2] - 189:8, 418:5

**Start** [9] - 230:7, 230:9, 230:11, 233:22, 234:12, 256:6, 360:1, 360:2, 391:10

**start** [9] - 215:12, 230:11, 324:24, 325:20, 326:23, 336:16, 336:19, 344:19, 371:11

**started** [11] - 228:15, 250:17, 278:3, 281:12, 285:22, 306:21, 307:15, 324:7, 325:23, 398:18, 412:1

**starting** [1] - 330:25

**starts** [4] - 177:12, 282:17, 326:8, 332:20

**starved** [1] - 324:6

**state** [17] - 157:13, 165:1, 183:17, 211:9, 263:7, 272:20, 287:4, 288:14, 313:20, 320:12, 321:11, 346:6, 368:3, 387:5, 387:6, 396:7, 398:14

**State** [3] - 186:4,

186:17, 369:3

**statement** [7] - 171:19, 234:9, 235:12, 236:6, 354:17, 374:4, 414:7

**states** [1] - 397:7

**States** [2] - 172:22, 173:12

**STATES** [2] - 155:1, 155:5

**stating** [1] - 261:1

**statistical** [2] - 382:22, 382:25

**statistically** [2] - 301:22, 425:11

**statistics** [1] - 303:18

**status** [1] - 294:12

**statutory** [1] - 390:17

**stay** [11] - 226:15, 226:18, 243:4, 243:8, 243:12, 272:2, 370:1, 423:10, 425:8, 425:13, 425:24

**stayed** [1] - 243:10

**stays** [1] - 256:24

**stem** [4] - 180:15, 180:17, 181:14

**step** [20] - 164:12, 168:6, 195:12, 210:21, 232:5, 262:23, 264:11, 264:15, 266:16, 271:2, 280:1, 305:10, 311:25, 317:11, 355:2, 372:14, 383:9, 383:13, 417:25, 423:1

**step-granddaughter** [1] - 264:11

**step-grandmother** [2] - 264:15, 264:16

**step-wise** [1] - 372:14

**Stephanie** [1] - 276:10

**stepson** [1] - 256:24

**stick** [1] - 177:7

**stiff** [1] - 328:23

**still** [23] - 171:4, 171:14, 175:19, 175:21, 178:2, 208:25, 243:2, 243:15, 268:15, 285:20, 292:5, 292:6, 325:15, 326:13, 339:17, 347:21, 369:1, 405:23, 409:2, 409:8, 420:13, 424:25, 427:6

**stipulate** [1] - 347:2
**stipulated** [8] -
345:12, 345:13,
345:19, 346:16,
346:17, 346:19,
346:21, 347:9
**stipulation** [8] -
345:8, 345:15,
345:16, 345:25,
346:2, 346:6, 346:10,
417:21
**stipulations** [1] -
345:5
**stoic** [1] - 362:19
**stomach** [1] - 377:12
**stood** [1] - 330:9
**stop** [4] - 180:18,
238:21, 260:9, 278:10
**stopped** [2] - 230:1,
363:15
**store** [2] - 228:8,
229:5
**stories** [1] - 200:1
**storm** [1] - 362:10
**story** [11] - 198:25,
200:1, 283:11,
328:12, 334:15,
334:16, 335:15,
358:3, 358:13, 358:14
**straight** [2] - 300:2,
300:8
**strength** [1] - 374:20
**stress** [2] - 207:5,
361:23
**stressed** [2] -
197:11, 355:23
**stressful** [1] - 285:21
**stricken** [4] - 247:4,
247:9, 252:19, 424:21
**strike** [6] - 248:4,
248:5, 275:16,
280:14, 283:7
**striking** [2] - 162:6,
338:14
**stripped** [1] - 302:21
**strong** [8] - 282:24,
284:5, 286:3, 286:11,
358:15, 360:17,
397:14
**strongly** [1] - 301:5
**struck** [9] - 224:2,
275:9, 275:18, 276:4,
283:6, 283:11,
283:14, 283:15,
283:17
**structure** [3] -
180:15, 181:18, 338:7
**structures** [1] -
180:14
**student** [1] - 319:23

**students** [1] - 320:3
**studies** [9] - 213:5,
296:9, 340:12,
341:12, 360:9,
407:15, 412:2
**study** [5] - 213:4,
296:18, 340:12,
369:6, 407:18
**studying** [1] - 369:6
**stuff** [4] - 252:16,
272:12, 353:2, 390:7
**subacute** [2] -
209:20, 408:16
**subarachnoid** [1] -
179:14
**subdural** [21] -
179:24, 179:25,
180:2, 209:9, 209:12,
209:18, 209:21,
210:2, 323:15,
323:17, 323:25,
324:13, 324:17,
325:8, 325:8,
325:10, 332:12,
333:3, 337:17,
337:22, 338:1
**subgaleal** [18] -
176:7, 177:17, 195:5,
197:7, 197:10, 209:8,
209:23, 331:7,
333:16, 388:14,
403:18, 403:24,
412:22, 413:23,
414:5, 414:15,
414:19, 421:5
**subject** [2] - 173:8,
185:13
**submit** [2] - 181:12,
365:1
**submitted** [8] -
180:21, 280:23,
309:19, 323:3,
325:24, 328:18,
363:25, 400:5
**subpoena** [1] -
210:24
**subpoenaed** [2] -
425:20, 425:21
**subsections** [1] -
249:6
**subsequent** [2] -
340:5, 401:15
**subspecialist** [2] -
291:11, 291:13
**subspecialty** [5] -
288:16, 288:19,
288:22, 300:20,
319:15
**substance** [1] -
254:22

**substituted** [1] -
347:19
**succession** [1] -
195:14
**sudden** [2] - 169:12,
328:11
**suffered** [1] - 361:11,
363:7
**suffers** [2] - 298:6,
361:4
**sufficient** [4] - 172:4,
173:9, 285:24, 365:1
**suggest** [3] - 231:3,
330:19, 417:10
**suggestions** [2] -
293:21, 359:16
**suggests** [1] - 298:4
**suicidal** [1] - 343:13
**suicide** [2] - 264:5,
343:10
**Suite** [2] - 155:23,
156:4
**summary** [1] -
391:16
**summer** [1] - 218:23
**summoned** [1] -
264:22
**Sunday** [20] -
233:12, 233:17,
234:1, 234:11,
234:14, 235:13,
237:18, 238:6,
238:13, 238:16,
354:20, 359:8,
359:12, 359:15,
359:23, 365:13,
365:14, 404:20,
404:23, 421:24
**sunny** [1] - 294:24
**sunshine** [1] -
294:24
**supervise** [1] -
306:11
**supervised** [2] -
306:10, 306:16
**supervisor** [8] -
185:5, 185:8, 185:11,
306:17, 306:23,
307:11, 357:24, 362:2
**supervisory** [1] -
306:10
**supplemental** [2] -
388:2
**support** [31] - 178:7,
218:14, 218:18,
238:18, 238:22,
238:24, 239:1, 239:4,
243:18, 244:14,
244:16, 244:23,
250:20, 254:10,

254:19, 255:17,
297:3, 297:5, 328:15,
339:10, 356:3,
357:19, 361:1, 361:2,
361:24, 362:1, 365:4,
394:13, 414:4, 414:15
**supported** [5] -
173:9, 285:24,
356:15, 357:1, 357:3
**supporting** [1] -
172:22
**supportive** [1] -
182:3
**suppose** [3] - 161:4,
236:25, 354:8
**supposed** [4] -
203:10, 218:16,
271:13, 307:12
**surface** [2] - 333:21,
414:16
**surprise** [2] - 354:20,
354:23
**surrounding** [1] -
384:9
**surveillance** [2] -
374:17, 376:3
**survey** [7] - 294:19,
294:21, 294:22,
295:8, 327:4, 327:6,
327:9
**susceptible** [7] -
201:19, 377:23,
379:15, 385:18,
387:19, 390:4, 406:8
**suspect** [2] - 386:1,
417:7
**sustain** [2] - 196:14,
196:15
**sustained** [17] -
184:21, 248:21,
249:3, 249:12,
259:22, 270:15,
270:16, 304:12,
373:16, 375:1, 377:6,
377:10, 377:16,
382:12, 388:16,
402:11, 407:9
**swat** [1] - 170:4
**swatted** [1] - 169:21
**swatting** [1] - 171:20
**swelling** [16] -
179:17, 179:18,
179:19, 180:7, 180:8,
180:9, 180:16,
180:19, 180:23,
181:7, 210:5, 210:14,
295:3, 332:23, 332:24
**swells** [4] - 210:15,
332:15, 337:23,
397:16

**Swim** [1] - 351:17
**swinging** [1] -
299:18
**swollen** [1] - 337:23
**sworn** [12] - 157:9,
164:22, 175:16,
211:5, 263:3, 272:15,
286:25, 305:15,
312:5, 317:16,
350:15, 366:16
**symptom** [3] -
352:15, 356:18,
384:23
**symptomatic** [2] -
328:6, 329:7
**symptomatology** [1]
- 328:13
**symptoms** [18] -
202:3, 327:24,
328:19, 328:21,
354:7, 377:14, 384:6,
396:19, 396:21,
396:22, 404:1, 404:5,
412:5, 412:6, 412:9,
415:18
**syndrome** [11] -
201:9, 201:15,
201:18, 201:22,
202:1, 202:15, 203:1,
203:5, 203:9, 230:24,
230:25
**system** [2] - 307:25,
308:10

## T

**table** [23] - 206:11,
206:12, 300:4, 301:9,
329:9, 332:4, 332:5,
334:14, 334:17,
334:20, 335:3,
335:16, 347:3,
347:24, 371:6,
378:13, 378:19,
419:16, 419:23,
420:3, 420:16, 422:8,
422:10
**tag** [1] - 347:22
**takoja** [1] - 264:17
**talks** [1] - 339:24
**tall** [3] - 418:5, 418:6,
418:9
**tape** [1] - 380:13
**tardy** [2] - 307:11,
308:5
**taught** [3] - 291:6,
291:8, 321:7
**teach** [1] - 289:17,
320:16

**teacher** [1] - 319:24
**teaching** [5] - 289:9,
289:13, 289:19,
291:25, 300:20
**Teal's** [4] - 226:25,
227:10, 228:1, 228:7
**technician** [1] -
292:5
**teenager** [1] - 299:11
**television** [1] -
282:13
**temper** [1] - 372:16
**temperature** [1] -
175:9
**temporal** [1] - 194:7
**tempting** [1] - 392:1
**ten** [2] - 307:16,
367:19
**tends** [1] - 302:14
**Tennessee** [2] -
318:14, 320:8
**tenuous** [1] - 363:21
**term** [5] - 297:16,
336:13, 340:5, 384:8,
408:16
**terminal** [2] - 395:24,
400:16
**terminate** [3] - 239:4,
244:14, 244:22
**terminated** [1] -
244:17
**terms** [10] - 177:10,
208:19, 209:6,
209:16, 280:23,
319:22, 390:10,
408:6, 409:2, 423:22
**terrible** [2] - 358:24,
361:21
**test** [9] - 190:18,
190:21, 216:16,
216:18, 288:10,
357:15, 360:20,
376:8, 395:25
**testified** [44] - 157:9,
164:22, 170:13,
171:6, 175:17, 185:6,
194:1, 206:1, 211:5,
254:9, 256:5, 260:21,
261:5, 263:3, 272:15,
283:16, 286:25,
304:11, 304:18,
305:15, 312:5,
317:16, 321:9,
321:12, 321:13,
350:15, 358:1, 358:9,
358:19, 359:7, 359:8,
359:20, 366:16,
377:1, 378:4, 392:3,
394:2, 398:11,
399:12, 399:17,

412:6, 418:4, 419:16,
425:9
**testify** [20] - 167:15,
169:2, 171:3, 171:5,
171:6, 206:3, 242:14,
250:4, 252:12, 261:8,
267:23, 281:15,
340:23, 349:8, 385:9,
387:12, 397:18,
425:24, 425:25
**testifying** [7] -
188:12, 188:14,
339:4, 351:2, 378:24,
389:7, 398:24
**testimony** [64] -
158:3, 169:9, 170:3,
170:21, 170:25,
171:9, 172:8, 175:14,
185:14, 187:21,
191:24, 197:9, 206:4,
235:16, 236:10,
236:11, 236:19,
250:1, 255:21,
260:22, 260:25,
280:19, 280:25,
281:17, 282:16,
286:6, 311:7, 312:19,
344:18, 348:24,
349:10, 354:14,
356:3, 356:7, 358:6,
360:6, 360:13, 361:5,
361:13, 361:22,
362:7, 362:14,
362:20, 364:2, 364:9,
374:11, 377:2,
379:22, 385:7,
387:10, 389:3, 389:6,
394:6, 396:13, 398:4,
405:3, 411:1, 413:2,
414:18, 421:23,
424:20, 425:22,
427:4, 427:7
**tests** [2] - 319:11,
384:22
**Texas** [1] - 212:13
**text** [7] - 246:18,
250:25, 254:20,
254:21, 254:22,
254:24, 255:11
**textbook** [3] -
372:18, 372:19
**textbooks** [6] -
290:25, 372:13,
372:14, 373:20,
411:12, 411:17
**THE** [313] - 157:5,
163:3, 163:25, 164:2,
164:4, 164:6, 164:12,
164:14, 164:19,
167:19, 167:21,

167:22, 167:23,
168:1, 168:3, 168:4,
168:6, 168:8, 168:16,
168:21, 168:25,
169:4, 170:9, 170:20,
171:8, 172:6, 172:14,
172:17, 174:5,
174:11, 174:16,
174:21, 175:2,
175:18, 175:20,
175:21, 175:23,
176:23, 184:21,
184:23, 184:25,
185:8, 186:25, 187:2,
187:3, 187:4, 187:5,
187:7, 187:17, 188:9,
189:21, 189:23,
190:2, 190:6, 192:14,
192:16, 199:14,
200:8, 200:10,
200:11, 201:13,
202:19, 204:13,
205:3, 206:24,
210:19, 210:21,
210:25, 211:2,
217:19, 219:8,
224:24, 225:19,
225:21, 232:3,
232:15, 232:24,
234:20, 235:3,
235:20, 236:1, 236:5,
236:8, 236:15,
236:25, 237:4, 237:7,
237:10, 237:13,
237:15, 238:11,
245:5, 245:15, 247:2,
247:17, 248:8,
248:16, 249:2,
249:16, 249:19,
250:3, 250:6, 250:16,
250:20, 251:3, 251:6,
252:18, 253:15,
253:17, 255:2,
256:23, 257:9,
257:19, 257:24,
258:5, 258:9, 258:20,
258:24, 259:6,
259:10, 259:15,
259:18, 259:23,
261:3, 261:14, 262:2,
262:21, 262:23,
262:25, 267:23,
268:2, 268:23,
270:15, 270:23,
270:25, 271:2, 271:4,
271:6, 271:11,
271:17, 271:19,
272:7, 272:10,
272:17, 277:13,
278:2, 278:5, 278:6,
278:8, 278:9, 278:11,

278:12, 278:13,
278:14, 278:15,
278:16, 278:17,
278:18, 278:20,
278:21, 278:22,
278:23, 278:24,
278:25, 279:2, 279:3,
279:4, 279:5, 279:7,
279:8, 279:10,
279:12, 279:14,
279:15, 279:17,
279:19, 279:21,
279:22, 280:1, 280:4,
281:1, 282:6, 284:2,
284:7, 284:21, 285:9,
285:14, 286:16,
286:18, 286:22,
290:3, 290:11, 304:5,
305:8, 305:10,
308:18, 309:14,
310:25, 311:25,
312:2, 312:10,
312:15, 312:18,
315:9, 315:13,
315:18, 316:21,
317:11, 317:13,
321:17, 322:9,
343:19, 343:22,
344:1, 344:23,
344:25, 345:3, 345:7,
345:12, 345:14,
345:19, 345:23,
346:1, 346:4, 346:16,
346:18, 347:8,
347:10, 347:15,
347:17, 348:3, 348:7,
348:9, 348:11,
348:18, 348:21,
349:2, 349:7, 349:11,
349:15, 349:18,
352:20, 354:15,
355:2, 355:4, 355:12,
357:10, 363:4,
363:10, 364:16,
366:3, 366:5, 366:10,
366:12, 368:22,
370:24, 375:18,
377:6, 380:4, 381:8,
382:12, 383:6, 383:8,
383:11, 385:2,
385:15, 385:21,
385:23, 386:3, 386:9,
386:13, 386:17,
387:1, 388:5, 388:10,
389:13, 390:6,
390:18, 390:24,
391:9, 391:14, 392:1,
394:19, 395:1,
395:17, 395:21,
396:1, 396:5, 396:16,
397:6, 399:9, 399:22,

407:9, 415:11,
415:14, 418:2,
419:11, 420:1,
421:14, 422:24,
423:1, 423:4, 423:14,
423:18, 423:21,
424:3, 424:8, 424:17,
424:22, 425:8,
425:17, 426:8, 427:2
**theme** [1] - 247:14
**theory** [10] - 171:16,
282:22, 283:10,
299:5, 355:21,
356:12, 356:23,
360:3, 361:15, 361:20
**therapy** [1] - 264:4
**thereafter** [1] - 378:2
**therefore** [6] -
341:10, 346:23,
387:21, 389:23,
390:3, 390:5
**they've** [3] - 355:22,
363:21, 377:25
**thick** [3] - 170:15,
198:7, 323:22
**thin** [1] - 202:6
**thinking** [2] - 167:7,
240:4
**thinner** [1] - 342:7
**third** [3] - 214:18,
222:21, 222:24
**thirty** [2] - 157:19,
211:15
**thirty-two** [2] -
157:19, 211:15
**Thomas** [1] - 155:19
**thousand** [2] -
292:12, 372:22
**threatening** [1] -
388:18
**three** [62] - 158:25,
169:15, 170:16,
170:21, 171:17,
173:9, 178:4, 183:8,
183:9, 183:15,
194:16, 195:6, 195:7,
209:19, 209:20,
212:15, 256:18,
256:21, 257:4,
260:24, 261:22,
263:14, 263:15,
263:16, 277:23,
281:10, 282:12,
283:17, 285:24,
288:1, 288:25, 301:9,
301:20, 326:24,
328:16, 331:1, 331:3,
332:7, 336:18, 337:4,
337:8, 344:19, 354:9,
354:18, 355:17,

357:20, 358:4, 358:20, 358:21, 362:20, 362:22, 364:6, 364:7, 372:22, 373:2, 399:13, 409:7, 409:18, 409:20, 412:11, 413:22

**three-centimeter** [1] - 260:24

**three-day** [3] - 358:20, 409:18, 409:20

**three-foot** [1] - 301:9

**threw** [2] - 352:24, 354:5

**throw** [6] - 162:5, 162:9, 170:4, 224:1, 224:7, 235:14

**ties** [1] - 373:12

**timing** [1] - 177:12

**tired** [1] - 396:22

**tissue** [8] - 181:23, 181:24, 182:3, 183:5, 195:5, 331:7, 339:2

**tissues** [2] - 319:6, 338:9

**title** [3] - 291:10, 291:14, 306:5

**today** [14] - 161:12, 167:15, 177:6, 198:11, 198:12, 321:14, 322:24, 339:5, 340:14, 349:17, 371:3, 379:22, 425:19, 425:22

**toddlers** [1] - 301:19

**toe** [1] - 360:5

**toes** [2] - 294:11, 294:13

**together** [7] - 179:11, 182:25, 215:11, 253:6, 321:25, 328:17, 376:15

**Tom** [1] - 424:14

**tomorrow** [8] - 252:5, 348:16, 349:1, 423:15, 423:16, 426:6, 426:17, 427:10

**tonight** [3] - 423:8, 426:7, 427:10

**tonsillar** [5] - 180:20, 181:2, 332:21, 332:22, 338:4

**took** [16] - 162:19, 171:2, 179:9, 186:14, 224:20, 250:9, 309:25, 316:17, 316:25, 317:4, 317:5,

317:6, 357:6, 365:9, 410:5, 426:23

**top** [24] - 194:2, 196:12, 255:6, 298:19, 298:24, 299:23, 300:11, 300:14, 323:23, 330:9, 331:8, 331:24, 332:11, 333:9, 333:11, 333:20, 341:21, 341:24, 362:24, 378:18, 380:11, 380:15, 418:22, 420:16

**topic** [1] - 296:16

**topics** [2] - 320:25, 321:2

**torn** [1] - 302:21

**tossing** [1] - 172:15

**total** [3] - 292:12, 333:10, 416:20

**totally** [3] - 242:18, 292:11, 360:24

**tough** [1] - 323:22

**toughest** [1] - 258:12

**towards** [1] - 249:2

**town** [2] - 227:11, 321:7

**toxicology** [2] - 188:25, 207:16

**toys** [1] - 217:5

**traditional** [1] - 217:24

**training** [21] - 178:24, 183:21, 189:13, 287:24, 288:16, 288:19, 288:22, 288:23, 300:20, 318:5, 318:8, 318:15, 318:21, 320:18, 320:21, 334:2, 340:23, 367:24, 368:2, 373:6

**transfer** [1] - 231:22

**transferred** [5] - 218:24, 220:20, 232:7, 338:20, 339:1

**transferring** [1] - 338:16

**translational** [2] - 299:19, 299:21

**trauma** [21] - 180:3, 182:5, 196:14, 269:10, 289:2, 295:18, 297:17, 297:18, 298:5, 298:8, 298:9, 298:11, 298:16, 302:7, 302:20, 328:7, 328:9, 338:17, 356:10,

373:3, 377:16

**traumas** [1] - 269:15

**traumatic** [14] - 179:4, 179:6, 181:11, 184:1, 205:12, 210:10, 269:4, 269:7, 269:23, 299:23, 303:6, 338:7, 342:20, 388:25

**travel** [2] - 241:18, 289:13

**treat** [2] - 217:8, 346:23

**treatise** [3] - 407:8, 407:11, 411:23

**treatises** [4] - 411:13, 411:15, 411:25, 412:1

**TRIAL** [1] - 155:14

**trial** [9] - 214:9, 220:7, 252:9, 282:3, 313:14, 347:11, 387:25, 388:3, 391:21

**tribal** [1] - 350:25

**Tribal** [2] - 199:2, 258:9

**tried** [3] - 164:1, 182:19, 361:25

**tries** [1] - 332:16

**trip** [2] - 219:3, 220:13

**trivial** [2] - 356:2, 388:18

**trouble** [5] - 234:9, 302:13, 302:18, 302:23, 304:24

**troubled** [1] - 352:9

**truck** [1] - 212:18

**true** [15] - 171:1, 171:2, 173:22, 196:22, 208:8, 219:17, 245:23, 284:11, 312:24, 358:13, 407:9, 408:3

**truly** [2] - 163:14, 393:9

**trump** [1] - 372:9

**truth** [4] - 235:8, 235:23, 236:1, 250:11

**try** [8] - 162:23, 175:11, 182:24, 271:19, 288:20, 293:4, 308:1, 343:9

**trying** [20] - 163:14, 164:9, 178:7, 192:22, 199:1, 200:22, 207:14, 209:2, 225:14, 235:14, 257:11, 258:12, 265:20, 266:10,

270:13, 289:3, 325:18, 332:24, 352:10, 426:25

**Tuesday** [1] - 243:14, 243:17

**turn** [5] - 162:25, 163:13, 224:21, 316:13, 425:24

**turned** [1] - 169:12

**turns** [1] - 352:13

**TV** [1] - 406:11

**twelve** [1] - 310:22

**twice** [2] - 212:9, 415:2

**two** [76] - 157:6, 157:19, 165:23, 168:17, 169:14, 171:17, 174:6, 178:2, 183:13, 188:20, 191:15, 198:6, 198:7, 201:16, 204:1, 204:11, 209:19, 211:15, 213:7, 218:11, 230:17, 230:21, 244:6, 244:13, 256:19, 282:12, 282:13, 290:24, 298:21, 301:8, 301:9, 301:20, 305:23, 323:25, 324:1, 329:10, 331:8, 331:16, 332:1, 332:8, 333:14, 333:23, 334:8, 334:12, 334:21, 334:22, 334:23, 334:25, 335:2, 335:13, 335:14, 336:25, 337:5, 340:13, 340:24, 346:25, 354:9, 359:9, 360:1, 362:25, 367:22, 369:13, 370:3, 379:7, 383:15, 402:19, 403:6, 403:22, 408:1, 409:13, 412:11, 413:8, 413:16, 414:25, 416:15

**two-foot** [2] - 301:9, 403:6

**two-inch** [1] - 301:8

**two-year-old** [3] - 183:13, 201:16, 340:24

**type** [20] - 179:16, 181:13, 182:12, 182:21, 182:23, 206:4, 210:17, 248:1, 281:13, 299:10, 308:14, 310:13,

318:19, 339:19, 341:11, 380:10, 387:19, 402:11, 421:4

**types** [4] - 178:9, 304:11, 338:11, 404:3

**typical** [1] - 183:10

**typically** [2] - 343:8, 403:6

**TZ** [2] - 273:7

## U

**U.S** [6] - 155:11, 155:16, 155:19, 155:23, 212:6, 212:19

**ultimate** [2] - 184:20, 385:9

**ultimately** [3] - 162:23, 187:14, 347:18

**unanimously** [3] - 173:21, 219:16, 312:24

**unanswered** [1] - 176:4

**unaware** [1] - 260:21

**uncertainty** [1] - 376:21

**unconscious** [3] - 182:8, 183:14, 200:3

**under** [32] - 169:17, 172:24, 175:19, 175:22, 181:11, 181:15, 181:21, 186:1, 186:22, 195:17, 209:1, 218:13, 225:17, 235:21, 251:25, 285:20, 301:23, 310:12, 325:5, 361:13, 361:22, 362:5, 365:6, 365:16, 372:6, 372:11, 387:8, 390:22, 391:23, 424:9, 424:11, 425:12

**undergo** [1] - 324:24

**undergraduate** [1] - 287:11, 287:12

**underlying** [1] - 379:10

**underneath** [6] - 175:7, 295:5, 297:25, 298:3, 323:24, 345:11

**underside** [1] - 332:18

**understood** [7] - 252:13, 266:13, 326:19, 345:25, 347:15, 365:14, 404:8

**undisclosed** [2] - 390:23, 391:22

**unexplained** [1] - 249:12

**unfairly** [1] - 236:24

**United** [2] - 172:22, 173:12

**UNITED** [2] - 155:1, 155:5

**University** [10] - 263:18, 263:20, 287:12, 287:17, 318:3, 318:9, 318:22, 367:23, 367:25

**unknowns** [1] - 376:9

**unlawfully** [1] - 356:4

**unless** [4] - 252:10, 269:20, 299:25, 423:23

**unlikely** [6] - 183:17, 409:12, 421:8, 422:19, 422:21, 422:22

**unresponsive** [8] - 240:14, 241:3, 294:15, 328:14, 329:17, 329:18, 329:20, 337:9

**unresponsiveness** [1] - 328:11

**untouched** [1] - 176:4

**unusual** [4] - 207:19, 267:17, 298:8, 305:23

**unwitnessed** [1] - 405:4

**up** [95] - 157:15, 165:3, 174:12, 175:6, 179:7, 207:12, 209:2, 209:18, 211:11, 215:5, 217:6, 217:7, 225:12, 226:9, 227:13, 228:10, 228:15, 228:17, 228:19, 229:7, 229:10, 231:12, 232:14, 233:8, 233:21, 240:1, 241:7, 241:11, 241:18, 241:21, 241:24, 242:2, 244:9, 248:2, 251:15, 257:14, 259:1, 261:4, 261:14, 272:22, 279:18, 282:18, 282:20, 283:11, 299:1, 300:3, 300:7, 300:8, 302:22, 303:15, 306:12,

308:10, 311:5, 313:22, 315:14, 315:15, 326:25, 332:21, 336:6, 336:7, 336:11, 336:14, 336:19, 348:16, 349:5, 350:7, 352:24, 354:5, 358:14, 359:10, 362:14, 378:15, 380:6, 384:7, 385:16, 385:17, 385:21, 385:23, 385:25, 394:7, 410:1, 410:11, 415:2, 417:3, 417:5, 419:22, 422:8, 423:23, 425:2, 425:4, 427:3, 427:7, 427:9, 427:10

**updated** [1] - 259:25

**updates** [1] - 246:21

**upper** [1] - 202:6

**urged** [1] - 224:15

**urinalysis** [1] - 319:12

**useful** [1] - 395:25

**uses** [1] - 185:10

**usual** [1] - 417:8

**utilized** [1] - 283:3

## V

**validity** [1] - 363:19

**value** [8] - 173:11, 219:24, 285:25, 286:4, 286:5, 286:8, 313:6

**variety** [1] - 250:7

**various** [6] - 180:14, 321:2, 322:12, 322:22, 323:1, 325:24

**vast** [3] - 399:16, 411:18, 411:20

**Vegas** [1] - 289:19

**vehicle** [2] - 182:22, 373:18

**ventilated** [1] - 268:13

**ventricles** [1] - 181:6

**verdict** [1] - 365:3

**versus** [6] - 177:20, 286:8, 380:11, 380:12, 383:25, 388:25

**vertex** [1] - 323:18

**vessels** [1] - 295:14

**victim** [8] - 169:20, 235:15, 247:12,

251:21, 281:6, 281:21, 292:17, 359:20

**victim's** [2] - 251:11, 251:15

**victims** [1] - 292:20

**VICTOR** [1] - 175:15

**video** [1] - 405:15

**videos** [1] - 231:16

**view** [3] - 292:24, 365:16, 425:13

**viewed** [1] - 369:22

**views** [1] - 357:15

**violence** [6] - 249:11, 257:5, 258:1, 259:17, 259:18, 356:15

**violent** [1] - 187:9

**viral** [2] - 416:17, 417:6

**virtually** [2] - 409:15, 409:16

**visit** [3] - 166:1, 177:8, 314:13

**visitation** [5] - 226:5, 253:25, 254:2, 254:5, 260:9

**visitations** [1] - 226:7

**visited** [1] - 227:5

**visits** [1] - 370:2

**vitae** [8] - 189:8, 189:12, 189:16, 290:6, 290:7, 322:4, 322:20, 368:15

**voice** [2] - 161:17, 223:18

**VOLUME** [1] - 155:6

**volume** [2] - 155:14, 341:7

**volumes** [2] - 296:14, 301:18

**voluntary** [1] - 357:6

**vomiting** [4] - 377:3, 377:8, 396:23, 404:3

**vote** [1] - 175:11

**vs** [3] - 155:6, 172:22, 173:12

**vulnerable** [2] - 247:13, 248:24

## W

**W-O-L-C-O-T-T** [1] - 350:23

**Wahpeton** [3] - 213:1, 215:9, 351:1

**waited** [1] - 192:8

**waiting** [1] - 242:3

**wake** [5] - 231:12, 351:18, 351:19, 351:25, 426:2

**walked** [1] - 229:10

**wants** [3] - 174:14, 186:10, 361:12

**warm** [3] - 175:5, 175:7, 175:10

**warm-blooded** [1] - 175:7

**warn** [1] - 194:15

**warned** [1] - 362:3

**Warrant** [1] - 347:4

**watch** [2] - 231:16, 231:20, 232:18, 353:19, 406:10

**watching** [2] - 282:13, 353:14

**water** [3] - 384:8, 416:25, 424:19

**Watertown** [4] - 216:4, 244:2, 244:3, 396:2

**ways** [3] - 269:10, 348:22, 396:23

**weak** [1] - 231:6

**weapons** [1] - 358:25

**wear** [1] - 217:6

**wearing** [1] - 217:25

**website** [1] - 382:17

**Wednesday** [6] - 231:19, 231:23, 234:1, 244:16, 244:22, 326:3

**week** [6] - 159:7, 231:18, 254:13, 274:4, 289:19, 404:18, 409:15, 410:8

**weekend** [15] - 158:11, 158:13, 159:6, 159:7, 159:10, 219:4, 220:13, 226:3, 226:6, 227:3, 228:23, 233:5, 262:15, 315:23, 415:18

**weekends** [1] - 226:14

**weeks** [10] - 169:15, 192:25, 207:17, 209:19, 209:20, 230:17, 336:24, 358:4, 360:1, 360:22

**weight** [7] - 204:2, 204:8, 204:22, 205:8, 219:24, 313:6, 383:16

**welcome** [2] - 194:10, 200:5

**well-developed** [1] - 203:19

**well-formed** [1] - 203:19

**wellness** [1] - 290:23

**whatsoever** [1] - 282:4

**whereas** [2] - 335:1, 341:5

**white** [10] - 159:2, 172:2, 182:1, 416:4, 416:13, 417:3, 417:8, 421:17, 421:20

**whole** [6] - 218:11, 250:7, 251:3, 287:25, 310:1, 417:3

**widely** [1] - 181:6

**widow** [2] - 165:9, 314:3

**Williams** [1] - 173:12

**Wilson** [1] - 306:1

**wind** [1] - 423:23

**Winnebago** [6] - 273:3, 273:4, 274:1, 274:5, 277:6, 277:7

**Wisconsin** [1] - 263:20

**Wisconsin-Madison** [1] - 263:20

**wise** [1] - 372:14

**withdraw** [1] - 250:23

**witness** [58] - 157:9, 163:24, 164:17, 164:22, 168:15, 174:19, 175:16, 185:1, 200:6, 210:23, 211:2, 211:5, 230:24, 231:25, 232:1, 232:5, 235:6, 238:15, 242:13, 245:2, 259:9, 262:25, 263:3, 267:22, 271:4, 271:10, 272:8, 272:15, 282:23, 286:10, 286:13, 286:22, 286:25, 305:13, 305:15, 305:21, 312:2, 312:5, 312:11, 317:13, 317:16, 321:12, 321:16, 345:3, 348:16, 348:17, 349:16, 349:18, 350:5, 350:15, 366:16, 374:19, 374:21, 383:10, 417:25, 426:18, 426:19, 426:25

**Witness** [24] - 161:25, 164:13, 168:7, 188:2, 206:21,

211:1, 214:17, 232:11, 233:11, 245:8, 262:24, 266:8, 271:3, 275:17, 280:3, 305:12, 312:1, 314:23, 317:12, 345:2, 355:3, 419:21, 420:12, 423:3

**WITNESS** [27] - 164:2, 167:21, 167:23, 168:3, 175:20, 175:23, 187:2, 187:4, 187:7, 192:14, 200:10, 278:5, 278:8, 278:11, 278:13, 278:15, 278:17, 278:20, 278:22, 278:24, 279:2, 279:4, 279:7, 279:10, 279:14, 279:17, 279:21

**witness'** [4] - 236:12, 391:16, 391:18, 427:1

**witnessed** [4] - 194:17, 374:4, 375:2, 375:7

**witnesses** [8] - 157:6, 168:13, 174:14, 195:22, 349:11, 355:20, 370:13, 425:1

**Wolcott** [3] - 350:13, 350:21, 365:24

**WOLCOTT** [1] - 350:14

**woman** [3] - 244:3, 244:4, 265:17

**women** [4] - 239:2, 352:3, 353:14, 361:23

**wonder** [1] - 272:11

**wondering** [1] - 271:8

**wood** [5] - 177:7, 327:21, 328:12, 345:11, 421:4

**Woodland** [1] - 211:25

**Woodrow** [1] - 306:1

**word** [7] - 209:15, 268:9, 268:10, 276:13, 362:19, 375:22, 402:14

**words** [14] - 188:1, 194:2, 194:19, 208:7, 208:12, 254:17, 299:11, 309:25, 377:17, 381:4, 391:9, 395:9, 402:16, 421:1

**worker** [5] - 263:25, 264:3, 267:20,

267:25, 268:5

**workers** [1] - 289:24

**workshops** [1] - 322:12

**world** [2] - 223:5, 272:11

**worried** [4] - 160:3, 160:12, 164:2, 221:11

**worry** [1] - 333:25

**worse** [1] - 206:18

**wound** [3] - 338:13, 373:17

**wounds** [1] - 358:23

**WRIGHT** [123] - 157:7, 157:12, 163:2, 163:4, 163:23, 164:5, 164:8, 164:11, 164:17, 164:20, 164:25, 167:18, 168:11, 168:19, 168:23, 169:3, 169:8, 174:4, 174:13, 211:3, 211:8, 217:17, 217:20, 220:11, 220:12, 224:23, 224:25, 225:16, 225:20, 225:22, 231:25, 232:4, 232:12, 232:16, 233:1, 235:5, 235:22, 236:3, 236:7, 237:2, 237:5, 237:8, 237:16, 238:9, 238:12, 245:2, 245:6, 245:14, 246:25, 247:4, 247:16, 251:8, 253:13, 255:8, 256:22, 257:8, 257:11, 258:11, 259:21, 261:1, 261:10, 262:3, 262:5, 262:20, 263:1, 263:6, 268:4, 268:22, 270:6, 270:17, 270:24, 271:5, 271:8, 271:15, 272:9, 272:19, 277:9, 279:24, 280:6, 283:2, 284:19, 284:22, 286:14, 286:17, 286:23, 287:3, 290:2, 290:4, 290:9, 290:12, 304:4, 305:9, 312:3, 313:19, 315:19, 316:20, 317:10, 345:4, 345:8, 345:16, 345:24, 346:2, 346:11, 346:25, 347:14, 347:21, 348:1, 352:18, 353:10, 354:16,

354:25, 357:12, 390:16, 390:19, 424:2, 424:4, 424:7, 424:11, 424:13, 424:15, 424:18, 425:16, 426:22

**Wright** [4] - 155:19, 171:18, 284:9, 346:6

**Wright's** [1] - 284:4

**write** [11] - 209:12, 232:1, 232:10, 233:9, 238:10, 238:13, 244:21, 245:3, 245:7, 332:19, 376:19

**writes** [1] - 232:13

**writings** [1] - 322:16

**written** [5] - 285:5, 296:7, 344:14, 344:16, 369:10

**wrote** [1] - 385:24

## X 

**X-ray** [4] - 294:22, 295:4, 327:5, 327:6

## Y

**year** [16] - 183:13, 201:16, 207:13, 212:13, 274:8, 287:14, 291:18, 299:2, 321:6, 340:24, 381:17, 383:21, 401:22, 402:1, 406:21, 407:1

**years** [35] - 165:23, 203:4, 212:8, 212:15, 212:19, 213:7, 218:11, 230:21, 244:6, 264:2, 270:8, 270:9, 275:5, 277:20, 277:24, 281:10, 281:12, 283:19, 288:1, 288:25, 292:12, 292:13, 325:12, 367:4, 367:13, 367:19, 369:9, 370:3, 372:16, 373:5, 398:18, 405:9, 406:5, 408:13

**yellow** [2] - 187:25, 310:11

**yellowish** [1] - 330:15

**yesterday** [12] - 175:22, 176:1, 176:5, 176:6, 177:9, 185:6, 186:7, 194:1, 195:4,

196:10, 305:21, 407:23

**young** [2] - 173:7, 283:6

**younger** [2] - 281:16, 373:24

**yourself** [6] - 305:19, 317:20, 321:25, 350:19, 366:20, 400:2