1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF SOUTH DAKOTA

3                       NORTHERN DIVISION
   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

4                                          Cr. 12-10047

5   UNITED STATES OF AMERICA,

6                    Plaintiff,

7       -vs-                               AUGUST 1, 2013
8                                          VOLUME III OF III

9   MARIO M. CONTRERAS,

10                   Defendant.

11

12                            U.S. District Courthouse
                              Sioux Falls, SD
13                            August 1, 2013
                              9:00 a.m.
14  *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

15                       JURY TRIAL
                         (VOLUME III)
16
    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
17  BEFORE:   The Honorable Lawrence L. Piersol, and a Jury
              U.S. District Court Judge
18            Sioux Falls, SD

19  APPEARANCES:

20  Mr. Thomas J. Wright
    U.S. Attorney's Office
21  PO Box 2638
    Sioux Falls, SD 57101-2638
22       -and-
    Mr. Jay P. Miller
23  U.S. Attorney's Office
    225 S. Pierre St.  Suite 337
24  Pierre, SD 57501-2489
                             for the Plaintiff
25

```
 1   APPEARANCES:   (Continued)

 2

 3   Mr. Sam E. Khoroosi
     Khoroosi Law Office
 4   300 N. Dakota Ave.   Suite 405
     Sioux Falls, SD 57104
 5                          for the Defendant

 6

 7   ALSO PRESENT:   Defendant Mario M. Contreras

 8

 9

10

11

12   COURT REPORTER:

13   Jill Connelly, RMR, CRR
     Federal Court Reporter
14   400 S. Phillips Ave.
     Sioux Falls, SD 57104
15   605-330-6669

16

17

18

19

20

21

22

23

24

25
```

```
  1              * * * * *  AUGUST 1, 2013  * * * * *

  2        (In open court, counsel and Defendant present,

  3   at 9:00 a.m.)

  4             THE COURT:  Good morning.  Bring in the jury,

  5   please.

  6                 (The jury entered the courtroom)

  7             THE COURT:  Good morning.  You may proceed.

  8             MR. KHOROOSI:  We call Vivian Gill.

  9                         VIVIAN GILL,

 10   called as a witness, being first duly sworn, testified as

 11   follows:

 12                      DIRECT EXAMINATION

 13   BY MR. KHOROOSI:

 14   Q.   Good morning, Vivian.  Could you state your name for

 15   the jury, please.

 16   A.   Yes.  My name is Vivian Gill Chasing Hawk.

 17   Q.   Where do you live, Vivian?

 18   A.   I live a few miles south of Sisseton.

 19   Q.   How are you related to Mario Contreras?

 20   A.   Mario is my nephew.

 21   Q.   How long have you known him?

 22   A.   All his life.

 23   Q.   Did you know Aleeyah Cook?

 24   A.   Yes.

 25   Q.   Who is Aleeyah?
```

1   A.   Aleeyah is the daughter of Mario Michael Contreras and

2   my granddaughter.

3   Q.   And you call her your granddaughter.  Could you

4   explain why you call her that?

5   A.   Sure.  In the Lakota tradition is that no child should

6   be without a grandparent or parent.  So when there's an

7   absent parent, then it's our obligation to step in and be

8   the caretaker.

9   Q.   It's not uncommon for folks to refer to their great

10  aunts and uncles as grandparents.  Correct?

11  A.   That's correct.

12  Q.   Now, when did you first meet Aleeyah?  Just when in

13  time?

14  A.   She was about three or four months old.

15  Q.   So that would probably have been about March, April

16  2010?

17  A.   Correct.

18  Q.   Who made the introduction?

19  A.   Mario did, but I call him Mike.

20  Q.   I'm sorry.  I should preface that, too.  You call

21  Mario by a nickname.  What is that nickname?

22  A.   It's Mike.

23  Q.   Why do you call him Mike?

24  A.   His middle name is Michael, Mario Michael.  We have a

25  few Mikes in our family.  But it's kind of an endearment,

"Mike."

Q.   Today if I refer to Mario and you refer to Mike, we're talking about the same person?

A.   That's correct.

Q.   So Mario introduced you when she was about a few months old.  When was the next time you saw Aleeyah?

A.   The next time was -- I was a caretaker whenever he needed a baby-sitter.  So it was kind of frequently between that time and September.

Q.   About how often during let's say the spring of 2010 would you see Aleeyah?

A.   Well, I seen her that one time, because he wanted to introduce her to me.

Q.   How about the summer of 2010?

A.   The summer?  Kind of frequently.  I mean maybe once or twice a week.  He was working at Sisseton, so my home is on the way back, so he would stop in and visit.

Q.   Were you serving as a baby-sitter at that time for Mike?

A.   Yes.

Q.   You would have Aleeyah for about how long at a time?

A.   I would baby-sit her all day long when he needed me, and then it kind of increased after September.

Q.   Why did it increase after September?

A.   Well, Mike would call me in the mornings early and let

```
 1   me know that he had Aleeyah.  Sometimes he would call and
 2   say --
 3               MR. WRIGHT:  Excuse me, I'll object to the
 4   hearsay, Your Honor.
 5               THE COURT:  Sustained.
 6   BY MR. KHOROOSI:
 7   Q.   So Mike would call you in the morning and ask you to
 8   baby-sit.
 9   A.   Correct.
10               MR. WRIGHT:  Again, object to the hearsay.
11               THE COURT:  Sustained.
12   BY MR. KHOROOSI:
13   Q.   After Mike would call you in the morning, you would
14   baby-sit?
15   A.   That's right.
16   Q.   How did you notice that Aleeyah acted normally?
17   A.   Because she was with me when I would baby-sit eight
18   hours a day.  Sometimes Mike had to work a little late, and
19   he would call me and say, "I'm a little late today."
20   Q.   That was a bad question.  How did she act and how did
21   she appear when Mario would bring her over, just in a
22   general way?
23   A.   General way?  She was happy.  He would put her down on
24   the floor, and she would come to us.  She was always happy
25   and in a good mood and smiling.
```

 1   Q.    Were there occasions when you would notice something

 2   wrong with Aleeyah?

 3   A.    Yeah.

 4   Q.    Now, she had some digestive diseases.   What

 5   precautions did you take because of that?

 6   A.    Mike was always thorough when he brought her in and

 7   said, "This is what she ate for breakfast."   She might be a

 8   little fussy because she did have acid reflux.   That

 9   affected her digestive --

10   Q.    So she was on a special diet?

11   A.    Yes.

12   Q.    What sorts of food would you need to feed her?

13   A.    We were careful about that.   Sometimes it would be

14   like oatmeal in the mornings or maybe some soup or mac and

15   cheese or the things she could tolerate.

16   Q.    Now, when Mario dropped Aleeyah off, would you also be

17   given other instructions on how to care for other ailments

18   she might have?

19   A.    Yeah.   Some of the times he would have her -- like he

20   would pick her up at 1:00 or 2:00 in the morning.   Then he

21   would tell me --

22             MR. WRIGHT:  Object to the hearsay, Your Honor.

23   Q.    You can't tell what Mario told you.

24             THE COURT:  Sustained.

25             MR. KHOROOSI:  I'm sorry, Judge.

BY MR. KHOROOSI:

Q.   You can't tell the jury what Mario told you, but you can tell what you did.  What sorts of extra things would you need to do when Mario would go and pick Aleeyah up at 1:00 or 2:00 in the morning from her mom's?

A.   Well, on several occasions she had severe diaper rash to where she was bleeding.

Q.   How did you take care of that?

A.   I would wash her.  I mean, you know, make sure she was clean.  There was always special ointment or something he sent along, so I would use that.

Q.   Did you ever notice any other injuries on Aleeyah?

A.   Well, there were a few times that she was bruised in the head.

Q.   Now, I'd like to jump forward a little bit.  You said you baby-sat pretty regularly until about September of 2011?

A.   That's correct.

Q.   I'd like to jump forward a little bit to January, the first week of January 2012.  Do you recall that week?

A.   Yes.

Q.   Now, you didn't see Aleeyah on Wednesday, the 4th. Did you?

A.   No.

Q.   Did you see her on the 5th?

1    A.    Yes.

2    Q.    How did you happen to come into contact?  Were you

3    baby-sitting?

4    A.    Yes.

5    Q.    Who brought her over?

6    A.    Mike.

7    Q.    How did Aleeyah appear that -- was it in the morning?

8    A.    The morning.

9    Q.    How did she appear that morning?

10   A.    She was pale, and she was I would say lethargic

11   because she wasn't her normal self.  She didn't want to

12   eat.  It was like the lights hurt her eyes.  I kind of

13   closed the curtains.  I thought maybe she had the flu.  So

14   I gave her Pedialyte and some baby Tylenol.  Just kind of

15   held her all day off and on, because I knew she wasn't

16   feeling well.

17   Q.    This was -- were these different symptoms than she

18   usually has with her acid reflux?

19   A.    A little bit.

20   Q.    Is she usually lethargic with her acid reflux?

21   A.    No.

22   Q.    All right.  I'm going to hand you what has been marked

23   Defense Exhibit 108.  Do you recognize that document?

24   A.    Yes, I do.

25   Q.    Is that a photograph you took?

 1   A.   Yes.

 2   Q.   When did you take that photo?

 3   A.   I took that on Thursday morning.

 4   Q.   Thursday, January 5?

 5   A.   That's correct.

 6   Q.   Of last year.

 7   A.   Yes.

 8   Q.   Does it truly and accurately reflect what you saw?

 9   A.   Yes.

10          MR. KHOROOSI:  Your Honor, I would offer Exhibit

11   108.

12          THE COURT:  Exhibit 108 is received.

13          MR. KHOROOSI:  Permission to publish?

14          THE COURT:  You may.

15   BY MR. KHOROOSI:

16   Q.   Vivian, the picture is a little bit washed out here.

17   Which one of these two girls is Aleeyah?

18   A.   Aleeyah is in the front and on the left side.

19   Q.   So on my left as I'm looking at the picture?

20   A.   Yes.

21   Q.   Is that how she looked that morning?

22   A.   Yes.

23   Q.   Is that how she usually looked that morning?

24   A.   No.

25   Q.   Is that how she usually looked when you would get her

1    in the morning?

2    A.    No.

3    Q.    You had her Thursday, baby-sat her Thursday from what

4    time until about what time?

5    A.    About 7:30 in the morning until 4:30, 5:00, maybe

6    after 5:00.

7    Q.    Is Aleeyah the only child you baby-sit?

8    A.    No.

9    Q.    How many children do you have on an average day in

10   your home?

11   A.    During that time it was these two, Miley and Aleeyah.

12   Q.    Do other folks use you as a baby-sitter from time to

13   time?

14   A.    Yes.

15   Q.    In fact, folks around there, even who aren't related

16   to you, have a nickname for you.  What do they call you?

17   A.    Auntie Viv.

18   Q.    Now, you had her Friday, as well.  Right?

19   A.    Yes.

20   Q.    From what time until what time?

21   A.    Pretty much same time.  Maybe a little later, 5:30,

22   6:00.  Mike had to work a little later.

23   Q.    We're talking about January 6.  Were you present at

24   the wake that evening?

25   A.    No, I wasn't.

```
 1   Q.   Did you see Aleeyah on Saturday?

 2   A.   No, I didn't.

 3   Q.   Did you see Aleeyah on Sunday?

 4   A.   No, I didn't.

 5   Q.   When was the next time you saw Aleeyah?

 6   A.   Monday morning.

 7   Q.   Was that at the hospital?

 8   A.   Yes.

 9   Q.   What caused you to go to the hospital?

10   A.   I received a phone call.  I noticed that Mike hadn't

11   shown up, and I received a phone call about 8:30 from one

12   of my nieces.

13   Q.   In response to that phone call, you went down to the

14   hospital?

15   A.   That's correct.

16   Q.   Now, when you arrived at the hospital, did you go

17   immediately into Aleeyah's room?

18   A.   No.  I went into the waiting room where the families

19   were starting to gather.  I asked where Mike was, and they

20   said he's in there with her.  So I immediately went in

21   there.

22   Q.   When you approached Mike, how did Mike react?

23   A.   He was standing kind of over the bed watching the

24   doctors and the nurses.  He noticed I came in, so he turned

25   to the left and saw me.  Then he broke down and just cried
```

1    and cried and cried.

2    Q.   Is Mike the kind of guy that cries very often?

3    A.   Not often, no.

4    Q.   How did you notice how Mike was interacting with

5    doctors and hospital staff?

6    A.   Could you repeat that?

7    Q.   How was Mike reacting with the doctors and hospital

8    staff, without saying what anyone said?

9    A.   He was very concerned.  He was standing over there

10   trying to -- he looked helpless, and he was like very

11   scared, very worried.  You could tell he was holding back

12   his tears.

13            MR. WRIGHT:  Object to those conclusions.  Calls

14   for another person's state of mind.

15            THE COURT:  Overruled.

16   BY MR. KHOROOSI:

17   Q.   What was Mike's facial expression like?  What was his

18   affect?

19   A.   Very cared, very worried.

20   Q.   Was he quiet?  Was he gregarious?  Was he talking a

21   lot?

22   A.   He was quiet.

23   Q.   Is that unusual for Mike?

24   A.   Yes.

25   Q.   When Aleeyah was transferred to Fargo, did you go

```
 1   along?
 2   A.   Yes.
 3   Q.   How was Mike's demeanor in Fargo?
 4   A.   In Fargo he was very, very concerned.  He was just
 5   very distraught.  I mean he was so concerned for his
 6   daughter.
 7            MR. KHOROOSI:  Thank you.  I don't have anything
 8   further.
 9            THE COURT:  You may examine.
10                        CROSS-EXAMINATION
11   BY MR. WRIGHT:
12   Q.   Ma'am, do I understand your testimony that you are the
13   Defendant's aunt.  Is that right?
14   A.   That's correct.
15   Q.   You said that you did have some contact with Aleeyah
16   during the summer of 2010?
17   A.   Yes.
18   Q.   Would you say that was a lot of contact?
19   A.   It was frequent enough to be real familiar with her.
20   Q.   So if the Defendant told Agent Mertz he had very
21   little contact with her during the first 22 months of her
22   life, would that be contrary to your understanding?
23   A.   That's contrary to my understanding.
24   Q.   Do you have any reason why the Defendant would tell
25   Agent Mertz that?
```

1          MR. KHOROOSI:  Objection.  Calls for speculation.

2          THE COURT:  Sustained.

3    BY MR. WRIGHT:

4    Q.   How much contact are you saying he had with Aleeyah

5    during the first six months of her life?

6    A.   As much as he could.

7    Q.   Are you implying that Shannon was keeping her from

8    him?

9    A.   Yes.

10   Q.   Okay.  Your nephew actually demanded a DNA test.

11         MR. KHOROOSI:  Objection, Your Honor.  It's

12   hearsay.  It's beyond the scope of direct.

13         THE COURT:  Overruled.

14         MR. KHOROOSI:  And it's argumentative.

15         THE COURT:  Overruled.

16   BY MR. WRIGHT:

17   Q.   Mike demanded a DNA test before he even acknowledged

18   he was Aleeyah's father.  Isn't that right?

19   A.   No.

20   Q.   That's not right?

21   A.   No.

22   Q.   How do you know that?

23   A.   Because he asked me, he introduced me to her before

24   the rest of the family.  I said to him, "You know, she's

25   gorgeous.  She's beautiful."  He said to me her mother said

1   that if he told anybody about her, she would not let him

2   see her ever again.

3   Q.   So you're saying Shannon kept Aleeyah from the

4   Defendant?

5   A.   I believe the first few months of her birth.

6   Q.   Let's talk about the times you were baby-sitting

7   Aleeyah.  You said often you would baby-sit her all day

8   long.  Right?

9   A.   That's correct.

10  Q.   Those were particular weekends when the Defendant had

11  custody of Aleeyah?

12  A.   Yes.

13  Q.   Those were weekends when Shannon allowed the Defendant

14  to have that custody.  Isn't that correct?

15  A.   I believe that he earnestly sought to see his

16  daughter.

17  Q.   I understand that.  There was no Court-ordered

18  visitation in this case.  Was there?

19  A.   No, because there was an agreement between them.

20  Q.   Shannon wasn't required by a Judge to transfer Aleeyah

21  to the Defendant at anytime.  Was she?

22  A.   I don't believe there was a Court Order, but she would

23  call him frequently to have him come and get her.

24  Q.   It was up to Shannon's discretion.

25  A.   Maybe 1:00, 2:00 in the morning.

1   Q.   Oftentimes when Shannon let the Defendant have

2   Aleeyah, what I'm hearing you say is you are the one that

3   was watching Aleeyah.  Isn't that right?

4   A.   I watched her frequently, yes.

5   Q.   So when the Defendant would get Aleeyah for the

6   weekend, he would give her to you so you can watch her all

7   day.

8   A.   That's not correct.  I watched her when he had to

9   work.

10  Q.   I just thought we were talking about the weekends.

11  A.   Sometimes he had to be called in on the weekends, so

12  if he had to go in for four hours, he would leave her with

13  me, and he would come back and get her.

14  Q.   Didn't you just tell this jury in the summer of 2010

15  you would routinely watch her all day long, eight hours a

16  day?

17  A.   That's not what I said.

18  Q.   I guess the jury can consider that.  You said she had

19  some digestive problems.

20  A.   That's correct.

21  Q.   Acid reflux?

22  A.   Yes.

23  Q.   The digestive problems and acid reflux often led her

24  to throw up.  Didn't it?

25  A.   Yes.

1    Q.   She would have certain milk products that would bother

2    her and make her throw up?

3    A.   Yes.

4    Q.   Also, there were certain foods that would bother her,

5    and she would throw up?

6    A.   Yes.

7    Q.   This jury heard testimony yesterday that Aleeyah threw

8    up Friday night at the wake.

9    A.   That's right.

10   Q.   That was because of the food they were serving at the

11   wake.  Wasn't it?

12   A.   No.  She threw up frequently when I had her Thursday

13   and Friday, as well.  That's why I thought she had the flu,

14   because she couldn't handle anything.  I gave her Pedialyte

15   and let her sip on that.  She was right like that right

16   away on Thursday.  That's why I was concerned.  Mike and I

17   both talked about this.

18   Q.   Thursday and Friday of the week before she died, you

19   believe she had the flu?

20   A.   Yes.

21   Q.   You understand by Sunday she was just fine?

22   A.   Repeat that, please.

23   Q.   Thursday and Friday you thought she had the flu?

24   A.   Yes.

25   Q.   On Sunday she was just fine.  Wasn't she?

```
 1              MR. KHOROOSI:  Objection.  That calls for
 2    speculation.  The witness testified on direct that she --
 3              THE COURT:  I don't want a speech.  I just want
 4    an objection.  What is it?
 5              MR. KHOROOSI:  It's been asked and answered.
 6    He's asking her to --
 7              THE COURT:  Asked and answered?  Is that your
 8    objection?
 9              MR. KHOROOSI:  Yes.
10              THE COURT:  Overruled.
11    BY MR. WRIGHT:
12    Q.   You can answer.
13    A.   Did you say I seen her on Sunday?  I didn't.
14    Q.   To the best of your knowledge, she was just fine on
15    Sunday?
16    A.   I wasn't with her on Sunday.
17    Q.   I understand that.  So you have no reason to believe
18    she had the flu and threw up on Sunday.  Do you?
19    A.   We visited later --
20    Q.   I'm not asking what anybody told you.
21    A.   I had no contact with her on Sunday.
22    Q.   Your picture here, this was on Thursday or Friday you
23    took this picture.
24    A.   Thursday morning early.
25    Q.   You took this picture just to show she had the flu?
```

A.   No.  I was trying to get her to smile.  We just
finished breakfast, but she wouldn't eat.  You could tell
by the frown on her face that she had a headache.  We
always took pictures of everybody.  I took pictures
frequently, but that morning I was trying to get her to
smile.

Q.   That particular morning I understand you thought she
had the flu.  Is that right?

A.   That's correct.

Q.   It's not unusual for a child not to smile when she has
the flu.

A.   That's right.

Q.   Friday night the Defendant had custody of Aleeyah,
too.  Didn't he?

A.   Yes.

Q.   You watched her essentially all Friday?

A.   Yes, I did.

Q.   Then Friday night he went to the wake.  Didn't he?

A.   Yes.

Q.   We heard testimony yesterday that a woman at the wake
said that the women in the kitchen were watching Aleeyah.
You wouldn't disagree with that.  Would you?

A.   We all did.  Traditionally we did make sure we'd be
comfortable with anybody who knew us.  We all kept an eye
on everybody's kids.

1    Q.    While the women were watching Aleeyah at the wake, the

2    Defendant was playing the drums.  Wasn't he?

3    A.    That's correct.

4    Q.    At the wake.

5    A.    This is what -- because on Monday when she was --

6    Q.    We're talking about Friday, Friday night.  He was

7    playing the drums while the women in the kitchen were

8    watching Aleeyah.

9              MR. KHOROOSI:  Objection.  Outside the scope of

10   direct.

11             THE COURT:  Overruled.

12   BY MR. WRIGHT:

13   Q.    Is that correct?

14   A.    I was not there Friday evening.

15   Q.    So Friday you watched Aleeyah all day.  The women in

16   the kitchen watched Aleeyah while he played the drums?

17   A.    I was not there Friday night.

18   Q.    What I'm getting at is, the Defendant isn't very used

19   to being around young children.  Is he?

20   A.    Oh, he's been around my kids, my grandkids.  He's

21   around kids a lot.

22   Q.    And who is watching those kids when he isn't around?

23   A.    We all are as a family.

24   Q.    Most of the time he's having you and other women watch

25   them.  Isn't he?

A.   No.  Only when he had to go to work.

Q.   Okay.  The particular Monday morning when Aleeyah went comatose, who do you understand was the only adult with Aleeyah that morning before she came to the hospital?

A.   Well, I knew that Mike was the caretaker of her.

Q.   No other adult there at the house.  Was there?

A.   I couldn't tell you that, because I wasn't there.

        MR. WRIGHT:  Thank you.  That's all.

        THE COURT:  Redirect?

                    REDIRECT EXAMINATION

BY MR. KHOROOSI:

Q.   Vivian, you were asked how much time you spent with Aleeyah.  When would Mike ask you to baby-sit?

A.   Sometimes he would call at 6:30 sometimes when he did get her in the morning and let me know.

Q.   When you would have Aleeyah, Mike would be where?

A.   He would be at work.

Q.   If Mike didn't have work, did he drop Aleeyah off at your house?

A.   No.

Q.   You were asked about the picture you took of Aleeyah. Did you take that picture because you knew you would be testifying here today?

A.   No.

Q.   Why did you take that picture?

```
 1   A.   Like I stated, we take a lot of pictures of the kids

 2   and grandkids.  That morning I knew she wasn't feeling

 3   well.  We had just got done eating breakfast.  She couldn't

 4   eat, so I gave her some Pedialyte.

 5        Anyway, I took that picture just to try to get her to

 6   smile a little bit, because she liked taking pictures.

 7             MR. KHOROOSI:  Thank you.  Nothing further.

 8             THE COURT:  Anything further?

 9             MR. WRIGHT:  Just real briefly.

10             THE COURT:  Very well.

11                      RECROSS-EXAMINATION

12   BY MR. WRIGHT:

13   Q.   In referencing that picture, as I understand it, the

14   significance of that picture today is that she had the flu

15   that morning?

16   A.   No.  Just that she wasn't feeling well.  Something was

17   wrong with her.  She wasn't the same.

18   Q.   And you thought it was the flu.

19   A.   Well, at first I did.

20   Q.   You gave her Pedialyte?

21   A.   Gave her Pedialyte, and treated her like she did have

22   the flu, because she wasn't well.

23             MR. KHOROOSI:  Nothing further.

24             THE COURT:  Thank you.  You may step down.

25                      (Witness excused)
```

```
 1            THE COURT:  Call your next witness.
 2            MR. KHOROOSI:  Call Dennis Gill.
 3                        DENNIS GILL,
 4   called as a witness, being first duly sworn, testified as
 5   follows:
 6                      DIRECT EXAMINATION
 7   BY MR. KHOROOSI:
 8   Q.   Good morning, Dennis.  Could you state your name for
 9   the jury.
10   A.   Dennis Gill.
11   Q.   How do you know Mario Contreras?
12   A.   He's my nephew.
13   Q.   Where do you live, Dennis?
14   A.   3322 Gill Road, Waubay, South Dakota.
15   Q.   Is that very close to Mario?
16   A.   About a block.
17   Q.   About a city block?
18   A.   About a city block.
19   Q.   But you live out in the country.  Correct?
20   A.   Yes.
21            MR. WRIGHT:  Excuse me, Your Honor.  We would
22   object to any exhibit being published before it's
23   introduced.
24            THE COURT:  Yes.
25            MR. KHOROOSI:  I apologize, Your Honor.
```

```
 1   BY MR. KHOROOSI:

 2   Q.   Mario, I'm showing you a copy of what will be entered

 3   as a --

 4             MR. WRIGHT:  Excuse me.  That's Dennis, not

 5   Mario.

 6   BY MR. KHOROOSI:

 7   Q.   I'm sorry.  Dennis, I'm showing you a digital copy of

 8   what will be marked Exhibit 103.  Do you recognize that

 9   photograph?

10   A.   Yes, I do.

11   Q.   What is it?

12   A.   It's an aerial view of where I live.

13   Q.   Of Gill Road?

14   A.   Yes.

15   Q.   Have you seen this before?

16   A.   Yes, I have.

17   Q.   Was it a true and accurate representation the last

18   time I showed it to you?

19   A.   Yes, it is.

20   Q.   Is it a true and accurate representation today?

21   A.   Yes, it is.

22   Q.   These two markings that have been added, do they

23   accurately reflect the labels beneath those circles?

24   A.   Yes, they do.

25             MR. KHOROOSI:  Your Honor, I would move the
```

 1  admission of Exhibit 103.

 2          MR. WRIGHT:  Could I see it, please?  We have no

 3  objection to foundation.

 4          THE COURT:  Well, 103 is received.  You're not

 5  going to want to give up your computer, because the clerk's

 6  office is going to get it.

 7          MR. KHOROOSI:  No, Your Honor.  We've agreed --

 8  the prosecution has agreed they wouldn't object to

 9  foundation, and we could enter a printed copy at a later

10  time.

11          THE COURT:  All right.  It's received.

12          MR. WRIGHT:  Your Honor, may I be heard on that?

13          THE COURT:  Yes.

14          MR. WRIGHT:  Actually I told him we would not

15  object to the foundation, but we're going to make an

16  objection to the relevance to the case.

17          THE COURT:  Have you made a relevancy objection

18  now then?

19          MR. WRIGHT:  That's what I'm making.

20          THE COURT:  Overruled.

21          MR. KHOROOSI:  Permission to publish?

22          THE COURT:  You may.

23  BY MR. KHOROOSI:

24  Q.   If you can take a look at the monitor, is that Exhibit

25  103?  Is that the aerial photograph you were just looking

```
 1    at?

 2    A.    Yes.

 3    Q.    Where it says "Mario's house," that's where Mario

 4    lives?

 5    A.    Yes.

 6    Q.    Where it says "Dennis Gill's house," that's where you

 7    live?

 8    A.    Yes.

 9    Q.    Dennis, about how far do you and Mario live from the

10    hospital in Sisseton, if you know?

11    A.    Twenty miles, 25 miles maybe.

12    Q.    How long does it take to get there?

13    A.    Half an hour, 45 minutes, an hour maybe.

14    Q.    Does it depend on traffic and everything like that?

15    A.    Yes.

16    Q.    Construction?  Now, do you remember seeing Mike on the

17    morning of January 9, 2012?

18    A.    Yes.

19    Q.    About what time in the morning did you see him?

20    A.    Early before 8:00.

21    Q.    Did Mike come over to your house that morning?

22    A.    Yes, he did.

23    Q.    Were you expecting him?

24    A.    No, I wasn't.

25    Q.    Was Mike alone?
```

1   A.   No.  He was carrying his daughter.

2   Q.   Was that Aleeyah?

3   A.   Yes.

4   Q.   How did Mike appear to you at that time?

5   A.   He was pretty shaken.

6   Q.   He was pretty shaken?

7   A.   Shaken, panicked.

8   Q.   What did you understand to be the problem?

9   A.   He pounded on the door, and he was carrying her in.

10              MR. WRIGHT:  Object to the hearsay.

11              THE COURT:  Sustained.

12  BY MR. KHOROOSI:

13  Q.   Did Mike tell you what he thought was wrong with her?

14  A.   He said she --

15              MR. WRIGHT:  Same objection.

16              THE COURT:  Yes.  The answer would be "yes," but

17  beyond that it's hearsay.  Sustained.

18  BY MR. KHOROOSI:

19  Q.   After Mike told you what he thought was wrong with

20  her, what did you do?

21  A.   I started to try to revive her.

22  Q.   Now, have you been trained in that sort of thing?

23  A.   Yes, when I was in the service.

24  Q.   When you were in the service.  What branch of the

25  service were you in, sir?

456

```
 1   A.    Navy.

 2   Q.    In the Navy.  Okay.  How did you come to be trained in

 3   revival in the Navy?

 4   A.    A couple stations I was placed at, was stationed at,

 5   they offered CPR classes, so I took them.

 6   Q.    Have you ever worked as an EMT?

 7   A.    No, I haven't.

 8   Q.    Have you used those revival skills before?

 9   A.    Yes, I have.

10   Q.    Have you told Mario that?

11   A.    Yes.

12   Q.    So Mario came to your house.  Did you perform CPR on

13   Aleeyah?

14   A.    Yes, I did.

15   Q.    How did you do that?

16   A.    I laid her on the back of a couch that was close to

17   the door.  It was a fairly hard surface.  I started

18   mouth-to-mouth, pushing on her chest.

19   Q.    About how long did you do that?

20   A.    I don't know.  Maybe two to five minutes.

21   Q.    Did it help?

22   A.    No, it didn't.

23   Q.    How would you describe Aleeyah's condition then?

24   A.    She was gray.  Her body was turning cold.

25   Q.    Did you give Mike any advice at that point?
```

```
 1    A.    Told him to take her down to IHS Hospital.

 2    Q.    To Coteau Hospital?

 3    A.    No.  IHS.

 4    Q.    IHS Hospital.  I'm not from the area.  I apologize.

 5    What's the difference between Coteau and IHS?

 6    A.    IHS is the Indian hospital.  Coteau is non-Indian.

 7    Q.    Why didn't you have Mario call 911?

 8    A.    Started to panic, and the response time is a long

 9    time.

10    Q.    Do you know that from experience?

11    A.    Yes, I do.

12    Q.    When you say "response time is a long time," how long

13    are we talking about to get an ambulance?

14    A.    Depends on how busy they are.  My father-in-law, it

15    took almost two hours for them to get there.

16    Q.    Why didn't you go along to help Mario?

17    A.    Mainly because of my back.

18    Q.    What was wrong with your back at the time?

19    A.    I've got six compressed discs, disc disease.  My discs

20    are collapsed.

21    Q.    How does it affect your speed of movement?

22    A.    That particular morning I couldn't hardly walk.

23           MR. KHOROOSI:  Thank you.  I don't have anything

24    further.

25                        CROSS-EXAMINATION
```

1    BY MR. WRIGHT:

2    Q.   Mr. Gill, the morning the Defendant brought Aleeyah

3    over, you weren't expecting him that morning.  Were you?

4    A.   No, I wasn't.

5    Q.   After he came in, you figured out that Aleeyah was in

6    pretty tough shape?

7    A.   Pardon?

8    Q.   After he brought Aleeyah in, you determined pretty

9    quickly that she was in tough shape.  Right?

10   A.   Yes.

11   Q.   Neither you, nor the Defendant, called 911.  Is that

12   right?

13   A.   That's right.

14   Q.   Why is it you didn't call 911?

15   A.   Well, because of the response time, and part of the

16   panic that was going on.

17   Q.   Well, sir, you testified in front of the Grand Jury in

18   this matter.  Didn't you?

19   A.   Yes.

20   Q.   At that time you were under oath?

21   A.   Yes, I was.

22   Q.   I'm on Page 33.  When I asked you why you didn't call

23   911, isn't it true you told me, "I assumed he did."  Is

24   that right?

25   A.   Pardon?

1    Q.    Did you ask Mr. Contreras if he called 911?

2    A.    No, I didn't.

3    Q.    You didn't ask him?

4    A.    No.

5    Q.    Why not?

6    A.    I think I told you at the time because of the panic.

7    Q.    So you are at your house.  Your nephew shows up with

8    his daughter.  She's nearly dead.  You didn't say to him,

9    "Did you call 911?"

10   A.    No, I didn't.

11   Q.    You never asked him that.

12   A.    No, I didn't.

13   Q.    And why didn't you call 911?

14   A.    Because I knew the response wouldn't be good.

15   Q.    You thought it would take a while.

16   A.    I know it would.

17   Q.    You are aware that an ambulance can meet people on the

18   way.  Can't they?

19   A.    On occasions, yeah, I imagine they could.

20   Q.    Pardon me?

21   A.    In some cases they could.

22   Q.    Did you think maybe you could call 911, and the

23   ambulance could meet Mario on the way to the hospital?

24   A.    No.

25   Q.    You didn't think that?

1  A.   I knew it wouldn't be possible.

2  Q.   Did you have a phone, a working phone in your house?

3  A.   I don't think I did at the time.

4  Q.   You certainly had -- in your picture there, there's

5  other people that live in that development.  Isn't there?

6  A.   Yeah.  Mario and my brother.

7  Q.   I assume you could have gotten a hold of someone in

8  the neighborhood to call the 911 authorities.  Couldn't

9  you?

10  A.   If I could have walked over, and I was in pretty bad

11  shape.

12  Q.   Essentially the Defendant shows up with his daughter

13  nearly dead, and you said, "Go to the hospital."  Right?

14  A.   Not like that, no.

15  Q.   You didn't call 911, and you didn't go with him.  Did

16  you?

17  A.   No.  Part of it is you have to live on an Indian

18  Reservation to understand that.

19  Q.   I think you said the reason you didn't go with him is

20  because your back was hurting?

21  A.   Yes.

22  Q.   So even though Aleeyah was near death, you couldn't

23  get in the car and ride with him to the hospital?

24  A.   Because of the panic, and I thought she was gone at

25  the time.

1    Q.   Was there any other adult you saw that went with Mike

2    to the hospital?

3    A.   No, I didn't.

4    Q.   So you let him get in the car with Aleeyah and another

5    child and drive to the hospital?

6    A.   Yes.

7    Q.   While you just stayed at your house?

8    A.   Yes.

9    Q.   When you were looking Aleeyah over, you didn't see any

10   bruising or any evidence of fresh trauma on her head.  Did

11   you?

12   A.   No.

13   Q.   You didn't feel a lump or see any visible swelling.

14   Did you?

15   A.   No.  I didn't really look for that.  My concern was to

16   revive her.

17   Q.   I understand you aren't a doctor.  You didn't feel a

18   lump or see a particular bruise or egg on her head.  Did

19   you?

20   A.   No.  I was trying to concentrate on reviving her.

21   Q.   Pardon?

22   A.   I was trying to revive her.

23   Q.   You were unable to do that.  Right?

24   A.   Correct.

25   Q.   When Mario came over that particular morning, he was

1   the only person that was with Aleeyah.  Isn't that correct?

2   A.   As far as I knew, yes.

3   Q.   You didn't see any other adult with him when he came

4   over?

5   A.   I didn't see one.

6   Q.   As far as you know, prior to him coming over, he was

7   the only adult that was with Aleeyah at his house?

8   A.   As far as I knew.

9            MR. WRIGHT:  Thank you.  That's all.

10           MR. KHOROOSI:  Nothing further.

11           THE COURT:  Thank you, Mr. Gill.  You may step

12   down.

13                    (Witness excused)

14           THE COURT:  Call your next witness.

15           MR. KHOROOSI:  Your Honor, my next witness is

16   scheduled for 10:00, but I believe he might be here.  Can I

17   check?

18           THE COURT:  Yes, you may.

19                    (Pause)

20           MR. KHOROOSI:  Your Honor, we call Edward

21   Seaboy, Jr.

22                    EDWARD SEABOY, JR.,

23   called as a witness, being first duly sworn, testified as

24   follows:

25                    DIRECT EXAMINATION

BY MR. KHOROOSI:

Q.  Good morning, Mr. Seaboy.  How are you?

A.  Fine.

Q.  Could you state your name for the jury.

A.  My full name is Edward D. Seaboy, Jr.

Q.  Do you go by Kenny sometimes with family?

A.  That's my nickname, yes.

Q.  Mr. Seaboy, have you -- do you ever remember meeting Mario Contreras?

A.  To my knowledge, my wife said I met him at the time he was employed at the IHS Clinic, but I don't recall.

Q.  Do you know him?

A.  Not personally.  I know his mom.

Q.  You are actually a relative of his.  Aren't you?

A.  Yes.  She's my niece.

Q.  His mom is your niece?

A.  Yes, kind of like in an Indian way.

Q.  Where do you live, sir?

A.  I live in Summit, South Dakota.

Q.  Where is that in relation to Enemy Swim and Sisseton?

A.  It's pretty close to 20 some miles from Summit, the little district I belong to, the Enemy Swim District.

Q.  Now, did you attend a wake service on the evening of January 6, 2012?

A.  Yes.

1    Q.    Did you see a girl that you later learned to be

2    Aleeyah Cook at that service?

3    A.    Pardon?

4    Q.    Did you see a little girl who you later learned to be

5    Aleeyah Cook at that service?

6    A.    I did.

7    Q.    The first time you saw her, what was she doing?

8    A.    Appears to me she was sitting on a chair against a

9    wall in a gymnasium.

10   Q.    You say you knew of Mario, but you didn't know of him

11   personally?

12   A.    No.

13   Q.    Now, there were drummers there.  Correct?

14   A.    Yes.

15   Q.    Was Mario one of those drummers?

16   A.    Yes.  He was amongst the young men that were standing

17   in a drum group.  We were all standing up.

18   Q.    Did you approach the drum group?

19   A.    Yes, I did.  When we got there at the gymnasium for

20   the wake services, I was accompanied by my wife.  My two

21   sisters were there.  My brother-in-law was officiating the

22   wake service.

23   Q.    As you were speaking to the men at the drum, what

24   happened that drew your attention away?

25   A.    When I first approached the drum over there, I shook

```
 1   hands with them for respect.  That's what we do in our

 2   culture, a native way of doing things.  Then there at my

 3   cousin's wake was songs.  So I went around and shook the

 4   hands of the people who were in that drum group.

 5   Q.   What sound did you hear that drew your attention from

 6   that?

 7   A.   What was that?

 8   Q.   What sound did you hear that drew your attention away

 9   from the drum group?

10   A.   Well, when we were there, we were all standing up, and

11   about six feet in the back of us, all of a sudden I heard a

12   crying of that little child, really loud.

13   Q.   Was the child on the chair or on the ground?

14   A.   It appeared to me that this little girl fell off the

15   chair, and that's why she was crying.  That's what appeared

16   to me.

17           MR. KHOROOSI:  Thank you, sir.  I don't have any

18   other questions.

19                      CROSS-EXAMINATION

20   BY MR. WRIGHT:

21   Q.   When you were at this wake, you said Mario was doing

22   the drumming?

23   A.   They were all around the drum group.  Some were

24   sitting, some were standing before the services.  So I went

25   over to shake hands.  Apparently I must have shook his
```

1    hand, too.

2    Q.    You said you heard a child crying.  Is that right?

3    A.    Yes.

4    Q.    Are you telling us you think that child was his

5    daughter, Aleeyah?

6    A.    What's that?

7    Q.    Are you telling us you think that child that was

8    crying was his daughter, Aleeyah?

9    A.    No, I didn't.

10   Q.    So you don't even know whose child that was that was

11   crying?

12   A.    No.

13          MR. WRIGHT:  Your Honor, we move to strike the

14   testimony as no relevance to the case.

15   A.    The thing about it is that this little girl was

16   crying.  Then he came over and picked her up to comfort

17   her.

18   BY MR. WRIGHT:

19   Q.    Okay.  So after she was crying, he came over there and

20   started talking to her?

21   A.    Right.

22   Q.    That's when you knew it was the Defendant's daughter?

23   A.    Well, he had to be the father of the girl.

24   Q.    What I'm getting at, when he was drumming, who was

25   watching the little girl?

```
 1   A.   There were ladies that were there next to the chair.

 2   Q.   So while Mario was drumming, he was having some woman

 3   watch his daughter.  Is that what you're trying to tell us?

 4   A.   Apparently that's the way it appeared.

 5   Q.   Let me ask you this.  You didn't see the girl fall.

 6   Did you?

 7   A.   No, I didn't.

 8   Q.   You just heard her crying.

 9   A.   Right.

10   Q.   So you don't know if she fell on her knee or on her

11   arm or what.  Did you?

12   A.   But when he picked her up, she wasn't on a chair.

13   Q.   Pardon me?

14   A.   When he picked her up, she wasn't on a chair.

15   Q.   But you didn't see the fall, so you don't know what

16   part of the body she fell on.

17   A.   No, we didn't.  Just some commotion that was going on

18   back there.

19            MR. WRIGHT:  Thank you.

20            MR. KHOROOSI:  Nothing further.

21            THE COURT:  Thank you, Mr. Seaboy.  You may be

22   excused.

23                  (Witness excused)

24            THE COURT:  Call your next witness.

25            MR. KHOROOSI:  Your Honor, I call Brenda Jackson.
```

1    Your Honor, before we begin Miss Jackson's testimony, could

2    I request a hearing at the bench?

3             THE COURT:  Yes.  Approach the bench, if you

4    would.

5    (Side bar with all counsel:)

6             MR. KHOROOSI:  Miss Jackson is the one that I was

7    referencing a couple days ago who has been threatened by

8    her employers.  Many of her co-workers are sitting in the

9    audience.  We would like to get on the record that

10   Miss Jackson has been harassed.  She's worried the

11   substance of her testimony may cost her her job.

12            THE COURT:  The facts that you told me before,

13   the fact she was appearing may cost her her job, without

14   regard to saying anything about the substance of her

15   testimony.  So just the fact that she appears, she's under

16   subpoena, or is it how she might testify?

17            MR. KHOROOSI:  I think both, Your Honor.

18            THE COURT:  Who does she work for?

19            MR. KHOROOSI:  She works for the IHS Clinic in

20   Sisseton.  The threat was directly, as she related to me,

21   was directly from Gail Williams.  I don't know if she's

22   been in the audience.  Miss Jackson hasn't been in the

23   courtroom obviously.

24            THE COURT:  So what do you want to do?

25            MR. KHOROOSI:  Well, I'd like to request, and I

1    realize it's unusual, especially in a criminal proceeding.

2    I would like to ask that we remove all the spectators from

3    the courtroom.

4            THE COURT:  We'll have a hearing out of the

5    presence of the jury on that one.

6            MR. WRIGHT:  We resist.

7            THE COURT:  We'll get to that.

8    (End of side bar)

9            THE COURT:  All right.  We're going to have one

10   of those hearings with regard to evidentiary matters out of

11   the presence of the jury.  So you'll take your morning

12   break a little early.  Please stand for the jury.

13               (Jury left the courtroom)

14   (Out of the presence of the jury, counsel and Defendant

15   present, the follow proceedings occurred at 10:00:)

16           THE COURT:  All right.  On the record.  I want to

17   make sure, sometimes the court reporter maybe can't hear

18   everything at a side bar.  So I want the defense to state

19   what they're concerned about and what their request is, and

20   then I'll take the Government's position.  Go ahead.

21           MR. KHOROOSI:  Well, Your Honor, I'm in a

22   Catch-22 at this point.  I'm here to ask you to clear the

23   courtroom for Miss Jackson's testimony.  I fear stating my

24   reasons in open Court, with spectators present.

25           THE COURT:  Well, you better.

1          MR. KHOROOSI:  Okay.  Well, Miss Jackson has

2     informed me she has reason to believe that her appearance

3     here and also the substance of her testimony may cost her

4     her job.

5          THE COURT:  Well, that's a serious concern.  If

6     so, could be obstruction of justice that would wind up with

7     somebody else being charged and getting tried in this

8     courtroom.

9          MR. KHOROOSI:  Yes, Your Honor.

10         THE COURT:  I've sentenced people before for

11    obstruction of justice.  What's the Government's position

12    on this?

13         MR. WRIGHT:  Your Honor, we would resist the

14    request to clear the courtroom.  We understand, Your Honor,

15    this Court tells us what the law is, and not the reverse,

16    but we're not sure the Court has the authority to clear the

17    courtroom based upon this kind of request.  We don't think

18    the defense has made a sufficient showing to clear the

19    courtroom.

20       Further, we are concerned that if the Court clears the

21    courtroom, the jury may think this is extra special or

22    secret testimony or should somehow be any different than

23    any of witness' testimony, so it could have a prominent

24    effect on the jury.

25       Finally, Your Honor, we are concerned and would move

1   in limine that if this witness does testify, there would be

2   no question or mention on the witness stand by the witness

3   that anybody has threatened her or anything else like that.

4   Otherwise the jury could assume the Government or

5   prosecution or somebody else is behind this threat, and

6   they could hold that against us.

7       I don't know who this person is that supposedly

8   threatened this potential witness, but the jury could infer

9   to the prosecution if it's brought up in this case.

10      We would resist the request.  We ask she not be

11  treated any different than any other witness.  We resist

12  any attempt for them to bring this alleged threat in front

13  of the jury.

14           MR. KHOROOSI:  Your Honor, if I could say

15  something.

16           THE COURT:  You may.

17           MR. KHOROOSI:  I don't object to that portion of

18  Miss Jackson's testimony taking place outside the presence

19  of the jury.  My purpose is not to use it as some evidence

20  in the trial to prove Mr. Contreras' guilt or innocence.  I

21  feel it's a necessary part of the record, however, for

22  potential future proceedings, if there are any.  That's why

23  I would request the hearing be on the record, but outside

24  the presence of the public.  I have no objection to hearing

25  it outside the presence of the jury.

```
 1              THE COURT:  To hearing what?

 2              MR. KHOROOSI:  To hearing Miss Jackson's

 3    testimony about the reason she is afraid to come testify

 4    today.

 5              THE COURT:  You have subpoenaed her.  Haven't

 6    you?

 7              MR. KHOROOSI:  I have.

 8              THE COURT:  So she doesn't have any choice.

 9              MR. KHOROOSI:  No.  She's here today.

10              THE COURT:  Well, she's under subpoena.  She's

11    going to testify.  If she does lose her job or her

12    employment is otherwise imperiled, that's a matter that

13    should be brought to the attention of the Court, and for

14    that matter, the United States Government, because the

15    Government has an interest in people that appear in Federal

16    trials not getting interfered with.  Whomever it is, if

17    there is somebody that thinks they are going to can her for

18    this reason, they should be made aware of the possibility

19    of obstruction of justice.

20         So we're going to go ahead.  I'm not going to clear

21    the courtroom.  She's here.  She's going to testify.  If

22    anybody is going to try to do anything to her, they're

23    already going to do it.  I'm not going to clear the

24    courtroom.

25         The other question is -- well, you don't have any
```

```
 1   reason to believe she's going to testify other than

 2   truthfully because of this possibility.  Do you?

 3            MR. KHOROOSI:  No, I don't.

 4            THE COURT:  So there's no reason to bring up the

 5   fact during her testimony that she thinks she might get

 6   fired because of her testimony.

 7            MR. KHOROOSI:  No, Your Honor.

 8            THE COURT:  So that's off grounds for both sides.

 9            MR. WRIGHT:  Can I make one other statement?

10            THE COURT:  Right.

11            MR. WRIGHT:  If the defense has any indication

12   that this witness has been threatened, or any evidence or

13   even allegation, can I ask that they get that to Special

14   Agent Mertz?

15            MR. KHOROOSI:  Yes.

16            THE COURT:  We'll take a 10-minute recess.  Then

17   we'll proceed, we'll call her, and she'll testify just like

18   anybody else.  We're in recess.

19                 (Recess at 10:05 until 10:16)

20                 (Jury entered the courtroom)

21            THE COURT:  Call your next witness.

22            MR. KHOROOSI:  Call Brenda Jackson.

23                      BRENDA JACKSON,

24   called as a witness, being first duly sworn, testified as

25   follows:
```

```
 1                    DIRECT EXAMINATION

 2   BY MR. KHOROOSI:

 3   Q.   Good morning.

 4   A.   Good morning.

 5   Q.   Could you introduce yourself to the jury?

 6   A.   I'm Brenda Jackson.

 7   Q.   Where do you live?

 8   A.   I live in Sisseton, South Dakota.

 9   Q.   How old are you?

10   A.   I am 36 years old.

11   Q.   What do you do for a living?

12   A.   I am a medical support assistant for the radiology

13   department at IHS in Sisseton.

14   Q.   IHS, is that at the hospital or clinic?

15   A.   It's a clinic.

16   Q.   How do you know Mario Contreras?

17   A.   Mario and I dated in 2011.

18   Q.   Approximately when did you start dating?

19   A.   Probably around April, May of '11.

20   Q.   Were you both employees at the IHS Clinic at the time?

21   A.   Yes.

22   Q.   Had you met before that?

23   A.   Yes.  We knew each other back in high school.

24   Q.   Had you dated in high school?

25   A.   No.  We were just acquaintances then.
```

475

```
1    Q.   Not even friends?

2    A.   We were friends.

3    Q.   After high school you moved away, though.  Where did

4    you go?

5    A.   I moved to Minnesota in 2002.

6    Q.   When did you come back?

7    A.   In the beginning of '07 -- end of '07, beginning of

8    '08.  Sorry.

9    Q.   Then you met -- you reconnected with Mike a couple

10   years later?

11   A.   Correct.

12   Q.   At the time you met Mario -- I'm sorry, we keep

13   referring to Mario and Mike.  Is that the same person?

14   A.   Yes.

15   Q.   So you met Mario or reconnected with him.  At that

16   time -- strike that.  When did you meet Aleeyah Cook?

17   A.   I met Aleeyah the second visit up to Mario's house at

18   the bay.  The family has a lake-front area.  I actually got

19   to meet her the second visit I spent with him up there.

20   Q.   The second time you went to Mario's house, you met

21   Aleeyah there?

22   A.   Yes.

23   Q.   That would have been about what time frame are we

24   talking about?

25   A.   In the summer, because everybody was swimming.  So
```

1   probably around July.  June, July maybe.

2   Q.   So you and Mario had been dating a couple of months?

3   A.   Right.

4   Q.   Do you have any kids?

5   A.   I have one son that I adopted, and he's four months

6   old.

7   Q.   And you and Mario don't have any children together.

8   Is that correct?

9   A.   That's correct.

10   Q.   When you first started having contact with Aleeyah,

11   how often were you seeing Mario outside of work?

12   A.   It was mainly on weekends.  After we started seeing

13   each other frequently, it was pretty much every weekend.

14   Q.   About how long did it take until you guys were

15   spending about every weekend together?

16   A.   Probably a month or so.

17   Q.   Would they typically be at your house or his house?

18   A.   We typically were at his house.

19   Q.   During those beginning few months, how often would you

20   see Aleeyah when you were at Mario's?

21   A.   Whenever he had her, which in the beginning wasn't as

22   often as it was towards the end.

23   Q.   So if we're talking about the summer of 2011, June,

24   July, August, how frequently are we talking about that

25   Mario would have Aleeyah?

1    A.   I think he was trying to have her every other weekend.

2    I was never part of the decisions on that.  I think then it

3    was every other weekend or whenever he agreed to take her

4    or they made the arrangements for him to have her.

5    Q.   The visitation arrangement, as you understood it, was

6    there a Court Order in effect that entitled Mario to

7    visitation?

8    A.   I wasn't aware of any Court stuff with that.

9    Q.   So when would he get to have visitation?  How would

10   they arrange that?

11   A.   Pretty much I think it was whenever she needed him to.

12   Q.   When you say "she," you are referring to?

13   A.   Shannon.  Aleeyah's mother, Shannon.

14   Q.   Shannon Sine?

15   A.   Yes.

16   Q.   So she would call and say it's okay to take the little

17   girl, and Mario would take her?

18   A.   Yes.  Then there were times, also, that we would

19   request to take her for the weekend to go do things.

20   Q.   Generally was Shannon willing to grant that time?

21   A.   Yes.  I believe so.  I really wasn't a part of how

22   that was set up.

23   Q.   You are seeing her about every other weekend.  When

24   did the contacts become more frequent?

25   A.   After the summertime, beginning when it was starting

1    to get cold and into the wintertime, it seemed like we were

2    having her more frequent, unexpectedly.

3    Q.   What do you mean by "unexpectedly"?

4    A.   We would get calls that he would need to come pick her

5    up.

6    Q.   What time of day are we talking about?

7    A.   Just depending.  Sometimes it was 1:00, 2:00 in the

8    morning.  Sometimes it was first thing in the morning.

9    Q.   When Mario would get those calls at 1:00 or 2:00 in

10   the morning, would he go over and get Aleeyah?

11   A.   Absolutely.

12   Q.   Now, when you would pick Aleeyah up, how would you

13   describe her condition?

14             MR. WRIGHT:  Can we ask for a time frame when

15   we're talking about here?

16             MR. KHOROOSI:  I'm sorry, I'll specify.

17   BY MR. KHOROOSI:

18   Q.   When we're talking about September and beyond 2011

19   when the frequency increased, what would you notice about

20   Aleeyah's physical condition?

21   A.   Around that time we were starting to receive Aleeyah

22   -- it was a lot different from the beginning when it was

23   planned visits.  We would get her -- if we had to pick her

24   up -- for example, if we had to pick her up from school,

25   short notice, a few of the times she would come in clothes

1    that didn't fit her.  Nothing in her backpack as far as

2    diapers.

3                MR. WRIGHT:  Your Honor, may we approach the

4    bench?

5                THE COURT:  You may.

6    (Side bar with all counsel:)

7                MR. WRIGHT:  We would object to all this

8    testimony.  This is the character evidence that our two

9    motions in limine sought to preclude.  Again, we understood

10   the Court's order was that counsel had to approach the

11   bench and ask permission before they could go into any of

12   this.

13      What they are trying to do with this testimony is

14   paint Shannon into some kind of bad mother, which again

15   goes to her character, which we think the Court precluded,

16   and we would move for no further reference to it, and that

17   last testimony be stricken.

18                MR. KHOROOSI:  Your Honor, this case is about

19   Aleeyah Cook, not Shannon Sine.  We're not introducing it

20   to somehow damage the character of the mother.  The

21   testimony will show on occasion she had bruises on her head

22   when she showed up.  Miss Jackson witnessed those

23   personally.  She has photographs that reflect what her

24   perception of these bruises were.  They go directly to the

25   central issue, which is whether or not Mario hit his baby

```
 1   girl in the head.
 2            MR. WRIGHT:  Can I be heard on that?
 3            THE COURT:  Yes.
 4            MR. WRIGHT:  As you said, we agree the bruises is
 5   fine, if you have evidence of bruises.  She's talking about
 6   changing diapers, clothes not fitting, and stuff like that.
 7            THE COURT:  It's two different things.  The
 8   bruises, that's fair game.  This business about whether or
 9   not she's a good mother or not, that's not an issue, other
10   than the fact that bruises, and however that might
11   adversely reflect upon the mother, that's still fair game.
12   But what other than bruises?
13            MR. KHOROOSI:  She'll testify that the child
14   would smell bad.  She will testify that -- I'm just telling
15   the Court, so we don't have to come up here every time.
16   She'll testify she smelled bad.  She will testify the child
17   had diaper rash so bad that she was bleeding.  She'll
18   testify about other unexplained injuries on the head, on
19   the legs, mostly bruises.
20            THE COURT:  What injuries other than bruises?
21            MR. KHOROOSI:  Nothing significant, other than
22   bruises.  Maybe a couple scratches.
23            THE COURT:  The fact she doesn't think she's
24   clean, and, of course, she wasn't potty trained yet at this
25   time, so sometimes she will smell if she's soiled her
```

1    diapers.  The testimony was she got spanked at least five

2    months earlier for not taking her Pamper once she had been

3    changed.  There hasn't been testimony with regard to what

4    amount she was toilet trained at the time she died.

5            MR. KHOROOSI:  Miss Johnson will testify to that.

6    She's going to testify that Mario and Brenda toilet trained

7    her, because they were too afraid to send her back to mom.

8            THE COURT:  That doesn't have anything to do with

9    anything.  But the bruises do.  Any injuries, that's fair.

10           MR. KHOROOSI:  Can I mention the toilet training

11   without mentioning the --

12           THE COURT:  No.  What does that have to do with

13   it?

14           MR. KHOROOSI:  She's also going to testify that

15   she was present when Mario spoke with -- she won't testify

16   to hearsay.  But she will testify that she was present when

17   Mario spoke to Shannon about the bruise that he noticed.

18           THE COURT:  I think we better have a hearing out

19   of the presence of the jury, so we know exactly where we're

20   going on this.

21   (End of side bar)

22           THE COURT:  Well, we're going to have another

23   hearing out of the presence of the jury.  Don't talk to

24   each other about the case.  Keep an open mind until you've

25   heard all the evidence.  Please stand for the jury.

 1          The witness can step outside during this hearing.

 2                    (The jury and witness left the courtroom)

 3     (Out of the presence of the jury, counsel and Defendant

 4     present, the following proceedings occurred at 10:30:)

 5               THE COURT:  Be seated, please.  There's a lot

 6     being said at the side bar, and it's hard for the court

 7     reporter to hear.  I'm not sure everything is captured, so

 8     I want to go through this so we're sure everything is on

 9     the record.

10          There was an objection by the Government that this

11     testimony was heading outside of what the Court allowed in

12     the rulings that it made in advance of trial when we had

13     our motion hearing with regard to the motions in limine.

14          So through Miss Jackson, what all is the defense

15     hoping to put in?

16               MR. KHOROOSI:  Well, Your Honor, the road I was

17     going down, when Miss Jackson was present with

18     Mr. Contreras and Aleeyah, as soon as Mario would pick up

19     his daughter, they would notice signs of neglect.  In other

20     words, she would have diaper rash.  It would be so severe

21     she would be bleeding.  It would be so severe to the point

22     that Mario decided to toilet train this two-year-old girl,

23     so she wouldn't require her mother not to change her, to

24     hopefully mitigate some of the damage.

25          Miss Jackson will also testify that the child showed

1    up with numerous inexplicable injuries, most notably

2    bruises all over her body, especially above her head, that

3    were of great concern to Mario and the witness.  She'll

4    state that the frequency of these bruises increased as the

5    child neared the end of her life.

6        She'll testify to specific incidents on which she

7    noticed bruises, specific incidents which were captured in

8    photographs which she'll attempt to enter into evidence.

9            THE COURT:  What's the date of the photograph?

10           MR. KHOROOSI:  The date of the photograph, the

11   metadata indicates they were taken on or about December 17,

12   so mid December 2012, very close in time to when Aleeyah

13   sustained her fatal injuries.

14           THE COURT:  What's the Government's position?

15           MR. WRIGHT:  Your Honor, this is the third time

16   we've covered this.  The Court was very clear in its

17   pretrial motions in limine hearings and in another side bar

18   during this trial, that I understood the Court to tell us

19   the defense could not go into any character issue without

20   first approaching the bench and the Court making a ruling

21   on it.

22       They knew this witness would testify to the fact that

23   Aleeyah was allegedly smelling bad, toilet training --

24           THE COURT:  Can't hear you.

25           MR. WRIGHT:  They knew this witness would testify

1    to things already in violation of this Court's order.  The

2    argument is that they knew they were going to present this

3    evidence in violation of the Court's order.  You've already

4    ruled twice they can't go into character of the victim or

5    the victim's husband.  They are trying to get in an

6    allegation that Shannon is a bad mother, that she doesn't

7    change the child's diaper.

8              THE COURT:  Wait a minute.  They can't go into

9    character without having an out-of-the-Court hearing.

10             MR. WRIGHT:  Right.  I don't recall them asking

11   the Court's permission before they just went into it.  I

12   thought they were just going into it, and that's why we

13   asked to approach the bench.

14        I understand the Court's order to be if they had any

15   evidence of bruising or injury, they could go into that

16   without approaching the bench.

17        But this business about being a bad mother, toilet

18   training, allegations of neglect, picking her up at 1:00 in

19   the morning, and things like that, Your Honor, we would

20   move in limine that none of that stuff be allowed.  We

21   believe it's a violation of the Court's order.  We believe

22   that defense counsel knew it was not supposed to be

23   allowed, and that he was trying to slip it in in violation

24   of the Court's order.

25             THE COURT:  All right.  The business about diaper

```
 1    rash and toilet training is the sort of thing that isn't
 2    relevant to the issues.
 3         Injuries are relevant to the issues.  When we go into
 4    that, there should be some specificity with regard to time.
 5    Also, with regard to the nature and location of the injury,
 6    but that's all fair game, and you can go into that.  All
 7    right.  Any questions by either side?
 8              MR. WRIGHT:  No, sir.
 9              MR. KHOROOSI:  Your Honor, the diaper rash and
10    toilet training, the Government has brought it into issue,
11    or the Government has brought Defendant's behavior into
12    issue specifically while he was doing something related to
13    toilet training his little girl.
14              THE COURT:  What?  Because he spanked her because
15    she wouldn't take the Pamper to the waste basket?
16              MR. KHOROOSI:  Yes.  Miss Jackson will testify to
17    that specific incident or to that specific weekend.
18              THE COURT:  Well, that's something else then.  If
19    she's going to testify to the time when the Defendant
20    spanked the baby back in August of 2011, so that when the
21    baby was taken to Shannon, that she called and the
22    Defendant then apologized for that?
23              MR. KHOROOSI:  She's going to state that didn't
24    happen, Your Honor.  She's going to state that
25    Mr. Contreras received a phone call from Miss Sine, but
```

1    that she didn't witness any spanking, and she was with

2    Mr. Contreras and Aleeyah the whole weekend.

3            THE COURT:  Whether that happened or not, and

4    according to her, it didn't, doesn't have to do with

5    whether later on the Defendant tried to potty train his

6    daughter.

7            MR. KHOROOSI:  It doesn't directly, Your Honor.

8    The prosecution is attempting to paint Mr. Contreras as

9    some kind of a sadist with this little two-year-old girl.

10   I think we're entitled to bring into evidence that this is

11   part of a potty-training regimen, that he teaches her

12   proper hygiene, proper use of materials and so forth.  I

13   think it goes directly to the issues raised by the

14   prosecution themselves.

15           THE COURT:  That's really character-type

16   evidence.  Isn't it?

17           MR. KHOROOSI:  It's not necessarily being

18   introduced as character against Ms. Sign.

19           THE COURT:  No.  Character evidence with regard

20   to the Defendant.

21           MR. KHOROOSI:  It's not character evidence in

22   regard to the Defendant either, Your Honor.

23           THE COURT:  What is it then?

24           MR. KHOROOSI:  It's evidence of the

25   characteristics of the alleged victim.

```
 1              THE COURT:  How is that?

 2              MR. KHOROOSI:  We're going to show that this is a

 3    vulnerable child.  This is a child who is susceptible to

 4    injury.  This is a child who --

 5              THE COURT:  What's that got to do with toilet

 6    training?

 7              MR. KHOROOSI:  Well, I think the totality of the

 8    circumstances goes to indicate that this child was not

 9    looked after or cared for, which increased her susceptible

10    to injury, accidental or otherwise.

11       We're not going to put on any evidence that's going to

12    say that Shannon Sine or Sam Sine hit this little girl on

13    the head.  Nothing affirmatively to say that.  We're going

14    to say she got into Mr. Contreras' care with unexplainable

15    bruises.

16              THE COURT:  For anything, I'm allowing that in,

17    even though for five days before this incident she wasn't

18    with Shannon Sine.

19              MR. KHOROOSI:  That's true, Your Honor.  But the

20    evidence that the prosecution put on states that you can't

21    precisely date those injuries.  The retinal hemorrhages are

22    absolutely impossible to date.

23              THE COURT:  From what I've heard of the

24    testimony, if she had deep enough brain injury to have

25    retinal hemorrhages, she wouldn't have been fine on Sunday
```

1   night.

2          MR. KHOROOSI:  Miss Jackson will testify she

3   wasn't fine on Sunday night.  Miss Jackson will testify the

4   family had dinner over at her house.

5          THE COURT:  She can testify to that.  That seems

6   contrary to what the Defendant told the FBI agent.  She can

7   testify to it, of course.  She can testify, also, to

8   injuries, whether it's head injuries or otherwise, but not

9   with regard to diaper rash or toilet training.  Any

10  questions?

11         MR. KHOROOSI:  No.

12         THE COURT:  All right.  Bring in the jury, and

13  also bring in the witness.

14  (The jury entered the courtroom, and the witness resumed

15  the witness stand at 10:42)

16         THE COURT:  Can you go back to the last question

17  so I can see it?  I'll come down and look at it.

18      Please be seated.

19      You may proceed.

20         MR. KHOROOSI:  Thank you, Your Honor.

21  BY MR. KHOROOSI:

22  Q.   Brenda, when we left off, I was asking you about the

23  time, at the start of the turn of the fall, talking

24  September of 2011, that time period.  You testified you and

25  Mario had started to receive Aleeyah more often.

```
 1   A.   Correct.

 2   Q.   Now, when you would receive those unexpected calls and

 3   you would get Aleeyah, did you notice specific injuries to

 4   Aleeyah?

 5   A.   Yes.  We were noticing things like diaper rashes.

 6   Q.   Aside from that, did you notice any cuts, scrapes,

 7   bruises, anything like that?

 8   A.   Yes.

 9   Q.   Tell the jury what you started to notice.

10   A.   We would get Aleeyah with bruises on her forehead.

11   Q.   Where on her forehead?

12   A.   Well, it would be different.  One weekend we would get

13   it here.  The following weekend it would be here.  (Witness

14   indicating)  It was frequent enough that me and Mario ended

15   up getting into an argument about it, because I wanted him

16   to ask the mother why every weekend we're getting her with

17   constant bruises on her head, and there was some bruising

18   on her legs, also.

19   Q.   Did that continue on through November?

20   A.   Yes.

21   Q.   Did the incidents of bruising increase or decrease?

22   A.   They increased.

23   Q.   What did you notice about the nature of the bruises?

24   Did they stay the same, or did they change, or did it vary

25   from week to week?
```

1   A.   My concern was they were not only bruises, but these

2   were knots on her head.   Sometimes one side wouldn't be

3   completely healed when she would be coming with another

4   one.   So that's where my concern was like, okay, it

5   shouldn't be every weekend.   They weren't just bruises.

6   They were nice-size knots.

7   Q.   Do you recall a weekend in December that Aleeyah came

8   to Mario's house with bruises?

9   A.   Yes.

10   Q.   I'm handing you what have been marked as Defense

11   Exhibits 110 and 111.   Do you recognize those documents?

12   A.   Yes, I do.

13   Q.   Were you present when those photographs were taken?

14   A.   Yes, I was.

15   Q.   Do those photographs truly and accurately depict what

16   they appear to show?

17   A.   The bruise that I see on the left side of Aleeyah's

18   head is minor to what they would look like initially.

19   Q.   But is it what -- does it accurately reflect what you

20   saw when that picture was taken?

21   A.   Yes.

22        MR. KHOROOSI:   Your Honor, I move the admission

23   of Exhibits 110 and 111.

24        MR. WRIGHT:   No objection.

25        THE COURT:   Exhibits 110 and 111 are received.

```
 1              MR. KHOROOSI:  Permission to publish?

 2              THE COURT:  You may.

 3              MR. KHOROOSI:  Your Honor, could I have the

 4    witness step down from the stand?

 5              THE COURT:  Yes.  Identify which exhibit that is.

 6    BY MR. KHOROOSI:

 7    Q.  Miss Jackson, if you could step off the stand, I'll

 8    show you what's been entered as Exhibit 110.  Could I have

 9    you indicate with this pen approximately where the bruise

10    was on Aleeyah's head.

11    A.  Right here.  (Witness indicating)

12    Q.  Could you take the blue pen and circle it, please?

13    A.  (Witness complies)

14    Q.  I'll ask you to do the same thing with Exhibit 111.

15    A.  It's right here.  (Witness indicating).

16    Q.  You can take your seat at the stand.

17        Now, how did those injuries that you see on Aleeyah,

18    were those more or less severe than her typical injuries,

19    or did it vary?

20    A.  It varied.

21    Q.  Can you tell the jury a little more about that?  How

22    did they vary?

23    A.  Well, it would -- depending if she had two, one would

24    be already trying to heal, so it would be a different color

25    and not as big as maybe the other side would be.
```

1   Q.   Did you only find the bruises on her forehead?

2   A.   I noticed bruises on Aleeyah's legs, as well.

3   Q.   Were they on other parts of her head, did you notice,

4   or could you tell?

5   A.   Not to my knowledge.  Just the ones that were very

6   apparent on her forehead.

7   Q.   I'd like to draw your attention -- backing up a little

8   bit.  Did you spend every weekend in August with

9   Mr. Contreras?

10  A.   Yes.

11  Q.   Were you and Mario together pretty much all weekend,

12  or were there times you were apart?

13  A.   We were pretty much together all weekend.

14  Q.   Was Aleeyah present on occasion for those?

15  A.   Yes.

16  Q.   Do you recall Mario getting a phone call from Shannon

17  after one weekend in August of 2011 regarding a mark on

18  Aleeyah's bottom?

19  A.   Yes.

20  Q.   Did you see Mario spank Aleeyah that weekend?

21  A.   No.

22  Q.   Let's go forward a little bit.  I would like to draw

23  your attention to the week of January 3, the week that

24  started January 3, 2012.  You had -- maybe it was the 2nd.

25  Did you see Aleeyah on Wednesday, January 4th?

1    A.    Yes.

2    Q.    How did Aleeyah appear to you?

3    A.    Aleeyah looked like she was sick.  She wasn't feeling

4    well.

5    Q.    She had some stomach issues.  Didn't she?

6    A.    Yes.

7    Q.    She had acid reflux, I believe?

8    A.    Yes.

9    Q.    Did she just appear to be suffering from acid reflux?

10   A.    No.  This was a different kind of sick.

11   Q.    How was it different?

12   A.    Typically with just her acid reflux, we just see a lot

13   of her getting sick would be after maybe something we fed

14   her that didn't agree with her.

15   Q.    When you say "getting sick," you mean vomiting?

16   A.    Yes.

17   Q.    Go on.

18   A.    But this time it was different.  She looked like she

19   had a headache.  She just didn't play with the kids like

20   she normally would come in and play.  She was really clingy

21   to her dad.

22   Q.    You say she was really clingy to her dad.  What do you

23   mean?

24   A.    She wanted to be held and just cuddled.  Normally when

25   we had the acid reflux issues, it was just after mainly the

1    time she ate, and she would be off running.  This time she

2    just was really different.

3    Q.    Even though she had the acid reflux and vomiting

4    spells, how was her appetite normally?

5    A.    Just depending.  Sometimes she would eat good, and

6    sometimes she wouldn't eat at all.

7    Q.    How was her appetite around the 4th?

8    A.    She really didn't have an appetite.  She just kind of

9    picked at what we gave her.

10    Q.    What was it, if you recall, that you gave her?

11    A.    What we tried to do is kind of -- when we ate dinners,

12    we would give her things without butter or the softer

13    things, so she kind of had a different meal than what we

14    would normally have, or if we had it, it would be kind of

15    prepped different to kind of cater to her reflux.

16    Q.    Now, January 5th did you see Aleeyah?

17    A.    Yes.

18    Q.    How did she appear on January 5th?

19    A.    She still looked like she didn't feel good.  She just

20    really looked like she wasn't herself.  She looked like she

21    had a headache.  She did a lot of frowning.  That's how I

22    remember seeing her initially when we first got her.

23    Q.    What did you notice about her eyes?

24    A.    Aleeyah had really droopy eyes, anyway.  She had a

25    different look in her eyes.  She looked sick.  Her eyes

1    looked like she was agitated.  I described it as a

2    headache.  It looked like maybe she had like her head hurt.

3    Q.   Now, Friday, January 6, did you see Aleeyah that day?

4    A.   Yes.

5    Q.   That was the date of that wake.  Were you at the wake?

6    A.   No, I wasn't.

7    Q.   Where were you at the time Mario was at the wake?

8    A.   I was at my house.

9    Q.   Afterwards did Mario and Aleeyah come over?

10   A.   Yes.

11   Q.   Did they spend the night?

12   A.   Yes.

13   Q.   How was Aleeyah that night?

14   A.   She was still clingy with her dad, wasn't really

15   interacting with the other kids.  Really didn't eat very

16   much.

17   Q.   Did she seem like -- again, did she seem like this was

18   a normal reaction for her acid reflux?

19   A.   No.

20   Q.   Let's talk about Saturday, the 7th.

21   A.   Yes.

22   Q.   Did Mario and Aleeyah stay at your house that night?

23   A.   Yes.

24   Q.   How would you describe Aleeyah on the 7th?

25   A.   The same.  She just wasn't feeling well.

```
 1    Q.    Was she responsive?

 2    A.    More so with her dad than the kids and I.  Like that

 3    wasn't normal for her not to really --

 4    Q.    Even with the acid reflux, it wasn't normal?

 5    A.    Right.

 6    Q.    Did they sleep over at your house on the 7th?

 7    A.    What was the 7th?

 8    Q.    Saturday.

 9    A.    Yes.

10    Q.    So they woke up at your house on Sunday morning?

11    A.    Yes.

12    Q.    Did you observe Aleeyah at that time?

13    A.    Yes.

14    Q.    How did she seem?  Did she seem better, worse, no

15    change?

16    A.    She seemed to be maybe getting a little worse at that

17    point.

18    Q.    What did you suggest that Mario do at that point, if

19    anything?

20    A.    I told him I thought we needed to get her to the

21    hospital.  There was definitely -- at this point I knew

22    there was something wrong.  It was out of the norm for her

23    to be that distant in the home from the kids and from

24    myself.  I thought that we needed to get her checked out

25    because it had been awhile.  It was since we had gotten
```

1    her, and by Sunday it was like we need to get her in.

2    Q.   They didn't sleep at your house on Sunday night, the

3    8th.  Did they?

4    A.   No.

5    Q.   Were they over on Sunday evening?

6    A.   Yes.

7    Q.   Why were they over?  What did you do when they were

8    there?

9    A.   I cooked supper.  We ate.  Aleeyah really didn't.  She

10   was still not eating.  So what we were trying to do was

11   just keep her pumped full of Pedialyte, and I was trying to

12   give her toast and stuff, just to give her something

13   because she hadn't really taken in a lot of food, it seemed

14   like.  She was just really clingy with her dad.

15   Q.   Did you cook a meal for everybody?

16   A.   Yes, I did.

17   Q.   What did you cook, if you remember?

18   A.   I made fried chicken, chicken fried rice.  I baked a

19   pie.  We had a vegetable, I believe.

20   Q.   Did Aleeyah eat what everybody else ate, or was she

21   expected to eat what everybody else ate?

22   A.   What I did for her was -- she picked a little bit what

23   her dad ate.  What I tried to do during this time is make a

24   hot cereal and something soft for her stomach.

25   Q.   Did she eat that?

1    A.    No.

2    Q.    Was that the last time you saw Aleeyah before she was

3    injured?

4    A.    Yes.

5    Q.    I would like to take you to the morning of January 9.

6    Did you get a call from Mario?

7    A.    Yes, I did.

8    Q.    About what time?

9    A.    Roughly around or just before 8:00.

10   Q.    In response to that call from Mario, what did you do?

11   A.    I left my job, and I went to Coteau des Prairie

12   Hospital.

13   Q.    Now, you work at the IHS Clinic in Sisseton.

14   A.    Right.

15   Q.    Do they have an emergency department?

16   A.    IHS?

17   Q.    Yes.

18   A.    No.

19   Q.    So everybody goes to Coteau for an emergency?

20   A.    Yes.

21   Q.    Where is Coteau in relation to where you work?

22   A.    Coteau is about two and a half, three miles,

23   approximately, from IHS.

24   Q.    Sisseton is not a very large place.  Is it?

25   A.    No.

1    Q.   When you arrived at Coteau, how would you describe the

2    state Mario was in?

3    A.   I believe Mario was in shock.  There was so much chaos

4    going on, different people approaching to him and talking

5    to him.  I felt like he was in shock.

6    Q.   Was Mario responsive to the people who were talking to

7    him?

8    A.   Yes.  He was trying to talk to multiple people at the

9    same time.

10   Q.   Who did you notice he was trying to talk to?

11   A.   There were ER nurses that were coming up trying to get

12   information from him, more background on the situation.

13   Gary Gaikowski was standing there, and then also we had

14   family members arriving at that time.

15          MR. KHOROOSI:  Thank you, Brenda.  I don't have

16   anything further.

17          THE COURT:  You may examine.

18                 CROSS-EXAMINATION

19   BY MR. WRIGHT:

20   Q.   Regarding the custody of Aleeyah, it was pretty much

21   up to Shannon whether or not Mario got to see Aleeyah.

22   Wasn't it?

23   A.   I believe so.

24   Q.   There was no Court Order that mandated that Mario got

25   her specific weekends or times.  Was there?

1    A.   If there was, I wasn't aware of it.

2    Q.   As I understand your testimony, that from the fall of

3    2011 until the time Aleeyah died, you steadily noticed an

4    increase in the number of bruises Aleeyah had when you

5    received her?  Is that right?

6    A.   I believe that I was starting to be more aware of the

7    bruising on Aleeyah from the beginning towards the end.

8    Q.   And during that same time period, that's when Mario

9    was seeing Aleeyah more often.  Isn't that right?

10   A.   We were getting the calls to come pick her up.

11   Q.   What I'm getting at, ma'am, the first part of 2011,

12   Mario didn't see Aleeyah as much as he did in the second

13   part of 2011.  Isn't that a fair statement?

14   A.   I could only account for anything from April, May, on

15   through.  I don't know anything from the beginning of that,

16   what their arrangements were for him to see her.

17   Q.   So the more that Mario saw Aleeyah, the more bruises

18   she had on her body.  Is that right?

19   A.   The more she would come to us with bruises on her

20   body.  Yes.

21   Q.   You're not alleging she didn't get any of those

22   bruises when she was in Mario's care.  Are you?

23   A.   If she did --

24            MR. KHOROOSI:  Objection.  Calls for speculation.

25            THE COURT:  Overruled.

1    A.   Can you ask me that again?

2    BY MR. WRIGHT:

3    Q.   You're not trying to tell this jury that Aleeyah got

4    every one of those bruises while she was in Shannon's care.

5    Are you?

6    A.   I believe so.

7    Q.   Really?  Are you aware this jury just heard an earlier

8    witness testify that she supposedly fell off a chair when

9    she was in Mario's care at a wake?

10   A.   I wasn't in here to hear that.

11   Q.   If this jury heard testimony that when Mario was

12   supposed to watch her Friday night at that wake and she

13   fell off the chair, that certainly wouldn't be Shannon's

14   fault.  Would it?

15   A.   I wasn't there at the wake.  I wasn't even aware of

16   that incident of that, so I wouldn't be aware of that.

17   Q.   Speaking of that wake, I understood your testimony to

18   be that Aleeyah was so sick on Wednesday, Thursday, and

19   Friday.  Is that right?

20   A.   Yes.

21   Q.   She wasn't herself.  She had a headache.  Her eyes

22   were drooping.  Is that right?

23   A.   Yes.

24   Q.   Can you tell us then why Mario took her to the wake if

25   she was that sick?  Why didn't he just leave her home in

 1   bed?

 2            MR. KHOROOSI:  Objection.  Calls for speculation.

 3            THE COURT:  Overruled.

 4   A.   I think with that situation, keeping his children

 5   closer to him made him feel like they were getting an

 6   adequate amount of care.

 7   BY MR. WRIGHT:

 8   Q.   So you thought it was in Aleeyah's best interest, that

 9   when she's that sick, she go to the wake and sit on a chair

10   while Mario is playing the drums.

11   A.   I guess you're asking for my opinion on that?

12   Q.   Yes.

13   A.   If I thought that was okay?

14   Q.   You thought that was the best for Aleeyah?

15   A.   It probably wasn't the best for Aleeyah.  I'm not the

16   mother, and I can't intervene and say what someone else's

17   child needs to do.  So no.

18   Q.   Let's talk about your two pictures here.  Those two

19   pictures were taken on the same date.  Weren't they?

20   A.   Yes.

21   Q.   That's not two separate incidents of two separate

22   bruises.  Are they?

23   A.   I don't believe so.

24   Q.   The child is holding the same toy?

25   A.   Yes.

1    Q.   She's got the same shirt on?

2    A.   Yes.

3    Q.   Those two pictures show the child on the same date

4    with the same bruise on the forehead.

5    A.   I believe so, yes.

6    Q.   Do you know when that picture was taken?

7    A.   No, I don't.  We took a lot of pictures of the kids.

8    So not specific, I couldn't tell you a specific date.  I

9    know it was taken at his house and I was there.

10   Q.   Do you know which year it was taken?

11   A.   I believe that was taken in 2011.

12   Q.   Do you know approximately which month?

13        MR. KHOROOSI:  Objection.  Witness has already

14   testified to that.  Asked and answered.

15        THE COURT:  Just a moment.  Remember, I don't

16   want long objections.  I want to know what the evidentiary

17   rule is that you're invoking, and then I'll rule on it.

18        MR. KHOROOSI:  Thank you.  It's been asked and

19   answered.

20        THE COURT:  Overruled.

21   A.   After August maybe, I believe.

22   BY MR. WRIGHT:

23   Q.   So you took that picture, can we say late August?

24   A.   I didn't take the picture.  The father took the

25   picture, and I was just there.

1    Q.   You are saying Mario took this picture?

2    A.   I believe so.

3    Q.   You don't know the reason why the picture was taken.

4    Do you?

5    A.   We always took pictures of the kids.  I mean he has

6    lots of pictures of all of his kids.

7    Q.   What I'm getting at, that picture wasn't taken to

8    document any concerns about the bruise.  Was it?

9    A.   No.

10   Q.   That's just a picture you took, and then later on you

11   noticed she had a bruise back in August.

12   A.   I asked Mario to at least take pictures of the

13   bruises.  That's where our argument came up.  I felt he

14   needed to at least document the type of bruises when we

15   were getting her.

16        That's where our argument stemmed from.  He didn't

17   want to cause friction with the mother, because he was

18   afraid he wouldn't be able to see her.  I proposed he take

19   pictures of these bruises when we got her, especially after

20   the statement of the --

21   Q.   And that picture there, though, that was not taken to

22   document any bruises.

23   A.   Right.

24   Q.   It's a picture you took, and later on you saw the

25   bruise.

1   A.   I believe so.

2   Q.   But you were very, according to you, you were really

3   concerned, and you wanted pictures taken of these alleged

4   bruises you saw later.  Right?

5   A.   Yeah.

6   Q.   Why didn't you take the pictures?

7   A.   As the girlfriend coming into this relationship, I

8   never wanted to be the one to stir the pot between these

9   two parents.  I respected Mario's decision on all the

10  decisions he made with his kids.  What good would it have

11  been for me to take a picture if him and I didn't agree for

12  that, if that wasn't his, you know.

13  Q.   You would agree with me you could have taken those

14  pictures, if you wanted to.  Couldn't you?

15  A.   Yes.

16  Q.   The only pictures this jury has to review of these

17  alleged bruises are one bruise on a forehead from back in

18  August of 2011.  Is that right?

19          MR. KHOROOSI:  Objection.  He's misstating

20  previous testimony.

21          THE COURT:  Overruled.

22  BY MR. WRIGHT:

23  Q.   Is that right?

24  A.   Can you ask that to me again?

25  Q.   Do you have any other pictures, other than this

1    picture from August of 2011?

2    A.   Of the bruise?

3    Q.   Yes.

4    A.   No.

5    Q.   Can I see Exhibit No. 1, please?  Ma'am, if you could

6    look over your right shoulder there, what I'm showing you

7    is what the Court received in evidence regarding an

8    evaluation a doctor made of Aleeyah in late December of

9    2011.  Can you see that from where you are sitting?

10   A.   Yes.

11   Q.   Isn't it true that on that exhibit there is a category

12   regarding "Physical Exam, General Appearance."

13   A.   Yes.

14   Q.   There's also a category for "Head"?

15   A.   Yes.

16   Q.   In fact, isn't it true that all the boxes, except for

17   "Cover Test" and "Optic Fundoscope," are checked normal for

18   her age?

19   A.   Yes.

20   Q.   And the underlying conclusion of the physician in late

21   December of 2011 is "healthy child."

22   A.   Yes.

23   Q.   There's no reference anywhere on that exhibit to

24   bruises.  Is there?

25   A.   No.

1    Q.   Now, Sunday night, the night before Aleeyah went to

2    the hospital comatose, you said she was still clingy or not

3    well?

4    A.   Yes.

5    Q.   So if Mr. Contreras told the FBI agent that Aleeyah

6    was just fine Sunday night, would you disagree with that?

7    A.   I would disagree with that.

8    Q.   According to you, she was a little clingy.  Is that

9    right?

10   A.   She was sick.  She was clinging to her dad.

11   Q.   This particular time, around the time that Aleeyah

12   went comatose in January of 2012, Mario had a lot going on

13   in his life.  Didn't he?

14   A.   As far as --

15   Q.   You were his girlfriend then.  Weren't you?

16   A.   Yes.

17   Q.   You still are right now.

18   A.   No, I'm not.

19   Q.   You aren't now?

20   A.   No.

21   Q.   Around that time Mario had work obligations.  Didn't

22   he?

23   A.   Yes.

24   Q.   Were you aware he had issues with his supervisor at

25   work?

```
 1    A.    Yes.

 2    Q.    About tardiness?

 3    A.    Not specifically that.

 4    Q.    And he had five different women chasing him for child

 5    support for seven kids?

 6    A.    He was paying five different women for child support,

 7    yes.

 8    Q.    For seven kids.

 9    A.    Right.

10    Q.    To pay the child support, he has to have a job.

11    A.    Right.

12    Q.    If he would lose his job because of tardiness, he

13    can't pay all that child support.

14              MR. KHOROOSI:  Your Honor, this is beyond the

15    scope of direct.

16              THE COURT:  Overruled.

17    BY MR. WRIGHT:

18    Q.    Is that right?

19    A.    If he didn't have a job, he couldn't pay child

20    support?  Is that what you asked me?

21    Q.    Right.  If he would have lost his job at the IHS

22    Hospital for being late, he can't pay child support.  Can

23    he?

24    A.    I don't know if he had other income as far as VA, so I

25    don't know if that may be in between, so I guess --
```

1    Q.   If you don't pay your child support, you can end up in

2    jail.  Can't you?

3    A.   Right.

4    Q.   So he has a lot of things he's juggling right around

5    this time that Aleeyah went comatose.  Is that right?

6    A.   In my eyes, he was doing what he needed to do as a

7    responsible father, and I don't know if you would think

8    that's overwhelming for a person, but it can be done.

9    Q.   That particular morning that Aleeyah did go comatose,

10   she went comatose initially at his house.  Didn't she?

11   A.   I wasn't there.

12   Q.   Didn't you receive a call from him?

13   A.   I did.  But he didn't say, "She's comatose at my

14   house."  He said, "There was an accident."

15   Q.   Where did you understand this accident occurred at?

16   A.   At that time I didn't ask.  He just said Aleeyah had

17   fallen.  It was a rushed phone call.  It was a panicked

18   phone call.  So I wasn't trying to get the details.

19   Q.   Since then have you found out where it supposedly

20   happened at?

21   A.   At his house.

22   Q.   And have you found out how many adults were at his

23   house when that happened?

24   A.   I didn't ask how many adults were at the house.

25   Q.   Have you found out in the interim?

1    A.   No.

2    Q.   So Aleeyah is dead, and you haven't talked to him

3    about what happened at the house?  Is that what you're

4    telling us?

5    A.   My concern was Aleeyah and my relationship I had with

6    Aleeyah.  To me it wasn't the facts, who did what, because

7    I never looked at it as a thing that was done to her.  I

8    looked at it as an accident.  So I didn't need to debrief

9    anybody on anything.  That wasn't my job.  My job was, as

10   his girlfriend at the time, to support him.

11   Q.   How many children do you understand were at that house

12   Monday morning besides Aleeyah?

13   A.   I know Miley was there.  I think Teton maybe was

14   there.  Again, I never questioned, because that's stepping

15   out of my bounds as a girlfriend.

16   Q.   There were actually four small children at the house

17   with him that morning.  Correct?

18   A.   I know of Miley, and I know of Aleeyah.  Even when you

19   mention Teton, I'm questioning that, because I never really

20   had it confirmed from anybody.

21   Q.   If Mario told Agent Mertz there were four small

22   children there with him, you would have no reason to doubt

23   that.  Would you?

24   A.   I don't think Mario would have a reason to lie.

25   Q.   If Mario told Agent Mertz there were no other adults

```
 1   there besides him, you would have no reason to doubt that.

 2   Would you?

 3   A.   I wouldn't think he would have a reason to lie.

 4            MR. WRIGHT:  Your Honor, may I have just a

 5   moment?

 6            THE COURT:  You may.

 7                      (Pause)

 8            MR. WRIGHT:  Thank you, sir.  That's all.

 9            THE COURT:  Any redirect?

10            MR. KHOROOSI:  Yes, Your Honor.

11                  REDIRECT EXAMINATION

12   BY MR. KHOROOSI:

13   Q.   Miss Jackson, you were asked about whether or not you

14   are still dating Mario.  When did your relationship end?

15   A.   When we lost Aleeyah in Fargo.

16   Q.   Why did it end?

17   A.   We came back.  He lost a child.  We came back two

18   different people, I feel like.  I felt like he needed the

19   support of his ex-wife and family.  She had more history

20   with him.

21        I wanted to be home with my child, my son, who I had

22   been away from during that whole duration.  To me it just

23   wasn't plausible to have us all together in one home,

24   without him getting the support he needed from his family,

25   and me giving mine to mine.
```

1   Q.   You heard Mr. Wright talk about Miley's presence in

2   the home that morning.  How old is Miley or how old was she

3   at the time?

4   A.   Gosh, Miley was four or five.  It's been a year and a

5   half, and Miley was fresh into the home.  So between four

6   and five, I believe.

7   Q.   But you're not sure?

8   A.   I couldn't be positive.

9   Q.   How old is Teton?

10  A.   I'm not sure either.

11  Q.   Do you know what grade he is in?

12  A.   No, I don't.

13  Q.   Do you remember what grade he was in at the time?

14  A.   No, I don't.

15  Q.   Was he old enough to talk?

16  A.   Yes.

17  Q.   Was he old enough to understand what was going on?  I

18  don't mean about this specific incident.  Just about

19  everything.

20  A.   Yes.

21  Q.   Visits in the home.  You were asked about visits

22  occurring solely at Shannon's discretion.

23  A.   Yes.

24  Q.   You testified that was a source of the argument

25  between you and Mario about whether to report the bruises?

```
 1   A.   I felt like he needed to get more answers for the
 2   bruising.  At that point I couldn't get him to take the
 3   pictures.  I felt like, okay, we need to get more answers
 4   on how they are happening and why so frequently now.  So
 5   yeah.
 6   Q.   And why didn't he want to do that?
 7   A.   He didn't want to upset her.
 8   Q.   What would happen if he upset her?
 9   A.   He felt like she wouldn't let him see her.
10            MR. KHOROOSI:  Thank you.  Nothing further.
11            THE COURT:  Thank you.  You may step down.
12                     (Witness excused)
13            THE COURT:  Call your next witness.
14            MR. KHOROOSI:  We rest, Your Honor.
15            THE COURT:  Very well.  Anything further?
16            MR. WRIGHT:  Yes.  May we approach?
17            THE COURT:  You may.
18   (Side bar with all counsel:)
19            MR. WRIGHT:  Earlier in the trial you denied our
20   404(b) evidence, but you did tell us we could ask your
21   permission, after the defense rested their case, about
22   possibly calling Mr. LaPointe in rebuttal if somehow it
23   became relevant in the case and the defense opened the
24   door.
25        During the testimony of Vivian Gill, the first
```

1    witness, she made the statement that Aleeyah was always

2    happy with Mario, said something about children are always

3    happy around Mario.  We think the Defendant has opened the

4    door, and we should be able to call Mr. LaPointe.  We would

5    ask the Court to reconsider its ruling and allow the 404(b)

6    testimony.  We understood the Court did give us permission

7    to renew our request.

8              THE COURT:  That's correct.  We'll hear about

9    that out of the presence of the jury.  I'll let the jury go

10   now, and we'll have a hearing out of the presence of the

11   jury on that.  So I'll let the jury go now.

12   (End of side bar)

13             THE COURT:  Well, we're going to have another

14   hearing out of the presence of the jury.  This will take

15   just a few minutes.  After that I'll have you come back in.

16   Please stand for the jury.

17                  (The jury left the courtroom)

18   (Out of the presence of the jury, counsel and Defendant

19   present, the following proceedings occurred at 11:22:)

20             THE COURT:  Out of the presence of the jury now.

21      The Government with regard to rebuttal testimony has

22   asked the Court, first of all, to reconsider its ruling it

23   previously made with regard to Austin LaPointe.  Yes, the

24   Court reconsiders its previous ruling, and the ruling is

25   the same.

1        The second thing was, the Court was asked by the

2   Government then to then allow Austin LaPointe to testify in

3   rebuttal.  For that, the Government urged that they thought

4   the defense opened the door with regard to the Defendant,

5   the Defendant around kids and how kids regarded him.  So

6   I'll let the Government restate their position, and then

7   I'll rule.

8            MR. WRIGHT:  Thank you, Your Honor.  I think the

9   Court has already made a nice record on it that summarized

10  what the Government's position is.

11       We believe the defense, by calling certain witnesses,

12  tended to imply to the jury that children are always happy

13  around the Defendant.  The first witness, Vivian Gill,

14  testified to that, that Aleeyah always seemed happy around

15  the Defendant.  There was an implication that all other

16  children that he has always seem happy with him.

17       The last witness made several statements to the fact

18  that Aleeyah was always clingy.  He even took Aleeyah to

19  the wake when she was supposedly sick, just because she

20  wanted to be in the room with her father, even though he is

21  up there playing the drums.

22       The whole implication of a lot of the testimony was

23  that the Defendant was some kind of a marvelous father, and

24  the children always wanted to be with him.  We believe it's

25  sufficient to open the door to the 404(b) evidence.  We

1    incorporate all the authority that we made when we filed

2    with the Court and incorporated our earlier arguments.

3         Finally, Your Honor, even if the Court denies our

4    request to have Mr. LaPointe testify on rebuttal, I wanted

5    to inform the Court that we do have another rebuttal

6    witness on another matter which will be very, very short.

7              THE COURT:  What is that?

8              MR. WRIGHT:  Agent Mertz will give some brief

9    testimony.

10             THE COURT:  All right.  Let me hear from the

11   defense with regard to Austin LaPointe.

12             MR. KHOROOSI:  I don't know how Mr. Wright's

13   cross-examination of Brenda Jackson equates to my having

14   opened the door to anything.  We were very specific in our

15   testimony we presented.  We always said on specific

16   instances, how did Aleeyah appear?  How did Aleeyah appear

17   on very specific instances?  We did not say, "How was

18   Aleeyah's relationship with her father generally?"  We

19   didn't say, "Was Mario an abusive parent?"  "Was Mario a

20   good parent?"  "Was Mario this or that?"

21        Naturally there will be evidence, and there is a --

22   that evidence can be relevant to parenting, but this is

23   exactly what this case is about, the actions the parents

24   took around this child, the action this specific parent

25   took around this child.

517

1          We brought in evidence to rebut the fact that was

2     introduced, the fact of the spanking back in August, the

3     fact that he loves spanking.  That's what was in issue.

4     Not whether Mario generally spanked his kids.  Not whether

5     Mario was generally a proponent of corporal punishment.

6          We specifically limited the testimony to how Aleeyah

7     acted on certain instances.  Miss Jackson testified that

8     Aleeyah was clingy that weekend, but she wasn't normally

9     clingy to her dad.  That's why the behavior was unusual.

10    She wasn't normally clingy.

11         In my mind that doesn't mean the Defendant is this

12    irresistible force for children that they can't help but be

13    around.  We talked about one child.  We talked about

14    Aleeyah Cook.

15              THE COURT:  All right.  Well, I don't believe the

16    defense opened the door, so to speak, with regard to how

17    the Defendant treated or related to children generally.  So

18    that basis that the Government claims was the door opening

19    that should allow Austin LaPointe to testify saying, "Isn't

20    so, here are specific instances otherwise."

21         But beyond that, taking the testimony as a whole, I

22    don't believe that the door was opened.  The Court allowed

23    the Government a lot of latitude in cross-examination of

24    Miss Jackson -- a lot of latitude.  That didn't open the

25    door either.

1          I wanted to see what the testimony in the defense case

2     would be, and I said that when I initially ruled Austin

3     LaPointe couldn't testify.  I wanted to hear what the

4     defense testimony was to see if Austin LaPointe's testimony

5     did become admissible under 404(b) considerations for

6     rebuttal.

7          Now having heard the defense case, that's not in

8     issue.  So the request to have Austin LaPointe testify is

9     denied.

10          We'll bring the jury back in and have the other

11     rebuttal witness testify.  Please stand for the jury.

12               (The jury entered the courtroom)

13          THE COURT:  Please be seated.  The Government may

14     proceed in rebuttal.

15          MR. WRIGHT:  Call Agent Mertz.

16                    ROB MERTZ,

17     recalled as a rebuttal witness, having been previously

18     sworn, testified as follows:

19          THE COURT:  You understand, Mr. Mertz, you are

20     still under oath?

21          AGENT MERTZ:  Yes, sir.

22          THE COURT:  Go ahead.

23               REBUTTAL DIRECT EXAMINATION

24     BY MR. WRIGHT:

25     Q.   Agent Mertz, the jury heard some testimony regarding

1    Aleeyah vomiting in the two or three days before she passed

2    away.  Do you recall that testimony?

3    A.   Yes, I do.

4    Q.   When you interviewed with the Defendant,

5    Mr. Contreras, on February 2 of 2012, did you discuss with

6    him the fact that Aleeyah had supposedly vomited in the two

7    or three days before she died?

8    A.   Yes.

9    Q.   Can you tell us what you said and he said?

10   A.   Mario said basically that Aleeyah was vomiting.  He

11   attributed it to a couple factors; one, her acid reflux,

12   and, two, the food she was eating during the wake service.

13   I believe he said she was eating fried bread and tater tot

14   hotdish and that kind of thing.

15   Q.   Did he specifically identify the food that he thought

16   was causing her to vomit?

17   A.   Those two foods, yes.

18   Q.   Did Mario also advise you that Shannon had repeatedly

19   told Mario to be careful of the food that Aleeyah was

20   eating?

21   A.   Yes.

22   Q.   What did he say in that regard?

23   A.   He said he was in contact with Shannon frequently

24   about what --

25             MR. KHOROOSI:  Objection.  That's hearsay,

1    Your Honor.  It's hearsay within hearsay.

2              THE COURT:  Nothing with regard to what Shannon

3    said.  I don't think he said anything about what Shannon

4    said.  If he did, strike it.  Ask your next question.

5    BY MR. WRIGHT:

6    Q.   Did Mario tell you whether or not he had discussed the

7    acid reflux with Shannon?

8    A.   Yes.

9    Q.   And was that during the interview on February 2?

10   A.   Yes.

11   Q.   And is that during that part of the conversation you

12   were talking about vomiting?

13   A.   Yes.

14             MR. WRIGHT:  Thank you.  That's all.

15             THE COURT:  Any questions?

16             MR. KHOROOSI:  No questions.

17             THE COURT:  Thank you.  You may step down.

18                  (Witness excused)

19             MR. WRIGHT:  No further rebuttal.

20             THE COURT:  Very well.  The Government rests its

21   rebuttal then?

22             MR. WRIGHT:  We do, sir.

23             THE COURT:  Very well.  Now, ladies and gentlemen

24   of the jury, you know you've heard the evidence, so it's

25   tempting when I release you now early for lunch to kind of

1    in your own mind kind of review things and maybe reach some

2    conclusions yourselves.  Don't do it.

3         Because when you come back, you'll hear both the

4    instructions, as well as argument.  The argument that the

5    lawyers will make isn't evidence, but it may be helpful to

6    you in looking at the evidence and how you view the

7    evidence, and how you apply the evidence to the law.  I'll

8    give you much more detailed instructions than I gave you at

9    the beginning of the case.

10        So once you've heard those things, then and only then

11   when you go back to the jury room and deliberate, then you

12   should talk to each other, you should exchange views at

13   that point, but not until.  So don't make any preliminary

14   determinations in your own mind when you are going to

15   lunch.

16        Once again, don't let anybody talk to you.  Don't do

17   any research on the Internet or any other way.  Go to

18   lunch.  We have to, by "we," I'm talking about the lawyers

19   and myself, have to do something called settling of the

20   instructions.  The final instructions I give you on the

21   law, I let the lawyers, of course, see what I'm going to

22   give them for instructions.  They proposed instructions,

23   too.  But, of course, I'm the one that decides what

24   instructions I give.

25        We have a process called settling the instructions.

1    If they some objection to an instruction that I have, they

2    make the objection, I consider it, sometimes I change an

3    instruction, because I think maybe there's a point of law

4    that should be stated a little bit differently.

5        But, in any event, when we get done, they are the

6    instructions I'm satisfied with.  If they aren't satisfied,

7    they have made their objections.  That process, as you can

8    see, takes a little bit of time.  Sometimes I'll have to

9    revise one of my instructions, which I already have here.

10   Once that process is done, then you'll come back for

11   argument.

12       I have to gauge this, because I don't want you to be

13   sitting around here any longer than you have to before you

14   hear it, but I don't know exactly how long it will take to

15   settle instructions.  You think, well, why didn't you do

16   this ahead of time?  The reason is because I don't know

17   what all the evidence is going to be, and the instructions

18   are in flux while this goes on, because I don't know what

19   the evidence is going to be, and I can only finalize the

20   instructions once the evidence is all in.

21       Be here at 2:00.  I'm not going to say a hundred

22   percent confident, but I'm quite confident we'll be ready

23   to go at that point so we can proceed ahead.

24       So, once again, remember the instructions I've given

25   you with regard to keeping an open mind.  Leave your notes

1    back here.   Nobody is going to look at them.   And we'll see

2    you at 2:00.   Counsel can stay.

3                    (Jury left the courtroom)

4    (Out of the presence of the jury, counsel and Defendant

5    present, the following occurred at 11:35)

6                    THE COURT:   Please be seated.   I'm going to have

7    a copy of the instructions, the Court's proposed

8    instructions with authorities, given to you in just a

9    moment.   These are pretty straightforward, frankly.   As

10   soon as you've read through them and are ready to settle

11   the instructions, let me know.   We'll come out and settle

12   them before lunchtime, so if I have to make any changes,

13   we'll make them over the noon hour.   So don't leave the

14   Courthouse.   Stay tight.   We're in recess.

15                    (Recess at 11:36 until 12:30)

16       * * *    SETTLING OF THE FINAL INSTRUCTIONS   * * *

17                    THE COURT:   Has the Government had adequate time

18   to go over the Court's proposed instructions?

19                    MR. MILLER:   Yes, Your Honor.

20                    THE COURT:   Has the defense had adequate time to

21   go over the Court's proposed instructions?

22                    MR. KHOROOSI:   Yes, Your Honor.

23                    THE COURT:   As you both know, because you've all

24   tried cases in front of me before, I don't go through each

25   of the Defendant's proposed instructions and say denied and

1    so on.  Instead, if there's something in the Court's

2    proposed instructions that has not been given -- that does

3    not, in substance, give the Defendant's proposed

4    instruction, you'll have an automatic exception to the

5    Court's proposed instructions.

6         The only thing I would comment upon that I notice --

7    obviously the proposed instructions with regard to Count 4

8    are not relevant anymore, because the Court severed

9    Count 4, the child abuse count.

10        But the only thing I noticed I would comment on is,

11   for instance, in the Defendant's proposed jury instruction

12   No. 6, that the jury will be deciding on Count 1, guilty or

13   not guilty.  If not guilty on Count 1, they won't be

14   deciding on Count 2, guilty or not guilty.

15        The jury has to, though, separately decide on Count 3.

16   Count 3 is not a lesser-included offense.  It's a separate

17   offense.  For that, the Court cites in the record United

18   States vs. Good Bird, a case coming up out of North Dakota,

19   a 1999 decision by the Eighth Circuit, at 197 F.3d 1203.

20   So I note that.

21        Then with regard to the Court's proposed instructions,

22   we'll go through -- I'll go through them by number.  If you

23   have any objection to that particular number, say so.  If

24   you don't have an objection to that particular number, then

25   if you don't say anything, you've waived any objection to

1    that instruction.

2         Instruction 1, "Members of the jury."

3         Instruction 2, "It is your duty."

4         Instruction 3, "There's nothing particularly

5    different."

6              MR. MILLER:  Your Honor, the Government does have

7    an objection to Instruction No. 3.  First of all, if you

8    look at the second paragraph beginning with the second

9    sentence, it reads, "Remember, as well, that the law never

10   imposes upon a Defendant in a criminal case the burden or

11   duty of calling any witnesses or producing any evidence,

12   because the burden of proving guilt beyond a reasonable

13   doubt is always assumed by the Government."

14        I don't have an objection to that.  That's an accurate

15   statement of the law.  However, it's our point that this

16   same point is covered in Instruction No. 11, so, therefore,

17   this language is duplicative.

18             THE COURT:  Fine, but doesn't hurt to say it

19   twice.  Your objection is overruled.

20        Instruction No. 4, "I have mentioned the word

21   evidence."

22        Instruction 5, "There are two types of evidence."

23        Instruction No. 6, "If any reference by the Court."

24        Instruction No. 7, "If you took notes during the

25   trial."

1        Instruction No. 8, "In deciding what the facts are."

2        Instruction No. 9, "Your decisions on the facts."

3        No. 10, "The Government and the Defendant have

4    stipulated."

5            MR. MILLER:  Your Honor, again, I would just

6    state I don't have an objection to this.  However, it's

7    duplicative to the instruction in 20.  Instruction No. 20

8    specifically covers the Indian in Indian Country

9    stipulation, where this more talks about generally the

10   stipulation.  So, therefore, I just think it's duplicative.

11           THE COURT:  It's not duplicative, because there

12   were other stipulations during the case.  The objection is

13   overruled.

14       Instruction No. 11, "The Indictment in this case

15   charges."

16       Instruction No. 12, "Reasonable doubt is a doubt based

17   upon reason and common sense."

18       Instruction 13, "You've heard testimony from persons

19   described as experts."

20       Instruction No. 14, "The crime of murder in the second

21   degree."

22           MR. MILLER:  Your Honor, the Government would

23   request a modification to this instruction.  It does

24   accurately list the elements to the offense.  However, in

25   this case there's a potential enhanced penalty, because the

```
 1    victim was under the age of 18, and under Apprendi, that

 2    additional element or fact that triggers the enhanced

 3    penalty has to be alleged in the Indictment, which it is,

 4    and found by the jury beyond a reasonable doubt, because

 5    the age is included in the first element that says, "The

 6    Defendant unlawfully killed A.C.," and then the second part

 7    is that she's an individual who is under the age of 18.

 8        I would ask that be made a separate and distinct

 9    element of the offense under the Apprendi case.  I think

10    it's probably a distinction, without a difference, because

11    I don't think her age is in dispute.  But just to be safe,

12    I would request that be a separate and distinct element.

13        THE COURT:  Well, my lawyer pointed out that --

14    if I leave it the way it is, I have to change 5 to 4.  If I

15    do what you are suggesting, I leave the 5 in and add a

16    fifth element.

17        I don't remember from your proposed instructions, that

18    it did that.  What's your proposed instruction number on

19    that?

20        MR. MILLER:  I didn't even notice that you said

21    it has five essential elements.  When you go down, it only

22    lists four.  I'm afraid that may cause confusion for the

23    jury as to why the heading says four.

24        My proposed instruction is No. 4, and I did list it

25    separately.
```

1          THE COURT:  Well, I don't think it has to be

2     listed as a separate element.  They have to find that she

3     was not 18 in order to convict under that, under either

4     one.  Don't you agree?

5          MR. MILLER:  I agree.  But I think they have to

6     find 1(a), that he unlawfully killed her.  Then (b), which

7     I'm proposing should be a second element, would be that

8     A.C. had not attained the age of 18 years.

9          I think if we're going to leave the instruction, also,

10     the way it is, we have to change the heading to four

11     essential elements, because --

12          THE COURT:  I agree with that.  All I'm saying is

13     I don't think we have to add a fifth element.

14          MR. MILLER:  Your Honor, like I said, I think

15     it's a distinction without a difference.  But just to be

16     safe, I would ask that the heading remain at five and there

17     be five essential elements, so there's not an argument that

18     the jury didn't make a separate finding beyond regarding

19     her age.

20          THE COURT:  Out of an abundance of caution, I'll

21     do what you are suggesting.  It will be altered

22     accordingly.

23          So that objection is granted.

24          Instruction No. 15, "As used in these instructions,

25     'malice aforethought'."

1          Instruction No. 16, "The crime of voluntary

2     manslaughter."

3               MR. KHOROOSI:  Your Honor, I have an objection.

4     I would ask that the Court use my language for that last

5     paragraph.  I don't have a substantive disagreement.

6     However, I would request that the Court include, instead of

7     saying that, "If all of these elements have been proved

8     beyond a reasonable doubt as to the Defendant, then you

9     must find the Defendant guilty."

10         I would ask the Court use the language that I had

11    suggested in my proposed instruction 4, which is, "For you

12    to find the Defendant guilty of this crime, the Government

13    must prove all of these elements beyond a reasonable

14    doubt."  I think the jury runs the risk of confusing the

15    Government's burden as opposed to kind of a neutral fact

16    finder starting from zero.

17              THE COURT:  It's clear the Government has the

18    burden.  I'm not going to change that one.  Your objection

19    is noted.

20         Instruction 17, "The Defendant acted upon heat of

21    passion."

22         Instruction 18, "The crime of assault."

23              MR. MILLER:  Your Honor, the Government would

24    make the same objection or request the same modification to

25    Instruction 18 that it had to 14 in that there's an

 1    enhanced penalty for the assault resulting in serious

 2    bodily injury based on the age of the victim.  We would

 3    request, therefore, that the age be made a separate

 4    element, and that in the heading it be changed from four

 5    elements to five.

 6            THE COURT:  Once again, out of an abundance of

 7    caution, even though I think it is a distinction, without a

 8    difference, I'll make that change.

 9        That objection is granted.

10            MR. KHOROOSI:  I would also object to Instruction

11    18.  The Court has already discussed its ruling, but I

12    would like to renew my objection, and ask it be included as

13    a lesser-included offense.

14        I do agree with the Court that, in general, assault is

15    not a lesser-included offense of murder.  However, in this

16    particular scenario with these facts with this Defendant,

17    he's only charged with assaulting his daughter and causing

18    her death.  He's not accused, for example, with poisoning

19    her, committing other such similar acts.  He's only accused

20    of assaulting her.  That's been the Government's theory

21    from Day 1.  I don't think the Government would disagree

22    that that's what they intend to prove.

23            THE COURT:  How would that be any different than

24    if he were accused of poisoning her?  I mean beating her,

25    poisoning her, what's the difference?

1          MR. KHAROOSI:  If the Government proved he had

2     done both of those acts, then the act of poisoning her

3     would obviously not be an assault and so not a

4     lesser-included offense.

5          Here the factual elements are exactly identical.  The

6     difference is the degree of bodily injury which the child

7     allegedly suffered.

8          THE COURT:  Well, as the Court indicated, I'm

9     relying upon the case that I cited at the beginning of this

10    hearing, Good Bird, and the Court there, among other

11    things, cited to United States vs. Cavanaugh, 948 F.2d 405,

12    at 410, 1991 Eighth Circuit decision.  Quoting from that

13    case, it said, "Assault resulting in serious bodily injury

14    and second degree murder are completely separate offenses."

15    That's what we have here if the jury finds those things.

16         Your objection is noted.

17         Instruction 19, "Serious bodily injury."

18         Instruction 20, "The prosecutor and Defendant have

19    stipulated."

20         Instruction 21, "Intent or knowledge."

21         Instruction 22, "In conducting your deliberations."

22         MR. KHAROOSI:  Your Honor, we would request a

23    slight modification to Instruction 22.  The paragraph that

24    begins, "Second, it is your duty."  I would draw the

25    Court's attention to the second line of that paragraph in

```
 1    which the Court uses the words, "reach an agreement if you

 2    can do so without violence to individual judgment."

 3         We would suggest a modification to slightly less

 4    visually suggestive language, given the alleged facts of

 5    the case.  We would suggest the word "undermining" instead

 6    of "doing violence to."

 7              THE COURT:  Why, because violence is allegedly in

 8    the case?

 9              MR. KHOROOSI:  Yes.

10              THE COURT:  Your objection is noted, but not

11    granted.

12         There is one thing, though, that should be changed.

13    It should be "because your verdicts."  It's plural, not

14    singular.  So I am going to add in Instruction 22, right

15    after the part you are talking about on violence, I am

16    going to add "verdicts" plural.

17              MR. KHOROOSI:  Could I note my objection for the

18    reasons that I stated previously?

19              THE COURT:  Yes.  Then we have the Verdict Form.

20    That's it.

21              MR. KHOROOSI:  I just object to the Verdict Form

22    on the same grounds, the lesser-included.

23              THE COURT:  Right.  That's overruled for the

24    cases I've cited in the fact that, in the Court's view,

25    Count 3 is a separate offense, not a lesser-included.
```

```
 1              MR. KHOROOSI:  Thank you.

 2              THE COURT:  That settles the instructions.  How

 3   much time does the Government want to argue?

 4              MR. WRIGHT:  Your Honor, the Government is asking

 5   for one hour total for the initial argument and rebuttal.

 6   We're asking for the Court's permission for Mr. Wright to

 7   do the initial argument and for Mr. Miller to do the

 8   rebuttal.

 9       If there were any objections to be made on

10   Mr. Khoroosi's argument, I would make those objections.

11              THE COURT:  You are batting 500.  You can split

12   up the argument, but you're not going to get an hour.

13   What's the defense requesting?

14              MR. KHOROOSI:  Your Honor, I don't think I'll

15   need more than half an hour.

16              THE COURT:  I think half an hour is adequate.

17   That's what we'll do.  The Government splits it.  Of

18   course, the Government is well familiar with my no sandbag

19   rule.  You can't use anymore time in rebuttal than you used

20   in opening.  If you only used 10 minutes in the opening,

21   you only get 10 minutes for rebuttal.

22       Anything further from the Government?

23              MR. WRIGHT:  No, sir.

24              THE COURT:  From the defense?

25              MR. KHOROOSI:  No, Your Honor.
```

534

1          THE COURT:  Do you have a copy of Exhibit 103?

2          MR. KHOROOSI:  I do.  I had spoken with

3    Government's counsel.  I attempted to print off a copy of

4    the exhibit as it was marked in my PowerPoint presentation.

5    Unfortunately, even by attempting to screen shot the image,

6    I wasn't able to capture the notations I made indicating

7    where Mr. Contreras' house and Mr. Gill's house were.

8      I spoke with the Government, and I believe they are

9    willing to stipulate that I can physically make the

10   markings that were present on the PowerPoint exhibit, and

11   we can submit that as Exhibit 103.

12         THE COURT:  Let's do it right now so the

13   Government gets to look at them, so we don't have any fuss

14   about it later, and then we have the record to go back to

15   the jury room.

16         MR. MILLER:  While Mr. Khoroosi is doing that, I

17   would just indicate that I think the Court's jury

18   instruction packet covers the instructions proposed by the

19   Government, so we would offer no additional instructions at

20   this point in time.

21         THE COURT:  Very well.  Thank you.

22         MR. KHOROOSI:  We would also offer no additional

23   instructions, Your Honor.

24         THE COURT:  Thank you.

25         MR. WRIGHT:  No objection.

```
 1              THE COURT:  All right.  That is, no objection to

 2    103, as substituted now.  That's good.  Now you won't lose

 3    your computer into the record.

 4              MR. KHOROOSI:  Thank you.

 5              THE COURT:  The jury is coming back at 2:00.

 6    That gives you a little time to eat a little bit and think

 7    more about your argument.  We're in recess.  Thank you.

 8              (Recess at 12:46 until 2:00)

 9              THE COURT:  Bring in the jury, please.

10               (The jury entered the courtroom)

11              THE COURT:  Please be seated.  Good afternoon.

12    We did keep the schedule I told you we would.

13      (The final jury instructions were read by the Court)

14              THE COURT:  Would counsel approach the bench for

15    a moment, please?

16    (Side bar with all counsel:)

17              THE COURT:  Through the instructions, I did not

18    ask if you wanted the comment that they can't hold it

19    against the Defendant that he didn't testify.

20              MR. KHOROOSI:  We would ask for that, yes.

21              THE COURT:  Yes, I know, but I wanted it on the

22    record.

23              MR. KHOROOSI:  Oh, I'm sorry.  Yes, I would like

24    that on the record.

25              THE COURT:  I would also note on Instruction
```

1   No. 9, we didn't catch the last sentence.  I changed that

2   to say, "You should judge the testimony of the witnesses as

3   I stated above."

4            MR. KHOROOSI:  No objection.

5            MR. WRIGHT:  That's fine.

6   (End of side bar)

7   (The Court continues to read the final instructions

8   starting on Instruction 11).

9            THE COURT:  Now, I'm going to send back the jury

10  instructions that I've just read, plus I'll send back two

11  more copies of the instructions themselves.  There will

12  only be, however, one Jury Verdict Form.  There won't be

13  copies of it attached to the copies of the instructions.

14  The other copies of the instructions are just so you have

15  more than one, if people want to look at maybe some

16  particular thing in the instructions.

17       Also, shortly the exhibits will be brought back to

18  you, also.

19       Then, as you know, and as I mentioned during jury

20  selection, we try the case with 13 people.  So we have an

21  alternate juror.  Sometimes a juror gets sick, or something

22  a juror is in a car accident, or something comes up and we

23  lose a juror.  Thankfully that didn't happen in this case.

24  The alternate then now at this point will be excused.

25  That's Kathryn Baer.  I thank you very much, Miss Baer, for

```
 1    your service.  Often the alternate sits.  In this case not.

 2    But thank you very much.

 3         Would the Court Security Officer come forward and be

 4    sworn?

 5                   (Court Security Officer, sworn).

 6              THE COURT:  Please stand for the jury.

 7              MR. WRIGHT:  Your Honor, can we approach?

 8              THE COURT:  You may, but the jury is excused to

 9    go back to the jury room.  So just a minute.

10                   (The jury left the courtroom)

11              THE COURT:  Please be seated.  All right.  You

12    may approach.

13    (Side bar with all counsel:)

14              MR. WRIGHT:  Your Honor, we didn't do our

15    closings.

16              THE COURT:  Oh, I'm so used to reading the

17    instructions.  Yes.  I'll get the instructions changed.

18    All right.  Now, bring the jury back in.

19                   (Jury entered the courtroom)

20              THE COURT:  Well, I have just proven that people

21    are creatures of habit.  In the 20 years I've been a

22    Federal Judge, it's up to the Judge's discretion as to

23    whether you read the instructions first or after argument

24    first.  For 20 years I've been always reading the

25    instructions after final argument.
```

538

1        I decided, for a different reason I won't go into, to

2    do it the other way around today.  That's why I sent you

3    out without the lawyers getting a change to argue, because

4    I normally do it the other way around.

5        Proceed with argument now.

6        MR. WRIGHT:  May it please the Court and counsel.

7        You can't get 18 contusions on four sides of your head

8    from a single fall.  Ladies and gentlemen, this is the time

9    of trial called the final argument.  The attorneys have an

10   opportunity to summarize the case and talk about the

11   evidence.

12       Before we get to the evidence, I thank you for your

13   kind attention to this case.  It's a very important case to

14   the United States.  I notice you've all been paying very

15   close attention, and for that attention and your

16   responsibility as jurors, you have my deepest thanks.

17       I'd like to go through the evidence in this case as it

18   was presented.  We'll kind of do it chronologically and

19   start with the first significant event.

20       Shannon delivered Aleeyah in late 2009.  The first

21   year of her life, 2010, was fairly insignificant in regard

22   to this case.  The first significant event really came

23   forward in August of 2011.

24       The Court told you how to consider that testimony,

25   that it involved the Defendant for having Aleeyah for one

1    of the first weekends.  During that event, he gave her a

2    very hard slap on the buttocks.  The slap was so hard, that

3    when she got back to Shannon, Shannon could see a handprint

4    on her butt.  She was very concerned about that, so she

5    contacted her mother.  They attempted to take a picture of

6    that.  They contacted the Defendant, and he admitted that

7    he struck Aleeyah very hard on the buttocks.

8         Aleeyah was a Native American child, which means she's

9    got dark skin, so she would have to get hit pretty hard to

10   see that handprint on the buttocks.  Shannon called the

11   Defendant, and he admitted he struck her on the buttocks

12   and he apologized.

13        The next real significant event came in late 2011 when

14   Shannon was picking up Aleeyah from a weekend with the

15   Defendant.  They arranged to meet each other at the parking

16   lot of Teal's Market in Sisseton.  Shannon took her

17   husband, Sam, with her.  Sam went into the grocery store

18   before the Defendant arrived.  The Defendant arrived with

19   Aleeyah.  He got out of his car and was having a pleasant

20   conversation with Shannon.

21        As Sam came out of the store and walked up to the

22   group, Aleeyah pointed to Sam and said, "That's my daddy."

23   The Defendant's demeanor immediately changed.  Now, hearing

24   your own child point to another man and say, "That's my

25   daddy," can be a painful event, but it will also make some

540

1    people very, very angry.

2         The next event in this case deals with about two weeks

3    before Aleeyah's death.  That was her examination at

4    Head Start.  Aleeyah was getting ready to start Head Start,

5    and as a start of a mandatory screening, she was examined

6    by a doctor.  The doctor testified that Aleeyah was, two

7    weeks before she died, a healthy child.  Nothing wrong with

8    her general appearance.  Nothing wrong with her head.

9    Nothing there on the checklist should draw attention.  At

10   the bottom of the checklist the physician writes, "She is a

11   healthy child."

12        Now, why is that important?  Because the defense is

13   trying to sew into this case that she had some kind of

14   preexisting condition or preconcussion syndrome or

15   something like that, but all we really know is two weeks

16   before she died she was as normal as every other child on

17   the earth, so she was healthy going into it.

18        The next event we get to is the 4th of January.

19   That's when the Defendant gets Aleeyah for that five-day

20   period before Aleeyah eventually dies.  The Defendant gets

21   her on Wednesday, keeps her through Friday, asked for more

22   time, has her Sunday night and Monday morning.

23        Now, Agent Mertz of the FBI testified that Aleeyah

24   was, according to the Defendant, fine on Sunday night.

25   When Agent Mertz interviewed the Defendant in February, the

1   Defendant was very clear in two parts of the interview that

2   there was nothing wrong with Aleeyah on Sunday night.

3   During the middle of the interview, the Defendant said

4   Aleeyah was fine on Sunday.  At the end Agent Mertz wanted

5   to make sure, so he asked him a second time.  The Defendant

6   said, "Yeah, she was fine Sunday night."

7        Why is that important?  Because the defense spent a

8   lot of time this morning talking about she wasn't very good

9   on Wednesday, Thursday, or Friday.  They talked about

10  Pedialyte.  They talked about vomiting and things like

11  this.  All of that is irrelevant, because she was fine on

12  Sunday night before she died.  That was confirmed by

13  Shannon when she testified that she talked to Aleeyah that

14  one last time on Sunday night.  It wasn't that she didn't

15  sound any different than she did on any other night.

16       So you have a child that's normally healthy two weeks

17  before this event happens.  The night before she dies, both

18  the Defendant and her mother thinks there's nothing wrong

19  with her.  The next day all of a sudden she has this myriad

20  of problems.

21       Now, regarding why the Defendant would kill his own

22  child like this, please understand, ladies and gentlemen,

23  that we are not required under the instructions the Court

24  read to establish a motive.  We don't have to prove why he

25  killed her.  We only have to prove that he killed her.

But even though we don't have to prove motive, we have suggested a few stress factors the Defendant was under that could lead someone to do such a terrible act to their own child.  We showed you that particular Monday morning he had four kids in his house all under the age of 10.  He was the only adult in the house to take care of those four kids and get them going.  He had to be to work at 8:00 that morning. He was on a very short leash from his supervisor because he had been tardy a number of times.  He had 30 miles from where he lived to get to work.

He was under all kinds of child support orders from five different women that he had to pay.  The previous night he talked to Shannon to try to get out of her child support order, and Shannon had said "no."

We know that Aleeyah is normally a fussy child in the morning.  He not only has to get himself to work, he has to get her to Head Start before he gets to work.  So it was just the perfect storm.  There was an incredible lot of things going on in the Defendant's life that particular morning in the whole sequence of events leading up to that.

The Defendant eventually told Agent Mertz from the FBI that Aleeyah was sitting on a chair.  The Defendant turned around, and all of a sudden she's on the floor barely breathing.  The Defendant never said she was standing on the chair.  The Defendant never said she was sitting on a

table.  He never said she was standing at a table.

     After she was barely comatose, he then takes her, not
to the hospital, by the way, not calling 911, he takes her
to his uncle's house, Dennis Gill.  Neither the Defendant
or Dennis Gill call 911.  They don't call the police.
Mr. Gill looks at her for a while, and says, "Well, you
better get her to the hospital."

     The United States believes the reason the Defendant
did not go to the hospital or call 911 initially is because
he didn't want to get the police involved right away.  If
you call 911, you will get the police, you will get the
ambulance, and there's going to be an investigation.

     He hoped that he had just knocked Aleeyah unconscious,
and maybe his uncle could wake her up, and they wouldn't
have to tell anybody what happened to Aleeyah.  But if you
call the authorities for help, you bring the police into
it.

     It's only when the Defendant and his uncle realized
she's not coming out of this and you better get her to the
hospital, and Dennis Gill basically said, "You're on your
own."  He didn't want any part of this, bringing this child
into the hospital with him, because he knew there was going
to be a lot of trouble for the Defendant.

     Mr. Gill said, "My back hurt a little bit that day.
That's why I didn't go."  Can you imagine that?  Your

1   nephew's child is nearly dead, and you don't want to go

2   with her to the hospital like that, when she's barely

3   alive, because your back is hurting that day.

4        They take the child to the hospital.  She is

5   eventually airlifted to Fargo and she dies.

6        Ladies and gentlemen, the Defendant in this case

7   murdered his daughter.  The Death Certificate in this case

8   is Exhibit No. 8.  Dr. Froloff and his boss, the

9   supervisor, Dr. McGee, on the Death Certificate provide

10  that in their opinion -- it's not binding on you, you folks

11  decide this case, nobody else -- the immediate cause of

12  death is traumatic head injuries from physical assault.

13  The manner of death, according to them, is homicide.

14       It's important to notice the Death Certificate, ladies

15  and gentlemen, is a public record.  When an individual puts

16  something in writing, they feel very strongly about it.

17  It's easy to say certain things, but when you put something

18  in writing and when you access it in a public record, you

19  better feel very strongly about it.  Because, as you

20  probably know, Death Certificates can be obtained by

21  anybody.  If you want a copy of that Death Certificate, you

22  can pay the fee and get a copy.

23       A person like Dr. Froloff and Dr. McGee are not going

24  to reduce something in writing and put it in a public

25  record unless they are really, really sure.  If those

1    gentlemen that did the autopsy on Aleeyah can believe that

2    strongly that the cause of death is homicide, then you can

3    easily believe it beyond any reasonable doubt.

4         Dr. Froloff said the child had 18 contusions, one to

5    the mid forehead, eight to the top of the head, two to the

6    left forehead, and seven to the right side.

7         Dr. Froloff testified in his opinion this child's

8    death was consistent with physical assault.  In fact, he

9    testified he was so sure, he called the FBI after the first

10   day of the autopsy.  Dr. Froloff testified the autopsy is

11   usually a two-day procedure.  Before he even finished the

12   autopsy, after the first day, he was so convinced this was

13   a homicide, he wanted to get law enforcement involved right

14   away.

15        When Jay asked Dr. Froloff in his opinion, "What do

16   you think were the objects of death?"  Do you remember in

17   his deep Russian accent what he said?  "Fist, knuckles,

18   punching."  Fist, knuckles, punching were the three words

19   he used.  Which means essentially, ladies and gentlemen,

20   that in that doctor's opinion, this Defendant, her father,

21   killed that child with no weapon.  He used his bare hands.

22        There were 18 contusions found on the child, both by

23   Dr. Froloff and by Dr. Snell.  Eighteen impact points.

24   Now, does that mean we believe he hit her 18 times?  No.  I

25   thought Mr. Khoroosi did a nice job yesterday when he held

1   up the piece of paper and slapped his hand on the paper.

2   That was one blow, but it was five impact points.

3   Essentially we're telling you that Aleeyah had 18 separate

4   points of impact on her head.

5       Ladies and gentlemen, it wouldn't take long for the

6   Defendant to have done that damage to his child.  Remember,

7   we have four knuckles on each hand.  It's essentially two

8   or three fast jabs, and he could kill his daughter.

9       Watch me for a second.  You are right in front of me.

10  (Indicating)   That's 20 knuckles, 4, 8, 12, 16, 20.  He

11  could kill her in less than five seconds if he swung hard

12  enough.  There were 18 contusions, not 20.  But her head

13  will move a little bit when he's striking her, and not all

14  20 will land exactly.

15      But his fists in this case, ladies and gentlemen, were

16  the objects of death.  You know, as a rational person, this

17  couldn't have been a fall.  You don't fall off a chair and

18  get 18 different contusions on four sides of your head.

19      The Defendant struck this child a number of times, and

20  that's what the evidence showed.  Mr. Miller asked

21  Dr. Froloff, when he was on the stand, if this was

22  consistent with a fall, and he said that makes no sense.

23  Both Dr. Froloff and Dr. Snell said these injuries were

24  acute.  They both said within three days.

25      Remember, ladies and gentlemen, when you are computing

1    the age, you count the day of death, also.  The day she

2    dies is one day; day before, second day; the day before,

3    the third day.  Isn't that amazing?  Dr. Froloff said two

4    to three days.  Aleeyah died 5:00 on Wednesday.  According

5    to the Agent Gaikowski, she came to the hospital at 0839 on

6    Monday.  That is almost exactly two-and-a-half days,

7    exactly within the two- to three-day period estimated by

8    the coroner in this case.

9        Dr. Graff also testified.  He was the guy from Fargo

10   that we had yesterday morning.  You can take a look at his

11   resume.  It's in evidence.  He is one of the leading

12   pediatricians in the country.  He saw Aleeyah up in Fargo.

13   He was there.  He tried to save her life.  He testified

14   that he concurred with Dr. Froloff that the cause of death

15   in this case was homicide.

16       Dr. Graff also testified on all the child abuse that

17   he works, he said that children who suffer a very, very

18   significant blow to their head will not show any external

19   damage.  All the damage, all the bleeding is interior.

20   That's why there were no bumps or bruises on her head when

21   she presented at the hospital.

22       In fact, Dr. Froloff estimated that the chances that

23   Aleeyah died from a fall in this case are one in a million.

24   That was his testimony.

25       We had Dr. Snell, the county coroner in this case.

Dr. Snell clearly explained one fall equals one bruise on one side of the head.  He concurred with Dr. Froloff that there were 18 contusions in the same place.  He concurred that those bruises were acute; that his count on the day of death, they were consistent.

Dr. Snell also testified if Aleeyah or any child had a fall from a table or chair like that, they wouldn't go unresponsive that fast.  They wouldn't get that bad that quickly.

In this case when Dr. Snell was asked by Mr. Miller, "Can a child get 18 bruises on their head from a single fall," Dr. Snell said, "No, sir, that's not possible." Dr. Snell also testified about the significant energy transfer that's required to the brain when you get struck that many blows.  And when Dr. Snell was asked what the chances were that this child died from a fall, he said less than one in a million, even less than Dr. Graff estimated.

The Defendant called Dr. Randall yesterday late in the afternoon, and basically there's three things from Dr. Randall's testimony that I would like you to pull out. This is the Defendant's expert the defense called to testify in this case.

Dr. Randall was asked, number one, "Is this case consistent with physical assault?"  He said, "Yes."

Dr. Randall was asked, number two, "Is it probable

that that child died from a fall in a chair?"  He said,

"Very unlikely."

Their own expert not only said it was unlikely the

child would die from a fall from a chair, as claimed by the

Defendant to the FBI, he said "very unlikely."

Number three.  When Dr. Randall was asked, "How can

the child be fine on Sunday night and have 18 contusions on

Monday morning?"  Dr. Randall said, "I can't explain that."

He could give no explanation for that.

Ladies and gentlemen, this case is 18 months old.

It's been 18 months since this happened.  The defense has

had 18 months to figure out how are we going to explain

this?  What are we going to do?  And after 18 months, they

come in here with their expert, and is asked the question,

and he says, "I can't explain it."

If they can't explain it, after having 18 months to

think about it, it's not your job, as jurors, to try and

figure out possible explanations.  You are not an arm of

the prosecution.  You're not an arm of the defense.  You

are an independent group that makes a decision.

So we've proven beyond any reasonable doubt in this

case that Aleeyah was murdered by the Defendant.  She

didn't fall from the chair.  The person that made up that

story, and that's what it is, it's a total story that this

child fell.

1          In addition to the medical testimony, I urge you to

2     utilize one other resource when you decide this case, and

3     that is your common sense, ladies and gentlemen.  Even if

4     you put aside what every doctor says in this case, don't

5     divorce your common sense from this proceeding.

6          All of you either have children or you have nieces or

7     nephews or have friends with children.  All of you were

8     children at one time.  You know that when a child or an

9     adult falls down, he doesn't get 18 bruises on different

10    parts of their body.  If you fall on the right side of your

11    head, you get a bruise on the right side of your head; not

12    the right and left side.  It's basic medicine that you've

13    lived with your entire life.

14         You know the Defendant's story is impossible, that

15    this child fell down and sustained these massive injuries

16    in four different parts of her head.  It's common sense,

17    and we urge you to use that in this case.

18         The three charges in this case are murder,

19    manslaughter, and assault resulting in serious bodily

20    injury.  Please notice that the Defendant is charged with

21    second-degree murder.  He's not charged with first-degree

22    murder.  He's not charged with a premeditated killing.  We

23    did not allege or have to show that he planned on killing

24    his daughter.  He didn't.  It was not a planned killing.

25         It's only second-degree murder that requires malice.

1    The Judge just gave you the instruction on that.  Malice

2    does not require ill will.  It does not require spite.  It

3    does not require hate.  The malice that the Defendant used

4    was shown in this severe, severe beatings that he gave that

5    child.

6        I want to touch on four themes that the defense has

7    raised in this case.  They brought up four issues, and I

8    would like to touch on them briefly.

9        The first one is the fetal alcohol syndrome.  The

10   defense asked a number of questions of Dr. Froloff about

11   the possibility of fetal alcohol syndrome affecting many

12   things.  The problem is there's never been a showing that

13   Aleeyah had fetal alcohol syndrome.  When I asked Shannon

14   on the witness stand, she looked kind of surprised by the

15   question, and she said, "No, Aleeyah did not have fatal

16   alcohol syndrome."

17       Dr. Randall, the defense's expert, testified he

18   reviewed all of Aleeyah's records since she was born, every

19   one of her records.  Did you hear him say anything about

20   fetal alcohol syndrome?  Wouldn't that be in one of the

21   records?  Don't you think the exhibit from Head Start would

22   reference that, too?

23       So there's no issue of fetal alcohol syndrome, despite

24   the defense asking a number of questions in this case about

25   its possible effect, but it doesn't matter, because Aleeyah

1    didn't have it.

2         Secondly, they make a big deal about the fact that

3    there were no eyewitnesses to the assault.  Mr. Khoroosi in

4    his PowerPoint put that up in his opening statement that

5    there were no witnesses.  I suspect they will probably

6    bring it up again in their final argument.

7         Well, ladies and gentlemen, the physical abuse of

8    children usually does not take place in the middle of Times

9    Square with about a hundred people watching.  The physical

10   abuse of children usually takes place in the home, and it

11   takes place when there are not a lot of people watching

12   things like that.

13        The fact that there were no witnesses in this case is

14   basically what we're alleging in the case that helps us.

15   The Defendant didn't have any other adult there to help him

16   that day.  The Defendant had the four kids there.  He was

17   super stressed out, and the fact that there were no

18   eyewitnesses to the case is part of what we're contending

19   drove him up the wall that day, because he didn't have any

20   help, and he was under a great deal of stress.

21        Finally, ladies and gentlemen, you have to consider

22   that there really aren't witnesses to every case.  If you

23   stop and think about it, most people don't kill other

24   people in front of witnesses.  Most people don't commit

25   robberies or rapes in front of a witness.

1          In fact, about the only crime that's ever routinely

2     committed in front of witnesses is bank robbery, and

3     usually the bank robber is wearing a mask.  So this is not

4     the kind of offense where witnesses are normally around.

5          The third thing is absolute certainty.  Dr. Randall

6     testified for a long time yesterday that there are no

7     certainties in medicine.  We absolutely don't know

8     positively for sure many things in medicine.

9          Ladies and gentlemen, there is only one person in

10    charge of this courtroom, and that's Judge Piersol.  He's

11    just read you an instruction that says we don't have to

12    prove the Defendant guilty with absolute certainty.  We

13    only have to prove it beyond a reasonable doubt.

14         Don't let their expert, Dr. Randall, make you believe

15    that you have to be absolutely certain in everything in

16    life.  Your doubt must be so high, it has to be reasonable

17    before you find the Defendant not guilty.

18         Again, when you stop and think about it, there are a

19    very few things that anyone knows in life with absolute

20    certainty.  If we had to prove every case to absolute

21    certainty, I probably wouldn't have a job.

22         I mean I hope I'm alive tomorrow, but I'm not

23    absolutely certain of it.  My dad died of a heart attack in

24    2007 in the middle of the night.  He probably thought he

25    would be here the next day, but he wasn't.  So there are

 1   very few things anyone knows with absolute certainty.

 2   Please don't put that burden on us, even though Dr. Randall

 3   talked about it for 15 minutes.

 4        Their last theme was vomiting.  They talked a lot

 5   about the fact that Aleeyah vomited during the last week of

 6   her life.  We've talked about Thursday and Pedialyte and

 7   Friday and things like that.

 8        I thought Agent Mertz did a nice job when he testified

 9   about he interviewed that part of it with the Defendant.

10   They had a long discussion about that.  The Defendant said,

11   "Hey, she vomited a lot from acid reflux, and I gave her

12   some bad food that week, and that was likely the cause of

13   that."

14        This vomiting theory, I think, again goes to their

15   pre-concussion syndrome, and maybe she had a concussion,

16   things like that.  Actually the explanation was she had

17   acid reflux, and she just wasn't feeling really good.

18   Ladies and gentlemen, this is not the one in a million case

19   that Dr. Graff and Dr. Snell were referring to.

20        Please understand that you are the only jury that will

21   ever speak for that child.  If you find the Defendant not

22   guilty, I can't come in here next week and pick a whole new

23   jury and try it again.  You are the only jury that will

24   speak for what happened to that child.

25        I ask you to find the Defendant guilty for stealing

1    the life of that child.  Thank you.

2          MR. KHOROOSI:  May it please the Court, counsel.

3       Members of the jury:  I remember a couple days ago

4    when I was first talking to you, and when Mr. Wright was

5    first talking to you, we both told you don't expect a

6    movie.  We asked you not to expect to see what you see on

7    TV, what you see in a movie, what you see anywhere else.

8    And it didn't unfold like a movie.

9       But when you listen to the prosecution's case, it's a

10   lot like a broken projector.  You can kind of make out an

11   image, but you know it's not reality.

12      Let's talk about what we do know about Aleeyah.  Let's

13   talk about reality.

14      Aleeyah Cook was born December 31, 2009.  Mario first

15   met Aleeyah when she was just a few months old.  Her

16   mother, Shannon Sine, said, "You can have visitation with

17   her, but you can't tell anybody she exists.  You can't tell

18   anybody she's yours."

19      Mario was a father of seven children, seven children.

20   So proud of his little daughter, he couldn't help but go

21   and show his Aunt Viv, "Look at my daughter, Aunt Viv.

22   Isn't she beautiful?"

23      As time went on, Mario started to get more and more

24   time with his little girl.  Eventually he had her about

25   every other weekend.  He introduced her to his girlfriend,

1    Brenda, who loved her almost like she was her own daughter.

2        Around early summer, late spring they started to get

3    even more time together.  As the summer went on, Mario got

4    even more time with his daughter.  He didn't complain about

5    that.  He wanted more time.  He asked for more time.

6    Sometimes Shannon would let him have it.  Sometimes she

7    wouldn't.

8                MR. MILLER:  Objection.  Facts not in evidence.

9                THE COURT:  Overruled.

10               MR. KHOROOSI:  Visitation was completely within

11   Shannon's discretion.  You heard the prosecution talk about

12   that until the cows came home.  Mario didn't have any

13   control over it.  He took what he could get.  Didn't want

14   to rock the boat.

15       As Mario started to spend more time with his daughter,

16   he and Brenda started to notice things.  Like occasionally

17   there would be a bruise, and it's normal for a little kid

18   to get hurt sometimes.  It's normal for a little kid to

19   fall down, see cuts, scrapes on their arms and legs and

20   anywhere.

21       But eventually as the summer turned into fall, she

22   would show up with more, with darker, with different kinds

23   of bruises on her head.  Mario would get calls at 1:00 or

24   2:00 in the morning to go get his daughter.  He would rush

25   out and go get her.

1          That's what we know about Mario Contreras.  That's

2     what we know about Aleeyah's life.  We know her dad loved

3     her.

4          We know sometime in August of 2011 Shannon called

5     Mario and said, "I noticed something on Aleeyah's butt when

6     she came home."  You heard what Brenda Jackson said.  They

7     were confused.  They had no idea what she was talking

8     about.  She spent the whole weekend with her.  She never

9     saw him hit her.

10         Then you heard Shannon Cook testify.  She swore up and

11    down that she saw that mark on her child's butt.  It was

12    about this wide, (indicating), about three centimeters

13    wide, same width as that Mongolian spot Dr. Froloff noted.

14    A Mongolian spot is a birthmark.  It's a birthmark.  That's

15    what she noticed.

16         Even after that incident, even after Miss Cook was so

17    convinced that Mario slapped his daughter on the butt so

18    hard, he left a mark, she offered him -- you heard Miss

19    Cook's testimony.  You heard her say, "Well, yeah, I guess

20    I did offer him 50 percent custody."

21         Folks, Judge Piersol instructed you to use your common

22    sense.  It doesn't take much common sense to see that a

23    parent, who is really worried that their child is being

24    hurt that badly, doesn't offer 50 percent custody to the

25    person they're not legally required to give any visitation

1   to.  That's the reality.

2       A person who is afraid that the other parent is going

3   to harm the child doesn't call the other parent at 12:00,

4   1:00 in the morning to come get the child.

5       We know that as the fall wore on, we saw some other

6   symptoms happen to Aleeyah.  You saw those bruises.  Don't

7   let the prosecution fool you.  You heard Brenda Jackson

8   testify those pictures were taken in December.  The

9   prosecution said they were taken in August.  Brenda never

10  did.

11      Should it matter when your kid comes over with those

12  kinds of bumps and bruises every single time or darn near

13  every single time towards the end there.  Brenda and Mario

14  argued about it.  He said, "I know.  I just don't want to

15  rock that boat.  I need to keep seeing my daughter.  I need

16  to keep seeing her."

17      Now, as we get closer to the end of her life, we start

18  to see some symptoms.  January 4, 2012, just a few days

19  after her last and second birthday, that Wednesday she

20  shows up, and she's not herself.  Mario knows.  Mario knows

21  what she's like.  Mario knows about acid reflux.  He knows

22  what foods to give her.  He doesn't always do it perfectly.

23  Which one of us does?  He knows when her stomach is upset

24  and when something bigger is wrong.

25      The problem is, you heard multiple experts testify.

 1   You can also use your common sense.  Those symptoms mimic a

 2   concussion.  There's no evidence that Aleeyah was sick when

 3   she came into that hospital.  She had those symptoms all

 4   week.

 5        Move on to January 5.  You heard Vivian testify.  You

 6   heard Brenda testify.  She still had those symptoms.  Not

 7   only is she throwing up, but she doesn't have an appetite.

 8   She doesn't have any energy.  She's lethargic.  She's not

 9   herself.

10        January 6.  At this point Mario thinks she has the

11   flu.  Who wouldn't?  She has flu-like symptoms.  He's

12   treating her like he would any other kid with the flu.

13   He's giving her Pedialyte.

14        They went to a wake.  This is an unusual event.  This

15   doesn't happen everyday.  Mario's role, and that important

16   religious ceremony is so important, he went to go fulfill

17   that and brought his daughter along.  You heard

18   Miss Wolcott.  She was well taken care of.

19        Sierra had never met Mario before then.  Never met

20   Aleeyah before then.  She was just a member of the

21   community who was watching the kids, watching Aleeyah.  She

22   saw the same symptoms.  She was lethargic.  She was a

23   little off.  She threw up on poor Sierra.

24        You heard Edward Seaboy.  The guy never met Aleeyah,

25   never met Mario.  Still to this day probably can't remember

1  doing it.  Probably still can't remember meeting him.  He

2  says, "Yeah, my wife tells me I met Mario, but I don't

3  know."  He says, "I saw Aleeyah.  She was sitting on a

4  folding chair.  I turned around, talked to the drummers.

5  All of a sudden I hear her crying, and I see Mario rushing

6  to her aid, telling her it's going to be okay."  That's the

7  reality.

8      January 7 she's still sick.  You heard from

9  Agent Mertz.  She fell in the shower.  She fell in the

10 bathtub.  Still having the same symptoms.  Still lethargic.

11 Still throwing up.  None of the usual remedies seemed to

12 work for this acid reflux.  Pedialyte doesn't work.  Soft

13 foods doesn't work.  Making sure they don't have dairy in

14 her diet doesn't work.  All of the normal stuff that Mario

15 is used to doing for this girl, they don't work.

16     I'll ask you to use your common sense.  It's

17 completely understandable that a parent who sees these

18 flu-like symptoms says, "Well, we'll wait until Monday to

19 see how it goes.  We'll give it a couple of days and keep

20 taking care of her.  It looks like she has the flu."

21     The night before, the night of the 7th and the night

22 of the 8th, Brenda Jackson saw Aleeyah.  She saw how she

23 was.  Aleeyah was exactly the same as before.  Wasn't

24 keeping down her special food.  Wasn't doing anything.

25     The prosecutor likes to make a lot about

1   Mr. Contreras' statement that, "Other than the throwing up

2   and stuff, she was fine.  I thought she was fine."  He did

3   think she was fine.  He's not a doctor.  He's a dad.

4       Aleeyah goes to sleep for the last time on January 8.

5   The morning of January 9 no one knows exactly what

6   happened.  Here is what we do know.  Here is what we do

7   know.  Mario woke up, welcomed his two older kids in the

8   house.  They went in to watch TV or do whatever it is they

9   were going to do.

10      One of those kids was Teton.  Brenda said he was old

11  enough to hear and see and know what was going on.  You

12  didn't hear anything from the prosecution about what Teton

13  heard.  You didn't hear Agent Mertz talk about it.  You

14  didn't see anything that would suggest that Teton perceived

15  anything out of the ordinary.

16      The prosecution wants you to believe that this father

17  of seven children is stressed out -- we're not sure why

18  he's stressed out.  It's kind of a moving target.  Either

19  he has to pay a $150 a month child support obligation.

20  He's late for work sometimes.  All he has to do is call in,

21  and they'll just deduct from his vacation time, his leave

22  time.  Is that really a reason a father of seven would kill

23  his baby girl?  To avoid a $150 a month child support

24  payment?  To get more vacation time at work?

25      Mr. Wright was correct.  The Government doesn't have

1   to show a motive.  But they've introduced a motive.

2   They've introduced several motives, none of which make

3   common sense.

4        The Government does have to prove, however, a number

5   of related items.  When you get back there, you'll see what

6   the instructions tell you.  That in order to find him

7   guilty of murder, you have to find he took some kind of

8   voluntary act that caused her death.  In order to find him

9   guilty of manslaughter, you have to find he took some kind

10  of voluntary act that caused her death.  In order to find

11  him guilty of assault, you need to find that he acted with

12  intention.  You need to find that beyond a reasonable

13  doubt.

14       In order to consider that, none of the reasons

15  advanced by the Government, and the Government has had 18

16  months to investigate this.  Like us -- actually they have

17  had longer.  The Government has had since January 4, 2012,

18  to investigate this case and find out what caused him to do

19  this.  The best they can come up with is he was late for

20  work, didn't want to lose his vacation time.  That's

21  ridiculous.  That's absolutely ridiculous.

22       He didn't want to go to jail for not paying child

23  support, so he punched his two-year-old daughter to death?

24  Insulting.

25       Now, the prosecution makes quite a bit out of the

563

expert testimony in this case.  If you look at the expert

testimony, they agree on one major premise, but there is no

way to tell when an injury occurred.  There's no way to

tell when an injury occurred.  Even the best estimates.

Dr. Graff came all the way from North Dakota.  He had

what I thought was probably the thickest resume of the

bunch.  I asked him, "Is it difficult to date a retinal

hemorrhage?"  His answer wasn't, "Well, it's difficult, but

you can pinpoint within a certain time frame."  His answer

was, "It's impossible.  It's impossible to date a retinal

hemorrhage."

So it's impossible to find that it happened on Mario's

watch.  It's even more impossible to find Mario took any

action that would have caused those retinal hemorrhages.

You can't do it.

The prosecution makes a big deal out of the fact that

Mario said, "She fell, she fell, so I took her to the

hospital."

At this point this is what Mario knows.  On the

morning of January 9 that's all Mario knows.  He sets her

on the chair, hears her fall, looks over and she's on the

floor crying.  Panic has to wash over him, sheer panic.

He's not thinking, well, she might have had some subgaleal

contusions and maybe some older injuries to her occipital

area.  No.  He was thinking, oh, my God, my daughter is

1    lying on the floor and not moving.

2        So what does he do?  He takes her to the closest

3    person he could find who can do CPR, his Uncle Dennis.  You

4    heard Dennis testify.  Dennis tried his best to save her.

5    He did CPR, he said about two to five minutes.  Realized it

6    wasn't working.  He said, "Get her to the hospital."

7        When you live out in the country, as Mario does, and

8    it takes up to an hour and a half, two hours, for an

9    ambulance to get there, you don't think about 911.  You

10   don't think about speed limits.  You don't think about

11   anything.  You think about saving your baby girl.  That's

12   what Mario did.  He tried his best.

13       The prosecution dared to ask Dennis Gill, "Oh, so it's

14   your back that stopped you?  Your back was a little sore?"

15   Dennis Gill testified, "I would have slowed him down.  He

16   needed to get there fast.  This girl wasn't breathing."

17       Was it medically the best decision?  Who knows?  There

18   was no testimony about that.  But think about it logically.

19   Think about it using your common sense.  You're not --

20   Mario wasn't thinking during that time.  He was acting.  He

21   was acting in the best way he knew how to save his girl's

22   life.

23       In the end, we don't know what caused the death of

24   Aleeyah Cook.  We do know the Government hasn't met its

25   burden.  They need to show us beyond a reasonable doubt,

1    beyond any reasonable doubt, not just that she was hurt on

2    Mario's watch, not just that she had more wounds than could

3    have been caused by a simple fall, that Mario, this man,

4    Mario Contreras, took an action against his two-year-old

5    daughter.  They haven't shown anything like that.

6         Mr. Wright wanted a witness.  There were three people

7    in that house that could have.  There were three people in

8    the house, anyway.  There is one we know that could have

9    said something.  You didn't hear him.  The Government has

10   had this case since January of 2012, and you haven't heard

11   from this kid?

12        You heard Dr. Randall talk about a black box.  The

13   Government didn't shed any light on that black box.

14   Sitting here today, it remains just as dark, if not more,

15   than it was when the Government started.  Folks, the

16   Government simply hasn't met its burden of proof.

17        I'd like to talk to you about the instructions you

18   were just given.  You will be given --

19             THE COURT:  You have five minutes to do that.

20             MR. KHOROOSI:  Thank you.  You'll be given this

21   instruction.  "Reasonable doubt is doubt based upon reason

22   and common sense.  A reasonable doubt may arise from

23   careful and impartial consideration of all the evidence, or

24   from a lack of evidence, or from a lack of evidence."

25   There's a lot of evidence lacking here, a lot of it.

1        And while the law doesn't require absolute certainty,

2   it does require proof beyond any reasonable doubt.

3            MR. MILLER:  Objection.  That's a misstatement of

4   the instruction.

5            THE COURT:  The jury can read it for themselves.

6            MR. KHOROOSI:  In order to find Mario Contreras

7   guilty, you have to find that you wouldn't hesitate to rely

8   on that information.  The Government hasn't shown that.

9        Folks, when you get into that jury room and

10  deliberate, you'll be presented with this form.

11       On Count 1 you'll see the only possible verdict is not

12  guilty.

13       Count 2, you'll see the only possible verdict is not

14  guilty.

15       No. 3, the only possible verdict is not guilty.

16       Thank you.

17           MR. MILLER:  Can I get the easel set up, please?

18       Ladies and gentlemen of the jury, you heard a lot

19  about science during the course of the trial.  I wasn't

20  ever very good at science in school, so I'm going to do the

21  math.  I ask you, when you go back to do your

22  deliberations, do the math.  What Mr. Khoroosi told you in

23  his closing argument does not add up.

24       He told you that you have to find the Defendant guilty

25  beyond any reasonable doubt.  Absolute certainty.  You

1    don't see the word "any" anywhere in this instruction.   It

2    just doesn't add up.

3         He told you some things during the course of his

4    closing argument.   That Shannon wanted to hide the fact

5    that the Defendant was the father of Aleeyah.   The facts

6    simply don't support that argument.   She went and got a

7    child support obligation from him.   She let him have

8    visitation more and more as the child grew older.   If she

9    wanted to keep it a big secret as to who the father was,

10   why would she go to the Court and get a Court-ordered

11   obligation and name him as the father and allow him to have

12   visitation.   Their argument just does not add up.

13        He said sometimes Shannon would let him have custody,

14   visitation.   Sometimes she wouldn't.   You heard the

15   testimony of Brenda Jackson.   She told you that Shannon was

16   cooperative in providing visitation.   There was no evidence

17   introduced that showed Shannon ever deprived him of

18   visitation when he would ask.   No evidence to support that.

19        He talked about the spanking incident, Mr. Khoroosi

20   did, in his closing argument.   He passed it off as Shannon

21   just mistook that for the Mongolian spot that Aleeyah had

22   on her butt.   Shannon had custody of that little girl

23   throughout her entire life, and would not mistake a

24   Mongolian spot for a three-fingered handprint she testified

25   to during her testimony.

1       Also, think about that picture, that picture she took.

2   It didn't turn out very good.  We do know what it is

3   attempting to show.  A butt.  You can see in the picture it

4   is a picture of a child's buttocks.  Why would Shannon take

5   a picture of the child's buttocks unless she was trying to

6   document the three-fingered bruise she saw?  She took it to

7   show what had happened.  She didn't mistake that for a

8   Mongolian spot.

9       Defense also talked about this preexisting condition.

10  They actually talked about it two-fold.  They said prior

11  falls and these flu-like symptoms.  They said there were

12  prior falls.  There is no evidence to show a prior fall.

13      What did we hear from the gentleman who was at the

14  wake?  He said, "I looked over and saw a little girl

15  sitting on a chair.  I was making the rounds seeing people,

16  shaking hands.  I went over and talked to the drummers.

17  She was about six foot behind me.  The next thing I knew,

18  she was crying.  The Defendant went to her.  She was no

19  longer on the chair."

20      He didn't say she fell.  He didn't say she was lying

21  on the floor.  We don't even know that she fell off that

22  chair.  She was just off the chair, and she was crying.  He

23  didn't see it.  He didn't say she was lying on the floor.

24  There's nothing to support that a fall took place on that

25  day.  Even if you believe that a fall did take place,

1    there's nothing to show she fell and hit her head.

2        Also he talked about a fall in a bathtub.  It's your

3    recollection of the counts, ladies and gentlemen of the

4    jury, but I don't remember any testimony being given about

5    a fall in a bathtub.  It's your recollection that counts.

6    It just doesn't add up.

7        Another thing Mr. Khoroosi told you is that Miss Sine

8    told Agent Mertz, other than the vomiting, she was fine

9    Sunday night.  Ladies and gentlemen, you heard the

10   testimony of Agent Mertz.  That's not what the Defendant

11   said.  That's not what the Defendant told Agent Mertz.  He

12   said the Defendant said, "Yes, she was sick when I picked

13   her up.  She was sick on Thursday, Friday, Saturday, but on

14   Sunday she was fine."  Not other than the vomiting, she was

15   fine.  "She was fine."

16       That's what dispels this prior existing condition.  If

17   you have this prior concussive injury that the defense

18   wants you to accept, you just don't get better on your own.

19   You just don't miraculously on Sunday feel better.

20       The defense talked about you can't date injuries.

21   That's true to an extent.  You can't be precise.  You can't

22   be exact.  Mr. Khoroosi, during question one of the

23   witnesses, said, "Well, if I get hit in one arm, and five

24   hours later I get hit in the other arm, you can't tell the

25   difference."  No, the science is not that exact.  You can't

1    tell a bruise is five hours old from one that's a couple

2    hours old.

3         But medically they do bruises by date ranges, days.

4    You heard testimony from the doctors that a bruise that is

5    three days old or less is an acute one.  Over three days

6    it's subacute.  After so long it becomes chronic.  No, you

7    can't tell it to the hour, but you can tell it within those

8    date ranges.  It's also, according to the testimony of

9    Dr. Graff, virtually impossible to date the subdural or,

10   excuse me, the optic nerve hemorrhage they saw.

11        That's not the only evidence you heard of injury.  You

12   heard of 18 subgaleal hemorrhages.  They testified about

13   the appearance of those and the iron deposits and how they

14   appeared, and both Dr. Froloff and Dr. Snell said those

15   injuries, the dating of them, is consistent with the time

16   frame she presented at the hospital.  Those injuries took

17   place on Monday.

18        They also told you something else.  They also told you

19   those injuries all appeared consistent with each other,

20   which is an indication that they all happened at the same

21   time.  Not all these preexisting conditions that the

22   Defendant wants you to believe.

23        You also heard about the subdural hematoma and the

24   lack of the organization that happens as that wound

25   attempts to heal.  They also testified that the subdural

1    hematoma, just like the subgaleal hemorrhages, points to an

2    injury consistent with the time frame that the little girl

3    presented at the hospital Monday morning; those three days,

4    the day she died, that Tuesday, and the Monday she

5    presented at the hospital.

6        The defense said use your common sense.  If Shannon

7    believed that the Defendant spanked her child, why would

8    she allow him more visitation?  Why would she offer him

9    joint custody?  Think of that in reverse.  If Brenda

10   Jackson loved Aleeyah, like a daughter, like Mr. Khoroosi

11   said she did, and I don't doubt Miss Jackson's affection to

12   the little girl, why would she not do something?  She was

13   an employee at the hospital.  Why wouldn't she take a

14   picture?  Why wouldn't she call somebody if she sees these

15   ever-increasing bruises she testified to?

16       Think about what she told you.  We know Shannon had

17   custody from Day 1 until the end.  She was the constant.

18   But two things changed over time.

19       One, the Defendant's access to the child.  From

20   November to January he got ever increasing visitation.

21   Brenda told you something else also increased during that

22   same time frame.  The bruising on Aleeyah.

23       That's not a coincidence, ladies and gentlemen.  The

24   correlation is stunning.  The more he got her, the more she

25   was in his custody, the more she appeared with bruises.

1    Shannon was always there from Day 1.  The Defendant was

2    not.  The more he got access to her, the more she was

3    bruised.

4        The defense says a lot of things.  Let's do the math.

5            THE COURT:  You have about a minute to do the

6    math.

7            MR. MILLER:  Thank you.  One fall, one bruise on

8    one side of the head.  Seven injuries, plus one, plus two,

9    plus eight, does not equal one fall.  It does not.

10       The pictures you get, the witness to this case that

11   tells you what happened is in Exhibit 9F.  Look at the

12   knuckle pattern circle in that picture.  It tells you the

13   instrumentality of death is a fist.  That is the witness.

14       I would ask you to go back to the jury room, return a

15   verdict of guilty and hold the Defendant accountable for

16   what he did to that little girl.  Thank you.

17           THE COURT:  Now that you've been instructed by

18   the Court, and you've heard argument by counsel, you'll go

19   back to the jury room and select your foreperson and

20   deliberate.  The exhibits will be brought back to you

21   shortly.  The instructions I read to you will be brought

22   back to you, also.  Please stand for the jury.

23       (Jury excused to begin deliberations at 3:31)

24           THE COURT:  I want counsel to come up to look at

25   the exhibits that are actually going to be taken back and

```
 1   agree they are the ones that should properly go back to the

 2   jury.

 3        Does the Government agree the exhibits going back are

 4   those that should properly go to the jury?

 5             MR. WRIGHT:  We do.

 6             THE COURT:  Does the defense agree?

 7             MR. KHOROOSI:  We do.

 8             THE COURT:  Here are the original jury

 9   instructions with the Verdict Form, with two more copies

10   also to be given to the jury.

11        Have counsel given your cell phone numbers and every

12   number where you can be reached to the courtroom deputy so

13   you can be reached on short notice?

14        Don't be far away.  It's my experience that jurors ask

15   more and more questions as years have gone on.  It used to

16   be a big deal if they asked a question.  Now it's an

17   exception if they don't.

18        If the Court Security Officer could come forward and

19   take the exhibits as well as the instructions back.  You

20   might have to have help with the exhibits.

21        Thank you.  We're in recess.

22             (Recess at 3:35 until 6:18)

23             * * * * *  VERDICT  * * * * *

24             THE COURT:  Bring in the jury, please.

25                  (The jury entered the courtroom)
```

```
 1              THE COURT:  Has the jury reached a verdict?

 2              THE FOREPERSON:  We have, Your Honor.

 3              THE COURT:  Would you give the verdicts to the

 4  Court Security Officer?  Are these verdicts unanimous?

 5              THE FOREPERSON:  They are, Your Honor.

 6              THE COURT:  I'm going to announce the verdicts by

 7  reading them.

 8       "Count 1.  We, the jury, in the above-entitled action,

 9  as to the crime of second-degree murder, as charged in

10  Count 1 of the Indictment, find Mario M. Contreras guilty."

11       Then it goes on to, "Count 3.  We, the jury, in the

12  above-entitled action, as to the crime of assault resulting

13  in serious bodily injury, as charged in Count 3 of the

14  Indictment, find Mario M. Contreras guilty."  Signed by the

15  foreperson.

16       Does either party desire the jury be polled?

17              MR. WRIGHT:  No, Your Honor.

18              MR. KHOROOSI:  Yes, Your Honor.

19              THE COURT:  I'll have the jury polled.  The Clerk

20  will read each of your names, and ask if this is your

21  verdict.  You either answer, "Yes, this is my verdict," or

22  if it isn't, say, "This is not my verdict."

23              THE CLERK:  Chuck Manning, is this your verdict?

24              JUROR MANNING:  Yes, it is.

25              THE COURT:  Leallen Endres, is this your verdict?
```

575

```
 1              JUROR ENDRES:  Yes, it is.

 2              THE CLERK:  Richard Bieber, is this your verdict?

 3              JUROR BIEBER:  Yes, it is.

 4              THE CLERK:  Diane Herrmann, is this your verdict?

 5              JUROR HERRMANN:  Yes, it is.

 6              THE CLERK:  Sheila Aslesen, is this your verdict?

 7              JUROR ASLESEN:  Yes, it is.

 8              THE CLERK:  Richelle Steiner, is this your

 9   verdict?

10              JUROR STEINER:  Yes, it is.

11              THE CLERK:  Gary Weismantel, is this your

12   verdict?

13              JUROR WEISMANTEL:  Yes, it is.

14              THE CLERK:  Phyllis Roehr, is this your verdict?

15              JUROR ROEHR:  Yes, it is.

16              THE CLERK:  Kirk Lardy, is this your verdict?

17              JUROR LARDY:  Yes, it is.

18              THE CLERK:  Jennifer Cimburek, is this your

19   verdict?

20              JUROR CIMBUREK:  Yes, it is.

21              THE CLERK:  Donald Johnson, is this your verdict?

22              JUROR JOHNSON:  Yes, it is.

23              THE CLERK:  Cleo Fulton-Gjerde, is this your

24   verdict?

25              JUROR FULTON-GJERDE:  Yes, it is.
```

1          THE COURT:  Very well.  I find these are the

2   verdicts of the jury in each instance, and the verdict is

3   unanimous.  Accordingly then, the jury with regard to this

4   case is discharged.  I do ask when you go back to the jury

5   room, you stay there for a moment, because I do come back

6   to answer questions with regard to general jury procedures

7   that you might have, since you haven't sat on a Federal

8   case before.

9      I don't talk to you about the case itself, because as

10  you know, the verdict was to be yours and yours alone.  So

11  I don't ask you about the case, but, rather, talk to you

12  about procedures and answer questions you have as to how we

13  proceed on things.  I don't talk about the specific case.

14     I thank you very much for your service.  I know this

15  is difficult service.  Without it, we couldn't have trial

16  by jury in our country.  So you performed a very valuable

17  function.  I thank you most sincerely for it.  Please stand

18  for the jury.

19               (The jury was excused)

20          THE COURT:  In light of the jury verdict then,

21  I'm going to set up times for a Presentence Report, which

22  will be disclosed not later than October 7.  Objections, if

23  there are any from either party, are due to be filed in

24  writing and actually filed by the 21st of October.

25     The sentencing of Mr. Contreras will take place in

1    this courtroom on November 4 at 1:30 p.m. in the afternoon.

2        Is there anything further from the Government?

3            MR. WRIGHT:  Yes, there is, Your Honor.  Pursuant

4    to the jury's verdict of guilty in this case, we would ask

5    the Court order the Defendant be detained pending

6    sentencing.

7            THE COURT:  I believe this is a mandatory

8    confinement, I believe, absent showing exceptions under the

9    statute.

10       Anything further from the defense?

11           MR. KHOROOSI:  Your Honor, we object to the

12   taking of Mr. Contreras into custody.  He's been out on

13   bond for the pendency of this case and hasn't even come

14   close to violating.  We would request the Court decline to

15   order his detention at this time.

16           THE COURT:  This is a case that requires

17   mandatory confinement.  No situation has been presented

18   that would prevent that situation from being the case.  So

19   Mr. Contreras is ordered into confinement at this time.

20       Anything further from the Government?

21           MR. WRIGHT:  No, sir.  Thank you.

22           THE COURT:  From the defense?

23           MR. KHOROOSI:  No, Your Honor.

24           THE COURT:  Very well.  We're in recess.

25           (End of proceedings at 6:25 p.m.)

```
 1   UNITED STATES DISTRICT COURT
     DISTRICT OF SOUTH DAKOTA :SS    CERTIFICATE OF REPORTER
 2   SOUTHERN DIVISION

 3
             I, Jill M. Connelly, Official United States
 4   District Court Reporter, Registered Merit Reporter,
     Certified Realtime Reporter, and Notary Public, hereby
 5   certify that the above and foregoing transcript is the
     true, full, and complete transcript of the above-entitled
 6   case, consisting of Pages 1 - 577.

 7           I further certify that I am not a relative or
     employee or attorney or counsel of any of the parties
 8   hereto, nor a relative or employee of such attorney or
     counsel, nor do I have any interest in the outcome or
 9   events of the action.

10           IN TESTIMONY WHEREOF, I have hereto set my hand
     this 23rd day of September, 2014.

11

12                       /s/ Jill M. Connelly
                         _____
13                       Jill M. Connelly, RMR, CRR
                         Court Reporter
14                       United States Courthouse
                         400 S. Phillips Avenue
15                       Sioux Falls, SD 57104
                         Phone:  (605) 330-6669
16                       E-mail:  Jill_Connelly@sdd.uscourts.gov

17

18

19

20

21

22

23

24

25
```

## $

**$150** [2] - 561:19, 561:23

## '

**'07** [2] - 475:7
**'08** [1] - 475:8
**'11** [1] - 474:19
**'malice** [1] - 528:25

## /

**/s** [1] - 578:12

## 0

**0839** [1] - 547:5

## 1

**1** [14] - 428:7, 428:13, 430:1, 506:5, 524:12, 524:13, 525:2, 530:21, 566:11, 571:17, 572:1, 574:8, 574:10, 578:6
**1(a** [1] - 528:6
**10** [4] - 526:3, 533:20, 533:21, 542:5
**10-minute** [1] - 473:16
**103** [7] - 452:8, 453:1, 453:4, 453:25, 534:1, 534:11, 535:2
**108** [3] - 436:23, 437:11, 437:12
**10:00** [2] - 462:16, 469:15
**10:05** [1] - 473:19
**10:16** [1] - 473:19
**10:30** [1] - 482:4
**10:42** [1] - 488:15
**11** [2] - 525:16, 526:14
**11)** [1] - 536:8
**110** [4] - 490:11, 490:23, 490:25, 491:8
**111** [4] - 490:11, 490:23, 490:25, 491:14
**11:22** [1] - 514:19
**11:35** [1] - 523:5
**11:36** [1] - 523:15

**12** [2] - 526:16, 546:10
**12-10047** [1] - 428:4
**1203** [1] - 524:19
**12:00** [1] - 558:3
**12:30** [1] - 523:15
**12:46** [1] - 535:8
**13** [2] - 526:18, 536:20
**14** [2] - 526:20, 529:25
**15** [2] - 528:24, 554:3
**16** [2] - 529:1, 546:10
**17** [2] - 483:11, 529:20
**18** [25] - 527:1, 527:7, 528:3, 528:8, 529:22, 529:25, 530:11, 538:7, 545:4, 545:22, 545:24, 546:3, 546:12, 546:18, 548:3, 548:11, 549:7, 549:10, 549:11, 549:12, 549:13, 549:16, 550:9, 562:15, 570:12
**19** [1] - 531:17
**197** [1] - 524:19
**1991** [1] - 531:12
**1999** [1] - 524:19
**1:00** [8] - 434:20, 435:5, 443:25, 478:7, 478:9, 484:18, 556:23, 558:4
**1:30** [1] - 577:1

## 2

**2** [5] - 519:5, 520:9, 524:14, 525:3, 566:13
**20** [10] - 463:21, 526:7, 531:18, 537:21, 537:24, 546:10, 546:12, 546:14
**2002** [1] - 475:5
**2007** [1] - 553:24
**2009** [2] - 538:20, 555:14
**2010** [6] - 431:16, 432:10, 432:14, 441:16, 444:14, 538:21
**2011** [18] - 435:17, 474:17, 476:23, 478:18, 485:20, 488:24, 492:17, 500:3, 500:11,

500:13, 503:11, 505:18, 506:1, 506:9, 506:21, 538:23, 539:13, 557:4
**2012** [10] - 435:20, 454:17, 463:24, 483:12, 492:24, 507:12, 519:5, 558:18, 562:17, 565:10
**2013** [3] - 428:7, 428:13, 430:1
**2014** [1] - 578:10
**21** [1] - 531:20
**21st** [1] - 576:24
**22** [4] - 441:21, 531:21, 531:23, 532:14
**225** [1] - 428:23
**23rd** [1] - 578:10
**25** [1] - 454:17
**2638** [1] - 428:21
**2:00** [10] - 434:20, 435:5, 443:25, 478:7, 478:9, 522:21, 523:2, 535:5, 535:8, 556:24
**2nd** [1] - 492:24

## 3

**3** [10] - 492:23, 492:24, 524:15, 524:16, 525:4, 525:7, 532:25, 566:15, 574:11, 574:13
**30** [1] - 542:9
**300** [1] - 531:14
**31** [1] - 555:14
**33** [1] - 458:22
**330-6669** [1] - 578:15
**3322** [1] - 451:14
**337** [1] - 428:23
**36** [1] - 474:10
**3:31** [1] - 572:23
**3:35** [1] - 573:22

## 4

**4** [10] - 524:7, 524:9, 525:20, 527:14, 527:24, 529:11, 546:10, 558:18, 562:17, 577:1
**400** [2] - 429:14, 578:14
**404(b** [4] - 513:20, 514:5, 515:25, 518:5
**405** [2] - 429:4, 531:11

**410** [1] - 531:12
**45** [1] - 454:13
**4:30** [1] - 438:5
**4th** [4] - 435:22, 492:25, 494:7, 540:18

## 5

**5** [5] - 437:4, 525:22, 527:14, 527:15, 559:5
**50** [2] - 557:20, 557:24
**500** [1] - 533:11
**57101-2638** [1] - 428:21
**57104** [3] - 429:4, 429:14, 578:15
**57501-2489** [1] - 428:24
**577** [1] - 578:6
**5:00** [3] - 438:5, 438:6, 547:4
**5:30** [1] - 438:21
**5th** [3] - 435:25, 494:16, 494:18

## 6

**6** [6] - 438:23, 463:24, 495:3, 524:12, 525:23, 559:10
**605** [1] - 578:15
**605-330-6669** [1] - 429:15
**6:00** [1] - 438:22
**6:18** [1] - 573:22
**6:25** [1] - 577:25
**6:30** [1] - 449:14

## 7

**7** [3] - 525:24, 560:8, 576:22
**7:30** [1] - 438:5
**7th** [5] - 495:20, 495:24, 496:6, 496:7, 560:21

## 8

**8** [4] - 526:1, 544:8, 546:10, 561:4
**8:00** [3] - 454:20, 498:9, 542:7
**8:30** [1] - 439:11
**8th** [2] - 497:3,

560:22

## 9

**9** [6] - 454:17, 498:5, 526:2, 536:1, 561:5, 563:20
**911** [15] - 457:7, 458:11, 458:14, 458:23, 459:1, 459:9, 459:13, 459:22, 460:8, 460:15, 543:3, 543:5, 543:9, 543:11, 564:9
**948** [1] - 531:11
**9:00** [2] - 428:13, 430:3
**9F** [1] - 572:11

## A

**A.C** [2] - 527:6, 528:8
**a.m** [2] - 428:13, 430:3
**able** [3] - 504:18, 514:4, 534:6
**above-entitled** [3] - 574:8, 574:12, 578:5
**absent** [2] - 431:7, 577:8
**absolute** [7] - 553:5, 553:12, 553:19, 553:20, 554:1, 566:1, 566:25
**absolutely** [6] - 478:11, 487:22, 553:7, 553:15, 553:23, 562:21
**abundance** [2] - 528:20, 530:6
**abuse** [4] - 524:9, 547:16, 552:7, 552:10
**abusive** [1] - 516:19
**accent** [1] - 545:17
**accept** [1] - 569:18
**access** [3] - 544:18, 571:19, 572:2
**accident** [4] - 509:14, 509:15, 510:8, 536:22
**accidental** [1] - 487:10
**accompanied** [1] - 464:20
**according** [7] - 486:4, 505:2, 507:8, 540:24, 544:13, 547:4, 570:8
**accordingly** [2] -

528:22, 576:3

**account** [1] - 500:14

**accountable** [1] - 572:15

**accurate** [3] - 452:17, 452:20, 525:14

**accurately** [5] - 437:8, 452:23, 490:15, 490:19, 526:24

**accused** [3] - 530:18, 530:19, 530:24

**acid** [18] - 434:8, 436:18, 436:20, 444:21, 444:23, 493:7, 493:9, 493:12, 493:25, 494:3, 495:18, 496:4, 519:11, 520:7, 554:11, 554:17, 558:21, 560:12

**acknowledged** [1] - 442:17

**acquaintances** [1] - 474:25

**act** [5] - 433:20, 531:2, 542:3, 562:8, 562:10

**acted** [4] - 433:16, 517:7, 529:20, 562:11

**acting** [2] - 564:20, 564:21

**action** [6] - 516:24, 563:14, 565:4, 574:8, 574:12, 578:9

**actions** [1] - 516:23

**acts** [2] - 530:19, 531:2

**acute** [3] - 546:24, 548:4, 570:5

**add** [8] - 527:15, 528:13, 532:14, 532:16, 566:23, 567:2, 567:12, 569:6

**added** [1] - 452:22

**addition** [1] - 550:1

**additional** [3] - 527:2, 534:19, 534:22

**adequate** [4] - 502:6, 523:17, 523:20, 533:16

**admissible** [1] - 518:5

**admission** [2] - 453:1, 490:22

**admitted** [2] - 539:6, 539:11

**adopted** [1] - 476:5

**adult** [8] - 449:3, 449:6, 461:1, 462:3, 462:7, 542:6, 550:9, 552:15

**adults** [3] - 509:22, 509:24, 510:25

**advance** [1] - 482:12

**advanced** [1] - 562:15

**adversely** [1] - 480:11

**advice** [1] - 456:25

**advise** [1] - 519:18

**aerial** [2] - 452:12, 453:25

**affect** [2] - 440:18, 457:21

**affected** [1] - 434:9

**affecting** [1] - 551:11

**affection** [1] - 571:11

**affirmatively** [1] - 487:13

**aforethought'** [1] - 528:25

**afraid** [5] - 472:3, 481:7, 504:18, 527:22, 558:2

**afternoon** [3] - 535:11, 548:19, 577:1

**afterwards** [1] - 495:9

**age** [11] - 506:18, 527:1, 527:5, 527:7, 527:11, 528:8, 528:19, 530:2, 530:3, 542:5, 547:1

**Agent** [19] - 441:20, 441:25, 473:14, 510:21, 510:25, 516:8, 518:15, 518:25, 540:23, 540:25, 541:4, 542:21, 547:5, 554:8, 560:9, 561:13, 569:8, 569:10, 569:11

**agent** [2] - 488:6, 507:5

**AGENT** [1] - 518:21

**agitated** [1] - 495:1

**ago** [2] - 468:7, 555:3

**agree** [12] - 480:4, 493:14, 505:11, 505:13, 528:4, 528:5, 528:12, 530:14, 563:2, 573:1, 573:3, 573:6

**agreed** [3] - 453:7, 453:8, 477:3

**agreement** [2] -

443:19, 532:1

**ahead** [5] - 469:20, 472:20, 518:22, 522:16, 522:23

**aid** [1] - 560:6

**ailments** [1] - 434:17

**airlifted** [1] - 544:5

**alcohol** [6] - 551:9, 551:11, 551:13, 551:16, 551:20, 551:23

**Aleeyah** [180] - 430:23, 430:25, 431:1, 431:12, 432:6, 432:11, 432:21, 433:1, 433:16, 434:2, 434:16, 435:4, 435:12, 435:22, 436:7, 437:17, 437:18, 438:7, 438:11, 439:1, 439:3, 439:5, 440:25, 441:15, 442:4, 443:3, 443:7, 443:11, 443:20, 444:2, 444:3, 444:5, 445:7, 447:13, 447:21, 448:1, 448:8, 448:15, 448:16, 449:2, 449:4, 449:13, 449:16, 449:18, 449:21, 455:2, 456:13, 458:2, 458:5, 458:8, 460:22, 461:4, 461:9, 462:1, 462:7, 464:2, 464:5, 466:5, 466:8, 475:16, 475:17, 475:21, 476:10, 476:20, 476:25, 478:10, 478:12, 478:21, 479:19, 482:18, 483:12, 483:23, 486:2, 488:25, 489:3, 489:4, 489:10, 490:7, 491:17, 492:14, 492:20, 492:25, 493:2, 493:3, 494:16, 494:24, 495:3, 495:9, 495:13, 495:22, 495:24, 496:12, 497:9, 497:20, 498:2, 499:20, 499:21, 500:3, 500:4, 500:7, 500:9, 500:12, 500:17, 501:3, 501:18, 502:14, 502:15, 506:8, 507:1, 507:5, 507:11, 509:5, 509:9, 509:16, 510:2, 510:5, 510:6, 510:12,

510:18, 511:15, 514:1, 515:14, 515:18, 516:16, 517:6, 517:8, 517:14, 519:1, 519:6, 519:10, 519:19, 538:20, 538:25, 539:7, 539:8, 539:14, 539:19, 539:22, 540:4, 540:6, 540:19, 540:20, 540:23, 541:2, 541:4, 541:13, 542:15, 542:22, 543:13, 543:15, 545:1, 546:3, 547:4, 547:12, 547:23, 548:6, 549:22, 551:13, 551:15, 551:25, 554:5, 555:12, 555:14, 555:15, 558:6, 559:2, 559:20, 559:21, 559:24, 560:3, 560:22, 560:23, 561:4, 564:24, 567:5, 567:21, 571:10, 571:22

**Aleeyah's** [15] - 439:17, 442:18, 456:23, 477:13, 478:20, 490:17, 491:10, 492:2, 492:18, 502:8, 516:18, 540:3, 551:18, 557:2, 557:5

**alive** [2] - 544:3, 553:22

**allegation** [2] - 473:13, 484:6

**allegations** [1] - 484:18

**allege** [1] - 550:23

**alleged** [6] - 471:12, 486:25, 505:3, 505:17, 527:3, 532:4

**allegedly** [3] - 483:23, 531:7, 532:7

**alleging** [2] - 500:21, 552:14

**allow** [5] - 514:5, 515:2, 517:19, 567:11, 571:8

**allowed** [5] - 443:13, 482:11, 484:20, 484:23, 517:22

**allowing** [1] - 487:16

**almost** [3] - 457:15, 547:6, 556:1

**alone** [2] - 454:25, 576:10

**ALSO** [1] - 429:6

**altered** [1] - 528:21

**alternate** [3] - 536:21, 536:24, 537:1

**amazing** [1] - 547:3

**ambulance** [5] - 457:13, 459:17, 459:23, 543:12, 564:9

**AMERICA** [1] - 428:5

**American** [1] - 539:8

**amount** [2] - 481:4, 502:6

**angry** [1] - 540:1

**announce** [1] - 574:6

**answer** [7] - 446:12, 455:16, 563:8, 563:9, 574:21, 576:6, 576:12

**answered** [4] - 446:5, 446:7, 503:14, 503:19

**answers** [2] - 513:1, 513:3

**anytime** [1] - 443:21

**anyway** [3] - 450:5, 494:24, 565:8

**apart** [1] - 492:12

**apologize** [2] - 451:25, 457:4

**apologized** [2] - 485:22, 539:12

**apparent** [1] - 492:6

**appear** [11] - 433:21, 436:7, 436:9, 455:4, 472:15, 490:16, 493:2, 493:9, 494:18, 516:16

**appearance** [3] - 470:2, 540:8, 570:13

**Appearance** [1] - 506:12

**APPEARANCES** [2] - 428:19, 429:1

**appeared** [6] - 465:14, 465:15, 467:4, 570:14, 570:19, 571:25

**appearing** [1] - 468:13

**appetite** [4] - 494:4, 494:7, 494:8, 559:7

**apply** [1] - 521:7

**Apprendi** [2] - 527:1, 527:9

**approach** [9] - 464:18, 468:3, 479:3, 479:10, 484:13, 513:16, 535:14, 537:7, 537:12

**approached** [2] - 439:22, 464:25

**approaching** [3] - 483:20, 484:16, 499:4

**April** [3] - 431:15, 474:19, 500:14

**area** [3] - 457:4, 475:18, 563:25

**argue** [2] - 533:3, 538:3

**argued** [1] - 558:14

**argument** [25] - 484:2, 489:15, 504:13, 504:16, 512:24, 521:4, 522:11, 528:17, 533:5, 533:7, 533:10, 533:12, 535:7, 537:23, 537:25, 538:5, 538:9, 552:6, 566:23, 567:4, 567:6, 567:12, 567:20, 572:18

**argumentative** [1] - 442:14

**arguments** [1] - 516:2

**arise** [1] - 565:22

**arm** [5] - 467:11, 549:18, 549:19, 569:23, 569:24

**arms** [1] - 556:19

**arrange** [1] - 477:10

**arranged** [1] - 539:15

**arrangement** [1] - 477:5

**arrangements** [2] - 477:4, 500:16

**arrived** [4] - 439:16, 499:1, 539:18

**arriving** [1] - 499:14

**aside** [2] - 489:6, 550:4

**Aslesen** [1] - 575:6

**ASLESEN** [1] - 575:7

**Assault** [1] - 531:13

**assault** [11] - 529:22, 530:1, 530:14, 531:3, 544:12, 545:8, 548:24, 550:19, 552:3, 562:11, 574:12

**assaulting** [2] - 530:17, 530:20

**assistant** [1] - 474:12

**assume** [2] - 460:7, 471:4

**assumed** [2] - 458:23, 525:13

**ate** [7] - 434:7, 442:1, 494:11, 497:9,

497:20, 497:21, 497:23

**attached** [1] - 536:13

**attack** [1] - 553:23

**attained** [1] - 528:8

**attempt** [2] - 471:12, 483:8

**attempted** [2] - 534:3, 539:5

**attempting** [3] - 486:8, 534:5, 568:3

**attempts** [1] - 570:25

**attend** [1] - 463:23

**attention** [11] - 464:24, 465:5, 465:8, 472:13, 492:7, 492:23, 531:25, 538:13, 538:15, 540:9

**attorney** [2] - 578:7, 578:8

**Attorney's** [2] - 428:20, 428:23

**attorneys** [1] - 538:9

**attributed** [1] - 519:11

**audience** [2] - 468:9, 468:22

**AUGUST** [2] - 428:7, 430:1

**August** [14] - 428:13, 476:24, 485:20, 492:8, 492:17, 503:21, 503:23, 504:11, 505:18, 506:1, 517:2, 538:23, 557:4, 558:9

**aunt** [1] - 441:13

**Aunt** [2] - 555:21

**auntie** [1] - 438:17

**aunts** [1] - 431:10

**Austin** [7] - 514:23, 515:2, 516:11, 517:19, 518:2, 518:4, 518:8

**authorities** [3] - 460:8, 523:8, 543:16

**authority** [2] - 470:16, 516:1

**automatic** [1] - 524:4

**autopsy** [4] - 545:1, 545:10, 545:12

**Ave** [2] - 429:4, 429:14

**Avenue** [1] - 578:14

**average** [1] - 438:9

**avoid** [1] - 561:23

**aware** [9] - 459:17, 472:18, 477:8, 500:1, 500:6, 501:7, 501:15, 501:16, 507:24

**awhile** [1] - 496:25

# B

**baby** [20] - 432:8, 432:18, 432:22, 433:8, 433:14, 433:17, 435:16, 436:3, 436:14, 438:3, 438:7, 438:12, 443:6, 443:7, 449:13, 479:25, 485:20, 485:21, 561:23, 564:11

**baby-sat** [2] - 435:16, 438:3

**baby-sit** [7] - 432:22, 433:8, 433:14, 433:17, 438:7, 443:7, 449:13

**baby-sitter** [3] - 432:8, 432:18, 438:12

**baby-sitting** [2] - 436:3, 443:6

**background** [1] - 499:12

**backing** [1] - 492:7

**backpack** [1] - 479:1

**bad** [11] - 433:20, 460:10, 479:14, 480:14, 480:16, 480:17, 483:23, 484:6, 484:17, 548:8, 554:12

**badly** [1] - 557:24

**Baer** [2] - 536:25

**baked** [1] - 497:18

**bank** [2] - 553:2, 553:3

**bar** [12] - 468:5, 469:8, 469:18, 479:6, 481:21, 482:6, 483:17, 513:18, 514:12, 535:16, 536:6, 537:13

**bare** [1] - 545:21

**barely** [3] - 542:23, 543:2, 544:2

**based** [4] - 470:17, 526:16, 530:2, 565:21

**basic** [1] - 550:12

**basis** [1] - 517:18

**basket** [1] - 485:15

**bathtub** [3] - 560:10, 569:2, 569:5

**batting** [1] - 533:11

**bay** [1] - 475:18

**beating** [1] - 530:24

**beatings** [1] - 551:4

**beautiful** [2] - 442:25, 555:22

**became** [1] - 513:23

**become** [2] - 477:24, 518:5

**becomes** [1] - 570:6

**bed** [2] - 439:23, 502:1

**BEFORE** [1] - 428:17

**begin** [2] - 468:1, 572:23

**beginning** [11] - 475:7, 476:19, 476:21, 477:25, 478:22, 500:7, 500:15, 521:9, 525:8, 531:9

**begins** [1] - 531:24

**behavior** [2] - 485:11, 517:9

**behind** [2] - 471:5, 568:17

**believes** [1] - 543:8

**belong** [2] - 463:22

**bench** [8] - 468:2, 468:3, 479:4, 479:11, 483:20, 484:13, 484:16, 535:14

**beneath** [2] - 452:23

**best** [10] - 446:14, 502:8, 502:14, 502:15, 562:19, 563:4, 564:4, 564:12, 564:17, 564:21

**better** [8] - 469:25, 481:18, 496:14, 543:7, 543:19, 544:19, 569:18, 569:19

**between** [7] - 432:8, 443:19, 457:5, 505:8, 508:25, 512:5, 512:25

**beyond** [12] - 442:12, 455:17, 478:18, 508:14, 517:21, 525:12, 527:4, 528:18, 529:8, 529:13, 545:3, 549:21, 553:13, 562:12, 564:25, 565:1, 566:2, 566:25

**Bieber** [1] - 575:2

**BIEBER** [1] - 575:3

**big** [5] - 491:25, 552:2, 563:16, 567:9, 573:16

**bigger** [1] - 558:24

**binding** [1] - 544:10

**Bird** [2] - 524:18, 531:10

**birth** [1] - 443:5

**birthday** [1] - 558:19

**birthmark** [1] - 557:14

**bit** [14] - 435:15, 435:19, 436:19, 437:16, 450:6, 492:8, 492:22, 497:22, 522:4, 522:8, 535:6, 543:24, 546:13, 562:25

**black** [2] - 565:12, 565:13

**bleeding** [4] - 435:7, 480:17, 482:21, 547:19

**block** [3] - 451:16, 451:17, 451:18

**blow** [2] - 546:2, 547:18

**blows** [1] - 548:15

**blue** [1] - 491:12

**boat** [2] - 556:14, 558:15

**bodily** [6] - 530:2, 531:6, 531:13, 531:17, 550:19, 574:13

**body** [6] - 456:24, 467:16, 483:2, 500:18, 500:20, 550:10

**bond** [1] - 577:13

**born** [2] - 551:18, 555:14

**boss** [1] - 544:8

**bother** [2] - 445:1, 445:4

**bottom** [2] - 492:18, 540:10

**bounds** [1] - 510:15

**Box** [1] - 428:21

**box** [2] - 565:12, 565:13

**boxes** [1] - 506:16

**brain** [2] - 487:24, 548:14

**branch** [1] - 455:24

**bread** [1] - 519:13

**break** [1] - 469:12

**breakfast** [3] - 434:7, 447:2, 450:3

**breathing** [2] - 542:24, 564:16

**BRENDA** [1] - 473:23

**Brenda** [19] - 467:25, 473:22, 474:6, 481:6, 488:22, 499:15, 516:13, 556:1, 556:16, 557:6, 558:7,

558:9, 558:13, 559:6,
560:22, 561:10,
567:15, 571:9, 571:21
**brief** [1] - 516:8
**briefly** [2] - 450:9,
551:8
**bring** [13] - 430:4,
433:21, 471:12,
473:4, 486:10,
488:12, 488:13,
518:10, 535:9,
537:18, 543:16,
552:6, 573:24
  **bringing** [1] - 543:21
**broke** [1] - 439:25
**broken** [1] - 555:10
**brother** [2] - 460:6,
464:21
**brother-in-law** [1] -
464:21
**brought** [14] - 434:6,
436:5, 458:2, 458:8,
471:9, 472:13,
485:10, 485:11,
517:1, 536:17, 551:7,
559:17, 572:20,
572:21
  **bruise** [17] - 461:18,
481:17, 490:17,
491:9, 503:4, 504:8,
504:11, 504:25,
505:17, 506:2, 548:1,
550:11, 556:17,
568:6, 570:1, 570:4,
572:7
  **bruised** [2] - 435:13,
572:3
  **bruises** [48] - 479:21,
479:24, 480:4, 480:5,
480:8, 480:10,
480:12, 480:19,
480:20, 480:22,
481:9, 483:2, 483:4,
483:7, 487:15, 489:7,
489:10, 489:17,
489:23, 490:1, 490:5,
490:8, 492:1, 492:2,
500:4, 500:17,
500:19, 500:22,
501:4, 502:22,
504:13, 504:14,
504:19, 504:22,
505:4, 505:17,
506:24, 512:25,
547:20, 548:4,
548:11, 550:9,
556:23, 558:6,
558:12, 570:3,
571:15, 571:25
  **bruising** [7] - 461:10,

484:15, 489:17,
489:21, 500:7, 513:2,
571:22
  **bumps** [2] - 547:20,
558:12
  **bunch** [1] - 563:7
**burden** [7] - 525:10,
525:12, 529:15,
529:18, 554:2,
564:25, 565:16
  **business** [3] - 480:8,
484:17, 484:25
**busy** [1] - 457:14
**butt** [6] - 539:4,
557:5, 557:11,
557:17, 567:22, 568:3
**butter** [1] - 494:12
**buttocks** [6] - 539:2,
539:7, 539:10,
539:11, 568:4, 568:5
**BY** [35] - 430:13,
433:6, 433:12, 435:1,
437:15, 440:16,
441:11, 442:3,
442:16, 446:11,
448:12, 449:11,
450:12, 451:7, 452:1,
452:6, 453:23,
455:12, 455:18,
458:1, 463:1, 465:20,
466:18, 478:17,
488:21, 491:6,
499:19, 501:2, 502:7,
503:22, 505:22,
508:17, 511:12,
518:24, 520:5

471:9, 479:18,
481:24, 513:21,
513:23, 516:23,
518:1, 518:7, 521:9,
524:18, 525:10,
526:12, 526:14,
526:25, 527:9, 531:9,
531:13, 532:5, 532:8,
536:20, 536:23,
537:1, 538:10,
538:13, 538:17,
538:22, 540:2,
540:13, 544:6, 544:7,
544:11, 546:15,
547:8, 547:15,
547:23, 547:25,
548:10, 548:22,
548:23, 549:10,
549:22, 550:2, 550:4,
550:17, 550:18,
551:7, 551:24,
552:13, 552:14,
552:18, 552:22,
553:20, 554:18,
555:9, 562:18, 563:1,
565:10, 572:10,
576:4, 576:8, 576:9,
576:11, 576:13,
577:4, 577:13,
577:16, 577:18, 578:6
  **cases** [3] - 459:21,
523:24, 532:24
**catch** [1] - 536:1
**Catch-22** [1] - 469:22
**category** [2] -
506:11, 506:14
  **cater** [1] - 494:15
**caused** [7] - 439:9,
562:8, 562:10,
562:18, 563:14,
564:23, 565:3
  **causing** [2] - 519:16,
530:17
  **caution** [2] - 528:20,
530:7
  **Cavanaugh** [1] -
531:11
  **cell** [1] - 573:11
**centimeters** [1] -
557:12
  **central** [1] - 479:25
**cereal** [1] - 497:24
**ceremony** [1] -
559:16
  **certain** [8] - 445:1,
445:4, 515:11, 517:7,
544:17, 553:15,
553:23, 563:9
  **certainly** [2] - 460:4,
501:13

**certainties** [1] -
553:7
**certainty** [7] - 553:5,
553:12, 553:20,
553:21, 554:1, 566:1,
566:25
**CERTIFICATE** [1] -
578:1
  **Certificate** [4] -
544:7, 544:9, 544:14,
544:21
  **Certificates** [1] -
544:20
  **Certified** [1] - 578:4
**certify** [2] - 578:5,
578:7
  **chair** [22] - 464:8,
465:13, 465:15,
467:1, 467:12,
467:14, 501:8,
501:13, 502:9,
542:22, 542:25,
546:17, 548:7, 549:1,
549:4, 549:23, 560:4,
563:21, 568:15,
568:19, 568:22
  **chances** [2] -
547:22, 548:16
**change** [10] - 482:23,
484:7, 489:24,
496:15, 522:2,
527:14, 528:10,
529:18, 530:8, 538:3
  **changed** [7] - 481:3,
530:4, 532:12, 536:1,
537:17, 539:23,
571:18
  **changes** [1] - 523:12
**changing** [1] - 480:6
**chaos** [1] - 499:3
**character** [10] -
479:8, 479:15,
479:20, 483:19,
484:4, 484:9, 486:15,
486:18, 486:19,
486:21
  **character-type** [1] -
486:15
  **characteristics** [1] -
486:25
  **charge** [1] - 553:10
**charged** [7] - 470:7,
530:17, 550:20,
550:21, 550:22,
574:9, 574:13
  **charges** [2] - 526:15,
550:18
  **chasing** [1] - 508:4
**Chasing** [1] - 430:16
**check** [1] - 462:17

**checked** [2] -
496:24, 506:17
**checklist** [2] - 540:9,
540:10
  **cheese** [1] - 434:15
**chest** [1] - 456:18
**chicken** [2] - 497:18
**child** [79] - 431:5,
438:7, 447:10, 461:5,
465:12, 465:13,
466:2, 466:4, 466:7,
466:10, 480:13,
480:16, 482:25,
483:5, 487:3, 487:4,
487:8, 502:17,
502:24, 503:3,
506:21, 508:4, 508:6,
508:10, 508:13,
508:19, 508:22,
509:1, 511:17,
511:21, 516:24,
516:25, 517:13,
524:9, 531:6, 539:8,
539:24, 540:7,
540:11, 540:16,
541:16, 541:22,
542:4, 542:11,
542:13, 542:15,
543:21, 544:1, 544:4,
545:4, 545:21,
545:22, 546:6,
546:19, 547:16,
548:6, 548:11,
548:16, 549:1, 549:4,
549:7, 549:25, 550:8,
550:15, 551:5,
554:21, 554:24,
558:4, 561:19,
561:23, 562:22,
567:7, 567:8, 571:7,
571:19
  **child's** [5] - 484:7,
545:7, 557:11, 568:4,
568:5
  **children** [22] - 438:9,
448:19, 476:7, 502:4,
510:11, 510:16,
510:22, 514:2,
515:12, 515:16,
515:24, 517:12,
517:17, 547:17,
550:6, 550:7, 550:8,
552:8, 552:10,
555:19, 561:17
  **choice** [1] - 472:8
**chronic** [1] - 570:6
**chronologically** [1] -
538:18
  **Chuck** [1] - 574:23

---

# C

**capture** [1] - 534:6
**captured** [2] - 482:7,
483:7
**car** [4] - 460:23,
461:4, 536:22, 539:19
**care** [10] - 434:17,
435:8, 487:14,
500:22, 501:4, 501:9,
502:6, 542:6, 559:18,
560:20
  **cared** [2] - 440:19,
487:9
**careful** [3] - 434:13,
519:19, 565:23
**caretaker** [1] - 431:8,
432:7, 449:5
**carrying** [2] - 455:1,
455:9
**case** [72] - 443:18,
453:16, 466:14,

**Cimburek** [1] - 575:18
**CIMBUREK** [1] - 575:20
**circle** [2] - 491:12, 572:12
**circles** [1] - 452:23
**Circuit** [2] - 524:19, 531:12
**circumstances** [1] - 487:8
**cited** [3] - 531:9, 531:11, 532:24
**cites** [1] - 524:17
**city** [2] - 451:17, 451:18
**claimed** [1] - 549:4
**claims** [1] - 517:18
**classes** [1] - 456:5
**clean** [2] - 435:10, 480:24
**clear** [9] - 469:22, 470:14, 470:16, 470:18, 472:20, 472:23, 483:16, 529:17, 541:1
**clearly** [1] - 548:1
**clears** [1] - 470:20
**Cleo** [1] - 575:23
**Clerk** [1] - 574:19
**CLERK** [11] - 574:23, 575:2, 575:4, 575:6, 575:8, 575:11, 575:14, 575:16, 575:18, 575:21, 575:23
**clerk's** [1] - 453:5
**clinging** [1] - 507:10
**clingy** [10] - 493:20, 493:22, 495:14, 497:14, 507:2, 507:8, 515:18, 517:8, 517:9, 517:10
**clinic** [2] - 474:14, 474:15
**Clinic** [4] - 463:11, 468:19, 474:20, 498:13
**close** [6] - 451:15, 456:16, 463:21, 483:12, 538:15, 577:14
**closed** [1] - 436:13
**closer** [2] - 502:5, 558:17
**closest** [1] - 564:2
**closing** [3] - 566:23, 567:4, 567:20
**closings** [1] - 537:15
**clothes** [2] - 478:25,

480:6
**co** [1] - 468:8
**co-workers** [1] - 468:8
**coincidence** [1] - 571:23
**cold** [2] - 456:24, 478:1
**collapsed** [1] - 457:20
**color** [1] - 491:24
**comatose** [8] - 449:3, 507:2, 507:12, 509:5, 509:9, 509:10, 509:13, 543:2
**comfort** [1] - 466:16
**comfortable** [1] - 447:24
**coming** [7] - 462:6, 490:3, 499:11, 505:7, 524:18, 535:5, 543:19
**comment** [3] - 524:6, 524:10, 535:18
**commit** [1] - 552:24
**committed** [1] - 553:2
**committing** [1] - 530:19
**common** [12] - 526:17, 550:3, 550:5, 550:16, 557:21, 557:22, 559:1, 560:16, 562:3, 564:19, 565:22, 571:6
**commotion** [1] - 467:17
**community** [1] - 559:21
**complain** [1] - 556:4
**complete** [1] - 578:5
**completely** [4] - 490:3, 531:14, 556:10, 560:17
**complies** [1] - 491:13
**compressed** [1] - 457:19
**computer** [2] - 453:5, 535:3
**computing** [1] - 546:25
**concentrate** [1] - 461:20
**concern** [6] - 461:15, 470:5, 483:3, 490:1, 490:4, 510:5
**concerned** [9] - 440:9, 441:4, 441:5, 445:16, 469:19, 470:20, 470:25,

505:3, 539:4
**concerns** [1] - 504:8
**conclusion** [1] - 506:20
**conclusions** [2] - 440:13, 521:2
**concurred** [3] - 547:14, 548:2, 548:3
**concussion** [3] - 554:15, 559:2
**concussive** [1] - 569:17
**condition** [6] - 456:23, 478:13, 478:20, 540:14, 568:9, 569:16
**conditions** [1] - 570:21
**conducting** [1] - 531:21
**confident** [2] - 522:22
**confinement** [3] - 577:8, 577:17, 577:19
**confirmed** [2] - 510:20, 541:12
**confused** [1] - 557:7
**confusing** [1] - 529:14
**confusion** [1] - 527:22
**Connelly** [4] - 429:13, 578:3, 578:12, 578:13
**consider** [5] - 444:18, 522:2, 538:24, 552:21, 562:14
**consideration** [1] - 565:23
**considerations** [1] - 518:5
**consistent** [7] - 545:8, 546:22, 548:5, 548:24, 570:15, 570:19, 571:2
**consisting** [1] - 578:6
**constant** [2] - 489:17, 571:17
**construction** [1] - 454:16
**contact** [8] - 436:2, 441:15, 441:18, 441:21, 442:4, 446:21, 476:10, 519:23
**contacted** [2] - 539:5, 539:6
**contacts** [1] - 477:24

**contending** [1] - 552:18
**continue** [1] - 489:19
**Continued** [1] - 429:1
**continues** [1] - 536:7
**contrary** [3] - 441:22, 441:23, 488:6
**Contreras** [22] - 429:6, 430:19, 431:1, 451:11, 459:1, 463:9, 474:16, 482:18, 485:25, 486:2, 486:8, 492:9, 507:5, 519:5, 557:1, 565:4, 566:6, 574:10, 574:14, 576:25, 577:12, 577:19
**CONTRERAS** [1] - 428:9
**Contreras'** [4] - 471:20, 487:14, 534:7, 561:1
**control** [1] - 556:13
**contusions** [8] - 538:7, 545:4, 545:22, 546:12, 546:18, 548:3, 549:7, 563:24
**conversation** [2] - 520:11, 539:20
**convict** [1] - 528:3
**convinced** [2] - 545:12, 557:17
**cook** [2] - 497:15, 497:17
**Cook** [10] - 430:23, 464:2, 464:5, 475:16, 479:19, 517:14, 555:14, 557:10, 557:16, 564:24
**Cook's** [1] - 557:19
**cooked** [1] - 497:9
**cooperative** [1] - 567:16
**copies** [5] - 536:11, 536:13, 536:14, 573:9
**copy** [8] - 452:2, 452:7, 453:9, 523:7, 534:1, 534:3, 544:21, 544:22
**coroner** [2] - 547:8, 547:25
**corporal** [1] - 517:5
**correct** [27] - 431:10, 431:11, 431:17, 432:4, 433:9, 435:18, 437:5, 439:15, 441:14, 443:9, 443:14, 444:8, 444:20, 447:9, 448:3,

448:13, 451:19, 461:24, 462:1, 464:13, 475:11, 476:8, 476:9, 489:1, 510:17, 514:8, 561:25
**correlation** [1] - 571:24
**cost** [3] - 468:11, 468:13, 470:3
**Coteau** [8] - 457:2, 457:5, 457:6, 498:11, 498:19, 498:21, 498:22, 499:1
**couch** [1] - 456:16
**counsel** [22] - 430:2, 468:5, 469:14, 479:6, 479:10, 482:3, 484:22, 513:18, 514:18, 523:2, 523:4, 534:3, 535:14, 535:16, 537:13, 538:6, 555:2, 572:18, 572:24, 573:11, 578:7, 578:8
**Count** [12] - 524:7, 524:9, 524:12, 524:13, 524:14, 524:15, 532:25, 566:11, 566:13, 574:10, 574:11, 574:13
**count** [5] - 524:9, 524:16, 547:1, 548:4, 574:8
**country** [4] - 451:19, 547:12, 564:7, 576:16
**Country** [1] - 526:8
**counts** [2] - 569:3, 569:5
**county** [1] - 547:25
**couple** [9] - 456:4, 468:7, 475:9, 476:2, 480:22, 519:11, 555:3, 560:19, 570:1
**course** [7] - 480:24, 488:7, 521:21, 521:23, 533:18, 566:19, 567:3
**COURT** [177] - 428:1, 429:12, 430:4, 430:7, 433:5, 433:11, 434:24, 437:12, 437:14, 440:15, 441:9, 442:2, 442:13, 442:15, 446:3, 446:7, 446:10, 448:11, 449:9, 450:8, 450:10, 450:24, 451:1, 451:24, 453:4, 453:11, 453:13,

453:17, 453:20,
453:22, 455:11,
455:16, 462:11,
462:14, 462:18,
467:21, 467:24,
468:3, 468:12,
468:18, 468:24,
469:4, 469:7, 469:9,
469:16, 469:25,
470:5, 470:10,
471:16, 472:1, 472:5,
472:8, 472:10, 473:4,
473:8, 473:10,
473:16, 473:21,
479:5, 480:3, 480:7,
480:20, 480:23,
481:8, 481:12,
481:18, 481:22,
482:5, 483:9, 483:14,
483:24, 484:8,
484:25, 485:14,
485:18, 486:3,
486:15, 486:19,
486:23, 487:1, 487:5,
487:16, 487:23,
488:5, 488:12,
488:16, 490:25,
491:2, 491:5, 499:17,
500:25, 502:3,
503:15, 503:20,
505:21, 508:16,
511:6, 511:9, 513:11,
513:13, 513:15,
513:17, 514:8,
514:13, 514:20,
516:7, 516:10,
517:15, 518:13,
518:19, 518:22,
520:2, 520:15,
520:17, 520:20,
520:23, 523:6,
523:17, 523:20,
523:23, 525:18,
526:11, 527:13,
528:1, 528:12,
528:20, 529:17,
530:6, 530:23, 531:8,
532:7, 532:10,
532:19, 532:23,
533:2, 533:11,
533:16, 533:24,
534:1, 534:12,
534:21, 534:24,
535:1, 535:5, 535:9,
535:11, 535:14,
535:17, 535:21,
535:25, 536:9, 537:6,
537:8, 537:11,
537:16, 537:20,
556:9, 565:19, 566:5,
572:5, 572:17,

572:24, 573:6, 573:8,
573:24, 574:1, 574:3,
574:6, 574:19,
574:25, 576:1,
576:20, 577:7,
577:16, 577:22,
577:24, 578:1
  **court** [3] - 430:2,
469:17, 482:6
  **Court** [58] - 428:17,
429:13, 443:17,
443:22, 469:24,
470:15, 470:16,
470:20, 472:13,
477:6, 477:8, 479:15,
480:15, 482:11,
483:16, 483:18,
483:20, 484:9,
499:24, 506:7, 514:5,
514:6, 514:22,
514:24, 515:1, 515:9,
516:2, 516:3, 516:5,
517:22, 524:8,
524:17, 525:23,
529:4, 529:6, 529:10,
530:11, 530:14,
531:8, 531:10, 532:1,
533:13, 536:7, 537:3,
537:5, 538:6, 538:24,
541:23, 555:2,
567:10, 572:18,
573:18, 574:4, 577:5,
577:14, 578:4, 578:13
  **Court's** [17] - 479:10,
484:1, 484:3, 484:11,
484:14, 484:21,
484:24, 523:7,
523:18, 523:21,
524:1, 524:5, 524:21,
531:25, 532:24,
533:6, 534:17
  **Court-ordered** [2] -
443:17, 567:10
  **Courthouse** [3] -
428:12, 523:14,
578:14
  **courtroom** [25] -
430:6, 468:23, 469:3,
469:13, 469:23,
470:8, 470:14,
470:17, 470:19,
470:21, 472:21,
472:24, 473:20,
482:2, 488:14,
514:17, 518:12,
523:3, 535:10,
530:10, 537:19,
553:10, 573:12,
573:25, 577:1
  **cousin's** [1] - 465:3

**Cover** [1] - 506:17
  **covered** [2] - 483:16,
525:16
  **covers** [2] - 526:8,
534:18
  **cows** [1] - 556:12
  **CPR** [4] - 456:5,
456:12, 564:3, 564:5
  **Cr** [1] - 428:4
  **creatures** [1] -
537:21
  **cried** [3] - 439:25,
440:1
  **cries** [1] - 440:2
  **crime** [7] - 526:20,
529:1, 529:12,
529:22, 553:1, 574:9,
574:12
  **criminal** [2] - 469:1,
525:10
  **CROSS** [4] - 441:10,
457:25, 465:19,
499:18
  **cross** [2] - 516:13,
517:23
  **CROSS-
EXAMINATION** [4] -
441:10, 457:25,
465:19, 499:18
  **cross-examination**
[2] - 516:13, 517:23
  **CRR** [2] - 429:13,
578:13
  **crying** [12] - 465:12,
465:15, 466:2, 466:8,
466:11, 466:16,
466:19, 467:8, 560:5,
563:22, 568:18,
568:22
  **cuddled** [1] - 493:24
  **culture** [1] - 465:2
  **curtains** [1] - 436:13
  **custody** [12] -
443:11, 443:14,
447:13, 499:20,
557:20, 557:24,
567:13, 567:22,
571:9, 571:17,
571:25, 577:12
  **cuts** [2] - 489:6,
556:19

# D

  **dad** [11] - 493:21,
493:22, 495:14,
496:2, 497:14,
497:23, 507:10,
517:9, 553:23, 557:2,

561:3
  **daddy** [2] - 539:22,
539:25
  **dairy** [1] - 560:13
  **DAKOTA** [2] - 428:2,
578:1
  **Dakota** [6] - 429:4,
451:14, 463:19,
474:8, 524:18, 563:5
  **damage** [5] - 479:20,
482:24, 546:6, 547:19
  **dared** [1] - 564:13
  **dark** [2] - 539:9,
565:14
  **darker** [1] - 556:22
  **darn** [1] - 558:12
  **date** [14] - 483:9,
483:10, 487:21,
487:22, 495:5,
502:19, 503:3, 503:8,
563:7, 563:10,
569:20, 570:3, 570:8,
570:9
  **dated** [2] - 474:17,
474:24
  **dating** [4] - 474:18,
476:2, 511:14, 570:15
  **daughter** [29] -
431:1, 441:6, 443:16,
455:1, 459:8, 460:12,
466:5, 466:8, 466:22,
467:3, 482:19, 486:6,
530:17, 544:7, 546:8,
550:24, 555:20,
555:21, 556:1, 556:4,
556:15, 556:24,
557:17, 558:15,
559:17, 562:23,
563:25, 565:5, 571:10
  **days** [14] - 468:7,
487:17, 519:1, 519:7,
546:24, 547:4, 547:6,
555:3, 558:18,
560:19, 570:3, 570:5,
571:3
  **dead** [4] - 459:8,
460:13, 510:2, 544:1
  **deal** [4] - 552:2,
552:20, 563:16,
573:16
  **deals** [1] - 540:2
  **Death** [5] - 544:7,
544:9, 544:14,
544:20, 544:21
  **death** [17] - 460:22,
530:18, 540:3,
544:12, 544:13,
545:2, 545:8, 545:16,
546:16, 547:1,
547:14, 548:5, 562:8,

562:10, 562:23,
564:23, 572:13
  **debrief** [1] - 510:8
  **December** [7] -
483:11, 483:12,
490:7, 506:8, 506:21,
555:14, 558:8
  **decide** [3] - 524:15,
544:11, 550:2
  **decided** [2] - 482:22,
538:1
  **decides** [1] - 521:23
  **deciding** [3] -
524:12, 524:14, 526:1
  **decision** [5] - 505:9,
524:19, 531:12,
549:20, 564:17
  **decisions** [3] -
477:2, 505:10, 526:2
  **decline** [1] - 577:14
  **decrease** [1] -
489:21
  **deduct** [1] - 561:21
  **deep** [2] - 487:24,
545:17
  **deepest** [1] - 538:16
  **Defendant** [99] -
428:10, 429:5, 429:6,
430:2, 441:20,
441:24, 443:4,
443:10, 443:13,
443:21, 444:1, 444:5,
447:13, 448:2,
448:18, 458:2,
458:11, 460:12,
469:14, 482:3,
485:19, 485:22,
486:5, 486:20,
486:22, 488:6, 514:3,
514:18, 515:4, 515:5,
515:13, 515:15,
515:23, 517:11,
517:17, 519:4, 523:4,
525:10, 526:3, 527:6,
529:8, 529:9, 529:12,
529:20, 530:16,
531:18, 535:19,
538:25, 539:6,
539:11, 539:15,
539:18, 540:19,
540:20, 540:24,
540:25, 541:1, 541:3,
541:5, 541:18,
541:21, 542:2,
542:21, 542:22,
542:24, 542:25,
543:4, 543:8, 543:18,
543:23, 544:6,
545:20, 546:6,
546:19, 548:18,

549:5, 549:22, 550:20, 551:3, 552:15, 552:16, 553:12, 553:17, 554:9, 554:10, 554:21, 554:25, 566:24, 567:5, 568:18, 569:10, 569:11, 569:12, 570:22, 571:7, 572:1, 572:15, 577:5

**Defendant's** [11] - 441:13, 466:22, 485:11, 523:25, 524:3, 524:11, 539:23, 542:19, 548:21, 550:14, 571:19

**defense** [34] - 469:18, 470:18, 473:11, 482:14, 483:19, 484:22, 513:21, 513:23, 515:4, 515:11, 516:11, 517:16, 518:1, 518:4, 518:7, 523:20, 533:13, 533:24, 540:12, 541:7, 548:21, 549:11, 549:19, 551:6, 551:10, 551:24, 568:9, 569:17, 569:20, 571:6, 572:4, 573:6, 577:10, 577:22

**Defense** [2] - 436:23, 490:10

**defense's** [1] - 551:17

**definitely** [1] - 496:21

**degree** [7] - 526:21, 531:6, 531:14, 550:21, 550:25, 574:9

**deliberate** [3] - 521:11, 566:10, 572:20

**deliberations** [3] - 531:21, 566:22, 572:23

**delivered** [1] - 538:20

**demanded** [2] - 442:10, 442:17

**demeanor** [2] - 441:3, 539:23

**denied** [3] - 513:19, 518:9, 523:25

**denies** [1] - 516:3

**Dennis** [16] - 451:2,

451:8, 451:10, 451:13, 452:4, 452:7, 454:6, 454:9, 543:4, 543:5, 543:20, 564:3, 564:4, 564:13, 564:15

**DENNIS** [1] - 451:3

**department** [2] - 474:13, 498:15

**depict** [1] - 490:15

**deposits** [1] - 570:13

**deprived** [1] - 567:17

**deputy** [1] - 573:12

**des** [1] - 498:11

**describe** [4] - 456:23, 478:13, 495:24, 499:1

**described** [2] - 495:1, 526:19

**desire** [1] - 574:16

**despite** [1] - 551:23

**detailed** [1] - 521:8

**details** [1] - 509:18

**detained** [1] - 577:5

**detention** [1] - 577:15

**determinations** [1] - 521:14

**determined** [1] - 458:8

**development** [1] - 460:5

**Diane** [1] - 575:4

**diaper** [8] - 435:6, 480:17, 482:20, 484:7, 484:25, 485:9, 488:9, 489:5

**diapers** [3] - 479:2, 480:6, 481:1

**die** [1] - 549:4

**died** [13] - 445:18, 481:4, 500:3, 519:7, 540:7, 540:16, 541:12, 547:4, 547:23, 548:16, 549:1, 553:23, 571:4

**dies** [4] - 540:20, 541:17, 544:5, 547:2

**diet** [2] - 434:10, 560:14

**difference** [7] - 457:5, 527:10, 528:15, 530:8, 530:25, 531:6, 569:25

**different** [27] - 436:17, 470:22, 471:11, 478:22, 480:7, 489:12, 491:24, 493:10, 493:11, 493:18, 494:2, 494:13,

494:15, 494:25, 499:4, 508:4, 508:6, 511:18, 525:5, 530:23, 538:1, 541:15, 542:12, 546:18, 550:9, 550:16, 556:22

**differently** [1] - 522:4

**difficult** [3] - 563:7, 563:8, 576:15

**digestive** [4] - 434:4, 434:9, 444:19, 444:23

**digital** [1] - 452:7

**dinner** [1] - 488:4

**dinners** [1] - 494:11

**direct** [4] - 442:12, 446:2, 448:10, 508:15

**DIRECT** [5] - 430:12, 451:6, 462:25, 474:1, 518:23

**directly** [5] - 468:20, 468:21, 479:24, 486:7, 486:13

**disagree** [4] - 447:22, 507:6, 507:7, 530:21

**disagreement** [1] - 529:5

**disc** [1] - 457:19

**discharged** [1] - 576:4

**disclosed** [1] - 576:22

**discretion** [4] - 443:24, 512:22, 537:22, 556:11

**discs** [2] - 457:19

**discuss** [1] - 519:5

**discussed** [2] - 520:6, 530:11

**discussion** [1] - 554:10

**disease** [1] - 457:19

**diseases** [1] - 434:4

**dispels** [1] - 569:16

**dispute** [1] - 527:11

**distant** [1] - 496:23

**distinct** [2] - 527:8, 527:12

**distinction** [3] - 527:10, 528:15, 530:7

**distraught** [1] - 441:5

**district** [1] - 463:22

**DISTRICT** [4] - 428:1, 428:2, 578:1, 578:1

**District** [4] - 428:12, 428:17, 463:22, 578:4

**DIVISION** [2] - 428:3, 578:2

**divorce** [1] - 550:5

**DNA** [2] - 442:10, 442:17

**doctor** [6] - 461:17, 506:8, 540:6, 550:4, 561:3

**doctor's** [1] - 545:20

**doctors** [4] - 439:24, 440:5, 440:7, 570:4

**document** [5] - 436:23, 504:8, 504:14, 504:22, 568:6

**documents** [1] - 490:11

**Donald** [1] - 575:21

**done** [7] - 450:3, 509:8, 510:7, 522:5, 522:10, 531:2, 546:6

**door** [11] - 455:9, 456:17, 513:24, 514:4, 515:4, 515:25, 516:14, 517:16, 517:18, 517:22, 517:25

**doubt** [21] - 510:22, 511:1, 525:13, 526:16, 527:4, 529:8, 529:14, 545:3, 549:21, 553:13, 553:16, 562:13, 564:25, 565:1, 565:21, 565:22, 566:2, 566:25, 571:11

**down** [18] - 433:23, 439:13, 439:25, 450:24, 457:1, 462:12, 482:17, 488:17, 491:4, 513:11, 520:17, 527:21, 550:9, 550:15, 556:19, 557:11, 560:24, 564:15

**Dr** [46] - 544:8, 544:9, 544:23, 545:4, 545:7, 545:10, 545:15, 545:23, 546:21, 546:23, 547:3, 547:9, 547:14, 547:16, 547:22, 547:25, 548:1, 548:2, 548:6, 548:10, 548:12, 548:13, 548:15, 548:17, 548:18, 548:20, 548:23, 548:25, 549:6, 549:8, 551:10, 551:17, 553:5,

553:14, 554:2, 554:19, 557:13, 563:5, 565:12, 570:9, 570:14

**draw** [4] - 492:7, 492:22, 531:24, 540:9

**drew** [3] - 464:24, 465:4, 465:8

**drive** [1] - 461:5

**drooping** [1] - 501:22

**droopy** [1] - 494:24

**drop** [1] - 449:18

**dropped** [1] - 434:16

**drove** [1] - 552:19

**drum** [7] - 464:17, 464:18, 464:23, 464:25, 465:4, 465:9, 465:23

**drummers** [4] - 464:13, 464:15, 560:4, 568:16

**drumming** [3] - 465:22, 466:24, 467:2

**drums** [5] - 448:2, 448:7, 448:16, 502:10, 515:21

**due** [1] - 576:23

**duly** [4] - 430:10, 451:4, 462:23, 473:24

**duplicative** [4] - 525:17, 526:7, 526:10, 526:11

**duration** [1] - 511:22

**during** [28] - 432:10, 438:11, 441:16, 441:21, 442:5, 473:5, 476:19, 482:1, 483:18, 497:23, 500:8, 511:22, 513:25, 519:12, 520:9, 520:11, 525:24, 526:12, 536:19, 539:1, 541:3, 554:5, 564:20, 566:19, 567:3, 567:25, 569:22, 571:21

**duty** [3] - 525:3, 525:11, 531:24

**E**

**E-mail** [1] - 578:16

**early** [6] - 432:25, 446:24, 454:20, 469:12, 520:25, 556:2

**earnestly** [1] - 443:15

**earth** [1] - 540:17
**easel** [1] - 566:17
**easily** [1] - 545:3
**easy** [1] - 544:17
**eat** [10] - 436:12, 447:2, 450:4, 494:5, 494:6, 495:15, 497:20, 497:21, 497:25, 535:6
**eating** [5] - 450:3, 497:10, 519:12, 519:13, 519:20
**Edward** [3] - 462:20, 463:5, 559:24
**EDWARD** [1] - 462:22
**effect** [3] - 470:24, 477:6, 551:25
**egg** [1] - 461:18
**eight** [4] - 433:17, 444:15, 545:5, 572:9
**eighteen** [1] - 545:23
**Eighth** [2] - 524:19, 531:12
**either** [10] - 485:7, 486:22, 512:10, 517:25, 528:3, 550:6, 561:18, 574:16, 574:21, 576:23
**element** [9] - 527:2, 527:5, 527:9, 527:12, 527:16, 528:2, 528:7, 528:13, 530:4
**elements** [8] - 526:24, 527:21, 528:11, 528:17, 529:7, 529:13, 530:5, 531:5
**emergency** [2] - 498:15, 498:19
**employed** [1] - 463:11
**employee** [3] - 571:13, 578:7, 578:8
**employees** [1] - 474:20
**employers** [1] - 468:8
**employment** [1] - 472:12
**EMT** [1] - 456:6
**end** [12] - 475:7, 476:22, 483:5, 500:7, 509:1, 511:14, 511:16, 541:4, 558:13, 558:17, 564:23, 571:17
**End** [2] - 469:8, 481:21, 514:12, 536:6, 577:25

**endearment** [1] - 431:25
**ended** [1] - 489:14
**Endres** [1] - 574:25
**ENDRES** [1] - 575:1
**Enemy** [2] - 463:20, 463:22
**energy** [2] - 548:13, 559:8
**enforcement** [1] - 545:13
**enhanced** [3] - 526:25, 527:2, 530:1
**enter** [2] - 453:9, 483:8
**entered** [9] - 430:6, 452:2, 473:20, 488:14, 491:8, 518:12, 535:10, 537:19, 573:25
**entire** [2] - 550:13, 567:23
**entitled** [5] - 477:6, 486:10, 574:8, 574:12, 578:5
**equal** [1] - 572:9
**equals** [1] - 548:1
**equates** [1] - 516:13
**ER** [1] - 499:11
**especially** [3] - 469:1, 483:2, 504:19
**essential** [3] - 527:21, 528:11, 528:17
**essentially** [5] - 447:16, 460:12, 545:19, 546:3, 546:7
**establish** [1] - 541:24
**estimated** [3] - 547:7, 547:22, 548:17
**estimates** [1] - 563:4
**evaluation** [1] - 506:8
**evening** [4] - 438:24, 448:14, 463:23, 497:5
**event** [10] - 522:5, 538:19, 538:22, 539:1, 539:13, 539:25, 540:2, 540:18, 541:17, 559:14
**events** [2] - 542:20, 578:9
**eventually** [5] - 540:20, 542:21, 544:5, 555:24, 556:21
**ever-increasing** [1] - 571:15
**everyday** [1] -

559:15
**evidence** [48] - 461:10, 471:19, 473:12, 479:8, 480:5, 481:25, 483:8, 484:3, 484:15, 486:10, 486:16, 486:19, 486:21, 486:24, 487:11, 487:20, 506:7, 513:20, 515:25, 516:21, 516:22, 517:1, 520:24, 521:5, 521:6, 521:7, 522:17, 522:19, 522:20, 525:11, 525:21, 525:22, 538:11, 538:12, 538:17, 546:20, 547:11, 556:8, 559:2, 565:23, 565:24, 565:25, 567:16, 567:18, 568:12, 570:11
**evidentiary** [2] - 469:10, 503:16
**ex** [1] - 511:19
**ex-wife** [1] - 511:19
**exact** [2] - 569:22, 569:25
**exactly** [9] - 481:19, 516:23, 522:14, 531:5, 546:14, 547:6, 547:7, 560:23, 561:5
**Exam** [1] - 506:12
**EXAMINATION** [12] - 430:12, 441:10, 449:10, 450:11, 451:6, 457:25, 462:25, 465:19, 474:1, 499:18, 511:11, 518:23
**examination** [3] - 516:13, 517:23, 540:3
**examine** [2] - 441:9, 499:17
**examined** [1] - 540:5
**example** [2] - 478:24, 530:18
**except** [1] - 506:16
**exception** [2] - 524:4, 573:17
**exceptions** [1] - 577:8
**exchange** [1] - 521:12
**excuse** [4] - 433:3, 451:21, 452:4, 570:10
**excused** [10] - 450:25, 462:13, 467:22, 467:23,

513:12, 520:18, 536:24, 537:8, 572:23, 576:19
**Exhibit** [13] - 436:23, 437:10, 437:12, 452:8, 453:1, 453:24, 491:8, 491:14, 506:5, 534:1, 534:11, 544:8, 572:11
**exhibit** [7] - 451:22, 491:5, 506:11, 506:23, 534:4, 534:10, 551:21
**Exhibits** [2] - 490:11, 490:23
**exhibits** [7] - 490:25, 536:17, 572:20, 572:25, 573:3, 573:19, 573:20
**existing** [1] - 569:16
**exists** [1] - 555:17
**expect** [2] - 555:5, 555:6
**expected** [1] - 497:21
**expecting** [2] - 454:23, 458:3
**experience** [2] - 457:10, 573:14
**expert** [7] - 548:21, 549:3, 549:14, 551:17, 553:14, 563:1
**experts** [2] - 526:19, 558:25
**explain** [6] - 431:4, 549:8, 549:12, 549:15, 549:16
**explained** [1] - 548:1
**explanation** [2] - 549:9, 554:16
**explanations** [1] - 549:18
**expression** [1] - 440:17
**extent** [1] - 569:21
**external** [1] - 547:18
**extra** [2] - 435:3, 470:21
**eye** [1] - 447:24
**eyes** [7] - 436:12, 494:23, 494:24, 494:25, 501:21, 509:6
**eyewitnesses** [2] - 552:3, 552:18

**F**

**F.2d** [1] - 531:11
**F.3d** [1] - 524:19

513:12, 520:18,
**face** [1] - 447:3
**facial** [1] - 440:17
**fact** [25] - 438:15, 468:13, 468:15, 473:5, 480:10, 480:23, 483:22, 506:16, 515:17, 517:1, 517:2, 517:3, 519:6, 527:2, 529:15, 532:24, 545:8, 547:22, 552:2, 552:13, 552:17, 553:1, 554:5, 563:16, 567:4
**factors** [2] - 519:11, 542:2
**facts** [8] - 468:12, 510:6, 526:1, 526:2, 530:16, 532:4, 556:8, 567:5
**factual** [1] - 531:5
**fair** [5] - 480:8, 480:11, 481:9, 485:6, 500:13
**fairly** [2] - 456:17, 538:21
**fall** [29] - 467:5, 467:15, 488:23, 500:2, 538:8, 546:17, 546:22, 547:23, 548:1, 548:7, 548:12, 548:16, 549:1, 549:4, 549:23, 550:10, 556:19, 556:21, 558:5, 563:21, 565:3, 568:12, 568:24, 568:25, 569:2, 569:5, 572:7, 572:9
**fallen** [1] - 509:17
**falls** [3] - 550:9, 568:11, 568:12
**Falls** [6] - 428:12, 428:18, 428:21, 429:4, 429:14, 578:15
**familiar** [2] - 441:19, 533:18
**families** [1] - 439:18
**family** [9] - 431:25, 442:24, 448:23, 463:6, 475:18, 488:4, 499:14, 511:19, 511:24
**far** [8] - 454:9, 462:2, 462:6, 462:8, 479:1, 507:14, 508:24, 573:14
**Fargo** [7] - 440:25, 441:3, 441:4, 511:15, 544:5, 547:9, 547:12
**fast** [3] - 546:8,

548:8, 564:16
**fatal** [2] - 483:13, 551:15
**father** [15] - 442:18, 457:14, 466:23, 503:24, 509:7, 515:20, 515:23, 516:18, 545:20, 555:19, 561:16, 561:22, 567:5, 567:9, 567:11
**father-in-law** [1] - 457:14
**fault** [1] - 501:14
**FBI** [6] - 488:6, 507:5, 540:23, 542:21, 545:9, 549:5
**fear** [1] - 469:23
**February** [3] - 519:5, 520:9, 540:25
**fed** [1] - 493:13
**Federal** [4] - 429:13, 472:15, 537:22, 576:7
**fee** [1] - 544:22
**feed** [1] - 434:12
**feet** [1] - 465:11
**fell** [14] - 465:14, 467:10, 467:16, 501:8, 501:13, 549:25, 550:15, 560:9, 563:17, 568:20, 568:21, 569:1
**felt** [6] - 499:5, 504:13, 511:18, 513:1, 513:3, 513:9
**fetal** [5] - 551:9, 551:11, 551:13, 551:20, 551:23
**few** [13] - 430:18, 431:25, 432:5, 435:13, 443:5, 476:19, 478:25, 514:15, 542:2, 553:19, 554:1, 555:15, 558:18
**fifth** [2] - 527:16, 528:13
**figure** [2] - 549:12, 549:18
**figured** [1] - 458:5
**filed** [3] - 516:1, 576:23, 576:24
**final** [6] - 521:20, 535:13, 536:7, 537:25, 538:9, 552:6
**FINAL** [1] - 523:16
**finalize** [1] - 522:19
**finally** [3] - 470:25, 516:3, 552:21
**finder** [1] - 529:16

**fine** [22] - 445:21, 445:25, 446:14, 463:3, 480:5, 487:25, 488:3, 507:6, 525:18, 536:5, 540:24, 541:4, 541:6, 541:11, 549:7, 561:2, 561:3, 569:8, 569:14, 569:15
**fingered** [1] - 567:24, 568:6
**finished** [2] - 447:2, 545:11
**fired** [1] - 473:6
**first** [35] - 430:10, 431:12, 435:20, 441:21, 442:5, 443:5, 450:19, 451:4, 462:23, 464:7, 464:25, 473:24, 476:10, 478:8, 483:20, 494:22, 500:11, 513:25, 514:22, 515:13, 525:7, 527:5, 537:23, 537:24, 538:19, 538:20, 538:22, 539:1, 545:9, 545:12, 550:21, 551:9, 555:4, 555:5, 555:14
**first-degree** [1] - 550:21
**fist** [3] - 545:17, 545:18, 572:13
**fists** [1] - 546:15
**fit** [1] - 479:1
**fitting** [1] - 480:6
**five** [19] - 456:20, 481:1, 487:17, 508:4, 508:6, 512:4, 512:6, 527:21, 528:16, 528:17, 530:5, 540:19, 542:12, 546:2, 546:11, 564:5, 565:19, 569:23, 570:1
**five-day** [1] - 540:19
**floor** [6] - 433:24, 542:23, 563:22, 564:1, 568:21, 568:23
**flu** [17] - 436:13, 445:13, 445:19, 445:23, 446:18, 446:25, 447:8, 447:11, 450:14, 450:18, 450:22, 521:11, 559:12, 560:18, 560:20, 568:11
**flu-like** [1] - 559:11, 560:18, 568:11
**flux** [1] - 522:18

**fold** [1] - 568:10
**folding** [1] - 560:4
**folks** [6] - 431:9, 438:12, 438:15, 544:10, 565:15, 566:9
**Folks** [1] - 557:21
**follow** [1] - 469:15
**following** [4] - 482:4, 489:13, 514:19, 523:5
**follows** [5] - 430:11, 451:5, 462:24, 473:25, 518:18
**food** [8] - 434:12, 445:10, 497:13, 519:12, 519:15, 519:19, 554:12, 560:24
**foods** [4] - 445:4, 519:17, 558:22, 560:13
**fool** [1] - 558:7
**foot** [1] - 568:17
**force** [1] - 517:12
**foregoing** [1] - 578:5
**forehead** [8] - 489:10, 489:11, 492:1, 492:6, 503:4, 505:17, 545:5, 545:6
**foreperson** [2] - 572:19, 574:15
**FOREPERSON** [2] - 574:2, 574:5
**form** [1] - 566:10
**Form** [4] - 532:19, 532:21, 536:12, 573:9
**forth** [1] - 486:12
**forward** [6] - 435:15, 435:19, 492:22, 537:3, 538:23, 573:18
**foundation** [3] - 453:3, 453:9, 453:15
**four** [20] - 431:14, 444:12, 476:5, 510:16, 510:21, 512:4, 512:5, 527:22, 527:23, 528:10, 530:4, 538:7, 542:5, 542:6, 546:7, 546:18, 550:16, 551:6, 551:7, 552:16
**frame** [6] - 475:23, 478:14, 563:9, 570:16, 571:2, 571:22
**frankly** [1] - 523:9
**frequency** [2] - 478:19, 483:4
**frequent** [4] - 441:19, 477:24, 478:2, 489:14
**frequently** [10] -

432:8, 432:15, 443:23, 444:4, 445:12, 447:5, 476:13, 476:24, 513:4, 519:23
**fresh** [2] - 461:10, 512:5
**friction** [1] - 504:17
**Friday** [21] - 438:18, 445:8, 445:13, 445:18, 445:23, 446:22, 447:13, 447:16, 447:18, 448:6, 448:14, 448:15, 448:17, 495:3, 501:12, 501:19, 540:21, 541:9, 554:7, 569:13
**fried** [2] - 497:18, 519:13
**friends** [3] - 475:1, 475:2, 550:7
**Froloff** [16] - 544:8, 544:23, 545:4, 545:7, 545:10, 545:15, 545:23, 546:21, 546:23, 547:3, 547:14, 547:22, 548:2, 551:10, 557:13, 570:14
**front** [9] - 437:18, 458:17, 471:12, 475:18, 523:24, 546:9, 552:24, 552:25, 553:2
**frown** [1] - 447:3
**frowning** [1] - 494:21
**fulfill** [1] - 559:16
**full** [3] - 463:5, 497:11, 578:5
**Fulton** [1] - 575:23
**FULTON** [1] - 575:25
**Fulton-Gjerde** [1] - 575:23
**FULTON-GJERDE** [1] - 575:25
**function** [1] - 576:17
**Fundoscope** [1] - 506:17
**fuss** [1] - 534:13
**fussy** [1] - 434:8, 542:15
**future** [1] - 471:22

# G

**Gaikowski** [2] - 499:13, 547:5
**Gail** [1] - 468:21

**game** [3] - 480:8, 480:11, 485:6
**Gary** [2] - 499:13, 575:11
**gather** [1] - 439:19
**gauge** [1] - 522:12
**general** [5] - 433:22, 433:23, 530:14, 540:8, 576:6
**General** [1] - 506:12
**generally** [6] - 477:20, 516:18, 517:4, 517:5, 517:17, 526:9
**gentleman** [1] - 568:13
**gentlemen** [20] - 520:23, 538:8, 541:22, 544:6, 544:15, 545:1, 545:19, 546:5, 546:15, 546:25, 549:10, 550:3, 552:7, 552:21, 553:9, 554:18, 566:18, 569:3, 569:9, 571:23
**Gill** [17] - 430:8, 430:16, 451:2, 451:10, 451:14, 452:13, 458:2, 462:11, 513:25, 515:13, 543:4, 543:5, 543:6, 543:20, 543:24, 564:13, 564:15
**GILL** [2] - 430:9, 451:3
**Gill's** [2] - 454:6, 534:7
**girl** [23] - 464:1, 464:4, 465:14, 466:15, 466:23, 466:25, 467:5, 477:17, 480:1, 482:22, 485:13, 486:9, 487:12, 555:24, 560:15, 561:23, 564:11, 564:16, 567:22, 568:14, 571:2, 571:12, 572:16
**girl's** [1] - 564:21
**girlfriend** [5] - 505:7, 507:15, 510:10, 510:15, 555:25
**girls** [1] - 437:17
**given** [11] - 434:17, 522:24, 523:8, 524:2, 532:4, 565:18, 565:20, 569:4,

**group** [7] - 464:17, 464:18, 465:4, 465:9, 465:23, 539:22, 549:20

**guess** [4] - 444:18, 502:11, 508:25, 557:19

**guilt** [2] - 471:20, 525:12

**guilty** [23] - 524:12, 524:13, 524:14, 529:9, 529:12, 553:12, 553:17, 554:22, 554:25, 562:7, 562:9, 562:11, 566:7, 566:12, 566:14, 566:15, 566:24, 572:15, 574:10, 574:14, 577:4

**guy** [3] - 440:2, 547:9, 559:24

**guys** [1] - 476:14

**gymnasium** [2] - 464:9, 464:19

# H

**habit** [1] - 537:21
**half** [7] - 454:13, 498:22, 512:5, 533:15, 533:16, 547:6, 564:8
**hand** [5] - 436:22, 466:1, 546:1, 546:7, 578:10
**handing** [1] - 490:10
**handle** [1] - 445:14
**handprint** [3] - 539:3, 539:10, 567:24
**hands** [5] - 465:1, 465:4, 465:25, 545:21, 568:16
**happy** [7] - 433:23, 433:24, 514:2, 514:3, 515:12, 515:14, 515:16
**harassed** [1] - 468:10
**hard** [8] - 456:17, 482:6, 539:2, 539:7, 539:9, 546:11, 557:18
**hardly** [1] - 457:22
**harm** [1] - 558:3
**hate** [1] - 551:3
**Hawk** [1] - 430:16
**Head** [5] - 506:14, 540:4, 542:17, 551:21
**head** [32] - 435:14, 461:10, 461:18,

479:21, 480:1, 480:18, 483:2, 487:13, 488:8, 489:17, 490:2, 490:18, 491:10, 492:3, 495:2, 538:7, 540:8, 544:12, 545:5, 546:4, 546:12, 546:18, 547:18, 547:20, 548:2, 548:11, 550:11, 550:16, 556:23, 569:1, 572:8
**headache** [5] - 447:3, 493:19, 494:21, 495:2, 501:21
**heading** [5] - 482:11, 527:23, 528:10, 528:16, 530:4
**heal** [2] - 491:24, 570:25
**healed** [1] - 490:3
**healthy** [5] - 506:21, 540:7, 540:11, 540:17, 541:16
**hear** [18] - 465:5, 465:8, 469:17, 482:7, 483:24, 501:10, 514:8, 516:10, 518:3, 521:3, 522:14, 551:19, 560:5, 561:11, 561:12, 561:13, 565:9, 568:13
**heard** [41] - 445:7, 447:20, 453:12, 465:11, 466:2, 467:8, 480:2, 481:25, 487:23, 501:7, 501:11, 512:1, 518:7, 518:25, 520:24, 521:10, 526:18, 556:11, 557:6, 557:10, 557:18, 557:19, 558:7, 558:25, 559:5, 559:6, 559:17, 559:24, 560:8, 561:13, 564:4, 565:10, 565:12, 566:18, 567:14, 569:9, 570:4, 570:11, 570:12, 570:23, 572:18
**hearing** [16] - 444:2, 468:2, 469:4, 471:23, 471:24, 472:1, 472:2, 481:18, 481:23, 482:1, 482:13, 484:9, 514:10, 514:14, 531:10, 539:23
**hearings** [2] -

469:10, 483:17
**hears** [1] - 563:21
**hearsay** [10] - 433:4, 433:10, 434:22, 442:12, 455:10, 455:17, 481:16, 519:25, 520:1
**heart** [1] - 553:23
**heat** [1] - 529:20
**held** [3] - 436:15, 493:24, 545:20
**help** [8] - 456:21, 457:16, 517:12, 543:16, 552:15, 552:20, 555:20, 573:20
**helpful** [1] - 521:5
**helpless** [1] - 440:10
**helps** [1] - 552:14
**hematoma** [2] - 570:23, 571:1
**hemorrhage** [3] - 563:8, 563:11, 570:10
**hemorrhages** [5] - 487:21, 487:25, 563:14, 570:12, 571:1
**hereby** [1] - 578:4
**hereto** [2] - 578:8, 578:10
**Herrmann** [1] - 575:4
**HERRMANN** [1] - 575:5
**herself** [4] - 494:20, 501:21, 558:20, 559:9
**hesitate** [1] - 566:7
**hide** [1] - 567:4
**high** [4] - 474:23, 474:24, 475:3, 553:16
**himself** [1] - 542:16
**history** [1] - 511:19
**hit** [8] - 479:25, 487:12, 539:9, 545:24, 557:9, 569:1, 569:23, 569:24
**hold** [4] - 460:7, 471:6, 535:18, 572:15
**holding** [2] - 440:11, 502:24
**home** [12] - 432:16, 438:10, 496:23, 501:25, 511:21, 511:23, 512:2, 512:5, 512:21, 552:10, 556:12, 557:6
**homicide** [4] - 544:13, 545:2, 545:13, 547:15
**Honor** [64] - 433:4, 434:22, 437:10, 442:11, 451:21,

451:25, 452:25, 453:7, 453:12, 462:15, 462:20, 466:13, 467:25, 468:1, 468:17, 469:21, 470:9, 470:13, 470:14, 470:25, 471:14, 473:7, 479:3, 479:18, 482:16, 483:15, 484:19, 485:9, 485:24, 486:7, 486:22, 487:19, 488:20, 490:22, 491:3, 508:14, 511:4, 511:10, 513:14, 515:8, 516:3, 520:1, 523:19, 523:22, 525:6, 526:5, 526:22, 528:14, 529:3, 529:23, 531:22, 533:4, 533:14, 533:25, 534:23, 537:7, 537:14, 574:2, 574:5, 574:17, 574:18, 577:3, 577:11, 577:23
**Honorable** [1] - 428:17
**hope** [1] - 553:22
**hoped** [1] - 543:13
**hopefully** [1] - 482:24
**hoping** [1] - 482:15
**Hospital** [5] - 457:1, 457:2, 457:4, 498:12, 508:22
**hospital** [33] - 439:7, 439:9, 439:14, 439:16, 440:5, 440:7, 449:4, 454:10, 457:6, 459:23, 460:13, 460:23, 461:2, 461:5, 474:14, 496:21, 507:2, 543:3, 543:7, 543:9, 543:20, 543:22, 544:2, 544:4, 547:5, 547:21, 559:3, 563:18, 564:6, 570:16, 571:3, 571:5, 571:13
**hot** [1] - 497:24
**hotdish** [1] - 519:14
**hour** [9] - 454:13, 523:13, 533:5, 533:12, 533:15, 533:16, 564:8, 570:7
**hours** [8] - 433:18, 444:12, 444:15, 457:15, 564:8,

573:10, 573:11
**Gjerde** [1] - 575:23
**GJERDE** [1] - 575:25
**God** [1] - 563:25
**gorgeous** [1] - 442:25
**gosh** [1] - 512:4
**Government** [46] - 471:4, 472:14, 472:15, 482:10, 485:10, 485:11, 514:21, 515:2, 515:3, 515:6, 517:18, 517:23, 518:13, 520:20, 523:17, 525:6, 525:13, 526:3, 526:22, 529:12, 529:17, 529:23, 530:21, 531:1, 533:3, 533:4, 533:17, 533:18, 533:22, 534:8, 534:13, 534:19, 561:25, 562:4, 562:15, 562:17, 564:24, 565:9, 565:13, 565:15, 565:16, 566:8, 573:3, 577:2, 577:20
**Government's** [7] - 469:20, 470:11, 483:14, 515:10, 529:15, 530:20, 534:3
**grade** [2] - 512:11, 512:13
**Graff** [6] - 547:9, 547:16, 548:17, 554:19, 563:5, 570:9
**Grand** [1] - 458:17
**granddaughter** [2] - 431:2, 431:3
**grandkids** [2] - 448:20, 450:2
**grandparent** [1] - 431:6
**grandparents** [1] - 431:10
**grant** [1] - 477:20
**granted** [3] - 528:23, 530:9, 532:11
**gray** [1] - 456:24
**great** [3] - 431:9, 483:3, 552:20
**gregarious** [1] - 440:20
**grew** [1] - 567:8
**grocery** [1] - 539:17
**ground** [1] - 465:13
**grounds** [2] - 473:8, 532:22

569:24, 570:1, 570:2
**house** [39] - 449:6,
449:19, 454:3, 454:6,
454:21, 456:12,
459:7, 460:2, 461:7,
462:7, 475:17,
475:20, 476:17,
476:18, 488:4, 490:8,
495:8, 495:22, 496:6,
496:10, 497:2, 503:9,
509:10, 509:14,
509:21, 509:23,
509:24, 510:3,
510:11, 510:16,
534:7, 542:5, 542:6,
543:4, 561:8, 565:7,
565:8
  **hundred** [2] -
522:21, 552:9
  **hurt** [7] - 436:12,
495:2, 525:18,
543:24, 556:18,
557:24, 565:1
  **hurting** [2] - 460:20,
544:3
  **husband** [2] - 484:5,
539:17
  **hygiene** [1] - 486:12

# I

  **idea** [1] - 557:7
  **identical** [1] - 531:5
  **identify** [2] - 491:5,
519:15
  **IHS** [14] - 457:1,
457:3, 457:4, 457:5,
457:6, 463:11,
468:19, 474:13,
474:14, 474:20,
498:13, 498:16,
498:23, 508:21
  **Ill** [3] - 428:8, 428:15
  **ill** [1] - 551:2
  **image** [2] - 534:5,
555:11
  **imagine** [2] - 459:19,
543:25
  **immediate** [1] -
544:11
  **immediately** [3] -
439:17, 439:20,
539:23
  **impact** [3] - 545:23,
546:2, 546:4
  **impartial** [1] - 565:23
  **imperiled** [1] -
472:12
  **implication** [1] -

**imply** [1] - 515:12
  **implying** [1] - 442:7
  **important** [6] -
538:13, 540:12,
541:7, 544:14,
559:15, 559:16
  **imposes** [1] - 525:10
  **impossible** [7] -
487:22, 550:14,
563:10, 563:12,
563:13, 570:9
  **IN** [1] - 578:10
  **incident** [6] - 485:17,
487:17, 501:16,
512:18, 557:16,
567:19
  **incidents** [4] - 483:6,
483:7, 489:21, 502:21
  **include** [1] - 529:6
  **included** [8] -
524:16, 527:5,
530:12, 530:13,
530:15, 531:4,
532:22, 532:25
  **income** [1] - 508:24
  **incorporate** [1] -
516:1
  **incorporated** [1] -
516:2
  **increase** [3] -
432:24, 489:21, 500:4
  **increased** [6] -
432:23, 478:19,
483:4, 487:9, 489:22,
571:21
  **increasing** [2] -
571:15, 571:20
  **incredible** [1] -
542:18
  **independent** [1] -
549:20
  **Indian** [6] - 457:6,
460:17, 463:17, 526:8
  **indicate** [3] - 487:8,
491:9, 534:17
  **indicated** [1] - 531:8
  **indicates** [1] -
483:11
  **Indicating** [1] -
546:10
  **indicating** [4] -
489:14, 491:11,
534:6, 557:12
  **indicating)** [1] -
491:15
  **indication** [2] -
473:11, 570:20
  **Indictment** [4] -
526:14, 527:3,

574:10, 574:14
  **individual** [3] -
527:7, 532:2, 544:15
  **inexplicable** [1] -
483:1
  **infer** [1] - 471:8
  **inform** [1] - 516:5
  **information** [2] -
499:12, 566:8
  **informed** [1] - 470:2
  **initial** [2] - 533:5,
533:7
  **injured** [1] - 498:3
  **injuries** [22] - 435:12,
480:18, 480:20,
481:9, 483:1, 483:13,
483:3, 487:21, 488:8,
489:3, 491:17,
491:18, 544:12,
546:23, 550:15,
563:24, 569:20,
570:15, 570:16,
570:19, 572:8
  **injury** [16] - 484:15,
485:5, 487:4, 487:10,
487:24, 530:2, 531:6,
531:13, 531:17,
550:20, 563:3, 563:4,
569:17, 570:11,
571:2, 574:13
  **innocence** [1] -
471:20
  **insignificant** [1] -
538:21
  **instance** [2] -
524:11, 576:2
  **instances** [4] -
516:16, 516:17,
517:7, 517:20
  **instead** [3] - 524:1,
529:6, 532:5
  **instructed** [2] -
557:21, 572:17
  **Instruction** [8] -
525:7, 525:16,
529:25, 530:10,
531:23, 532:14,
535:25, 536:8
  **instruction** [39] -
522:1, 522:3, 524:4,
524:11, 525:1, 525:2,
525:3, 525:4, 525:20,
525:22, 525:23,
525:24, 526:1, 526:2,
526:7, 526:14,
526:16, 526:18,
526:20, 526:23,
527:18, 527:24,
528:9, 528:24, 529:1,
529:11, 529:20,

529:22, 531:17,
531:18, 531:20,
531:21, 534:18,
551:1, 553:11,
565:21, 566:4, 567:1
  **instructions** [49] -
434:17, 521:4, 521:8,
521:20, 521:22,
521:24, 521:25,
522:6, 522:9, 522:15,
522:17, 522:20,
522:24, 523:7, 523:8,
523:11, 523:18,
523:21, 523:25,
524:2, 524:5, 524:7,
524:21, 527:17,
528:24, 533:2,
534:18, 534:19,
534:23, 535:13,
535:17, 536:7,
536:10, 536:11,
536:13, 536:14,
536:16, 537:17,
537:23, 537:25,
541:23, 562:6,
565:17, 572:21,
573:9, 573:19
  **INSTRUCTIONS** [1] -
523:16
  **instrumentality** [1] -
572:13
  **insulting** [1] - 562:24
  **intend** [1] - 530:22
  **Intent** [1] - 531:20
  **intention** [1] - 562:12
  **interacting** [2] -
440:4, 495:15
  **interest** [3] - 472:15,
502:8, 578:8
  **interfered** [1] -
472:16
  **interim** [1] - 509:25
  **interior** [1] - 547:19
  **Internet** [1] - 521:17
  **intervene** [1] -
502:16
  **interview** [3] - 520:9,
541:1, 541:3
  **interviewed** [3] -
519:4, 540:25, 554:9
  **introduce** [2] -
432:13, 474:5
  **introduced** [9] -
432:5, 442:23,
451:23, 486:18,
517:2, 555:25, 562:1,
562:2, 567:17
  **introducing** [1] -
479:19
  **introduction** [1] -

431:18
  **investigate** [2] -
562:16, 562:18
  **investigation** [1] -
543:12
  **invoking** [1] - 503:17
  **involved** [3] -
538:25, 543:10,
545:13
  **iron** [1] - 570:13
  **irrelevant** [1] -
541:11
  **irresistible** [1] -
517:12
  **issue** [8] - 479:25,
480:9, 483:19,
485:10, 485:12,
517:3, 518:8, 551:23
  **issues** [7] - 485:2,
485:3, 486:13, 493:5,
493:25, 507:24, 551:7
  **items** [1] - 562:5
  **itself** [1] - 576:9

# J

  **jabs** [1] - 546:8
  **JACKSON** [1] -
473:23
  **Jackson** [24] -
467:25, 468:6,
468:10, 468:22,
470:1, 473:22, 474:6,
479:22, 482:14,
482:17, 482:25,
485:16, 488:2, 488:3,
491:7, 511:13,
516:13, 517:7,
517:24, 557:6, 558:7,
560:22, 567:15,
571:10
  **Jackson's** [5] -
468:1, 469:23,
471:18, 472:2, 571:11
  **jail** [2] - 509:2,
562:22
  **January** [25] -
435:19, 435:20,
437:4, 438:23,
454:17, 463:24,
492:23, 492:24,
492:25, 494:16,
494:18, 495:3, 498:5,
507:12, 540:18,
558:18, 559:5,
559:10, 560:8, 561:4,
561:5, 562:17,
563:20, 565:10,
571:20

**Jay** [2] - 428:22, 545:15

**Jennifer** [1] - 575:18

**Jill** [4] - 429:13, 578:3, 578:12, 578:13

**Jill_Connelly@sdd. uscourts.gov** [1] - 578:16

**job** [15] - 468:11, 468:13, 470:4, 472:11, 498:11, 508:10, 508:12, 508:19, 508:21, 510:9, 545:25, 549:17, 553:21, 554:8

**Johnson** [2] - 481:5, 575:21

**JOHNSON** [1] - 575:22

**joint** [1] - 571:9

**Jr** [2] - 462:21, 463:5

**JR** [1] - 462:22

**Judge** [7] - 428:17, 434:25, 443:20, 537:22, 551:1, 553:10, 557:21

**judge** [1] - 536:2

**Judge's** [1] - 537:22

**judgment** [1] - 532:2

**juggling** [1] - 509:4

**July** [3] - 476:1, 476:24

**jump** [2] - 435:15, 435:19

**June** [2] - 476:1, 476:23

**juror** [4] - 536:21, 536:22, 536:23

**JUROR** [12] - 574:24, 575:1, 575:3, 575:5, 575:7, 575:10, 575:13, 575:15, 575:17, 575:20, 575:22, 575:25

**jurors** [3] - 538:16, 549:17, 573:14

**JURY** [1] - 428:15

**jury** [103] - 430:4, 430:6, 430:15, 435:2, 444:14, 444:18, 445:7, 451:9, 463:4, 469:5, 469:11, 469:12, 469:14, 470:21, 470:24, 471:4, 471:8, 471:13, 471:19, 471:25, 474:5, 481:19, 481:23, 481:25, 482:2, 482:3, 488:12, 488:14, 489:9,

491:21, 501:3, 501:7, 501:11, 505:16, 514:9, 514:11, 514:14, 514:16, 514:17, 514:18, 514:20, 515:12, 518:10, 518:11, 518:12, 518:25, 520:24, 521:11, 523:4, 524:11, 524:12, 524:15, 525:2, 527:4, 527:23, 528:18, 529:14, 531:15, 534:15, 534:17, 535:5, 535:9, 535:10, 535:13, 536:9, 536:19, 537:6, 537:8, 537:9, 537:10, 537:18, 554:20, 554:23, 555:3, 566:5, 566:9, 566:18, 569:4, 572:14, 572:19, 572:22, 573:2, 573:4, 573:8, 573:10, 573:24, 573:25, 574:1, 574:8, 574:11, 574:16, 574:19, 576:2, 576:3, 576:4, 576:6, 576:16, 576:18, 576:19, 576:20

**Jury** [8] - 428:17, 458:17, 469:13, 473:20, 523:3, 536:12, 537:19, 572:23

**jury's** [1] - 577:4

**justice** [3] - 470:6, 470:11, 472:19

## K

**Kathryn** [1] - 536:25

**keep** [8] - 475:12, 481:24, 497:11, 535:12, 558:15, 558:16, 560:19, 567:9

**keeping** [4] - 442:7, 502:4, 522:25, 560:24

**keeps** [1] - 540:21

**Kenny** [1] - 463:6

**kept** [2] - 443:3, 447:24

**Khoroosi** [10] - 429:3, 429:3, 534:16, 545:25, 552:3, 566:22, 567:19, 569:7, 569:22, 571:10

**KHOROOSI** [124] - 430:8, 430:13, 433:6,

433:12, 434:25, 435:1, 437:10, 437:13, 437:15, 440:16, 441:7, 442:1, 442:11, 442:14, 446:1, 446:5, 446:9, 448:9, 449:11, 450:7, 450:23, 451:2, 451:7, 451:25, 452:1, 452:6, 452:25, 453:7, 453:21, 453:23, 455:12, 455:18, 457:23, 462:10, 462:15, 462:20, 463:1, 465:17, 467:20, 467:25, 468:6, 468:17, 468:19, 468:25, 469:21, 470:1, 470:9, 471:14, 471:17, 472:2, 472:7, 472:9, 473:3, 473:7, 473:15, 473:22, 474:2, 478:16, 478:17, 479:18, 480:13, 480:21, 481:5, 481:10, 481:14, 482:16, 483:10, 485:9, 485:16, 485:23, 486:7, 486:17, 486:21, 486:24, 487:2, 487:7, 487:19, 488:2, 488:11, 488:20, 488:21, 490:22, 491:1, 491:3, 491:6, 499:15, 500:24, 502:2, 503:13, 503:18, 505:19, 508:14, 511:10, 511:12, 513:10, 513:14, 516:12, 519:25, 520:16, 523:22, 529:3, 530:10, 531:1, 531:22, 532:9, 532:17, 532:21, 533:1, 533:14, 533:25, 534:2, 534:22, 535:4, 535:20, 535:23, 536:4, 555:2, 556:10, 565:20, 566:6, 573:7, 574:18, 577:11, 577:23

**Khoroosi's** [1] - 533:10

**kid** [5] - 556:17, 556:18, 558:11, 559:12, 565:11

**kids** [25] - 447:25,

448:20, 448:21, 448:22, 450:1, 476:4, 493:19, 495:15, 496:2, 496:23, 503:7, 504:5, 504:6, 505:10, 508:5, 508:8, 515:5, 517:4, 542:5, 542:6, 552:16, 559:21, 561:7, 561:10

**kill** [5] - 541:21, 546:8, 546:11, 552:23, 561:22

**killed** [5] - 527:6, 528:6, 541:25, 545:21

**killing** [3] - 550:22, 550:23, 550:24

**kind** [32] - 431:25, 432:8, 432:15, 432:23, 436:12, 436:14, 439:23, 440:2, 463:17, 470:17, 479:14, 486:9, 493:10, 494:8, 494:11, 494:13, 494:14, 494:15, 515:23, 519:14, 520:25, 521:1, 529:15, 538:13, 538:18, 540:13, 551:14, 553:4, 555:10, 561:18, 562:7, 562:9

**kinds** [3] - 542:11, 556:22, 558:12

**Kirk** [1] - 575:16

**kitchen** [3] - 447:21, 448:7, 448:16

**knee** [1] - 467:10

**knocked** [1] - 543:13

**knots** [2] - 490:2, 490:6

**knowledge** [4] - 446:14, 463:10, 492:5, 531:20

**known** [1] - 430:21

**knows** [11] - 553:19, 554:1, 558:20, 558:21, 558:23, 561:5, 563:19, 563:20, 564:17

**knuckle** [1] - 572:12

**knuckles** [4] - 545:17, 545:18, 546:7, 546:10

## L

**labels** [1] - 452:23

**lack** [3] - 565:24,

570:24

**lacking** [1] - 565:25

**ladies** [20] - 467:1, 520:23, 538:8, 541:22, 544:6, 544:14, 545:19, 546:5, 546:15, 546:25, 549:10, 550:3, 552:7, 552:21, 553:9, 554:18, 566:18, 569:3, 569:9, 571:23

**laid** [1] - 456:16

**lake** [1] - 475:18

**lake-front** [1] - 475:18

**Lakota** [1] - 431:5

**land** [1] - 546:14

**language** [4] - 525:17, 529:4, 529:10, 532:4

**LaPointe** [9] - 513:22, 514:4, 514:23, 515:2, 516:4, 516:11, 517:19, 518:3, 518:8

**LaPointe's** [1] - 518:4

**Lardy** [1] - 575:16

**LARDY** [1] - 575:17

**large** [1] - 498:24

**last** [13] - 437:6, 452:17, 479:17, 488:16, 498:2, 515:17, 529:4, 536:1, 541:14, 554:4, 554:5, 558:19, 561:4

**late** [12] - 433:18, 433:19, 503:23, 506:8, 506:20, 508:22, 538:20, 539:13, 548:18, 556:2, 561:20, 562:19

**latitude** [2] - 517:23, 517:24

**law** [10] - 457:14, 464:21, 470:15, 521:7, 521:21, 522:3, 525:9, 525:15, 545:13, 566:1

**Law** [1] - 429:3

**Lawrence** [1] - 428:17

**lawyer** [1] - 527:13

**lawyers** [4] - 521:5, 521:18, 521:21, 538:3

**lead** [1] - 542:3

**leading** [2] - 542:20, 547:11

**Leallen** [1] - 574:25

learned [2] - 464:1, 464:4
leash [1] - 542:8
least [3] - 481:1, 504:12, 504:14
leave [8] - 444:12, 501:25, 522:25, 523:13, 527:14, 527:15, 528:9, 561:21
led [1] - 444:23
left [14] - 437:18, 437:19, 439:25, 469:13, 482:2, 488:22, 490:17, 498:11, 514:17, 523:3, 537:10, 545:6, 550:12, 557:18
legally [1] - 557:25
legs [4] - 480:19, 489:18, 492:2, 556:19
less [6] - 491:18, 532:3, 546:11, 548:16, 548:17, 570:5
lesser [6] - 524:16, 530:13, 530:15, 531:4, 532:22, 532:25
lesser-included [6] - 524:16, 530:13, 530:15, 531:4, 532:22, 532:25
lethargic [5] - 436:10, 436:20, 559:8, 559:22, 560:10
lie [2] - 510:24, 511:3
life [17] - 430:22, 441:22, 442:5, 483:5, 507:13, 538:21, 542:19, 547:13, 550:13, 553:16, 553:19, 554:6, 555:1, 557:2, 558:17, 564:22, 567:23
light [2] - 565:13, 576:20
lights [1] - 436:12
likely [1] - 554:12
limine [5] - 471:1, 479:9, 482:13, 483:17, 484:20
limited [1] - 517:6
limits [1] - 564:10
line [1] - 531:25
list [2] - 526:24, 527:24
listed [1] - 528:2
listen [1] - 555:9
lists [1] - 527:22
live [14] - 430:17, 430:18, 451:13, 451:19, 452:12,

454:7, 454:9, 460:5, 460:17, 463:18, 463:19, 474:7, 474:8, 564:7
lived [2] - 542:10, 550:13
lives [1] - 454:4
living [1] - 474:11
location [1] - 485:5
logically [1] - 564:18
look [15] - 453:24, 461:15, 488:17, 490:18, 494:25, 506:6, 523:1, 525:8, 534:13, 536:15, 547:10, 555:21, 563:1, 572:11, 572:24
looked [17] - 437:21, 437:23, 437:25, 440:10, 487:9, 493:3, 493:18, 494:19, 494:20, 494:25, 495:1, 495:2, 510:7, 510:8, 551:14, 568:14
looking [4] - 437:19, 453:25, 461:9, 521:6
looks [3] - 543:6, 560:20, 563:21
lose [5] - 472:11, 508:12, 535:2, 536:23, 562:20
lost [3] - 508:21, 511:15, 511:17
loud [1] - 465:12
loved [3] - 556:1, 557:2, 571:10
loves [1] - 517:3
lump [2] - 461:13, 461:18
lunch [3] - 520:25, 521:15, 521:18
lunchtime [1] - 523:12
lying [3] - 564:1, 568:20, 568:23

**M**

ma'am [3] - 441:12, 500:11, 506:5
mac [1] - 434:14
mail [1] - 578:16
major [1] - 563:2
malice [2] - 550:25, 551:3
Malice [1] - 551:1
man [2] - 539:24, 565:3
mandated [1] -

499:24
mandatory [3] - 540:5, 577:7, 577:17
manner [1] - 544:13
Manning [1] - 574:23
MANNING [1] - 574:24
manslaughter [3] - 529:2, 550:19, 562:9
March [1] - 431:15
Mario [126] - 429:6, 430:19, 430:20, 431:1, 431:19, 431:21, 431:24, 432:2, 432:5, 433:21, 434:16, 434:23, 435:2, 435:4, 451:11, 451:15, 452:2, 452:5, 454:3, 454:9, 456:10, 456:12, 457:7, 457:16, 459:23, 460:6, 461:25, 463:9, 464:10, 464:15, 465:21, 467:2, 474:16, 474:17, 475:12, 475:13, 475:15, 476:2, 476:7, 476:11, 476:25, 477:6, 477:17, 478:9, 479:25, 481:6, 481:15, 481:17, 482:18, 482:22, 483:3, 488:25, 489:14, 492:11, 492:16, 492:20, 495:7, 495:9, 495:22, 496:18, 498:6, 498:10, 499:2, 499:3, 499:6, 499:21, 499:24, 500:8, 500:12, 500:17, 501:11, 501:24, 502:10, 504:1, 504:12, 507:12, 507:21, 510:21, 510:24, 510:25, 511:14, 512:25, 514:2, 514:3, 516:19, 516:20, 517:4, 517:5, 519:10, 519:18, 519:19, 520:6, 555:14, 555:19, 555:23, 556:3, 556:12, 556:15, 556:23, 557:1, 557:5, 557:17, 558:13, 558:20, 558:21, 559:10, 559:19, 559:25, 560:2, 560:5, 560:14, 561:7,

563:13, 563:17, 563:19, 563:20, 564:7, 564:12, 564:20, 565:3, 565:4, 566:6, 574:10, 574:14
MARIO [1] - 428:9
Mario's [11] - 454:3, 475:17, 475:20, 476:20, 490:8, 500:22, 501:9, 505:9, 559:15, 563:12, 565:9
mark [3] - 492:17, 557:11, 557:18
marked [4] - 436:22, 452:8, 490:10, 534:4
Market [1] - 539:16
markings [2] - 452:22, 534:10
marvelous [1] - 515:23
mask [1] - 553:3
massive [1] - 550:15
materials [1] - 486:12
math [4] - 566:21, 566:22, 572:4, 572:6
matter [6] - 458:18, 472:12, 472:14, 516:6, 551:25, 558:11
matters [1] - 469:10
McGee [2] - 544:9, 544:23
meal [2] - 494:13, 497:15
mean [12] - 432:15, 435:9, 441:5, 478:3, 493:15, 493:23, 504:5, 512:18, 517:11, 530:24, 545:24, 553:22
means [2] - 539:8, 545:19
medical [2] - 474:12, 550:1
medically [2] - 564:17, 570:3
medicine [3] - 550:12, 553:7, 553:8
meet [6] - 431:12, 459:17, 459:23, 475:16, 475:19, 539:15
meeting [2] - 463:8, 560:1
member [1] - 559:20
members [2] - 499:14, 553:3
Members [1] - 525:2
men [2] - 464:16, 464:23

mention [3] - 471:2, 481:10, 510:19
mentioned [2] - 525:20, 536:19
mentioning [1] - 481:11
Merit [1] - 578:4
Mertz [19] - 441:20, 441:25, 473:14, 510:21, 510:25, 516:8, 518:15, 518:19, 518:25, 540:23, 540:25, 541:4, 542:21, 554:8, 560:9, 561:13, 569:8, 569:10, 569:11
MERTZ [2] - 518:16, 518:21
met [15] - 463:10, 474:22, 475:9, 475:12, 475:15, 475:17, 475:20, 555:15, 559:19, 559:24, 559:25, 560:2, 564:24, 565:16
metadata [1] - 483:11
Michael [3] - 431:1, 431:24
mid [2] - 483:12, 545:5
middle [4] - 431:24, 541:3, 552:8, 553:24
might [9] - 434:7, 434:18, 462:16, 468:16, 473:5, 480:10, 563:23, 573:20, 576:7
Mike [37] - 431:19, 431:22, 431:23, 432:1, 432:2, 432:19, 432:25, 433:7, 433:13, 433:18, 434:6, 436:6, 438:22, 439:10, 439:19, 439:22, 440:2, 440:4, 440:7, 440:23, 442:17, 445:16, 449:5, 449:13, 449:16, 449:18, 454:16, 454:21, 454:25, 455:4, 455:13, 455:19, 456:25, 461:1, 475:9, 475:13
Mike's [2] - 440:17, 441:3
Mikes [1] - 431:25
miles [6] - 430:18, 454:11, 463:21,

498:22, 542:9
**Miley** [6] - 438:11, 510:13, 510:18, 512:2, 512:4, 512:5
**Miley's** [1] - 512:1
**milk** [1] - 445:1
**Miller** [4] - 428:22, 533:7, 546:20, 548:10
**MILLER** [13] - 523:19, 525:6, 526:5, 526:22, 527:20, 528:5, 528:14, 529:23, 534:16, 556:8, 566:3, 566:17, 572:7
**million** [3] - 547:23, 548:17, 554:18
**mimic** [1] - 559:1
**mind** [6] - 440:14, 481:24, 517:11, 521:1, 521:14, 522:25
**mine** [2] - 511:25
**Minnesota** [1] - 475:5
**minor** [1] - 490:18
**minute** [3] - 484:8, 537:9, 572:5
**minutes** [8] - 454:13, 456:20, 514:15, 533:20, 533:21, 554:3, 564:5, 565:19
**miraculously** [1] - 569:19
**Miss** [18] - 468:1, 468:10, 469:23, 470:1, 471:18, 472:2, 482:14, 482:17, 485:16, 485:25, 511:13, 517:24, 536:25, 557:16, 557:18, 559:18, 569:7, 571:11
**miss** [9] - 468:6, 468:22, 479:22, 481:5, 482:25, 488:2, 488:3, 491:7, 517:7
**misstatement** [1] - 566:3
**misstating** [1] - 505:19
**mistake** [2] - 567:23, 568:7
**mistook** [1] - 567:21
**mitigate** [1] - 482:24
**modification** [4] - 526:23, 529:24, 531:23, 532:3
**mom** [3] - 463:13, 463:16, 481:7
**mom's** [1] - 435:5

**moment** [5] - 503:15, 511:5, 523:9, 535:15, 576:5
**Monday** [12] - 439:6, 448:5, 449:2, 510:12, 540:22, 542:4, 547:6, 549:8, 560:18, 570:17, 571:3, 571:4
**Mongolian** [5] - 557:13, 557:14, 567:21, 567:24, 568:8
**monitor** [1] - 453:24
**month** [4] - 476:16, 503:12, 561:19, 561:23
**months** [16] - 431:14, 432:6, 441:21, 442:5, 443:5, 476:2, 476:5, 476:19, 481:2, 549:10, 549:11, 549:12, 549:13, 549:16, 555:15, 562:16
**mood** [1] - 433:25
**morning** [60] - 430:4, 430:7, 430:14, 433:7, 433:13, 434:20, 435:5, 436:7, 436:8, 436:9, 437:3, 437:21, 437:23, 438:1, 438:5, 439:6, 443:25, 446:24, 447:5, 447:7, 449:2, 449:4, 449:15, 450:2, 450:15, 451:8, 454:17, 454:19, 454:21, 457:22, 458:2, 458:3, 461:25, 463:2, 469:11, 474:3, 474:4, 478:8, 478:10, 484:19, 496:10, 498:5, 509:9, 510:12, 510:17, 512:2, 540:22, 541:8, 542:4, 542:7, 542:16, 542:20, 547:10, 549:8, 556:24, 558:4, 561:5, 563:20, 571:3
**mornings** [2] - 432:25, 434:14
**most** [5] - 448:24, 483:1, 552:23, 552:24, 576:17
**mostly** [1] - 480:19
**mother** [15] - 442:25, 477:13, 479:14, 479:20, 480:9, 480:11, 482:23, 484:6, 484:17, 489:16, 502:16, 504:17, 539:5,

541:18, 555:16
**motion** [1] - 482:13
**motions** [3] - 479:9, 482:13, 483:17
**motive** [4] - 541:24, 542:1, 562:1
**motives** [1] - 562:2
**mouth** [2] - 456:18
**mouth-to-mouth** [1] - 456:18
**move** [8] - 452:25, 466:13, 470:25, 479:16, 484:20, 490:22, 546:13, 559:5
**moved** [2] - 475:3, 475:5
**movement** [1] - 457:21
**movie** [3] - 555:6, 555:7, 555:8
**moving** [2] - 561:18, 564:1
**MR** [206] - 430:8, 430:13, 433:3, 433:6, 433:10, 433:12, 434:22, 434:25, 435:1, 437:10, 437:13, 437:15, 440:13, 440:16, 441:7, 441:11, 442:1, 442:3, 442:11, 442:14, 442:16, 446:1, 446:5, 446:9, 446:11, 448:9, 448:12, 449:8, 449:11, 450:7, 450:9, 450:12, 450:23, 451:2, 451:7, 451:21, 451:25, 452:1, 452:4, 452:6, 452:25, 453:2, 453:7, 453:12, 453:14, 453:19, 453:21, 453:23, 455:10, 455:12, 455:15, 455:18, 457:23, 458:1, 462:9, 462:10, 462:15, 462:20, 463:1, 465:17, 465:20, 466:13, 466:18, 467:19, 467:20, 467:25, 468:6, 468:17, 468:19, 468:25, 469:6, 469:21, 470:1, 470:9, 470:13, 471:14, 471:17, 472:2, 472:7, 472:9, 473:3, 473:7, 473:9, 473:11, 473:15, 473:22,

474:2, 478:14, 478:16, 478:17, 479:3, 479:7, 479:18, 480:2, 480:4, 480:13, 480:21, 481:5, 481:10, 481:14, 482:16, 483:10, 483:15, 483:25, 484:10, 485:8, 485:9, 485:16, 485:23, 486:7, 486:17, 486:21, 486:24, 487:2, 487:7, 487:19, 488:2, 488:11, 488:20, 488:21, 490:22, 490:24, 491:1, 491:3, 491:6, 499:15, 499:19, 500:24, 501:2, 502:2, 502:7, 503:13, 503:18, 503:22, 505:19, 505:22, 508:14, 508:17, 511:4, 511:8, 511:10, 511:12, 513:10, 513:14, 513:16, 513:19, 515:8, 516:8, 516:12, 518:15, 518:24, 519:25, 520:5, 520:14, 520:16, 520:19, 520:22, 523:19, 523:22, 525:6, 526:5, 526:22, 527:20, 528:5, 528:14, 529:3, 529:23, 530:10, 531:1, 531:22, 532:9, 532:17, 532:21, 533:1, 533:4, 533:14, 533:23, 533:25, 534:2, 534:16, 534:22, 534:25, 535:4, 535:20, 535:23, 536:4, 536:5, 537:7, 537:14, 538:6, 555:2, 556:8, 556:10, 565:20, 566:3, 566:6, 566:17, 572:7, 573:5, 573:7, 574:17, 574:18, 577:3, 577:11, 577:21, 577:23
**multiple** [2] - 499:8, 558:25
**murder** [9] - 526:20, 530:15, 531:14, 550:18, 550:21, 550:22, 550:25, 562:7, 574:9
**murdered** [2] - 544:7, 549:22

**must** [4] - 465:25, 529:9, 529:13, 553:16
**myriad** [1] - 541:19

# N

**name** [7] - 430:14, 430:16, 431:24, 451:8, 463:4, 463:5, 567:11
**names** [1] - 574:20
**native** [1] - 465:2
**Native** [1] - 539:8
**naturally** [1] - 516:21
**nature** [2] - 485:5, 489:23
**Navy** [3] - 456:1, 456:2, 456:3
**near** [2] - 460:22, 558:12
**neared** [1] - 483:5
**nearly** [3] - 459:8, 460:13, 544:1
**necessarily** [1] - 486:17
**necessary** [1] - 471:21
**need** [12] - 434:12, 435:4, 478:4, 497:1, 510:8, 513:3, 533:15, 558:15, 562:11, 562:12, 564:25
**needed** [11] - 432:8, 432:22, 477:11, 496:20, 496:24, 504:14, 509:6, 511:18, 511:24, 513:1, 564:16
**needs** [1] - 502:17
**neglect** [2] - 482:19, 484:18
**neighborhood** [1] - 460:8
**nephew** [4] - 430:20, 442:10, 451:12, 459:7
**nephew's** [1] - 544:1
**nephews** [1] - 550:7
**nerve** [1] - 570:10
**neutral** [1] - 529:15
**never** [17] - 459:11, 477:2, 505:8, 510:7, 510:14, 510:19, 525:9, 542:24, 542:25, 543:1, 551:12, 557:8, 558:9, 559:19, 559:24, 559:25
**new** [1] - 554:22
**next** [18] - 432:6,

432:7, 439:5, 451:1,
462:14, 462:15,
467:1, 467:24,
473:21, 513:13,
520:4, 539:13, 540:2,
540:18, 541:19,
553:25, 554:22,
568:17
  **nice** [4] - 490:6,
515:9, 545:25, 554:8
  **nice-size** [1] - 490:6
  **nickname** [4] -
431:21, 438:16, 463:7
  **niece** [2] - 463:15,
463:16
  **nieces** [2] - 439:12,
550:6
  **night** [30] - 445:8,
447:13, 447:18,
448:6, 448:17, 488:1,
488:3, 495:11,
495:13, 495:22,
497:2, 501:12, 507:1,
507:6, 540:22,
540:24, 541:2, 541:6,
541:12, 541:14,
541:15, 541:17,
542:13, 549:7,
553:24, 560:21, 569:9
  **nobody** [1] - 544:11
  **Nobody** [1] - 523:1
  **non** [1] - 457:6
  **non-Indian** [1] -
457:6
  **none** [4] - 484:20,
560:11, 562:2, 562:14
  **noon** [1] - 523:13
  **norm** [1] - 496:22
  **normal** [9] - 436:11,
495:18, 496:3, 496:4,
506:17, 540:16,
556:17, 556:18,
560:14
  **normally** [11] -
433:16, 493:20,
493:24, 494:4,
494:14, 517:8,
517:10, 538:4,
541:16, 542:15, 553:4
  **North** [2] - 524:18,
563:5
  **NORTHERN** [1] -
428:3
  **notably** [1] - 483:1
  **Notary** [1] - 578:4
  **notations** [1] - 534:6
  **note** [3] - 524:20,
532:17, 535:25
  **noted** [4] - 529:19,
531:16, 532:10,

557:13
  **notes** [2] - 522:25,
525:24
  **nothing** [17] - 450:7,
450:23, 462:10,
467:20, 479:1,
480:21, 487:13,
513:10, 520:2, 525:4,
540:7, 540:8, 540:9,
541:2, 541:18,
568:24, 569:1
  **notice** [21] - 433:16,
434:1, 435:12, 440:4,
478:19, 478:25,
482:19, 489:3, 489:6,
489:9, 489:23, 492:3,
494:23, 499:10,
524:6, 527:20,
538:14, 544:14,
550:20, 556:16,
573:13
  **noticed** [10] -
439:10, 439:24,
481:17, 483:7, 492:2,
500:3, 504:11,
524:10, 557:5, 557:15
  **noticing** [1] - 489:5
  **November** [3] -
489:19, 571:20, 577:1
  **number** [14] - 500:4,
524:22, 524:23,
524:24, 527:18,
542:9, 546:19,
548:23, 548:25,
549:6, 551:10,
551:24, 562:4, 573:12
  **numbers** [1] - 573:11
  **numerous** [1] -
483:1
  **nurses** [2] - 439:24,
499:11

## O

  **oath** [2] - 458:20,
518:20
  **oatmeal** [1] - 434:14
  **object** [13] - 433:3,
433:10, 434:22,
440:13, 451:22,
453:8, 453:15,
455:10, 471:17,
479:7, 530:10,
532:21, 577:11
  **objection** [42] -
442:1, 442:11, 446:1,
446:4, 446:8, 448:9,
453:3, 453:16,
453:17, 455:15,
471:24, 482:10,

490:24, 500:24,
502:2, 503:13,
505:19, 519:25,
522:1, 522:2, 524:23,
524:24, 524:25,
525:7, 525:14,
525:19, 526:6,
526:12, 528:23,
529:3, 529:18,
529:24, 530:9,
530:12, 531:16,
532:10, 532:17,
534:25, 535:1, 536:4,
556:8, 566:3
  **objections** [5] -
503:16, 522:7, 533:9,
533:10, 576:22
  **objects** [2] - 545:16,
546:16
  **obligation** [4] -
431:7, 561:19, 567:7,
567:11
  **obligations** [1] -
507:21
  **observe** [1] - 496:12
  **obstruction** [3] -
470:6, 470:11, 472:19
  **obtained** [1] - 544:20
  **obviously** [3] -
468:23, 524:7, 531:3
  **occasion** [2] -
479:21, 492:14
  **occasionally** [1] -
556:16
  **occasions** [3] -
434:1, 435:6, 459:19
  **occipital** [1] - 563:24
  **occurred** [7] -
469:15, 482:4,
509:15, 514:19,
523:5, 563:3, 563:4
  **occurring** [1] -
512:22
  **October** [2] - 576:22,
576:24
  **OF** [6] - 428:2, 428:5,
428:8, 523:16, 578:1
  **offense** [9] - 524:16,
524:17, 526:24,
527:9, 530:13,
530:15, 531:4,
532:25, 553:4
  **offenses** [1] - 531:14
  **offer** [6] - 437:10,
534:19, 534:22,
557:20, 557:24, 571:8
  **offered** [2] - 456:5,
557:18
  **office** [1] - 453:6
  **Office** [3] - 428:20,

428:23, 429:3
  **Officer** [4] - 537:3,
537:5, 573:18, 574:4
  **Official** [1] - 578:3
  **officiating** [1] -
464:21
  **often** [11] - 432:10,
440:2, 440:3, 443:7,
444:23, 476:11,
476:19, 476:22,
488:25, 500:9, 537:1
  **oftentimes** [1] -
444:1
  **ointment** [1] - 435:10
  **old** [20] - 431:14,
432:6, 474:9, 474:10,
476:6, 482:22, 486:9,
512:2, 512:9, 512:15,
512:17, 549:10,
555:15, 561:10,
562:23, 565:4, 570:1,
570:2, 570:5
  **older** [3] - 561:7,
563:24, 567:8
  **once** [8] - 432:15,
481:2, 521:10,
521:16, 522:10,
522:20, 522:24, 530:6
  **one** [64] - 432:12,
437:17, 439:11,
444:2, 462:5, 464:15,
468:6, 469:5, 469:9,
473:9, 476:5, 489:12,
490:2, 490:4, 491:23,
492:17, 501:4, 505:8,
505:17, 511:23,
517:13, 519:11,
521:23, 522:9, 528:4,
529:18, 532:12,
533:5, 536:12,
536:15, 538:25,
541:14, 545:4, 546:2,
547:2, 547:11,
547:23, 548:1, 548:2,
550:2, 550:8, 551:9,
551:19, 551:20,
553:9, 554:18,
558:23, 561:5,
561:10, 563:2, 565:8,
569:22, 569:23,
570:1, 570:5, 571:19,
572:7, 572:8, 572:9
  **ones** [2] - 492:5,
573:1
  **open** [6] - 430:2,
469:24, 481:24,
515:25, 517:24,
522:25
  **opened** [6] - 513:23,

514:3, 515:4, 516:14,
517:16, 517:22
  **opening** [4] - 517:18,
533:20, 552:4
  **opinion** [5] - 502:11,
544:10, 545:7,
545:15, 545:20
  **opportunity** [1] -
538:10
  **opposed** [1] - 529:15
  **optic** [1] - 570:10
  **Optic** [1] - 506:17
  **order** [15] - 479:10,
484:1, 484:3, 484:14,
484:21, 484:24,
528:3, 542:14, 562:6,
562:8, 562:10,
562:14, 566:6, 577:5,
577:15
  **Order** [3] - 443:22,
477:6, 499:24
  **ordered** [3] - 443:17,
567:10, 577:19
  **orders** [1] - 542:11
  **ordinary** [1] - 561:15
  **organization** [1] -
570:24
  **original** [1] - 573:8
  **otherwise** [5] -
471:4, 472:12,
487:10, 488:8, 517:20
  **out-of-the-Court** [1]
- 484:9
  **outcome** [1] - 578:8
  **outside** [7] - 448:9,
471:18, 471:23,
471:25, 476:11,
482:1, 482:11
  **overruled** [14] -
440:15, 442:13,
446:10, 448:11,
453:20, 500:25,
502:3, 503:20,
505:21, 508:16,
525:19, 526:13,
532:23, 556:9
  **Overruled** [1] -
442:15
  **overwhelming** [1] -
509:8
  **own** [9] - 521:1,
521:14, 539:24,
541:21, 542:3,
543:21, 549:3, 556:1,
569:18

## P

  **p.m** [2] - 577:1,

577:25
  **packet** [1] - 534:18
  **Page** [1] - 458:22
  **Pages** [1] - 578:6
  **painful** [1] - 539:25
  **paint** [2] - 479:14,
486:8
  **pale** [1] - 436:10
  **Pamper** [2] - 481:2,
485:15
  **panic** [6] - 457:8,
458:16, 459:6,
460:24, 563:22
  **panicked** [2] - 455:7,
509:17
  **paper** [2] - 546:1
  **paragraph** [4] -
525:8, 529:5, 531:23,
531:25
  **pardon** [6] - 458:7,
458:25, 459:20,
461:21, 464:3, 467:13
  **parent** [9] - 431:6,
431:7, 516:19,
516:20, 516:24,
557:23, 558:2, 558:3,
560:17
  **parenting** [1] -
516:22
  **parents** [2] - 505:9,
516:23
  **parking** [1] - 539:15
  **part** [15] - 458:15,
460:17, 467:16,
471:21, 477:2,
477:21, 486:11,
500:11, 500:13,
520:11, 527:6,
532:15, 543:21,
552:18, 554:9
  **particular** [14] -
443:10, 447:7, 449:2,
457:22, 461:18,
461:25, 507:11,
509:9, 524:23,
524:24, 530:16,
536:16, 542:4, 542:19
  **particularly** [1] -
525:4
  **parties** [1] - 578:7
  **parts** [4] - 492:3,
541:1, 550:10, 550:16
  **party** [2] - 574:16,
576:23
  **passed** [2] - 519:1,
567:20
  **passion** [1] - 529:21
  **pattern** [1] - 572:12
  **Pause** [2] - 462:19,
511:7

  **pay** [8] - 508:10,
508:13, 508:19,
508:22, 509:1,
542:12, 544:22,
561:19
  **paying** [3] - 508:6,
538:14, 562:22
  **payment** [1] - 561:24
  **Pedialyte** [10] -
436:14, 445:14,
450:4, 450:20,
450:21, 497:11,
541:10, 554:6,
559:13, 560:12
  **pediatricians** [1] -
547:12
  **pen** [2] - 491:9,
491:12
  **penalty** [3] - 526:25,
527:3, 530:1
  **pendency** [1] -
577:13
  **pending** [1] - 577:5
  **people** [21] - 459:17,
460:5, 465:4, 470:10,
472:15, 499:4, 499:6,
499:8, 511:18,
536:15, 536:20,
537:20, 540:1, 552:9,
552:11, 552:23,
552:24, 565:6, 565:7,
568:15
  **perceived** [1] -
561:14
  **percent** [3] - 522:22,
557:20, 557:24
  **perception** [1] -
479:24
  **perfect** [1] - 542:18
  **perfectly** [1] - 558:22
  **perform** [1] - 456:12
  **performed** [1] -
576:16
  **period** [4] - 488:24,
500:8, 540:20, 547:7
  **permission** [8] -
437:13, 453:21,
479:11, 484:11,
491:1, 513:21, 514:6,
533:6
  **person** [12] - 432:3,
462:1, 471:7, 475:13,
509:8, 544:23,
546:16, 549:23,
553:9, 557:25, 558:2,
564:3
  **person's** [1] - 440:14
  **personally** [3] -
463:13, 464:11,
479:23

  **persons** [1] - 526:18
  **Phillips** [2] - 429:14,
578:14
  **phone** [10] - 439:10,
439:11, 439:13,
460:2, 485:25,
492:16, 509:17,
509:18, 573:11
  **Phone** [1] - 578:15
  **photo** [1] - 437:2
  **photograph** [5] -
436:25, 452:9,
453:25, 483:9, 483:10
  **photographs** [4] -
479:23, 483:8,
490:13, 490:15
  **Phyllis** [1] - 575:14
  **Physical** [1] - 506:12
  **physical** [6] -
478:20, 544:12,
545:8, 548:24, 552:7,
552:9
  **physically** [1] - 534:9
  **physician** [2] -
506:20, 540:10
  **pick** [9] - 434:20,
435:4, 478:4, 478:12,
478:23, 478:24,
482:18, 500:10,
554:22
  **picked** [6] - 466:16,
467:12, 467:14,
494:9, 497:22, 569:12
  **picking** [2] - 484:18,
539:14
  **picture** [33] - 437:16,
437:19, 446:22,
446:23, 446:25,
449:21, 449:22,
449:25, 450:5,
450:13, 450:14,
460:4, 490:20, 503:6,
503:23, 503:24,
503:25, 504:1, 504:3,
504:7, 504:10,
504:21, 504:24,
505:11, 506:1, 539:5,
568:1, 568:3, 568:4,
568:5, 571:14, 572:12
  **pictures** [20] - 447:4,
450:1, 450:6, 502:18,
502:19, 503:3, 503:7,
504:5, 504:6, 504:12,
504:19, 505:3, 505:6,
505:14, 505:16,
505:25, 513:3, 558:8,
572:10
  **pie** [1] - 497:19
  **piece** [1] - 546:1
  **Pierre** [2] - 428:23,

428:24
  **Piersol** [3] - 428:17,
553:10, 557:21
  **pinpoint** [1] - 563:9
  **place** [10] - 471:18,
498:24, 548:3, 552:8,
552:10, 552:11,
568:24, 568:25,
570:17, 576:25
  **placed** [1] - 456:4
  **Plaintiff** [2] - 428:6,
428:24
  **planned** [3] - 478:23,
550:23, 550:24
  **plausible** [1] -
511:23
  **play** [2] - 493:19,
493:20
  **played** [1] - 448:16
  **playing** [4] - 448:2,
448:7, 502:10, 515:21
  **pleasant** [1] - 539:19
  **plural** [2] - 532:13,
532:16
  **plus** [4] - 536:10,
572:8, 572:9
  **PO** [1] - 428:21
  **point** [17] - 456:25,
469:22, 482:21,
496:17, 496:18,
496:21, 513:2,
521:13, 522:3,
522:23, 525:15,
525:16, 534:20,
536:24, 539:24,
559:10, 563:19
  **pointed** [2] - 527:13,
539:22
  **points** [4] - 545:23,
546:2, 546:4, 571:1
  **poisoning** [4] -
530:18, 530:24,
530:25, 531:2
  **police** [4] - 543:5,
543:10, 543:11,
543:16
  **polled** [2] - 574:16,
574:19
  **poor** [1] - 559:23
  **portion** [1] - 471:17
  **position** [5] - 469:20,
470:11, 483:14,
515:6, 515:10
  **positive** [1] - 512:8
  **positively** [1] - 553:8
  **possibility** [3] -
472:18, 473:2, 551:11
  **possible** [7] - 460:1,
548:12, 549:18,
551:25, 566:11,

566:13, 566:15
  **possibly** [1] - 513:22
  **pot** [1] - 505:8
  **potential** [3] - 471:8,
471:22, 526:25
  **potty** [3] - 480:24,
486:5, 486:11
  **potty-training** [1] -
486:11
  **pounded** [1] - 455:9
  **PowerPoint** [3] -
534:4, 534:10, 552:4
  **Prairie** [1] - 498:11
  **pre** [1] - 554:15
  **pre-concussion** [1] -
554:15
  **precautions** [1] -
434:5
  **precise** [1] - 569:21
  **precisely** [1] -
487:21
  **preclude** [1] - 479:9
  **precluded** [1] -
479:15
  **preconcussion** [1] -
540:14
  **preexisting** [3] -
540:14, 568:9, 570:21
  **preface** [1] - 431:20
  **preliminary** [1] -
521:13
  **premeditated** [1] -
550:22
  **premise** [1] - 563:2
  **prepped** [1] - 494:15
  **presence** [16] -
469:5, 469:11,
469:14, 471:18,
471:24, 471:25,
481:19, 481:23,
482:3, 512:1, 514:9,
514:10, 514:14,
514:18, 514:20, 523:4
  **PRESENT** [1] - 429:6
  **present** [14] - 430:2,
438:23, 469:15,
469:24, 481:15,
481:16, 482:4,
482:17, 484:2,
490:13, 492:14,
514:19, 523:5, 534:10
  **presentation** [1] -
534:4
  **presented** [8] -
516:15, 538:18,
547:21, 566:10,
570:16, 571:3, 571:5,
577:17
  **Presentence** [1] -
576:21

**pretrial** [1] - 483:17
**pretty** [15] - 435:16, 438:21, 455:5, 455:6, 458:6, 458:8, 460:10, 463:21, 476:13, 477:11, 492:11, 492:13, 499:20, 523:9, 539:9
**prevent** [1] - 577:18
**previous** [3] - 505:20, 514:24, 542:12
**previously** [3] - 514:23, 518:17, 532:18
**print** [1] - 534:3
**printed** [1] - 453:9
**probable** [1] - 548:25
**problem** [3] - 455:8, 551:12, 558:25
**problems** [3] - 444:19, 444:23, 541:20
**procedure** [1] - 545:11
**procedures** [2] - 576:6, 576:12
**proceed** [7] - 430:7, 473:17, 488:19, 518:14, 522:23, 538:5, 576:13
**proceeding** [2] - 469:1, 550:5
**proceedings** [5] - 469:15, 471:22, 482:4, 514:19, 577:25
**process** [3] - 521:25, 522:7, 522:10
**producing** [1] - 525:11
**products** [1] - 445:1
**projector** [1] - 555:10
**prominent** [1] - 470:23
**proof** [2] - 565:16, 566:2
**proper** [2] - 486:12
**properly** [2] - 573:1, 573:4
**proponent** [1] - 517:5
**proposed** [17] - 504:18, 521:22, 523:7, 523:18, 523:21, 523:25, 524:2, 524:3, 524:5, 524:7, 524:11, 524:21, 527:17, 527:18, 527:24,

529:11, 534:18
**proposing** [1] - 528:7
**prosecution** [15] - 453:8, 471:5, 471:9, 486:8, 486:14, 487:20, 549:19, 556:11, 558:7, 558:9, 561:12, 561:16, 562:25, 563:16, 564:13
**prosecution's** [1] - 555:9
**prosecutor** [2] - 531:18, 560:25
**proud** [1] - 555:20
**prove** [10] - 471:20, 529:13, 530:22, 541:24, 541:25, 542:1, 553:12, 553:13, 553:20, 562:4
**proved** [2] - 529:7, 531:1
**proven** [2] - 537:20, 549:21
**provide** [1] - 544:9
**providing** [1] - 567:16
**proving** [1] - 525:12
**Public** [1] - 578:4
**public** [4] - 471:24, 544:15, 544:18, 544:24
**publish** [3] - 437:13, 453:21, 491:1
**published** [1] - 451:22
**pull** [1] - 548:20
**pumped** [1] - 497:11
**punched** [1] - 562:23
**punching** [2] - 545:18
**punishment** [1] - 517:5
**purpose** [1] - 471:19
**pursuant** [1] - 577:3
**pushing** [1] - 456:18
**put** [9] - 433:23, 482:15, 487:11, 487:20, 544:17, 544:24, 550:4, 552:4, 554:2
**puts** [1] - 544:15

## Q

**questioned** [1] - 510:14
**questioning** [1] -

510:19
**questions** [10] - 465:18, 485:7, 488:10, 520:15, 520:16, 551:10, 551:24, 573:15, 576:6, 576:12
**quickly** [2] - 458:9, 548:9
**quiet** [2] - 440:20, 440:22
**quite** [2] - 522:22, 562:25
**quoting** [1] - 531:12

## R

**radiology** [1] - 474:12
**raised** [2] - 486:13, 551:7
**Randall** [10] - 548:18, 548:23, 548:25, 549:6, 549:8, 551:17, 553:5, 553:14, 554:2, 565:12
**Randall's** [1] - 548:20
**ranges** [2] - 570:3, 570:8
**rapes** [1] - 552:25
**rash** [6] - 435:6, 480:17, 482:20, 485:1, 485:9, 488:9
**rashes** [1] - 489:5
**rather** [1] - 576:11
**rational** [1] - 546:16
**reach** [2] - 521:1, 532:1
**reached** [3] - 573:12, 573:13, 574:1
**react** [1] - 439:22
**reacting** [1] - 440:7
**reaction** [1] - 495:18
**read** [10] - 523:10, 535:13, 536:7, 536:10, 537:23, 541:24, 553:11, 566:5, 572:21, 574:20
**reading** [3] - 537:16, 537:24, 574:7
**reads** [1] - 525:9
**ready** [3] - 522:22, 523:10, 540:4
**real** [3] - 441:19, 450:9, 539:13
**reality** [4] - 555:11, 555:13, 558:1, 560:7
**realize** [1] - 469:1

**realized** [2] - 543:18, 564:5
**really** [27] - 461:15, 465:12, 477:21, 486:15, 493:20, 493:22, 494:2, 494:8, 494:20, 494:24, 495:14, 495:15, 496:3, 497:9, 497:13, 497:14, 501:7, 505:2, 510:19, 538:22, 540:15, 544:25, 552:22, 554:17, 557:23, 561:22
**Realtime** [1] - 578:4
**reason** [19] - 441:24, 446:17, 460:19, 470:2, 472:3, 472:18, 473:1, 473:4, 504:3, 510:22, 510:24, 511:1, 511:3, 522:16, 526:17, 538:1, 543:8, 561:22, 565:21
**reasonable** [15] - 525:12, 527:4, 529:8, 529:13, 545:3, 549:21, 553:13, 553:16, 562:12, 564:25, 565:1, 565:21, 565:22, 566:2, 566:25
**Reasonable** [1] - 526:16
**reasons** [3] - 469:24, 532:18, 562:14
**rebut** [1] - 517:1
**rebuttal** [15] - 513:22, 514:21, 515:3, 516:4, 516:5, 518:6, 518:11, 518:14, 518:17, 520:19, 520:21, 533:5, 533:8, 533:19, 533:21
**REBUTTAL** [1] - 518:23
**recalled** [1] - 518:17
**receive** [4] - 478:21, 488:25, 489:2, 509:12
**received** [9] - 437:12, 439:10, 439:11, 453:4, 453:11, 485:25, 490:25, 500:5, 506:7
**recess** [7] - 473:16, 473:18, 523:14, 535:7, 535:8, 573:21, 577:24
**Recess** [3] - 473:19, 523:15, 573:22

**recognize** [3] - 436:23, 452:8, 490:11
**recollection** [2] - 569:3, 569:5
**reconnected** [2] - 475:9, 475:15
**reconsider** [2] - 514:5, 514:22
**reconsiders** [1] - 514:24
**record** [14] - 468:9, 469:16, 471:21, 471:23, 482:9, 515:9, 524:17, 534:14, 535:3, 535:22, 535:24, 544:15, 544:18, 544:25
**records** [2] - 551:18, 551:19, 551:21
**RECROSS** [1] - 450:11
**RECROSS-EXAMINATION** [1] - 450:11
**redirect** [2] - 449:9, 511:9
**REDIRECT** [2] - 449:10, 511:11
**reduce** [1] - 544:24
**refer** [3] - 431:9, 432:2
**reference** [4] - 479:16, 506:23, 525:23, 551:22
**referencing** [2] - 450:13, 468:7
**referring** [3] - 475:13, 477:12, 554:19
**reflect** [5] - 437:8, 452:23, 479:23, 480:11, 490:19
**reflux** [19] - 434:8, 436:18, 436:20, 444:21, 444:23, 493:7, 493:9, 493:12, 493:25, 494:3, 494:4, 495:18, 496:4, 519:11, 520:7, 554:11, 554:17, 558:21, 560:12
**regard** [22] - 468:14, 469:10, 481:3, 482:13, 485:4, 485:5, 486:19, 486:22, 488:9, 514:21, 514:23, 515:4, 516:11, 517:16, 519:22, 520:2, 522:25, 524:7,

524:21, 538:21,
576:3, 576:6
  **regarded** [1] - 515:5
  **regarding** [7] -
492:17, 499:20,
506:7, 506:12,
518:25, 528:18,
541:21
  **regimen** [1] - 486:11
  **Registered** [1] -
578:4
  **regularly** [1] - 435:16
  **related** [6] - 430:19,
438:15, 468:20,
485:12, 517:17, 562:5
  **relation** [2] - 463:20,
498:21
  **relationship** [4] -
505:7, 510:5, 511:14,
516:18
  **relative** [3] - 463:14,
578:7, 578:8
  **release** [1] - 520:25
  **relevance** [2] -
453:16, 466:14
  **relevancy** [1] -
453:17
  **relevant** [5] - 485:2,
485:3, 513:23,
516:22, 524:8
  **religious** [1] - 559:16
  **rely** [1] - 566:7
  **relying** [1] - 531:9
  **remain** [1] - 528:16
  **remains** [1] - 565:14
  **remedies** [1] -
560:11
  **remember** [16] -
454:16, 463:8,
494:22, 497:17,
503:15, 512:13,
522:24, 525:9,
527:17, 545:16,
546:6, 546:25, 555:3,
559:25, 560:1, 569:4
  **remove** [1] - 469:2
  **renew** [2] - 514:7,
530:12
  **repeat** [2] - 440:6,
445:22
  **repeatedly** [1] -
519:18
  **report** [1] - 512:25
  **Report** [1] - 576:21
  **reporter** [2] - 469:17,
482:7
  **REPORTER** [2] -
429:12, 578:1
  **Reporter** [5] -
429:13, 578:4, 578:4,

578:13
  **representation** [2] -
452:17, 452:20
  **request** [18] - 468:2,
468:25, 469:19,
470:14, 470:17,
471:10, 471:23,
477:19, 514:7, 516:4,
518:8, 526:23,
527:12, 529:6,
529:24, 530:3,
531:22, 577:14
  **requesting** [1] -
533:13
  **require** [6] - 482:23,
551:2, 551:3, 566:1,
566:2
  **required** [4] -
443:20, 541:23,
548:14, 557:25
  **requires** [2] - 550:25,
577:16
  **research** [1] - 521:17
  **Reservation** [1] -
460:18
  **resist** [4] - 469:6,
470:13, 471:10,
471:11
  **resource** [1] - 550:2
  **respect** [1] - 465:1
  **respected** [1] - 505:9
  **response** [6] -
439:13, 457:8,
457:12, 458:15,
459:14, 498:10
  **responsibility** [1] -
538:16
  **responsible** [1] -
509:7
  **responsive** [2] -
496:1, 499:6
  **rest** [2] - 442:24,
513:14
  **restate** [1] - 515:6
  **rested** [1] - 513:21
  **rests** [1] - 520:20
  **resulting** [4] - 530:1,
531:13, 550:19,
574:12
  **resume** [2] - 547:11,
563:6
  **resumed** [1] - 488:14
  **retinal** [1] - 487:21,
487:25, 563:7,
563:10, 563:14
  **return** [1] - 572:14
  **reverse** [2] - 470:15,
571:9
  **review** [2] - 505:16,
521:1

  **reviewed** [1] -
551:18
  **revise** [1] - 522:9
  **revival** [2] - 456:3,
456:8
  **revive** [3] - 455:21,
461:16, 461:22
  **reviving** [1] - 461:20
  **rice** [1] - 497:18
  **Richard** [1] - 575:2
  **Richelle** [1] - 575:8
  **ride** [1] - 460:23
  **ridiculous** [2] -
562:21
  **risk** [1] - 529:14
  **RMR** [2] - 429:13,
578:13
  **Road** [2] - 451:14,
452:13
  **road** [1] - 482:16
  **ROB** [1] - 518:16
  **robber** [1] - 553:3
  **robberies** [1] -
552:25
  **robbery** [1] - 553:2
  **rock** [2] - 556:14,
558:15
  **Roehr** [1] - 575:14
  **ROEHR** [1] - 575:15
  **role** [1] - 559:15
  **room** [10] - 439:17,
439:18, 515:20,
521:11, 534:15,
537:9, 566:9, 572:14,
572:19, 576:5
  **roughly** [1] - 498:9
  **rounds** [1] - 568:15
  **routinely** [2] -
444:15, 553:1
  **rule** [4] - 503:17,
515:7, 533:19
  **ruled** [2] - 484:4,
518:2
  **ruling** [6] - 483:20,
514:5, 514:22,
514:24, 530:11
  **rulings** [1] - 482:12
  **running** [1] - 494:1
  **runs** [1] - 529:14
  **rush** [1] - 556:24
  **rushed** [1] - 509:17
  **rushing** [1] - 560:5
  **Russian** [1] - 545:17

## S

  **sadist** [1] - 486:9
  **safe** [2] - 527:11,
528:16

  **Sam** [6] - 429:3,
487:12, 539:17,
539:21, 539:22
  **sandbag** [1] - 533:18
  **sat** [3] - 435:16,
438:3, 576:7
  **satisfied** [2] - 522:6
  **Saturday** [4] - 439:1,
495:20, 496:8, 569:13
  **save** [3] - 547:13,
564:4, 564:21
  **saving** [1] - 564:11
  **saw** [23] - 432:6,
437:8, 439:5, 439:25,
461:1, 464:7, 490:20,
498:2, 500:17,
504:24, 505:4,
547:12, 557:9,
557:11, 558:5, 558:6,
559:22, 560:3,
560:22, 568:6,
568:14, 570:10
  **scared** [1] - 440:11
  **scenario** [1] - 530:16
  **schedule** [1] -
535:12
  **scheduled** [1] -
462:16
  **school** [5] - 474:23,
474:24, 475:3,
478:24, 566:20
  **science** [3] - 566:19,
566:20, 569:25
  **scope** [3] - 442:12,
448:9, 508:15
  **scrapes** [2] - 489:6,
556:19
  **scratches** [1] -
480:22
  **screen** [1] - 534:5
  **screening** [1] - 540:5
  **SD** [7] - 428:12,
428:18, 428:21,
428:24, 429:4,
429:14, 578:15
  **Seaboy** [5] - 462:21,
463:2, 463:5, 463:8,
467:21, 559:24
  **SEABOY** [1] - 462:22
  **seat** [1] - 491:16
  **seated** [6] - 482:5,
488:18, 518:13,
523:6, 535:11, 537:11
  **second** [19] - 475:17,
475:19, 475:20,
500:12, 515:1, 525:8,
526:20, 527:6, 528:7,
531:14, 531:25,
541:5, 546:9, 547:2,
550:21, 550:25,

558:19, 574:9
  **Second** [1] - 531:24
  **second-degree** [3] -
550:21, 550:25, 574:9
  **secondly** [1] - 552:2
  **seconds** [1] - 546:11
  **secret** [2] - 470:22,
567:9
  **Security** [4] - 537:3,
537:5, 573:18, 574:4
  **see** [58] - 432:11,
435:22, 435:25,
439:1, 439:3, 443:2,
443:15, 453:2,
454:19, 461:9,
461:13, 461:18,
462:3, 462:5, 464:1,
464:4, 467:5, 467:15,
476:20, 488:17,
490:17, 491:17,
492:20, 492:25,
493:12, 494:16,
495:3, 499:21,
500:12, 500:16,
504:18, 506:5, 506:9,
513:9, 518:1, 518:4,
521:21, 522:8, 523:1,
539:3, 539:10, 555:6,
555:7, 556:19,
557:22, 558:18,
560:5, 560:19,
561:11, 561:14,
562:5, 566:11,
566:13, 567:1, 568:3,
568:23
  **seeing** [9] - 454:16,
476:11, 476:12,
477:23, 494:22,
500:9, 558:15,
558:16, 568:15
  **seem** [5] - 495:17,
496:14, 515:16
  **sees** [2] - 560:17,
571:14
  **select** [1] - 572:19
  **selection** [1] -
536:20
  **self** [1] - 436:11
  **send** [3] - 481:7,
536:9, 536:10
  **sense** [13] - 526:17,
546:22, 550:3, 550:5,
550:16, 557:22,
559:1, 560:16, 562:3,
564:19, 565:22, 571:6
  **sent** [2] - 435:11,
538:2
  **sentence** [2] - 525:9,
536:1
  **sentenced** [1] -

470:10
**sentencing** [2] -
576:25, 577:6
**separate** [11] -
502:21, 524:16,
527:8, 527:12, 528:2,
528:18, 530:3,
531:14, 532:25, 546:3
**separately** [2] -
524:15, 527:25
**September** [7] -
432:9, 432:23,
432:24, 435:16,
478:18, 488:24,
578:10
**sequence** [1] -
542:20
**serious** [5] - 470:5,
530:1, 531:13,
550:19, 574:13
**Serious** [1] - 531:17
**service** [11] - 455:23,
455:24, 455:25,
463:23, 464:2, 464:5,
464:22, 519:12,
537:1, 576:14, 576:15
**services** [2] - 464:20,
465:24
**serving** [2] - 432:18,
445:10
**set** [4] - 477:22,
566:17, 576:21,
578:10
**sets** [1] - 563:20
**settle** [3] - 522:15,
523:10, 523:11
**settles** [1] - 533:2
**settling** [2] - 521:19,
521:25
**SETTLING** [1] -
523:16
**seven** [8] - 508:5,
508:8, 545:6, 555:19,
561:17, 561:22, 572:8
**several** [3] - 435:6,
515:17, 562:2
**severe** [6] - 435:6,
482:20, 482:21,
491:18, 551:4
**severed** [1] - 524:8
**sew** [1] - 540:13
**shake** [1] - 465:25
**shaken** [3] - 455:5,
455:6, 455:7
**shaking** [1] - 568:16
**Shannon** [48] -
442:7, 443:3, 443:13,
443:20, 444:1,
477:13, 477:14,
477:20, 479:14,

479:19, 481:17,
484:6, 485:21,
487:12, 487:18,
492:16, 499:21,
519:18, 519:23,
520:2, 520:3, 520:7,
538:20, 539:3,
539:10, 539:14,
539:16, 539:20,
541:13, 542:13,
542:14, 551:13,
555:16, 556:6, 557:4,
557:10, 567:4,
567:13, 567:15,
567:17, 567:20,
567:22, 568:4, 571:6,
571:16, 572:1
**Shannon's** [5] -
443:24, 501:4,
501:13, 512:22,
556:11
**shape** [3] - 458:6,
458:9, 460:11
**shed** [1] - 565:13
**sheer** [1] - 563:22
**Sheila** [1] - 575:6
**shirt** [1] - 503:1
**shock** [2] - 499:3,
499:5
**shook** [3] - 464:25,
465:3, 465:25
**short** [4] - 478:25,
516:6, 542:8, 573:13
**shortly** [2] - 536:17,
572:21
**shot** [1] - 534:5
**shoulder** [1] - 506:6
**show** [16] - 446:25,
479:21, 487:2,
490:16, 491:8, 503:3,
547:18, 550:23,
555:21, 556:22,
562:25, 564:25, 568:3,
568:7, 568:12, 569:1
**showed** [6] - 452:18,
479:22, 482:25,
542:4, 546:20, 567:17
**shower** [1] - 560:9
**showing** [6] - 452:2,
452:7, 470:18, 506:6,
551:12, 577:8
**shown** [4] - 439:11,
551:4, 565:5, 566:8
**shows** [3] - 459:7,
460:12, 558:20
**sick** [15] - 493:3,
493:10, 493:13,
493:15, 494:25,
501:18, 501:25,
502:9, 507:10,

515:19, 536:21,
559:2, 560:8, 569:12,
569:13
**Side** [5] - 468:5,
479:6, 513:18,
535:16, 537:13
**side** [18] - 437:18,
469:8, 469:18,
481:21, 482:6,
483:17, 485:7, 490:2,
490:17, 491:25,
514:12, 536:6, 545:6,
548:2, 550:10,
550:11, 550:12, 572:8
**sides** [3] - 473:8,
538:7, 546:18
**Sierra** [2] - 559:19,
559:23
**sign** [1] - 486:18
**signed** [1] - 574:14
**significance** [1] -
450:14
**significant** [6] -
480:21, 538:19,
538:22, 539:13,
547:18, 548:13
**signs** [1] - 482:19
**similar** [1] - 530:19
**simple** [1] - 565:3
**simply** [2] - 565:16,
567:6
**sincerely** [1] -
576:17
**Sine** [8] - 477:14,
479:19, 485:25,
487:12, 487:18,
555:16, 569:7
**single** [4] - 538:8,
548:11, 558:12,
558:13
**singular** [1] - 532:14
**Sioux** [6] - 428:12,
428:18, 428:21,
429:4, 429:14, 578:15
**sip** [1] - 445:15
**Sisseton** [10] -
430:18, 432:16,
454:10, 463:20,
468:20, 474:8,
474:13, 498:13,
498:24, 539:16
**sisters** [1] - 464:21
**sit** [8] - 432:22,
433:8, 433:14,
433:17, 438:7, 443:7,
449:13, 502:9
**sits** [1] - 537:1
**sitter** [3] - 432:8,
432:18, 438:12
**sitting** [12] - 436:3,

443:6, 464:8, 465:24,
468:8, 506:9, 522:13,
542:22, 542:25,
560:3, 565:14, 568:15
**situation** [4] -
499:12, 502:4,
577:17, 577:18
**six** [4] - 442:5,
457:19, 465:11,
568:17
**size** [1] - 490:6
**skills** [1] - 456:8
**skin** [1] - 539:2
**slap** [2] - 539:2
**slapped** [2] - 546:1,
557:17
**sleep** [3] - 496:6,
497:2, 561:4
**slight** [1] - 531:23
**slightly** [1] - 532:3
**slip** [1] - 484:23
**slowed** [1] - 564:15
**small** [2] - 510:16,
510:21
**smell** [2] - 480:14,
480:25
**smelled** [1] - 480:16
**smelling** [1] - 483:23
**smile** [4] - 447:1,
447:6, 447:10, 450:6
**smiling** [1] - 433:25
**Snell** [11] - 545:23,
546:23, 547:25,
548:1, 548:6, 548:10,
548:12, 548:13,
548:15, 554:19,
570:14
**soft** [2] - 497:24,
560:12
**softer** [1] - 494:12
**soiled** [1] - 480:25
**solely** [1] - 512:22
**someone** [3] - 460:7,
502:16, 542:3
**sometime** [1] - 557:4
**sometimes** [23] -
433:1, 433:18,
434:13, 444:11,
449:14, 463:6,
469:17, 478:7, 478:8,
480:25, 490:2, 494:5,
494:6, 522:2, 522:8,
536:21, 556:6,
556:18, 561:20,
567:13, 567:14
**son** [2] - 476:5,
511:21
**songs** [1] - 465:3
**soon** [2] - 482:18,
523:10

**sore** [1] - 564:14
**sorry** [7] - 431:20,
434:25, 452:7, 475:8,
475:12, 478:16,
535:23
**sort** [2] - 455:22,
485:1
**sorts** [1] - 434:12,
435:3
**sought** [2] - 443:15,
479:9
**sound** [3] - 465:5,
465:8, 541:15
**soup** [1] - 434:14
**source** [1] - 512:24
**SOUTH** [2] - 428:2,
578:1
**south** [1] - 430:18
**South** [3] - 451:14,
463:19, 474:8
**SOUTHERN** [1] -
578:2
**spank** [1] - 492:20
**spanked** [5] - 481:1,
485:14, 485:20,
517:4, 571:7
**spanking** [4] - 486:1,
517:2, 517:3, 567:19
**speaking** [2] -
464:23, 501:17
**Special** [1] - 473:13
**special** [4] - 434:10,
435:10, 470:21,
560:24
**specific** [15] - 483:6,
483:7, 485:17, 489:3,
499:25, 503:8,
512:18, 516:14,
516:15, 516:17,
516:24, 517:20,
576:13
**specifically** [5] -
485:12, 508:3, 517:6,
519:15, 526:8
**specificity** [1] -
485:4
**specify** [1] - 478:16
**spectators** [2] -
469:2, 469:24
**speculation** [4] -
442:1, 446:2, 500:24,
502:2
**speech** [1] - 446:3
**speed** [2] - 457:21,
564:10
**spells** [1] - 494:4
**spend** [2] - 492:8,
495:11, 556:15
**spending** [1] -
476:15

**spent** [4] - 449:12, 475:19, 541:7, 557:8
**spite** [1] - 551:2
**split** [1] - 533:11
**splits** [1] - 533:17
**spoken** [1] - 534:2
**spot** [5] - 557:13, 557:14, 567:21, 567:24, 568:8
**spring** [2] - 432:10, 556:2
**Square** [1] - 552:9
**SS** [1] - 578:1
**St** [1] - 428:23
**staff** [2] - 440:5, 440:8
**stand** [14] - 469:12, 471:2, 481:25, 488:15, 491:4, 491:7, 491:16, 514:16, 518:11, 537:6, 546:21, 551:14, 572:22, 576:17
**standing** [9] - 439:23, 440:9, 464:16, 464:17, 465:10, 465:24, 499:13, 542:24, 543:1
**Start** [4] - 540:4, 542:17, 551:21
**start** [6] - 474:18, 488:23, 538:19, 540:4, 540:5, 558:17
**started** [14] - 455:21, 456:17, 457:8, 466:20, 476:10, 476:12, 488:25, 489:9, 492:24, 555:23, 556:2, 556:15, 556:16, 565:15
**starting** [6] - 439:19, 477:25, 478:21, 500:6, 529:16, 536:8
**state** [10] - 430:14, 440:14, 451:8, 463:4, 469:18, 483:4, 485:23, 485:24, 499:2, 526:6
**statement** [7] - 473:9, 500:13, 504:20, 514:1, 525:15, 552:4, 561:1
**statements** [1] - 515:17
**states** [1] - 487:20
**States** [7] - 472:14, 524:18, 531:11, 538:14, 543:8, 578:3, 578:14

**STATES** [3] - 428:1, 428:5, 578:1
**stating** [1] - 469:23
**stationed** [1] - 456:4
**stations** [1] - 456:4
**statute** [1] - 577:9
**stay** [5] - 489:24, 495:22, 523:2, 523:14, 576:5
**stayed** [1] - 461:7
**steadily** [1] - 500:3
**stealing** [1] - 554:25
**Steiner** [1] - 575:8
**STEINER** [1] - 575:10
**stemmed** [1] - 504:16
**step** [8] - 431:7, 450:24, 462:11, 482:1, 491:4, 491:7, 513:11, 520:17
**stepping** [1] - 510:14
**still** [15] - 480:11, 494:19, 495:14, 497:10, 507:2, 507:17, 511:14, 518:20, 559:6, 559:25, 560:1, 560:8, 560:10, 560:11
**stipulate** [1] - 534:9
**stipulated** [2] - 526:4, 531:19
**stipulation** [2] - 526:9, 526:10
**stipulations** [1] - 526:12
**stir** [1] - 505:8
**stomach** [3] - 493:5, 497:24, 558:23
**stop** [3] - 432:17, 552:23, 553:18
**stopped** [1] - 564:14
**store** [2] - 539:17, 539:21
**storm** [1] - 542:18
**story** [3] - 549:24, 550:14
**straightforward** [1] - 523:9
**stress** [2] - 542:2, 552:20
**stressed** [3] - 552:17, 561:17, 561:18
**stricken** [1] - 479:17
**strike** [3] - 466:13, 475:16, 520:4
**striking** [1] - 546:13
**strongly** [3] - 544:16, 544:19, 545:2

**struck** [4] - 539:7, 539:11, 546:19, 548:14
**stuff** [6] - 477:8, 480:6, 484:20, 497:12, 560:14, 561:2
**stunning** [1] - 571:24
**subacute** [1] - 570:6
**subdural** [3] - 570:9, 570:23, 570:25
**subgaleal** [3] - 563:23, 570:12, 571:1
**submit** [1] - 534:11
**subpoena** [2] - 468:16, 472:10
**subpoenaed** [1] - 472:5
**substance** [4] - 468:11, 468:14, 470:3, 524:3
**substantive** [1] - 529:5
**substituted** [1] - 535:2
**sudden** [4] - 465:11, 541:19, 542:23, 560:5
**suffer** [1] - 547:17
**suffered** [1] - 531:7
**suffering** [1] - 493:9
**sufficient** [2] - 470:18, 515:25
**suggest** [4] - 496:18, 532:3, 532:5, 561:14
**suggested** [2] - 529:11, 542:2
**suggesting** [2] - 527:15, 528:21
**suggestive** [1] - 532:4
**Suite** [2] - 428:23, 429:4
**summarize** [1] - 538:10
**summarized** [1] - 515:9
**summer** [9] - 432:14, 432:15, 441:16, 444:14, 475:25, 476:23, 556:2, 556:3, 556:21
**summertime** [1] - 477:25
**Summit** [2] - 463:19, 463:21
**Sunday** [27] - 439:3, 445:21, 445:25, 446:13, 446:15, 446:16, 446:18, 446:21, 487:25, 488:3, 496:10, 497:1,

497:2, 497:5, 507:1, 507:6, 540:22, 540:24, 541:2, 541:4, 541:6, 541:12, 541:14, 549:7, 569:9, 569:14, 569:19
**super** [1] - 552:17
**supervisor** [3] - 507:24, 542:8, 544:9
**supper** [1] - 497:9
**support** [20] - 474:12, 508:5, 508:6, 508:10, 508:13, 508:20, 508:22, 509:1, 510:10, 511:19, 511:24, 542:11, 542:14, 561:19, 561:23, 562:23, 567:6, 567:7, 567:18, 568:24
**supposed** [2] - 484:22, 501:12
**supposedly** [5] - 471:7, 501:8, 509:19, 515:19, 519:6
**surface** [1] - 456:17
**surprised** [1] - 551:14
**susceptible** [2] - 487:3, 487:9
**suspect** [1] - 552:5
**sustained** [8] - 433:5, 433:11, 434:24, 442:2, 455:11, 455:17, 483:13, 550:15
**swelling** [1] - 461:13
**Swim** [2] - 463:20, 463:22
**swimming** [1] - 475:25
**swore** [1] - 557:10
**sworn** [6] - 430:10, 451:4, 462:23, 473:24, 518:18, 537:4
**sworn)** [1] - 537:5
**swung** [1] - 546:11
**symptoms** [11] - 436:17, 558:6, 558:18, 559:1, 559:3, 559:6, 559:11, 559:22, 560:10, 560:18, 568:11
**syndrome** [8] - 540:14, 551:9, 551:11, 551:13, 551:16, 551:20, 551:23, 554:15

**T**

**table** [3] - 543:1, 548:7
**talks** [1] - 526:9
**tardiness** [2] - 508:2, 508:12
**tardy** [1] - 542:9
**target** [1] - 561:18
**tater** [1] - 519:13
**teaches** [1] - 486:11
**Teal's** [1] - 539:16
**tears** [1] - 440:12
**tempting** [1] - 520:25
**tended** [1] - 515:12
**terrible** [1] - 542:3
**test** [2] - 442:10, 442:17
**Test** [1] - 506:17
**testified** [31] - 430:10, 446:2, 451:4, 458:17, 462:23, 473:24, 488:24, 503:14, 512:24, 515:14, 517:7, 518:18, 540:6, 540:23, 541:13, 545:7, 545:9, 545:10, 547:9, 547:13, 547:16, 548:6, 548:13, 551:17, 553:6, 554:8, 564:15, 567:24, 570:12, 570:25, 571:15
**testify** [43] - 468:16, 471:1, 472:3, 472:11, 472:21, 473:1, 473:17, 480:13, 480:14, 480:16, 480:18, 481:5, 481:6, 481:14, 481:15, 481:16, 482:25, 483:6, 483:22, 483:25, 485:16, 485:19, 488:2, 488:3, 488:5, 488:7, 501:8, 515:2, 516:4, 517:19, 518:3, 518:8, 518:11, 535:19, 548:22, 557:10, 558:8, 558:25, 559:5, 559:6, 564:4
**testifying** [1] - 449:23
**TESTIMONY** [1] - 578:10
**testimony** [56] - 441:12, 445:7, 447:20, 466:14,

468:1, 468:11, 468:15, 469:23, 470:3, 470:22, 470:23, 471:18, 472:3, 473:5, 473:6, 479:8, 479:13, 479:17, 479:21, 481:1, 481:3, 482:11, 487:24, 500:2, 501:11, 501:17, 505:20, 513:25, 514:6, 514:21, 515:22, 516:9, 516:15, 517:6, 517:21, 518:1, 518:4, 518:25, 519:2, 526:18, 536:2, 538:24, 547:24, 548:20, 550:1, 557:19, 563:1, 563:2, 564:18, 567:15, 567:25, 569:4, 569:10, 570:4, 570:8

**Teton** [6] - 510:13, 510:19, 512:9, 561:10, 561:12, 561:14

**thankfully** [1] - 536:23

**THE** [188] - 430:4, 430:7, 433:5, 433:11, 434:24, 437:12, 437:14, 440:15, 441:9, 442:2, 442:13, 442:15, 446:3, 446:7, 446:10, 448:11, 449:9, 450:8, 450:10, 450:24, 451:1, 451:24, 453:4, 453:11, 453:13, 453:17, 453:20, 453:22, 455:11, 455:16, 462:11, 462:14, 462:18, 467:21, 467:24, 468:3, 468:12, 468:18, 468:24, 469:4, 469:7, 469:9, 469:16, 469:25, 470:5, 470:10, 471:16, 472:1, 472:5, 472:8, 472:10, 473:4, 473:8, 473:10, 473:16, 473:21, 479:5, 480:3, 480:7, 480:20, 480:23, 481:8, 481:12, 481:18, 481:22, 482:5, 483:9, 483:14, 483:24, 484:8, 484:25, 485:14,

485:18, 486:3, 486:15, 486:19, 486:23, 487:1, 487:5, 487:16, 487:23, 488:5, 488:12, 488:16, 490:25, 491:2, 491:5, 499:17, 500:25, 502:3, 503:15, 503:20, 505:21, 508:16, 511:6, 511:9, 513:11, 513:13, 513:15, 513:17, 514:8, 514:13, 514:20, 516:7, 516:10, 517:15, 518:13, 518:19, 518:22, 520:2, 520:15, 520:17, 520:20, 520:23, 523:6, 523:16, 523:17, 523:20, 523:23, 524:5, 527:13, 528:1, 528:12, 528:20, 529:17, 530:6, 530:23, 531:8, 532:7, 532:10, 532:19, 532:23, 533:2, 533:11, 533:16, 533:24, 534:1, 534:12, 534:21, 534:24, 535:1, 535:5, 535:9, 535:11, 535:14, 535:17, 535:21, 535:25, 536:9, 537:6, 537:8, 537:11, 537:16, 537:20, 556:9, 565:19, 566:5, 572:5, 572:17, 572:24, 573:6, 573:8, 573:24, 574:1, 574:2, 574:3, 574:5, 574:6, 574:19, 574:23, 574:25, 575:2, 575:4, 575:6, 575:8, 575:11, 575:14, 575:16, 575:18, 575:21, 575:23, 576:1, 576:20, 577:7, 577:16, 577:22, 577:24

**theme** [1] - 554:4
**themes** [1] - 551:6
**themselves** [3] - 486:14, 536:11, 566:5
**theory** [2] - 530:20, 554:14

**therefore** [3] -

525:16, 526:10, 530:3
**they've** [2] - 562:1, 562:2
**thickest** [1] - 563:6
**thinking** [3] - 563:23, 563:25, 564:20
**thinks** [4] - 472:17, 473:5, 541:18, 559:10
**third** [3] - 483:15, 547:3, 553:5
**Thomas** [1] - 428:20
**thorough** [1] - 434:6
**threat** [3] - 468:20, 471:5, 471:12
**threatened** [4] - 468:7, 471:3, 471:8, 473:12
**three** [20] - 431:14, 498:22, 519:1, 519:7, 545:18, 546:8, 546:24, 547:4, 547:7, 548:19, 549:6, 550:18, 557:12, 565:6, 565:7, 567:24, 568:6, 570:5, 571:3
**three-day** [1] - 547:7
**three-fingered** [2] - 567:24, 568:6
**threw** [4] - 445:7, 445:12, 446:18, 559:23
**throughout** [1] - 567:23
**throw** [3] - 444:24, 445:2, 445:5
**throwing** [3] - 559:7, 560:11, 561:1
**Thursday** [14] - 437:3, 437:4, 438:3, 445:12, 445:16, 445:18, 445:23, 446:22, 446:24, 501:18, 541:9, 554:6, 569:13
**tight** [1] - 523:14
**toast** [1] - 497:12
**today** [9] - 432:2, 433:19, 449:23, 450:14, 452:20, 472:4, 472:9, 538:2, 565:14
**together** [6] - 476:7, 476:15, 492:11, 492:13, 511:23, 556:3
**toilet** [11] - 481:4, 481:6, 481:10, 482:22, 483:23, 484:17, 485:1, 485:10, 485:13, 487:5, 488:9

**tolerate** [1] - 434:15
**tomorrow** [1] - 553:22
**took** [33] - 436:25, 437:3, 446:23, 446:25, 447:4, 449:21, 450:5, 456:5, 457:15, 501:24, 503:7, 503:23, 503:24, 504:1, 504:5, 504:10, 504:24, 515:18, 516:24, 516:25, 525:24, 539:16, 556:13, 562:7, 562:9, 563:13, 563:17, 565:4, 568:1, 568:6, 568:24, 570:16
**top** [1] - 545:5
**tot** [1] - 519:13
**total** [2] - 533:5, 549:24
**totality** [1] - 487:7
**touch** [2] - 551:6, 551:8
**tough** [2] - 458:6, 458:9
**towards** [3] - 476:22, 500:7, 558:13
**toy** [1] - 502:24
**tradition** [1] - 431:5
**traditionally** [1] - 447:23
**traffic** [2] - 454:14
**train** [2] - 482:22, 486:5
**trained** [5] - 455:22, 456:2, 480:24, 481:4, 481:6
**training** [9] - 481:10, 483:23, 484:18, 485:1, 485:10, 485:13, 486:11, 487:6, 488:9
**transcript** [2] - 578:5, 578:5
**transfer** [2] - 443:20, 548:14
**transferred** [1] - 440:25
**trauma** [1] - 461:10
**traumatic** [1] - 544:12
**treated** [2] - 450:21, 471:11, 517:17
**treating** [1] - 559:12
**trial** [8] - 471:20, 482:12, 483:18, 513:19, 525:25, 538:9, 566:19, 576:15
**TRIAL** [1] - 428:15

**trials** [1] - 472:16
**tried** [8] - 470:7, 486:5, 494:11, 497:23, 523:24, 547:13, 564:4, 564:12
**triggers** [1] - 527:2
**trouble** [1] - 543:23
**true** [8] - 452:17, 452:20, 458:23, 487:19, 506:11, 506:16, 569:21, 578:5
**truly** [2] - 437:8, 490:15
**truthfully** [1] - 473:2
**try** [7] - 450:5, 455:21, 472:22, 536:20, 542:13, 549:17, 554:23
**trying** [20] - 440:10, 447:1, 447:5, 461:20, 461:22, 467:3, 477:1, 479:13, 484:5, 484:23, 491:24, 497:10, 497:11, 499:8, 499:10, 499:11, 501:3, 509:18, 540:13, 568:5
**Tuesday** [1] - 571:4
**turn** [2] - 488:23, 568:2
**turned** [4] - 439:24, 542:22, 556:21, 560:4
**turning** [1] - 456:24
**TV** [2] - 555:7, 561:8
**twenty** [1] - 454:11
**twice** [3] - 432:16, 484:4, 525:19
**two** [46] - 437:17, 438:11, 452:22, 456:20, 457:15, 464:20, 479:8, 480:7, 482:22, 486:9, 491:23, 498:22, 502:18, 502:21, 503:3, 505:9, 511:17, 519:1, 519:6, 519:12, 519:17, 525:22, 536:10, 540:2, 540:6, 540:15, 541:1, 541:16, 545:5, 545:11, 546:7, 547:3, 547:6, 547:7, 548:25, 561:7, 562:23, 564:5, 564:8, 565:4, 568:10, 571:18, 572:8, 573:9
**two-and-a-half** [1] - 547:6
**two-day** [1] - 545:11
**two-fold** [1] - 568:10
**two-year-old** [4] -

482:22, 486:9, 562:23, 565:4

**Tylenol** [1] - 436:14
**type** [2] - 486:15, 504:14
**types** [1] - 525:22
**typical** [1] - 491:18
**typically** [3] - 476:17, 476:18, 493:12

## U

**U.S** [4] - 428:12, 428:17, 428:20, 428:23
**unable** [1] - 461:23
**unanimous** [2] - 574:4, 576:3
**uncle** [2] - 543:14, 543:18
**Uncle** [1] - 564:3
**uncle's** [1] - 543:4
**uncles** [1] - 431:10
**uncommon** [1] - 431:9
**unconscious** [1] - 543:13
**under** [17] - 458:20, 468:15, 472:10, 518:5, 518:20, 527:1, 527:7, 527:9, 528:3, 541:23, 542:2, 542:5, 542:11, 552:20, 577:8
**underlying** [1] - 506:20
**undermining** [1] - 532:5
**understandable** [1] - 560:17
**understood** [5] - 477:5, 479:9, 483:18, 501:17, 514:6
**unexpected** [1] - 489:2
**unexpectedly** [2] - 478:2, 478:3
**unexplainable** [1] - 487:14
**unexplained** [1] - 480:18
**unfold** [1] - 555:8
**unfortunately** [1] - 534:5
**UNITED** [3] - 428:1, 428:5, 578:1
**United** [7] - 472:14, 524:17, 531:11, 538:14, 543:8, 578:3, 578:14

**unlawfully** [2] - 527:6, 528:6
**unless** [2] - 544:25, 568:5
**unlikely** [3] - 549:2, 549:4, 549:5
**unresponsive** [1] - 548:8
**unusual** [5] - 440:23, 447:10, 469:1, 517:9, 559:14
**up** [75] - 434:20, 435:4, 439:11, 443:24, 444:24, 445:2, 445:5, 445:8, 445:12, 446:18, 453:5, 459:7, 460:12, 464:17, 465:10, 466:16, 467:12, 467:14, 470:6, 471:9, 473:4, 475:17, 475:19, 477:22, 478:12, 478:24, 479:22, 480:15, 482:18, 483:1, 484:18, 489:15, 492:7, 496:10, 499:11, 499:21, 500:10, 504:13, 509:1, 515:21, 524:18, 533:12, 536:22, 537:22, 539:14, 539:21, 542:20, 543:14, 546:1, 547:12, 549:23, 551:7, 552:4, 552:6, 552:19, 556:22, 557:10, 558:20, 559:7, 559:23, 560:11, 561:1, 561:7, 562:19, 564:8, 566:17, 566:23, 567:2, 567:12, 569:6, 569:13, 572:24, 576:21
**upset** [3] - 513:7, 513:8, 558:23
**urge** [2] - 550:1, 550:17
**urged** [1] - 515:3
**uses** [1] - 532:1
**usual** [1] - 560:11
**utilize** [1] - 550:2

## V

**VA** [1] - 508:24
**vacation** [3] - 561:21, 561:24,

562:20
**valuable** [1] - 576:16
**varied** [1] - 491:20
**vary** [3] - 489:24, 491:19, 491:22
**vegetable** [1] - 497:19
**VERDICT** [1] - 573:23
**verdict** [24] - 566:11, 566:13, 566:15, 572:15, 574:1, 574:21, 574:22, 574:23, 574:25, 575:2, 575:4, 575:6, 575:9, 575:12, 575:14, 575:16, 575:19, 575:21, 575:24, 576:2, 576:10, 576:20, 577:4
**Verdict** [4] - 532:19, 532:21, 536:12, 573:9
**verdicts** [6] - 532:13, 532:16, 574:3, 574:4, 574:6, 576:2
**victim** [4] - 484:4, 486:25, 527:1, 530:2
**victim's** [1] - 484:5
**view** [3] - 452:12, 521:6, 532:24
**views** [1] - 521:12
**violating** [1] - 577:14
**violation** [4] - 484:1, 484:3, 484:21, 484:23
**violence** [4] - 532:2, 532:6, 532:7, 532:15
**virtually** [1] - 570:9
**visible** [1] - 461:13
**visit** [3] - 432:17, 475:17, 475:19
**Visitation** [1] - 556:10
**visitation** [13] - 443:18, 477:5, 477:7, 477:9, 555:16, 557:25, 567:8, 567:12, 567:14, 567:16, 567:18, 571:8, 571:20
**visited** [1] - 446:19
**visits** [3] - 478:23, 512:21
**visually** [1] - 532:4
**Viv** [3] - 438:17, 555:21
**Vivian** [9] - 430:8, 430:14, 430:16, 430:17, 437:16, 449:12, 513:25, 515:13, 559:5

**VIVIAN** [1] - 430:9
**VOLUME** [2] - 428:8, 428:15
**voluntary** [3] - 529:1, 562:8, 562:10
**vomit** [1] - 519:16
**vomited** [3] - 519:6, 554:5, 554:11
**vomiting** [10] - 493:15, 494:3, 519:1, 519:10, 520:12, 541:10, 554:4, 554:14, 569:8, 569:14
**vs** [3] - 428:7, 524:18, 531:11
**vulnerable** [1] - 487:3

## W

**wait** [2] - 484:8, 560:18
**waiting** [1] - 439:18
**waived** [1] - 524:25
**wake** [26] - 438:24, 445:8, 445:11, 447:18, 447:20, 448:1, 448:4, 463:23, 464:20, 464:22, 465:3, 465:21, 495:5, 495:7, 501:9, 501:12, 501:15, 501:17, 501:24, 502:9, 515:19, 519:12, 543:14, 559:14, 568:14
**walk** [1] - 457:22
**walked** [2] - 460:10, 539:21
**wall** [2] - 464:9, 552:19
**wants** [3] - 561:16, 569:18, 570:22
**wash** [2] - 435:9, 563:22
**washed** [1] - 437:16
**waste** [1] - 485:15
**watch** [9] - 444:6, 444:15, 448:24, 467:3, 501:12, 546:9, 561:8, 563:13, 565:2
**watched** [5] - 444:4, 444:8, 447:16, 448:15, 448:16
**watching** [11] - 439:23, 444:3, 447:21, 448:1, 448:8, 448:22, 466:25, 552:9, 552:11, 559:21

**Waubay** [1] - 451:14
**weapon** [1] - 545:21
**wearing** [1] - 553:3
**Wednesday** [7] - 435:22, 492:25, 501:18, 540:21, 541:9, 547:4, 558:19
**week** [12] - 432:16, 435:20, 445:18, 489:25, 492:23, 554:5, 554:12, 554:22, 559:4
**weekend** [23] - 444:6, 476:13, 476:15, 477:1, 477:3, 477:19, 477:23, 485:17, 486:2, 489:12, 489:13, 489:16, 490:5, 490:7, 492:8, 492:11, 492:13, 492:17, 492:20, 517:8, 539:14, 555:25, 557:8
**weekends** [7] - 443:10, 443:13, 444:10, 444:11, 476:12, 499:25, 539:1
**weeks** [4] - 540:2, 540:7, 540:15, 541:16
**Weismantel** [1] - 575:11
**WEISMANTEL** [1] - 575:13
**welcomed** [1] - 561:7
**WHEREOF** [1] - 578:10
**whole** [7] - 486:2, 511:22, 515:22, 517:21, 542:20, 554:22, 557:8
**wide** [2] - 557:12, 557:13
**width** [1] - 557:13
**wife** [4] - 463:10, 464:20, 511:19, 560:2
**Williams** [1] - 468:21
**willing** [2] - 477:20, 534:9
**wind** [1] - 470:6
**wintertime** [1] - 478:1
**witness** [40] - 430:10, 446:2, 451:1, 451:4, 462:14, 462:15, 462:23, 467:24, 471:1, 471:2, 471:8, 471:11, 473:12, 473:21, 473:24, 482:1, 482:2,

483:3, 483:22,
483:25, 486:1,
488:13, 488:14,
488:15, 491:4, 501:8,
503:13, 513:13,
514:1, 515:13,
515:17, 516:6,
518:11, 518:17,
551:14, 552:25,
565:6, 572:10, 572:13
  **Witness** [9] - 450:25,
462:13, 467:23,
489:13, 491:11,
491:13, 491:15,
513:12, 520:18
  **witness'** [1] - 470:23
  **witnessed** [1] -
479:22
  **witnesses** [10] -
515:11, 525:11,
536:2, 552:5, 552:13,
552:22, 552:24,
553:2, 553:4, 569:23
  **woke** [2] - 496:10,
561:7
  **Wolcott** [1] - 559:18
  **woman** [2] - 447:20,
467:2
  **women** [8] - 447:21,
448:1, 448:7, 448:15,
448:24, 508:4, 508:6,
542:12
  **word** [3] - 525:20,
532:5, 567:1
  **words** [3] - 482:20,
532:1, 545:18
  **wore** [1] - 558:5
  **workers** [1] - 468:8
  **works** [2] - 468:19,
547:17
  **worried** [4] - 440:11,
440:19, 468:10,
557:23
  **worse** [2] - 496:14,
496:16
  **wound** [1] - 570:24
  **wounds** [1] - 565:2
  **WRIGHT** [69] - 433:3,
433:10, 434:22,
440:13, 441:11,
442:3, 442:16,
446:11, 448:12,
449:8, 450:9, 450:12,
451:21, 452:4, 453:2,
453:12, 453:14,
453:19, 455:10,
455:15, 458:1, 462:9,
465:20, 466:13,
466:18, 467:19,
469:6, 470:13, 473:9,

473:11, 478:14,
479:3, 479:7, 480:2,
480:4, 483:15,
483:25, 484:10,
485:8, 490:24,
499:19, 501:2, 502:7,
503:22, 505:22,
508:17, 511:4, 511:8,
513:16, 513:19,
515:8, 516:8, 518:15,
518:24, 520:5,
520:14, 520:19,
520:22, 533:4,
533:23, 534:25,
536:5, 537:7, 537:14,
538:6, 573:5, 574:17,
577:3, 577:21
  **Wright** [6] - 428:20,
512:1, 533:6, 555:4,
561:25, 565:6
  **Wright's** [1] - 516:12
  **writes** [1] - 540:10
  **writing** [4] - 544:16,
544:18, 544:24,
576:24

### Y

  **year** [8] - 437:6,
482:22, 486:9,
503:10, 512:4,
538:21, 562:23, 565:4
  **years** [6] - 474:10,
475:10, 528:8,
537:21, 537:24,
573:15
  **yesterday** [6] -
445:7, 447:20,
545:25, 547:10,
548:18, 553:6
  **young** [2] - 448:19,
464:16
  **yourself** [1] - 474:5
  **yourselves** [1] -
521:2

### Z

  **zero** [1] - 529:16